Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:     (212) 940-8800
Facsimile:     (212) 940-8776

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's, Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819). The location of the Debtors' service address is 575 Fifth Avenue New York, New York 10017.

**DECLARATION OF MOHSIN Y. MEGHJI,**
**CHIEF RESTRUCTURING OFFICER OF BARNEYS NEW YORK, INC.,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mohsin Y. Meghji, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Barneys New York, Inc., a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Barneys").

2.      I have served in this role since August 5, 2019.  Prior to becoming the Debtors' Chief Restructuring Officer, I advised the Debtors in my capacity as Managing Partner of M-III Advisors, LP ("M-III") beginning June 26, 2019.  In my capacity as Chief Restructuring Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today.

3.      Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

**Preliminary Statement**

4.      Barneys—an iconic luxury retailer and Manhattan staple since 1923—is suffering under severe liquidity constraints.  Barneys, like many other retail and apparel-focused companies, has suffered as of late from adverse macro-trends as well as certain operational shortfalls.  More

specifically, the general shift from brick-and-mortar retail has been further exacerbated by sharp increases in Barneys' lease obligations, including over ten million dollars in rent increases on an annualized basis and corresponding letter of credit obligations, which severely decreased EBITDA and significantly constrained liquidity.  Due to these pressures, Barneys has been operating without sufficient liquidity throughout the summer of 2019.  Cash-on-delivery demands have paralyzed the inventory stream.  Efforts to raise incremental liquidity or implement an actionable holistic solution to these issues, in each case on an out-of-court basis, did not bear fruit.  As a result, Barneys is unable to procure necessary inventory for sale or otherwise fund its operations.

5.     The Debtors and their advisors worked tirelessly to solicit and develop various strategic alternatives throughout June, July, and August of this year, including simultaneous financing and sale marketing processes with more than three dozen strategic or financial investors, the majority of which became restricted and received confidential information.  With respect to financing, the Debtors explored new money solutions in the form of junior debt or equity capital. The Debtors also considered certain consignment arrangements and requested concessions from lessors to enhance and preserve liquidity.  With respect to a potential sale transaction, several strategic and financial investors expressed interest in acquiring Barneys as a going concern.  The Debtors' intellectual property, including its brand equity, also received meaningful market interest. Several parties engaged in substantial due diligence and submitted indications of interest.  Despite substantial, around-the-clock efforts—and some very close calls—the Debtors ran out of time to execute an out-of-court transaction that would address their liquidity challenges and otherwise position Barneys for long-term success.  Many of these investors nonetheless remain interested in Barneys, and the Debtors intend to continue exploring potential transactions with such parties on a postpetition basis to maximize value for the benefit of all stakeholders.

6.    Barneys determined to commence these chapter 11 cases to conduct an operational rightsizing, including an evaluation and adjustment to its lease portfolio, explore value-maximizing transactions, including a going concern sale, and obtain postpetition financing necessary to fund these chapter 11 cases and provide operating capital on a go-forward basis. These circumstances led to negotiations with Barneys' secured lenders, certain potential third-party lenders, and equity owners regarding the terms of a comprehensive restructuring that would, among other things, provide immediate access to liquidity and preserve value through an efficient and expeditious going concern market test.  These negotiations were successful.

7.    The proposed debtor-in-possession financing and related bidding procedures are designed to facilitate a process that market tests the assets, optimizes the Company's brick-and-mortar footprint, and sets the Debtors on a path to consummating a value-maximizing transaction, all within two months.  The proposed process minimizes the Debtors' expected stay in chapter 11 and related costs.  As comparable retail chapter 11 cases have shown, moving the process forward expeditiously is critical to the Debtors' ability to continue operating as a going concern.

8.    As described in more detail below, Hilco Global and Gordon Brothers Retail Partners, LLC (collectively, "Hilco") have proposed to provide up to $75 million in postpetition financing, $50 million of which would be used to pay down the Debtors' prepetition secured debt and $25 million of which would be available as incremental liquidity to fund these chapter 11 cases and optimize the business.  The milestones applicable to the financing arrangements include:

- no later than September 5, 2019, the Court shall have entered a final order approving the DIP Facility;

- no later than September 25, 2019, the Debtors shall have received a qualified bid in connection with the sale process;

- if the foregoing milestone is not met, the Debtors shall immediately commence a full liquidation of their assets;

- no later than October 1, 2019, a hearing to approve the sale of all or substantially all of the Debtors' assets shall have been held; and

- no later than October 4, 2019, the Court shall have approved the sale and the sale shall have closed.

9.      In the meantime, the Debtors will work closely with their advisors on closing underperforming stores and negotiating go-forward concessions with remaining landlords to ensure long-term viability.  The Debtors expect to complete at least fifteen store closings (and vacate such premises) within the first thirty days of these chapter 11 cases.

10.      The key to achieving a restructuring is speed and cooperation.  As such, the new money financing is highly conditioned on moving efficiently and expeditiously through these chapter 11 cases with support from all major stakeholders, including lenders, trade vendors, and landlords.  In an ever-shifting retail landscape that has seen dozens of casualties over the past few years, the Debtors can maximize value for the benefit of all stakeholders so long as all parties in interest work collaboratively to ensure that these chapter 11 cases stay on time and track.

11.      To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** describes the circumstances leading to these chapter 11 cases;

- **Part III** provides an overview of the Debtors' prepetition corporate and capital structure;

- **Part IV** describes the Debtors' prepetition strategic and financing initiatives;

- **Part V** describes the Debtors' proposed debtor-in-possession financing;

- **Part VI** sets forth the evidentiary basis for the relief requested in each of the first day pleadings; and

- **Part VII** sets forth certain additional information about the Debtors, as required by Local Rule 1007-2.

## I.    Barneys' Corporate History and Business Operations.

### A.    The Barneys Brand.

12.    Originally conceived in 1923 when Barney Pressman pawned his wife's engagement ring to lease a small Manhattan store with 200 feet of frontage at the corner of Seventh Avenue and 17th Street, Barneys has grown from a downtown Manhattan-based men's retailer into an international arbiter of high style for both women and men and an iconic fashion institution.  Throughout the 1970s, Barneys became renowned for discovering and developing new and innovative design talent.  The once-local specialty retailer garnered acclaim for its ability to push the fashion industry forward by opening its doors to mesmerizing collections from the world's top designers, including women's and men's ready-to-wear, accessories, shoes, jewelry, cosmetics, fragrances, and gifts for the home.

13.    In the late 1980s, Barneys sought to expand its business outside Manhattan by developing a national chain of department stores.  To secure the financing necessary for this endeavor, Barneys partnered with Isetan Co. ("Isetan"), one of Japan's largest retailers and a leading department store chain in Tokyo.  Under this arrangement, Barneys was to provide Isetan with expertise in merchandising and store design in exchange for the financing needed to construct stores in New York, Chicago, and Beverly Hills.  In 1993, Barneys achieved a corporate milestone when it opened its first store outside Manhattan, in Beverly Hills.  By the mid-1990s, however, Barneys became entangled in a dispute with Isetan with respect to its capital investment in Barneys.  The dispute culminated in Barneys' voluntary chapter 11 petition in 1996 and its contemporaneous lawsuit against Isetan to recoup millions in real estate payments.

14.     When Barneys completed its chapter 11 reorganization in 1998, it received approximately $62 million in new capital from former unsecured creditors, Bay Harbour Management L.C. ("Bay Harbour") and Whippoorwill Associates Inc. ("Whippoorwill"), in exchange for over 70% of Barneys' reorganized equity.  The reorganization plan also resolved Barneys' dispute with Isetan.  Bay Harbour and Whippoorwill retained control of Barneys until 2004, when both controlling shareholders sold their interest in Barneys to Jones Apparel Group, Inc. ("Jones") for approximately $294 million in cash and Jones' assumption of approximately $106 million in debt.

15.     Three years after purchasing Barneys, Jones sold its interest in Barneys to certain funds related to Istithmar World ("Istithmar") on August 8, 2007, pursuant to an amended and restated definitive stock purchase agreement for approximately $942 million in cash.  Leveraged financing funded slightly over half of the purchase price.   In early March 2012, Barneys, represented by Kirkland & Ellis LLP ("K&E") and Blackstone Group LP, completed a consensual out-of-court restructuring among Barneys, Perry Capital, LLC ("Perry Capital"), the Yucaipa Companies, LLC ("Yucaipa"), and Istithmar, designed to permit each class of creditors to receive a recovery consistent with their own view of the value of Barneys.  In May 2012, Barneys struck a deal with Perry Capital that reduced its debt from approximately $590 million to approximately $50 million, and turned Perry Capital into its majority owner along with Yucaipa and Istithmar holding minority positions.  As described below, these parties remain the Debtors' sole equity holders.

## B.     Barneys' Business Operations.

16.     Barneys operates a network of fine specialty retail stores and outlets across three business channels:  (a) flagship stores; (b) warehouse stores; and (c) digital platforms.

### 1.    Flagship Stores.

17.    Barneys leases its flagship stores in New York City, Beverly Hills, Chicago, Boston, San Francisco, Seattle, and Las Vegas.  Comprising well over half of total consolidated sales, the Debtors' thirteen flagship stores constitute the key component of Barneys' core business. In recent years, Barneys remodeled its legacy flagship stores with a focus on growing sales through a revamped merchandise assortment and improved shopping environment.  Several flagship stores also operate a "Fred's" restaurant, which the Debtors own and operate.

