Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE OF FILING OF REVISED**
**DEBTOR IN POSSESSION SECURED MULTI-DRAW TERM PROMISSORY NOTE**

**PLEASE TAKE NOTICE** that on August 6, 2019, the above-captioned debtors and

debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of Interim*

*and Final Orders (A) Authorizing Debtors and Debtors in Possession to Obtain Junior Lien*

*Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 575 Fifth Avenue, New York, New York 10017.

*Superpriority Claims, (D) Granting Adequate Protection to Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 20] (the "Motion"), which annexed the Debtor In Possession Secured Multi-Draw Term Promissory Note (the "DIP Credit Agreement"), substantially in the form attached thereto as Exhibit C.

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file a revised proposed Debtor In Possession Secured Multi-Draw Term Promissory Note, substantially in the form attached hereto as **Exhibit A** (the "Revised DIP Credit Agreement").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Revised DIP Credit Agreement and the DIP Credit Agreement is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that a hearing  to consider entry of a final order with respect to the relief requested in the Motion will be held before the Honorable Cecilia G. Morris, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of New York, located at 355 Main Street, Poughkeepsie, NY 12601, on **September 4, 2019, at 10:30 a.m. (prevailing Eastern Time)**.

Dated:  August 7, 2019  
New York, New York

*/s/ Joshua A. Sussberg, P.C.*

Edward O. Sassower, P.C.  
Joshua A. Sussberg, P.C.  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900

-and-

Chad J. Husnick, P.C.  
W. Benjamin Winger (*pro hac vice* pending)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:    (312) 862-2200

-and-

Steven J. Reisman  
**KATTEN MUCHIN ROSENMAN LLP**  
575 Madison Avenue  
New York, New York 10022  
Telephone:    (212) 940-8800  
Facsimile:    (212) 940-8776

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**DIP Credit Agreement**

PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT
[EXECUTION VERSION]

## DEBTOR IN POSSESSION SECURED
## MULTI-DRAW TERM PROMISSORY NOTE

$75,000,000                                                         New York, New York
                                                                    [__], 2019

On [__], 2019 (the "Petition Date"), BARNEY's INC., (the "Borrower") and certain of its affiliates commenced Chapter 11 Case Nos. [19-_____], [19-_____], [19-_____], [19-_____] and [19-_____] respectively, which cases are being jointly administered under Chapter 11 Case No. [19-_____] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested that GACP Finance Co., LLC ,as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make term loans (the "Term Loans") from time to time evidenced by this Note. Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent. The Borrower intends to utilize such Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

1.      Term Loans.

(a)     Subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with (i) Tranche A Term Loans in the principal amount of $50,000,000 and (ii) Tranche B Term Loans in the principal amount of $25,000,000 in each case on the Closing Date (the loans made pursuant to clauses (i) and (ii), "Initial Loan"). Each DIP Lender shall provide the respective Term Loans in an amount equal to its respective Commitment and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several. The respective Commitment of each DIP Lender shall be permanently reduced upon the making of such Term Loan in an amount equal to such Term Loan. Additionally, at the Borrower's request, the DIP Lenders and/or at their election, certain of their respective affiliates (collectively in such capacity, the "Consignor") will provide the Loan Parties with a consignment facility to support post-petition inventory purchases, subject to the terms and conditions set forth on Exhibit B attached hereto (the "Consignment Facility"). The Borrower and the Consigner may mutually agree upon new inventory purchases (collectively, the "Consigned Inventory") pursuant to which the Consignor will purchase new inventory from the applicable vendor at prices negotiated between the Loan Parties and such vendor. For the avoidance of doubt, (i) the

Consigned Inventory are not assets of the Loan Parties and shall not constitute "Collateral" nor be subject to the liens of the Agent or DIP Lenders hereunder, the Prepetition ABL Agent, or Prepetition Term Loan Parties; (ii) upon the sale of any Consigned Inventory, the Loan Parties' share of the proceeds on the Consigned Inventory (less the amounts payable to the Consignor in Section 7(b)(1)) shall constitute "Collateral" hereunder and the other DIP Documents, and (iii) any fees paid to the Loan Parties described on Exhibit C shall constitute "Collateral" hereunder and under the other DIP Documents.

(b)     The aggregate principal amount of Terms Loans outstanding shall not exceed $75,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)     The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders); provided, that (a) the Tranche A Term Loans shall be used to repay a portion of the Prepetition Secured Debt under the Prepetition ABL Facility on the Closing Date, and the Tranche B Term Loans may be used to pay adequate protection payments in the form of interest, fees, and expenses (excluding any other form of adequate protection payments)  and (b) no portion of any Term Loan shall be used, directly or indirectly, to finance or make any Restricted Payment (except as described in clause (a) of this proviso), or to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower.

(e)     Except to the extent expressly provided otherwise in the Financing Orders, the Obligations shall be deemed to (i) constitute a DIP Superpriority Claim and (ii) be secured pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

2.     Certain Conditions to Each Term Loan.  No DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

(a)     The Borrower shall not have paid any amount then payable hereunder or under any other DIP Document;

(b)     The Loan Parties shall not have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(c)     The Loan Parties shall not have delivered guarantees of each of the Guarantors, each in form and substance satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

-2-

(d)      any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)      with respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified or amended, in each case, without Agent's consent;

(f)      [reserved];

(g)      except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, the Store Closure Motion, the Sale Motion, this Note or the Financing Orders), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(h)      any Default or Event of Default shall have occurred and be continuing or would result after giving effect to any Term Loan;

(i)      after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(j)      the Agent shall not have received and approved the Budget in accordance with this Note and the Financing Orders;

(k)      Mo Meghi shall not have been retained as Chief Restructuring Officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent;

(l)      [reserved];

(m)      the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner that is adverse to the Agent and the DIP Lenders in any material respect, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(n)      the Bankruptcy Court shall have entered orders, which orders could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner adverse to the Agent and the DIP Lenders in any material respect, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a

representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.　　Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided in this Note.

4.　　Payment of Interest.

(a)　　Tranche A Term Loans.

(1)　　Subject to the terms of this Note, the Tranche A Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche A Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche A Term Loans (or such portion thereof) plus 12.0%.

(b)　　Tranche B Term Loans.

(1)　　Subject to the terms of this Note, the Tranche B Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche B Term Loans (or such portion thereof) plus 12.0%.

(c)　　Interest on the Term Loans shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(d)　　All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(e)　　So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(f)　　It is the intention of the parties hereto that the Agent and each DIP

-4-

Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower). If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(f) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(f).

(g)     The LIBOR Rate may be adjusted by the DIP Lenders on a prospective basis to take into account any additional or increased costs to the DIP Lenders of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law (other than change with respect to tax law, which are addressed in Section 10 hereof) occurring subsequent to the commencement of the then applicable Interest Period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the DIP Lenders shall give the Borrower notice of such a determination and adjustment and, upon its receipt of the notice from such DIP Lender, the Borrower may, by notice to such DIP Lender (1) request the DIP Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made.

(h)     Anything to the contrary contained herein notwithstanding, the DIP Lenders are not required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate. The provisions of Sections 4(g) through (i) shall apply as if the DIP Lenders had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

(i)        If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

(j)        The Borrower may elect the Interest Period in effect for the Term Loans (or any portion thereof); provided, that (1) In no event will the Borrower have more than 2 Interest Periods outstanding at any time and (2) if the Agent reasonably determines that the LIBOR Rate is unavailable, then the Term Loans shall bear interest, at a rate per annum equal to the Base Rate plus, in the case of the Tranche A Term Loans, 11.00% and in the case of the Tranche B Term Loans, 11.00% on the principal amount thereof from the date that the LIBOR Rate became unavailable until such time the Agent or such DIP Lender determines that the LIBOR Rate is available.