### 2.    Warehouse Stores.

18.    Barneys operates approximately nine warehouse stores nationwide.  The warehouse stores allow Barneys to efficiently transfer designer merchandise from its flagship stores to an off-price setting, thus attracting a lower price point customer base.  Most of Barneys' peers utilize similar supply chain logistics to liquidate excess inventory.

### 3.    Digital Platforms.

19.    Barneys maintains two e-commerce websites, www.Barneys.com and www.BarneysWarehouse.com, and mobile applications across a variety of digital platforms.  To keep apace of the rise of online retail, Barneys has historically invested significantly into its digital presence.  Barneys' online business has steadily developed into a profitable and promising revenue channel.  Most recently, Barneys achieved rapid digital sales growth of 12.4% in FY 2018, with e-commerce constituting approximately 30% of Barneys' revenue.

### C.    Critical Components of the Debtors' Cost Structure.

### 1.    Supply Chain.

20.    The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations.  Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign

manufacturers.  In limited circumstances, the Debtors contract with foreign manufacturers directly.

Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the

Debtors ship the merchandise to a domestic warehouse that serves as the Debtors' distribution

center.

### 2.    Employee Compensation and Benefits.

21.    The Debtors employ approximately 2,300 employees, including approximately

2,100 full-time employees and approximately 200 part-time employees (collectively,

the "Employees").  Approximately 900 Employees are members of a labor union (collectively, the

"Union Employees").[2]  The Debtors offer their Employees the ability to participate in a number of

insurance and benefits programs, including, among other programs, medical, prescription drug,

dental, and vision plans, flexible benefits plans, workers' compensation, life insurance, accidental

death and dismemberment insurance, disability benefits, retirement plans, and other employee

benefit plans.  As the Debtors implement right-sizing measures, including a reduced physical store

footprint, the Debtors believe a more efficient allocation of employees will present a significant

opportunity for savings.

### 3.    Real Estate Obligations.

22.    The Debtors lease all of their store locations.  The majority of the Debtors' leased

premises reside in New York, consisting of (a) their corporate headquarters, (b) two New York

City flagship stores, including their historic Madison Avenue location, (c) two warehouse stores,

including their Central Valley, New York location, (d) a web studio, and (e) a visual arts studio.

---

[2]    The Union Employees are members of one of the three following unions (collectively, the "Unions"):
(a) New York New Jersey, Joint Board, Workers United; (b) Philadelphia Joint Board, Workers United; and
(c) Western States Regional Board, Workers United.  The Union Employees work at stores located in Brooklyn,
New York City, Long Island City, Philadelphia, Las Vegas, Los Angeles, and the Lyndhurst Distribution Center.
The Debtors are party to collective bargaining agreements with local chapters of the Unions.

The Debtors anticipate seven go-forward locations following certain store closures (described in greater detail below).  The remaining store presence is anticipated to be comprised of five flagship stores and two warehouse stores.

23.    Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors undertook an extensive analysis of the Debtors' existing store footprint to determine if (and how many) stores the Debtors should close in connection with their broader financial and operational restructuring initiatives.  The Debtors' management team and advisors ultimately determined that it is appropriate to close fifteen unprofitable brick and mortar store locations (the "Stores").

24.    In formulating the list of Stores, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance.  Each of the Stores identified for closing has historically operated at a loss.  Collectively, the Stores generated approximately $14.2 million in losses for fiscal year 2018, which represents 98 percent of the Debtors' total losses from stores with negative contribution margin.  The Stores to be closed include both flagship and warehouse stores (the "Store Closings").  The Debtors anticipate seven go-forward locations following certain store closures.  The remaining store presence is anticipated to be comprised of five flagship stores and two warehouse stores.

25.    Significantly, delay in consummating the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons.  First, the Stores fail to generate positive cash flow and therefore are a drain on liquidity.  Thus, the Debtors will realize an immediate benefit in terms of liquidity upon the sale of the Store Closure Assets and the

termination of operations at the Stores.  Second, the swift and orderly commencement of Sales will allow the Debtors to timely reject the applicable Store leases, and therefore avoid the accrual of unnecessary administrative expenses on account of rent payments.  The delay of the Store Closings may cause the Debtors to incur additional postpetition rent at many of these stores, at a possible cost to the estate of up to $2.2 million per month.

## II.    Events Leading to These Chapter 11 Cases.

26.    Since 2012, the Debtors opened four new locations, including New York, New York, San Francisco and Livermore, California, and Rosemont, Illinois to achieve their current retail footprint of twenty-two flagship stores and warehouse locations.  During this period, the Debtors also invested in renovating their legacy flagship stores, as described above, as well as their operational infrastructure and digital platforms to provide a top-of-class digital customer experience available across a variety of mobile and web platforms.  In recent years, however, the Debtors have consistently experienced decreased EBITDA due to increased operating expenses and decreased sales revenue as a result of the challenging macro retail and promotional sales environment.  In addition, recent rent increases and corresponding credit support obligations in key locations, coupled with an onerous debt load, have challenged the Debtors' operations.  As described below, these factors came to a head in 2019.

27.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These include macroeconomic factors—including most significantly, the general downturn in the retail industry, which has led to a decrease in sales, competitive sales promotions resulting in reduced profit margins, and the marked shift away from brick-and-mortar retail to online channels.  These also include microeconomic factors—primarily a sharp increase in lease and rental obligations and a downturn in spring 2019 sales volumes.  Over time, these factors have tightened the Debtors' liquidity and complicated their vendor relationships.  As described above

and in further detail below, these factors culminated in a liquidity crisis by summer 2019, when Barneys faced dwindling cash flows, inaccessible inventory, the inability to access even incremental liquidity, and sales projections well below historical numbers.

### A.    Challenging Operating Environment and Increased Rent Obligations.

28.    The Debtors, along with many other apparel and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores.  Given the Debtors' brick-and-mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets.  In particular, the Debtors experienced a sharp increase in rent obligations and corresponding credit support obligations of approximately $12 million and $6 million, respectively, as compared to FY 2018.  The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their sale targets and depressed profitability performance.

### B.    Supply Chain and Borrowing Base Challenges.

29.    The Debtors' retail sales substantially underperformed expectations in the first half of 2019.  This has been especially true at the Debtors' locations outside of major metropolitan markets.  In particular, the challenging sales performance from February to June 2019 resulted in a decrease of revenue of $34 million as compared to the same period for the prior fiscal year.  In particular, the lenders (the "ABL Lenders") under the Debtors' prepetition asset-based revolving credit facility (the "ABL Facility") increased the discretionary reserve under the ABL Facility by approximately $5 million in response to the Debtors' weak sales performance, further constraining access to operating capital.  These pressures led to a buildup in excess merchandise at unprofitable

locations, while other, more profitable locations were unable to meet demand.  The ensuing lack of liquidity has made it difficult for the Debtors to appropriately allocate merchandise.

30.    The historically low sales volume anticipated during July further complicated the liquidity shortage confronting the Debtors during the summer of 2019.  Moreover, July is characterized by committed payments, such as rent, payroll, sales tax, and purchase card expenses totaling approximately $34.5 million, which leave minimal funds to satisfy the Debtors' vendor base.  As the Debtors' liquidity tightened, supply chain vendors began to place pressure on the supply chain cost structure.  During summer 2019, merchandise shipments and inventory receipts began to slow due to liquidity tightness and a lack of vendor and factor support.  Prior the Petition Date, substantial numbers of vendors refused to ship inventory unless the Debtors paid cash on delivery, resulting in shelf-ready merchandise being stranded.  The lack of fresh and sufficient inventory further tightens the Debtors' liquidity (including by reducing the borrowing base under the ABL Facility), creating a negative feedback loop.  Without the flow of fresh inventory, the Debtors' retail business will effectively starve.

31.    A critical component of the Debtors' proposed postpetition financing debtor-in-possession term loan facility (the "DIP Facility"), described in greater detail below, is securing approximately $25 million in incremental liquidity to fund the Debtors' operations and providing sufficient runway to canvas market interest in a going concern sale process.  Maintaining operations in the ordinary course will preserve the value of the Debtors' business as a going concern.  The proposed DIP Facility balances the Debtors' interest in pursuing a going concern transaction (i.e., what the Debtors believe will maximize value) with the DIP lenders' interest in monetizing their collateral package without incremental value leakage (i.e., what the prepetition lenders are willing to finance).

III.     **The Debtors' Prepetition Corporate and Capital Structure.**

32.     The Debtors' corporate enterprise consists of Debtor entities Barneys New York, Inc., Barney's, Inc., BNY Catering, Inc., BNY Licensing Corp., and Barneys Asia Co. LLC.  A simplified illustration is set forth below.[3]



33.     As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $190 million under the ABL Facility and Term Loan Facility that is secured on a first priority basis by substantially all of the Debtors' assets under the Credit Agreement (as defined below).

---

3      The chart, attached hereto as **Exhibit A**, depicts the Debtors' current corporate and capital structure.

| Funded Debt | Lenders | Maturity | Interest Rates | Principal Amount |
|---|---|---|---|---|
| **ABL Facility** | Wells<br>Citizens Bank<br>TD Bank | Dec. 19, 2023 | Base Rate + Applicable Margin OR LIBOR + Applicable Margin | $141 million[4] |
| **Term Loan Facility** | Wells<br>TPG | Dec. 19, 2023 | LIBOR + 7.00% OR Base Rate + 6.00% | $48.8 million |
| | | | | $189.8 million |

34.     In addition to funded debt obligations, Debtor Barney's, Inc. has outstanding unsecured trade debts (*e.g.*, amounts owed to trade vendors, suppliers, landlords) that total approximately $100 million as of the Petition Date.