5.        Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the following account:

| | |
|---|---|
| Bank: | City National Bank |
| | 555 South Flower Street |
| | Los Angeles, CA  90071 |
| ABA/Routing: | 122016066 |
| Swift Number: | CINAUS6L   (International Wires Only) |
| Account Name: | GACP II, LP |
| Account Number: | 210427139 |
| Reference: | Barney's |

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower.  Any payments of Term Loans shall be applied as follows: first, to the payment of all fees, and all expenses, to the full extent thereof; second, to the payment of any accrued interest at the Default Rate, if any; third, to the payment of any accrued interest (other than Default Rate interest); fourth, to prepay the Tranche B Term Loans to the full extent thereof; fifth, to prepay the

Tranche A Term Loans to the full extent thereof, sixth, to the payment in full of all other Obligations; and seventh, upon satisfaction in full of all Obligations, to the Borrower or as otherwise required by law.  During the continuance of an Event of Default, the Agent shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

6.      Optional Prepayments.  Subject to the terms and conditions of the Financing Orders, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to the Agent; provided that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

7.      Mandatory Prepayments.  In each case, subject to the terms and conditions of the Financing Orders:

(a)      If at any time the aggregate outstanding principal amount of the Term Loans exceed the Maximum Amount, the Borrower shall immediately repay the aggregate outstanding Term Loans to the extent required to eliminate such excess.

(b)      Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, such Loan Party shall contribute such proceeds to the Borrower and the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes actually paid or payable by a Loan Party in connection with such disposition, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note.  Notwithstanding anything in this Note to the contrary, (i) the following shall not be subject to mandatory prepayment under this clause (b): proceeds of sales of Inventory or other sales in the ordinary course of business or in accordance with the Budget, the Store Closure Motion, or the Financing Orders, and (ii) if the Borrower or any Loan Party and the Consignor enter into a Consignment Facility, the proceeds of sales of Consigned Inventory shall be paid to Consignor as follows:

(1)      Upon the sale of an item of Consigned Inventory by or on behalf of the Borrower or any Loan Party, the Borrower or such Loan Party shall pay the Consignor the applicable invoice price plus the applicable Consignment Fee.

(c)      If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection

therewith.

(d)     Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)     No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.     Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)     First Facility Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay in cash to the Agent (or net such fee from the proceeds of the Initial Loan) an initial facility fee (the " Facility Fee") equal to 5% of the principal amount of the Initial Loan, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(b)     [Reserved].

(c)     Exit Fee.  On the Maturity Date, the Borrower shall pay in cash to the Agent an exit fee (the "Exit Fee") equal to five percent (5%) of the aggregate Commitments hereunder on the date hereof, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid; provided, that, the Prepetition Secured Debt shall be paid in full prior to the payment of any portion of the Exit Fee.

9.     Indemnity.

(a)     The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the parties to any of the DIP Documents on the one hand and any Loan Party on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP**

**DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    <u>Adjustments for Withholding, Capital Adequacy Etc.</u>  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "<u>Taxes</u>") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "<u>Other Taxes</u>") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes

imposed on the Agent or any DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Form W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.     Priority of Obligations and DIP Lenders' Liens.

(a)     To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any Loan Party, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case (a "DIP Superpriority Claim"), and (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) (including adequate protections liens) and any other Liens as set forth in the Financing Orders. The security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties'

-10-

estates under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders, subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)    The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)    Notwithstanding anything herein to the contrary, (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the prior payment of the Carve Out, and the superpriority claims granted to the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) under the Financing Orders and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(d)    Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)    The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve Out, in accordance with the Financing Orders.

12.    Further Assurances.  The Borrower agrees that it shall, at the Borrower's reasonable expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents granting to the Agent, on behalf of the DIP Lenders, Liens (subject in all respect to the Financing Orders and the priorities set forth in Section 11 hereof) in the Collateral to secure the Obligations; provided that the "Collateral" shall not include (such assets "Excluded Assets") (a) leases not subject to a mortgage in favor of the Prepetition Agent as of the Petition Date (the "Unencumbered Leases"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case limited as provided in the Prepetition Financing Documents), and (c) claims under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions.

13.    Reports and Notices.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The

Borrower agrees that no Subsidiary of the Borrower will change its fiscal year in a manner prohibited by the Prepetition Credit Agreement. In addition, the Borrower agrees to, and to cause each of its Subsidiaries to, maintain a system of accounting that enables the Borrower and such Subsidiaries to produce financial statements in accordance with GAAP in all material respects.

14.     Affirmative Covenants.

The Borrower agrees that:

(a)     Upon the reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants. The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     (A) Except as otherwise excused by the Bankruptcy Code, the Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or to the extent such failure could not reasonably be expected to have a Material Adverse Effect.

(c)     In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge promptly when due (x) the Borrower and its Subsidiaries will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary, (2) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (3) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)     (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair

-12-

and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances, and (iv) the Borrower and each of its Subsidiaries will ensure that the mix of Inventory not sold pursuant to the Store Closure Motion (together if applicable, with any Consigned Inventory), as to type, category, style, brand and description, shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix on the Petition Date.

(e)     The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may be required by the Prepetition ABL Facility (whether or not such facility remains in effect). Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as may be required by the Prepetition ABL Facility (whether or not such facility remains in effect), with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)     The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders.

(g)     The Borrower and its Subsidiaries shall at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)     The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(1)     no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)     no later than August 7, 2019, the Loan Parties shall file one or more motions seeking entry of orders authorizing and approving (x) store closure and inventory transfer procedures for certain of the Loan Parties' store locations with such store closings to be conducted by affiliates of the Agent and/or the DIP Lenders who shall have been hired by the Loan Parties pursuant to Section 363 of the Bankruptcy Code to perform such services on a "fee-for-service" basis in accordance with the terms and conditions set forth on Exhibit C (the "Store Closure Motion"), and (y) bid and sale procedures for all or

-13-

substantially all of the Loan Parties' assets (the "Sale Motion"), in each case in form and substance reasonably acceptable to the Agent;

(3)     as soon as reasonably practicable but in no event later than August 16, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Store Closure Motion, which order shall provide, among other things, that the Borrower may designate, or the DIP Lenders may elect in the event the Milestones in subsections (6), (7), or (8) below are not achieved, additional store locations to be closed pursuant thereto on the same terms and conditions set forth therein and that any store closings conducted thereby shall be binding on any chapter 7 or 11 trustee;

(4)     no later than 21 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Agent, establishing bidding procedures in connection with the Sale Motion, which order, shall provide, among other things, that bids for any, or all, of the Loan Parties' assets shall be considered in connection therewith (such order, the "Bid Procedures Order");

(5)     no later than 30 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(6)     by September 25, 2019, the Loan Parties shall receive a binding Qualified Bid (as defined by the Bid Procedures Order) that provides sufficient cash consideration to indefeasibly pay in full all of the Obligations under this Note and all of the Obligations under the Prepetition ABL Facility and Prepetition Term Loans (such bid, "Acceptable Bid");

(7)     no later than October 1, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, (i) granting the relief requested in the Sale Motion and (ii) approving the binding Acceptable Bid; and

(8)     no later than by October 4, 2019, a closing of the Acceptable Bid shall have occurred.

(i)     the Loan Parties shall (i) use commercially reasonable efforts to provide the Agent and the DIP Lenders with reasonable access to, and reasonably cooperate with, Berkeley Research Group, as financial advisor to the Prepetition ABL Agent (it being understood that the Prepetition ABL Agent and Berkeley Research Group may share all applicable information with the Agent) or any other financial advisor engaged by the Agent of the DIP Lenders and (ii) compensate Berkeley Research Group, as financial advisor to the Prepetition ABL Agent, in strict accordance with the Budget.

(j)     the gross margin earned on the sale of Inventory shall not be more than 2% less than the gross margin forecasted in the file named "190804 - BNY DIP Budget (Hilco Pivot at 60 Days ~$2mm Merch per Week).xlsm" on the "Direct Cash Flow Tab" in row "198" (other than in connection with store closure sales and consignments) tested weekly and calculated in

-14-

accordance with the Borrower's books and records, in the aggregate, for sales occurring in the Cumulative Three-Week Period prior to such test.

15.     Negative Covenants.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent and other than in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or as permitted under the Prepetition ABL Facility (assuming that all dollar baskets were $0 and that any conditions relating to availability, liquidity or Payment Conditions (as defined therein) were not satisfied):

(a)     Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld).

(b)     Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness for borrowed money in an amount in excess of $500,000 in the aggregate, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)     [Reserved].