**A.     The ABL Facility.**

35.     The Debtors are party to that certain Amended and Restated Revolving Credit and Term Loan Facility Agreement, dated as of June 5, 2012, (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Credit Agreement") by and among Barney's Inc., as lead borrower, the remaining Debtors as guarantor parties thereto, the ABL Lenders, and Wells, as administrative agent (in such capacities, together with its successors and assigns, the "ABL Agent").  The Credit Agreement provides for a $225 million ABL Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of December 19, 2023.

36.     The ABL Facility provides for LIBOR loans and Base Rate loans.  The LIBOR loans bear interest at LIBOR plus an applicable margin of (a) 2.00% if the Quarterly Average Excess Availability (as defined in the Credit Agreement) exceeds $100,000,000 or (b) 2.25% if the Quarterly Average Excess Availability is equal to or less than $100,000,000.  The borrower

---

[4]     This amount includes approximately $26 million in undrawn letter of credit obligations.

may elect interest periods with respect to the LIBOR loans; *provided* that interest payments under these loans occur at least every three months.  The Base Rate loans bear interest at a Base Rate plus an applicable margin of (x) 1.00% if the Quarterly Average Excess Availability exceeds $100,000,000 or (y) 1.25% if the Quarterly Average Excess Availability is $100,000,000 or less.

37.    Obligations under the ABL Facility are secured by an all asset lien, including, without limitation, a first priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash and cash equivalents, intellectual property, and all equity interests of the Debtors and their subsidiaries (collectively, the "Collateral").

38.    Additionally, the Debtors have entered into deposit account control agreements in favor of the ABL Agent with respect to their bank accounts.  Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the ABL Agent.  Due to the non-payment of rental obligations and alleged events of default under the corresponding leases, the ABL Agent notified the Debtors of an alleged Event of Default under the Credit Agreement.  As a result of this Event of Default, the Debtors are required to remit all cash receipts on a daily basis to a non-Debtor account maintained by the ABL Agent (the "Agent Account").  Accordingly, each day, any excess cash is swept to the Agent Account and applied to prepay loans in accordance with the ABL Facility.  Due to the alleged Event of Default, there was no availability under the ABL Facility as of the Petition Date.  On August 5, 2019, the ABL Lenders and the ABL Agent terminated the ABL Facility.

**B.    The Term Loan Facility.**

39.    In April 2019, the Credit Agreement was amended to provide for the issuance of a last-out term loan (the "Term Loan Facility") with Barney's, Inc., as borrower, the remaining Debtors as guarantor parties thereto, the lenders thereto (the "Term Loan Lenders"), and Wells, as administrative agent.  The Term Loan Facility provides for a loan in an original principal amount

of $50 million, with a maturity date of December 19, 2023. Obligations under the Term Loan Facility are secured by the Collateral.

40.    The LIBOR loans bear interest at LIBOR plus 7.00%, and the Base Rate loans bear interest at Base Rate plus 6.00%. Interest on the Term Loan Facility is due on the first calendar day of each month. As of the Petition Date, approximately $48.8 million in aggregate principal amount remained outstanding under the Term Loan Facility. Upon an Event of Default and notice to the ABL Agent by the Requisite Lenders (as defined in the Credit Agreement) or upon an acceleration of the obligations in connection with an exercise of remedies under the Credit Agreement, the Term Loan Facility payments are subordinate to payment to the ABL Lenders until the ABL Facility obligations are paid in full (other than Bank Products Obligations (as defined in the Credit Agreement) in excess of a $5 million cap).

### C.    Ownership Interests.

41.    As of the Petition Date, the ownership interests of each Debtor is 100% held by its immediate parent. Common stock in Debtor Barneys New York, Inc., the ultimate parent entity, is held by certain funds related to Perry Capital (approximately 72%), Yucaipa (approximately 20%), and Istithmar (approximately 8%).

## IV.    Prepetition Strategic and Financing Initiatives.

### A.    Operational Right-Sizing Initiatives.

#### 1.    Landlord Engagement.

42.    In response to their lease pressures, the Debtors' undertook efforts to obtain lease concessions and rent abatements from their landlords throughout spring 2019. For example, members of the Debtors' management team met with the landlord for the Debtors' Chicago flagship store during January 2019 in response to requested letter of credit obligation increases of approximately $6 million seeking (a) a rent reduction, (b) reduced letter of credit obligations to

three months' rent (as compared to six months' rent), and (c) authorization for a partial sublease of the leased premises.  With respect to its Madison Avenue flagship store, the Debtors sought a reduction in the rent increase for the first one to two years and a standstill on letter of credit obligations.  The Debtors sought similar rent reductions with respect to their Las Vegas flagship store.

### 2.    Sales Promotions.

43.    To increase sales revenue and generate traffic to their physical stores, the Debtors conducted in-store sales promotion throughout 2019.  These promotions included merchandise markdown by approximately $70 million, an approximate 76% mark-down rate.    These promotions generated approximately $6 million in incremental sale proceeds, an increase of approximately 2% compared to the same period for the prior fiscal year.  Despite these efforts, the Debtors were unable to generate sufficient revenue in light of their significant operating expenses.  With a negative cash flow expected for most of the first half of FY 2019, the Debtors determined to explore financing initiatives to provide necessary liquidity to fund operations and unlock dormant inventory.

### B.    The Need for Imminent Liquidity.

### 1.    The Term Loan Facility.

44.    During the early spring of 2019, the Debtors faced a liquidity crisis following sustained market conditions, operational losses, and significant increases in rent and related lease obligations.  The Debtors, with the assistance of K&E,[5] evaluated funding alternatives necessary to obtain liquidity critical to unlocking withheld inventory and implementing Barneys' go-forward

---

[5]    Katten Muchin Rosenman LLP ("Katten") will act as co-counsel to the Debtors' lead counsel, K&E.  Katten will work on conflict matters as well as other matters that Katten is able to handle more efficiently, and matters the Debtors may delegate to Katten.

business plan.  To obtain liquidity to fund inventory purchases and operating capital in advance of

the summer season, the Debtors negotiated with Wells and TPG Specialty Lending, Inc. ("TPG")

and ultimately obtained $50 million in the form of the Term Loan Facility described above.

Decreased sales figures and ongoing rental pressures, however, proved the Term Loan Facility

insufficient to overcome the Debtors' ongoing operational issues.  In response, the Debtors and

their advisors determined that, given their severe liquidity constraints and the need to unlock

inventory for sale during the summer season, new money in the form of attractive secured

financing was critical.

### 2.    Concurrent Marketing Efforts.

45.    At the same time the Debtors were exploring options for increasing liquidity, they

conducted a marketing process.  The Debtors prepared a list of thirty-eight potential investors

(including various financial sponsors and strategic buyers) that were considered likely participants

in a sale process.  Following the initial outreach to the identified thirty-eight parties, information

was provided to these parties to gauge their interest prior to executing a non-disclosure agreement

("NDAs").  Twenty-five parties executed NDAs.  Parties who executed NDAs received access to

a dataroom.  After the Debtors' initial outreach, two financial institutions and three non-financial

parties, expressed preliminary interest and submitted non-binding letters of interest.  In some

instances, the parties negotiated definitive documents and sought necessary consents.  The Debtors

developed such proposals as much as they could have in advance of commencing these chapter 11

cases.  Given the Debtors' limited runway and certain necessary consents, however, they were

unable to execute on any such out-of-court transaction.

### 3.    Efforts to Obtain Incremental Working Capital.

46.    In response to the liquidity shortfall, the Debtors engaged M-III to act as financial

advisor, and Houlihan Lokey, Inc. ("Houlihan"), as investment banker, in connection with a

potential financing and/or other strategic transaction.  The Debtors, with the assistance of their advisors, evaluated funding alternatives necessary to obtain liquidity critical to unlocking withheld inventory and implementing Barneys' go-forward business plan.  During July 2019, the Debtors and their advisors negotiated with their prepetition lenders, equity holders, potential strategic investors, and other potential third-party investors to facilitate a new money investment.  Proposed financing alternatives generally took the form of junior secured debt.  For example, one financing alternative was structured as a secured note convertible into common equity.  Another financing alternative involved a consignment arrangement whereby a financial investor would fund the Debtors' suppliers directly.

### 4.    Landlords Exercise Remedies.

47.    The Debtors elected to enter the grace periods under their leases to preserve liquidity.  Several lessors sent notices to the Debtors in connection with the non-payment of rent. The Debtors engaged with and ultimately obtained forbearances from many of their lessors tp forestall the exercise of remedies.  Although many lessors agreed to such forbearances for limited durations, the constant overhang of lessors exercising remedies in the near term—especially with respect to the Debtors' flagship stores—amplified the timing demands with respect to the financing and sales transaction alternatives.  When the lessors would not afford the Debtors any additional runway to implement an out-of-court transaction, the Debtors, in consultation with their advisors, determined it was in the best interests of their estates to commence these chapter 11 cases.