(d)     Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien securing obligations in an amount in excess of $500,000 in the aggregate on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)     Neither the Borrower nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders and the Prepetition ABL Facility.

(f)     Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)     Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired, or engage any third party provider to assist in disposition of the foregoing, whether pursuant to Sections 327, 328, or 363 of the Bankruptcy Code, other than (a) the sale of Inventory (or in the event applicable, Consigned Inventory) in the ordinary course of business and or in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (b) the sale or disposition of obsolete equipment and (c) the sale of other property on terms

-15-

acceptable to the Agent.

(h)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (a) the Financing Orders or (b) the Prepetition Secured Debt, except as otherwise provided in the Financing Orders.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(l)(A) of the Bankruptcy Code, (iii) utility deposits made in accordance with Section 366 of the Bankruptcy Code, (iv) payments permitted by the Financing Orders and the Budget and (v) payments permitted under Section 15(e), neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)     Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

(j)     The Loan Parties borrowings under the Prepetition ABL Facility shall comply with Minimum Excess Availability Amount (as defined in the Interim Order), after giving effect to the DIP Tranche A Term Loan Reserve, as further provided in the Financing Orders.

(k)     Neither the Loan Parties nor any of their Subsidiaries shall permit any unspent amounts on Inventory line items in the Budget to instead be spent on any any non-inventory line item in the Budget.

16.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.     Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e), 14(f), of this Note and such failure shall remain uncured for a period of one (1) Business Day after notice from the Agent, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days after notice from the Agent, or (iii) Sections 14(g), 14(h), 14(j), or 15 of this Note or any material provision of the Guaranty.

C.     Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by

-16-

any other clause of this Section (i)) and the same, if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D.        Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $500,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $500,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.        Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.        Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions materially adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.        Any Loan Party permits a plan or plans of reorganization to be filed, or permits the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization, that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note and the obligations under the Prepetition ABL Facility on or before the effective date of such plan or plans.

H.        The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.        The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a

-17-

confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and the obligations under the Prepetition ABL Facility and termination of the DIP Lenders' commitment to make Term Loans.

J.      [Reserved].

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claims or Liens permitted by Section 11 hereof and the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations and the obligations under the Prepetition ABL Facility and Term Loans are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

O.      The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $500,000.

P.      The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.      There shall commence any suit or action against the Agent or any DIP Lender or any lenders or agents under the Prepetition ABL Facility by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.      Failure of the Loan Parties to comply in all material respects with any Milestone set forth in Section 14(h).

S.      Any material provision of any material DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party

-18-

shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any material Lien created under any DIP Document shall cease to be a valid and perfected Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

T.     In the event the accrued amount of professional fees for case professionals for the applicable Cumulative Two -Week Period exceed by greater than 10.0% the "Total Professional Fee Disbursements" line item as set forth in the Budget for the applicable Cumulative Two Week Period.

U.     Assets of any Loan Party with a fair market value of $500,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

V.     A breach by any Loan Party of the terms of any of the Financing Order.

W.     A Material Adverse Deviation shall have occurred.

X.     Entry of an order authorizing and/or directing the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Loan Party.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.  The Loan Parties shall immediately commence all liquidation processes as contemplated by the Store Closure Motion upon the acceleration of the Term Loans.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control

-19-

of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

For the avoidance of doubt, the Agent or any DIP Lender may be a qualified bidder and the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of DIP Lenders (or any DIP Lender or the DIP Lenders in its or their respective individual capacities unless the DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such private or public sale (other than any sale in the ordinary course of business), to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent (or any DIP Lenders) at such sale.

17.    Reference Agreements.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $75,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    Definitions.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Base Rate" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Budget" means a (8)-week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 8 weeks after the Petition Date, which shall be in substantially the form as the Initial Budget or otherwise in form and substance acceptable to the Agent and shall be approved by the Agent, in its sole discretion.

-20-

The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means the Business Day when each of the conditions applicable to the Initial Loans and listed in Section 2 of this Note shall have been satisfied or waived in a manner reasonably satisfactory to the Agent.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations; provided that Excluded Assets shall in no event constitute "Collateral." Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Consigned Inventory Proceeds" means gross proceeds from the sale of Consigned Inventory, less applicable sales taxes.

"Consignment Facility" shall have the meaning given to such term in Section 1(a) of this Note.

"Consignment Fee" means the fees payable to the Consignor in exchange for providing the Consignment Facility calculated at a rate of 7% per annum of outstanding amounts under the Consignment Facility, payable only with Consigned Inventory Proceeds.

-21-

"Consignor" shall have the meaning given to such term in Section 1(a) of this Note.

"Cumulative Three-Week Period" means the three-week period up to and through the Saturday of the most recent week then ended, or if a three-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(e) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with the Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"DIP Tranche A Term Loan Reserve" shall mean a reserve against the Borrowing Base (as defined in the Prepetition Credit Agreement) in the amount of the Tranche A Term Loan.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning given such term in Section (i) of this Note.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such

-22-

Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extraordinary Receipts" means any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof or of any cash proceeds provided for in the Budget), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Facility Fee" shall have the meaning given such term in Section 8 of this Note.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent in its sole discretion, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this

Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest Payment Date" shall mean the first Business Day of each month to occur while such Term Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan and ending 1 month thereafter; provided, however, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Inventory" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate" means "LIBO Rate" as such term is defined in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

-24-

"Liquidity Forecast" means a rolling 8-week forecast of projected liquidity for the consecutive 8-week period immediately following the date of delivery of such forecast as certified in a certificate delivered by the Borrower.

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the following line items of the Budget:  "Operating Disbursements" and "Net Cash Flow", in each case, for such Cumulative Three-Week Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Borrower or the Loan Parties as a whole to perform any of their material obligations under any material DIP Document to which it is a party, (iii) the legality, validity or enforceability of this Note or any other material DIP Document, (iv) the rights and remedies of the Agent and DIP Lenders taken as a whole under the DIP Documents, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any material portion of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section (i).

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 20 of this Note.

-25-

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date, to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code; (i) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Order (including the Carve-Out) and (j) Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) Prepetition Secured Debt; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) any Indebtedness existing on the Petition Date; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall have the meaning given such term in the Financing Orders.

"Permitted Variance" means (a) a variance of up to the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis) between the actual disbursements for the applicable Cumulative Three-Week Period and the "Operating Disbursements" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than professional fees and disbursements in connection with store closure sales and consignments), (b) a negative variance of up to the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis) between the actual net cash flow for the applicable Cumulative Three-Week Period and the "Net Cash Flow" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than receipts in connection with store closure sales and consignments), and (c) a negative variance of up to  the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis) between the actual receipts for the applicable Cumulative Three-Week Period and the "Total Cash Receipts" line item as set forth in the Budget for the applicable Cumulative Three-Week Period  (other than disbursements in connection with store closure sales

and consignments).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" means that certain senior secured asset based revolving credit facility and term loan facility pursuant to the Prepetition Financing Documents.

"Prepetition Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Financing Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Debt" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Parties" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 20 of this Note.

"Registered Loan" shall have the meaning given such term in Section 20 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Restricted Payment" shall mean, with respect to any Person: (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Person's Stock or any other payment or distribution made in respect thereof, either directly or

indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any subordinated debt of such Person; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Person now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Person's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Person other than payment of compensation in the ordinary course to Stockholders who are employees of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Person to any Stockholder of such Person or its affiliates.

"Stock" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Tranche A Term Loans" " shall mean the $50,000,000 of the DIP Loan to applied to the Prepetition Secured Debt under the Prepetition ABL Facility in accordance with Section 2.13(g) of the Prepetition Credit Agreement (the amount of which shall be at all times maintained as the DIP Tranche A Term Loan Reserve), and will be secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B Term Loans" shall mean the $25,000,000 of the DIP Loan that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Weekly Permitted Variance Percentage" means

|  | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 and thereafter |
|---|---|---|---|---|---|
| Weekly Perm. Var. - % | 12.5% | 12.5% | 10.0% | 10.0% | 7.5% |

-28-

19.     Representations and Warranties.  The Borrower and each of its Subsidiaries represent as follows:

(a)     the Borrower and each of its Subsidiaries are duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)     upon entry of the Financing Orders and subject to the terms thereof, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties, except in respect of Prepetition Secured Debt;

(c)     the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)     upon entry of the Financing Orders and subject to the terms thereof, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)     the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)     no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)     the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to the Permitted Prior Liens or other Liens permitted to have such priority under Section 11 of this Note and the Financing Orders;

(h)     except for proceedings in the Chapter 11 Cases in connection with the entry of the Financing Orders, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

-29-

(i)      the Borrower and its Subsidiaries are and will be at all times the owners of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)      [reserved]; and

(k)      except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or, to the knowledge of the Borrower, threatened against or in any way affecting (i) any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other DIP Document.