## V.    The Proposed DIP Financing and Marketing Process.

48.    In connection with the chapter 11 filing, the Debtors, with the assistance of their advisors, undertook a process for identifying sources of capital on the best available terms.  This marketing process focused on developing proposals with (a) the Debtors' existing funded debt and equity stakeholders, and (b) alternative sources of capital from parties outside the Debtors' existing

capital structure.  Specifically, the Debtors and their advisors contacted twenty-three banks and institutions in the business of extending postpetition financing under similar circumstances, twenty-one of whom executed non-disclosure agreements and gained access to a data room established by Houlihan.  To date, two financial institutions have provided DIP financing proposals, in addition to three proposals from non-financial parties, as described below.  The remaining parties declined to provide financing proposals, citing the compressed timeline, priming concerns, and the likely high costs of third-party senior financing.

49.    As described above, the Debtors began their outreach by engaging in good faith, arm's-length negotiations with their ABL Lenders and Term Loan Lenders to provide a source of incremental liquidity to fund their operations.  Despite the Debtors' outreach, the ABL Lenders were not interested in providing the Debtors with incremental liquidity beyond the existing borrowing base less then applicable reserves under the ABL Facility.  One of the Debtors' Term Loan Lenders, TPG Specialty Lending ("TPG"), provided a proposal to advance $10 million in new money through a multi-draw term loan (the "TPG Proposal").  TPG's proposal would have given them a first lien on all unencumbered assets, and a junior lien on all encumbered assets.  The TPG Proposal required the Debtors to pursue "going-out-of-business" sales at all but two of their brick and mortar locations within two days of the Petition Date.

50.    In parallel with discussions with their incumbent lenders, the Debtors and their advisors worked diligently to evaluate options for third-party DIP financing.  Specifically, Houlihan contacted twenty-five banks and institutions in the business of extending postpetition financing under similar circumstances, twenty-three of whom executed non-disclosure agreements and gained access to a data room established by Houlihan.  Through those efforts, the Debtors received an additional four preliminary, non-binding proposals for incremental financing,

including proposals from (a) a group of third-party financial institutions (the "Investor Group"), (b) a specialty finance firm, (c) one of the Debtors' landlords, and (d) a potential purchaser of the Debtors' intellectual property.  The proposals received from the Debtors' landlords and a potential purchaser of the Debtors' intellectual property were each insufficient in amount to adequately fund the contemplated sale process and as such were not pursued further.

51.     On July 28, 2019, the Debtors received a preliminary, non-binding proposal from a group of third-party financial institutions (the "Investor Group").  This proposal (the "Investor Proposal") contemplated providing approximately $75 million of financing secured by liens junior to the ABL Facility.  Fifty million of the proceeds from the Investor Proposal would repay a portion of the ABL Facility, as required by the Prepetition Lenders to obtain their consent to the proposed financing.  Absent the Prepetition Lenders' consent, the Debtors would not have had a meaningful ability to obtain DIP financing.  The Investor Proposal also included terms and conditions for additional liquidity through a consignment program, which in subsequent discussions they indicated could be available to the Debtors on advantageous terms.

52.     On August 1, 2019, the Debtors received a preliminary, non-binding proposal from Hilco Global and Gordon Brothers Retail Partners, LLC (the "Hilco Proposal").  After subsequent negotiations, the Hilco Proposal contemplated $75 million of financing secured by junior liens on all of the Debtors' assets, $50 million of which will be used to pay down the Debtors' prepetition secured debt and $25 million of which will be available as incremental liquidity to fund these chapter 11 cases and optimize the business (the "DIP Facility").  As stated previously, the Prepetition Lenders require the $50 million pay down to obtain their consent to the proposed financing.  The Hilco Proposal also contained a consignment program that may allow the Debtors

to substantially increase their inventory purchases.  The Hilco DIP Facility contained more flexible terms, conditions and covenants.

53.     As set forth in greater detail in the Burian Declaration, these efforts culminated in the DIP Facility that would fund the Debtors' working capital needs and these chapter 11 process. There are four key points to highlight with respect to the proposed DIP Facility.  ***First***, the DIP Facility is being provided on a junior secured basis and the DIP Lenders will pay down the ABL Facility with the Prepetition Lenders' consent.  This was a negotiated point, and the Debtors did their best to obtain the consent of the ABL Lenders, absent this partial repayment.  The ABL Lenders insisted on this partial repayment, and would not otherwise consent to the proposed financing.  Absent the prepetition lenders' consent, the Debtors would not have had meaningful access to DIP financing.  As a result, the Debtors are not facing value-destructive priming or non-consensual use of cash collateral issues and have the full support from their secured lenders. ***Second***, the DIP Facility enables the Debtors to continue their marketing process at the outset of these chapter 11 cases and attempt to realize a going-concern transaction.  As set forth above, the Debtors believe several parties in interest value their intellectual property and will pay a premium for purchasing such assets insofar as the Debtors remain a going concern.  ***Third***, the DIP Facility provides a bridge to implementing a transaction in the event the Debtors are unable to restructure as a going concern.  The Debtors' secured lenders have provided a path forward if the market test is unsuccessful through customary milestones, as described below.  The Debtors will continue to work to maximize value in all scenarios and circumstances.  And ***fourth***, as detailed in the Burian Declaration, the DIP Facility represents the best available financing under the circumstances.

54.     The Debtors have thus far largely been able to maintain operations (and thus the continued trust of their customers) notwithstanding their liquidity challenges, however the Debtors

project they will run out of money as early as next week without an immediate infusion of postpetition financing and access to cash collateral.  In that scenario, the Debtors would be unable to pay wages for their employees, taxes and fees to public authorities, or anticipated ordinary course postpetition administrative expenses.  Further, access to ample post-petition financing is necessary to send a strong market signal that these chapter 11 cases are well-funded and there is a path forward.  Without access to the DIP Facility, the Debtors would likely need to liquidate immediately to the detriment of the Debtors, their stakeholders, and all other parties-in-interest.

55.    Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to consummating a value-maximizing transaction while minimizing the effects of the Debtors' chapter 11 cases on the Debtors' brand—a critical component of the value of their businesses.  Due to the fact that retail customer sentiment shifts rapidly and stakeholders (including key suppliers and landlords) often turn swiftly against apparel and retail debtors, such debtors often do not fare well in bankruptcy—in many instances electing to liquidate as opposed to reorganize.  The Debtors intend to swiftly proceed with a fair and efficient process to preserve and maximize the value of that achievement for enterprise-wide stakeholders.

## VI.    Evidentiary Support for First Day Motions.[6]

56.    Contemporaneously herewith, the Debtors filed a number of First Day Motions and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run the Debtors' business, ensure the continuation of the Debtors' cash management systems, and allow for other

---

[6]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

business operations without interruption.  I believe that the relief requested in the First Day

Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11

cases that will benefit all of the Debtors stakeholders.

57.     The First Day Motions request authority to pay certain prepetition claims.  I

understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part,

that the Court shall not consider motions to pay prepetition claims during the first twenty-one days

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid

immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored

their requests for immediate authority to pay certain prepetition claims to those circumstances

where the failure to pay such claims would cause immediate and irreparable harm to the Debtors

and their estates.  Other relief will be deferred for consideration at a later hearing.

58.     I am familiar with the content and substance of the First Day Motions.  The facts

stated therein are true and correct to the best of my knowledge, information, and belief, and I

believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors

to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical

element in successfully implementing a chapter 11 strategy.  A description of the relief requested

and the facts supporting each of the First Day Motions is detailed in **Exhibit B.**

## VII.    Information Required by Local Bankruptcy Rule 1007-2.

59.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors,

which I have provided in the exhibits attached hereto as **Exhibit C** through **Exhibit N**.

Specifically, these exhibits contain the following information with respect to the Debtors (on a

consolidated basis, unless otherwise noted):[7]

---

[7]    The information contained in **Exhibit C** through **Exhibit N** attached to this declaration does not constitute an
admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt

- **Exhibit C**. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee.

- **Exhibit D**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(4), provides the following information with respect to each of the holders of the debtors' thirty largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- **Exhibit E**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(5), provides the following information with respect to each of the holders of the five largest secured claims against the debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- **Exhibit F**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(6), provides a summary of the debtors' assets and liabilities.

- **Exhibit G**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(7), provides a summary of the publicly held securities of the debtors.

- **Exhibit H**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(8), provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- **Exhibit I**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which the debtors operate their business.

- **Exhibit J**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(10), sets forth the location of the debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the debtors outside the territorial limits of the United States.

---

or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

- **Exhibit K**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(11), provides a list of the nature and present status of each action or proceeding, pending or threatened, against the debtors or their property where a judgment or seizure of their property may be imminent.

- **Exhibit L**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(12), sets forth a list of the names of the individuals who comprise the debtors' existing senior management, their tenure with the debtors, and a brief summary of their relevant responsibilities and experience.

- **Exhibit M**.  Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), provides the estimated amount of payroll to the debtors' employees (not including officers, directors, and equity holders) and the estimated amounts to be paid to officers, equity holders, directors, and financial and business consultants retained by the debtors, for the 30-day period following the Petition Date.