20.      Agent.

(a)      Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.

(b)      Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)      Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d)      Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good

-30-

faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)     Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)     Collateral Matters.

(1)     The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)     Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.     Miscellaneous.

(a)     All notices, demands, requests or other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

If to Borrower:     BARNEY'S INC.
                    C/O Barney's New York, Inc.

-31-

<div style="margin-left: 40%">

575 Fifth Avenue
New York NY 10017
Attn: Chief Executive Officer and Chief Financial Officer
Email: gfu@barneys.com
        sfisi@barrneys.com

</div>

with copies to:          KIRKLAND & ELLIS
                         601 Lexington Avenue
                         New York, New York 10022
                         Attn:  Josh Sussberg; and Chad Husnick
                          Email: jsussberg@kirkland.com
                         chusnick@kirkland.com

If to Agent or any       GACP FINANCE CO., LLC
Lender:                  21255 Burbank Blvd, Suite 400
                         Woodland Hills, California 91367

with copies to:          JONES DAY LLP
                         250 Vesey Street
                          New York, New York 10281
                         Attn: Sidney P. Levinson, Michael Schneidereit, and
                         Jeremy Evans
                         Email: slevinson@jonesday.com,
                         mschneidereit@jonesday.com, jdevans@jonesday.com

All such notices, demands, requests or other communications shall, when mailed or sent by overnight courier, be effective two Business Days after being deposited in the mails, with adequate postage prepaid, and sent by registered or certified mail with return receipt requested by such sending party, or the next Business Day after being sent by an overnight courier to a party at its address set forth above, as the case may be, or when sent by email be effective the day when sent.

(b)      The Borrower shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of one firm of outside counsel for Agent and DIP Lenders, taken as a whole, all of their respective special local counsel limited to one firm in any material jurisdiction to the extent necessary to obtain the Liens contemplated by the DIP Documents, reasonable financial advisory fees for one financial advisor each for (i) the Agents (under and as defined in the Prepetition ABL Facility) and the Prepetition Secured Parties, subject to the Budget and (ii) the Agent hereunder and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).  The Borrower shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of one firm of outside counsel for advice, assistance, or other representation, including, in connection with:

<p style="text-align: center">-32-</p>

(1) any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2) the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3) any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the DIP Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4) any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5) any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6) any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales in connection with store closures or other sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services. All expenses incurred by the Agent shall

-33-

receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to Section 11 hereof and the Financing Orders).

(c)      No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)      Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)      If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)      **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(h)      **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS**

-34-

**TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)     The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(j)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lenders may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)     Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)    A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)    In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)    No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent.

(p)    Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)    This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)    THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(s)    This Note may be executed in any number of counterparts, each of which

shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. Delivery of an executed counterpart to this Note by facsimile transmission or electric transmission in "pdf" or other imaging format shall be as effective as delivery of a manually signed original.

     (t)    In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

<p align="center">*   *   *   *   *</p>

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BARNEY'S, INC., as Debtor and Debtor in Possession

By: _____

    Name:

    Title

Acknowledged and Agreed

GACP FINANCE CO., LLC, as Agent

By: _____

    Name:

    Title:

Brigade Capital Management, LP on behalf of its managed funds and accounts, as DIP Lender

By: _____

Name:

Title:

Commitment Amount: $37,500,000

BRF Finance Co., LLC, as DIP Lender

By: _____

Name:

Title:

Commitment Amount: $37,500,000

DOC ID - 32321110.5

EXHIBIT A

(attach Budget)

DOC ID - 32321110.5

## EXHIBIT B

Consignment Facility



|  |  | In addition to customary terms and conditions for a consignment relationship, the Consignment Facility shall include the following terms and conditions:<br><br>1. The Consignor will have access to information and reporting.<br>2. The Consignor may have onsite representatives at the Borrower to assist the Borrower and Loan Parties with the consignment program.<br>3. The Consignor shall have the right to use the stores and the e-commerce platform to liquidate the Consigned Inventory from the stores and through the e-commerce platform if the going concern sale process is not successful or an event of default occurs and is not cured in which case the Consignor shall be responsible for payment of a proportionate share of the four-wall operating expenses of the stores and costs associated with operating the e-commerce platform and, in light of such obligation, the Consignor shall be entitled to receive and retain for its sole and exclusive benefit all proceeds (other than sales taxes) from the sale of all Consigned Inventory.<br>4. The Consignor shall be entitled to a work fee in the amount of $100,000 per month.<br><br>If the going concern process is successful, (i) the Consignor shall have the right (exercised in the Consignor's sole discretion) to require the purchaser to purchase all or a portion of the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale; and (ii) a going concern purchaser shall have the right (exercised in the purchaser's sole discretion) to purchase the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale. |
|  |  |  |

<u>Exhibit C</u>

<u>Store Closing Fees</u>

For any stores for which affiliates of Agent and/or DIP Lender are engaged to conduct a "store closing" or similar themed sale, such affiliates in their capacity as "consultant" thereunder shall earn a fee equal to 1.25% of the aggregate gross proceeds from the sale of goods and 15.0% of the aggregate gross proceeds from the sale of FF&E.  The Loan Parties shall reimburse such consultant for its out of pocket costs and expenses, including costs of supervision.  Consultant shall have the right to supplement the inventory in such store closing sales with additional goods procured by consultant at its sole cost and expense and the consultant shall pay the Loan Parties 5.0% of the gross proceeds thereof (excluding sales taxes) and shall retain the remaining proceeds from the sale thereof.

Schedule 13

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the Monthly Reports, Annual Reports and Compliance Certificates required by Sections 6.1(a) (c) and (d) of the Prepetition Credit Agreement and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| | |
|---|---|
| on Wednesday of each week beginning with the second full calendar week after the Petition Date | (a)      a weekly DIP variance report/reconciliation for the prior Cumulative Three-Week Period and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) liquidity and excess availability (as determined under the Prepetition ABL Facility), (E) Term Loan balances and outstanding loans under the Prepetition ABL Facility and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer of Barney's, <br><br> (b)      to the extent received by a Loan Party, a weekly report of sales in connection with store closures results (including detail on gross recoveries and expenses) from the affiliates of the Agent and/or DIP Lenders retained by the Loan Parties, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (c)      a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its reasonable discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered Liquidity Forecast and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (d)      copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; provided that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, | (e)      copies of all "Borrowing Base Certificates" (as such term is defined in the Prepetition Credit Agreement) delivered pursuant to the Prepetition ABL Facility), |

| | |
|---|---|
| promptly, but in any event within 5 Business Days after Borrower has knowledge of any event or condition that constitutes a Default (provided that the delivery of a notice of any such event of default at any time will cure any Event of Default arising from the failure to timely deliver such notice of such event of default), | (f)      notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |

**<u>Exhibit B</u>**

**Redline**

K&E Comments # 2 8-6-2019 ¶PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT¶
[EXECUTION VERSION]

## DEBTOR IN POSSESSION SECURED
## MULTI-DRAW TERM PROMISSORY NOTE

$75,000,000
New York, New York

[__], 2019

On [__], 2019 (the "Petition Date"), BARNEY's INC., (the "Borrower") and certain of its affiliates commenced Chapter 11 Case Nos. [19-_____], [19-_____], [19-_____], [19-_____] and [19-_____] respectively, which cases are being jointly administered under Chapter 11 Case No. [19-_____] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that Retail Funding (BNY)GACP Finance Co., LLC ,as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make term loans (the "Term Loans") from time to time evidenced by this Note.  Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent.  The Borrower intends to utilize such Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget.  Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