- **Exhibit N**.  Pursuant to Local Bankruptcy Rule 1007-2(b)(3), provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: August 6, 2019                    */s/ Mohsin J. Meghji*
New York, New York                        Name: Mohsin J. Meghji
                                          Title: Managing Partner, M-III Advisors, LP

**<u>Exhibit A</u>**

**Corporate Structure**

# KIRKLAND & ELLIS



**BARNEYS NEW YORK**

## Barneys Corporate Structure Chart



**Istithmar Bentley Cayman Ltd.**
(Cayman Islands Exempted Company)

**Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P.**

**Perry Private Opportunities Fund, L.P.; Spring Investments II Ltd.; Perry Principals, L.L.C.; Perry Partners International, Inc.; Perry Partners, L.P.; and Spring Investments Ltd.**

—8%—— ——20%—— ——72%——

**Barneys New York, Inc.**
(Delaware) ————30%[1]

**Barney's, Inc.**
(New York)

**BNY Catering, Inc.**
(New York)

**BNY Licensing Corp.**
(Delaware)

70%

**Barneys Asia Co. LLC**
(Delaware)

### LEGEND

| | |
|---|---|
| Borrower | (white box) |
| Guarantor | (hatched box) |
| Equity | (oval) |

### NOTES

1. Unless otherwise specified, the equity ownership of each entity is 100% held by its immediate parent.
2. The Company must maintain excess availability at all times under the Revolver equal to the greater of 10% of Adjusted Combined Maximum Credit and $20 million. *See* Section 5.1 of the Fifth Amendment to the Revolving Credit and Term Loan Facility Agreement ("Adjusted Combined Maximum Credit" is the (a) lesser of the ABL commitments and ABL borrowing base and (b) lesser of outstanding term loan and term loan borrowing base).
3. The greatest of (a) the Federal Funds Rate plus 0.5%, (b) the LIBO Rate plus 1%, and (c) the rate of interest announced, from time to time, within Wells Fargo Bank, N.A., at its principal office in San Francisco as its "prime rate."
4. Applicable Margin is as follows:

| QUARTERLY AVERAGE EXCESS AVAILABILITY | APPLICABLE MARGIN FOR LIBO RATE LOANS | APPLICABLE MARGIN FOR BASE RATE LOANS |
|---|---|---|
| Greater than $100,000,000 | 2.00% | 1.00% |
| Less than or equal to $100,000,000 | 2.25% | 1.25% |

5. Subject to certain exceptions, the Interest Period is (i) initially, the period beginning on the date the loan is made or on the date of conversion of a Base Rate Loan to a LIBO Rate Loan and ending one, two, or three months thereafter, and (ii) if the loan is continued, the period commencing on the last day of the immediately preceding Interest Period and ending one, two, or three months thereafter, as selected by the borrower.
6. All payments and any other amounts received by the Administrative Agent shall be applied as follows: (i) to pay principal and interest on any portion of the Revolving Loans the Administrative Agent advanced; (ii) to pay all other Obligations in respect of the Revolving Facility, (iii) all other Obligations due and payable, and (iv) as the Borrower designates. *See* Section 2.13(g) of the Fifth Amendment to the Revolving Credit and Term Loan Facility Agreement.
7. This amount includes approximately $26 million in letters of credit.

### REVOLVING CREDIT FACILITY AGREEMENT ("ABL")

**Maturity:** December 19, 2023
**Agent:** Wells Fargo Bank, N.A.
**Revolving Commitments:** Up to $225 million (subject to borrowing base availability)[2]
**Unused Commitment Fee:** 0.25% per annum
**Outstanding Balance:** $141 million[7]
**Revolving Loan Interest:** Base Rate[3] + Applicable Margin[4] OR LIBO Rate + Applicable Margin[5]
**Revolving Loan Interest Date:** (i) Interest on Base Rate Loans is payable on the first calendar day of each calendar quarter; (ii) interest accrued on LIBO Rate Loans is payable on the last calendar day of each Interest Period (subject to prepayment and maturity exceptions)[5]
**Collateral:** First priority lien on substantially all assets[6]

### TERM LOAN ("FILO")

**Maturity:** December 19, 2023
**Amortization Payments:** Quarterly principal payments each in the amount equal to $1,250,000, on the first calendar day of each February, May, August, and November, commencing on August 1, 2019.
**Agent:** Wells Fargo Bank, N.A.
**Outstanding Balance:** $48.75 million
**Term Loan Interest Rate:** LIBO Rate + 7.00% OR Base Rate + 6.00%
**Term Loan Interest Dates:** The first calendar day of each calendar month (subject to prepayment and maturity exceptions)
**Collateral:** First priority lien on substantially all assets

### ABL LENDERS



- Wells Fargo Bank, N.A. 62.5%
- Citizens Business Capital 22.2%
- TD Bank, N.A. 15.3%

### FILO LENDERS



- TPG Specialty Lending, Inc. 70%
- Wells Fargo Bank, N.A. 30%

## **Exhibit B**

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[8]

### Administrative and Procedural Motions

**A.    Debtors' Motion Seeking Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granted Related Relief (the "<u>Joint Administration Motion</u>").**

1.        The Debtors have filed several purely administrative or procedural First Day Pleadings, including a motion to jointly administer the Debtors' chapter 11 cases.  As in many large chapter 11 cases that are jointly administered, the Debtors do not maintain lists of the names and addresses of their respective creditors on a debtor-by-debtor basis.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

**B.    Debtors' Motion for Entry of Interim and Final Orders Establishing Certain Notice, Case Management, and Administrative Procedures (the "<u>Case Management Motion</u>").**

2.        Pursuant to the Case Management Motion, the Debtors seek entry of interim and final orders approving and implementing the notice, case management, and administrative procedures.  The proposed Case Management Procedures, among other things: (a) establish requirements for filing and serving Court Filings; (b) delineate standards for notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court.  Given the size and complexity of these chapter 11 cases, implementing the Case Management Procedures will facilitate the fair and efficient administration of these cases and promote judicial economy.

---

[8]    Capitalized terms used but not defined herein have the meanings given to them in the applicable First Day Motion.

**C.      Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief (the "<u>Schedules and Statements Extension Motion</u>").**

3.          Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by thirty days, for a total of forty-four days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions.

4.          Given the size and complexity of the Debtors' business and financial affairs, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.  Accordingly, the relief requested in the Schedules and Statements Extension Motion is warranted under the circumstances.

**D.      Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information for The Debtors' Employees, (IV) Approving the Form and Manner of Notifying Creditors of Commencement, and (V) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

5.          Pursuant to the Credit Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor (the "<u>Creditor Matrix</u>"), (ii) file a consolidated list of the Debtors' thirty largest unsecured creditors, (iii) redact certain personal identifiable information for the

Debtors' Employees, and (b) approving the form and manner of notifying creditors of commencement of these chapter 11 cases.

6.        *First*, the preparation of separate lists of creditors for each debtor would be expensive, and time consuming. Therefore, the Debtors have requested to file a consolidated creditor matrix.  Moreover, filing a top thirty list will help alleviate administrative burdens, costs, and the possibility of duplicative service.  *Second*, the list of creditors may include information of the Debtors' Employees with personal information; such information can be used to perpetrate identity theft.  *Third*, mailing initial notices of bankruptcy through the Debtors' proposed claims and noticing agent, Stretto, to parties in interest will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.  Accordingly the relief requested in the Creditor Matrix Motion is warranted under the circumstances.

**E.    Debtors' Application Seeking Entry of an Order (I) Authorizing and Approving the Appointment of Stretto as Claims and Noticing Agent and (II) Granting Related Relief (the "Stretto 156(c) Retention Application").**

7.        Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Stretto ("Stretto")[9] as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors in their chapter 11 cases effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

8.        Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all

---

[9]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

engagement proposals obtained and reviewed that Stretto's rates are competitive and comparable to the rates charged by their competitors for similar services.

9.        The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Stretto 156(c) Retention Application.

## **Operational Motions**

**F.        Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief (the "Cash Management Motion").**

10.        Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash management system substantially as illustrated on Exhibit 1 annexed to **Exhibit A** attached to the Cash Management Motion, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions consistent with historical practice; and (b) granting administrative expense status to postpetition Intercompany Balances.

11.        The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds

and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtors' corporate accounting, treasury, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

12.    Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**G.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").**

13.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, reimbursable employee expenses, and severance obligations, and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

14.    The Debtors employ approximately 2,300 Employees, including approximately 2,100 full-time Employees and 200 part-time Employees.  As of the Petition Date, approximately 900 Employees are members of a labor union.  The Employees perform a wide variety of functions which will be critical to the Debtors' go-forward business operations and the administration of these chapter 11 cases.  In many instances, the Employees include personnel who are intimately

familiar with the Debtors' businesses, processes, and systems, who possess unique skills and experience to the core business segments of the Debtors, and/or who have developed relationships with wholesalers and distributors that are essential to the Debtors' business. The Debtors also retain from time to time specialized individuals as Independent Contractors to complete discrete projects, as well as Temporary Staff from several Staffing Agencies to fulfill certain duties, including, among other things, sales, web services, building services, and catering. The Debtors currently retain approximately 260 Independent Contractors and Temporary Staff in the aggregate.

15.        The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, sales commissions and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, severance obligations, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, and certain other benefits that the Debtors have historically provided in the ordinary course (collectively, the "Employee Compensation and Benefits") and as further described in the Wages Motion.

16.        Pursuant to the Wages Motion, the Debtors also seek authority to continue their incentive programs and to honor their obligations to non-insider Employees and Union Employees under these pre-existing incentives programs, described more fully in the Wages Motion. The Debtors believe the incentive programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency of the Debtors' operations. I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to any bonus programs or severance payments.