1.      Term Loans.

(a)      Subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with (i) Tranche A Term Loans in the principal amount of $50,000,000 and (ii) Tranche B Term Loans in the principal amount of $25,000,000 in each case on the Closing Date (the loans made pursuant to clauses (i) and (ii), "Initial Loan").   Each DIP Lender shall provide the respective Term Loans in an amount equal to its respective Commitment and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  The respective Commitment of each DIP Lender shall be permanently reduced upon the making of such Term Loan in an amount equal to such Term Loan.  Additionally, at the Borrower's request, the DIP Lenders and/or at their election, certain of their respective affiliates (collectively in such capacity, the "Consignor") will provide the Loan Parties with a consignment facility to support post-petition inventory purchases, subject to the terms and conditions set forth on Exhibit B attached hereto (the "Consignment Facility").  The Borrower and the Consigner

may mutually agree upon new inventory purchases (collectively, the "Consigned Inventory") pursuant to which the Consignor will purchase new inventory from the applicable vendor at prices negotiated between the Loan Parties and such vendor.  For the avoidance of doubt, (i) the Consigned Inventory are not assets of the Loan Parties and shall not constitute "Collateral" nor be subject to the liens of the Agent or DIP Lenders hereunder, the Prepetition ABL Agent, or Prepetition Term Loan Parties; (ii) upon the sale of any Consigned Inventory, the Loan Parties' share of the proceeds on the Consigned Inventory (less the amounts payable to the Consignor in Section 7(b)(1)) shall constitute "Collateral" hereunder and the other DIP Documents, and (iii) any fees paid to the Loan Parties described on Exhibit C shall constitute "Collateral" hereunder and under the other DIP Documents.

(b)      The aggregate principal amount of Terms Loans outstanding shall not exceed $75,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)      The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)      The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders); provided, that (a) the Tranche A Term Loans shall be used to repay a portion of the Prepetition Secured Debt under the Prepetition ABL Facility on the Closing Date, and the Tranche B Term Loans may be used to pay adequate protection payments in the form of interest, fees, and expenses (excluding any other form of adequate protection payments)  and (b) no portion of any Term Loan shall be used, directly or indirectly, to finance or make any Restricted Payment (except as described in clause (a) of this proviso), or to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower.

(e)      Except to the extent expressly provided otherwise in the Financing Orders, the Obligations shall be deemed to (i) constitute a DIP Superpriority Claim and (ii) be secured pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

2.      Certain Conditions to Each Term Loan.  No DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

(a)      The Borrower shall not have paid any amount then payable hereunder or under any other DIP Document;

(b)      The Loan Parties shall not have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and

thereby;

(c)     The Loan Parties shall not have delivered guarantees of each of the Guarantors, each in form and substance satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(d)     any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)     with respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified or amended, in each case, without Agent's consent;

(f)     [reserved];

(g)     except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, the Store Closure Motion, the Sale Motion, this Note or the Financing Orders), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(h)     any Default or Event of Default shall have occurred and be continuing or would result after giving effect to any Term Loan;

(i)     after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(j)     the Agent shall not have received and approved the Budget in accordance with this Note and the Financing Orders;

(k)     Mo Meghi shall not have been retained as Chief Restructuring Officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent;

(l)     [reserved];

(m)     the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner that is adverse to the Agent and the DIP Lenders in any material respect, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(n)     the Bankruptcy Court shall have entered orders, which orders could affect

the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner adverse to the Agent and the DIP Lenders in any material respect, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.      Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided in this Note.

4.      Payment of Interest.

(a)      Tranche A Term Loans.

(1)      Subject to the terms of this Note, the Tranche A Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche A Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche A Term Loans (or such portion thereof) plus 12.0%.

(b)      Tranche B Term Loans.

(1)      Subject to the terms of this Note, the Tranche B Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche B Term Loans (or such portion thereof) plus 12.0%.

(c)      Interest on the Term Loans shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(d)      All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(e)      So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise

- 4-

applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(f)     It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(g)     The LIBOR Rate may be adjusted by the DIP Lenders on a prospective basis to take into account any additional or increased costs to the DIP Lenders of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law (other than change with respect to tax law, which are addressed in Section 10 hereof) occurring subsequent to the commencement of the then applicable Interest Period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate.  In any such event, the DIP Lenders shall give the Borrower notice of such a determination and adjustment and, upon its receipt of the notice from such DIP Lender, the Borrower may, by notice to such DIP Lender (1) request the DIP Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made.

(h)    Anything to the contrary contained herein notwithstanding, the DIP Lenders are not required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of Sections 4(g) through (i) shall apply as if the DIP Lenders had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

(i)    If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

(j)    The Borrower may elect the Interest Period in effect for the Term Loans (or any portion thereof); provided, that (1) In no event will the Borrower have more than 2 Interest Periods outstanding at any time and (2) if the Agent  reasonably determines that the LIBOR Rate is unavailable, then the Term Loans shall bear interest, at a rate per annum equal to the Base Rate plus, in the case of the Tranche A Term Loans, 11.00% and in the case of the Tranche B Term Loans, 11.00% on the principal amount thereof from the date that the LIBOR Rate became unavailable until such time the Agent or such DIP Lender determines that the LIBOR Rate is available.

5.    Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the following account:

> Bank ~~Name~~:   **City National Bank**¶
> **555 South Flower Street**¶
> **Los Angeles, CA  90071**
> ABA**/Routing:        122016066**¶
> **Swift** Number:  **CINAUS6L   (International Wires Only)**
> Account Name:  **GACP II, LP**
> Account Number:   **210427139**

- 6-

Reference:  **Barney's**

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower.  Any payments of Term Loans shall be applied as follows: first, to the payment of all fees, and all expenses, to the full extent thereof; second, to the payment of any accrued interest at the Default Rate, if any; third, to the payment of any accrued interest (other than Default Rate interest); fourth, to prepay the Tranche B Term Loans to the full extent thereof; fifth, to prepay the Tranche A Term Loans to the full extent thereof, sixth, to the payment in full of all other Obligations; and seventh, upon satisfaction in full of all Obligations, to the Borrower or as otherwise required by law.  During the continuance of an Event of Default, the Agent shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

6.       Optional Prepayments.   Subject to the terms and conditions of the Financing Orders, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to the Agent; provided that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

7.       Mandatory Prepayments.  In each case, subject to the terms and conditions of the Financing Orders:

(a)      If at any time the aggregate outstanding principal amount of the Term Loans exceed the Maximum Amount, the Borrower shall immediately repay the aggregate outstanding Term Loans to the extent required to eliminate such excess.

(b)      Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, such Loan Party shall contribute such proceeds to the Borrower and the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes actually paid or payable by a Loan Party in connection with such disposition, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note.  Notwithstanding anything in this Note to the contrary, (i) the following shall not be subject to mandatory prepayment under this clause (b): proceeds of sales of Inventory or other sales in the ordinary course of business or in accordance with the Budget, the Store Closure Motion, or the Financing Orders, and (ii) if the Borrower or any Loan Party and the Consignor enter into a Consignment Facility, the proceeds of sales of Consigned Inventory shall be paid to Consignor as follows:

(1)     Upon the sale of an item of Consigned Inventory by or on behalf of the Borrower or any Loan Party, the Borrower or such Loan Party shall pay the Consignor the applicable invoice price plus the applicable Consignment ~~Revenue Share~~**Fee**.

(c)     If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)     Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)     No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.     Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)     First Facility Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay in cash to the Agent (or net such fee from the proceeds of the Initial Loan) an initial facility fee (the " Facility Fee") equal to 5% of the principal amount of the Initial Loan, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(b)     [Reserved].

(c)     Exit Fee.  On the Maturity Date, the Borrower shall pay in cash to the Agent an exit fee (the "Exit Fee") equal to five percent (5%) of the aggregate Commitments hereunder on the date hereof, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid; provided, that, the Prepetition Secured Debt shall be paid in full prior to the payment of any portion of the Exit Fee.

9.     Indemnity.

(a)     The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and

- 8-

thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the parties to any of the DIP Documents on the one hand and any Loan Party on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.     Adjustments for Withholding, Capital Adequacy Etc.  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or

- 9-

similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income.   Payment under this indemnification shall be made upon demand.   A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Form W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made.   In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.    Priority of Obligations and DIP Lenders' Liens.