17.        I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors will likely experience Employee turnover and instability at this critical time.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.  Employees may then elect to seek alternative employment opportunities.  I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

18.        Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**H.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>")**

19.        Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to maintain and administer their Customer Programs and honor certain prepetition obligations related thereto.

20.        The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors'

business and the value of their "brand." Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

21.        As of the Petition Date, the Debtors estimate that there are approximately $22.2 million of prepetition obligations outstanding related to Customer Programs. These obligations include accrued credits, adjustments, discounts, prepayments, or other similar programs owing to customers. The vast majority of these obligations ***do not*** entail the expenditure of cash.

22.        I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving the Debtors' valuable customer relationships, goodwill, and market share, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating their customers, and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates. The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

23.        I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings. Such uncertainty could erode the Debtors' hard-earned reputation and customer loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.

24.        I believe that the relief requested in the Customer Programs Motion will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**I.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Satisfy Obligations Related to Insurance Policies, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (C) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (D) Enter into New Financing Agreements in the Ordinary Course of Business and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

25.        Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) satisfy their obligations related to insurance policies entered into prepetition, including payment of certain brokerage fees, (b) renew, supplement, modify, or purchase insurance coverage in the ordinary course, (c) renew or enter into new premium financing agreements in the ordinary course of business, and (d) honor the terms of the Financing Agreement with Aon Premium Finance LLC and pay premiums thereunder.

26.        The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.  Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' operations.

27.        I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**J.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

28.        Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay (or use tax credits to offset) certain accrued and outstanding prepetition obligations accrued on account of sales taxes, use taxes, annual report and licensing fees, personal property taxes, franchise taxes and fees, and various other governmental taxes, fees, and assessments.  In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various governmental authorities.  The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay.

29.        I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**K.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "<u>Equity Trading Motion</u>").**

30.        Pursuant to the Equity Trading Motion, the Debtors seek entry of interim and final orders (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor Barneys New York, Inc.'s existing common stock or any Beneficial Ownership therein (any such record or Beneficial Ownership of common stock, the "<u>Common Stock</u>"), as detailed in **<u>Exhibit 1</u>** to the Interim Order and Final

Order to the Equity Trading Motion (the "Procedures"), and (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*.

31.    As of January 1, 2019, the Debtors estimate that they have approximately $118 million of federal NOLs approximately $3.5 million of federal charitable contribution carryforwards; and approximately $6 million of disallowed interest carryforwards (collectively, and together with state and certain other tax attributes, the "Tax Attributes").[10] The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or directly offset federal tax liability in future years or utilize the Tax Attributes to offset any taxable income or federal tax liability generated by transactions consummated during these chapter 11 cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

32.    Implementation of the Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes may provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties-in-interest.  Thus, granting the relief requested in the Equity Trading Motion will preserve the Debtors' flexibility in operating their business during the pendency of these chapter 11 cases and making full and efficient use of the Tax Attributes and maximizes the value of the Debtors' estates.  Accordingly, on behalf of the Debtors, the relief requested in the Equity Trading Motion should be approved.

---

[10]    The Tax Attributes include certain alternative minimum tax credits.  These credits are not discussed further herein as a result of changes to the treatment of such credits in U.S. federal income tax legislation enacted in 2017.

**L.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Prepetition Claims of Lien Claimants, (B) Foreign Vendor Claims, (C) Section 503(b)(9) Claims, and (D) Critical Vendor Claims, and (II) Granting Related Relief (the "<u>All Vendor Motion</u>").**

33.    Pursuant to the All Vendor Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay an aggregate amount up to $3 million, absent further order of the Court, on account of prepetition claims held by certain (a)  shippers and warehousemen, (b) foreign vendors, (c) certain 503(b)(9) claimants, and (d) critical vendors.

34.    *Lien Claimants:* The Debtors' business depends on the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' Merchandise.  As described above, the Debtors pay various freight forwarders, common carriers, and custom brokers (collectively, the "<u>Lien Claimants</u>") to transport the Merchandise.  As of the Petition Date, the Debtors owe approximately $3.5 million.

35.    *Foreign Vendors*: A critical component of the Debtors' supply chain involves transacting with certain foreign vendors, including by purchasing the Merchandise and other goods and materials from entities located abroad (collectively, the "<u>Foreign Vendors</u>").  Generally, the Debtors contract with various domestic vendors to design and source the Merchandise from foreign manufacturers.  In certain circumstances, the Debtors contract with foreign manufacturers directly. Many of these Foreign Vendors supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing U.S. operations—specifically the Merchandise necessary to stock the shelves and racks in the Debtors' stores.

36.    The Debtors propose to pay the Foreign Vendor Claims only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business.  The Debtors estimate that as of the Petition Date,

approximately $6.9 million is accrued and outstanding on account of Foreign Vendor Claims, of

which the vast majority are past due and short vendor terms may come due within the first 30 days

after the Petition Date.

37.     ***Critical Vendor Claims.***  The Debtors' supply chain consists, in addition to the

Foreign Vendors, of certain domestic vendors (collectively, the "Critical Vendors") that supply

products and services that are essential to the Debtors' go-forward operations. With the assistance

of their advisors, the Debtors have spent significant time reviewing and analyzing their books and

records, consulting operations managers and purchasing personnel, reviewing contracts and supply

agreements, and analyzing applicable law, regulations, and historical practice to identify certain

critical business relationships and suppliers of goods and services—the loss of which would

immediately and irreparably harm their businesses, by, inter alia, shrinking their market share,

reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern.

38.     ***The 503(b)(9) Claims.***  The Debtors have received certain goods from various

Vendors within the 20 days before the Petition Date (collectively, the "503(b)(9) Claimants").

Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term

contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a

503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade

credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited

liquidity.  As of the Petition Date, the Debtors believe they owed approximately $8.7 million on

account of the 503(b)(9) Claims.

39.     Accordingly, the Debtors request the authority, but not the direction, the

Debtors are only seeking authority to pay an amount necessary to preserve the value of their

estates, which shall not exceed $2.2 million on an interim basis and $3 million on a final basis on

account of prepetition claims held by certain Vendor Claimants and accrued in the ordinary course

of business.

**M.    Debtors' Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Nonresidential Real Property, Effective as of the Rejection Date, and (B) Abandonment of any Personal Property Related Thereto, and (II) Granting Related Relief (the "<u>Lease Rejection Motion</u>").**

40.        Pursuant to the Lease Rejection Motion, the Debtors seek entry of an order

authorizing the Debtors to (a) reject certain unexpired leases of real property, including any

guaranties thereof and any amendments, modifications, or subleases thereto (collectively, the

"<u>Leases</u>") for nonresidential real property, (b) authorizing the abandonment of certain equipment,

fixtures, furniture, or other personal property that may be located at the premises and not otherwise

transitioned to another store location (collectively, the "<u>Personal Property</u>"), both rejection of

Leases and abandonment of Personal Property to be effective as of the date the Debtors have

surrendered the premises to the landlord via delivery of the keys, key codes, and alarm codes to

the premises, as applicable, to the applicable lease counterparty, or, if not delivering such keys or

codes, providing notice that the landlord may re-let the premises (the "<u>Rejection Date</u>").

41.        As part of their ongoing restructuring efforts, the Debtors have determined that

certain of their brick-and-mortar retail and outlet stores do not have a place in the Debtors'

go-forward business plan.  The Debtors are party to twenty-eight nonresidential real property

leases across the United States, twenty-two of which relate to store locations.  Debtor Barney's,

Inc. is the lessee counterparty to each such lease.

42.        The Debtors, with the assistance of their advisors, undertook a comprehensive

review and store-by-store analysis of their lease portfolio and the performance of each of their

stores.  The Debtors' lease portfolio is a significant contributing factor to their current financial

challenges and they have determined, as a sound exercise of business judgment, that closure of numerous underperforming stores would be value maximizing. Accordingly, the Debtors seek to reject fifteen leases associated with such stores at this time.

43.    The Debtors estimate that rejecting the Leases will save approximately $2.2 million per month in rent and associated costs and have determined in their business judgment that such costs constitute a wasteful drain of estate assets. Accordingly, in an effort to avoid unnecessary postpetition rent and administrative costs, the Debtors have determined that it is in the best interests of their estates to reject the fifteen Leases, effective as of the Rejection Date.

**N.    Debtors' Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing Fee Payments to NUS Consulting Group for Services Performed, and (V) Granting Related Relief (the "<u>Utilities Motion</u>").**

44.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) prohibiting utility providers from altering, refusing, or discontinuing services, (b) determining adequate assurance of payment for future utility services, (c) establishing procedures for determining adequate assurance of payment for future utility services, and (d) authorizing fee payments to NUS Consulting Group ("<u>NUS</u>") for services performed.

45.    In connection with the operation of their businesses, the Debtors obtain water, sewer service, electricity, waste disposal, natural gas, and other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers or their broker (collectively, the "<u>Utility Providers</u>"). The relief requested in the Utilities Motion applies to all Utility Providers.