(a)    To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 or 1114 of the Bankruptcy

-10-

Code or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any Loan Party, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case (a "DIP Superpriority Claim"), and (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) (including adequate protections liens) and any other Liens as set forth in the Financing Orders. The security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estates under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders, subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)     Notwithstanding anything herein to the contrary, (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the prior payment of the Carve Out, and the superpriority claims granted to the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) under the Financing Orders and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(d)     Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)     The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve Out, in accordance with the Financing Orders.

12.     Further Assurances.  The Borrower agrees that it shall, at the Borrower's reasonable expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents granting to the Agent, on behalf of the DIP Lenders, Liens (subject in all respect to the Financing Orders and the

priorities set forth in Section 11 hereof) in the Collateral to secure the Obligations; provided that the "Collateral" shall not include (such assets "Excluded Assets") (a) leases not subject to a mortgage in favor of the Prepetition Agent as of the Petition Date (the "Unencumbered Leases"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case limited as provided in the Prepetition Financing Documents), and (c) claims under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions.

13.      Reports and Notices.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The Borrower agrees that no Subsidiary of the Borrower will change its fiscal year in a manner prohibited by the Prepetition Credit Agreement.  In addition, the Borrower agrees to, and to cause each of its Subsidiaries to, maintain a system of accounting that enables the Borrower and such Subsidiaries to produce financial statements in accordance with GAAP in all material respects.

14.      Affirmative Covenants.

The Borrower agrees that:

(a)      Upon the reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)      (A) Except as otherwise excused by the Bankruptcy Code, the Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or to the extent such failure could not reasonably be expected to have a Material Adverse Effect.

(c)      In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge promptly when due (x) the Borrower and its Subsidiaries will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on

-12-

which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary, (2) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (3) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)      (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion  or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances, and (iv) the Borrower and each of its Subsidiaries will ensure that the mix of Inventory not sold pursuant to the Store Closure Motion (together if applicable, with any Consigned Inventory), as to type, category, style, brand and description, shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix on the Petition Date.

(e)      The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may be required by the Prepetition ABL Facility (whether or not such facility remains in effect). Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as may be required by the Prepetition ABL Facility (whether or not such facility remains in effect), with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)      The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders.

(g)      The Borrower and its Subsidiaries shall at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)      The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

-13-

(1)       no later than ~~1~~2 day**s** after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)       no later than August 7, 2019, the Loan Parties shall file one or more motions seeking entry of orders authorizing and approving (x) store closure and inventory transfer procedures for certain of the Loan Parties' store locations with such store closings to be conducted by affiliates of the Agent and/or the DIP Lenders who shall have been hired by the Loan Parties pursuant to Section 363 of the Bankruptcy Code to perform such services on a "fee-for-service" basis in accordance with the terms and conditions set forth on Exhibit C (the "Store Closure Motion"), and (y) bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in each case in form and substance reasonably acceptable to the Agent;

(3)       as soon as reasonably practicable but in no event  later than August 16, 2019,  the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Store Closure Motion, which order shall provide, among other things, that the Borrower may designate, or the DIP Lenders may elect in the event the Milestones in subsections (6), (7), or (8) below are not achieved, additional store locations to be closed pursuant thereto on the same terms and conditions set forth therein and that any store closings conducted thereby shall be binding on any chapter 7 or 11 trustee;

(4)       no later than 21 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Agent, establishing bidding procedures in connection with the Sale Motion, which order, shall provide, among other things, that bids for any, or all, of the Loan Parties' assets shall be considered in connection therewith (such order, the "Bid Procedures Order");

(5)       no later than 30 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(6)       by September 25, 2019, the Loan Parties shall receive a binding Qualified Bid (as defined by the Bid Procedures Order) that provides sufficient cash consideration to indefeasibly pay in full all of the Obligations under this Note and all of the Obligations under the Prepetition ABL Facility and Prepetition Term Loans (such bid, "Acceptable Bid");

(7)       no later than October 1, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, (i) granting the relief requested in the Sale Motion and (ii) approving the binding Acceptable Bid; and

(8)       no later than by October 4, 2019, a closing of the Acceptable Bid shall have occurred.

(i)       the Loan Parties shall (i) use commercially reasonable efforts to provide the Agent and the DIP Lenders with reasonable access to, and reasonably cooperate with,

Berkeley Research Group, as financial advisor to the Prepetition ABL Agent (it being understood that the Prepetition ABL Agent and Berkeley Research Group may share all applicable information with the Agent) or any other financial advisor engaged by the Agent of the DIP Lenders and (ii) compensate Berkeley Research Group, as financial advisor to the Prepetition ABL Agent, in strict accordance with the Budget.

(j)    the gross margin earned on the sale of Inventory shall not be more than 2% less than the gross margin forecasted in the file named "190804 - BNY DIP Budget (Hilco Pivot at 60 Days  ~$2mm Merch per Week).xlsm" on the "Direct Cash Flow Tab" in row "198" (other than in connection with store closure sales and consignments) tested weekly and calculated in accordance with the Borrower's books and records, in the aggregate, for sales occurring in the Cumulative Three-Week Period prior to such test.

15.    <u>Negative Covenants</u>.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent and other than in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or as permitted under the Prepetition ABL Facility (assuming that all dollar baskets were $0 and that any conditions relating to availability, liquidity or Payment Conditions (as defined therein) were not satisfied):

(a)    Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld).

(b)    Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness for borrowed money in an amount in excess of $500,000 in the aggregate, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)    [Reserved].

(d)    Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien securing obligations in an amount in excess of $500,000 in the aggregate on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)    Neither the Borrower nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders and the Prepetition ABL Facility.

(f)    Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of

-15-

any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)     Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired, or engage any third party provider to assist in disposition of the foregoing, whether pursuant to Sections 327, 328, or 363 of the Bankruptcy Code, other than (a) the sale of Inventory (or in the event applicable, Consigned Inventory) in the ordinary course of business and or in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (b) the sale or disposition of obsolete equipment and (c) the sale of other property on terms acceptable to the Agent.

(h)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (a) the Financing Orders or (b) the Prepetition Secured Debt, except as otherwise provided in the Financing Orders.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(l)(A) of the Bankruptcy Code, (iii) utility deposits made in accordance with Section 366 of the Bankruptcy Code, (iv) payments permitted by the Financing Orders and the Budget and (v) payments permitted under Section 15(e), neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)     Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

(j)     The Loan Parties borrowings under the Prepetition ABL Facility shall comply with Minimum Excess Availability Amount (as defined in the Interim Order), after giving effect to the DIP Tranche A Term Loan Reserve, as further provided in the Financing Orders.

(k)     Neither the Loan Parties nor any of their Subsidiaries shall permit any unspent amounts on Inventory line items in the Budget to instead be spent on any any non-inventory line item in the Budget.

16.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due

-16-

and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.      Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e), 14(f), of this Note and such failure shall remain uncured for a period of one (1) Business Day after notice from the Agent, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days after notice from the Agent, or (iii) Sections 14(g), 14(h), 14(j), or 15 of this Note or any material provision of the Guaranty.

C.      Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D.      Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $500,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $500,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.      Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.      Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions materially adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.      Any Loan Party permits a plan or plans of reorganization to be filed, or permits the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization, that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note and the obligations under the Prepetition ABL Facility on or before the effective date of such plan or plans.

H.      The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.      The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and the obligations under the Prepetition ABL Facility and termination of the DIP Lenders' commitment to make Term Loans.

J.      [Reserved].

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claims or Liens permitted by Section 11 hereof and the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations and the obligations under the Prepetition ABL Facility and Term Loans are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

O.      The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $500,000.

P.      The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.      There shall commence any suit or action against the Agent or any

-18-

DIP Lender or any lenders or agents under the Prepetition ABL Facility by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.      Failure of the Loan Parties to comply in all material respects with any Milestone set forth in Section 14(h).