46.    The Debtors manage most payments for Utility Services through NUS pursuant to a Utility Management Agreement. On average, the Debtors pay approximately $515,000 each

month for third-party Utility Services, calculated as a historical average payment for the twelve-month period that ended July 2019, and including the monthly fee to NUS. The Debtors receive monthly invoices from NUS and pay NUS approximately $795 a month for services. As of the Petition Date, the Debtors owe approximately $3,975 to NUS for past services, and approximately $4,770 will become due and owing within twenty-one days on account of such outstanding amounts and anticipated invoices for prepetition services. The Debtors make payments for rubbish Utility Services directly to the respective Utility Providers. As of the Petition Date, the Debtors estimate that they have posted approximately $375,000 in the form of security deposits on behalf of certain Utility Providers.

47.     Over the next twenty-one days, the Debtors estimate that their cost for Utility Services will be approximately $515,000. The Debtors propose depositing $257,500 into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit"), which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment. The Adequate Assurance Deposit will be held at Wells Fargo Bank, N.A., and the Debtors' creditors will have no lien on any Adequate Assurance Deposit.

48.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures. These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient. This ensures that all key stakeholder groups obtain notice of such request before it is honored.

49.     Furthermore, the Debtors request that Utility Providers be prohibited from altering, refusing or discontinuing service to the Debtors on account of: (a) unpaid charges for prepetition services; (b) a pending Adequate Assurance Request; or (c) any objections filed in

response to the Adequate Assurance Deposit.  Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization.  The Debtors' retail enterprise requires maintaining open and active stores to entice and allow customers to make purchases.  Any disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  This, in turn, jeopardizes the value of the Debtors' estates and impact creditor recoveries.  Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

[*Remainder of page intentionally left blank*]

## **EXHIBIT C**

### **Committees Organized Prepetition**

None.

## EXHIBIT D

**Consolidated List of Holders of the Debtors' Thirty Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the thirty largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the thirty largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 1 | Jenel Management | Attn: Jack Dushey Jenel Management Corp. 275 Madison Avenue (1100) New York, NY 10016 (212) 889-6406 jd@jenel.net | Lease | | | | $5,984,632 |
| 2 | The Row LLC | Attn: Legal 609 Greenwich Street New York, New York 10014 (646) 358-3888 Jan.Kaplan@therow.com | Trade Payable | | | | $3,737,748 |
| 3 | Celine Inc. | Attn: Legal 538 Madison Avenue New York, NY 10022 (646) 346-7613 luc.ferriere@lvmhfashion.com | Trade Payable | | | | $2,747,305 |

---

[11] The Debtors reserve the right to assert setoff and other rights with respect to any of the claims listed herein.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 4 | Thor Equities 1-15 EAST OAK STREET, LLC | 25 West 39th St. New York, NY 10018 United States (212) 529-4175 Ext. 0000 jxenitelis@thorequities.com | Lease | | | | $2,228,976 |
| 5 | Yves Saint Laurent America, Inc. | Attn: Legal 50 Hartz Way Secaucus, NJ 07094 (201) 553-6945 (201) 770-2921 daniel.byrnes@kering.com | Trade Payable | | | | $2,186,576 |
| 6 | Balenciaga America, Inc. | Attn: Legal 50 Hartz Way Secaucus, NJ 07094 (212) 279-4440 daniel.byrnes@kering.com | Trade Payable | | | | $2,139,845 |
| 7 | Givenchy Corporation/LVMH | Attn: Legal 19 East 57th Street New York, NY 10022 (212) 965-5582 luc.ferriere@lvmhfashion.com | Trade Payable | | | | $1,944,171 |
| 8 | Gucci | Attn: Legal 195 Broadway New York, NY 10007 (201) 330-2738 daniel.byrnes@kering.com | Trade Payable | | | | $1,797,504 |
| 9 | Google Inc. | Attn: Legal 1600 Amphitheatre Parkway Mountain View, CA 94043 (800) 467-1894 jo.keri@google.com | Trade Payable | | | | $1,706,932 |
| 10 | Prada | Attn: Legal 609 West 52nd Street New York, NY 10019 (212) 307-9300 Aimee.Nsang@prada.com | Trade Payable | | | | $1,626,504 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
|---|---|---|---|---|---|---|---|
| 11 | Rakuten Marketing Formerly Linkshare Corp. | Attn: Legal 215 Park Avenue South 2nd Floor New York, NY 10003 (646) 943-8294 shannon.le@rakuten.com | Trade Payable | | | | $1,584,130 |
| 12 | GGR US LLC | Attn: Legal Dept. 3486 24 E 64th St New York, NY 10065 (212) 947-3333 veronica.nanni@ggr-distribution.com | Trade Payable | | | | $1,461,149 |
| 13 | Azzedine Alaia | Attn: Legal 5 Rue Marignan 75008 Paris, France patricia.carry@alaia.fr | Trade Payable | | | | $1,396,258 |
| 14 | Margiela USA, Inc | 220 W 19TH STREET 11TH FLOOR New York, NY 10011 (646) 813-4124 Ext. 0000 kenny_kalipershad@staffinternation.com | Trade Payable | | | | $1,370,604 |
| 15 | CL US Distribution Corporation | Attn: Legal 306 W. 38th Street Floor 14 New York, NY 10018-2927 (212) 279-7365 j.jiang@us.christianlouboutin.com | Trade Payable | | | | $1,283,586 |
| 16 | Moncler USA, Inc | 568 BROADWAY SUITE # 301 ATTN: A/R & CREDIT DPT. New York, NY 10012 (347) 745-2873 Ext. 0000 valentina.pretto@moncler.com | Trade Payable | | | | $1,205,973 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 17 | Chloe | Attn: Legal Division of Richemont North America 10 East 52nd Street 3rd Floor New York, NY 10022 (917) 606-7031 clemence.asaria@chloe.com | Trade Payable | | | | $995,965 |
| 18 | Shiseido Cosmetics | Attn: Legal 390 Madison Avenue New York. NY 10017 (201) 651-3917 jcohen@sac.shiseido.com | Trade Payable | | | | $990,192 |
| 19 | STOCKTON STREET PROPERTIES, INC. | PO BOX 847130 Dallas, TX 75284-7130 (952) 852-5200 Ext. 0000 Lori.Coleman@MadisonMarquette.com; kevin.pirozzoli@invesco.com | Lease | | | | $953,528 |
| 20 | ISAIA CORP | 730 FIFTH AVE, CROWN BLDG., STE 1004 New York. NY 10019 (212) 245-3733 Ext. 0000 anthony.bozzi@isaia.it | Trade Payable | | | | $942,977 |
| 21 | FedEx | 942 South Shady Grove Road Memphis, Tennessee 38120 (901) 818-7500 christie.burns@fedex.com | Trade Payable | | | | $929,944 |
| 22 | CHANEL | 885 CENTENNIAL AVENUE Piscataway, NJ 08854 (732) 980-3845 Ext. 0000 KAREN.ALBRECHT@CHANELUSA.COM | Trade Payable | | | | $877,516 |
| 23 | Loewe LLC | Attn: Legal 598 Madison Ave FL 6 New York, NY 10022 (646) 346-7914 luc.ferriere@lvmhfashion.com | Trade Payable | | | | $877,323 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 24 | CANADA GOOSE US, INC. | C/O TX911OU P.O.BOX 55950 Boston, MA 02205-5950 (416) 780-9850 Ext. 0000 crenfrey@canadagoose.com | Trade Payable | | | | $870,103 |
| 25 | ETOILLE 660 MADISON LLC | 660 MADISON AVENUE New York, NY 10065 tedh@jsrellc.com | Trade Payable | | | | $866,977 |
| 26 | Tribeca Design Studio LLC | Attn: Legal 48 Walker Street New York, New York 10013 (212) 431-7713 shira@nililotan.com | Trade Payable | | | | $854,691 |
| 27 | Manolo Blahnik USA, LTD | Attn: Legal 31 West 54th Street New York, New York 10019 (212) 582-5647 Tony@manoloblahnikusa.com | Trade Payable | | | | $831,984 |
| 28 | RAG & BONE | 425 W 13TH ST., 3RD FL New York, NY 10014 (212) 278-8214 Ext. 0000 credit@rag-bone.com | Trade Payable | | | | $823,234 |
| 29 | OWENSCORP ITALIA SPA | VIA PONZA, 4 10121 TORINO (TO) ITALY luca.ruggeri@owenscorp.com | Trade Payable | | | | $816,999 |
| 30 | THE BUILDING AT 575 FIFTH OFFICE OWNER LL | PO BOX 780254 Philadelphia, PA 19178-0254 MattP@575fifth.com | Lease | | | | $815,240 |

## **EXHIBIT E**

### **Consolidated List of the Holders of the Debtors' Five Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. the Debtors reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name of Creditor | Creditor name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of claim (as of the Petition Date) | Collateral description and value |
|---|---|---|---|
| Wells Fargo Bank, N.A. as administrative and collateral agent on behalf of the lenders under the ABL Facility | Riemer & Braunstein LLP<br>100 Cambridge Street<br>Boston, Massachusetts 02114<br>Attn: Donald E. Rothman<br><br>-and-<br><br>Riemer & Braunstein LLP<br>Times Square Tower, Seven Times Square, Suite 2506<br>New York, New York 10036<br>Attn: Steve E. Fox | $141 million | Substantially all of the Debtors' assets, whether now owned or hereafter acquired, serve as collateral for certain obligations in the applicable credit agreement, except to the extent that such assets are considered excluded in accordance therewith. The collateral's value is unknown as of the date hereof. |
| Wells Fargo Bank, N.A. as term agent on behalf of the lenders under the Term Loan Facility | Choate, Hall & Stewart LLP<br>Two International Place<br>Boston, Massachusetts 02110<br>Attn: Kevin J. Simard and Mark D. Silva | $48.8 million | Substantially all of the Debtors' assets, whether now owned or hereafter acquired, serve as collateral for certain obligations in the applicable credit agreement, except to the extent that such assets are considered excluded in accordance therewith. The collateral's value is unknown as of the date hereof. |

## <u>EXHIBIT F</u>

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with their affiliated debtors and non-debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
| --- | --- |
| Total Assets (Book Value as of July 6, 2019) | Approximately $457 million |
| Total Liabilities (Book Value as of July 6, 2019) | Approximately $377 million |

## **EXHIBIT G**

**Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date.

None.