S.      Any material provision of any material DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any material Lien created under any DIP Document shall cease to be a valid and perfected Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

T.      In the event the accrued amount of professional fees for case professionals for the applicable Cumulative Two -Week Period exceed by greater than 10.0% the "Total Professional Fee Disbursements" line item as set forth in the Budget for the applicable Cumulative Two Week Period.

U.      Assets of any Loan Party with a fair market value of $500,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

V.      A breach by any Loan Party of the terms of any of the Financing Order.

W.      A Material Adverse Deviation shall have occurred.

X.      Entry of an order authorizing and/or directing the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Loan Party.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their

-19-

rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.  The Loan Parties shall immediately commence all liquidation processes as contemplated by the Store Closure Motion upon the acceleration of the Term Loans.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

For the avoidance of doubt, the Agent or any DIP Lender may be a qualified bidder and the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of DIP Lenders (or any DIP Lender or the DIP Lenders in its or their respective individual capacities unless the DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such private or public sale (other than any sale in the ordinary course of business), to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent (or any DIP Lenders) at such sale.

17.    Reference Agreements.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $75,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    Definitions.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

-20-

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Base Rate" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "Base Rate" hereunder shall be no less than one and a half percent (1.50%) per annum.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Budget" means a (8)-week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 8 weeks after the Petition Date, which shall be in substantially the form as the Initial Budget or otherwise in form and substance acceptable to the Agent and shall be approved by the Agent, in its sole discretion. The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means the Business Day when each of the conditions applicable to the Initial Loans and listed in Section 2 of this Note shall have been satisfied or waived in a manner reasonably satisfactory to the Agent.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations; provided that Excluded Assets shall in no event constitute "Collateral."  Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations,

-21-

including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Consigned Inventory Proceeds" means gross proceeds from the sale of Consigned Inventory, less applicable sales taxes.

"Consignment Facility" shall have the meaning given to such term in Section 1(a) of this Note.

"Consignment ~~Revenue Share~~Fee" means the fees payable to the Consignor in exchange for providing the Consignment Facility calculated ~~in accordance with the following table:~~**at a rate of 7% per annum of outstanding amounts under the Consignment Facility, payable only with Consigned Inventory Proceeds.** ¶

| ~~Invoice Purchase Discount from Vendor of Consigned Inventory~~ | ~~Revenue Share of Consigned Inventory Proceeds~~ |
|---|---|
| ~~0%~~ | ~~5.00%~~ |
| ~~1%~~ | ~~4.00%~~ |
| ~~2%~~ | ~~3.50%~~ |
| ~~3%~~ | ~~3.00%~~ |
| ~~4%~~ | ~~2.75%~~ |
| ~~5%~~ | ~~2.50%~~ |
| ~~6%~~ | ~~2.25%~~ |
| ~~7%~~ | ~~2.00%~~ |
| ~~8%~~ | ~~1.75%~~ |
| ~~9%~~ | ~~1.50%~~ |
| ~~10%~~ | ~~1.00%~~ |

"Consignor" shall have the meaning given to such term in Section 1(a) of this Note.

"Cumulative Three-Week Period" means the three-week period up to and through the Saturday of the most recent week then ended, or if a three-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(e) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with the Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"DIP Tranche A Term Loan Reserve" shall mean a reserve against the Borrowing Base (as defined in the Prepetition Credit Agreement) in the amount of the Tranche A Term Loan.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extraordinary Receipts" means any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof or of any cash proceeds provided for in the Budget), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan

-23-

reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Facility Fee" shall have the meaning given such term in Section 8 of this Note.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent in its sole discretion, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest Payment Date" shall mean the first Business Day of each month to occur while such Term Loan is outstanding; provided that, in addition to the foregoing, each of (x) the

-24-

date upon which all of the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan and ending 1 month thereafter; provided, however, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Inventory" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate" means "LIBO Rate" as such term is defined in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "LIBOR Rate" hereunder shall not be less than two and a half percent (2.50%) per annum.

"LIBOR Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Liquidity Forecast" means a rolling 8-week forecast of projected liquidity for the consecutive 8-week period immediately following the date of delivery of such forecast as certified in a certificate delivered by the Borrower.

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the following line items of the Budget:  "Operating Disbursements" and "Net Cash Flow", in each case, for such Cumulative Three-Week Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Borrower or the Loan Parties as a whole to perform any of their material obligations under any material DIP Document to which it is a party, (iii) the legality, validity or enforceability of this Note or any other material DIP Document, (iv) the rights and remedies of the Agent and DIP Lenders taken as a whole under the DIP Documents, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any material portion of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 20 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

-26-

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date, to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code; (i) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Order (including the Carve-Out) and (j) Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) Prepetition Secured Debt; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) any Indebtedness existing on the Petition Date; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall have the meaning given such term in the Financing Orders.

"Permitted Variance" means (a) a variance of up to the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis) between the actual disbursements for the applicable Cumulative Three-Week Period and the "Operating Disbursements" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than professional fees and disbursements in connection with store closure sales and consignments), (b) a negative variance of up to the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis) between the actual net cash flow for the applicable Cumulative Three-Week Period and the "Net Cash Flow" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than receipts in connection with store closure sales and consignments), and (c) a negative variance of up to  the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis) between the actual receipts for the applicable Cumulative Three-Week Period and the "Total Cash Receipts" line item as set forth in the Budget for the applicable Cumulative Three-Week Period  (other than disbursements in connection with store closure sales and consignments).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" means that certain senior secured asset based revolving credit facility and term loan facility pursuant to the Prepetition Financing Documents.

"Prepetition Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Financing Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Debt" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Parties" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 20 of this Note.

"Registered Loan" shall have the meaning given such term in Section 20 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Restricted Payment" shall mean, with respect to any Person:  (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Person's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance,

sinking fund or similar payment and any claim for rescission with respect to, any subordinated debt of such Person; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Person now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Person's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Person other than payment of compensation in the ordinary course to Stockholders who are employees of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Person to any Stockholder of such Person or its affiliates.

"Stock" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Tranche A Term Loans" " shall mean the $50,000,000 of the DIP Loan to applied to the Prepetition Secured Debt under the Prepetition ABL Facility in accordance with Section 2.13(g) of the Prepetition Credit Agreement (the amount of which shall be at all times maintained as the DIP Tranche A Term Loan Reserve), and will be secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B Term Loans" shall mean the $25,000,000 of the DIP Loan that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Weekly Permitted Variance Percentage" means

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 and thereafter |
|---|---|---|---|---|---|
| Weekly Perm. Var. - % | 12.5% | 12.5% | 10.0% | 10.0% | 7.5% |

19.   Representations and Warranties.   The Borrower and each of its Subsidiaries represent as follows:

-29-

(a)     the Borrower and each of its Subsidiaries are duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)     upon entry of the Financing Orders and subject to the terms thereof, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties, except in respect of Prepetition Secured Debt;

(c)     the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)     upon entry of the Financing Orders and subject to the terms thereof, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)     the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)     no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)     the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to the Permitted Prior Liens or other Liens permitted to have such priority under Section 11 of this Note and the Financing Orders;

(h)     except for proceedings in the Chapter 11 Cases in connection with the entry of the Financing Orders, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)     the Borrower and its Subsidiaries are and will be at all times the owners of

-30-

the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j) [reserved]; and

(k) except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or, to the knowledge of the Borrower, threatened against or in any way affecting (i) any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other DIP Document.

20. Agent.

(a) Appointment. Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including: (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.

(b) Nature of Duties. The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c) Rights, Exculpation, Etc. The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d) Reliance. The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in

good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)     Indemnification.   To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)     Collateral Matters.

(1)     The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)     Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.     Miscellaneous.

(a)     All notices, demands, requests or other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

If to Borrower:          BARNEY'S INC.