## EXHIBIT H

### Summary of the Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors' is likely to be in the possession of various other persons, including but not limited to maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical. The Debtors estimate that (a) the value of goods in transit is approximately approximately $488 million; (b) the aggregate value of deposits held by trade partners is approximately $2.1 million; and (c) the aggregate value of utilities provider deposits, surety bonds, letters of credits, and other prepayment is approximately $26 million.

## EXHIBIT I

**Summary of the Debtors' Property From Which the Debtors Operate Their Business**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operates its business as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 660 Madison Avenue<br>New York, NY 10065 | New York | NY | United States | Leased |
| 707 7th Avenue<br>New York, NY 10011 | New York | NY | United States | Leased |
| 194 Atlantic Avenue<br>New York, NY 11201 | New York | NY | United States | Leased |
| 9570 Wilshire Boulevard<br>Beverly Hills, CA 90212 | Beverly Hills | CA | United States | Leased |
| 2 Stockton Street<br>San Francisco, CA 94108 | San Francisco | CA | United States | Leased |
| 48 Stockton Street<br>San Francisco, CA 94108 | San Francisco | CA | United States | Leased |
| 869 Americana Way<br>Glendale, CA 91210 | Glendale | CA | United States | Leased |
| 395 Santa Monica Place<br>Santa Monica, CA 90401 | Santa Monica | CA | United States | Leased |
| 189 The Grove Drive, Suite S-10<br>Los Angeles, CA 90036 | Los Angeles | CA | United States | Leased |
| 15 East Oak Street<br>Chicago, IL 60611 | Chicago | IL | United States | Leased |
| 100 Huntington Avenue<br>Boston, MA 02116 | Boston | MA | United States | Leased |
| 3327 Las Vegas Boulevard South<br>Las Vegas, NV 89109 | Las Vegas | NV | United States | Leased |
| 800 Pine Street<br>Seattle, WA 98101 | Seattle | WA | United States | Leased |
| 1811 Walnut Street<br>Philadelphia, PA 19103 | Philadelphia | PA | United States | Leased |
| 240 Hudson Valley District, Suite 240<br>Central Valley, NY 10971 | Central Valley | NY | United States | Leased |
| 200 Tanger Mall Drive, Suite 912<br>Riverhead, NY 11901 | Riverhead | NY | United States | Leased |
| 48650 Seminole Drive, Suite 128<br>Cabazon, CA 92230 | Cabazon | CA | United States | Leased |
| 5620 Paseo Del Norte, Suite 100-D<br>Carlsbad, CA 92008 | Carlsbad | CA | United States | Leased |

| | | | | |
|---|---|---|---|---|
| 850 East Ventura Boulevard, Suite 710 Camarillo, CA 93010 | Camarillo | CA | United States | Leased |
| 2626 Livermore Outlets Drive, Suite 880 Livermore, CA 94551 | Livermore | CA | United States | Leased |
| 94-790 Lumiaina Street, Suite 103 Waipahu, HI 96797 | Waipahu | HI | United States | Leased |
| 5220 Fashion Outlets Way Rosemont, IL 60018 | Rosemont | IL | United States | Leased |
| 1840 Sawgrass Mills Circle, Unit #4100 Sunrise, FL 33323 | Sunrise | FL | United States | Leased |
| 575 Fifth Avenue New York, NY 10017 | New York | NY | United States | Leased |
| 5-46 46th Avenue Long Island City, NY 11101 | Long Island City | NY | United States | Leased |
| 36-36 33rd Street Long Island City, NY 11106 | Long Island City | NY | United States | Leased |
| 1201 Valley Brook Avenue Lyndhurst, NJ 07071 | Lyndhurst | NJ | United States | Leased |
| 49 Geary Street San Francisco, CA 94108 | San Francisco | CA | United States | Leased |

## <u>EXHIBIT J</u>

**Location of the Debtors' Substantial Assets, Books and Records,
and Nature and Location of the Debtors' Assets Outside the United States**

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

None.

**EXHIBIT K**

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or its properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status |
|--------|-------------|---------------------|--------|
| Barney's, Inc. | Corey Davis | Employment/wages | In Process |
| Barney's, Inc. | James Brereton | Employment / Wage | In Process |
| Barney's, Inc. | Robin Gesling | Employment / Wage | In Process |
| Barney's, Inc. | Marilyn Pawalek | Employment / Wage | In Process |
| Barney's, Inc. | Melvin Perez | Employment / Wage | In Process |
| Barney's, Inc. | Raymond Stauffer | Employment / Wage | In Process |
| Barney's, Inc. | Pacific Trail Attorneys | Employment / Wage | In Process |
| Barney's, Inc. | Mihaela Predescu | Employment / Wage | In Process |
| Barney's, Inc. | Elena Nacarino | Employment / Wage | In Process |
| Barney's, Inc. | Octavio Ayala | Employment / Wage | In Process |
| Barney's, Inc. | Shaye Grant | Employment / Wage | In Process |
| Barney's, Inc. | Kathleen Ortino | Employment / Wage | In Process |
| Barney's, Inc. | Daniel Moncada | ADA | In Process |
| Barney's, Inc. | Kaitlin O'Connor | Employment / Wage | In Process |
| Barney's, Inc. | 424 Group Wholesale, Inc. | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Masserano srl Strada Cascina Cortella 70/a 13900 Biella and Claudio Masserao | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Ekipe Italia s.r.l. | Vendor non-payment Claim | In Process |

| Barney's, Inc. | Villa Group Srl | Vendor non-payment Claim | In Process |
|---|---|---|---|
| Barney's, Inc. | Sergio Rossi USA, Inc. | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Moynat | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Shi International Corp. | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Ovative Group | Vendor non-payment Claim | In Process |
| Barney's, Inc. | 17th Street Property Owner LLC | Vendor non-payment Claim | In Process |
| Barney's, Inc. | CSS Building Services | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Epsilon Data Management, LLC | Vendor non-payment Claim | In Process |
| Barney's, Inc. | iProspect | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Nielsen | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Onward Luxury Group Inc., Jil Sander USA Inc., and La Maison Moreau S.A.S. | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Golden Goose | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Nest | Vendor non-payment Claim | In Process |
| Barney's, Inc. | One Security Group | Vendor non-payment Claim | In Process |
| Barney's, Inc. | Xposure Photo Agency, Inc. | Cease and desist | In Process |
| Barney's, Inc. | Astrodeck Inc. | Cease and desist | In Process |
| Barney's, Inc. | Tish & Snooky's N.Y.C. d/b/a MANIC PANIC® | Cease and desist | In Process |
| Barney's, Inc. | The High End Management Company, LLC | Cease and desist | In Process |
| Barney's, Inc. | Juul Labs, Inc. | Cease and desist | In Process |
| Barney's, Inc. | Wes Lang | Cease and desist | In Process |
| Barney's, Inc. | Heather E. Dempsey | Defective Merchandise | In Process |
| Barney's, Inc. | Paul Foote | Arbitration | In Process |
| Barney's, Inc. | Taisiya Jacobson | Small Claim | In Process |
| Barney's, Inc. | Amalgamated National Health Fund | Health Fund Contribution | In Process |

## EXHIBIT L

### The Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Danielle Vitale | Daniella Vitale was appointed Barneys' Chief Executive Officer and President in February 2017.  She has over twenty-five years of experience working in the fashion industry, with nearly ten years of experience working for Barneys in various managerial capacities. | February 2017–Present |
| Sandro Risi | Sandro Risi was appointed Barneys' Chief Financial Officer and Executive Vice President in February 2017.  He has nearly twenty years of experience working in the fashion industry, with twenty-five years of relevant financial and accounting experience. | February 2017–Present |
| Grace Fu | Grace Fu was appointed Barneys' Executive Vice President of Human Resources, General General Counsel, and Secretary in February 2016.  She has nearly a decade of legal experience in all matters pertaining to business, including labor and employment, transactions, litigation, regulatory issues, intellectual property, and others. | February 2016–Present |

## <u>EXHIBIT M</u>

**The Debtors' Payroll for the 30-Day Period**
**Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained the Debtors.

| Payments | Payment Amount |
|---|---:|
| Payments to employees (not including officers, directors, and stockholders) | $2.0 million |
| Payments to officers, directors, and stockholders | $532,500 |
| Payments to financial and business consultants | $0 |

## <u>EXHIBIT N</u>

**The Debtors' Estimated Cash Receipts and Disbursements for
the 30-Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|-------:|
| Cash Receipts | $50 million |
| Cash Disbursements | $51 million |
| Net Cash Loss | $1 million |
| Unpaid Obligations (excluding professional fees) | Approximately $94 million |
| Unpaid Receivables (excluding professional fees | $13.9 million |