C/O Barney's New York, Inc.
575 Fifth Avenue
New York NY 10017
Attn: Chief Executive Officer and Chief Financial Officer
Email: gfu@barneys.com
         sfisi@barrneys.com

with copies to:          KIRKLAND & ELLIS
                         601 Lexington Avenue
                         New York, New York 10022
                         Attn:  Josh Sussberg; and Chad Husnick
                          Email: jsussberg@kirkland.com
                         chusnick@kirkland.com

If to Agent or any       ~~RETAIL FUNDING (BNY)~~**GACP FINANCE CO.**, LLC
Lender:                  ~~[_____]¹~~**21255 Burbank Blvd, Suite 400**
                         **Woodland Hills, California 91367**

with copies to:          ~~PAUL HASTINGS~~**JONES DAY** LLP
                         ~~71 S. Wacker   45th Floor~~
                         ~~Chicago, Illinois 60606~~
                         **250 Vesey Street**
                          **New York, New York 10281**
                         Attn:  ~~Chris L. Dickerson, Holly Snow, and~~
                                ~~Brendan M.    Gage~~
                         ~~Email: chrisdickerson@paulhastings.com~~
                                ~~hollysnow@paulhastings.com~~
                                ~~brendangage@paulhastings.com~~**Sidney P.**
                         **Levinson, Michael Schneidereit, and Jeremy Evans**
                         **Email: slevinson@jonesday.com,**
                         **mschneidereit@jonesday.com, jdevans@jonesday.com**

        All such notices, demands, requests or other communications shall, when mailed or sent by overnight courier, be effective two Business Days after being deposited in the mails, with adequate postage prepaid, and sent by registered or certified mail with return receipt requested by such sending party, or the next Business Day after being sent by an overnight courier to a party at its address set forth above, as the case may be, or when sent by email be effective the day when sent.

        (b)     The Borrower shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of one firm of outside counsel for Agent and

---

¹ ~~Note to Draft:  Hilco and Gordon Brothers to provide address.~~

-33-

DIP Lenders, taken as a whole, all of their respective special local counsel limited to one firm in any material jurisdiction to the extent necessary to obtain the Liens contemplated by the DIP Documents, reasonable financial advisory fees for one financial advisor each for (i) the Agents (under and as defined in the Prepetition ABL Facility) and the Prepetition Secured Parties, subject to the Budget and (ii) the Agent hereunder and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).  The Borrower shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of one firm of outside counsel for advice, assistance, or other representation, including, in connection with:

>  (1)   any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

>  (2)   the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

>  (3)   any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the DIP Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

>  (4)   any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

>  (5)   any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

>  (6)   any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales in connection with store closures or other sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and

service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to Section 11 hereof and the Financing Orders).

(c)     No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)     Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding

-35-

arising out of or relating to this Note or any DIP Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(h)     **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)     The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(j)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lenders may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder. An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment

-36-

notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)  Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)  A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)  In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)  No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent.

(p)  Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)  This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan

-37-

Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)    THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(s)    This Note may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.  Delivery of an executed counterpart to this Note by facsimile transmission or electric transmission in "pdf" or other imaging format shall be as effective as delivery of a manually signed original.

(t)    In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

\*    \*    \*    \*    \*

K&E Comments # 2 8-6-2019 ¶
PRIVILEGED/CONFIDENTIAL¶
ATTORNEY WORK PRODUCT¶

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BARNEY'S, INC., as Debtor and Debtor in Possession

By: _____
    Name:
    Title

Acknowledged and Agreed

~~RETAIL FUNDING (BNY)~~**GACP FINANCE CO.**, LLC, as Agent ~~and DIP Lender~~

By: _____
    Name:
    Title:

~~Commitment Amount: $75,000,000~~

¶
**Brigade Capital Management, LP on behalf of its managed funds and accounts, as DIP Lender¶**

**By: _____ ¶**
**Name: ¶**
**Title:¶**
¶
¶
**Commitment Amount: $37,500,000¶**
¶
¶
**BRF Finance Co., LLC, as DIP Lender¶**

**By: _____ ¶**

DOC ID - 32321110.5

-40-

**Name:  ¶**
**Title:¶**
**¶**
**¶**
**Commitment Amount: $37,500,000**

K&E Comments # 2 8-6-2019 ¶
PRIVILEGED/CONFIDENTIAL¶
ATTORNEY WORK PRODUCT¶

EXHIBIT A

(attach Budget)

DOC ID - 32321110.5

**K&E Comments # 2 8-6-2019 ¶**
**PRIVILEGED/CONFIDENTIAL¶**
**ATTORNEY WORK PRODUCT¶**

EXHIBIT B

Consignment Facility

| | |
|---|---|
| | In addition to customary terms and conditions for a consignment relationship, the Consignment Facility shall include the following terms and conditions:<br><br>1. The Consignor will have access to information and reporting.<br>2. The Consignor may have onsite representatives at the Borrower to assist the Borrower and Loan Parties with the consignment program.<br>3. The Consignor shall have the right to use the stores and the e-commerce platform to liquidate the Consigned Inventory from the stores and through the e-commerce platform if the going concern sale process is not successful or an event of default occurs and is not cured in which case the Consignor shall be responsible for payment of a proportionate share of the four-wall operating expenses of the stores and costs associated with operating the e-commerce platform and, in light of such obligation, the Consignor shall be entitled to receive and retain for its sole and exclusive benefit all proceeds (other than sales taxes) from the sale of all Consigned Inventory.<br>4. **The Consignor shall be entitled to a work fee in the amount of $100,000 per month.**<br><br>If the going concern process is successful, (i) the Consignor shall have the right (exercised in the Consignor's sole discretion) to require the purchaser to purchase all or a portion of the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale; and (ii) a going concern purchaser shall have the right (exercised in the purchaser's sole discretion) to purchase the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale.<br>**7.** |

Exhibit C

Store Closing Fees

For any stores for which affiliates of Agent and/or DIP Lender are engaged to conduct a "store closing" or similar themed sale, such affiliates in their capacity as "consultant" thereunder shall earn a fee equal to 1.25% of the aggregate gross proceeds from the sale of goods and 15.0% of the aggregate gross proceeds from the sale of FF&E.  The Loan Parties shall reimburse such consultant for its out of pocket costs and expenses, including costs of supervision.  Consultant shall have the right to supplement the inventory in such store closing sales with additional goods procured by consultant at its sole cost and expense and the consultant shall pay the Loan Parties 5.0% of the gross proceeds thereof (excluding sales taxes) and shall retain the remaining proceeds from the sale thereof.

<u>Schedule 13</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the Monthly Reports, Annual Reports and Compliance Certificates required by Sections 6.1(a) (c) and (d) of the Prepetition Credit Agreement and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| | |
|---|---|
| on Wednesday of each week beginning with the second full calendar week after the Petition Date | (a)  a weekly DIP variance report/reconciliation for the prior Cumulative Three-Week Period and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) liquidity and excess availability (as determined under the Prepetition ABL Facility), (E) Term Loan balances and outstanding loans under the Prepetition ABL Facility and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer of Barney's, <br><br> (b)  to the extent received by a Loan Party,[2] a weekly report of sales in connection with store closures results (including detail on gross recoveries and expenses) from the affiliates of the Agent and/or DIP Lenders retained by the Loan Parties, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (c)  a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its reasonable discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered Liquidity Forecast and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (d)  copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, | (e)  copies of all "Borrowing Base Certificates" (as such |

---

[2] ~~NTD: These are your representatives so you have this info, but we can give it to you to the extent we get it.~~

-45-

| | |
|---|---|
| | term is defined in the Prepetition Credit Agreement) delivered pursuant to the Prepetition ABL Facility), |
| promptly, but in any event within 5 Business Days after Borrower has knowledge of any event or condition that constitutes a Default (provided that the delivery of a notice of any such event of default at any time will cure any Event of Default arising from the failure to timely deliver such notice of such event of default), | (f)      notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |

Document comparison by Workshare Compare on Wednesday, August 7, 2019
1:02:52 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\dsteiger\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\R4TK78ON\Barney's - Hilco DIP Term Note (KE Comments # 2 August 6 2019)-63373017-v7 (002).docx |
| Description | Barney's - Hilco DIP Term Note (KE Comments # 2 August 6 2019)-63373017-v7 (002) |
| Document 2 ID | interwovenSite://FWDMS/LEGAL/63373017/11 |
| Description | #63373017v11<LEGAL> - Barney's - Brigade (First Interim) DIP Term Note (Execution Version) |
| Rendering set | Color |

| Legend: | |
|---|---|
| **Insertion** | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 44 |
| Deletions | 62 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |

| Format changed | 0 |
|---|---|
| Total changes | 106 |