**Hearing Date: August 14, 2019 at 2:30 p.m. (prevailing Eastern Time)**
**Objection Deadline: August 13, 2019 at 12:00 p.m. (prevailing Eastern Time)**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:     (212) 940-8800
Facsimile:     (212) 940-8776

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| BARNEYS NEW YORK, INC., *et al.*,[1] | )  )  Case No. 19-36300 (CGM) |
| Debtors. | )  ) )  (Jointly Administered) |

**NOTICE OF FILING**
**OF SECOND INTERIM ORDER**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507**
**AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING**
**DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POST-PETITION**
**FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS,**
**(III) AUTHORIZING PAYMENT OF PREPETITION SECURED OBLIGATIONS,**
**(IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED**
**PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING**
**A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819). The location of the Debtors' service address is 575 Fifth Avenue, New York, New York 10017.

**PLEASE TAKE NOTICE** that on August 7, 2019, the Court entered the Debtors' proposed *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 49] (the "Initial Interim DIP Order").

**PLEASE TAKE FURTHER NOTICE** that on August 7, 2019, the Debtors filed the *Notice of Filing of Revised Debtor in Possession Secured Multi-Draw Term Promissory Note* [Docket No. 40] (the "Initial DIP Credit Agreement"), in connection with the Initial Interim DIP Order.

**PLEASE TAKE FURTHER NOTICE** that on August 9, 2019 the Debtors filed the *Debtors' Motion for Entry of an Amended Interim DIP Order on Shortened Notice* (the "DIP Amendment Motion") [Docket No. 89].

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit A to the DIP Amendment Motion was a proposed *Amended Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Authorizing Payment in Full and Final Satisfaction of Prepetition Secured Obligations, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Schedule a Final Hearing, and (VII) Granting Related Relief* (the "Proposed First Amended Interim DIP Order").

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit B to the DIP Amendment Motion was a proposed *Amended and Restated Debtor in Possession Secured Term Promissory Note* (the "First Revised DIP Credit Agreement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised proposed *Second Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Authorizing Payment of Prepetition Secured Obligations, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Proposed Second Interim DIP Order"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the changes from the Initial Interim DIP Order is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the changes from the Proposed First Amended Interim DIP Order is attached hereto as **Exhibit C**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a further *Amended and Restated Debtor in Possession Secured Term Promissory Note* (the "Second Revised DIP Credit Agreement"), attached hereto as **Exhibit D**.

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the changes from the Initial DIP Credit Agreement is attached hereto as **Exhibit E**.

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the changes from the First Revised DIP Credit Agreement is attached hereto as **Exhibit F**.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Proposed Second Interim DIP Order will be held before the Honorable Cecelia G. Morris, United

States Bankruptcy Judge, in Courtroom 621, One Bowling Green, New York, New York on **August 14, 2019 at 2:30 p.m.** (prevailing Eastern Time) or as soon thereafter as counsel may be heard.  Objections, if any, must have been served so as to have been actually received **on or before August 13, 2019 at 12:00 p.m.**, prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to materially alter, amend, or modify the Proposed Second Interim DIP Order; provided, that if the Proposed Second Interim DIP Order is altered, amended, or modified in any materials respect, the Debtors will file a revised version of such document with the Court.

[*Remainder of page intentionally left blank*]

Dated:  August 14, 2019
New York, New York

/s/ Joshua A. Sussberg, P.C.
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

-and-

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Second Interim DIP Order**

***Important Note: This proposed form of order remains subject to ongoing review and revision by and among the Debtors, the DIP Parties, and the Prepetition Secured Parties. The parties continue to work in good faith. Each such parties' respective rights are expressly reserved.***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : | **Chapter 11** |
| **In re:** | : | **Case No. 19-36300 (CGM)** |
|  | : |  |
| **BARNEY'S NEW YORK, INC., et al.,** | : | **Jointly Administered** |
|  | : |  |
| **Debtors.** | : |  |
|  | : | **Ref. Docket No. 49** |

----------------------------------------------------------------x

## SECOND INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) AUTHORIZING PAYMENT OF PREPETITION SECURED OBLIGATIONS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the DIP Motion and the Amended DIP Motion (collectively, the "***DIP Motions***")[1] of

**BARNEY'S, INC.**, on behalf of itself and its affiliated debtors and debtors-in-possession in the above-

captioned cases (collectively, the "***Debtors***"), pursuant to sections 105, 361, 362, 363, 364, and 507 of Title

11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***"), and in accordance with Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule

4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York

(the "***Local Rules***"), filed in the United States Bankruptcy Court for the Southern District of New York (this

"***Court***"), in these chapter 11 cases (the "***Chapter 11 Cases***"), for entry of interim and final orders granting

the following relief:

(I)    **DIP Financing**

(A)    Authorizing the Debtors to obtain up to $217 million in post-petition financing (the "***DIP Facility***") pursuant to (and in accordance with the terms of) that certain *Debtor-In-Possession Secured Term Promissory Note* (as may be amended, modified, or supplemented and in effect from time-to-time, the "***DIP Credit Agreement***"), substantially in the form as filed with the Court, by and among

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning given to them in the DIP Credit Agreement (defined below).

(x) Barney's Inc., as borrower (the "***Borrower***"), (y) the financial institutions that are or may from time to time become parties thereto (together with their respective successors and assigns, the "***DIP Lenders***"), and (z) GACP Finance Co., LLC, as administrative agent (in such capacity, "***DIP Agent***," and together with the DIP Lenders, the "***DIP Parties***"):

    (i)       to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

    (ii)      to repay all of the Prepetition Secured Debt in cash in full, including interest and fees (including any prepayment and/or early termination fees), as set forth in clause (I)(D) below;

    (iii)     for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

    (iv)     for making other payments as provided in this Order (this "***Second Interim Order***") (and upon its entry, the Final Order (defined below)); and

    (v)     to fund the Carve Out (as defined below)

in each case in accordance with the Approved Budget (defined below) and the terms of this Second Interim Order.

(B)     Authorizing the Borrower to enter into the DIP Credit Agreement and for the Borrower and the other Debtors to enter into all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and/or the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed, delivered, and/or ratified by the Debtors in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, and together with the DIP Credit Agreement, the "***DIP Financing Agreements***");[2]

(C)     Authorization of the Debtors to grant security interests, liens, and superpriority claims (including, as applicable, superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, and liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code), solely to the extent set forth in this Second Interim Order, to the DIP Agent, for the benefit of itself and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in this

---

[2]     For the avoidance of doubt, "DIP Financing Agreements" shall not include this Second Interim Order or any other postpetition financing or cash collateral order.

Second Interim Order;

(D)     (x) Authorization for the Debtors to immediately use proceeds of the DIP Facility to, upon entry of this Second Interim Order and by no later than 2:00 p.m. (New York time) on August 15, 2019, (i) repay all of the Prepetition Secured Debt (defined below) in cash in full, including interest and fees (including any prepayment and/or early termination fees) through the date of repayment (at the default contract rate) as set forth in that certain Payoff Letter, by and between the Debtors and the Prepetition Secured Parties (defined below) (the "*Payoff Letter*"), which repayment shall be indefeasible upon the occurrence of the Indemnity Termination Date [3] and (y) approval of the form and substance of, and authorization for the Debtors to execute and perform under, the Payoff Letter;

(E)     (x) Up to and including the Indemnity Termination Date, the granting of adequate protection and Prepetition Indemnity Account Lien (as defined below), to the Prepetition Secured Parties under or in connection with the Prepetition Financing Documents, and (y) authorizing the Debtors to fund the Prepetition Indemnity Account (defined below); and

**(II)     Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Second Interim Order;

**(III)     Waiving Any Applicable Stay –** Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Second Interim Order;

**(IV)     Waiving the Provisions of Sections 506(c) and 552(b) of the Bankruptcy Code –** Upon entry of the Final Order (as defined below), granting the DIP Parties and the Prepetition Secured Parties, as applicable, a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code and of the provisions of section 506(c) of the Bankruptcy Code; and

**(V)     Final Hearing –** Scheduling a final hearing (the "*Final Hearing*") to consider entry of an order (the "*Final Order*") granting the relief requested in the DIP Motions on a final basis and approving the form of notice with respect to the Final Hearing.

---

[3]     "*Indemnity Termination Date*" means [the date of indefeasible payment in full in cash of the Prepetition Secured Debt, including interest and fees through the date of repayment, which shall be deemed to have occurred] (i) on the Challenge Period Termination Date (defined below), if no Challenge Proceeding has timely and properly been commenced in accordance with Paragraphs 46-52 hereof with respect to the Prepetition Secured Debt or against the Prepetition Secured Parties prior to the Challenge Period Termination Date or (ii) if a Challenge Proceeding is timely and properly commenced in accordance with Paragraphs 46-52 hereof with respect to the Prepetition Secured Debt or against the Prepetition Secured Parties prior to the Challenge Period Termination Date, on the date of any dismissal with prejudice, withdrawal with prejudice, or entry of final judgement or final order in connection with such Challenge Proceeding and (iii) in the case of either (i) or (ii), upon payment in full of any Prepetition Indemnity Obligations [then liquidated and due].

and upon the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Barneys New York, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**")* and the *Declaration of Saul Burian in Support of the Debtors' Motion For Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Lenders, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief (the "**Burian Declaration**"),* each of which was filed contemporaneously with the DIP Motion; and this Court having reviewed the DIP Motion and held a hearing with respect to the DIP Motion on August 6, 2019 (the "**First Interim Hearing**") and another hearing with respect to the Amended DIP Motion on August 14, 2019 (the "**Second Interim Hearing**" and, together with the First Interim Hearing, the "**Interim Hearings**"); and upon the DIP Motions, the First Day Declaration, the Burian Declaration, any other declarations filed in support of the DIP Motions and the record of the Interim Hearings; and upon the entry of the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing the Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 49] (the "**First Interim Order**"); and all objections, if any, to the entry of this Second Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

## I.    Procedural Findings of Fact

1.      **Petition Date.** On August 6, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue

to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

2.  **Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

3.  **Statutory Predicates**.  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 and Local Rule 4001-2.

4.  **Committee Formation.**  As of the date hereof, no statutory committee (a "*Committee*") of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter 11 Cases.

5.  **Notice.**  The Second Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014.  Notice of the Second Interim Hearing and the emergency relief requested in the Amended DIP Motion has been provided by the Debtors to certain parties-in-interest, including: (a) the Office of the United States Trustee (the "*U.S. Trustee*"); (b) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates, on a consolidated basis; (c) counsel to the DIP Agent and counsel to the Prepetition Agents; and (d) all other secured creditors of record, and no other or further notice need be given.

## II.    Debtors' Acknowledgements and Agreements

6.  Subject in all respects to the rights of a Committee and other parties-in-interest (other than the Debtors) and to the extent as set forth in Paragraphs 46-52 hereof, each of the Debtors admits, stipulates, acknowledges, and agrees (collectively, Paragraphs II.6(1) through (9) hereof shall be referred to herein as the "*Debtors' Stipulations*") that:

(a)    Prepetition Financing Documents.  Prior to the commencement of the Chapter 11 Cases, the Debtors were parties to (A) that certain Amended and Restated Revolving Credit and Term Loan Facility Agreement, first dated as of June 5, 2012 (as amended, modified, or supplemented and in effect from time-to-time, the "***Prepetition Credit Agreement***"), by and among (1) the Debtors that comprised the "Loan Parties" thereunder, (2) WELLS FARGO BANK,

NATIONAL ASSOCIATION, as administrative agent (in such capacity, the "**Prepetition ABL Agent**"), and (3) the other lenders party to the Revolving Facility (as defined in the Prepetition Credit Agreement) from time to time (collectively, the "**Prepetition ABL Lenders**"), and (B) WELLS FARGO BANK, NATIONAL ASSOCIATION, as term loan agent (in such capacity, the "**Prepetition Term Agent**;" and together with the Prepetition ABL Agent, the "**Prepetition Agents**") under the Prepetition Credit Agreement, for itself and on behalf of the term loan lenders who have prepetition Term Loans (collectively, the "**Prepetition Term Lenders**;" and together with the Prepetition ABL Lenders and Prepetition Agents, the "**Prepetition Secured Parties**"); and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Secured Parties, including, without limitation, control agreements, mortgages, security agreements, guaranties, UCC financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto, including, without limitation, that certain WellsOne® Commercial Card Agreement, dated April 10, 2013 (the "**PCard Agreement**") (each as amended, modified or supplemented and in effect, collectively, the "**Prepetition Financing Documents**").

     (b)     <u>Prepetition Secured Debt Amount</u>.

     (i)     As of the Petition Date, the Debtors were liable to the Prepetition ABL Agent and Prepetition ABL Lenders under the Prepetition Financing Documents, on account of "Revolving Loans" in the approximate aggregate principal amount of $121,307,911.10, *plus* letters of credit in the approximate stated amount of not less than $20,571,590.02, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations, including, without limitation, on account of cash management, credit card, amounts due under the PCard Agreement, depository, leasing, hedging and other banking or financial services secured by the Prepetition Financing Documents (collectively the "**Prepetition ABL Debt**"); and

     (ii)     As of the Petition Date, the Debtors were liable to the Prepetition Term Agent and Prepetition Term Lenders under the Prepetition Financing Documents, on account of "Term Loans" in the approximate aggregate principal amount of $50,212,500.00, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations secured by the Prepetition Financing Documents (collectively the "**Prepetition Term Debt**"; and together with the Prepetition ABL Debt, the "**Prepetition Secured Debt**" and, together with any other obligations arising under, based upon, in connection with or related to the Prepetition Financing Documents, the "**Prepetition Secured Obligations**").

     (c)     <u>Prepetition Collateral</u>. To secure the Prepetition Secured Debt (including, without limitation, amounts due and owing under the PCard Agreement), each of the Debtors granted continuing security interests and Liens (collectively, the "**Prepetition Liens**") to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition Secured Parties, upon the "Collateral" (as defined in that certain Amended and Restated Pledge And Security Agreement (ABL) dated as of June 5, 2012 (as amended, modified, or supplemented and in effect from time-to-time, the "**Prepetition Security Agreement**"), comprising substantially all of its/their assets and property (collectively, the "**Prepetition Collateral**"). As of the Petition Date, the value of the Prepetition Collateral exceeded the aggregate amount of Prepetition Secured Debt, and the Prepetition Secured Debt constitutes allowed secured claims pursuant to section 506 of the Bankruptcy Code.

(d)    <u>Prepetition Lien Priority</u>. As of the Petition Date, the Prepetition Liens of the Prepetition Secured Parties had and continue to have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement (if any), including this Second Interim Order, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement (if any), are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***"); <u>provided</u>, <u>however</u>, that any right or alleged right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and such reclamation right is expressly subject to the Prepetition Liens, the Adequate Protection Liens and the DIP Liens.

(e)    As of the Petition Date,

(i)    the Prepetition Liens were and continue to be valid, binding, enforceable, and perfected first-priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(ii)    (a) the Prepetition Secured Obligations constitute legal, valid, and binding obligations of the "Loan Parties" thereunder, enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Secured Debt exists, and (c) no portion of the Prepetition Secured Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(iii)    the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Agents or any other Prepetition Secured Party with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code,

(iv)    the Prepetition Secured Debt constitutes an allowed secured claim(s);

(v)    the Debtors acknowledge and stipulate that they have been and are in default of their obligations under the Prepetition Financing Documents and that, as of the Petition Date, the Prepetition Secured Debt had been accelerated and was due and payable, and that interest was accruing on the Prepetition Secured Debt at the default rate.

(f)    Effective as of the date of the entry of the First Interim Order, each of the Debtors has waived, discharged, and released the Prepetition Agents and each of the other Prepetition Secured Parties, together with their respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "***Released Parties***"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Secured Debt, (ii) to challenge or object to the Prepetition Liens or any other security for the Prepetition Secured Debt,

and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.  None of the Debtors possesses and none of the Debtors will assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents or the Prepetition Liens, or any claim of the Prepetition Agents and/or the Prepetition Secured Parties pursuant to the Prepetition Financing Documents, or otherwise.

(g)    _Cash Collateral_.  As of the Petition Date, the Prepetition Secured Parties had and continue to have a continuing security interest in and Lien on all or substantially all of the Debtors' "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"), including, without limitation, any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, any and all cash released as a result of the termination and/or cancellation of any letters of credit issued for the benefit of Debtors that have been or may be cash collateralized prior to or after the Petition Date, any amounts generated by the collection of accounts receivable all amounts located in the Debtors' stores and on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral (but excluding any payroll, withholding tax and other fiduciary accounts and certain accounts with de minimis balances (but solely to the extent provided in the Prepetition Financing Documents), to secure the Prepetition Secured Obligations, and the proceeds and products of each of the foregoing; provided, however, that any Liens, interests, or rights of the Prepetition Secured Parties with respect to Cash Collateral or other property on account of the Consignment Facility (the "***DIP Priority Collateral***") are junior to the Liens, interests, and rights of the DIP Parties.

(h)    _Adequate Protection_.  The Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, as set forth in this Second Interim Order.

(i)    None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are managed or conducted, or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the First Interim Order, this Second Interim Order, the DIP Facility, the DIP Financing Agreements, the Prepetition Secured Obligations and/or the Prepetition Financing Documents.

7.    Based upon the record before the Court, including the First Interim Order and this Second Interim Order, the terms of the DIP Facility and this Second Interim Order have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, by each of the Debtors, the DIP Parties, and the Prepetition Secured Parties, are fair and reasonable and within the Debtors' business judgment, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

8.     Pursuant to the terms and conditions of this Second Interim Order and the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), the Debtors are authorized to use the advances under the DIP Facility during the Interim Period (defined below) and terminating upon notice being provided by the DIP Agent that a DIP Event of Default (defined below) and/or the DIP Maturity Date (defined below), as applicable, has occurred; provided, that the Debtors shall not be authorized to use any cash that constitutes DIP Collateral to cash collateralize (a) any prepetition Letter of Credit issued under the Prepetition Credit Agreement or (b) any amounts due or to become due under the PCard Agreement (including, without limitation, any applicable fees and customary charges accrued and accruing thereunder); provided further, that in no event shall the Debtors be authorized during the Interim Period to incur obligations under the PCard Agreement (exclusive of applicable fees and customary charges) in an amount greater than $200,000, including any usual and customary fees, costs, and expenses under the PCard Agreement.

9.     The DIP Parties and the Debtors have agreed that the budget, the short form of which is attached hereto as **Exhibit "1"** (as the same may be modified, supplemented, or updated from time to time in the sole discretion and mutual consent of the Debtors and DIP Agent, the "**Approved Budget**") is adequate considering all the available assets, to pay the administrative expenses due and accruing for the period commencing on the Petition Date and continuing through until the Final Hearing (the "**Interim Period**"). The Approved Budget has been prepared and is predicated on the requirement that the Debtors shall (a) remain "in-formula" throughout the Interim Period and otherwise adhere to the "Borrowing Base" (as defined in the DIP Credit Agreement but calculated as if the Additional Liquidity Amount (as defined in the DIP Credit Agreement) were included therein) formula (including for the avoidance of doubt, the "Term Loan Borrowing Base" and without giving effect to any Reserves (each, as defined in the Prepetition Credit Agreement)) and after giving effect to the Liquidity Credit (as defined in the DIP Credit Agreement), and (b) at all times during the period covered by the Approved Budget maintain Excess Availability (as defined

in the DIP Credit Agreement) of not less than ten percent (10%) of the Borrowing Base (as defined in the DIP Credit Agreement) at such time (the "***Minimum Excess Availability Amount***").

10.    During the Interim Period, all collections of cash shall be deposited by the Debtors with Wells Fargo in accordance with the Debtors' existing consolidated cash management system, the maintenance of which has been approved under separate order of the Court.  Upon receipt of cash , it shall automatically be swept to the Debtors' operating and disbursement accounts, subject to the terms of this Second Interim Order.  In furtherance of the foregoing, not later than noon (prevailing Eastern Time) on Friday of each week during the Interim Period the Debtors shall be required to deliver an updated Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) based on best available estimates to the DIP Parties, which Borrowing Base Certificate shall include a reserve for the amount necessary to fund the Carve-Out Reserve (to the extent not funded).

11.    Adequate Protection for Prepetition Indemnity Obligations.  As adequate protection, up to and including the Indemnity Termination Date, the Prepetition Secured Parties shall receive the following (collectively, "***Adequate Protection***"):

(a)    **Adequate Protection Liens**.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, solely to the extent of the Diminution in Value[4] of the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) and solely to secure the Prepetition Indemnity Obligations (defined below), the Prepetition Secured Parties shall have, subject to the terms and conditions set forth below, valid, perfected, and enforceable additional and replacement security interests and Liens in the DIP Collateral (defined below) (the "***Adequate Protection Liens***") which shall be junior and subordinated in priority only to the Carve Out, the Permitted Prior Liens, and the DIP Liens.

(b)    **Adequate Protection Superpriority Claim**.  Solely to the extent of the Diminution in Value of the interests of the Prepetition Secured Parties in the Prepetition Collateral and solely for payment of any Prepetition Indemnity Obligations, each of the Prepetition Secured Parties shall have an allowed superpriority administrative expense claim (each a "***Adequate Protection Superpriority Claim***"; and collectively the "***Adequate Protection Superpriority Claims***") which shall have priority in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature

---

[4]    "***Diminution in Value***" means any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral as a result of (a) the incurrence of the DIP Obligations, (b) the use of Cash Collateral, (c) the subordination of the Prepetition Secured Debt to the Carve Out and the DIP Liens and DIP Superpriority Claims, (d) any other diminution in value of the Prepetition Collateral (or the proceeds thereof), and (e) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment, but which shall be junior and subordinated in payment right to the Carve Out, the DIP Obligations (including the Enhancement Fee and the Exit Fee) and the DIP Superpriority Claim, and other than the Carve Out, the DIP Obligations (including the Enhancement Fee and the Exit Fee) and the DIP Superpriority Claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claims.

12.    <u>Reimbursement on a Current Basis of Fees Until Challenge Period Termination Date</u>.

Following the Prepetition Payoff (as defined below), and thereafter up to and including the Challenge

Period Termination Date, the Prepetition Agents and the other Prepetition Secured Parties shall be

reimbursed, on a current basis and pursuant to the provisions of Paragraph [68], for all reasonable and

documented out-of-pocket fees, costs, and expenses incurred by (x) the professionals (including attorneys)

engaged by such parties solely in connection with any investigation conducted by the Committee pursuant

to this Second Interim Order and (y) the attorneys engaged by such parties solely in connection with such

parties' rights under this Second Interim Order and/or the cash management order; *provided*, *however*, that

any such reimbursement on a current basis pursuant to this Paragraph 12 (a) shall be subject to a cap of

$100,000 and to the terms and conditions of the Prepetition Financing Documents, and (b) such cap shall

increase by $100,000 for each 30-day period the Court extends the Challenge Period Termination Date

beyond September 4, 2019, not to exceed $250,000 in the aggregate (i.e., no more than $350,000 after

giving effect to subparts (a) and (b) of this proviso, without regard to the funds held in the Prepetition

Indemnity Account).

13.    <u>Subordination of Claims and Liens of Prepetition Secured Parties to DIP Obligations and

DIP Liens</u>.  Notwithstanding anything in this Second Interim Order to the contrary, upon the Prepetition

Payoff, and thereafter, until such time as the DIP Obligations (including the Enhancement Fee and the Exit

Fee) are indefeasibly repaid in full, any and all claims of the Prepetition Secured Parties against the Debtors

(other than current reimbursement of fees, costs and expenses pursuant to Paragraph [12] and Prepetition

Indemnity Obligations to the extent paid from the Prepetition Indemnity Account) shall be subordinated in right of payment to the Carve Out and the DIP Obligations (including the Enhancement Fee and the Exit Fee), and any and all liens of the Prepetition Secured Parties securing Prepetition Secured Debt (other than the Prepetition Indemnity Account Lien) shall be subordinated to the Carve Out and the DIP Liens.  In addition, the Prepetition Secured Parties:  (a) shall not be entitled to receive any payment from the Debtors, unless such payment is made from the Prepetition Indemnity Account on account of the Prepetition Indemnity Obligations that are then due and payable or as otherwise expressly authorized in Paragraph 12 hereof; (b) shall hold in trust for the benefit of the DIP Parties, and promptly turnover to the DIP Agent, any payment received on account of their Prepetition Indemnity Obligations that are then due and payable or any Prepetition Secured Debt, in each case, that is not otherwise authorized under subclause (a); (c) shall be prohibited from exercising any remedies against any DIP Collateral, provided, that for the avoidance of doubt, the Prepetition Secured Parties shall not be precluded from seeking an order from the Court to compel payment by the Debtors of any amounts authorized under Paragraph 12 hereof; (d) shall not object to or otherwise take any action to prevent the Debtors from taking any action or obtaining any relief to which the DIP Parties have consented (including, without limitation, a sale of any property securing all or any part of any DIP Obligations), unless such action or relief would extinguish or materially prejudice the rights granted to the Prepetition Secured Parties under this Second Interim Order; (e) shall not object to or otherwise take any action to prevent the DIP Parties from taking any action or obtaining any relief sought by the DIP Agent or DIP Lenders (including, without limitation, the enforcement of the DIP Obligations (including the Enhancement Fee and the Exit Fee), the sale of any property securing all or any part of any DIP Obligations, or any request for adequate protection, use of cash collateral, relief from the automatic stay, or payment of fees and/or expenses), unless such action or relief would extinguish or materially prejudice the rights granted to the Prepetition Secured Parties under this Second Interim Order; (f) shall not provide or seek to provide financing, either directly or indirectly, to the Debtors in the Chapter 11 Cases without the prior written consent of the DIP Parties; (g) shall not, without the prior written consent of the DIP Parties, propose a plan of reorganization, arrangement or proposal, or file any motion, pleading or

12

material, that would have the effect of impairing or reducing the amount of or the interest rate, fees or other amounts on, or delaying the time of payment of, any DIP Obligations (including the Enhancement Fee and the Exit Fee), or otherwise materially impair the rights of the DIP Agent or any of the DIP Parties, or that would be in conflict with the terms of this Interim Order; and (h) shall no longer have any consent rights granted under the First Interim Order, except as otherwise provided in this Second Interim Order.

14.    <u>Subrogation</u>.  In addition to and not in lieu of any DIP Liens and other rights and protections granted to the DIP Lenders under the DIP Financing Agreements and this Interim Order, with respect to any proceeds of the DIP Credit Agreement that any of the DIP Parties has paid or will pay to any of the Prepetition Secured Parties in satisfaction of any Prepetition Secured Obligations, the DIP Secured Parties shall be subrogated to the Prepetition Liens of such Prepetition Secured Parties (which, for purposes of this Paragraph 14, shall survive for the benefit of the DIP Parties) with respect to such satisfied Prepetition Secured Obligations until the payment in full in cash of all DIP Obligations (including the Enhancement Fee and the Exit Fee); provided, however, that notwithstanding anything to the contrary herein, no such subrogation shall either (a) impose, create or otherwise result in any liability or claim against (i) the Debtors in relation to any Prepetition Secured Obligation, or (ii) the DIP Lenders in relation to any Prepetition Secured Obligation that may otherwise exist against the Prepetition Secured Parties prior to the Indemnity Termination Date, or (b) impair the rights granted to the Committee under this Interim Order to investigate and prosecute claims against the Prepetition Secured Parties and the Prepetition Liens pursuant to Paragraphs 46 to 52 hereof.  For the avoidance of doubt, the payoff of the Prepetition Secured Obligations and the related rights of subrogation pursuant to this Interim Order shall not reduce any of the DIP Obligations nor impair or prejudice any rights and protections granted to the DIP Parties hereunder.

15.    <u>Adequate Protection Payments</u>**.**

(a)    Until the repayment in full of the Prepetition Secured Obligations (other than the Prepetition Indemnity Obligations) in accordance with the Payoff Letter, the Prepetition Secured Parties shall receive payment of all accrued and unpaid interest at the default rate set forth in the Prepetition Financing Documents in accordance with the Payoff Letter.

(b)    Consistent with and as mandated under the First Interim Order, the Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition Secured Parties, a consent fee

("**Consent Fee**") in accordance with the Payoff Letter. The Consent Fee shall be fully earned and paid in accordance with the Payoff Letter, and shall not be subject to refund or rebate under any circumstances. For the avoidance of doubt, after payment of such Consent Fee in accordance with the Payoff Letter, neither the Prepetition ABL Agent nor any Prepetition Secured Party shall be entitled to any additional consent fee.

16.    <u>Enhancement Fee</u>.  Subject to and effective upon entry of the Final Order, the net proceeds ("**Sale Proceeds**") of any disposition of DIP Collateral (each such disposition, a "**Sale**"), after the payment in full of all DIP Obligations[5] (other than the Enhancement Fee) and other administrative and priority claims (including, for the avoidance of doubt, the Carve Out), other than with respect to the sale of inventory or other sales in the ordinary course of business (which, for the avoidance of doubt, shall exclude any sale of inventory in accordance with a store closure or other form of liquidation), shall be promptly paid and shared at closing on such Sale(s) (including if such Sale constitutes a DIP Maturity Event) as follows: (a) 37.5% to the DIP Lenders and (b) 62.5% to the Debtors (the amount of such Sale Proceeds payable to the DIP Lenders pursuant to the foregoing, the "**Enhancement Fee**," the payment of which shall constitute a DIP Obligation pursuant to this Second Interim Order), with the Debtors' 62.5% share subject to the liens and security interests granted in favor of the Prepetition Secured Parties, including the Adequate Protection Liens and the Prepetition Indemnity Account Lien. The Debtors shall keep the DIP Agent fully informed of the Debtors' efforts to consummate any Sale(s) and any other sales of equity interests and/or assets of the Debtors after the Petition Date, and without limiting the generality of the foregoing, the Debtors shall: (x) promptly provide to the DIP Agent copies of all offers for the purchase of any asset(s) and/or equity interests of any of the Debtors and copies of all bids from any liquidator(s); (y) provide, promptly upon written (including by e-mail) request of the DIP Agent, and in any event no less frequently than weekly, status updates on the Debtors' efforts to consummate any Sale(s) and/or any other dispositions or capital/equity raises; and (z) promptly advise the DIP Agent of any expressions of interest in any or all of the Debtors' assets and/or equity interests.

---

[5] For purposes of this Second Interim Order, "DIP Obligations" shall have the same meaning ascribed to the term "Obligations" in the DIP Credit Agreement.

17. <u>Credit Bid</u>. In connection with any Sale(s) or other dispositions of any assets of the Debtors (outside of the ordinary course of business), the DIP Agent and DIP Lenders, respectively, may credit bid, in accordance with the DIP Financing Agreements, some or all of the DIP Obligations for the DIP Collateral, including for the avoidance of doubt any Enhancement Fee that would be payable to the DIP Parties upon closing of any such Sale as provided in Paragraph 16 (each a "***Credit Bid***") pursuant to section 363 of the Bankruptcy Code, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. In all such instances, each of the DIP Agent and DIP Lenders, respectively, shall be considered a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid. For the avoidance of doubt, the DIP Agent and DIP Lenders, in accordance with any order entered by the Court authorizing bidding procedures with respect to a sale of all or substantially all of the Debtors' assets, shall be permitted to combine their respective allocations of the DIP Obligations into a single Credit Bid and submit joint Bids as provided therein.

18. <u>Access to Records; Reporting</u>. In addition to, and without limiting, whatever rights to access the DIP Parties have under the DIP Financing Agreements, as applicable, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Parties: (a) to have access to and inspect the Debtors' properties; (b) to examine the Debtors' books and records; (c) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors; and (d) otherwise to have the full cooperation of the Debtors; <u>provided</u>, <u>however</u>, that the Prepetition Secured Parties and their professionals shall be granted access to information to the extent necessary to respond to a Challenge Proceeding. In connection with the foregoing, during the Chapter 11 Cases, and until such time as the DIP Obligations shall have been paid in full, the Debtors shall cooperate fully with a financial advisor engaged by the DIP Agent. Notwithstanding anything to the contrary herein, none of the Loan Parties will be required to disclose information or provide access to the DIP Agent (or any agent or representative thereof) where such disclosure or access is prohibited by

applicable law or is subject to attorney-client or similar privilege, constitutes attorney work product, or implicates conflicts matters.

19.    <u>Pleadings to Be Filed in the Chapter 11 Cases</u>.  Promptly, and at least two (2) calendar days prior to filing, the Debtors shall provide (i) to the DIP Parties copies of all material pleadings (including, without limitation, any proposed orders, motions and applications) and any other pleadings wherein such parties' rights are impacted to be filed or entered in the Chapter 11 Cases and/or in any related proceedings, which pleadings shall be in form and substance reasonably acceptable to the DIP Parties, and (ii) up to and including the Indemnity Termination Date, to the Prepetition Secured Parties copies of all material pleadings (including, without limitation, any proposed orders, motions and applications) wherein such parties' rights and protections granted under this Second Interim Order may be materially prejudiced to be filed or entered in the Chapter 11 Cases and/or in any related proceedings; provided that the Final Order (including any amendments or modification thereto) and any amendments or modifications to this Second Interim Order, in each case, shall be, with respect to any rights and protections granted to the Prepetition Secured Parties under this Second Interim Order, in form and substance acceptable to the Prepetition Secured Parties.

20.    [<u>Final Satisfaction of Prepetition Secured Obligations</u>.  The Debtors are authorized and directed to [(x) execute the Payoff Letter and perform the transactions and undertakings set forth therein, which are hereby approved in all respects, and, (y)] within one business day of the date hereof and contemporaneous with the second interim funding of the DIP Loans, but in no event later than 2:00 p.m. (prevailing Eastern Time) on August 15, 2019, irrevocably pay approximately up to $[142] million in full in cash to the Prepetition Agents in full and final satisfaction of the Prepetition Secured Obligations (other than the Prepetition Indemnity Obligations, if any) including interest and fees (including any prepayment and/or early termination fees) through the date of repayment (at the default contract rate) in accordance and pursuant to [the Payoff Letter] (the "**Prepetition Payoff**"), which repayment shall be indefeasible upon the occurrence of the Indemnity Termination Date; provided that the Prepetition Indemnity Obligations, if any, shall continue until the Indemnity Termination Date.  Effective immediately upon the Prepetition Payoff:]

(a)     [the Prepetition Financing Documents and any other "Loan Documents" as defined in the Prepetition Credit Agreement, in each case, other than the Prepetition Indemnity Obligations and any other provisions whose survival is contemplated under this Second Interim Order (including those that, subject to Paragraphs [15 and 39] hereof survive for the benefit of the DIP Lenders and the prepetition mortgages granted in favor of the Prepetition ABL Agent), shall be deemed cancelled, terminated, and of no further force and effect (other than the Prepetition Indemnity Obligations, cash management and letter of credit arrangements, and any other provisions whose survival is contemplated under this Second Interim Order), and all rights, and obligations (other than any contingent indemnity obligations that by their terms survive termination, cash management and letter of credit obligations, and any other provisions whose survival is contemplated under this Second Interim Order) under the Prepetition Financing Documents, including the Prepetition Secured Obligations, shall be released, cancelled, and of no further force or effect; provided, that the Prepetition Liens shall remain in effect solely until the occurrence of the Indemnity Termination Date and solely to secure payment of the Prepetition Indemnity Obligations or other amounts due to the Prepetition Secured Parties pursuant to this Second Interim Order.]   On the Indemnity Termination Date, the Prepetition Liens and Prepetition Indemnity Obligations shall be fully and irrevocably deemed released, cancelled, and of no further force or effect except to the extent they survive under this Second Interim Order for the benefit of the DIP Lenders; provided further that any and all Prepetition Liens that survive until the Indemnity Termination Date shall be subordinate in all respects to the Carve Out, the Permitted Prior Liens, and the DIP Liens, and shall be enforceable only to the extent that any Prepetition Indemnity Obligations are not capable of being satisfied from the application of funds on deposit in the Prepetition Indemnity Account;

(b)     the Prepetition Agents will cooperate fully with the DIP Agent to transfer to the DIP Agent any possessory DIP Collateral (other than, for the avoidance of doubt, the Prepetition Indemnity Account (as defined below)) that is in the possession of the Prepetition Agents.

21.     <u>Prepetition Indemnity Account</u>.  Upon entry of this Second Interim Order, and no later than 2:00 p.m. (New York time) on August 15, 2019, the Debtors are authorized and directed to pay or deliver to the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) the sum of $[750,000] to be segregated and held under the control of the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) (the "***Prepetition Indemnity Account***") as security for any amounts owing but not paid to the Prepetition Secured Parties and any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition Agents and the other Prepetition Secured Parties that expressly by their terms survive termination of the Prepetition Financing Documents, including without limitation, the

provisions of Sections 11.3 and 11.4 of the Prepetition Credit Agreement (the "***Prepetition Indemnity Obligations***").

(a)     Without limiting the generality of the foregoing, the funds in the Prepetition Indemnity Account shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition Agents and the other Prepetition Secured Parties in connection with or responding to (i) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraphs 46-52 hereof, or (ii) any Challenge Proceeding against any one or more of the Prepetition Agent(s) and/or the other Prepetition Secured Parties related to the Prepetition Financing Documents, the Prepetition Liens, or the Prepetition Secured Obligations, whether in the Chapter 11 Cases or independently in another forum, court, or venue; <u>provided</u>, that the relative interests of the Prepetition Agents and other Prepetition Secured Parties in the funds deposited in the Prepetition Indemnity Account on account of any Prepetition Indemnity Obligations shall be subject in all respects to the priority provisions set forth in the Prepetition Financing Documents.

(b)     The Prepetition Indemnity Obligations shall be secured by a first-priority lien (the "***Prepetition Indemnity Account Lien***") in favor of the Prepetition ABL Agent (on behalf of itself and the other Prepetition Secured Parties) on the Prepetition Indemnity Account and the funds therein and by a Lien in favor of the Prepetition ABL Agent (on behalf of itself and the other Prepetition Secured Parties) on the DIP Collateral (subject and subordinate to the Carve Out, Permitted Prior Liens and the DIP Liens).  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, (i) up to and including the Indemnity Termination Date, the Prepetition Indemnity Account and the funds therein shall not constitute DIP Collateral or be subject to the Carve Out, the DIP Liens, the DIP Superpriority Claim or any other Lien or claim granted to any person or entity other than the Prepetition Secured Parties, and (ii) any Prepetition Indemnity Obligations, other than those payable under Paragraph 12 hereof or from the Prepetition Indemnity Account (or any Prepetition Indemnity Account Lien), shall be subject and subordinate to the Carve Out, Permitted Prior Liens, the DIP Obligations, and the DIP Liens.

(c)     The Prepetition Agents and other Prepetition Secured Parties may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court.

(d)     In addition to the establishment and maintenance of the Prepetition Indemnity Account, up to and including the Indemnity Termination Date the Prepetition Agents (for themselves and on behalf of the other Prepetition Secured Parties), shall retain and maintain the Prepetition Liens (subject to the Carve Out, Permitted Prior Liens and the DIP Liens ) as security for the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account; <u>provided</u>, that any such indemnification claim(s) shall (i) be subject to the terms of the Prepetition Financing Documents, (ii) the rights of parties in interest with requisite standing

18

to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs 46-52 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).

(e)     Promptly upon, but in no event later than five Business Days after, the occurrence of the Indemnity Termination Date, the Prepetition ABL Agent shall return to the Debtors the remaining amount, if any, net of any unpaid fees and expenses of the Prepetition Secured Parties and the Prepetition Indemnity Obligations, in the Prepetition Indemnity Account.  Upon such return, such funds shall constitute DIP Collateral.

(f)     For the avoidance of doubt, nothing contained in this Paragraph 21 shall relieve the Debtors of their obligation to timely reimburse the fees, costs and expenses of the Prepetition Agents and the other Prepetition Secured Parties pursuant to Paragraph 12 and subject to Paragraph [67] hereof.

22.     **Treatment of Disgorged Amounts**.  In the event that the Prepetition Agents or any of the other Prepetition Secured Parties is ordered by this Court to disgorge, refund or in any manner repay to any of the Debtors or their estates any amounts ("*Disgorged Amounts*") the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account in the control of the Prepetition ABL Agent, pending a further final, non-appealable order of a court of competent jurisdiction (for the avoidance of doubt the Court is a court of competent jurisdiction) regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Agents and the other Prepetition Secured Parties, distributing such amounts to the Debtors or the DIP Parties, or otherwise).

23.     Section 507(b).  Nothing herein or the DIP Financing Agreements shall prejudice, limit or otherwise impair or modify the Prepetition Secured Parties' respective rights under section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for the diminution in value of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case(s); provided, however, that: (a) nothing herein shall impair the right of the Debtors, the DIP Parties, or any other party in interest to contest any request for additional or different adequate protection; and (b) any section 507(b) claim granted in the Chapter 11 Cases to any Prepetition Secured Party(ies) shall be subject and subordinate to the Carve Out and DIP Obligations.

24.    Subject to section 364(e) of the Bankruptcy Code and Paragraph [66] of this Second Interim Order, nothing included herein shall prejudice, impair or otherwise affect Prepetition Secured Parties' rights to seek any other or supplemental relief from the Court in respect of the Debtors.

### III.    Authorization for the DIP Facility

**A.    Findings Regarding the DIP Financing.**

25.    <u>Good Cause</u>. Good cause has been shown for immediate entry of this Second Interim Order.

26.    <u>Need for Post-Petition Financing</u>.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates for the benefit of their various stakeholders.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility (in each case in the manner and in the amounts provided herein and in the Approved Budget (including any permitted variances), in the DIP Credit Agreement, and this Second Interim Order), the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

27.    <u>No Credit Available on More Favorable Terms</u>. As set forth in the DIP Motions, the Debtors have been unable to obtain any of the following:

(a)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense;

(b)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code;

(c)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien; or

(d)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien;

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Second Interim Order.  The Debtors are unable to obtain credit from the DIP Lenders without granting to the DIP Agent and the DIP Lenders the DIP Protections (defined below).

28.    <u>Business Judgment; Good Faith Pursuant to Section 364(e) of the Bankruptcy Code</u>.  The

extension of credit under the DIP Facility, the DIP Credit Agreement, and the other DIP Financing

Agreements, and the fees paid and to be paid thereunder and the repayment of the Prepetition Secured Debt

herein: (a) are fair, reasonable, and the best available under the circumstances; (b) reflect the Debtors'

exercise of prudent business judgment consistent with their fiduciary duties; and (c) are supported by

reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms'

length between the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, and the

proceeds to be extended under the DIP Facility will be so extended in good faith and used for valid business

purposes and uses, as a consequence of which the DIP Agent, the DIP Lenders, and the Prepetition Secured

Parties are each entitled to the protections and benefits of sections 363(m) and 364(e) of the Bankruptcy

Code.

29.    <u>Sections 506(c)</u>.  As a further condition of the DIP Facility and any obligation of the DIP

Lenders to make credit extensions pursuant to the DIP Credit Agreement, upon entry of the Final Order,

the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in

the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of

section 506(c) of the Bankruptcy Code with respect to the DIP Agent, the DIP Lenders, the DIP Collateral,

the Prepetition Agents, the Prepetition Secured Parties, and the Prepetition Collateral.

30.    <u>Relief Essential; Best Interest</u>.  The relief requested in the DIP Motions (and as provided

in this Second Interim Order) is necessary, essential, and appropriate for the continued operation of the

Debtors' business, the management and preservation of the Debtors' assets during the Interim Period, and

to avoid immediate and irreparable harm.  It is in the best interest of the Debtors' estates that the Debtors

be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP

Financing Agreements.  The Debtors have demonstrated good and sufficient cause for the relief granted

herein.

**B.**     **Approval of Entry into the DIP Financing Agreements**

31.    The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Second Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Second Interim Order and the DIP Financing Agreements.  In furtherance of the foregoing, the Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the "Exit Fee" (as defined in the DIP Financing Agreements), and, subject to the provisions of Paragraph [67] hereof, the DIP Agent's and DIP Lenders' reasonable attorneys', financial advisors', consultants', and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court.

32.    In order to enable them to continue to operate their businesses during the Interim Period, and subject to the terms and conditions of this Second Interim Order, the DIP Credit Agreement, the other DIP Financing Agreements, including the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), during the Interim Period the Debtors are hereby authorized under the DIP Facility to borrow an amount up to $217 million in accordance with the terms and conditions of the DIP Credit Agreement, of which $75 million was advanced pursuant to the First Interim Order.

33.    The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements and this Second Interim Order, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), solely as follows:

(a)      to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(b)      for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(c)      for making payments in respect of Adequate Protection and other payments, all subject to and as provided in this Second Interim Order;

(d)      to repay the Prepetition Secured Obligations as provided herein;

(e)      to fund the Prepetition Indemnity Account, as provided herein; and

(f)      to fund the Carve Out.

34.      <u>DIP Obligations</u>.  The DIP Financing Agreements and this Second Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations (as defined in the DIP Financing Agreements), which shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee appointed in these Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***").  Upon entry of this Second Interim Order, the DIP Obligations will include all loans, and any other indebtedness or obligations, contingent or absolute, including, for the avoidance of doubt, the Enhancement Fee (approval of which is subject to entry of the Final Order), which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, under the DIP Financing Agreements or this Second Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owing under the DIP Financing Agreements. The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand except as provided herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Financing Agreements (including any DIP Obligation or DIP Liens (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under

any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

35.      Pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and subject to the limitations set forth below, effective immediately upon the entry of this Second Interim Order the DIP Agent is hereby granted the Liens (the "*DIP Liens*") (which DIP Liens are subject and subordinate to the Carve Out) for the ratable benefit of itself and the DIP Lenders, which DIP Liens constitute continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and liens, and except as otherwise expressly provided in this Second Interim Order, upon and to all of the following (collectively, the "*DIP Collateral*"): Liens with the priorities set forth in 11 U.S.C. § 364(c)(2), (c)(3) , and (d)(1) on all "property of the estate" as defined in section 541 of the Bankruptcy Code (including tangible and intangible assets and equity interests of the Borrowers (and any guarantors), including all assets constituting Prepetition Collateral), subject only to any Permitted Prior Liens and the Carve Out.  The DIP Collateral shall exclude (a) leases not subject to a mortgage in favor of the Prepetition ABL Agent as of the Petition Date (the "*Unencumbered Leases*"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case limited as provided in the Prepetition Financing Documents), (c) claims under chapter 5 of the Bankruptcy Code ("*Avoidance Actions*"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions, and (d) prior to and including the Indemnity Termination Date, the Prepetition Indemnity Account and any funds therein (including the $[750,000] to be funded pursuant to this Second Interim Order).

36.      From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Second Interim Order, in compliance with and as limited by the Approved Budget (subject to any

variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order). The Approved Budget, and any modification to, or amendment or update thereof, shall be approved by, and in form and substance satisfactory to, the Debtors and the DIP Agent, each in their sole discretion. The Approved Budget shall be updated, modified, or supplemented by the Debtors from time to time in accordance with the DIP Credit Agreement (provided that any update, modification or supplement shall be approved in writing by, and shall be in form and substance satisfactory to the DIP Agent in its sole discretion), and no such updated, modified or supplemented budget shall be effective until so approved and once approved shall be deemed the "Approved Budget." Each budget delivered to the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable. A copy of any Approved Budget shall be delivered to counsel for a Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the DIP Agent.

37.     Subject and subordinate to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases and any Successor Case(s) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

38.     Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no

priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP

Obligations or with any other claims of the DIP Agent and/or DIP Lenders arising hereunder.

39.     This Second Interim Order shall be sufficient and conclusive evidence of the validity,

perfection, and priority of the DIP Liens, Adequate Protection Liens, and Prepetition Indemnity Account

Lien without the necessity of filing or recording any financing statement, deed of trust, mortgage, security

agreement, notice of Lien or other instrument or document that may otherwise be required under the law of

any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any

deposit account control agreement or securities account control agreement) to validate or perfect such DIP

Liens, Adequate Protection Liens, or Prepetition Indemnity Account Lien, or to entitle the DIP Liens,

Adequate Protection Liens, or Prepetition Indemnity Account Lien to the priorities granted herein.

40.     Notwithstanding the foregoing, the DIP Parties and/or the Prepetition Secured Parties, as

applicable, may, in their respective discretion, file such financing statements, deeds of trust, mortgages,

security agreements, notices of Liens, and other similar instruments and documents to evidence, confirm,

validate, or perfect, or to ensure the contemplated priority of, the DIP Liens, the Adequate Protection Liens

and/or the Prepetition Indemnity Account Lien, and are hereby granted relief from the automatic stay of

section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust,

mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be

deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11

Cases.

41.     The Debtors shall execute and deliver to the DIP Agent and each Prepetition Secured Party,

as applicable, all such financing statements, deeds of trust, mortgages, security agreements, notices of

Liens, and other similar instruments and documents as the DIP Agent and/or the applicable Prepetition

Secured Party may reasonably request to evidence, confirm, validate, or perfect, or to ensure the

contemplated priority of, the DIP Liens, the Adequate Protection Liens and/or the Prepetition Indemnity

Account Lien.

42.    The DIP Parties and the Prepetition Secured Parties, in their respective discretion, may file a photocopy of the entered, docketed version of this Second Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Second Interim Order. Subject to the priorities set forth in this Second Interim Order, the prepetition mortgages granted in favor of the Prepetition ABL Agent shall remain in full force and effect in accordance with its/their terms as if the same were executed and delivered under this Second Interim Order and thereafter recorded with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and each such mortgage (or any mortgage granted to the DIP Agent in respect of the DIP Facility, regardless of whether the same is recorded with any applicable registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property) shall serve as evidence of validity, perfection and contemplated priority of the DIP Liens, the Adequate Protection Liens and/or the Prepetition Indemnity Account Lien.

43.    Subject to the terms of this Second Interim Order (including the subordination provisions hereof), the DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, succeed to the rights of the Prepetition Agents with respect to all third-party notifications in connection with the Prepetition Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including, without limitation, each collateral access agreement duly executed and delivered by any landlord of any Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements, provided, that nothing herein shall impair any such rights of the Prepetition Agents that may continue to exist, subject to Paragraph 15 of this Second Interim Order.

44.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

(a)    permit the Debtors to grant the DIP Liens, the Adequate Protection Liens, and Prepetition Indemnity Account Lien, and to incur all liabilities and obligations to the DIP Agent and DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Second Interim Order; and

(b)    authorize the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Second Interim Order.

45.    The DIP Lenders are authorized to provide the Consignment Facility to the Debtors pursuant to the terms contained in the DIP Financing Agreements.

C.    <u>**Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**</u>

46.    Nothing in this Second Interim Order, the Prepetition Financing Documents, the DIP Credit Agreement, or the other DIP Financing Agreements shall prejudice whatever rights any Committee or any other party-in-interest (other than the Debtors) with requisite standing that has been sought and granted by this Court, as applicable, may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any one or more of the Prepetition Secured Parties, the Prepetition Secured Debt and/or the Prepetition Liens (collectively, a "***Challenge Proceeding***"), including, but not limited to, any of the following:

(a)    in the case of the Prepetition Secured Parties, an objection to or challenge of the Debtors' Stipulations set forth in Paragraphs [II.6.(a) through (i)], including (i) the validity, extent, perfection, or priority of the security interests and Prepetition Liens of the Prepetition Agents in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured Debt; or

(b)    a suit against any one or more of the Prepetition Secured Parties in connection with or related to the Prepetition Secured Debt and/or the Prepetition Liens, or the actions or inactions of the such Prepetition Secured Party(ies) arising out of or related to such Prepetition Secured Debt and/or Prepetition Liens;

<u>provided</u>, <u>however</u>, that any Committee or any other party-in-interest with requisite standing that has been sought and granted by this Court, as applicable, must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against any one or more of the Prepetition Agents and/or other Prepetition Secured Parties, as applicable, in the nature of a claim, cause of action, setoff, counterclaim, or defense in respect of the Prepetition Secured Debt and/or the Prepetition Liens (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the

Bankruptcy Code), by 5:00 p.m. (prevailing Eastern Time) on September 4, 2019 (the "***Challenge Period***

***Termination Date***"). The failure of any Committee or other third party who desires to investigate either (i)

the validity, extent, perfection, or priority of the security interests and Prepetition Liens in and to the

Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured

Debt, to make a formal written request to the affected Prepetition Secured Parties for information validating

such Prepetition Secured Debt and/or Prepetition Liens on or before the date that is ten (10) calendar days

prior to the Challenge Period Termination Date shall operate as a bar to any motion, application or other

request by such party(ies) for an extension of the Challenge Period Termination Date.

47.     Not less than five (5) business days prior to filing a motion seeking standing (a "***Challenge***

***Standing Motion***") to commence a Challenge Proceeding, a Committee or other third party, as the context

makes applicable, shall inform the affected Prepetition Agent(s) and/or other Prepetition Secured Party(ies),

in writing, of its intent to file such standing motion (such writing shall contain a reasonably detailed

statement of the claims proposed to be asserted in such Challenge Proceeding and the legal/other bases

supporting such claim(s) in the event standing were to be granted by the Court ("***Challenge Statement***")).

The parties shall thereafter meet and confer for purposes of attempting to resolve any issues/claims asserted

in the Challenge Statement. In the event a third party, including any Committee, thereafter files a Challenge

Standing Motion seeking standing to commence a Challenge Proceeding in accordance with the terms of

this Second Interim Order, any such Challenge Standing Motion shall, at a minimum, include a copy of any

proposed objection or adversary complaint containing a detailed description of the claims and causes of

action such party proposes to pursue. The Challenge Period Termination Date shall be tolled for a period

not to exceed thirty (30) days upon the filing of a Challenge Standing Motion (the "***Tolling Period***") by an

interested party (including any Committee) seeking standing to commence a Challenge Proceeding in

accordance with the terms of this Second Interim Order); provided, that any such tolling shall be applicable

solely to the party that files the subject Challenge Standing Motion and solely as to the Challenge

Proceedings for which standing is sought (as set forth in such Challenge Standing Motion); and provided,

further, that, unless otherwise ordered by the Court, the granting of any Challenge Standing Motion shall

not extend the Challenge Period Termination Date beyond expiration of the Tolling Period. The Challenge Period Termination Date may occur as to some, but not all, of the Prepetition Agents and/or other Prepetition Secured Parties if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and/or other Prepetition Secured Parties.

48.    For the avoidance of doubt, in the event any one or more of the Chapter 11 Cases is converted to a case under Chapter 7, or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then in either such event and solely as applies to any such trustee the Challenge Period shall not expire until sixty (60) days after such trustee's appointment. In the event that the Committee or any other party in interest with requisite standing, as applicable, has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding. In the event that the Committee or any other party in interest with requisite standing, as applicable, has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding. Until the later of the Challenge Period Termination Date without commencement of a Challenge Proceeding or the entry of a final, non-appealable order or judgment on account of any Challenge Proceeding properly commenced before the Challenge Period Termination Date, such trustee shall not be bound by the Debtors' Stipulations in this Second Interim Order.

49.    Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition Secured Parties, any and all such challenges, claims, and/or objections by any party (including, without limitation, any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) ***shall be deemed to be forever waived and barred*** with respect to the Prepetition Agents and other Prepetition Secured Parties, as applicable, and the Prepetition Secured Obligations and Prepetition Liens as to one or more or all of the Prepetition Agents and/or other Prepetition Secured Parties, as the case may be, as of the Petition Date, shall be deemed to be an allowed fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations as to one or more or all of the Prepetition Agents and/or

other Prepetition Secured Parties, as the case may be, shall be binding on all creditors, interest holders, and parties-in-interest, including any Committee.

50.    To the extent any such Challenge Proceeding is commenced, or any claim is asserted against any one or more of the Prepetition Agents and/or other Prepetition Secured Parties, the affected Prepetition Secured Parties, or any of them, as the case may be, shall be entitled to include the costs and expenses, including, but not limited to, reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents, and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the prepetition claims and Liens of such Prepetition Secured Party(ies) to the extent permitted pursuant to the applicable Prepetition Financing Documents, and subject to the provisions herein, including with respect to the priority of such claims and Liens.  To the extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the affected Prepetition Secured Party(ies), or any of them, as the case may be, shall be entitled to include such costs and expenses, including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of such party's prepetition claim which shall be reimbursed by the Debtors, (x) subject, and subordinate as provided herein, to the Carve Out and the indefeasible payment in full in cash of the DIP Obligations, or (y) where applicable, out of the Prepetition Indemnity Account or as provided under Paragraph 12 herein for fees and expenses incurred prior to the Challenge Period Termination Date, and as part of the Adequate Protection Superpriority Claims.  In addition to any other provisions in this Second Interim Order, the Prepetition Indemnity Account shall be maintained until the final resolution of all such objections or claims that would, if successful, be payable as Prepetition Indemnity Obligations, against the affected Prepetition Secured Party(ies).  Subject in all respects to the Carve Out and prior payment in full in cash of the DIP Obligations, the Debtors shall remain liable to the Prepetition Secured Parties, or any of them, as the case may be, for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the Prepetition Indemnity Account are insufficient to satisfy the Prepetition Indemnity Obligations in full.

51.     Notwithstanding anything to the contrary contained in this Second Interim Order, in the event there is a timely and successful Challenge Proceeding by any party in interest in accordance with the terms hereof, this Court may fashion an appropriate remedy as applicable to the payment of any adequate protection or Prepetition Secured Debt consisting of an unsecured claim or other claim or amount not allowable under section 502 of the Bankruptcy Code.

52.     Notwithstanding anything contained in this Second Interim Order or any of the DIP Financing Agreements, the Challenge Period Termination Date shall not be modified, amended or extended without the prior written consent of the Prepetition Secured Parties, in their sole discretion, and the DIP Parties, with such consent of the DIP Parties not to be unreasonably withheld or delayed.

**D.    Carve Out and Payment of Professionals**

53.     <u>Carve Out</u>.   As used in this Second Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (exclusive of any fee which becomes due and payable upon consummation of a transaction) (the "<u>Allowed Professional Fees</u>")[6] incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all Allowed Professional Fees incurred by persons or firms retained by the Committee (the "<u>Committee Professionals</u>" and, together

---

[6]     Any fee that is or will become due and payable upon the consummation of a transaction shall be payable solely from the proceeds received by the Debtors resulting from such transaction, free and clear of the liens of the DIP Agent and the DIP Lenders.

with the Debtor Professionals, the "Professional Persons") up to and as limited by the aggregate Approved Budget amounts for each Committee Professional or category of Committee Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to (x) any payments made to Committee Professionals under the Approved Budget pursuant orders of the Court, and (y) all carryforwards and carrybacks from prior or subsequent favorable budget variances), and (v) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee by the DIP Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

54.     Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the entry of the First Interim Order, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation

Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration
Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such
Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out
Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for
the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering
such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the
Approved Budget for such period for such Professional Person; provided, that such Professional Person
shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed
Professional Fees included in the Approved Budget for such period for such Professional Person from a
reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter
held by any Debtor.  The Debtors shall at all times fund and maintain in a segregated account (the "Funded
Reserve Account") in trust for the benefit of Professional Persons in an amount (the "Funded Reserve
Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and
Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount
of Allowed Professional Fees contemplated to be unpaid in the Approved Budget at the applicable time,
plus (ii) the Post-Carve Out Trigger Notice Cap, plus (iii) the amounts contemplated under paragraph
45(a)(i) and 45(a)(ii) above, plus (iv) an amount equal to the amount of Allowed Professional Fees set forth
in the Approved Budget for the then current week occurring after the most recent Calculation Date and the
two weeks succeeding such current week.  Any and all amounts in the Funded Reserve Account shall not
be subject to any cash sweep and/or foreclosure provisions in the DIP Financing Agreements and the DIP
Lenders shall not be entitled to sweep or foreclose on such amounts notwithstanding any provision to the
contrary in the DIP Financing Agreements.  Not later than 7:00 p.m. New York time on the fourth business
day of each week starting with the first full calendar week following the entry of the First Interim Order,
the Debtors shall deliver to the DIP Parties a report setting forth the Funded Reserve Amount as of such
time.  Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Debtors shall
calculate the Funded Reserve Amount by reference to the Approved Budget for subsection (i) of the Funded

34

Reserve Amount.  The information supplied by Professional Persons pursuant to this paragraph shall be used to determine whether there is compliance with Section 16(T) of the DIP Credit Agreement.  Once the Funded Reserve Amount is funded into the Funded Reserve Account, the DIP Lenders shall not have any further obligations with respect to the payments to Professional Persons relating to such amounts, and Professional Persons may only be paid from the Funded Reserve Account.  For the avoidance of doubt, the Prepetition Secured Parties shall have no obligations with respect to any payments to Professional Persons, or to fund the Funded Reserve Amount or any other amounts related to the Carve Out.

55.    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including any amounts held in the Funded Reserve Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account with the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand (including any amounts held in the Funded Reserve Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date until such obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the DIP Agent for the benefit of the DIP Lenders.  All funds in the Post-Carve Out Trigger Notice

Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay to the DIP Agent for the benefit of the DIP Lenders in accordance with their rights and priorities set forth in this Second Interim Order, until the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date, until the Prepetition Secured Obligations, if any, have been indefeasibly paid in full in cash. Notwithstanding anything to the contrary in this Second Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 55, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 55, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in this Second Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Financing Agreements until the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, and thereafter to the Prepetition Secured Parties until the Prepetition Secured Obligations, if any, have been indefeasibly paid in full. Further, notwithstanding anything to the contrary in this Second Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Term Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees of the Debtor Professionals shall not affect the priority of the Carve Out with respect to the Debtor Professionals, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and

payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this
Second Interim Order, the DIP Financing Agreements, or in any Prepetition Financing Agreement(s), the
Carve Out with respect to the Debtor Professionals shall be senior to all liens and claims securing the DIP
Facility, the Adequate Protection Liens, the Prepetition Indemnity Obligations (other than the Prepetition
Indemnity Account Lien and/or any claims of Prepetition Secured Parties to the Prepetition Indemnity
Account and/or funds therein), and the Prepetition Secured Parties' and DIP Lenders' respective
superpriority claims, and any and all other forms of adequate protection, liens, or claims securing the DIP
Obligations and/or Prepetition Secured Obligations (other than the Prepetition Indemnity Account Lien
and/or any claims of Prepetition Secured Parties to the Prepetition Indemnity Account and/or funds therein).
The Carve Out with respect to all other Professional Persons, other than Debtor Professionals, shall be
limited to the Carve Out Reserve.

56.    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any
payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of
any Allowed Professional Fees shall not reduce the Carve Out.

57.    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP
Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any
fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any
successor cases under any chapter of the Bankruptcy Code.  Nothing in this Second Interim Order or
otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties,
in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee
that the Debtors have sufficient funds to pay such compensation or reimbursement.

58.    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or
reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any
Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any
funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP

Collateral and shall be otherwise entitled to the protections granted under this Second Interim Order, the DIP Financing Agreements, the Bankruptcy Code, and applicable law.

59.    <u>Restriction on Use of Funds</u>.  Notwithstanding anything herein to the contrary, no proceeds of the DIP Facility, DIP Collateral or the Prepetition Indemnity Account (including funds therein) may be used by the Debtors, any official committee, or any other person or entity without the consent of the DIP Agent and/or the Prepetition Secured Parties in connection with any of the following: (a)  the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Agent, the DIP Lenders, or Prepetition Secured Parties, or any of their respective officers, directors, employees, agents, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter in any way related to the DIP Financing Agreements or the Prepetition Loan Documents (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or the DIP Liens; (ii) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations, the Prepetition Indemnity Obligations, Prepetition Liens, Adequate Protection Superpriority Claims, Adequate Protection Liens, or the Prepetition Indemnity Account Lien; (iii) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code or under similar laws of any jurisdiction against any of the Prepetition Secured Parties or the DIP Parties; (iv) investigating or asserting any so-called "lender liability" claims and causes of action against any of the Prepetition Secured Parties or the DIP Parties; and (v) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Secured Obligations, the Prepetition Indemnity Obligations, the Prepetition Liens, the Adequate Protection Superpriority Claim, the Adequate Protection Liens, the Prepetition Indemnity Account Lien, the DIP Obligations, the DIP Superpriority Claim, and the DIP Liens; (b) asserting any claims or causes of action against the DIP Parties or the Prepetition Secured Parties in

such capacity, including, without limitation, claims or actions to object to or contest in any manner the DIP Parties' or the Prepetition Secured Parties' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the DIP Financing Agreements, the Prepetition Loan Documents, or this Second Interim Order; (c) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Parties or the Prepetition Secured Parties hereunder or under the DIP Financing Agreements or Prepetition Loan Documents (as applicable), in each of the foregoing cases without such applicable parties' prior written consent; provided, however, that the proceeds of the DIP Facility and DIP Collateral shall be available for payment of any fees or expenses incurred by any official committee (if appointed) to investigate, but not prosecute, any of the foregoing in an amount not to exceed $25,000.

**E.      Maturity; DIP Order Events of Default; Remedies**

60.      The DIP Facility shall mature (the "***DIP Maturity Date***"), and the Debtors' ability to utilize cash shall terminate, upon the expiration of five (5) business days' prior written notice (a "***DIP Remedies Notice***" and the "***DIP Remedies Notice Period***") to each of (a) the Debtors, (b) lead restructuring counsel to the Debtors, (c) counsel to the Prepetition Agents, (d) counsel for any Committee, (e) counsel to the DIP Agent, and (f) the U.S. Trustee, after the occurrence and continuation of any of the following events (each, a "***DIP Maturity Event***"), unless waived by the DIP Agent or cured by the Debtors during the DIP Remedies Notice Period:

(a)      March 31, 2020;

(b)      the date which is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Court on or prior to such date;

(c)      the failure of the Debtors to adhere to the Approved Budget, including any failure to maintain Excess Availability at the levels required hereunder;

(d)      the date on which the DIP Agent accelerates the DIP Obligations outstanding under the terms of the DIP Facility after the occurrence of an Event of Default (as defined in the DIP Credit Agreement and the passage of any applicable cure period) in accordance with the terms of the DIP Credit Agreement;

(e)      the occurrence of  DIP Order Event of Default (defined below);

(f)  the consummation of a sale of all or substantially all of the Debtors' assets;

(g)  any stay, reversal, vacatur, rescission or other modification of the terms of this Second Interim Order not consented to by the DIP Parties;

(h)  the failure of the Debtors to provide all financial reports as well as any budget variance report required under the DIP Financing Agreements;

(i)  the dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases;

(j)  the failure of the Debtors to comply with any of the budget covenants or Milestones as set forth in the DIP Financing Agreements; or

(k)  the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Court.

61.    Immediately upon the occurrence of the DIP Maturity Date, notwithstanding any automatic stay otherwise applicable to the DIP Parties pursuant to section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Second Interim Order, the DIP Parties may exercise their rights and remedies in accordance with this Second Interim Order upon the expiration of the DIP Remedies Notice Period following delivery of a DIP Remedies Notice, in each case such DIP Remedies Notice being given to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel for any Committee, (iv) counsel to the DIP Agent, and (vi) the U.S. Trustee.

62.    Following the giving of a DIP Remedies Notice, the Debtors and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than two (2) business days' notice to the Committee and the DIP Agent; provided, that if a hearing to consider any relief in connection with the delivery of a DIP Remedies Notice or continued use of cash is requested to be heard within such DIP Remedies Notice Period but is scheduled for a later date by the Court, the DIP Remedies Notice Period shall be automatically extended to the date of such hearing. If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Maturity Event and/or the right of the DIP Parties to exercise their remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Maturity.  Event and/or the right of the DIP Parties to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the DIP

Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Parties, shall automatically terminate at the end of the DIP Remedies Notice Period.

63.     Subject to the provisions of Paragraphs [61-62] hereof, upon the expiration of the DIP Remedies Notice Period, the DIP Parties are authorized to exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except that with respect to any of the Debtors' leasehold locations, the DIP Parties can only enter upon a leased premises following the DIP Maturity Date in accordance with (i) a separate written agreement by and between the DIP Agent and any applicable landlord, (ii) pre-existing rights of the DIP Parties and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the DIP Parties on such notice to the landlord, the Debtors, any Committee, and the U.S. Trustee as shall be required by this Court.

64.     Unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Agent, in its sole and exclusive discretion have been made), and all DIP Commitments have been irrevocably terminated, the protections afforded to the DIP Agent and the DIP Lenders pursuant to this Second Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "***Plan***") or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens and the DIP Superpriority Claim shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priorities as provided by this Second Interim Order.  Unless and until the Indemnity Termination Date has occurred, the protections afforded to the Prepetition Secured Parties pursuant to this Second Interim Order and under the Prepetition Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "***Plan***") or converting the Chapter 11 Cases into a Successor Case, and the Prepetition Indemnity Obligations, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and the Prepetition Indemnity Account Lien shall continue in these Chapter 11 Cases and in any Successor Case, and such Prepetition

Indemnity Obligations, Prepetition Liens, Adequate Protection Liens, Adequate Protection Superpriority Claims and Prepetition Indemnity Account Lien shall maintain their respective priorities as provided by this Second Interim Order.

65.    Each of the following, unless waived by the DIP Agent or cured by the Debtors, shall constitute a "***DIP Order Event of Default***":

(a)    the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement;

(b)    the failure of the Debtors to obtain entry of the Final Order on or before the date that is thirty (30) days after the Petition Date, unless such date has been extended by consent of the DIP Agent, in its sole and absolute discretion;

(c)    the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Credit Agreement (including, without limitation, the Milestones (as defined therein), and after giving effect to any notice or cure periods provided therein) or this Second Interim Order;

(d)    the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(e)    termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(f)    other than as contemplated by this Second Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief), unless the obligations owing to the DIP Agent and DIP Lenders are indefeasibly paid in full in cash and the DIP Lenders' commitment to make loans is terminated ;

(g)    entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

(h)    payment of or granting adequate protection with respect to prepetition debt (other than as set forth in this Second Interim Order or as may be agreed by the DIP Agent);

(i)    the failure of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable with the priority described herein;

42

(j)     the entry of one or more orders of the Court lifting the automatic stay under section 362 of the Bankruptcy Code with respect to assets of the Debtors having a value in excess of $500,000 in the aggregate; or

(k)     the Interim Order or Final Order, as applicable, shall be amended, modified, stayed or vacated without the written consent of the DIP Agent.

66.     Upon the service of a DIP Remedies Notice, to the extent the DIP Agent, as and to the extent provided for by the DIP Credit Agreement, determines in its sole and absolute discretion to exercise its rights and remedies in accordance with this Second Interim Order:

(a)     any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion;

(b)     the Debtors shall continue to deliver and cause the delivery of the proceeds of the DIP Collateral to the DIP Agent, as provided in this Second Interim Order and in the DIP Financing Agreements;

(c)     the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Second Interim Order and the DIP Financing Agreements, as applicable; and

(d)     the Debtors shall have no right to use any of such proceeds, nor any cash that constitutes DIP Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out, as provided in the DIP Financing Agreements and this Second Interim Order; provided, however, that during the DIP Remedies Notice Period the Debtors may use cash (excluding any amounts in the Prepetition Indemnity Account) solely to meet accrued but unpaid payroll obligations (other than severance) and trust fund obligations strictly in accordance with the Approved Budget.

(e)     [Upon the occurrence of either (a) an Event of Default and, subject to the DIP Remedies Notice Period and other terms of this Second Interim Order, the exercise by the Agent or the DIP Lenders of their rights and remedies under the Financing Orders or the other DIP Documents, or (b) the failure of any Loan Party to comply with the October 24, 2019 Milestone under Section 14(h)(6), each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition, and the Loan Parties shall immediately commence all liquidation processes in the manner contemplated by the Store Closure Motion.]

67.     Upon expiration of the DIP Remedies Notice Period, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (subject to the subordination agreement and other limitations contained herein) are authorized to exercise their remedies and proceed under or pursuant to the DIP Credit Agreement

or the Prepetition Financing Documents, as applicable; except that, with respect to any of the Debtors' leasehold locations, the DIP Agent and/or DIP Lenders can only enter upon a leased premises after expiration of the DIP Remedies Notice Period in accordance with (i) the rights of the Prepetition Agents where the DIP Agent succeeds to such rights under this Second Interim Order, or (ii) entry of an order of this Court obtained by motion of the applicable DIP Agent or DIP Lender on such notice to the landlord as shall be required by this Court.

68.    Nothing included herein shall prejudice, impair or otherwise affect either the DIP Agent's rights to seek any other or supplemental relief from the Court in respect of the Debtors, nor the DIP Lenders' rights, as provided herein and in the DIP Financing Agreements, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

69.    The delay in or the failure of the DIP Agent and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, DIP Lenders' and/or Prepetition Secured Parties' rights and remedies. Notwithstanding anything herein, the entry of this Second Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Agent, DIP Lenders, Prepetition Agents, and/or the Prepetition Secured Parties to: (i) request conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the DIP Agent, DIP Lenders, and/or Prepetition Secured Parties may have.

### IV. Certain Limiting Provisions

#### A.    Section 506(c) Claims and Waiver

70.    Nothing contained in this Second Interim Order shall be deemed a consent by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to any charge, Lien, assessment, or claim against

the DIP Collateral, the DIP Liens, the Prepetition Collateral, the Adequate Protection Liens, Prepetition

Indemnity Account (and the funds therein), or the Prepetition Indemnity Account Lien under section 506(c)

of the Bankruptcy Code or otherwise, including for any amounts set forth in the Approved Budget;

provided, however, that during the Interim Period there shall be no waiver of section 506(c) of the

Bankruptcy Code.

71.    As a further condition of the DIP Facility and any obligation of the DIP Lenders to make

credit extensions pursuant to the DIP Credit Agreement, upon entry of the Final Order, the Debtors (and

any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11

Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of

the Bankruptcy Code with respect to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the

DIP Collateral, the Prepetition Collateral, and the Prepetition Indemnity Account (and the funds therein).

**B.**    **Proceeds of Subsequent Financing**

72.    If at any time prior to the irrevocable repayment in full in cash of all DIP Obligations and

the Prepetition Secured Obligations, and the termination of the DIP Lenders' obligations to make loans and

advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any

responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1)

or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement, then all of the cash proceeds

derived from such credit or debt shall immediately be turned over first, to the DIP Agent to be applied in

reduction of the DIP Obligations, and after payment in full of the DIP Obligations, second, to the Prepetition

Secured Parties to be applied in reduction of the remaining Prepetition Secured Obligations (including any

accrued Adequate Protection), if any, and third, solely to the extent that the DIP Obligations and the

Prepetition Secured Obligations (including any accrued Adequate Protection) have been irrevocably paid

in full, to the Debtors.

**C.**    **No Priming of DIP Facility**

73.    In entering into the DIP Financing Agreements, each of the Debtors hereby agrees that

until such time as all DIP Obligations and all Prepetition Secured Obligations have been irrevocably paid

in full in cash (or other arrangements for payment of thereof satisfactory to the DIP Lenders and Prepetition Secured Parties, as applicable, in their sole and exclusive discretion, have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to in writing by the DIP Agent and the DIP Lenders, each in their sole respective discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Agent by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.  For the avoidance of doubt, nothing contained herein shall prejudice the rights of any of the Prepetition Secured Parties to contest the adequacy of any adequate protection offered, or to seek any other form of adequate protection, in connection with any such priming postpetition financing.

### V. Other Rights and Obligations

**A.     Good Faith Under Section 364(e) of the Bankruptcy
Code; No Modification or Stay of this Second Interim Order**

74.     Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Second Interim Order, any claim or protection granted to the DIP Agent, DIP Lenders and/or the Prepetition Secured Parties hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the DIP Agent, the DIP Lenders, or Prepetition Secured Parties shall be governed in all respects by the original provisions of this Second Interim Order, and the DIP Agent, the DIP Lenders, and Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections and Adequate Protection granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.     Prepetition Secured Parties', DIP Agent's, and DIP Lenders' Expenses**

75.     All reasonable out-of-pocket costs and expenses of the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and

other out of pocket expenses (whether incurred prior to, on or after the Petition Date), whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget), shall promptly be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtors, the U.S. Trustee, or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, and/or the other Prepetition Secured Parties be required to comply with the Court's and/or U.S. Trustee's fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges; provided, however, the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties shall provide the Debtors, the U.S. Trustee, and any Committee with a copy of the invoice summary, for professional fees and expenses incurred during the pendency of the Chapter 11 Cases.  Each such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine.  If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the invoice summary submitted by the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties, and the parties cannot resolve such objection within ten (10) days of receipt of such invoice summary, the Debtors, U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the applicable DIP Agent, DIP Lender, or Prepetition Secured Party an objection (a "*Fee Objection*") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall promptly pay the amounts set forth in any submitted invoice summary after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely received, the Debtors shall promptly pay the undisputed amount only

of any invoice summary that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice summary if the parties are unable to resolve the Fee Objection. Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination or disgorgement. Notwithstanding anything to the contrary contained herein, the aggregate amount of reasonable and documented fees and expenses paid to or for the benefit of the Prepetition Secured Parties pursuant to Paragraphs 12 and 21 hereof shall not exceed $1.1 million (inclusive of the amounts held in the Prepetition Indemnity Account), irrespective of whether there is a Challenge Proceeding.

**C.      No Marshaling__**  

**C.      Binding Effect**

76.      The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs 46-52 hereof), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

**D.      No Third Party Rights**

77.      Except as explicitly provided for herein, this Second Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.

**E.      No Marshaling**

78.      Upon entry of the Final Order, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable; provided, that the Prepetition Secured Parties hereby waive any such "marshaling" or rights under any other similar doctrine with respect to any of the DIP Collateral unless and until the DIP Obligations are indefeasibly paid in full..

**F.**    **Section 552(b) of the Bankruptcy Code**

79.    Upon entry of the Final Order, the Prepetition Secured Parties (and, to the extent applicable, the DIP Parties) shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors and/or any successors thereto shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the Prepetition Secured Parties (and, to the extent applicable, the DIP Parties) with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

**G.**    **Amendments**

80.    The Debtors and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of this Court; provided, however, that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court, and any Committee or the U.S. Trustee or the Prepetition Secured Parties each shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; provided, further, that if any Committee or the U.S. Trustee or any Prepetition Secured Party timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court after notice and a hearing.  For purposes of this Paragraph 80, a "material" amendment means: any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the committed amounts under the DIP Credit Agreement, (iii) changes the maturity date of the DIP Facility to a date sooner than that which is provided under the DIP Credit Agreement and this Second Interim Order as of the date hereof, (iv) amends any Event of Default under the DIP Credit Agreement to make same more restrictive than exists as of the date hereof, (v) revises any Milestone set forth in the DIP Credit Agreement in a manner that reduces or shortens the time periods provided for in the DIP Credit Agreement, or (vi) otherwise modifies any of the DIP Financing Agreements in a manner adverse and/or less favorable to the Debtors. All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf

of the Debtors, the DIP Agent and, if required, approved by this Court.  Notwithstanding anything in this Paragraph 80 to the contrary, the Debtors and the DIP Agent shall not amend, modify, supplement, or waive any provision of the DIP Financing Agreements that provides for repayment in full of the Prepetition Secured Debt on or before August 15, 2019 at 2:00 pm (New York time).

**H.      Limits on Lender Liability**

81.      Nothing in this Second Interim Order, any of the DIP Financing Agreements, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses, whether before or after the Petition Date, or in connection with the administration of these Chapter 11 Cases.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not, solely by reason of having made, or consented to the making of, loans under the DIP Facility, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Second Interim Order or the DIP Financing Agreements, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors.

**I.      Survival of Interim Order**

82.      The provisions of this Second Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

(a)      confirming any Plan in the Chapter 11 Cases,

(b)      converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

(c)      dismissing the Chapter 11 Cases,

(d)      withdrawing of the reference of the Chapter 11 Cases from this Court, or

50

> (e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

83.    The terms and provisions of this Second Interim Order, including any protections granted the DIP Parties and the Prepetition Secured Parties and the DIP Protections granted pursuant to this Second Interim Order, shall continue in full force and effect notwithstanding the entry of any order described in Paragraph [82] hereof, and such DIP Protections and protections for the DIP Parties and the Prepetition Secured Parties shall maintain their priority as provided by this Second Interim Order until all of the DIP Obligations of the Debtors to the DIP Lenders pursuant to the DIP Credit Agreement have indefeasibly been paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and, with respect to any protections granted to the Prepetition Secured Parties herein, until the Indemnity Termination Date has occurred.

**J.    Inconsistency**

84.    Up to the entry of this Second Interim Order, in the event of any inconsistency between the First Interim Order, on the one hand, and the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, or the other DIP Financing Agreements, on the other hand, the provisions of the First Interim Order shall govern and control. Upon the entry of this Second Interim Order, in the event of any inconsistency between this Second Interim Order, on the one hand, and the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, or the other DIP Financing Agreements, on the other hand, the provisions of this Second Interim Order shall govern and control.

**K.    Enforceability**

85.    This Second Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry by the Court of this Second Interim Order.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed and vice versa.

L.    **Objections Overruled**

86.    All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby

overruled.

M.    **Waiver of Any Applicable Stay**

87.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is

hereby waived and shall not apply to this Second Interim Order.

N.    **Proofs of Claim**

88.    The Prepetition Secured Parties and the DIP Parties will not be required to file proofs of

claim or any request for payment of an administrative expense in the Chapter 11 Cases or in any Successor

Case in order to maintain their respective claims for payment of the Prepetition Secured Obligations under

the Prepetition Financing Documents, for payment and performance of the Adequate Protection, for

payment of any claim granted in this Second Interim Order and/or the Final Order, and/or for payment of

the DIP Obligations under the DIP Financing Agreements.  The statements of claim in respect of the

Prepetition Secured Obligations, Adequate Protection, and DIP Obligations set forth in this Second Interim

Order, together with the evidence accompanying the DIP Motion and presented at the Interim Hearing are

deemed sufficient to and do constitute proofs of claim (and requests for payment of an administrative

expense) in respect of such obligations and such secured status.  Notwithstanding any order entered by this

Court in relation to the establishment of a bar date for filing a claim (including without limitation,

administrative claims) in any of the Chapter 11 Cases or in any Successor Case to the contrary, the

Prepetition ABL Agent, on behalf and for the benefit of the Prepetition Secured Parties, (i) is hereby

authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it

sees fit) a single, master consolidated proof of claim in respect of the Prepetition Secured Obligations

(including, without limitation, in respect of all guarantees by any of the Debtors of such Prepetition Secured

Obligations), the Adequate Protection, and any claim granted in this Second Interim Order and/or the Final

Order, in the Debtors' lead Chapter 11 Case, *In re Barneys New York, Inc., et al*. (Case No. 19- 36300

(CGM)), which master proof of claim shall be deemed a valid, timely and properly filed proof of claim

against each applicable Debtor in the Chapter 11 Cases and/or in any Successor Case and (ii) shall not be required to file any agreements, documents, or other instruments evidencing such Prepetition Secured Debt, Adequate Protection and/or any claim granted in this Second Interim Order and/or the Final Order with such master proof of claim. Any master proof of claim filed by the Prepetition ABL Agent shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any of the other Prepetition Secured Parties at such party's election; provided that no such Prepetition Secured Party is required to file any such proof of claim.  Notwithstanding anything to the contrary herein, the Debtors reserve the right to estimate or object to the quantum of any contingent, unliquidated Prepetition Secured Obligation, including the Prepetition Indemnity Obligations (if any), or Adequate Protection.

**O.      Provisions Regarding Certain Leases**

89.      With respect to those certain real property leases related to the Madison Avenue and Beverly Hills store locations, the Debtors shall either (x) assume both of the leases or (y) reject both of the leases contemporaneously, as the case may be.

**P.      Headings**

90.      The headings in this Second Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Second Interim Order.

**Q.      Retention of Jurisdiction**

91.      This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Second Interim Order.

**VI.Final Hearing**

92.      The Final Hearing on the DIP Motion shall be held before this Court on September 4, 2019, at 10:30 a.m. (prevailing Eastern time) before the Honorable Cecelia G. Morris United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of New York, located at 355 Main Street, Poughkeepsie, NY 12601.

93.      The Debtors shall, within three (3) business days of the entry of this Second Interim Order, serve a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order

upon: (A) the U.S. Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia Leonhard, Esq.); (B) counsel to the Prepetition ABL Agent, Riemer & Braunstein LLP (Attn: Donald Rothman, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: drothman@riemerlaw.com; and sfox@riemerlaw.com); (C) counsel to the Prepetition Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq. and Mark D. Silva, Esq.) (Email: ksimard@chaote.com and msilva@choate.com); (D) counsel to TPG Specialty Lending, Inc., Schulte Roth & Zabel, 919 Third Avenue, New York, NY 10022 (Attn: Adam Harris, Esq., Kristine Manoukian, Esq. and Kelly V. Knight, Esq.) (Email: adam.harris@srz.com, Kristine.manoukian@srz.com, and kelly.knight@srz.com); (E) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans (Email: slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com); (F) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (G) any and all parties known to the Debtors to assert a lien or security interest in any of the Prepetition Collateral and/or DIP Collateral, including, without limitation, any party that holds an asserted Permitted Prior Lien; (H) the Internal Revenue Service; (I) all appropriate state taxing authorities; (J) all landlords, owners, and/or operators of premises at which any of the Debtors' operate their businesses; and (K) any other party that files a request for notices with the Court as of the date of such service.

94.     If no objections to the relief sought in the DIP Motion are filed and served in accordance with this Second Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Agent and entered by this Court upon certification of counsel by the Debtors.

95.     Any party in interest objecting to the relief sought in the DIP Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than **August 28, 2019 at 4:00 p.m. (ET)** on the following parties: (A) the U.S. Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia Leonhard, Esq.); (B) counsel to the Prepetition ABL

Agent, Riemer & Braunstein LLP (Attn: Donald Rothman, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: drothman@riemerlaw.com; sfox@riemerlaw.com); (C) counsel to the Prepetition Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq. and Mark D. Silva, Esq.) (Email: ksimard@chaote.com and msilva@choate.com); (D) counsel to TPG Specialty Lending, Inc., Schulte Roth & Zabel, 919 Third Avenue, New York, NY 10022 (Attn: Adam Harris, Esq., Kristine Manoukian, Esq., and Kelly V. Knight, Esq.) (Email: adam.harris@srz.com, Kristine.manoukian@srz.com and kelly.knight@srz.com); (E) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans (Email: slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com); and (F) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Edward O. Sassower, P.C., Joshua A. Sussberg, P.C., and Gene Goldmintz, and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, Attn: Chad J. Husnick, P.C., and W. Benjamin Winger.

Dated:  _____ __, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit "1"</u>**

**Approved Budget**

**[TO COME]**

## **EXHIBIT B**

**Redline to the Initial Interim DIP Order**

*Important Note:  This proposed form of order remains subject to ongoing review and revision by and among the Debtors, the DIP Parties, and the Prepetition Secured Parties. The parties continue to work in good faith. Each such parties' respective rights are expressly reserved.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:     **Chapter 11**
**In re:**     :
:     **Case No. 19-36300 (CGM)**
:
**BARNEY'S NEW YORK, INC., et al.,**     :     **Jointly Administered**
:
     **Debtors.**     :
:     **Ref. Docket No. ⸺49**
-------------------------------------------------------------------x

**SECOND INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. ~~2002, 4001 AND 9014 (I) AUTHORIZING~~ 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) AUTHORIZING PAYMENT OF PREPETITION SECURED OBLIGATIONS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**
~~DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN JUNIOR LIEN POST-PETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF~~

Upon the DIP Motion (~~and~~ the "~~Amended~~ DIP Motion (collectively, the "***DIP Motions***")[1] of **BARNEY'S, INC.**, on behalf of itself and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "***Debtors***"), pursuant to sections 105, 361, 362, 363, 364, and 507 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***"), and in accordance with Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "***Local Rules***"), filed in the United States Bankruptcy Court for the Southern District of New York (this "***Court***"), in these chapter 11 cases (the "***Chapter 11 Cases***"), for entry of interim and final orders granting the following relief:

---

[1] Capitalized terms used but not otherwise defined herein have the meaning given to them in the DIP Credit Agreement (defined below).

**(I)    DIP Financing**

(A)    Authorizing the Debtors to obtain up to $~~75~~217 million in post-petition financing (the "***DIP Facility***") pursuant to (and in accordance with the terms of) that certain *Debtor-In-Possession Secured ~~Multi-Draw~~ Term Promissory Note* (as may be amended, modified, or supplemented and in effect from time-to-time, the "***DIP Credit Agreement***"), substantially in the form as filed with the Court, by and among (x)~~—~~ Barney's Inc., as borrower (the "***Borrower***"), (y) the financial institutions that are or may from time to time become parties thereto (together with their respective successors and assigns, the "***DIP Lenders***"), and (z) GACP Finance Co., LLC, as administrative agent (in such capacity, "***DIP Agent***," and together with the DIP Lenders, the "***DIP Parties***"):

(i)    to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(ii)    to repay ~~$50 million~~all of the Prepetition ~~ABL~~Secured Debt in cash in full, including interest and fees (including any prepayment and/or early termination fees), as set forth in clause (I)(D) below;

(iii)    for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(iv)    for making ~~adequate protection payments and~~ other payments as provided in this Order (this "***Second Interim Order***") (and upon its entry, the Final Order (defined below)); and

(v)    to fund the Carve Out (as defined below)

in each case in accordance with the Approved Budget (defined below) and the terms of this Second Interim Order.

(B)    Authorizing the Borrower to enter into the DIP Credit Agreement and for the Borrower and the other Debtors to enter into all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and/or the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed, delivered, and/or ratified by the Debtors in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, and together with the DIP Credit Agreement, the "***DIP Financing Agreements***");[2]

---

[2]    For the avoidance of doubt, "DIP Financing Agreements" shall not include this Second Interim Order or any other postpetition financing or cash collateral order.

(C) Authorization of the Debtors to grant security interests, liens, and superpriority claims (including, as applicable, superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, and liens pursuant to sections 364(c)(2), 364(c)(3), and 364(c)(3d)(1) of the Bankruptcy Code), solely to the extent set forth in this Second Interim Order, to the DIP Agent, for the benefit of itself and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in this Second Interim Order; and

**(II)** ~~**Interim Use of Cash Collateral** – Authorizing the Debtors to (i) use Cash Collateral (defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, in accordance with the Approved Budget (defined below), including to fund the Prepetition Indemnity Account (defined below) and for the purposes set forth in Paragraphs I(A)(i)-(iv) above; and (ii) provide adequate protection to Prepetition Secured Parties (defined below) for their respective interests in the Prepetition Collateral (defined below), including Cash Collateral, to the extent of any Diminution in Value (defined below), on the terms set forth in this Interim Order;~~

(A) (x) Authorization for the Debtors to immediately use proceeds of the DIP Facility to, upon entry of this Second Interim Order and by no later than 2:00 p.m. (New York time) on August 15, 2019, (i) repay all of the Prepetition Secured Debt (defined below) in cash in full, including interest and fees (including any prepayment and/or early termination fees) through the date of repayment (at the default contract rate) as set forth in that certain Payoff Letter, by and between the Debtors and the Prepetition Secured Parties (defined below) (the "*Payoff Letter*"), which repayment shall be indefeasible upon the occurrence of the Indemnity Termination Date[3] and (y) approval of the form and substance of, and authorization for the Debtors to execute and perform under, the Payoff Letter;

(B) (x) Up to and including the Indemnity Termination Date, the granting of adequate protection and Prepetition Indemnity Account Lien (as defined below), to the Prepetition Secured Parties under or in connection with the Prepetition Financing Documents, and (y) authorizing the Debtors to fund the Prepetition Indemnity Account (defined below); and

**(III)** **Modifying the Automatic Stay** – Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Second Interim Order;

---

[3] "*Indemnity Termination Date*" means [the date of indefeasible payment in full in cash of the Prepetition Secured Debt, including interest and fees through the date of repayment, which shall be deemed to have occurred] (i) on the Challenge Period Termination Date (defined below), if no Challenge Proceeding has timely and properly been commenced in accordance with Paragraphs 46-52 hereof with respect to the Prepetition Secured Debt or against the Prepetition Secured Parties prior to the Challenge Period Termination Date or (ii) if a Challenge Proceeding is timely and properly commenced in accordance with Paragraphs 46-52 hereof with respect to the Prepetition Secured Debt or against the Prepetition Secured Parties prior to the Challenge Period Termination Date, on the date of any dismissal with prejudice, withdrawal with prejudice, or entry of final judgement or final order in connection with such Challenge Proceeding and (iii) in the case of either (i) or (ii), upon payment in full of any Prepetition Indemnity Obligations [then liquidated and due].

**(IV)** **Waiving Any Applicable Stay** – Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Second Interim Order;

**(V)** **Waiving the Provisions of Sections 506(c) and 552(b) of the Bankruptcy Code** – Upon entry of the Final Order (as defined below), granting the DIP ~~Agent, the DIP Lenders~~Parties and the Prepetition Secured Parties, as applicable, a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code and of the provisions of section 506(c) of the Bankruptcy Code; and

**(VI)** **Final Hearing** – Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motions on a final basis and approving the form of notice with respect to the Final Hearing.

and upon the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Barneys New York, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration")* and the *Declaration of Saul Burian in Support of the Debtors' Motion For Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Lenders, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief (the "Burian Declaration*)*, each of which was filed contemporaneously with the DIP Motion; and this Court having reviewed the DIP Motion and held a hearing with respect to the DIP Motion on August 6, 2019 (the "*First **Interim Hearing**") and another hearing with respect to the Amended DIP Motion on August 14, 2019 (the "Second Interim Hearing" and, together with the First Interim Hearing, the "Interim Hearings*"); and upon the DIP Motions, the First Day Declaration, the Burian Declaration, any other declarations filed in support of the DIP Motions and the record of the Interim ~~Hearing;~~Hearings; and upon the entry of the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing the Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 49] (the "***First Interim Order***"); and all objections, if any, to the

entry of this Second Interim Order having been withdrawn, resolved, or overruled by this Court; and after

due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**I.      Procedural Findings of Fact**

1.      **Petition Date.**  On August ~~5~~6, 2019 (the "***Petition Date***"), each of the Debtors filed a

voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue

to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

2.      **Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a "core"

proceeding pursuant to 28 U.S.C. § 157(b).

3.      **Statutory Predicates.**  The statutory bases for the relief sought herein are sections 105,

361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and

9014 and Local Rule 4001-2.

4.      **Committee Formation.**  As of the date hereof, no statutory committee (a "***Committee***")

of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter

11 Cases.

5.      **Notice.**  The Second Interim Hearing is being held pursuant to the authorization of

Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014.  Notice of the Second Interim Hearing and the

emergency relief requested in the Amended DIP Motion has been provided by the Debtors to certain parties-

in-interest, including: (~~i~~a) the Office of the United States Trustee (the "***U.S. Trustee***"); (~~ii~~b) those creditors

holding the thirty (30) largest unsecured claims against the Debtors' estates, on a consolidated basis; (~~iii~~c)

counsel to the DIP Agent and counsel to the Prepetition Agents; and (~~iv~~d) all other secured creditors of

record, and no other or further notice need be given.

## II.   **Debtors' Acknowledgements and Agreements**

6.      Subject in all respects to the rights of a Committee and other parties-in-interest (other than the Debtors) and to the extent as set forth in Paragraphs ~~39-43~~46-52 hereof, each of the Debtors admits, stipulates, acknowledges, and agrees (collectively, Paragraphs II.~~1~~6(1) through (9) hereof shall be referred to herein as the "***Debtors' Stipulations***") that:

(a)      Prepetition Financing Documents.  Prior to the commencement of the Chapter 11 Cases, the Debtors were parties to (A) that certain Amended and Restated Revolving Credit and Term Loan Facility Agreement, first dated as of June 5, 2012 (as amended, modified, or supplemented and in effect from time-to-time, the "***Prepetition Credit Agreement***"), by and among (1) the Debtors that comprised the "Loan Parties" thereunder, (2) WELLS FARGO BANK, NATIONAL ASSOCIATION, as administrative agent (in such capacity, the "***Prepetition ABL Agent***"), and (3) the other lenders party to the Revolving Facility (as defined in the Prepetition Credit Agreement) from time to time (collectively, the "***Prepetition ABL Lenders***"), and (B) WELLS FARGO BANK, NATIONAL ASSOCIATION, as term loan agent (in such capacity, the "***Prepetition Term Agent***~~"~~;" and together with the Prepetition ABL Agent, the "***Prepetition Agents***") under the Prepetition Credit Agreement, for itself and on behalf of the term loan lenders who have prepetition Term Loans (collectively, the "***Prepetition Term Lenders***~~"~~;" and together with the Prepetition ABL Lenders and Prepetition Agents, the "***Prepetition Secured Parties***"); and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Secured Parties, including, without limitation, control agreements, mortgages, security agreements, guaranties, ~~and~~ UCC financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto, including, without limitation, that certain WellsOne® Commercial Card Agreement, dated April 10, 2013 (the "***PCard Agreement***") (each as amended, modified or supplemented and in effect, collectively, the "***Prepetition Financing Documents***").

(b)      Prepetition Secured Debt Amount.

(i)      As of the Petition Date, the Debtors were liable to the Prepetition ABL Agent and Prepetition ABL Lenders under the Prepetition Financing Documents, on account of "Revolving Loans" in the approximate aggregate principal amount of $121,307,911.10, *plus* letters of credit in the approximate stated amount of not less than $20,571,590.02, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations, including, without limitation, on account of cash management, credit card, amounts due under the PCard Agreement, depository, leasing, hedging and other banking or financial services secured by the Prepetition Financing Documents (collectively the "***Prepetition ABL Debt***"); and

(ii)      As of the Petition Date, the Debtors were liable to the Prepetition Term Agent and Prepetition Term Lenders under the Prepetition Financing Documents, on account of "Term Loans" in the approximate aggregate principal amount of $50,212,500.00, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations secured by the Prepetition Financing Documents (collectively the "***Prepetition Term Debt***"; and together with the Prepetition ABL Debt, the "***Prepetition Secured Debt***" and, together with

any other obligations arising under, based upon, in connection with or related to the Prepetition Financing Documents, the "***Prepetition Secured Obligations***").

(c)    <u>Prepetition Collateral</u>. To secure the Prepetition Secured Debt (including, without limitation, amounts due and owing under the PCard Agreement), each of the Debtors granted continuing security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition Secured Parties, upon the "Collateral" (as defined in that certain Amended and Restated Pledge And Security Agreement (ABL) dated as of June 5, 2012 (as amended, modified, or supplemented and in effect from time-to-time, the "***Prepetition Security Agreement***"), comprising substantially all of its/their assets and property (collectively, the "***Prepetition Collateral***"). As of the Petition Date, the value of the Prepetition Collateral exceeded the aggregate amount of Prepetition Secured Debt, and the Prepetition Secured Debt constitutes allowed secured claims pursuant to section 506 of the Bankruptcy Code.

(d)    <u>Prepetition Lien Priority</u>. ~~The~~As of the Petition Date, the Prepetition Liens of the Prepetition Secured Parties had and continue to have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement (if any), including this Second Interim Order, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement (if any), are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***"); <u>provided</u>, <u>however</u>, that any right or alleged right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and such reclamation right is expressly subject to the Prepetition Liens, the Adequate Protection Liens and the DIP Liens.

(e)    As of the Petition Date,

(i)    the Prepetition Liens ~~are~~were and continue to be valid, binding, enforceable, and perfected first-priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(ii)    (a) the Prepetition Secured ~~Debt constitutes~~Obligations constitute legal, valid, and binding obligations of the "Loan Parties" thereunder, enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Secured Debt exists, and (c) no portion of the Prepetition Secured Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(iii)    the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Agents or any other Prepetition Secured Party with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code,

(iv)    the Prepetition Secured Debt constitutes an allowed secured claim(s);

(v)    the Debtors acknowledge and stipulate that they have been and are in default of their obligations under the Prepetition Financing Documents and that, as of the Petition Date, the Prepetition Secured Debt had been accelerated and was due and payable, and that interest was accruing on the Prepetition Secured Debt at the default rate.

(f)    OnEffective as of the date that thisof the entry of the First Interim Order is entered, each of the Debtors has waived, discharged, and released the Prepetition Agents and each of the other Prepetition Secured Parties, together with their respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "*Released Parties*"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Secured Debt, (ii) to challenge or object to the Prepetition Liens or any other security for the Prepetition Secured Debt, and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.  None of the Debtors possesses and none of the Debtors will assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents or the Prepetition Liens, or any claim of the Prepetition Agents and/or the Prepetition Secured Parties pursuant to the Prepetition Financing Documents, or otherwise.

(g)    Cash Collateral.  TheAs of the Petition Date, the Prepetition Secured Parties had and continue to have a continuing security interest in and Lien on all or substantially all of the Debtors' "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "*Cash Collateral*"), including, without limitation, any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, any and all cash released as a result of the termination and/or cancellation of any letters of credit issued for the benefit of Debtors that have been or may be cash collateralized prior to or after the Petition Date, any amounts generated by the collection of accounts receivable all amounts located in the Debtors' stores and on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral (but excluding any payroll, withholding tax and other fiduciary accounts and certain accounts with de minimis balances (but solely to the extent provided in the Prepetition Financing Documents)).), to secure the Prepetition Secured DebtObligations, and the proceeds and products of each of the foregoing; provided, however, that any Liens, interests, or rights of the Prepetition Secured Parties with respect to Cash Collateral or other property on account of the Consignment Facility (the "*DIP Priority Collateral*") shall beare junior to the Liens, interests, and rights of the DIP Parties.

(h)    Adequate Protection.  The Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, to the extent of any diminution in the value of such interests, as a result of (i) the incurrence of the DIP Obligations (as defined below), (ii) the use of Cash Collateral as set forth in this Interim Order, (iii) the subordination of the Prepetition Secured Debt to the Carve Out (as defined below), (iv) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale or disposition of Prepetition Collateral (or the proceeds thereof), and (v) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "*Diminution in Value*").as set forth in this Second Interim Order.

(i)       None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are managed or conducted, or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from ~~this~~the First Interim Order, this Second Interim Order, the DIP Facility, the DIP Financing Agreements, the Prepetition Secured ~~Debt~~Obligations and/or the Prepetition Financing Documents.

### III.    ~~Authorization for Use of Cash Collateral; Adequate Protection~~

7.    ~~In exchange for the grant of Adequate Protection as provided herein, the Prepetition Secured Parties have agreed to the Debtors' use of Cash Collateral on the terms set forth in this Interim Order, subject to the Approved Budget, and to the subordination of the Prepetition Liens to the Carve Out, in each case as set forth herein.~~

8.    Based upon the record before the Court, ~~this~~ including the First Interim Order and this Second Interim Order, ~~including~~ the terms of the DIP Facility~~, the use of Cash Collateral,~~ and ~~the Adequate Protection granted in this~~this Second Interim Order~~,~~ have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, by each of the Debtors, the DIP ~~Agent~~Parties, and the Prepetition Secured Parties, are fair and reasonable and within the Debtors' business judgment, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

9.    Pursuant to the terms and conditions of this Second Interim Order and the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), the Debtors are authorized to use ~~Cash Collateral and to use~~ the advances under the DIP Facility during the Interim Period (defined below) and terminating upon notice being provided ~~(x) by the Prepetition Agents that a Cash Collateral Termination Event has occurred, or (y)~~ by the DIP Agent that a DIP Event of Default (defined below) and/or the DIP Maturity Date (defined below), as applicable, has occurred; provided, that the Debtors shall not be authorized to use any ~~Cash~~cash that constitutes DIP Collateral ~~that has been posted with the Prepetition ABL Agent~~ to cash collateralize (a) any prepetition Letter of Credit issued under the Prepetition Credit Agreement or (b) any amounts due or to become due

9

under the PCard Agreement (including, without limitation, any applicable fees and customary charges accrued and accruing thereunder); provided further, that in no event shall the Debtors be authorized during the Interim Period to incur obligations under the PCard Agreement (exclusive of applicable fees and customary charges) in an amount greater than $200,000, including any usual and customary fees, costs, and expenses under the PCard Agreement.

10.     The ~~Prepetition Secured Parties, the~~ DIP Parties~~,~~ and the Debtors have agreed that the budget, the short form of which is attached hereto as ***Exhibit "1"*** (as the same may be modified, supplemented, or updated from time to time in the sole discretion and mutual consent of the Debtors~~, and~~ DIP Agent ~~and the Prepetition Agents~~, the "***Approved Budget***") is adequate considering all the available assets, to pay the administrative expenses due and accruing for the period commencing on the Petition Date and continuing through until the Final Hearing (the "***Interim Period***").  The Approved Budget has been prepared and is predicated on the requirement that the Debtors shall (a)~~-~~ remain "in-formula" throughout the Interim Period and otherwise adhere to the "Borrowing Base" ~~formula (~~as ~~set forth~~ defined in the DIP Credit Agreement but calculated as if the Additional Liquidity Amount (as defined in the DIP Credit Agreement) were included therein) formula (including for the avoidance of doubt, the "Term Loan Borrowing Base" and without giving effect to any Reserves (each, as defined in the Prepetition Credit Agreement ~~(for avoidance of doubt,~~ )) and after giving effect to the ~~implementation of~~ Liquidity Credit (as defined in the DIP ~~Tranche A Term Loan Reserve)]~~,Credit Agreement), and (b) at all times during the period covered by the Approved Budget maintain Excess Availability (as defined in the ~~Prepetition~~DIP Credit Agreement) of not less than ten percent (10%) ~~-~~of the ~~sum of (i) the Revolving~~ Borrowing Base (~~calculated (A) without subtracting the Term Loan Reserve from the Revolving Borrowing Base at such time, and (B) after subtracting the DIP Tranche A Term Loan Reserve), plus (ii) the lesser of (x) the outstanding amount of the Term Loan at such time, and (y) the Term Loan Borrowing Base,~~as defined in the DIP Credit Agreement) at such time (the "***Minimum Excess Availability Amount***")~~.~~]").

11.     During the Interim Period, all collections of ~~Cash Collateral~~cash shall be deposited by the Debtors with ~~the Prepetition ABL Agent~~Wells Fargo in accordance with the Debtors' existing consolidated

cash management system, the maintenance of which has been approved under separate order of the Court entered contemporaneously herewith. .  Upon receipt of Cash Collateral as provided herein, the Prepetition ABL Agent shall maintain such collections in a pooling, suspense or similar account ("*Cash Collateral Account*"),cash , it shall automatically be swept to the Debtors' operating and disbursement accounts, subject to the terms of this Second Interim Order. .  In furtherance of the foregoing, not later than noon (prevailing Eastern Time) on Friday of each Business Day (as defined in the Prepetition Credit Agreement) week during the Interim Period the Debtors shall be required to deliver an updated Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) based on best available estimates (as defined in the Prepetition Credit Agreement) to the Prepetition Secured Parties and to the DIP Parties, which Borrowing Base Certificate shall include a reserve for the amount necessary to fund the Carve-Out Reserve (to the extent not funded).  Each Tuesday (by noon (prevailing Eastern Time)) during the Interim Period the Debtors shall be permitted to deliver to the Prepetition ABL Agent and the DIP Agent a written cash collateral draw request (each a "*CC Draw Request*"), together with a schedule of all proposed disbursements for such week (each a "*Disbursement Schedule*"), including identification of which line item(s) in the Approved Budget such proposed disbursements relate to.  Upon the Prepetition ABL Agent's and the DIP Agent's receipt of a CC Draw Request and associated Disbursement Schedule, and following verification of conformity thereof with the Approved Budget, the Prepetition ABL Agent shall disburse funds from the Cash Collateral Account as appropriate to fund the amounts provided for in the subject Disbursement Schedule.  For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent and the DIP Agent the CC Draw Request and associated Disbursement Schedule in the manner and time as provided herein.  In the event a Borrowing Base Certificate reveals that the Minimum Excess Availability Amount is not satisfied, the Prepetition Secured Parties are authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to satisfy the Minimum Excess Availability Amount; provided, however, that no portion of the DIP Facility may be applied to satisfy the Minimum Excess Availability Amount.  The initial CC Draw Request shall be made upon entry of this Interim Order,

~~shall be in the amount of $75 million of which $50 million shall be used to repay the Prepetition ABL Debt, and shall be applied as determined by the Prepetition ABL Agent in accordance with the Prepetition Financing Documents.~~

12.    Adequate Protection for Prepetition Indemnity Obligations.    As adequate protection ~~for any Diminution in Value of the interests of the Prepetition Secured Parties in the Prepetition Collateral (~~, up to and including ~~Cash Collateral),~~ the Indemnity Termination Date, the Prepetition Secured Parties shall receive the following (collectively, "**Adequate Protection**"):

(a)    **Adequate Protection Liens**.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, ~~and~~ solely to the extent of the Diminution in Value[4] of the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) and solely to secure the Prepetition Indemnity Obligations (defined below), the Prepetition Secured Parties shall have, subject to the terms and conditions set forth below, valid, perfected, and enforceable additional and replacement security interests and Liens in the DIP Collateral (~~as~~ defined below) (the "**Adequate Protection Liens**") which shall be junior and subordinated in priority only to the Carve Out ~~and, the~~ Permitted Prior Liens, and the DIP Liens.

(b)    **Adequate Protection Superpriority Claim**. Solely to the extent of the Diminution in Value of the interests of the Prepetition Secured Parties in the Prepetition Collateral and solely for payment of any Prepetition Indemnity Obligations, each of the Prepetition Secured Parties shall have an allowed superpriority administrative expense claim (each a "**Adequate Protection Superpriority Claim**"; and collectively the "**Adequate Protection Superpriority Claims**") which shall have priority ~~(except with respect to the Carve Out),~~ in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment, but which shall be junior ~~only~~and subordinated in payment right to the Carve Out~~.~~

(c)    ~~Other~~, the DIP Obligations (including the Enhancement Fee and the Exit Fee) and the DIP Superpriority Claim, and other than the Carve Out, the DIP Obligations (including the Enhancement Fee and the Exit Fee) and the DIP Superpriority Claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the

---

[4]    "**Diminution in Value**" means any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral as a result of (a) the incurrence of the DIP Obligations, (b) the use of Cash Collateral, (c) the subordination of the Prepetition Secured Debt to the Carve Out and the DIP Liens and DIP Superpriority Claims, (d) any other diminution in value of the Prepetition Collateral (or the proceeds thereof), and (e) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claims.

13.     Reimbursement on a Current Basis of Fees Until Challenge Period Termination Date. Following the Prepetition Payoff (as defined below), and thereafter up to and including the Challenge Period Termination Date, the Prepetition Agents and the other Prepetition Secured Parties shall be reimbursed, on a current basis and pursuant to the provisions of Paragraph [68], for all reasonable and documented out-of-pocket fees, costs, and expenses incurred by (x) the professionals (including attorneys) engaged by such parties solely in connection with any investigation conducted by the Committee pursuant to this Second Interim Order and (y) the attorneys engaged by such parties solely in connection with such parties' rights under this Second Interim Order and/or the cash management order; *provided, however*, that any such reimbursement on a current basis pursuant to this Paragraph 12 (a) shall be subject to a cap of $100,000 and to the terms and conditions of the Prepetition Financing Documents, and (b) such cap shall increase by $100,000 for each 30-day period the Court extends the Challenge Period Termination Date beyond September 4, 2019, not to exceed $250,000 in the aggregate (i.e., no more than $350,000 after giving effect to subparts (a) and (b) of this proviso, without regard to the funds held in the Prepetition Indemnity Account).

14.     Subordination of Claims and Liens of Prepetition Secured Parties to DIP Obligations and DIP Liens.  Notwithstanding anything in this Second Interim Order to the contrary, upon the Prepetition Payoff, and thereafter, until such time as the DIP Obligations (including the Enhancement Fee and the Exit Fee) are indefeasibly repaid in full, any and all claims of the Prepetition Secured Parties against the Debtors (other than current reimbursement of fees, costs and expenses pursuant to Paragraph [12] and Prepetition Indemnity Obligations to the extent paid from the Prepetition Indemnity Account) shall be subordinated in right of payment to the Carve Out and the DIP Obligations (including the Enhancement Fee and the Exit Fee), and any and all liens of the Prepetition Secured Parties securing Prepetition Secured Debt (other than the Prepetition Indemnity Account Lien) shall be subordinated to the Carve Out and the DIP Liens.  In addition, the Prepetition Secured Parties:  (a) shall not be entitled to receive any payment from the Debtors,

13

unless such payment is made from the Prepetition Indemnity Account on account of the Prepetition Indemnity Obligations that are then due and payable or as otherwise expressly authorized in Paragraph 12 hereof; (b) shall hold in trust for the benefit of the DIP Parties, and promptly turnover to the DIP Agent, any payment received on account of their Prepetition Indemnity Obligations that are then due and payable or any Prepetition Secured Debt, in each case, that is not otherwise authorized under subclause (a); (c) shall be prohibited from exercising any remedies against any DIP Collateral, provided, that for the avoidance of doubt, the Prepetition Secured Parties shall not be precluded from seeking an order from the Court to compel payment by the Debtors of any amounts authorized under Paragraph 12 hereof; (d) shall not object to or otherwise take any action to prevent the Debtors from taking any action or obtaining any relief to which the DIP Parties have consented (including, without limitation, a sale of any property securing all or any part of any DIP Obligations), unless such action or relief would extinguish or materially prejudice the rights granted to the Prepetition Secured Parties under this Second Interim Order; (e) shall not object to or otherwise take any action to prevent the DIP Parties from taking any action or obtaining any relief sought by the DIP Agent or DIP Lenders (including, without limitation, the enforcement of the DIP Obligations (including the Enhancement Fee and the Exit Fee), the sale of any property securing all or any part of any DIP Obligations, or any request for adequate protection, use of cash collateral, relief from the automatic stay, or payment of fees and/or expenses), unless such action or relief would extinguish or materially prejudice the rights granted to the Prepetition Secured Parties under this Second Interim Order; (f) shall not provide or seek to provide financing, either directly or indirectly, to the Debtors in the Chapter 11 Cases without the prior written consent of the DIP Parties; (g) shall not, without the prior written consent of the DIP Parties, propose a plan of reorganization, arrangement or proposal, or file any motion, pleading or material, that would have the effect of impairing or reducing the amount of or the interest rate, fees or other amounts on, or delaying the time of payment of, any DIP Obligations (including the Enhancement Fee and the Exit Fee), or otherwise materially impair the rights of the DIP Agent or any of the DIP Parties, or that would be in conflict with the terms of this Interim Order; and (h) shall no longer have any consent rights granted under the First Interim Order, except as otherwise provided in this Second Interim Order.

15.    Subrogation.  In addition to and not in lieu of any DIP Liens and other rights and protections granted to the DIP Lenders under the DIP Financing Agreements and this Interim Order, with respect to any proceeds of the DIP Credit Agreement that any of the DIP Parties has paid or will pay to any of the Prepetition Secured Parties in satisfaction of any Prepetition Secured Obligations, the DIP Secured Parties shall be subrogated to the Prepetition Liens of such Prepetition Secured Parties (which, for purposes of this Paragraph 14, shall survive for the benefit of the DIP Parties) with respect to such satisfied Prepetition Secured Obligations until the payment in full in cash of all DIP Obligations (including the Enhancement Fee and the Exit Fee); provided, however, that notwithstanding anything to the contrary herein, no such subrogation shall either (a) impose, create or otherwise result in any liability or claim against (i) the Debtors in relation to any Prepetition Secured Obligation, or (ii) the DIP Lenders in relation to any Prepetition Secured Obligation that may otherwise exist against the Prepetition Secured Parties prior to the Indemnity Termination Date, or (b) impair the rights granted to the Committee under this Interim Order to investigate and prosecute claims against the Prepetition Secured Parties and the Prepetition Liens pursuant to Paragraphs 46 to 52 hereof.  For the avoidance of doubt, the payoff of the Prepetition Secured Obligations and the related rights of subrogation pursuant to this Interim Order shall not reduce any of the DIP Obligations nor impair or prejudice any rights and protections granted to the DIP Parties hereunder.

16.    Adequate Protection Payments.

16.27.    Adequate Protection Payments.

(a)    Until the repayment in full of the Prepetition Secured Debt, on the last business day of each monthObligations (other than the Prepetition Indemnity Obligations) in accordance with the Payoff Letter, the Prepetition Secured Parties shall receive payment of all accrued and unpaid interest at the default rate set forth in the Prepetition Financing Documents in accordance with the Payoff Letter.

(i)    In the period between the Petition Date and the Final Hearing (defined below), the Debtors shall continue to deposit all cash and other proceeds of the Prepetition Collateral into the Debtors' existing accounts maintained under the prepetition cash management system, and such collections and proceeds shall not be available for use by the Debtors for any purpose except as expressly provided for in this Interim Order.

(ii)    Commencing August 30, 2019, and continuing each Friday during the Chapter 11 Cases until the Secured Obligations (as defined in the Prepetition Credit Agreement) are indefeasibly paid in full, the Debtors shall make a mandatory prepayment

to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders and the Prepetition Term Lenders, in partial satisfaction of the Prepetition Secured Debt, in an amount equal to all cash on hand as of the immediately preceding Friday above a minimum retained threshold of $10.0 million.

(b) For each week that the Prepetition Secured Debt, or any portion thereof, remains outstandingConsistent with and as mandated under the First Interim Order, the Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition Secured Parties, a consent fee ("*Consent Fee*") in accordance with the amount of $100,000.00 per week. Payoff Letter. The Consent Fee shall be fully earned and paid on each Friday as of which any Prepetition Secured Debt remains outstandingin accordance with the Payoff Letter, and shall not be subject to refund or rebate under any circumstances. For the avoidance of doubt, after payment of such Consent Fee in accordance with the Payoff Letter, neither the Prepetition ABL Agent nor any Prepetition Secured Party shall be entitled to any additional consent fee.

(i) Enhancement Fee. Subject to the provisions of paragraph 65 hereof, the Prepetition Agents and the other Prepetition Secured Parties shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the consultants, financial advisors and outside attorneys engaged by such parties, whether incurred prior to, on or after the Petition Date. For the avoidance of doubt, (a) nothing in this paragraph 12(e)(v) or this Interim Order shall be construed as limiting the obligation of the Debtors to pay the DIP Parties all fees, costs, and expenses provided for in the DIP Financing Agreements, including, without limitation, the First Facility Fee, the Additional Facility Fee, the Exit Fee, and the Store Closing Fees (described in Exhibit C to the DIP Credit Agreement), as applicable, and (b) the Exit Fee shall not be paid until all Prepetition Secured Debt has been paid in full.

. (d) **Adequate Protection With Respect to Sales or Other Dispositions**.

(i) Until the payment in full of the Prepetition Secured Debt, effective upon entry of the Final Order, the net proceeds ("*Sale Proceeds*") of any disposition of PrepetitionDIP Collateral, (each such disposition, a "*Sale*"), after the payment in full of all DIP Obligations[5] (other than the Enhancement Fee) and other administrative and priority claims (including, for the avoidance of doubt, the Carve Out), other than with respect to the sale of inventory or other sales in the ordinary course of business, revenues generated from the Japanese licensing arrangements, and related operations (each such disposition a "*Sale*"), (which, for the avoidance of doubt, shall exclude any sale of inventory in accordance with a store closure or other form of liquidation), shall be promptly paid and shared at closing on such Sale(s) (including if such Sale constitutes a DIP Maturity Event): first, to the Prepetition Agents to be applied to the Prepetition Secured Debt in accordance with the Prepetition Financing Documents to the extent outstanding; second, to the DIP Agent for application to the DIP Obligations in accordance with the terms of the DIP Credit Agreement, and after payment in full of the DIP Obligations, third, to the Debtors; provided, however, that any Sale Proceeds on account of the DIP Priority Collateral shall be promptly paid at closing of such sales to the DIP Agent to be applied to the DIP Obligations; provided, further, however, that, subject to entry of the Final Order, any Sale Proceeds remaining after satisfaction of the DIP Obligations and administrative expenses shall be shared) as follows: (a) 37.5% to the DIP Lenders and (b) 62.5% to the Debtors,

---

[5] For purposes of this Second Interim Order, "DIP Obligations" shall have the same meaning ascribed to the term "Obligations" in the DIP Credit Agreement.

*(the amount of such Sale Proceeds payable to the DIP Lenders pursuant to the foregoing, the "**Enhancement Fee**," the payment of which shall constitute a DIP Obligation pursuant to this Second Interim Order),* with the Debtors' 62.5% share subject to the ~~first priority~~ liens and security interests granted in favor of the Prepetition Secured Parties, including the Adequate Protection Liens~~.~~

17.     ~~(ii)     and the Prepetition Indemnity Account Lien.~~  The Debtors shall keep the ~~Prepetition Agents (and the~~ DIP Agent~~)~~ fully informed of the Debtors' efforts to consummate any Sale(s) and any other sales of equity interests and/or assets of the Debtors after the Petition Date, and without limiting the generality of the foregoing, the Debtors shall~~:~~ (A~~x~~) promptly provide to the DIP Agent~~ and Prepetition Agents~~ copies of all offers for the purchase of any asset(s) and/or equity interests of any of the Debtors and copies of all bids from any liquidator(s)~~,~~; (B~~y~~) provide, promptly upon written (including by e-mail) request of the DIP Agent~~ or Prepetition Agents~~, and in any event no less frequently than weekly, status updates on the Debtors' efforts to consummate any Sale(s) and/or any other dispositions or capital/equity raises~~,~~; and (C~~z~~) promptly advise the DIP Agent~~ and Prepetition Agents~~ of any expressions of interest in any or all of the Debtors' assets and/or equity interests.

18.     ~~(iii)     Subject in all respects to the rights and limitations set forth in Paragraphs 39-43 hereof, in~~Credit Bid.  In connection with any Sale(s) or other dispositions of any assets of the Debtors (outside of the ordinary course of business), the DIP Agent~~,~~ and DIP Lenders, ~~and the Prepetition Secured Parties,~~ respectively, may ~~seek to~~ credit bid, in accordance with the DIP Financing Agreements~~ and/or the Prepetition Financing Documents (as applicable),~~. some or all of ~~their claims~~the DIP Obligations for ~~their respective collateral~~the DIP Collateral, including for the avoidance of doubt any Enhancement Fee that would be payable to the DIP Parties upon closing of any such Sale as provided in Paragraph 16 (each a "**Credit Bid**") pursuant to section 363~~(k)~~ of the Bankruptcy Code.  ~~A Credit Bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such Credit Bid holds~~, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a ~~security interest.~~chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  In all such instances, each of the DIP Agent~~,~~ and DIP Lenders, ~~and Prepetition Secured Parties~~, respectively, shall be considered

17

a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid, and, notwithstanding anything to the contrary contained herein, any credit bid by the DIP Agent and/or any DIP Lender shall provide for the payment in full of the Prepetition Secured Debt.  For the avoidance of doubt, the DIP Agent and DIP Lenders, in accordance with any order entered by the Court authorizing bidding procedures with respect to a sale of all or substantially all of the Debtors' assets, shall be permitted to combine their respective allocations of the DIP Obligations into a single Credit Bid and submit joint Bids as provided therein.

19.    Access to Records; Reporting.  In addition to, and without limiting, whatever rights to access the DIP Parties and Prepetition Secured Parties have under the DIP Financing Agreements and the Prepetition Financing Documents, as applicable, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the Prepetition Secured Parties and the DIP Parties: (ia) to have access to and inspect the Debtors' properties, (ii; (b) to examine the Debtors' books and records, (iii; (c) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors,; and (ivd) otherwise to have the full cooperation of the Debtors. In addition, the Debtors shall provide to the ; provided, however, that the Prepetition Secured Parties all of the financial, collateral, and related reporting required under the DIP Financing Agreements as and when provided to the DIP Agent under the DIP Credit Agreement.their professionals shall be granted access to information to the extent necessary to respond to a Challenge Proceeding.  In connection with the foregoing, during the Chapter 11 Cases, and until such time as the Prepetition Secured DebtDIP Obligations shall have been paid in full, the Debtors shall cooperate fully with the Prepetition Secured Parties' retained financial advisor, Berkeley Research Group and anya financial advisor engaged by the DIP Agent.  Notwithstanding anything to the contrary herein, none of the Loan Parties will be required to disclose information or provide access to the Prepetition Secured Parties or the DIP Agent (or any agent or representative thereof) where such disclosure or access is prohibited by applicable law or is subject to attorney-client or similar privilege, constitutes attorney work product, or implicates conflicts matters.

20.     <u>Pleadings to ~~be~~Be Filed in the Chapter 11 Cases</u>.  Promptly, and at least two (2) calendar days prior to filing, the Debtors shall provide ~~to the Prepetition Secured Parties and~~(i) to the DIP Parties copies of all material pleadings (including, without limitation, any proposed orders, motions and applications) and any other pleadings wherein such parties' rights are impacted to be filed or entered in the Chapter 11 Cases and/or in any related proceedings, which pleadings shall be in form and substance reasonably acceptable to the ~~Prepetition Secured Parties and the DIP~~DIP Parties, and (ii) up to and including the Indemnity Termination Date, to the Prepetition Secured Parties copies of all material pleadings (including, without limitation, any proposed orders, motions and applications) wherein such parties' rights and protections granted under this Second Interim Order may be materially prejudiced to be filed or entered in the Chapter 11 Cases and/or in any related proceedings; provided that the Final Order (including any amendments or modification thereto) and any amendments or modifications to this Second Interim Order, in each case, shall be, with respect to any rights and protections granted to the Prepetition Secured Parties under this Second Interim Order, in form and substance acceptable to the Prepetition Secured Parties.

21.     ~~**Prepetition Indemnity Account**~~.  ~~On the date that is 30 days after the entry of this Interim Order, the Debtors shall establish a segregated account in the control of the Prepetition ABL Agent (the "~~***Prepetition Indemnity Account***~~"), into which the sum of $250,000 of Cash Collateral shall be deposited~~[Final Satisfaction of Prepetition Secured Obligations.  The Debtors are authorized and directed to [(x) execute the Payoff Letter and perform the transactions and undertakings set forth therein, which are hereby approved in all respects and, (y)] within one business day of the date hereof and contemporaneous with the second interim funding of the DIP Loans, but in no event later than 2:00 p.m. (prevailing Eastern Time) on August 15, 2019, irrevocably pay approximately up to $[142] million in full in cash to the Prepetition Agents in full and final satisfaction of the Prepetition Secured Obligations (other than the Prepetition Indemnity Obligations, if any) including interest and fees (including any prepayment and/or early termination fees) through the date of repayment (at the default contract rate) in accordance and pursuant to [the Payoff Letter] (the "**Prepetition Payoff**"), which repayment shall be indefeasible upon the

occurrence of the Indemnity Termination Date; provided that the Prepetition Indemnity Obligations, if any, shall continue until the Indemnity Termination Date.  Effective immediately upon the Prepetition Payoff:]

(a)    [the Prepetition Financing Documents and any other "Loan Documents" as defined in the Prepetition Credit Agreement, in each case, other than the Prepetition Indemnity Obligations and any other provisions whose survival is contemplated under this Second Interim Order (including those that, subject to Paragraphs [15 and 39] hereof survive for the benefit of the DIP Lenders and the prepetition mortgages granted in favor of the Prepetition ABL Agent), shall be deemed cancelled, terminated, and of no further force and effect (other than the Prepetition Indemnity Obligations, cash management and letter of credit arrangements, and any other provisions whose survival is contemplated under this Second Interim Order), and all rights, and obligations (other than any contingent indemnity obligations that by their terms survive termination, cash management and letter of credit obligations, and any other provisions whose survival is contemplated under this Second Interim Order) under the Prepetition Financing Documents, including the Prepetition Secured Obligations, shall be released, cancelled, and of no further force or effect; provided, that the Prepetition Liens shall remain in effect solely until the occurrence of the Indemnity Termination Date and solely to secure payment of the Prepetition Indemnity Obligations or other amounts due to the Prepetition Secured Parties pursuant to this Second Interim Order.]  On the Indemnity Termination Date, the Prepetition Liens and Prepetition Indemnity Obligations shall be fully and irrevocably deemed released, cancelled, and of no further force or effect except to the extent they survive under this Second Interim Order for the benefit of the DIP Lenders; provided further that any and all Prepetition Liens that survive until the Indemnity Termination Date shall be subordinate in all respects to the Carve Out, the Permitted Prior Liens, and the DIP Liens, and shall be enforceable only to the extent that any Prepetition Indemnity Obligations are not capable of being satisfied from the application of funds on deposit in the Prepetition Indemnity Account;

(b)    the Prepetition Agents will cooperate fully with the DIP Agent to transfer to the DIP Agent any possessory DIP Collateral (other than, for the avoidance of doubt, the Prepetition Indemnity Account (as defined below)) that is in the possession of the Prepetition Agents.

22.    Prepetition Indemnity Account.  Upon entry of this Second Interim Order, and no later than 2:00 p.m. (New York time) on August 15, 2019, the Debtors are authorized and directed to pay or deliver to the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) the sum of $[750,000] to be segregated and held under the control of the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) (the "***Prepetition Indemnity Account***") as security for any amounts owing but not paid to the Prepetition Secured Parties and any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition Agents and the other Prepetition Secured Parties under~~that~~

expressly by their terms survive termination of the Prepetition Financing Documents, including without limitation, the provisions of Sections 11.3 and 11.4 of the Prepetition Credit Agreement (the "***Prepetition Indemnity Obligations***").

(a)  Without limiting the generality of the foregoing, the funds in the Prepetition Indemnity Account shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition Agents and the other Prepetition Secured Parties in connection with or responding to (ai) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraphs 39-43 46-52 hereof, or (bii) any Challenge Proceeding against any one or more of the Prepetition Agent(s) and/or the other Prepetition Secured Parties related to the Prepetition Financing Documents, the Prepetition Liens, or the Prepetition Secured Debt Obligations, whether in the Chapter 11 Cases or independently in another forum, court, or venue; provided, that the relative interests of the Prepetition Agents and other Prepetition Secured Parties in the funds deposited in the Prepetition Indemnity Account on account of any Prepetition Indemnity Obligations shall be subject in all respects to the priority provisions set forth in the Prepetition Financing Documents.

1)  ~~The Prepetition Indemnity Obligations shall be secured by a first-priority lien on the Prepetition Indemnity Account and the funds therein and by a Lien on the Prepetition Collateral.~~

(b)  The Prepetition Indemnity Obligations shall be secured by a first-priority lien (the "***Prepetition Indemnity Account Lien***") in favor of the Prepetition ABL Agent (on behalf of itself and the other Prepetition Secured Parties) on the Prepetition Indemnity Account and the funds therein and by a Lien in favor of the Prepetition ABL Agent (on behalf of itself and the other Prepetition Secured Parties) on the DIP Collateral (subject and subordinate to the Carve Out, Permitted Prior Liens and the DIP Liens). For the avoidance of doubt, notwithstanding anything to the contrary contained herein, (i) up to and including the Indemnity Termination Date, the Prepetition Indemnity Account and the funds therein shall not constitute DIP Collateral or be subject to the Carve Out, the DIP Liens, the DIP Superpriority Claim or any other Lien or claim granted to any person or entity other than the Prepetition Secured Parties, and (ii) any Prepetition Indemnity Obligations, other than those payable under Paragraph 12 hereof or from the Prepetition Indemnity Account (or any Prepetition Indemnity Account Lien), shall be subject and subordinate to the Carve Out, Permitted Prior Liens, the DIP Obligations, and the DIP Liens.

(c)  The Prepetition Agents and other Prepetition Secured Parties may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court.

(d)    In addition to the establishment and maintenance of the Prepetition Indemnity Account, ~~until~~up to and including the ~~Challenge Period~~Indemnity Termination Date ~~(as defined below)~~ the Prepetition Agents (for themselves and on behalf of the other Prepetition Secured Parties), shall retain and maintain the Prepetition Liens (subject to the Carve Out, Permitted Prior Liens and the DIP Liens ) as security for the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account; provided, that ~~(i)~~ any such indemnification claim(s) shall (i) be subject to the terms of the Prepetition Financing Documents, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs ~~39-43~~46-52 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).

(e)    ~~Upon~~ Promptly upon, but in no event later than five Business Days after, the occurrence of the ~~Challenge Period~~ Indemnity Termination Date ~~and indefeasible payment in full, in cash of the Prepetition Secured Debt, and provided that no Challenge Proceeding has been commenced or any such Challenge Proceeding has been resolved by a final order of the Court in favor of the affected Prepetition Agent(s) and/or Prepetition Secured Party(ies), as applicable~~, the Prepetition ABL Agent shall ~~promptly~~ return to the Debtors the remaining amount, if any, ~~of~~net of any unpaid fees and expenses of the Prepetition Secured Parties and the Prepetition Indemnity Obligations, in the Prepetition Indemnity Account.  Upon such return, such funds shall constitute DIP Collateral.

(f)    For the avoidance of doubt, nothing contained in this Paragraph ~~12~~21 shall relieve the Debtors of their obligation to timely reimburse the fees, costs and expenses of the Prepetition Agents and the other Prepetition Secured Parties pursuant to Paragraph ~~65~~12 and subject to Paragraph [67] hereof.

23.    **Treatment of Disgorged Amounts**.  In the event that the Prepetition Agents or any of the other Prepetition Secured Parties is ordered by this Court to disgorge, refund or in any manner repay to any of the Debtors or their estates any amounts ("***Disgorged Amounts***") the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account in the control of the Prepetition ABL Agent, pending a further final, non-appealable order of a court of competent jurisdiction (for the avoidance of doubt the Court is a court of competent jurisdiction) regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Agents and the other Prepetition Secured Parties, distributing such amounts to the Debtors or the DIP Parties, or otherwise).

24.    Section 507(b).  Nothing herein ~~shall~~or the DIP Financing Agreements shall prejudice, limit or otherwise impair or modify the Prepetition Secured Parties' respective rights under section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for the ~~D~~diminution in ~~V~~value of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case(s); provided, however, that~~:~~ (a) nothing herein shall impair the ~~Debtors'~~right of the Debtors, the DIP Parties, or any other party in ~~interest's right to seek~~interest to contest any request for additional or different adequate protection~~,~~; and (b) any section 507(b) claim granted in the Chapter 11 Cases to any Prepetition Secured Party(ies) shall be ~~(x)~~ subject and subordinate to the Carve Out and ~~(y) senior in right to payment of all~~ DIP Obligations ~~(as defined below)~~.

25.    ~~The Debtors' authority to use Cash Collateral pursuant to the terms set forth in this Interim Order shall terminate (the "*Cash Collateral Termination Date*") upon the earliest to occur of any of the following (each, a "*Cash Collateral Termination Event*"):~~

        a)    ~~the date that is 90 days from the Petition Date;~~

        b)    ~~the date that is 30 days following the date of entry of the Interim Order if a Final Order acceptable to the DIP Agent and the Prepetition Agents approving the use of Cash Collateral and the DIP Facility has not been entered by the Court on or prior to such date;~~

        c)    ~~any failure of the Debtors to adhere to the Approved Budget, including any failure to maintain Excess Availability at the levels required hereunder;~~

        d)    ~~the acceleration of the DIP Obligations and/or the occurrence of a DIP Order Event of Default (defined below) in accordance with the DIP Financing Agreements or the commencement of the Remedies Notice Period;~~

        e)    ~~the consummation of a sale of all or substantially all of the Debtors' assets;~~

        f)    ~~any stay, reversal, vacatur, rescission or other modification of the terms of this Interim Order not consented to by the Prepetition Agents;~~

        g)    Subject to section 364(e) of the Bankruptcy Code and Paragraph [66] of this Second Interim Order, nothing~~the failure of the Debtors to provide all financial reports as well as any budget variance report required under the DIP Financing Agreements;~~

        ~~(a)    the dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases;~~

23

h) ~~the failure of the Debtors to comply with any of the budget covenants or Milestones as set forth in the DIP Financing Agreements;~~

i) ~~the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order (in form and substance acceptable to the Prepetition Secured Parties) of the Court;~~

j) ~~failure of the Debtors to file a motion or other pleading (in form and substance acceptable to the Prepetition Secured Parties) by August 8, 2019, seeking payment in full, in cash, of the Prepetition Secured Debt, together with a commitment letter from the DIP Parties (the "*Prepetition Secured Debt Refinancing*");~~

k) ~~no order (in form and substance acceptable to the Prepetition Secured Parties) shall have been entered by the Court by 11:59 p.m. on August 14, 2019, authorizing and approving the Prepetition Secured Debt Refinancing; or~~

l) ~~the Prepetition Secured Debt Refinancing shall not have been consummated by 11:59 p.m. on August 15, 2019.~~

26. ~~Immediately upon the occurrence of the Cash Collateral Termination Date, notwithstanding any automatic stay otherwise applicable to the Prepetition Secured Parties pursuant to section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the Prepetition Secured Parties or the DIP Parties may exercise their rights and remedies in accordance with this Interim Order and the Prepetition Financing Documents five (5) days (the "*Remedies Notice Period*") following delivery of written notice (a "*Remedies Notice*") of such occurrence, in each case such Remedies Notice being given to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel to the Prepetition Secured Parties, (iv) counsel for any Committee, (v) counsel to the DIP Agent, and (vi) the U.S. Trustee; provided,~~ however, ~~that no Remedies Notice or Remedies Notice Period shall apply to any of the Cash Collateral Termination Events in clauses (k) (m) of paragraph 14 of this Order and use of Cash Collateral shall terminate automatically, without any notice, application, motion, hearing before, or order from, the Court, upon the occurrence of any of the Cash Collateral Termination Events in clauses (k) (m) of paragraph 14 of this Order. Subject in all respects to paragraph 16 hereof, in addition to providing notice of an intention to exercise remedies as provided~~

herein, a Remedies Notice may also advise the Debtors that any further use of Cash Collateral will be made in the sole discretion of the Prepetition Secured Parties.

27.    Upon the service of a Remedies Notice:

(a)    the Debtors shall continue to deliver and cause the delivery of the proceeds of the Prepetition Collateral to the Prepetition Agents as provided in this Interim Order and in the DIP Financing Agreements;

(b)    the Prepetition Secured Parties and the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Interim Order, the DIP Financing Agreements, and the Prepetition Financing Documents, as applicable; and

(c)    the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations, the Prepetition Secured Debt of the Prepetition Secured Parties, and the Carve Out, as provided in the DIP Financing Agreements and this Interim Order; provided, however, that during the Remedies Notice Period the Debtors may use Cash Collateral solely to meet accrued and unpaid payroll obligations (other than severance) and trust fund obligations strictly in accordance with the Approved Budget.

28.    Following the giving of a Remedies Notice, the Debtors and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than two (2) business days' notice to the Committee, the DIP Agent, and the Prepetition Secured Parties; provided, that if a hearing to consider any relief in connection with the delivery of a Remedies Notice or continued use of Cash Collateral is requested to be heard within such Remedies Notice Period but is scheduled for a later date by the Court, the Remedies Notice Period shall be automatically extended to the date of such hearing. If (x) the Debtors or any such Committee do not contest the occurrence of a Cash Collateral Termination Event and/or the right of the Prepetition Secured Parties or the DIP Parties to exercise their remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a Cash Collateral Termination Event and/or the right of the Prepetition Secured Parties or the DIP Parties to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the Prepetition Secured Parties, shall automatically terminate at the end of the Remedies Notice Period.

29.    Subject to the provisions of Paragraph 17 above, upon the expiration of the Remedies Notice Period, the Prepetition Secured Parties are authorized to exercise their remedies and proceed under

or pursuant to the Prepetition Financing Documents; except that with respect to any of the Debtors' leasehold locations, the Prepetition Secured Parties can only enter upon a leased premises following the Cash Collateral Termination Date in accordance with (i) a separate written agreement by and between the Prepetition ABL Agent and any applicable landlord, (ii) pre-existing rights of the Prepetition Secured Parties and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the Prepetition Secured Party on such notice to the landlord, the DIP Agent, the Debtors, any Committee, and the U.S. Trustee as shall be required by this Court.

30.    ~~Nothing~~ included herein shall prejudice, impair or otherwise affect Prepetition Secured Parties' rights to seek any other or supplemental relief from the Court in respect of the Debtors.

## IV.    Authorization for the DIP Facility

### A.    Findings Regarding the DIP Financing.

31.    <u>Good Cause</u>. Good cause has been shown for immediate entry of this Second Interim Order.

32.    <u>Need for Post-Petition Financing</u>.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates for the benefit of their various stakeholders.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility ~~and the use of Cash Collateral~~ (in each case in the manner and in the amounts provided herein and in the Approved Budget (including any permitted variances), in the DIP Credit Agreement, and this Second Interim Order), the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

33.    <u>No Credit Available on More Favorable Terms</u>. As set forth in the DIP Motions, the Debtors have been unable to obtain any of the following:

(a)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense;

(b)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code;

(c)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien; or

(d)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien;

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Second Interim Order.  The Debtors are unable to obtain credit from the DIP Lenders without granting to the DIP Agent and the DIP Lenders the DIP Protections (as defined below).

34.    Business Judgment; Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.  The extension of credit under the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (iand the repayment of the Prepetition Secured Debt herein: (a) are fair, reasonable, and the best available under the circumstances, (ii: (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iiic) are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length between the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, and the proceeds to be extended under the DIP Facility will be so extended in good faith and used for valid business purposes and uses, as a consequence of which the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties are each entitled to the protections and benefits of sections 363(m) and 364(e) of the Bankruptcy Code.

35.    Sections 506(c).  As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Credit Agreement, and in consideration of the Prepetition Agents' and Prepetition Secured Parties' consent to the use of their Prepetition Collateral, including Cash Collateral, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect

to the DIP Agent, the DIP Lenders, the DIP Collateral, the Prepetition Agents, the Prepetition Secured Parties, and the Prepetition Collateral, and the DIP Collateral.

36.    <u>Relief Essential; Best Interest</u>.  The relief requested in the DIP Motions (and as provided in this Second Interim Order) is necessary, essential, and appropriate for the continued operation of the Debtors' business, the management and preservation of the Debtors' assets during the Interim Period, and to avoid immediate and irreparable harm.  It is in the best interest of the Debtors' estates that the Debtors be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP Financing Agreements.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

**B.    <u>Approval of Entry into the DIP Financing Agreements</u>**

37.    The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Second Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Second Interim Order and the DIP Financing Agreements.   In furtherance of the foregoing, the Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the "Closing Fee" and "Exit Fee" (each as defined in the DIP Financing Agreements), and, subject to the provisions of Paragraph 65[67] hereof, the DIP Agent's and DIP Lenders' reasonable attorneys', financial advisors', consultants', and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court.

38.    In order to enable them to continue to operate their businesses during the Interim Period, and subject to the terms and conditions of this Second Interim Order, the DIP Credit Agreement, the other DIP Financing Agreements, including the Approved Budget (subject to any variances thereto permitted

under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), during the Interim Period the Debtors are hereby authorized under the DIP Facility to borrow an amount up to $75217 million in accordance with the terms and conditions of the DIP Credit Agreement, of which $75 million was advanced pursuant to the First Interim Order.

39.     The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements and this Second Interim Order, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), solely as follows:

       (a)      to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

       (b)      for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

       (c)      for making payments in respect of Adequate Protection and other payments, all subject to and as provided in this Second Interim Order;

       (d)      to repay $50 million of the Prepetition ABL DebtSecured Obligations as provided herein;

       (e)      to fund the Prepetition Indemnity Account, as provided herein; and

       (f)      to fund the Carve Out.

40.     DIP Obligations.  The DIP Financing Agreements and this Second Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations (as defined in the DIP Financing Agreements), which shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee appointed in these Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "*Successor Cases*").  Upon entry of this Second Interim Order, the DIP Obligations will include all loans, and any other indebtedness or obligations,

contingent or absolute, including, for the avoidance of doubt, the Enhancement Fee (approval of which is subject to entry of the Final Order), which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, under the DIP Financing Agreements or this Second Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owing under the DIP Financing Agreements. The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand except as provided herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Financing Agreements (including any DIP Obligation or DIP Liens (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

41.     Pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(c)(3)d)(1) of the Bankruptcy Code, and subject to the limitations set forth below, effective immediately upon the entry of this Second Interim Order the DIP Agent is hereby granted the Liens (the "**DIP Liens**") (which DIP Liens are subject to the Adequate Protection Liens, the Prepetition Liens, any Permitted Prior Liens, andand subordinate to the Carve Out) for the ratable benefit of itself and the DIP Lenders, which DIP Liens constitute continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and liens, and except as otherwise expressly provided in this Second Interim Order, upon and to all of the following (collectively, the "**DIP Collateral**"): Liens with the priorities set forth in 11 U.S.C. § 364(c)(2), (c)(3) , and (c)(3)d)(1) on all "property of the estate" as defined in section 541 of the Bankruptcy Code (including tangible and intangible assets and equity interests of the Borrowers (and any guarantors), including all assets constituting Prepetition Collateral), subject only to Liens (including any Adequate

Protection Liens) granted in favor of the Prepetition Agents (for the benefit of the Prepetition Secured Parties), any Prior Permitted Prior Liens, and the Carve- Out.  The DIP Collateral shall exclude (a) leases not subject to a mortgage in favor of the Prepetition ABL Agent as of the Petition Date (the "***Unencumbered Leases***"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case limited as provided in the Prepetition Financing Documents), and (c) claims under chapter 5 of the Bankruptcy Code ("***Avoidance Actions***"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions, and (d) prior to and including the Indemnity Termination Date, the Prepetition Indemnity Account and any funds therein (including the $[750,000] to be funded pursuant to this Second Interim Order).

42.     From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Second Interim Order, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order).  The Approved Budget, and any modification to, or amendment or update thereof, shall be approved by, and in form and substance satisfactory to, the Prepetition Secured PartiesDebtors and the DIP Agent, each in their sole discretion.  The Approved Budget shall be updated, modified, or supplemented by the Debtors from time to time in accordance with the DIP Credit Agreement (provided that any update, modification or supplement shall be approved in writing by, and shall be in form and substance satisfactory to the Prepetition Agents and the DIP Agent, each in theirits sole discretion), and no such updated, modified or supplemented budget shall be effective until so approved and once approved shall be deemed the "Approved Budget".."  Each budget delivered to the Prepetition Agents and the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the Prepetition Agents and the DIP Agent and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable.  A copy of any Approved Budget shall be delivered to counsel for a Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by each of the Prepetition Agents and the DIP Agent.

43.    Subject and subordinate ~~first~~ to the Carve Out ~~and then to the Adequate Protection Superpriority Claims~~, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases and any Successor Case(s) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

44.    Other than the Carve Out ~~and the Adequate Protection granted to the Prepetition Secured Parties hereunder~~, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims ~~(other than the Adequate Protection Superpriority Claims)~~ are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations or with any other claims of the DIP Agent and/or DIP Lenders arising hereunder.

45.    This _Second_ Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens ~~and the~~, Adequate Protection Liens, and Prepetition Indemnity Account Lien without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect ~~the~~such DIP Liens ~~and the~~, Adequate Protection Liens, or Prepetition Indemnity Account Lien, or to entitle

the DIP Liens and the, Adequate Protection Liens, or Prepetition Indemnity Account Lien to the priorities granted herein.

46.    Notwithstanding the foregoing, the DIP Parties and/or the Prepetition Secured Parties, as applicable, may, in their respective discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens and/or, the Adequate Protection Liens granted pursuant hereto and/or the Prepetition Indemnity Account Lien, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

47.    The Debtors shall execute and deliver to the DIP Agent and each Prepetition Secured Party, as applicable, all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Agent and/or the applicable Prepetition Secured Party may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens and/or, the Adequate Protection Liens granted pursuant hereto and/or the Prepetition Indemnity Account Lien.

48.    The DIP Parties and the Prepetition Secured Parties, in their respective discretion, may file a photocopy of the entered, docketed version of this Second Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Second Interim Order. The Subject to the priorities set forth in this Second Interim Order, the prepetition mortgages granted in favor of the Prepetition ABL Agent shall remain in full force and effect in accordance with its/their terms as if the same were executed and delivered under this Second Interim Order and thereafter recorded with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal

property, and each such mortgage (or any mortgage granted to the DIP Agent in respect of the DIP Facility, regardless of whether the same is recorded with any applicable registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property) shall serve as evidence of validity, perfection and contemplated priority of the DIP Liens and/or, the Adequate Protection Liens granted pursuant hereto and/or the Prepetition Indemnity Account Lien.

49.     The Subject to the terms of this Second Interim Order (including the subordination provisions hereof), the DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have co-equal rights with the Prepetition Agents and succeed to the rights of the Prepetition Agents with respect to all third-party notifications in connection with the Prepetition Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including, without limitation, each collateral access agreement duly executed and delivered by any landlord of any Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements, provided, that nothing herein shall impair any such rights of the Prepetition Agents that may continue to exist, subject to Paragraph 15 of this Second Interim Order.

50.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

(a)     permit the Debtors to grant the DIP Liens and, the Adequate Protection Liens, and Prepetition Indemnity Account Lien, and to incur all liabilities and obligations to the DIP Agent and DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Second Interim Order; and

(b)     authorize the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Second Interim Order.

51.     The DIP Lenders are authorized to provide the Consignment Facility to the Debtors pursuant to the terms contained in the DIP Financing Agreements.

**C.     Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**

52.    Nothing in this Second Interim Order, the Prepetition Financing Documents, the DIP Credit

Agreement, or the other DIP Financing Agreements shall prejudice whatever rights any Committee or any

other party-in-interest (other than the Debtors) with requisite standing that has been sought and granted by

this Court, as applicable, may have to bring an adversary proceeding, cause of action, objection, claim,

defense, or other challenge against any one or more of the Prepetition Secured Parties, the Prepetition

Secured Debt and/or the Prepetition Liens (collectively, a "***Challenge Proceeding***"), including, but not

limited to, any of the following:

(a)    in the case of the Prepetition Secured Parties, an objection to or challenge of the
Debtors' Stipulations set forth in Paragraphs [III.6.(1a) through (9i)], including (i) the validity,
extent, perfection, or priority of the security interests and Prepetition Liens of the Prepetition
Agents in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or
amount of the Prepetition Secured Debt; or

(b)    a suit against any one or more of the Prepetition Secured Parties in connection with
or related to the Prepetition Secured Debt and/or the Prepetition Liens, or the actions or inactions
of the such Prepetition Secured Party(ies) arising out of or related to such Prepetition Secured Debt
and/or Prepetition Liens;

provided, however, that any Committee or any other party-in-interest with requisite standing that has been

sought and granted by this Court, as applicable, must commence a Challenge Proceeding asserting such

objection or challenge, including, without limitation, any claim against any one or more of the Prepetition

Agents and/or other Prepetition Secured Parties, as applicable, in the nature of a claim, cause of action,

setoff, counterclaim, or defense in respect of the Prepetition Secured Debt and/or the Prepetition Liens

(including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the

Bankruptcy Code), by ~~the later of (x) for any Committee, sixty (60) days from the date of entry of the Final~~

~~Order, or (y) for any party in interest other than an official Committee, seventy-five (75) days from the~~

~~Petition Date (collectively, (x) and (y) shall be referred to as the "*Challenge Period*"; and as of 12:01 a.m.~~

~~(Prevailing Eastern Time) on the date that is the next calendar day after the termination of the Challenge~~

~~Period, in the event that no Challenge Proceeding has been commenced during the Challenge Period, such~~

~~date shall be the "*Challenge Period Termination Date*").~~5:00 p.m. (prevailing Eastern Time) on September

4, 2019 (the "***Challenge Period Termination Date***").    The failure of any Committee or other third party

who desires to investigate either (i) the validity, extent, perfection, or priority of the security interests and Prepetition Liens in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured Debt, to make a formal written request to the affected Prepetition Secured Parties for information validating such Prepetition Secured Debt and/or Prepetition Liens on or before the date that is ten (10) calendar days prior to the ~~expiration of the~~ Challenge Period Termination Date shall operate as a bar to any motion, application or other request by such party(ies) for an extension of the Challenge Period~~.~~ Termination Date.

53.     Not less than five (5) business days prior to filing a motion seeking standing (a "***Challenge Standing Motion***") to commence a Challenge Proceeding, a Committee or other third party, as the context makes applicable, shall inform the affected Prepetition Agent(s) and/or other Prepetition Secured Party(ies), in writing, of its intent to file such standing motion (such writing shall contain a reasonably detailed statement of the claims proposed to be asserted in such Challenge Proceeding and the legal/other bases supporting such claim(s) in the event standing were to be granted by the Court ("***Challenge Statement***")). The parties shall thereafter meet and confer for purposes of attempting to resolve any issues/claims asserted in the Challenge Statement.  In the event a third party, including any Committee, thereafter files a Challenge Standing Motion seeking standing to commence a Challenge Proceeding in accordance with the terms of this Second Interim Order, any such Challenge Standing Motion shall, at a minimum, include a copy of any proposed objection or adversary complaint containing a detailed description of the claims and causes of action such party proposes to pursue.  The Challenge Period Termination Date shall be tolled for a period not to exceed thirty (30) days upon the filing of a Challenge Standing Motion (the "***Tolling Period***") by an interested party (including any Committee) seeking standing to commence a Challenge Proceeding in accordance with the terms of this Second Interim Order); provided, that any such tolling shall be applicable solely to the party that files the subject Challenge Standing Motion and solely as to the Challenge Proceedings for which standing is sought (as set forth in such Challenge Standing Motion); and provided, further, that, unless otherwise ordered by the Court, the granting of any Challenge Standing Motion shall not extend the Challenge Period Termination Date beyond expiration of the Tolling Period.  The Challenge

Period Termination Date may occur as to some, but not all, of the Prepetition Agents and/or other Prepetition Secured Parties if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and/or other Prepetition Secured Parties.

54.    For the avoidance of doubt, in the event any one or more of the Chapter 11 Cases is converted to a case under Chapter 7, or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then in either such event and solely as applies to any such trustee the Challenge Period shall not expire until sixty (60) days after such trustee's appointment.  In the event that the Committee or any other party in interest with requisite standing, as applicable, has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding.  In ~~either~~ event~~, until~~ that the Committee or any other party in interest with requisite standing, as applicable, has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding.  Until the later of the ~~expiration of the~~ Challenge Period Termination Date without commencement of a Challenge Proceeding or the entry of a final, non-appealable order or judgment on account of any Challenge Proceeding properly commenced ~~within~~before the Challenge Period Termination Date, such trustee shall not be bound by the Debtors' Stipulations in this Second Interim Order.

55.    Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition Secured Parties, any and all such challenges, claims, and/or objections by any party (including, without limitation, any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) ***shall be deemed to be forever waived and barred*** with respect to the Prepetition Agents and other Prepetition Secured Parties, as applicable, and the Prepetition Secured ~~Debt~~Obligations and Prepetition Liens as to one or more or all of the Prepetition Agents and/or other Prepetition Secured Parties, as the case may be, as of the Petition Date, shall be deemed to be an allowed fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations as to one or more or all of the Prepetition Agents

and/or other Prepetition Secured Parties, as the case may be, shall be binding on all creditors, interest holders, and parties-in-interest, including any Committee.

56.    To the extent any such Challenge Proceeding is commenced, or any claim is asserted against any one or more of the Prepetition Agents and/or other Prepetition Secured Parties, the affected Prepetition Secured Parties, or any of them, as the case may be, shall be entitled to include the costs and expenses, including, but not limited to, reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents, and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the prepetition claims and Liens of such Prepetition Secured Party(ies) to the extent permitted pursuant to the applicable Prepetition Financing Documents, and subject to the provisions herein, including with respect to the priority of such claims and Liens. To the extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the affected Prepetition Secured Party(ies), or any of them, as the case may be, shall be entitled to include such costs and expenses, including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of such party's prepetition claim which shall be reimbursed by the Debtors, including (x) each monthsubject, and subordinate as provided forherein, to the Carve Out and the indefeasible payment in Paragraph 65, below andfull in cash of the DIP Obligations, or (y) where applicable, out of the Prepetition Indemnity Account or as provided under Paragraph 12 herein for fees and expenses incurred prior to the Challenge Period Termination Date, and as part of the Adequate Protection Superpriority Claims. In addition to any other provisions in this Second Interim Order, the Prepetition Indemnity Account shall be maintained until the final resolution of all such objections or claims that would, if successful, be payable as Prepetition Indemnity Obligations, against the affected Prepetition Secured Party(ies). TheSubject in all respects to the Carve Out and prior payment in full in cash of the DIP Obligations, the Debtors shall remain liable to the Prepetition Secured Parties, or any of them, as the case may be, for all unpaid Prepetition Indemnity Obligations to the extent that the

funds in the Prepetition Indemnity Account are insufficient to satisfy the Prepetition Indemnity Obligations in full.

57.      Notwithstanding anything to the contrary contained in this Second Interim Order, in the event there is a timely and successful Challenge Proceeding by any party in interest in accordance with the terms hereof, this Court may fashion an appropriate remedy as applicable to the payment of any adequate protection or Prepetition Secured Debt consisting of an unsecured claim or other claim or amount not allowable under section 502 of the Bankruptcy Code.

58.      Notwithstanding anything contained in this Second Interim Order or any of the DIP Financing Agreements, the Challenge Period Termination Date shall not be modified, amended or extended without the prior written consent of the Prepetition Secured Parties, in their sole discretion, and the DIP Parties, with such consent of the DIP Parties not to be unreasonably withheld or delayed.

**D.      Carve Out and Payment of Professionals**

59.      Carve Out.   As used in this Second Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (exclusive of any fee which becomes due and payable upon consummation of a transaction) (the "Allowed Professional Fees")[6] incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") at any time before or on the first business day following delivery by the ~~Prepetition Secured Parties and/or the DIP Agent or Prepetition ABL Agent, as applicable,~~ DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed

---

[6]      Any fee that is or will become due and payable upon the consummation of a transaction shall be payable solely from the proceeds received by the Debtors resulting from such transaction, free and clear of the liens of the ~~Prepetition Agents, the Prepetition Secured Parties, the~~ DIP Agent and the DIP Lenders.

by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all Allowed Professional Fees incurred by persons or firms retained by the Committee (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") up to and as limited by the aggregate Approved Budget amounts for each Committee Professional or category of Committee Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to (x) any payments made to Committee Professionals under the Approved Budget pursuant orders of the Court, and (y) all carryforwards and carrybacks from prior or subsequent favorable budget variances), and (v) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the ~~Prepetition Secured Parties and/or the DIP Agent or Prepetition ABL Agent, as applicable~~DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee ~~either~~ by ~~(i)~~ the DIP Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, ~~or (ii) the Prepetition ABL Agent which notice may be delivered following the occurrence and during the continuation of a Cash Collateral Termination Event in each case~~ stating that the Post-Carve Out Trigger Notice Cap has been invoked.

60.     Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the entry of ~~this~~the First Interim Order, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable

Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person; provided, that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor.  The Debtors shall at all times fund and maintain in a segregated account (the "Funded Reserve Account") in trust for the benefit of Professional Persons in an amount (the "Funded Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Approved Budget at the applicable time, plus (ii) the Post-Carve Out Trigger Notice Cap, plus (iii) the amounts contemplated under paragraph 45(a)(i) and 45(a)(ii) above, plus (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the ~~Prepetition Financing Documents or~~ DIP Financing Agreements and ~~neither the Prepetition Secured Parties nor~~ the DIP Lenders shall <u>not</u> be entitled

41

to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the ~~Prepetition Financing Documents or~~ DIP Financing Agreements. Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the entry of ~~this~~the First Interim Order, the Debtors shall deliver to the DIP ~~Parties and the Prepetition Secured~~ Parties a report setting forth the Funded Reserve Amount as of such time. Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Debtors shall calculate the Funded Reserve Amount by reference to the Approved Budget for subsection (i) of the Funded Reserve Amount. The information supplied by Professional Persons pursuant to this paragraph shall be used to determine whether there is compliance with Section 16(T) of the DIP Credit Agreement. Once the Funded Reserve Amount is funded into the Funded Reserve Account, ~~neither the Prepetition Secured Parties nor~~ the DIP Lenders shall not have any further obligations with respect to the payments to Professional Persons relating to such amounts, and Professional Persons may only be paid from the Funded Reserve Account. For the avoidance of doubt, the Prepetition Secured Parties shall have no obligations with respect to any payments to Professional Persons, or to fund the Funded Reserve Amount or any other amounts related to the Carve Out.

61.    <u>Carve Out Reserves</u>. On the day on which a Carve Out Trigger Notice is given by ~~the Prepetition ABL Agent and/or~~ the DIP Agent to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including any amounts held in the Funded Reserve Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account with the ~~Prepetition ABL~~DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims. On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand (including any amounts held in the Funded Reserve Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-

Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date until such obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the DIP Agent for the benefit of the DIP Lenders.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay ~~the Prepetition Secured Parties~~ to the DIP Agent for the benefit of the DIP Lenders in accordance with their rights and priorities ~~as of the Petition Date, unless the Prepetition Secured Debt have been indefeasibly paid~~ set forth in ~~full, in cash, in which case any such excess shall be paid to the DIP Agent for the benefit of the DIP Lenders~~ this Second Interim Order, until the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated~~.~~, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date, until the Prepetition Secured Obligations, if any, have been indefeasibly paid in full in cash.  Notwithstanding anything to the contrary in this Second Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph ~~47~~55, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph ~~47~~55, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in this Second Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent ~~and the Prepetition Secured Parties~~ shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any

residual interest in the Carve Out Reserves, with any excess paid to the ~~Prepetition Secured Parties until the~~ ~~Prepetition Secured Debt has been paid in full, and thereafter to the~~ DIP Agent for application in accordance with the DIP Financing Agreements, until the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, and thereafter to the Prepetition Secured Parties until the Prepetition Secured Obligations, if any, have been indefeasibly paid in full. Further, notwithstanding anything to the contrary in this Second Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Term Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees of the Debtor Professionals shall not affect the priority of the Carve Out with respect to the Debtor Professionals, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Second Interim Order, the DIP ~~Facility~~Financing Agreements, or in any Prepetition Financing Agreement(s), the Carve Out with respect to the Debtor Professionals shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Prepetition Indemnity Obligations (other than the Prepetition Indemnity Account Lien and/or any claims of Prepetition Secured Parties to the Prepetition Indemnity Account and/or funds therein), and the Prepetition Secured Parties' and DIP Lenders' respective superpriority claims, and any and all other forms of adequate protection, liens, or claims securing the ~~Prepetition Secured Debt or the DIP Obligations.~~DIP Obligations and/or Prepetition Secured Obligations (other than the Prepetition Indemnity Account Lien and/or any claims of Prepetition Secured Parties to the Prepetition Indemnity Account and/or funds therein). The Carve Out with respect to all other Professional Persons, other than Debtor Professionals, shall be limited to the Carve Out Reserve.

62.    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

63.     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP

Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any

fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any

successor cases under any chapter of the Bankruptcy Code.  Nothing in this Second Interim Order or

otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties,

in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee

that the Debtors have sufficient funds to pay such compensation or reimbursement.

64.     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or

reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any

Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any

funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP

Collateral and shall be otherwise entitled to the protections granted under this Second Interim Order, the

DIP Financing Agreements, the Bankruptcy Code, and applicable law.

65.     <u>Restriction on Use of Funds</u>.  Notwithstanding anything herein to the contrary, no proceeds

of the DIP Facility, DIP Collateral, or ~~Cash Collateral~~the Prepetition Indemnity Account (including funds

therein) may be used by the Debtors, any official committee, or any other person or entity without the

consent of the DIP Agent and/or the Prepetition Secured Parties in connection with any of the following:

(a)  the investigation (including by way of examinations or discovery proceedings), initiation, assertion,

joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or

other litigation against any of the DIP Agent, the DIP Lenders, or Prepetition Secured Parties, or any of

their respective officers, directors, employees, agents, attorneys, consultants, financial advisors, affiliates,

assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter in any

way related to the DIP Financing Agreements or the Prepetition Loan Documents (including formal

discovery proceedings in anticipation thereof), including, without limitation, (i) investigating or challenging

the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim,

or offset to the DIP Obligations, DIP Superpriority Claims or the DIP Liens; (ii) investigating or challenging

45

the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured ~~Debt~~Obligations, the Prepetition Indemnity Obligations, Prepetition Liens, Adequate Protection Superpriority Claims ~~or~~, Adequate Protection Liens, or the Prepetition Indemnity Account Lien; (iii) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code or under similar laws of any jurisdiction against any of the Prepetition Secured Parties or the DIP Parties; (iv) investigating or asserting any so-called "lender liability" claims and causes of action against any of the Prepetition Secured Parties or the DIP Parties; and (v) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Secured ~~Debt~~Obligations, the Prepetition Indemnity Obligations, the Prepetition Liens, the Adequate Protection Superpriority Claim, the Adequate Protection Liens, the Prepetition Indemnity Account Lien, the DIP Obligations, the DIP Superpriority Claim, ~~the Adequate Protection Superpriority Claim;~~and the DIP ~~Liens or the Adequate Protection~~ Liens; (b) asserting any claims or causes of action against the DIP Parties or the Prepetition Secured Parties in such capacity, including, without limitation, claims or actions to object to or contest in any manner the DIP Parties' or the Prepetition Secured Parties' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the DIP Financing Agreements, the Prepetition Loan Documents, or this Second Interim Order; (c) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Parties or the Prepetition Secured Parties hereunder or under the DIP Financing Agreements or Prepetition Loan Documents (as applicable), in each of the foregoing cases without such applicable parties' prior written consent; provided, however, that the proceeds of the DIP Facility ~~Collateral, or Cash~~ and DIP Collateral shall be available for payment of any fees or expenses incurred by any official committee (if appointed) to investigate, but not prosecute, any of the foregoing in an amount not to exceed $25,000.

**E.    Maturity; DIP Order Events of Default; Remedies**

66.    The DIP Facility shall mature (the "***DIP Maturity Date***"~~)~~"), and the Debtors' ability to utilize cash shall terminate, upon the expiration of five (5) business days' prior written notice (a "***DIP Remedies Notice***" and the "***DIP Remedies Notice Period***") to each of (a) the Debtors, (b) lead restructuring

counsel to the Debtors, (c) counsel to the Prepetition Agents, (d) counsel for any Committee, (e) counsel to the DIP Agent, and (f) the U.S. Trustee, after the occurrence and continuation of any of the following events (each, a "**DIP Maturity Event**"), unless waived by the DIP Agent or cured by the Debtors during the DIP Remedies Notice Period:

(a)    March 31, 2020;

(b)    the date which is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Court on or prior to such date;

(c)    the failure of the Debtors to adhere to the Approved Budget, including any failure to maintain Excess Availability at the levels required hereunder;

(d)    the date on which the DIP Agent accelerates the DIP Obligations outstanding under the terms of the DIP Facility after the occurrence of an Event of Default (as defined in the DIP Credit Agreement and the passage of any applicable cure period) in accordance with the terms of the DIP Credit Agreement;

a)    the occurrence of a Cash Collateral Termination Event;

(e)    the occurrence of  DIP Order Event of Default; (defined below);

(f)    the consummation of a sale of all or substantially all of the Debtors' assets; and

(g)    any stay, reversal, vacatur, rescission or other modification of the terms of this Second Interim Order not consented to by the DIP Parties;

(h)    the failure of the Debtors to provide all financial reports as well as any budget variance report required under the DIP Financing Agreements;

(i)    the dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases;

(i)(j)    the failure of the Debtors to comply with any of the budget covenants or Milestones as set forth in the DIP Financing Agreements; or

(j)(k)    the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Court.

67.    ~~Unless and until the DIP Obligations and the Prepetition Secured Debt of the Prepetition Secured Parties have been irrevocably repaid in full in cash (or other arrangements for payment of (i) the Prepetition Secured Debt of the Prepetition Secured Parties satisfactory to the respective Prepetition Secured Parties and (ii) the DIP Obligations satisfactory to the DIP Agent, in each case in their sole and exclusive discretion have been made) and all DIP Commitments have been irrevocably terminated, the protections afforded to the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders pursuant to this Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "**Plan**") or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.~~

68.    Immediately upon the occurrence of the DIP Maturity Date, notwithstanding any automatic stay otherwise applicable to the DIP Parties pursuant to section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Second Interim Order, the DIP Parties may exercise their rights and remedies in accordance with this Second Interim Order upon the expiration of the DIP Remedies Notice Period following delivery of a DIP Remedies Notice, in each case such DIP Remedies Notice being given to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel for any Committee, (iv) counsel to the DIP Agent, and (vi) the U.S. Trustee.

69.~~27.~~    Each of the following, unless waived by the DIP Agent or cured by the Debtors, shall constitute a "***DIP Order Event of Default***":

        (a)    ~~the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement;~~

        ~~(b)~~(a)    the failure of the Debtors to obtain entry of the Final Order on or before the date that is thirty (30) days after the Petition Date, unless such date has been extended by consent of the ~~Prepetition Agents and~~ DIP Agent, each in their sole and absolute discretion;

(c)(b)   the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Credit Agreement (including, without limitation, the Milestones (as defined therein), and after giving effect to any notice or cure periods provided therein) or this Interim Order; or

(d)(a)   the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(e)(a)   termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(f)(c)   other than as contemplated by this Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief), unless the obligations owing to the Prepetition Secured Parties (including, without limitation, cash collateralizing any issued and undrawn letters of credit), the DIP Agent and DIP Lenders are indefeasibly paid in full in cash and the DIP Lenders' commitment to make loans is terminated ;

(g)(a)   entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

(h)(d)   payment of or granting adequate protection with respect to prepetition debt (other than as set forth in this Interim Order or as may be agreed among the Prepetition Secured Parties and the DIP Agent);

(i)(a)   the failure of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable with the priority described herein;

(j)(e)   the failure of liens or superpriority claims granted with respect to the Prepetition Liens and Prepetition Secured Debt to be valid, perfected and enforceable with the priority described herein;

(k)(f)   the entry of one or more orders of the Court lifting the automatic stay under section 362 of the Bankruptcy Code with respect to assets of the Debtors having a value in excess of $500,000 in the aggregate; and

(l)(g)   the Interim Order or Final Order, as applicable, shall be amended, modified, stayed or vacated without the written consent of the Prepetition Agents and the DIP Agent.

70.69.   Following the giving of a DIP Remedies Notice, the Debtors and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court, with any such

hearing to be held on not less than two (2) business days' notice to the Committee, and the DIP Agent, and the Prepetition Agents; provided, that if a hearing to consider any relief in connection with the delivery of a DIP Remedies Notice or continued use of Cash Collateralcash is requested to be heard within such DIP Remedies Notice Period but is scheduled for a later date by the Court, the DIP Remedies Notice Period shall be automatically extended to the date of such hearing. If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Maturity Event, and/or the right of the DIP AgentParties to exercise itstheir remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Maturity. Event and/or the right of the DIP AgentParties to exercise itstheir remedies, and unless this Court, after notice and hearing prior to the expiry of the DIP Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Agent and DIP Lenders, shall automatically terminate at the end of the DIP Remedies Notice Period, following which any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders pursuant to section 362 of the Bankruptcy Code shall no longer be applicable, and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the DIP Financing Agreements, and the DIP Remedies Notice Period, each of the DIP Agent may exercise their rights and remedies in accordance with the DIP Credit Agreement and this Interim OrderParties, shall automatically terminate at the end of the DIP Remedies Notice Period.

71.70.   Subject to the provisions of Paragraphs [61-62] hereof, upon the expiration of the DIP Remedies Notice Period, the DIP Parties are authorized to exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except that with respect to any of the Debtors' leasehold locations, the DIP Parties can only enter upon a leased premises following the DIP Maturity Date in accordance with (i) a separate written agreement by and between the DIP Agent and any applicable landlord, (ii) pre-existing rights of the DIP Parties and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the DIP Parties on such notice to the landlord, the Debtors, any Committee, and the U.S. Trustee as shall be required by this Court.

72.71.   Unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Agent, in its sole and exclusive discretion have been made), and all DIP Commitments have been irrevocably terminated, the protections afforded to the DIP Agent and the DIP Lenders pursuant to this Second Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "*Plan*") or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens and the DIP Superpriority Claim shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priorities as provided by this Second Interim Order.  Unless and until the Indemnity Termination Date has occurred, the protections afforded to the Prepetition Secured Parties pursuant to this Second Interim Order and under the Prepetition Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "*Plan*") or converting the Chapter 11 Cases into a Successor Case, and the Prepetition Indemnity Obligations, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and the Prepetition Indemnity Account Lien shall continue in these Chapter 11 Cases and in any Successor Case, and such Prepetition Indemnity Obligations, Prepetition Liens, Adequate Protection Liens, Adequate Protection Superpriority Claims and Prepetition Indemnity Account Lien shall maintain their respective priorities as provided by this Second Interim Order.

72.     Each of the following, unless waived by the DIP Agent or cured by the Debtors, shall constitute a "***DIP Order Event of Default***":

(a)     the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement;

(a)(b)     the failure of the Debtors to obtain entry of the Final Order on or before the date that is thirty (30) days after the Petition Date, unless such date has been extended by consent of the DIP Agent, in its sole and absolute discretion;

(b)(c)     the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Credit Agreement (including, without limitation, the Milestones (as defined therein), and after giving effect to any notice or cure periods provided therein) or this Second Interim Order;

(d)      the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(e)      termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(c)(f)    other than as contemplated by this Second Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent's lien and claims under the DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief), unless the obligations owing to the DIP Agent and DIP Lenders are indefeasibly paid in full in cash and the DIP Lenders' commitment to make loans is terminated ;

(g)      entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

(d)(h)    payment of or granting adequate protection with respect to prepetition debt (other than as set forth in this Second Interim Order or as may be agreed by the DIP Agent);

(i)      the failure of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable with the priority described herein;

(e)(j)    the entry of one or more orders of the Court lifting the automatic stay under section 362 of the Bankruptcy Code with respect to assets of the Debtors having a value in excess of $500,000 in the aggregate; or

(f)(k)    the Interim Order or Final Order, as applicable, shall be amended, modified, stayed or vacated without the written consent of the DIP Agent.

73.      Upon the service of a DIP Remedies Notice, to the extent the DIP Agent, as and to the extent provided for by the DIP Credit Agreement, determines in its sole and absolute discretion to exercise its rights and remedies in accordance with this Second Interim Order:

(a)      any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion;

(b)      the Debtors shall continue to deliver and cause the delivery of the proceeds of the Prepetition Collateral to the Prepetition Agents, and following payment in full of the Prepetition Secured Debt (including, without limitation, cash collateralizing any issued and undrawn letters of credit), the DIP Collateral DIP Collateral to the

DIP Agent, as provided in this Second Interim Order and in the DIP Financing Agreements;

(c)    the Prepetition Secured Parties and the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Second Interim Order, and the DIP Financing Agreements, and the Prepetition Financing Documents, as applicable; and

(d)    the Debtors shall have no right to use any of such proceeds, nor any other Cashcash that constitutes DIP Collateral, other than towards the satisfaction of the DIP Obligations, the Prepetition Secured Debt of the Prepetition Secured Parties, and the Carve Out, as provided in the DIP Financing Agreements and this Second Interim Order; provided, however, that during the DIP Remedies Notice Period the Debtors may use Cash Collateralcash (excluding any amounts in the Prepetition Indemnity Account) solely to meet accrued but unpaid payroll obligations (other than severance) and trust fund obligations strictly in accordance with the Approved Budget.

(e)    [Upon the occurrence of either (a) an Event of Default and, subject to the DIP Remedies Notice Period and other terms of this Second Interim Order, the exercise by the Agent or the DIP Lenders of their rights and remedies under the Financing Orders or the other DIP Documents, or (b) the failure of any Loan Party to comply with the October 24, 2019 Milestone under Section 14(h)(6), each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition, and the Loan Parties shall immediately commence all liquidation processes in the manner contemplated by the Store Closure Motion.]

74.    Upon expiration of the DIP Remedies Notice Period, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (subject to the subordination agreement and other limitations contained herein) are authorized to exercise their remedies and proceed under or pursuant to the DIP Credit Agreement or the Prepetition Financing Documents, as applicable; except that, with respect to any of the Debtors' leasehold locations, the DIP Agent, and/or DIP Lenders, and/or Prepetition Secured Parties can only enter upon a leased premises after expiration of the DIP Remedies Notice Period in accordance with (i) a separate written agreement by and between the Prepetition ABL Agent and any applicable landlord, (ii) pre-existing rights of the Prepetition Agents where the DIP Agent, DIP Lenders, and the Prepetition Secured Parties, as applicable, and any applicable landlord succeeds to such rights under applicable non-bankruptcy law, (iii) consent of the applicable landlordthis Second Interim Order, or (ivii) entry of an order of this Court obtained by motion of the applicable DIP Agent, or DIP Lender, or Prepetition Secured Party on such notice to the landlord as shall be required by this Court.

75.     Nothing included herein shall prejudice, impair or otherwise affect either the DIP Agent's, Prepetition Agents', or other Prepetition Secured Parties' rights to seek any other or supplemental relief from the Court in respect of the Debtors, nor the DIP Lenders' rights, as provided herein and in the DIP Financing Agreements, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

76.     The delay in or the failure of the DIP Agent, Prepetition Agents, and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, DIP Lenders', Prepetition Agents' and/or Prepetition Secured Parties' rights and remedies.  Notwithstanding anything herein, the entry of this Second Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the DIP Agent, the DIP Lenders, Prepetition Agents', or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Agent, DIP Lenders, Prepetition Agents, and/or the Prepetition Secured Parties to: (i) request conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the DIP Agent, DIP Lenders, and/or Prepetition Secured Parties may have.

<div align="center">IV.  Certain Limiting Provisions</div>

A.     Section 506(c) Claims and Waiver

77.     Nothing contained in this Second Interim Order shall be deemed a consent by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to any charge, Lien, assessment, or claim against the DIP Collateral, the DIP Liens, the Prepetition Collateral, or the Adequate Protection Liens, Prepetition Indemnity Account (and the funds therein), or the Prepetition Indemnity Account Lien under section 506(c) of the Bankruptcy Code or otherwise, including for any amounts set forth in the Approved Budget;

provided, however, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

78.     As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Credit Agreement, ~~and in consideration of the Prepetition Agents' and Prepetition Secured Parties' consent to the use of their Prepetition Collateral, including Cash Collateral,~~ upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the DIP Agent, the DIP Lenders, the Prepetition ~~Agents, the Prepetition~~ Secured Parties, the <u>DIP Collateral, the</u> Prepetition Collateral, and the ~~DIP Collateral.~~<u>Prepetition Indemnity Account (and the funds therein).</u>

**B.     Proceeds of Subsequent Financing**

79.     If at any time prior to the irrevocable repayment in full in cash of all DIP Obligations and the ~~respective claims of the~~ Prepetition Secured ~~Parties~~<u>Obligations</u>, and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt ~~and all Cash Collateral~~ shall immediately be turned over <u>first</u>~~, to the Prepetition Secured Parties to be applied in reduction of the Prepetition Secured Debt (including any accrued Adequate Protection),~~ <u>second</u>, to the DIP Agent to be applied in reduction of the DIP Obligations, and after payment in full of the DIP Obligations, <u>second, to the Prepetition Secured Parties to be applied in reduction of the remaining Prepetition Secured Obligations (including any accrued Adequate Protection), if any, and third</u>, solely to the extent that the DIP Obligations and the Prepetition Secured ~~Debt of the Prepetition Secured Parties~~ <u>Obligations</u> (including any accrued Adequate Protection) have been irrevocably paid in full, to the Debtors~~to be used in accordance with and subject to the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).~~<u>.</u>

**C.**    **No Priming of DIP Facility**

80.    In entering into the DIP Financing Agreements~~, and consenting to the use of Cash Collateral, and as consideration therefor~~, each of the Debtors hereby agrees that until such time as all DIP Obligations and all Prepetition Secured ~~Debt of the Prepetition Secured Parties~~Obligations have been irrevocably paid in full in cash (or other arrangements for payment of thereof satisfactory to the DIP Lenders and Prepetition Secured Parties, as applicable, in their sole and exclusive discretion, have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to in writing by the DIP Agent~~,~~ and the DIP Lenders~~, and the Prepetition Secured Parties~~, each in their sole respective discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Agent ~~or the Prepetition Liens of the Prepetition Secured Parties or Adequate Protection Liens granted to the Prepetition Secured Parties under this Interim Order~~ by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.  For the avoidance of doubt, nothing contained herein shall prejudice the ~~agreement~~rights of ~~the Debtors set forth in this Paragraph 63 shall apply in all circumstances, including~~ any ~~potential refinancing of all or any portion of~~ of the Prepetition Secured ~~Debt~~Parties to contest the adequacy of any adequate protection offered, or to seek any other form of adequate protection, in connection with any such priming postpetition financing.

**V.**    **Other Rights and Obligations**

**A.**    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Second Interim Order**

81.    Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Second Interim Order, any claim or protection granted to the DIP Agent, DIP Lenders and/or the Prepetition Secured Parties~~, the DIP Agent and/or the DIP Lenders~~ hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the DIP Agent, the DIP Lenders, or Prepetition Secured Parties~~, DIP Agent, or the DIP Lenders~~ shall be governed in all respects by the original provisions of this Second Interim Order, and the ~~Prepetition Agents~~DIP Agent,

the other DIP Lenders, and Prepetition Secured Parties, the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections and Adequate Protection and the DIP Protections granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.      Prepetition Secured Parties', DIP Agent's, and DIP Lenders' Expenses**

82.      All reasonable out-of-pocket costs and expenses of the Prepetition Agents, the other Prepetition Secured Parties, the DIP Agent, and the DIP Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses (whether incurred prior to, on or after the Petition Date), whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget), shall promptly be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtors, the U.S. Trustee, or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, the Prepetition Agents, and/or the other Prepetition Secured Parties be required to comply with the Court's and/or U.S. Trustee's fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges; provided, however, the DIP Agent, the DIP Lenders, the Prepetition Agents, and/or the other Prepetition Secured Parties shall provide the Debtors, the U.S. Trustee, and any Committee with a copy of the invoice summary, for professional fees and expenses incurred during the pendency of the Chapter 11 Cases.  Each such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or

any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine. If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the invoice summary submitted by the DIP Agent, the DIP Lenders, ~~the Prepetition Agents,~~ and/or the ~~other~~ Prepetition Secured Parties, and the parties cannot resolve such objection within ten (10) days of receipt of such invoice summary, the Debtors, U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the applicable DIP Agent, DIP Lender, or Prepetition Secured Party an objection (a "***Fee Objection***") limited to the issue of reasonableness of such fees and expenses. The Debtors shall promptly pay the amounts set forth in any submitted invoice summary after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period. If a Fee Objection is timely received, the Debtors shall promptly pay the undisputed amount only of any invoice summary that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice summary if the parties are unable to resolve the Fee Objection. Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination or disgorgement. Notwithstanding anything to the contrary contained herein, the aggregate amount of reasonable and documented fees and expenses paid to or for the benefit of the Prepetition Secured Parties pursuant to Paragraphs 12 and 21 hereof shall not exceed $1.1 million (inclusive of the amounts held in the Prepetition Indemnity Account), irrespective of whether there is a Challenge Proceeding.

C.    **Binding Effect**

83.    The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs ~~39-43~~46-52 hereof), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

D.    **No Third Party Rights**

84.     Except as explicitly provided for herein, this Second Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.

**E.     No Marshaling**

85.     Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents and the other Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable., provided, that the Prepetition Secured Parties hereby waive any such "marshaling" or rights under any other similar doctrine with respect to any of the DIP Collateral unless and until the DIP Obligations are indefeasibly paid in full..

**F.     Section 552(b) of the Bankruptcy Code**

86.     Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents and the other Prepetition Secured Parties (and, to the extent applicable, the DIP Parties) shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors and/or any successors thereto shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties (and, to the extent applicable, the DIP Parties) with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

**G.     Amendments**

87.     The Debtors, the Prepetition Secured Parties and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of this Court; provided, however, (a) no amendment to the Milestones or modifications of any kind to the DIP Tranche A Term Loan Reserve with respect to the prepetition debt shall be permitted absent the prior written consent of the Prepetition Agents and the DIP Agent (and, with respect to the change of any DIP Maturity Date, the prior written consent of the Prepetition Secured Parties and the DIP Lenders), (b) any amendment, modification, supplementation and/or waiver of any provision of any of the DIP Financing Agreements that

adversely affects any of the Debtors and/or any of the Prepetition Secured Parties shall require the prior consent of the Prepetition Secured Parties, and (c) that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court, and any Committee or the U.S. Trustee or the Prepetition Secured Parties each shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; provided, further, that if any Committee or the U.S. Trustee or any Prepetition Secured Party timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court after notice and a hearing.  For purposes of this Paragraph 70 80, a "material" amendment means: any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the committed amounts under the DIP Credit Agreement, (iii) changes the maturity date of the DIP Facility to a date sooner than that which is provided under the DIP Credit Agreement and this Second Interim Order as of the date hereof, (iv) amends any Event of Default under the DIP Credit Agreement to make same more restrictive than exists as of the date hereof, (v) revises any Milestone set forth in the DIP Credit Agreement in a manner that reduces or shortens the time periods provided for in the DIP Credit Agreement, or (vi) otherwise modifies any of the DIP Financing Agreements in a manner adverse and/or less favorable to the Debtors or any of the Prepetition Secured Parties.  All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors, the Prepetition Agents, the other Prepetition Secured Parties, the DIP Agent and, if required, approved by this Court. DIP Agent and, if required, approved by this Court. Notwithstanding anything in this Paragraph 80 to the contrary, the Debtors and the DIP Agent shall not amend, modify, supplement, or waive any provision of the DIP Financing Agreements that provides for repayment in full of the Prepetition Secured Debt on or before August 15, 2019 at 2:00 pm (New York time).

**H.**    **Limits on Lender Liability**

88.    Nothing in this Second Interim Order, any of the DIP Financing Agreements, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses, whether before or after the Petition Date, or in connection with the administration of these Chapter 11 Cases.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not, solely by reason of having made, or consented to the making of, loans under the DIP Facility, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Second Interim Order or the DIP Financing Agreements, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors.

**I.**    **Survival of Interim Order**

89.    The provisions of this Second Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

(a)    confirming any Plan in the Chapter 11 Cases,

(b)    converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

(c)    dismissing the Chapter 11 Cases,

(d)    withdrawing of the reference of the Chapter 11 Cases from this Court, or

(e)    providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

90.    The terms and provisions of this Second Interim Order, including any protections granted the DIP Parties and the Prepetition Secured Parties and the DIP Protections granted pursuant to this Second

Interim Order, shall continue in full force and effect notwithstanding the entry of any order described in Paragraph ~~73~~[82] hereof, and such DIP Protections and protections for the DIP Parties and the Prepetition Secured Parties shall maintain their priority as provided by this Second Interim Order until all of the DIP Obligations of the Debtors to the DIP Lenders pursuant to the DIP Credit Agreement ~~and the Prepetition Secured Parties' Prepetition Secured Debt (including any Adequate Protection) have been irrevocably~~have indefeasibly been paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms~~).~~) and, with respect to any protections granted to the Prepetition Secured Parties herein, until the Indemnity Termination Date has occurred.

**J.      Inconsistency**

91.      ~~In~~Up to the entry of this Second Interim Order, in the event of any inconsistency between ~~this~~the First Interim Order, on the one hand, and the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, or the other DIP Financing Agreements, on the other hand, the provisions of the First Interim Order shall govern and control. Upon the entry of this Second Interim Order, in the event of any inconsistency between this Second Interim Order, on the one hand, and the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, or the other DIP Financing Agreements, on the other hand, the provisions of this Second Interim Order shall govern and control.

**K.      Enforceability**

92.      This Second Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable ~~nunc pro tunc to the Petition Date~~ immediately upon ~~execution hereof~~entry by the Court of this Second Interim Order.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed and vice versa.

**L.      Objections Overruled**

93.      All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

**M.      Waiver of Any Applicable Stay**

94.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Second Interim Order.

**N.**    **Proofs of Claim**

95.    The Prepetition Secured Parties and the DIP Parties will not be required to file proofs of claim or any request for payment of an administrative expense in the Chapter 11 Cases or in any Successor Case in order to maintain their respective claims for payment of the Prepetition Secured DebtObligations under the Prepetition Financing Documents, for payment and performance of the Adequate Protection, for payment of any claim granted in this Second Interim Order and/or the Final Order, and/or for payment of the DIP Obligations under the DIP Financing Agreements.  The statements of claim in respect of the Prepetition Secured DebtObligations, Adequate Protection, and DIP Obligations set forth in this Second Interim Order, together with the evidence accompanying the DIP Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim (and requests for payment of an administrative expense) in respect of such obligations and such secured status.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date for filing a claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or in any Successor Case to the contrary, the Prepetition ABL Agent, on behalf and for the benefit of the Prepetition Secured Parties, (i) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a single, master consolidated proof of claim in respect of the Prepetition Secured DebtObligations (including, without limitation, in respect of all guarantees by any of the Debtors of such Prepetition Secured DebtObligations), the Adequate Protection, and any claim granted in this Second Interim Order and/or the Final Order, in the Debtors' lead Chapter 11 Case, *In re Barneys New York, Inc., et al*. (Case No. 19- 36300 (CGM)), which master proof of claim shall be deemed a valid, timely and properly filed proof of claim against each applicable Debtor in the Chapter 11 Cases and/or in any Successor Case and (ii) shall not be required to file any agreements, documents, or other instruments evidencing such Prepetition Secured Debt, Adequate Protection and/or any claim granted in this Second Interim Order and/or the Final Order with such master proof of claim. Any master proof of claim filed by the Prepetition ABL Agent shall be deemed

to be in addition to, and not in lieu of, any other proof of claim that may be filed by any of the other Prepetition Secured Parties at such party's election; provided that no such Prepetition Secured Party is required to file any such proof of claim.  Notwithstanding anything to the contrary herein, the Debtors reserve the right to estimate or object to the quantum of any contingent, unliquidated Prepetition Secured Obligation, including the Prepetition Indemnity Obligations (if any), or Adequate Protection.

**O.**     **Provisions Regarding Certain Leases**

96.     With respect to those certain real property leases related to the Madison Avenue and Beverly Hills store locations, the Debtors shall either (x) assume both of the leases or (y) reject both of the leases contemporaneously, as the case may be.

**P.**     **Headings**

97.     The headings in this Second Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Second Interim Order.

**Q.**     **Retention of Jurisdiction**

98.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Second Interim Order.

**VI. Final Hearing**

99.     The Final Hearing on the DIP Motion shall be held before this Court on September 4, 2019, at 10:30 a.m. (prevailing Eastern time) before the Honorable Cecelia G. Morris United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of New York, located at 355 Main Street, Poughkeepsie, NY 12601.

100.     The Debtors shall, within three (3) business days of the entry of this Second Interim Order, serve a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order upon: (A) the U.S. Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia Leonhard, Esq.); (B) counsel to the Prepetition ABL Agent, Riemer & Braunstein LLP (Attn: Donald Rothman, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: drothman@riemerlaw.com; and sfox@riemerlaw.com); (C) counsel to the

Prepetition Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq. and Mark D. Silva, Esq.) (Email: ksimard@chaote.com and msilva@choate.com); (D) counsel to TPG Specialty Lending, Inc., Schulte Roth & Zabel, 919 Third Avenue, New York, NY 10022 (Attn: Adam Harris, Esq., Kristine Manoukian, Esq. and Kelly V. Knight, Esq.) (Email: adam.harris@srz.com adam.harris@srz.com, Kristine.manoukian@srz.com, and kelly.knight@srz.com); (E) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans (Email: slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com); (F) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (G) any and all parties known to the Debtors to assert a lien or security interest in any of the Prepetition Collateral and/or DIP Collateral, including, without limitation, any party that holds an asserted Permitted Prior Lien; (H) the Internal Revenue Service; (I) all appropriate state taxing authorities; (J) all landlords, owners, and/or operators of premises at which any of the Debtors' operate their businesses; and (K) any other party that files a request for notices with the Court as of the date of such service.

101.    If no objections to the relief sought in the DIP Motion are filed and served in accordance with this Second Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Agent and entered by this Court upon certification of counsel by the Debtors.

102.    Any party in interest objecting to the relief sought in the DIP Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than **August 28, 2019 at 4:00 p.m. (ET)** on the following parties: (A) the U.S. Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia Leonhard, Esq.); (B) counsel to the Prepetition ABL Agent, Riemer & Braunstein LLP (Attn: Donald Rothman, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: drothman@riemerlaw.com; sfox@riemerlaw.com); (C) counsel to the Prepetition Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq. and Mark D. Silva, Esq.) (Email:

ksimard@chaote.com and msilva@choate.com); (D) counsel to TPG Specialty Lending, Inc., Schulte Roth & Zabel, 919 Third Avenue, New York, NY 10022 (Attn: Adam Harris, Esq., Kristine Manoukian, Esq., and Kelly V. Knight, Esq.) (Email: adam.harris@srz.com, Kristine.manoukian@srz.com and kelly.knight@srz.com); kelly.knight@srz.com); (E) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans (Email: slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com); and (F) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Edward O. Sassower, P.C., Joshua A. Sussberg, P.C., and Gene Goldmintz, and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, Attn: Chad J. Husnick, P.C., and W. Benjamin Winger.

Dated:  _____ __, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit "1"**

**Approved Budget**

**[TO COME]**

**EXHIBIT C**

**Redline to the Proposed First Amended Interim DIP Order**

*Important Note: This proposed form of order remains subject to ongoing review and revision by and among the Debtors, the DIP Parties, and the Prepetition Secured Parties. The parties continue to work in good faith* ~~to document certain agreed terms of the Amended Interim DIP Order.~~ *. Each such parties' respective rights are expressly reserved.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                          :        Chapter 11
In re:                                    :        Case No. 19-36300 (CGM)
                                          :
BARNEY'S NEW YORK, INC., et al.,          :        Jointly Administered
                                          :
       Debtors.                           :
                                          :        Ref. Docket No. 49
---------------------------------------------------------------x
```

~~**AMENDED**~~**SECOND INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364,
AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014
(I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN
POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-
PRIORITY CLAIMS, (III)** ~~**AUTHORIZING PAYMENT IN FULL AND FINAL SATISFACTION OF PREPETITION SECURED OBLIGATIONS, (IV**~~**AUTHORIZING PAYMENT OF PREPETITION SECURED OBLIGATIONS, (IV) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the DIP Motion and the Amended DIP Motion (collectively, the "***DIP Motions***")[1] of

**BARNEY'S, INC.**, on behalf of itself and its affiliated debtors and debtors-in-possession in the above-

captioned cases (collectively, the "***Debtors***"), pursuant to sections 105, 361, 362, 363, 364, and 507 of Title

11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***"), and in accordance with Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule

4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York

(the "***Local Rules***"), filed in the United States Bankruptcy Court for the Southern District of New York (this

"***Court***"), in these chapter 11 cases (the "***Chapter 11 Cases***"), for entry of interim and final orders granting

the following relief:

    **(I)**      **DIP Financing**

           **(A)**      Authorizing the Debtors to obtain up to $217 million in post-petition financing (the

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning given to them in the DIP Credit Agreement (defined below).

"**DIP Facility**") pursuant to (and in accordance with the terms of) that certain *Debtor-In-Possession Secured Term Promissory Note* (as may be amended, modified, or supplemented and in effect from time-to-time, the "**DIP Credit Agreement**"), substantially in the form as filed with the Court, by and among (x) Barney's Inc., as borrower (the "**Borrower**"), (y) the financial institutions that are or may from time to time become parties thereto (together with their respective successors and assigns, the "**DIP Lenders**"), and (z) GACP Finance Co., LLC, as administrative agent (in such capacity, "**DIP Agent**," and together with the DIP Lenders, the "**DIP Parties**"):

(i)     to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(ii)    to pay $[•] million in full and final satisfactionrepay all of the Prepetition Secured ObligationsDebt in cash in full, including interest and fees (including any prepayment and/or early termination fees), as set forth in clause (I)(D) below;

(iii)   for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(iv)    for making other payments as provided in this Order (this "*Second* **Interim Order**") (and upon its entry, the Final Order (defined below)); and

(v)     to fund the Carve Out (as defined below)

in each case in accordance with the Approved Budget (defined below) and the terms of this Second Interim Order.

(B)     Authorizing the Borrower to enter into the DIP Credit Agreement and for the Borrower and the other Debtors to enter into all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and/or the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("**UCC**") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed, delivered, and/or ratified by the Debtors in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "*DIP Financing Agreements*," and together with the DIP Credit Agreement, the "**DIP** *Documents*");*Financing Agreements*");[2]

(C)     Authorization of the Debtors to grant security interests, liens, and superpriority claims (including, as applicable, superpriority administrative claims pursuant to

---

[2]     For the avoidance of doubt, "DIP Financing Agreements" shall not include this Second Interim Order or any other postpetition financing or cash collateral order.

section 364(c)(1) of the Bankruptcy Code, and liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code), solely to the extent set forth in this Second Interim Order, to the DIP Agent, for the benefit of itself and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in this Second Interim Order; and

(D)     (x) Authorization for the Debtors to immediately use proceeds of the DIP Facility to, upon entry of this Second Interim Order and by no later than 2:00 p.m. (New York time) on August 15, 2019, (i) repay all of the Prepetition Secured Debt (defined below) in cash in full, including interest and fees (including any prepayment and/or early termination fees) through the date of repayment (at the default contract rate) as set forth in that certain Payoff Letter, by and between the Debtors and the Prepetition Secured Parties (defined below) (the "*Payoff Letter*"), which repayment shall be indefeasible upon the occurrence of the Indemnity Termination Date[3] and (y) approval of the form and substance of, and authorization for the Debtors to execute and perform under, the Payoff Letter;

(E)     (x) Up to and including the Indemnity Termination Date, the granting of adequate protection and Prepetition Indemnity Account Lien (as defined below), to the Prepetition Secured Parties under or in connection with the Prepetition Financing Documents, and (y) authorizing the Debtors to fund the Prepetition Indemnity Account (defined below); and

**(II)     Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Second Interim Order;

**(III)     Waiving Any Applicable Stay –** Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Second Interim Order;

**(IV)     Waiving the Provisions of Sections 506(c) and 552(b) of the Bankruptcy Code –** Upon entry of the Final Order (as defined below), granting the DIP AgentParties and the DIP LendersPrepetition Secured Parties, as applicable, a waiver of the "equities of the case"

---

[3]     "*Indemnity Termination Date*" means [the date of indefeasible payment in full in cash of the Prepetition Secured Debt, including interest and fees through the date of repayment, which shall be deemed to have occurred] (i) on the Challenge Period Termination Date (defined below), if no Challenge Proceeding has timely and properly been commenced in accordance with Paragraphs 46-52 hereof with respect to the Prepetition Secured Debt or against the Prepetition Secured Parties prior to the Challenge Period Termination Date or (ii) if a Challenge Proceeding is timely and properly commenced in accordance with Paragraphs 46-52 hereof with respect to the Prepetition Secured Debt or against the Prepetition Secured Parties prior to the Challenge Period Termination Date, on the date of any dismissal with prejudice, withdrawal with prejudice, or entry of final judgement or final order in connection with such Challenge Proceeding and (iii) in the case of either (i) or (ii), upon payment in full of any Prepetition Indemnity Obligations [then liquidated and due].

exception under section 552(b) of the Bankruptcy Code and of the provisions of section 506(c) of the Bankruptcy Code; and

(V)    **Final Hearing** – Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motions on a final basis and approving the form of notice with respect to the Final Hearing.

and upon the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Barneys New York, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**")* and the *Declaration of Saul Burian in Support of the Debtors' Motion For Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Lenders, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief (the "**Burian Declaration**"),* each of which was filed contemporaneously with the DIP Motion; and this Court having reviewed the DIP Motion and held a hearing with respect to the DIP Motion on August 6, 2019 (the "***First Interim Hearing***") and another hearing with respect to the Amended DIP Motion on August 14, 2019 (the "***Second Interim Hearing***" and, together with the First Interim Hearing, the "***Interim Hearings***"); and upon the DIP Motions, the First Day Declaration, the Burian Declaration, any other declarations filed in support of the DIP Motions and the record of the Interim Hearings; and upon the entry of the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing the Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 49] (the "***First Interim Order***"); and all objections, if any, to the entry of this Second Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

## I.     Procedural Findings of Fact

1.     **Petition Date.**  On August 6, 2019 (the "***Petition Date***"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

2.     **Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

3.     **Statutory Predicates.**  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 and Local Rule 4001-2.

4.     **Committee Formation.**  As of the date hereof, no statutory committee (a "***Committee***") of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter 11 Cases.

5.     **Notice.**  The Second Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014.  Notice of the Second Interim Hearing and the emergency relief requested in the Amended DIP Motion has been provided by the Debtors to certain parties-in-interest, including: (~~i~~a) the Office of the United States Trustee (the "***U.S. Trustee***"); (~~ii~~b) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates, on a consolidated basis; (~~iii~~c) counsel to the DIP Agent and counsel to the Prepetition Agents; and (~~iv~~d) all other secured creditors of record, and no other or further notice need be given.

## II.     Debtors' Acknowledgements and Agreements~~.~~

6.     Subject in all respects to the rights of a Committee and other parties-in-interest (other than the Debtors) and to the extent as set forth in Paragraphs ~~41-45~~46-52 hereof, each of the Debtors admits,

2

stipulates, acknowledges, and agrees (collectively, Paragraphs III.6(1) through (9) hereof shall be referred to herein as the "***Debtors' Stipulations***") that:

(a)    Prepetition Financing Documents.  Prior to the commencement of the Chapter 11 Cases, the Debtors were parties to (A) that certain Amended and Restated Revolving Credit and Term Loan Facility Agreement, first dated as of June 5, 2012 (as amended, modified, or supplemented and in effect from time-to-time, the "***Prepetition Credit Agreement***"), by and among (1) the Debtors that comprised the "Loan Parties" thereunder, (2) WELLS FARGO BANK, NATIONAL ASSOCIATION, as administrative agent (in such capacity, the "***Prepetition ABL Agent***"), and (3) the other lenders party to the Revolving Facility (as defined in the Prepetition Credit Agreement) from time to time (collectively, the "***Prepetition ABL Lenders***"), and (B) WELLS FARGO BANK, NATIONAL ASSOCIATION, as term loan agent (in such capacity, the "***Prepetition Term Agent***"; and together with the Prepetition ABL Agent, the "***Prepetition Agents***") under the Prepetition Credit Agreement, for itself and on behalf of the term loan lenders who have prepetition Term Loans (collectively, the "***Prepetition Term Lenders***"; and together with the Prepetition ABL Lenders and Prepetition Agents, the "***Prepetition Secured Parties***"); and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Secured Parties, including, without limitation, control agreements, mortgages, security agreements, guaranties, and UCC financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto, including, without limitation, that certain WellsOne® Commercial Card Agreement, dated April 10, 2013 (the "***PCard Agreement***") (each as amended, modified or supplemented and in effect, collectively, the "***Prepetition Financing Documents***").

(b)    Prepetition Secured Debt Amount.

(i)    As of the Petition Date, the Debtors were liable to the Prepetition ABL Agent and Prepetition ABL Lenders under the Prepetition Financing Documents, on account of "Revolving Loans" in the approximate aggregate principal amount of $121,307,911.10, *plus* letters of credit in the approximate stated amount of not less than $20,571,590.02, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations, including, without limitation, on account of cash management, credit card, amounts due under the PCard Agreement, depository, leasing, hedging and other banking or financial services secured by the Prepetition Financing Documents (collectively the "***Prepetition ABL Debt***"); and

(ii)    As of the Petition Date, the Debtors were liable to the Prepetition Term Agent and Prepetition Term Lenders under the Prepetition Financing Documents, on account of "Term Loans" in the approximate aggregate principal amount of $50,212,500.00, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), other charges and other obligations secured by the Prepetition Financing Documents (collectively the "***Prepetition Term Debt***"; and together with the Prepetition ABL Debt, the "***Prepetition Secured Debt***" and, together with any other obligations arising under, based upon, in connection with, or related to the Prepetition Financing Documents, the "***Prepetition Secured Obligations***").

(c)    Prepetition Collateral.  To secure the Prepetition Secured Debt (including, without limitation, amounts due and owing under the PCard Agreement), each of the  Debtors granted continuing security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition

2

ABL Agent, for the benefit of itself and the other Prepetition Secured Parties, upon the "Collateral" (as defined in that certain Amended and Restated Pledge And Security Agreement (ABL) dated as of June 5, 2012 (as amended, modified, or supplemented and in effect from time-to-time, the "***Prepetition Security Agreement***"), comprising substantially all of its/their assets and property (collectively, the "***Prepetition Collateral***"). As of the Petition Date, the value of the Prepetition Collateral exceeded the aggregate amount of Prepetition Secured Debt, and the Prepetition Secured Debt constitutes allowed secured claims pursuant to section 506 of the Bankruptcy Code.

(d)    Prepetition Lien Priority. ~~The~~As of the Petition Date, the Prepetition Liens of the Prepetition Secured Parties had and continue to have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement (if any), including this Second Interim Order, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement (if any), are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***"); provided, however, that any right or alleged right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and such reclamation right is expressly subject to the Prepetition Liens, the Adequate Protection Liens and the DIP Liens.

(e)    As of the Petition Date,

(i)    the Prepetition Liens ~~are~~were and continue to be valid, binding, enforceable, and perfected first-priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(ii)    (a) the Prepetition Secured ~~Debt constitutes~~Obligations constitute legal, valid, and binding obligations of the "Loan Parties" thereunder, enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Secured Debt exists, and (c) no portion of the Prepetition Secured Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(iii)    the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Agents or any other Prepetition Secured Party with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code,

(iv)    the Prepetition Secured Debt constitutes an allowed secured claim(s);

(v)    the Debtors acknowledge and stipulate that they have been and are in default of their obligations under the Prepetition Financing Documents and that, as of the Petition Date, the Prepetition Secured Debt had been accelerated and was

2

due and payable, and that interest was accruing on the Prepetition Secured Debt at the default rate.

(f) ~~On~~Effective as of the date ~~that this~~of the entry of the First Interim Order ~~is entered~~, each of the Debtors has waived, discharged, and released the Prepetition Agents and each of the other Prepetition Secured Parties, together with their respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "***Released Parties***"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Secured Debt, (ii) to challenge or object to the Prepetition Liens or any other security for the Prepetition Secured Debt, and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.  None of the Debtors possesses and none of the Debtors will assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents or the Prepetition Liens, or any claim of the Prepetition Agents and/or the Prepetition Secured Parties pursuant to the Prepetition Financing Documents, or otherwise.

(g) Cash Collateral.  ~~The~~As of the Petition Date, the Prepetition Secured Parties had and continue to have a continuing security interest in and Lien on all or substantially all of the Debtors' "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"), including, without limitation, any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, any and all cash released as a result of the termination and/or cancellation of any letters of credit issued for the benefit of Debtors that have been or may be cash collateralized prior to or after the Petition Date, any amounts generated by the collection of accounts receivable all amounts located in the Debtors' stores and on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral (but excluding any payroll, withholding tax and other fiduciary accounts and certain accounts with de minimis balances (but solely to the extent provided in the Prepetition Financing Documents~~)),~~.), to secure the Prepetition Secured ~~Debt~~Obligations, and the proceeds and products of each of the foregoing; provided, however, that any Liens, interests, or rights of the Prepetition Secured Parties with respect to Cash Collateral or other property on account of the Consignment Facility (the "***DIP Priority Collateral***") are junior to the Liens, interests, and rights of the DIP Parties.

(h) ~~[RESERVED].~~

(i) Adequate Protection.  The Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, as set forth in this Second Interim Order.

(j) None of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are managed or conducted, or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from ~~this~~the First Interim Order, this Second Interim Order, the DIP Facility, the DIP Financing Agreements, the Prepetition Secured ~~Debt~~Obligations and/or the Prepetition Financing Documents.

7.    Based upon the record before the Court, ~~this Interim Order,~~ including the First Interim Order and this Second Interim Order, the terms of the DIP Facility and this Second Interim Order have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, by each of the Debtors, the DIP ~~Agent~~Parties, and the Prepetition Secured Parties, are fair and reasonable and within the Debtors' business judgment, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

8.    Pursuant to the terms and conditions of this Second Interim Order and the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), the Debtors are authorized to use the advances under the DIP Facility during the Interim Period (defined below) and terminating upon notice being provided by the DIP Agent that a DIP Event of Default (defined below) and/or the DIP Maturity Date (defined below), as applicable, has occurred; provided, that the Debtors shall not be authorized to use any cash that constitutes DIP Collateral to cash collateralize (a) any prepetition Letter of Credit issued under the Prepetition Credit Agreement or (b) any amounts due or to become due under the PCard Agreement (including, without limitation, any applicable fees and customary charges accrued and accruing thereunder); provided further, that in no event shall the Debtors be authorized during the Interim Period to incur obligations under the PCard Agreement (exclusive of applicable fees and customary charges) in an amount greater than $200,000, including any usual and customary fees, costs, and expenses under the PCard Agreement.

9.    The DIP Parties and the Debtors have agreed that the budget, the short form of which is attached hereto as ***Exhibit "1"*** (as the same may be modified, supplemented, or updated from time to time in the sole discretion and mutual consent of the Debtors and DIP Agent, the "***Approved Budget***") is adequate considering all the available assets, to pay the administrative expenses due and accruing for the period commencing on the Petition Date and continuing through until the Final Hearing (the "***Interim Period***"). The Approved Budget has been prepared and is predicated on the requirement that the Debtors shall (a) remain "in-formula" throughout the Interim Period and otherwise adhere to the "Borrowing Base" (as 2

defined in the DIP Credit Agreement but calculated as if the Additional Liquidity Amount (as defined in the DIP Credit Agreement) were included therein) formula (including for the avoidance of doubt, the "Term Loan Borrowing Base", in each case) as set forth in the Prepetition Credit Agreement" and without giving effect to any Reserves (each, as defined in the Prepetition Credit Agreement))) and after giving effect to the Liquidity Credit (as defined in the DIP Credit Agreement), and (b) at all times during the period covered by the Approved Budget maintain Excess Availability (as defined in the DIP Credit Agreement) of not less than ten percent (10%) of the Borrowing Base (including for the avoidance of doubt, the "Term Loan Borrowing Base", in each case) as set forth in the Prepetition Credit Agreement without giving effect to any Reserves (as defined in the Prepetition as defined in the DIP Credit Agreement) at such time (the "**Minimum Excess Availability Amount**").

10.     During the Interim Period, all collections of cash shall be deposited by the Debtors with Wells Fargo in accordance with the Debtors' existing consolidated cash management system, the maintenance of which has been approved under separate order of the Court entered contemporaneously herewith. Upon receipt of cash , Wells Fargoit shall maintain such collections in a pooling, suspense or similar account ("*DIP Collateral Account*"),automatically be swept to the Debtors' operating and disbursement accounts, subject to the terms of this Second Interim Order. In furtherance of the foregoing, not later than noon (prevailing Eastern Time) on Friday of each week (as defined in the DIP Credit Agreement) during the Interim Period the Debtors shall be required to deliver an updated Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) based on best available estimates to the DIP Parties, which Borrowing Base Certificate shall include a reserve for the amount necessary to fund the Carve-Out Reserve (to the extent not funded).

11.     Adequate Protection for Prepetition Indemnity Obligations.  As adequate protection, up to and including the Indemnity Termination Date, the Prepetition Secured Parties shall receive the following (collectively, "*Adequate Protection*"):

(a)    **Adequate Protection Liens**. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, solely to the extent of the Diminution in Value[4] of the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) and solely to secure the Prepetition Indemnity Obligations (defined below), the Prepetition Secured Parties shall have, subject to the terms and conditions set forth below, valid, perfected, and enforceable additional and replacement security interests and Liens in the DIP Collateral (defined below) (the "***Adequate Protection Liens***") which shall be junior and subordinated in priority only to the Carve Out, the Permitted Prior Liens, and the DIP Liens.

(b)    **Adequate Protection Superpriority Claim**. Solely to the extent of the Diminution in Value of the interests of the Prepetition Secured Parties in the Prepetition Collateral and solely for payment of any Prepetition Indemnity Obligations, each of the Prepetition Secured Parties shall have an allowed superpriority administrative expense claim (each a "***Adequate Protection Superpriority Claim***"; and collectively the "***Adequate Protection Superpriority Claims***") which shall have priority in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment, but which shall be junior and subordinated in payment right to the Carve Out, the DIP Obligations (including the Enhancement Fee and the Exit Fee) and the DIP Superpriority Claim, and other than the Carve Out, the DIP Obligations (including the Enhancement Fee and the Exit Fee) and the DIP Superpriority Claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claims.

12.    Reimbursement on a Current Basis of Fees Until Challenge Period Termination Date. Following the Prepetition Payoff (as defined below), and thereafter up to and including the Challenge Period Termination Date, the Prepetition Agents and the other Prepetition Secured Parties shall be reimbursed, on a current basis and pursuant to the provisions of Paragraph [68], for all reasonable and documented out-of-pocket fees, costs, and expenses incurred by (x) the professionals (including attorneys) engaged by such parties solely in connection with any investigation conducted by the Committee pursuant to this Second Interim Order and (y) the attorneys engaged by such parties solely in connection with such

---

[4]    "***Diminution in Value***" means any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral as a result of (a) the incurrence of the DIP Obligations, (b) the use of Cash Collateral, (c) the subordination of the Prepetition Secured Debt to the Carve Out and the DIP Liens and DIP Superpriority Claims, (d) any other diminution in value of the Prepetition Collateral (or the proceeds thereof), and (e) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

parties' rights under this Second Interim Order and/or the cash management order; *provided, however,* that any such reimbursement on a current basis pursuant to this Paragraph 12 (a) shall be subject to a cap of $100,000 and to the terms and conditions of the Prepetition Financing Documents, and (b) such cap shall increase by $100,000 for each 30-day period the Court extends the Challenge Period Termination Date beyond September 4, 2019, not to exceed $250,000 in the aggregate (i.e., no more than $350,000 after giving effect to subparts (a) and (b) of this proviso, without regard to the funds held in the Prepetition Indemnity Account).

13.    Subordination of Claims and Liens of Prepetition Secured Parties to DIP Obligations and DIP Liens.  Notwithstanding anything in this Second Interim Order to the contrary, upon the Prepetition Payoff, and thereafter, until such time as the DIP Obligations (including the Enhancement Fee and the Exit Fee) are indefeasibly repaid in full, any and all claims of the Prepetition Secured Parties against the Debtors (other than current reimbursement of fees, costs and expenses pursuant to Paragraph [12] and Prepetition Indemnity Obligations to the extent paid from the Prepetition Indemnity Account) shall be subordinated in right of payment to the Carve Out and the DIP Obligations (including the Enhancement Fee and the Exit Fee), and any and all liens of the Prepetition Secured Parties securing Prepetition Secured Debt (other than the Prepetition Indemnity Account Lien) shall be subordinated to the Carve Out and the DIP Liens.  In addition, the Prepetition Secured Parties:  (a) shall not be entitled to receive any payment from the Debtors, unless such payment is made from the Prepetition Indemnity Account on account of the Prepetition Indemnity Obligations that are then due and payable or as otherwise expressly authorized in Paragraph 12 hereof; (b) shall hold in trust for the benefit of the DIP Parties, and promptly turnover to the DIP Agent, any payment received on account of their Prepetition Indemnity Obligations that are then due and payable or any Prepetition Secured Debt, in each case, that is not otherwise authorized under subclause (a); (c) shall be prohibited from exercising any remedies against any DIP Collateral, provided, that for the avoidance of doubt, the Prepetition Secured Parties shall not be precluded from seeking an order from the Court to compel payment by the Debtors of any amounts authorized under Paragraph 12 hereof; (d) shall not object to or otherwise take any action to prevent the Debtors from taking any action or obtaining any relief to which the

2

DIP Parties have consented (including, without limitation, a sale of any property securing all or any part of any DIP Obligations), unless such action or relief would extinguish or materially prejudice the rights granted to the Prepetition Secured Parties under this Second Interim Order; (e) shall not object to or otherwise take any action to prevent the DIP Parties from taking any action or obtaining any relief sought by the DIP Agent or DIP Lenders (including, without limitation, the enforcement of the DIP Obligations (including the Enhancement Fee and the Exit Fee), the sale of any property securing all or any part of any DIP Obligations, or any request for adequate protection, use of cash collateral, relief from the automatic stay, or payment of fees and/or expenses), unless such action or relief would extinguish or materially prejudice the rights granted to the Prepetition Secured Parties under this Second Interim Order; (f) shall not provide or seek to provide financing, either directly or indirectly, to the Debtors in the Chapter 11 Cases without the prior written consent of the DIP Parties; (g) shall not, without the prior written consent of the DIP Parties, propose a plan of reorganization, arrangement or proposal, or file any motion, pleading or material, that would have the effect of impairing or reducing the amount of or the interest rate, fees or other amounts on, or delaying the time of payment of, any DIP Obligations (including the Enhancement Fee and the Exit Fee), or otherwise materially impair the rights of the DIP Agent or any of the DIP Parties, or that would be in conflict with the terms of this Interim Order; and (h) shall no longer have any consent rights granted under the First Interim Order, except as otherwise provided in this Second Interim Order.

14.     Subrogation. In addition to and not in lieu of any DIP Liens and other rights and protections granted to the DIP Lenders under the DIP Financing Agreements and this Interim Order, with respect to any proceeds of the DIP Credit Agreement that any of the DIP Parties has paid or will pay to any of the Prepetition Secured Parties in satisfaction of any Prepetition Secured Obligations, the DIP Secured Parties shall be subrogated to the Prepetition Liens of such Prepetition Secured Parties (which, for purposes of this Paragraph 14, shall survive for the benefit of the DIP Parties) with respect to such satisfied Prepetition Secured Obligations until the payment in full in cash of all DIP Obligations (including the Enhancement Fee and the Exit Fee); provided, however, that notwithstanding anything to the contrary herein, no such subrogation shall either (a) impose, create or otherwise result in any liability or claim against (i) the Debtors

2

in relation to any Prepetition Secured Obligation, or (ii) the DIP Lenders in relation to any Prepetition Secured Obligation that may otherwise exist against the Prepetition Secured Parties prior to the Indemnity Termination Date, or (b) impair the rights granted to the Committee under this Interim Order to investigate and prosecute claims against the Prepetition Secured Parties and the Prepetition Liens pursuant to Paragraphs 46 to 52 hereof.  For the avoidance of doubt, the payoff of the Prepetition Secured Obligations and the related rights of subrogation pursuant to this Interim Order shall not reduce any of the DIP Obligations nor impair or prejudice any rights and protections granted to the DIP Parties hereunder.

15.    Adequate Protection Payments.

(a)    Until the repayment in full of the Prepetition Secured Obligations (other than the Prepetition Indemnity Obligations) in accordance with the Payoff Letter, the Prepetition Secured Parties shall receive payment of all accrued and unpaid interest at the default rate set forth in the Prepetition Financing Documents in accordance with the Payoff Letter.

(b)    Consistent with and as mandated under the First Interim Order, the Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition Secured Parties, a consent fee ("*Consent Fee*") in accordance with the Payoff Letter. The Consent Fee shall be fully earned and paid in accordance with the Payoff Letter, and shall not be subject to refund or rebate under any circumstances.  For the avoidance of doubt, after payment of such Consent Fee in accordance with the Payoff Letter, neither the Prepetition ABL Agent nor any Prepetition Secured Party shall be entitled to any additional consent fee.

16.    Enhancement Fee.  Subject to and effective upon entry of the Final Order, the net proceeds ("*Sale Proceeds*") of any disposition of DIP Collateral (each such disposition, a "*Sale*"), after the payment in full of all DIP Obligations[5] (other than the Enhancement Fee) and other administrative and priority claims (including, for the avoidance of doubt, the Carve Out), other than with respect to the sale of inventory or other sales in the ordinary course of business (which, for the avoidance of doubt, shall exclude any sale of inventory in accordance with a store closure or other form of liquidation), shall be promptly paid and shared at closing on such Sale(s) (including if such Sale constitutes a DIP Maturity Event) as follows: (a) 37.5% to the DIP Lenders and (b) 62.5% to the Debtors (the amount of such Sale Proceeds payable to the DIP Lenders pursuant to the foregoing, the "*Enhancement Fee*," the payment of which shall constitute a DIP

---

[5] For purposes of this Second Interim Order, "DIP Obligations" shall have the same meaning ascribed to the term "Obligations" in the DIP Credit Agreement.

2

Obligation pursuant to this ~~Interim Order).~~Second Interim Order), with the Debtors' 62.5% share subject to the liens and security interests granted in favor of the Prepetition Secured Parties, including the Adequate Protection Liens and the Prepetition Indemnity Account Lien.  The Debtors shall keep the DIP Agent fully informed of the Debtors' efforts to consummate any Sale(s) and any other sales of equity interests and/or assets of the Debtors after the Petition Date, and without limiting the generality of the foregoing, the Debtors shall~~:~~ (~~A~~x) promptly provide to the DIP Agent copies of all offers for the purchase of any asset(s) and/or equity interests of any of the Debtors and copies of all bids from any liquidator(s)~~,~~; (~~B~~y) provide, promptly upon written (including by e-mail) request of the DIP Agent, and in any event no less frequently than weekly, status updates on the Debtors' efforts to consummate any Sale(s) and/or any other dispositions or capital/equity raises~~,~~; and (~~C~~z) promptly advise the DIP Agent of any expressions of interest in any or all of the Debtors' assets and/or equity interests.

17.    **Credit Bid.**  In connection with any Sale(s) or other dispositions of any assets of the Debtors (outside of the ordinary course of business), the DIP Agent and DIP Lenders, respectively, may credit bid, in accordance with the DIP Financing Agreements, some or all of the DIP Obligations for the DIP Collateral, including for the avoidance of doubt any Enhancement Fee that would be payable to the DIP Parties upon closing of any such Sale as provided in Paragraph 16 (each a "***Credit Bid***") pursuant to section 363 of the Bankruptcy Code, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  ~~A Credit Bid may be applied only to reduce the cash consideration with respect to the DIP Collateral.~~ In all such instances, each of the DIP Agent and DIP Lenders, respectively, shall be considered a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid.  For the avoidance of doubt, the DIP Agent and DIP Lenders, in accordance with any order entered by the Court authorizing bidding procedures with respect to a sale of all or substantially all of the Debtors' assets, shall be permitted to combine their respective allocations of the DIP Obligations into a single Credit Bid and submit joint Bids as provided therein.

18.    Access to Records; Reporting.  In addition to, and without limiting, whatever rights to access the DIP Parties have under the DIP Financing Agreements, as applicable, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Parties: (~~i~~a) to have access to and inspect the Debtors' properties, ~~(ii~~; (b) to examine the Debtors' books and records, ~~(iii~~; (c) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors~~,~~; and (~~iv~~d) otherwise to have the full cooperation of the Debtors; provided, however, that the Prepetition Secured Parties and their professionals shall be granted access to information to the extent necessary to respond to a Challenge Proceeding.  In connection with the foregoing, during the Chapter 11 Cases, and until such time as the DIP Obligations shall have been paid in full, the Debtors shall cooperate fully with a financial advisor engaged by the DIP Agent.  Notwithstanding anything to the contrary herein, none of the Loan Parties will be required to disclose information or provide access to the DIP Agent (or any agent or representative thereof) where such disclosure or access is prohibited by applicable law or is subject to attorney-client or similar privilege, constitutes attorney work product, or implicates conflicts matters.

19.    Pleadings to Be Filed in the Chapter 11 Cases.  Promptly, and at least two (2) calendar days prior to filing, the Debtors shall provide (i) to the DIP Parties copies of all material pleadings (including, without limitation, any proposed orders, motions and applications) and any other pleadings wherein such parties' rights are impacted to be filed or entered in the Chapter 11 Cases and/or in any related proceedings, which pleadings shall be in form and substance reasonably acceptable to the DIP Parties~~.~~, and (ii) up to and including the Indemnity Termination Date, to the Prepetition Secured Parties copies of all material pleadings (including, without limitation, any proposed orders, motions and applications) wherein such parties' rights and protections granted under this Second Interim Order may be materially prejudiced to be filed or entered in the Chapter 11 Cases and/or in any related proceedings; provided that the Final Order (including any amendments or modification thereto) and any amendments or modifications to this Second Interim Order, in each case, shall be, with respect to any rights and protections granted to the Prepetition

Secured Parties under this Second Interim Order, in form and substance acceptable to the Prepetition Secured Parties.

20. [Final Satisfaction of Prepetition Secured Obligations.  WithinThe Debtors are authorized and directed to [(x) execute the Payoff Letter and perform the transactions and undertakings set forth therein, which are hereby approved in all respects, and, (y)] within one business day of the date hereof and contemporaneous with the second interim funding of the DIP Loans, the Debtors shall irrevocably pay $[•]but in no event later than 2:00 p.m. (prevailing Eastern Time) on August 15, 2019, irrevocably pay approximately up to $[142] million in full in cash to the Prepetition Agents in full and final satisfaction of the Prepetition Secured Obligations (other than the Prepetition Indemnity Obligations, if any) including interest and fees (including any prepayment and/or early termination fees) through the date of repayment (at the default contract rate) in accordance and pursuant to [the Payoff Letter] (the "**Prepetition Payoff**"), which repayment shall be indefeasible upon the occurrence of the Indemnity Termination Date; provided that the Prepetition Indemnity Obligations, if any, shall continue until the expiration of the Challenge Period.Indemnity Termination Date.  Effective immediately upon such payment:the Prepetition Payoff:]

(a) [the Prepetition Financing Documents and any other "Loan Documents" as defined in the Prepetition Credit Agreement, in each case, other than the Prepetition Indemnity Obligations and any other provisions whose survival is contemplated under this Second Interim Order (including those that, subject to paragraph 38Paragraphs [15 and 39] hereof survive for the benefit of the DIP Lenders, but including and the prepetition mortgages granted in favor of the Prepetition ABL Agent,), shall be deemed cancelled, terminated, and of no further force and effect [(other than the Prepetition Indemnity Obligations, cash management and letter of credit arrangements, and any other provisions whose survival is contemplated under this Second Interim Order), and all rights, and obligations (other than any contingent indemnity obligations that by their terms survive termination)], and all liens, rights, and obligations [(other than any contingent indemnity, cash management and letter of credit obligations that by their terms survive termination)], and any other provisions whose survival is contemplated under this Second Interim Order) under the Prepetition Financing Documents, including the Prepetition Secured Obligations, shall be released, cancelled, and of no further force or effect; provided, that the Prepetition Liens shall remain in effect solely until the occurrence of the Indemnity Termination Date and solely to secure payment of the Prepetition Indemnity Obligations or other amounts due to the Prepetition Secured Parties pursuant to this Second Interim Order.]  On the Indemnity Termination Date, the Prepetition Liens and Prepetition Indemnity Obligations shall be fully and irrevocably deemed released, cancelled, and of no further force or effect except to the extent they survive under this Second Interim

2

Order for the benefit of the DIP Lenders; provided further that any and all Prepetition Liens that survive until the Indemnity Termination Date shall be subordinate in all respects to the Carve Out, the Permitted Prior Liens, and the DIP Liens, and shall be enforceable only to the extent that any Prepetition Indemnity Obligations are not capable of being satisfied from the application of funds on deposit in the Prepetition Indemnity Account;

(b)      the Prepetition Agents will cooperate fully with the DIP Agent to transfer to the DIP Agent any possessory DIP Collateral [((other than, for the avoidance of doubt, the Prepetition Indemnity Account (as defined below))]) that is in the possession of the Prepetition Agents;.

(c)      [solely with respect to and to the extent, if any, of the Prepetition Indemnification Obligations, the Prepetition Secured Parties shall be entitled to replacement liens and superpriority claims, subject and subordinate in all respects to the Carve Out, DIP Obligations (including, uponPrepetition Indemnity Account.  Upon entry of the Final Order, the Enhancement Fee), and DIP Liens, and reimbursement of reasonable and documented professional fees and expenses in accordance with Paragraph [67] hereof as adequate protection];

(d)      [RESERVED]; and

(e)      [RESERVED].

21.      **Prepetition Indemnity Account.**  On the date that is 30 days after the entry of the First Interim Orderthis Second Interim Order, and no later than 2:00 p.m. (New York time) on August 15, 2019, the Debtors shall establish aare authorized and directed to pay or deliver to the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) the sum of $[750,000] to be segregated account inand held under the control of the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) (the "***Prepetition Indemnity Account***"), into which the sum of $[•] of cash shall be deposited") as security for any amounts owing but not paid to the Prepetition Secured Parties and any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition Agents and the other Prepetition Secured Parties underthat expressly by their terms survive termination of the Prepetition Financing Documents, including without limitation, the provisions of Sections 11.3 and 11.4 of the Prepetition Credit Agreement (the "***Prepetition Indemnity Obligations***").

(a)      Without limiting the generality of the foregoing, the funds in the Prepetition Indemnity Account shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition Agents and the other Prepetition Secured Parties in connection with or responding to (i) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause

2

18

of action, objection, claim, defense, or other challenge as contemplated in Paragraphs 41–45 46-52 hereof, or (ii) any Challenge Proceeding against any one or more of the Prepetition Agent(s) and/or the other Prepetition Secured Parties related to the Prepetition Financing Documents, the Prepetition Liens, or the Prepetition Secured Debt Obligations, whether in the Chapter 11 Cases or independently in another forum, court, or venue; provided, that the relative interests of the Prepetition Agents and other Prepetition Secured Parties in the funds deposited in the Prepetition Indemnity Account on account of any Prepetition Indemnity Obligations shall be subject in all respects to the priority provisions set forth in the Prepetition Financing Documents.

(b)    [The Prepetition Indemnity Obligations shall be subordinate in all respects to the DIP Obligations and secured by a lien (subordinate in all respects to the DIP Liens) on the Prepetition Indemnity Account.]

(c)    The Prepetition Indemnity Obligations shall be secured by a first-priority lien (the "***Prepetition Indemnity Account Lien***") in favor of the Prepetition ABL Agent (on behalf of itself and the other Prepetition Secured Parties) on the Prepetition Indemnity Account and the funds therein and by a Lien in favor of the Prepetition ABL Agent (on behalf of itself and the other Prepetition Secured Parties) on the DIP Collateral (subject and subordinate to the Carve Out, Permitted Prior Liens and the DIP Liens). For the avoidance of doubt, notwithstanding anything to the contrary contained herein, (i) up to and including the Indemnity Termination Date, the Prepetition Indemnity Account and the funds therein shall not constitute DIP Collateral or be subject to the Carve Out, the DIP Liens, the DIP Superpriority Claim or any other Lien or claim granted to any person or entity other than the Prepetition Secured Parties, and (ii) any Prepetition Indemnity Obligations, other than those payable under Paragraph 12 hereof or from the Prepetition Indemnity Account (or any Prepetition Indemnity Account Lien), shall be subject and subordinate to the Carve Out, Permitted Prior Liens, the DIP Obligations, and the DIP Liens.

(d)    The Prepetition Agents and other Prepetition Secured Parties may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court.

(e)    Upon In addition to the establishment and maintenance of the Prepetition Indemnity Account, up to and including the Indemnity Termination Date the Prepetition Agents (for themselves and on behalf of the other Prepetition Secured Parties), shall retain and maintain the Prepetition Liens (subject to the Carve Out, Permitted Prior Liens and the DIP Liens ) as security for the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account; provided, that any such indemnification claim(s) shall (i) be subject to the terms of the Prepetition Financing Documents, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs 46-52 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).

2

(f)     Promptly upon, but in no event later than five Business Days after, the occurrence of the ~~Challenge Period Termination Date and provided that no Challenge Proceeding has been commenced~~Indemnity Termination Date, the Prepetition ABL Agent shall return to the Debtors the remaining amount, if any, net of any unpaid fees and expenses of the Prepetition Secured Parties and the Prepetition Indemnity Obligations, in the Prepetition Indemnity Account.  Upon such return, such funds shall constitute DIP Collateral.

(g)     For the avoidance of doubt, nothing contained in this Paragraph 21 shall relieve the Debtors of their obligation to timely reimburse the fees, costs and expenses of the Prepetition Agents and the other Prepetition Secured Parties pursuant to Paragraph 12 and subject to Paragraph [67] hereof.

22.     **Treatment of Disgorged Amounts**.  In the event that the Prepetition Agents or any ~~such Challenge Proceeding has been resolved~~of the other Prepetition Secured Parties is ordered by this Court to disgorge, refund or in any manner repay to any of the Debtors or their estates any amounts ("**_Disgorged Amounts_**") the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account in the control of the Prepetition ABL Agent, pending a further final, non-appealable order of ~~the Court in favor of the affected Prepetition Agent(s) and/or~~ a court of competent jurisdiction (for the avoidance of doubt the Court is a court of competent jurisdiction) regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Agents and the other Prepetition Secured Parties, distributing such amounts to the Debtors or the DIP Parties, or otherwise).

23.     Section 507(b).  Nothing herein or the DIP Financing Agreements shall prejudice, limit or otherwise impair or modify the Prepetition Secured Parties' respective rights under section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for the diminution in value of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case(s); provided, however, that: (a) nothing herein shall impair the right of the Debtors, the DIP Parties, or any other party in interest to contest any request for additional or different adequate protection; and (b) any section 507(b) claim granted in the Chapter 11 Cases to any Prepetition Secured Party(ies~~, as applicable, the Prepetition ABL Agent~~) shall ~~promptly return~~be subject and subordinate to the ~~Debtors~~Carve Out and DIP Obligations.

24.    Subject to section 364(e) of the Bankruptcy Code and Paragraph [66] of this Second Interim Order, nothing included herein shall prejudice, impair or otherwise affect Prepetition Secured Parties' rights to seek any other or supplemental relief from the remaining amount, if any, Court in respect of the Prepetition Indemnity Account Debtors.

### III.    Authorization for the DIP Facility

**A.    Findings Regarding the DIP Financing.**

25.    Good Cause.  Good cause has been shown for immediate entry of this Second Interim Order.

26.    Need for Post-Petition Financing.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates for the benefit of their various stakeholders.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility (in each case in the manner and in the amounts provided herein and in the Approved Budget (including any permitted variances), in the DIP Credit Agreement, and this Second Interim Order), the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

27.    No Credit Available on More Favorable Terms.  As set forth in the DIP Motions, the Debtors have been unable to obtain any of the following:

(a)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense;

(b)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code;

(c)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien; or

(d)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien;

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Second Interim Order.  The Debtors are unable to obtain credit from the DIP Lenders without granting to the DIP Agent and the DIP Lenders the DIP Protections (as defined below).

28.    Business Judgment; Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.  The extension of credit under the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (iand the repayment of the Prepetition Secured Debt herein: (a) are fair, reasonable, and the best available under the circumstances, (ii; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties,; and (iiic) are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length between the Debtors, the DIP Agent, and the DIP Lenders, and the Prepetition Secured Parties, and the proceeds to be extended under the DIP Facility will be so extended in good faith and used for valid business purposes and uses, as a consequence of which the DIP Agent and, the DIP Lenders, and the Prepetition Secured Parties are each entitled to the protections and benefits of sections 363(m) and 364(e) of the Bankruptcy Code.

29.    Sections 506(c).  As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Credit Agreement, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the DIP Agent, the DIP Lenders, and the DIPthe DIP Collateral, the Prepetition Agents, the Prepetition Secured Parties, and the Prepetition Collateral.

30.    Relief Essential; Best Interest.  The relief requested in the DIP Motions (and as provided in this Second Interim Order) is necessary, essential, and appropriate for the continued operation of the Debtors' business, the management and preservation of the Debtors' assets during the Interim Period, and to avoid immediate and irreparable harm.  It is in the best interest of the Debtors' estates that the Debtors be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP

Financing Agreements.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

**B.    Approval of Entry into the DIP Financing Agreements**

31.    The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Second Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Second Interim Order and the DIP Financing Agreements.  In furtherance of the foregoing, the Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the "Exit Fee" (as defined in the DIP Financing Agreements), and, subject to the provisions of Paragraph [67] hereof, the DIP Agent's and DIP Lenders' reasonable attorneys', financial advisors', consultants', and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court.

32.    In order to enable them to continue to operate their businesses during the Interim Period, and subject to the terms and conditions of this Second Interim Order, the DIP Credit Agreement, the other DIP Financing Agreements, including the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), during the Interim Period the Debtors are hereby authorized under the DIP Facility to borrow an amount up to $217 million in accordance with the terms and conditions of the DIP Credit Agreement, of which $75 million was advanced pursuant to the First Interim Order.

33.    The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements and this Second Interim Order, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted

2

under the terms and conditions of the DIP Financing Agreements and this Second Interim Order), solely as follows:

     (a)    to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

     (b)    for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

     (c)    for making payments in respect of Adequate Protection and other payments, all subject to and as provided in this Second Interim Order;

     (d)    to repay the Prepetition Secured Obligations as provided herein;~~and~~

     (e)    to fund the Prepetition Indemnity Account, as provided herein; and

     (f)    to fund the Carve Out.

34.    **DIP Obligations.**  The DIP ~~Documents~~Financing Agreements and this Second Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations (as defined in the DIP ~~Documents~~Financing Agreements), which shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee appointed in these Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***"). Upon entry of this Second Interim Order, the DIP Obligations will include all loans, and any other indebtedness or obligations, contingent or absolute, including, for the avoidance of doubt, ~~but~~the Enhancement Fee (approval of which is subject to entry of the Final Order,~~ the Enhancement Fee,~~), which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, under the DIP ~~Documents~~Financing Agreements or this Second Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owing under the DIP ~~Documents.~~Financing Agreements. The Debtors shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand except as provided herein. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP

2

~~Documents~~Financing Agreements (including any DIP Obligation or DIP Liens (as defined herein~~)~~)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

35.    Pursuant to sections 361, 362, 364(c)(2), 364(c)(3~~,~~) and 364(d)(1) of the Bankruptcy Code, and subject to the limitations set forth below, effective immediately upon the entry of this Second Interim Order the DIP Agent is hereby granted the Liens (the "**DIP Liens**") (which DIP Liens are subject and subordinate to the Carve Out) for the ratable benefit of itself and the DIP Lenders, which DIP Liens constitute continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and liens, and except as otherwise expressly provided in this Second Interim Order, upon and to all of the following (collectively, the "**DIP Collateral**"): Liens with the priorities set forth in 11 U.S.C. § 364(c)(2), (c)(3~~,~~).  and (d)(1) on all "property of the estate" as defined in section 541 of the Bankruptcy Code (including tangible and intangible assets and equity interests of the Borrowers (and any guarantors), including all assets constituting Prepetition Collateral), subject only to any ~~Prior~~ Permitted Prior Liens and the Carve Out.  The DIP Collateral shall exclude (a) leases not subject to a mortgage in favor of the Prepetition ABL Agent as of the Petition Date (the "**Unencumbered Leases**"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case limited as provided in the Prepetition Financing Documents), ~~and~~ (c) claims under chapter 5 of the Bankruptcy Code ("**Avoidance Actions**"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions~~.~~, and (d) prior to and including the Indemnity Termination Date, the Prepetition Indemnity Account and any funds therein (including the $[750,000] to be funded pursuant to this Second Interim Order).

~~2~~

36.    From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Second Interim Order, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreements and this Second Interim Order).  The Approved Budget, and any modification to, or amendment or update thereof, shall be approved by, and in form and substance satisfactory to, the Debtors and the DIP Agent, each in their sole discretion.  The Approved Budget shall be updated, modified, or supplemented by the Debtors from time to time in accordance with the DIP Credit Agreement (provided that any update, modification or supplement shall be approved in writing by, and shall be in form and substance satisfactory to the DIP Agent in its sole discretion), and no such updated, modified or supplemented budget shall be effective until so approved and once approved shall be deemed the "Approved Budget."  Each budget delivered to the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable.  A copy of any Approved Budget shall be delivered to counsel for a Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the DIP Agent.

37.    Subject and subordinate to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "**_DIP Superpriority Claim_**" and, together with the DIP Liens, collectively, the "**_DIP Protections_**") with priority in the Chapter 11 Cases and any Successor Case(s) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

2

38.     Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations or with any other claims of the DIP Agent and/or DIP Lenders arising hereunder.

39.     This Second Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens, Adequate Protection Liens, and Prepetition Indemnity Account Lien without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect thesuch DIP Liens, Adequate Protection Liens, or Prepetition Indemnity Account Lien, or to entitle the DIP Liens, Adequate Protection Liens, or Prepetition Indemnity Account Lien to the priorities granted herein.

40.     Notwithstanding the foregoing, the DIP Parties and/or the Prepetition Secured Parties, as applicable, may, in their respective discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto, the Adequate Protection Liens and/or the Prepetition Indemnity Account Lien, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

41.     The Debtors shall execute and deliver to the DIP Agent and each Prepetition Secured Party, as applicable, all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Agent and/or the applicable Prepetition Secured Party may reasonably request to evidence, confirm, validate, or perfect, or to ensure the

2

contemplated priority of, the DIP Liens granted pursuant hereto., the Adequate Protection Liens and/or the Prepetition Indemnity Account Lien.

42. The DIP Parties and the Prepetition Secured Parties, in their respective discretion, may file a photocopy of the entered, docketed version of this Second Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order. Second Interim Order. Subject to the priorities set forth in this Second Interim Order, the prepetition mortgages granted in favor of the Prepetition ABL Agent shall remain in full force and effect in accordance with its/their terms as if the same were executed and delivered under this Second Interim Order and thereafter recorded with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and each such mortgage (or any mortgage granted to the DIP Agent in respect of the DIP Facility, regardless of whether the same is recorded with any applicable registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property) shall serve as evidence of validity, perfection and contemplated priority of the DIP Liens, the Adequate Protection Liens and/or the Prepetition Indemnity Account Lien.

43. TheSubject to the terms of this Second Interim Order (including the subordination provisions hereof), the DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, succeed to the rights of the Prepetition Agents with respect to all third-party notifications in connection with the Prepetition Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including, without limitation, each collateral access agreement duly executed and delivered by any landlord of any Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements, provided, that nothing herein shall impair any such rights of the Prepetition Agents that may continue to exist, subject to Paragraph 15 of this Second Interim Order.

2

44.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

(a)    permit the Debtors to grant the DIP Liens, the Adequate Protection Liens, and Prepetition Indemnity Account Lien, and to incur all liabilities and obligations to the DIP Agent and DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Second Interim Order; and

(b)    authorize the DIP Agent and, the DIP Lenders, and the Prepetition Secured Parties to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Second Interim Order.

45.    The DIP Lenders are authorized to provide the Consignment Facility to the Debtors pursuant to the terms contained in the DIP Documents.Financing Agreements.

## C.    Reservation of Certain Third-Party Rights and Bar of Challenges and Claims

46.    Nothing in this Second Interim Order, the Prepetition Financing Documents, the DIP Credit Agreement, or the other DIP Financing Agreements shall prejudice whatever rights any Committee or any other party-in-interest (other than the Debtors) with requisite standing that has been sought and granted by this Court, as applicable, may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any one or more of the Prepetition Secured Parties, the Prepetition Secured Debt and/or the Prepetition Liens (collectively, a "***Challenge Proceeding"***), including, but not limited to, any of the following:

(a)    in the case of the Prepetition Secured Parties, an objection to or challenge of the Debtors' Stipulations set forth in Paragraphs [III.6.(1a) through (9i)], including (i) the validity, extent, perfection, or priority of the security interests and Prepetition Liens of the Prepetition Agents in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured Debt; or

(b)    a suit against any one or more of the Prepetition Secured Parties in connection with or related to the Prepetition Secured Debt and/or the Prepetition Liens, or the actions or inactions of the such Prepetition Secured Party(ies) arising out of or related to such Prepetition Secured Debt and/or Prepetition Liens;

provided, however, that any Committee or any other party-in-interest with requisite standing that has been sought and granted by this Court, as applicable, must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against any one or more of the Prepetition Agents and/or other Prepetition Secured Parties, as applicable, in the nature of a claim, cause of action,

2

setoff, counterclaim, or defense in respect of the Prepetition Secured Debt and/or the Prepetition Liens

(including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the

Bankruptcy Code), by 5:00 p.m. (prevailing Eastern Time) on September 4, 2019 (the "***Challenge Period***";

and as of 12:01 a.m. (Prevailing Eastern Time) on the date that is the next calendar day after the termination

of the Challenge Period, in the event that no Challenge Proceeding has been commenced during the

Challenge Period, such date shall be the "***Challenge Period*** *Termination Date*").  The failure of any

Committee or other third party who desires to investigate either (i) the validity, extent, perfection, or priority

of the security interests and Prepetition Liens in and to the Prepetition Collateral, or (ii) the validity,

allowability, priority, status, or amount of the Prepetition Secured Debt, to make a formal written request

to the affected Prepetition Secured Parties for information validating such Prepetition Secured Debt and/or

Prepetition Liens on or before the date that is ten (10) calendar days prior to the expiration of the Challenge

Period Termination Date shall operate as a bar to any motion, application or other request by such party(ies)

for an extension of the Challenge Period. Termination Date.

47.    Not less than five (5) business days prior to filing a motion seeking standing (a "***Challenge***

***Standing Motion***") to commence a Challenge Proceeding, a Committee or other third party, as the context

makes applicable, shall inform the affected Prepetition Agent(s) and/or other Prepetition Secured Party(ies),

in writing, of its intent to file such standing motion (such writing shall contain a reasonably detailed

statement of the claims proposed to be asserted in such Challenge Proceeding and the legal/other bases

supporting such claim(s) in the event standing were to be granted by the Court ("***Challenge Statement***")).

The parties shall thereafter meet and confer for purposes of attempting to resolve any issues/claims asserted

in the Challenge Statement.  In the event a third party, including any Committee, thereafter files a Challenge

Standing Motion seeking standing to commence a Challenge Proceeding in accordance with the terms of

this Second Interim Order, any such Challenge Standing Motion shall, at a minimum, include a copy of any

proposed objection or adversary complaint containing a detailed description of the claims and causes of

action such party proposes to pursue.  The Challenge Period Termination Date shall be tolled for a period

not to exceed thirty (30) days upon the filing of a Challenge Standing Motion (the "***Tolling Period***") by an

2

interested party (including any Committee) seeking standing to commence a Challenge Proceeding in accordance with the terms of this Second Interim Order); provided, that any such tolling shall be applicable solely to the party that files the subject Challenge Standing Motion and solely as to the Challenge Proceedings for which standing is sought (as set forth in such Challenge Standing Motion); and provided, further, that, unless otherwise ordered by the Court, the granting of any Challenge Standing Motion shall not extend the Challenge Period Termination Date beyond expiration of the Tolling Period.  The Challenge Period Termination Date may occur as to some, but not all, of the Prepetition Agents and/or other Prepetition Secured Parties if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and/or other Prepetition Secured Parties.

48.    For the avoidance of doubt, in the event any one or more of the Chapter 11 Cases is converted to a case under Chapter 7, or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then in either such event and solely as applies to any such trustee the Challenge Period shall not expire until sixty (60) days after such trustee's appointment.  In the event that the Committee or any other party in interest with requisite standing, as applicable, has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding.  In either event, until that the Committee or any other party in interest with requisite standing, as applicable, has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding.  Until the later of the expiration of the Challenge Period Termination Date without commencement of a Challenge Proceeding or the entry of a final, non-appealable order or judgment on account of any Challenge Proceeding properly commenced withinbefore the Challenge Period Termination Date, such trustee shall not be bound by the Debtors' Stipulations in this Second Interim Order.

49.    Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition Secured Parties, any and all such challenges, claims, and/or objections by any party (including, without limitation, any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor

2

Case, and any other party-in-interest) *shall be deemed to be forever waived and barred* with respect to the

Prepetition Agents and other Prepetition Secured Parties, as applicable, and the Prepetition Secured

~~Debt~~Obligations and Prepetition Liens as to one or more or all of the Prepetition Agents and/or other

Prepetition Secured Parties, as the case may be, as of the Petition Date, shall be deemed to be an allowed

fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection

with the Chapter 11 Cases and the Debtors' Stipulations as to one or more or all of the Prepetition Agents

and/or other Prepetition Secured Parties, as the case may be, shall be binding on all creditors, interest

holders, and parties-in-interest, including any Committee.

50.    To the extent any such Challenge Proceeding is commenced, or any claim is asserted

against any one or more of the Prepetition Agents and/or other Prepetition Secured Parties, the affected

Prepetition Secured Parties, or any of them, as the case may be, shall be entitled to include the costs and

expenses, including, but not limited to, reasonable and documented attorneys' fees and disbursements,

incurred in responding to any inquiry, producing documents, and/or witnesses in response to formal or

informal discovery requests, or otherwise defending the objection or complaint, as part of the prepetition

claims and Liens of such Prepetition Secured Party(ies) to the extent permitted pursuant to the applicable

Prepetition Financing Documents~~,~~, and subject to the provisions herein, including with respect to the

priority of such claims and Liens.    To the extent any such inquiry or discovery is undertaken or any such

objection or complaint is filed (or as part of any agreed upon resolution thereof), the affected Prepetition

Secured Party(ies), or any of them, as the case may be, shall be entitled to include such costs and expenses,

including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the

inquiry or discovery or in defending the objection or complaint, as part of such party's prepetition claim

which shall be reimbursed by the Debtors, (x) subject, and subordinate as provided herein, to the Carve Out

and the indefeasible payment in full in cash of the DIP Obligations, ~~and~~or (y) where applicable, out of the

Prepetition Indemnity Account ~~and subject to~~ or as provided under Paragraph ~~67 hereof.~~12 herein for fees

and expenses incurred prior to the Challenge Period Termination Date, and as part of the Adequate

Protection Superpriority Claims.    In addition to any other provisions in this Second Interim Order, the

~~2~~

Prepetition Indemnity Account shall be maintained until the final resolution of all such objections or claims that would, if successful, be payable as Prepetition Indemnity Obligations, against the affected Prepetition Secured Party(ies). TheSubject in all respects to the Carve Out and prior payment in full in cash of the DIP Obligations, the Debtors shall remain liable to the Prepetition Secured Parties, or any of them, as the case may be, for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the Prepetition Indemnity Account are insufficient to satisfy the Prepetition Indemnity Obligations in full.

51.     Notwithstanding anything to the contrary contained in this Second Interim Order, in the event there is a timely and successful Challenge Proceeding by any party in interest in accordance with the terms hereof, this Court may fashion an appropriate remedy as applicable to the payment of any adequate protection or Prepetition Secured Debt consisting of an unsecured claim or other claim or amount not allowable under section 502 of the Bankruptcy Code.

52.     Notwithstanding anything contained in this Second Interim Order or any of the DIP Financing Agreements, the Challenge Period Termination Date shall not be modified, amended or extended without the prior written consent of the Prepetition Secured Parties, in their sole discretion, and the DIP Parties, with such consent of the DIP Parties not to be unreasonably withheld or delayed.

**D.     Carve Out and Payment of Professionals**

53.     Carve Out.   As used in this Second Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (exclusive of any fee which becomes due and payable upon consummation of a transaction) (the "Allowed Professional Fees")[6] incurred by persons or firms retained by the Debtors pursuant to section

---

[6]     Any fee that is or will become due and payable upon the consummation of a transaction shall be payable

2

327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all Allowed Professional Fees incurred by persons or firms retained by the Committee (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") up to and as limited by the aggregate Approved Budget amounts for each Committee Professional or category of Committee Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to (x) any payments made to Committee Professionals under the Approved Budget pursuant orders of the Court, and (y) all carryforwards and carrybacks from prior or subsequent favorable budget variances), and (v) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee by the DIP Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

54.    Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the entry of ~~this~~the First Interim Order, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by

---

solely from the proceeds received by the Debtors resulting from such transaction, free and clear of the liens of the DIP Agent and the DIP Lenders.

2

such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith

estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable

Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by

the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the

occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver

one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees

and expenses incurred during the period commencing on the calendar day after the most recent Calculation

Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration

Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such

Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out

Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for

the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering

such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the

Approved Budget for such period for such Professional Person; provided, that such Professional Person

shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed

Professional Fees included in the Approved Budget for such period for such Professional Person from a

reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter

held by any Debtor.  The Debtors shall at all times fund and maintain in a segregated account (the "Funded

Reserve Account") in trust for the benefit of Professional Persons in an amount (the "Funded Reserve

Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and

Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount

of Allowed Professional Fees contemplated to be unpaid in the Approved Budget at the applicable time,

plus (ii) the Post-Carve Out Trigger Notice Cap, plus (iii) the amounts contemplated under paragraph

45(a)(i) and 45(a)(ii) above, plus (iv) an amount equal to the amount of Allowed Professional Fees set forth

in the Approved Budget for the then current week occurring after the most recent Calculation Date and the

two weeks succeeding such current week.  Any and all amounts in the Funded Reserve Account shall not

2

be subject to any cash sweep and/or foreclosure provisions in the DIP Financing Agreements and the DIP Lenders shall not be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the DIP Financing Agreements. Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the entry of ~~this~~the First Interim Order, the Debtors shall deliver to the DIP Parties a report setting forth the Funded Reserve Amount as of such time. Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Debtors shall calculate the Funded Reserve Amount by reference to the Approved Budget for subsection (i) of the Funded Reserve Amount. The information supplied by Professional Persons pursuant to this paragraph shall be used to determine whether there is compliance with Section 16(T) of the DIP Credit Agreement. Once the Funded Reserve Amount is funded into the Funded Reserve Account, the DIP Lenders shall not have any further obligations with respect to the payments to Professional Persons relating to such amounts, and Professional Persons may only be paid from the Funded Reserve Account. For the avoidance of doubt, the Prepetition Secured Parties shall have no obligations with respect to any payments to Professional Persons, or to fund the Funded Reserve Amount or any other amounts related to the Carve Out.

55.    <u>Carve Out Reserves</u>. On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including any amounts held in the Funded Reserve Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account with the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims. On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand (including any amounts held in the Funded Reserve Account) as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to

~~2~~

any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date until such obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the DIP Agent for the benefit of the DIP Lenders. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, any such excess shall be paid to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay to the DIP Agent for the benefit of the DIP Lenders in accordance with their rights and priorities set forth in this Second Interim Order, until the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date, until the Prepetition Secured Obligations, if any, have been indefeasibly paid in full in cash. Notwithstanding anything to the contrary in this Second Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 47 55, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 47 55, prior to making any payments to the DIP Agent, or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in this Second Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Financing Agreements until the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, and thereafter to the Prepetition Secured Parties until the

2

Prepetition Secured Obligations, if any, have been indefeasibly paid in full. Further, notwithstanding anything to the contrary in this Second Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Term Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees of the Debtor Professionals shall not affect the priority of the Carve Out with respect to the Debtor Professionals, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Second Interim Order or, the DIP Facility,Financing Agreements, or in any Prepetition Financing Agreement(s), the Carve Out with respect to the Debtor Professionals shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Prepetition Indemnity Obligations (other than the Prepetition Indemnity Account Lien and/or any claims of Prepetition Secured Parties to the Prepetition Indemnity Account and/or funds therein), and the Prepetition Secured Parties' and DIP Lenders' respective superpriority claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations. and/or Prepetition Secured Obligations (other than the Prepetition Indemnity Account Lien and/or any claims of Prepetition Secured Parties to the Prepetition Indemnity Account and/or funds therein). The Carve Out with respect to all other Professional Persons, other than Debtor Professionals, shall be limited to the Carve Out Reserve.

56.    Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

57.    No Direct Obligation To Pay Allowed Professional Fees. None of the DIP Agent or, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Second Interim Order or otherwise shall be construed to obligate the DIP Agent or, the DIP Lenders, or the Prepetition Secured

Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

58.    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Second Interim Order, the DIP Financing Agreements, the Bankruptcy Code, and applicable law.

59.    <u>Restriction on Use of Funds</u>.  Notwithstanding anything herein to the contrary, no proceeds of the DIP Facility or, DIP Collateral or the Prepetition Indemnity Account (including funds therein) may be used by the Debtors, any official committee, or any other person or entity without the consent of the DIP Agent and/or the Prepetition Secured Parties in connection with any of the following: (a)  the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Agent, the DIP Lenders, or Prepetition Secured Parties, or any of their respective officers, directors, employees, agents, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter in any way related to the DIP Financing Agreements or the Prepetition Loan Documents (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or the DIP Liens; (ii) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Debt or Prepetition Liens Obligations, the Prepetition Indemnity Obligations, Prepetition Liens, Adequate Protection Superpriority Claims, Adequate Protection Liens, or the Prepetition Indemnity Account Lien; (iii) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code or under similar laws of any jurisdiction against any of the Prepetition Secured

2

39

Parties or the DIP Parties; (iv) investigating or asserting any so-called "lender liability" claims and causes of action against any of the Prepetition Secured Parties or the DIP Parties; and (v) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Secured ~~Debt~~Obligations, the Prepetition Indemnity Obligations, the Prepetition Liens, the Adequate Protection Superpriority Claim, the Adequate Protection Liens, the Prepetition Indemnity Account Lien, the DIP Obligations, the DIP Superpriority Claim, ~~or~~and the DIP Liens; (b) asserting any claims or causes of action against the DIP Parties or the Prepetition Secured Parties in such capacity, including, without limitation, claims or actions to object to or contest in any manner the DIP Parties' or the Prepetition Secured Parties' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the DIP Financing Agreements, the Prepetition Loan Documents, or this Second Interim Order; (c) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Parties or the Prepetition Secured Parties hereunder or under the DIP Financing Agreements or Prepetition Loan Documents (as applicable), in each of the foregoing cases without such applicable parties' prior written consent; provided, however, that the proceeds of the DIP Facility and DIP Collateral shall be available for payment of any fees or expenses incurred by any official committee (if appointed) to investigate, but not prosecute, any of the foregoing in an amount not to exceed $25,000.

**E.    Maturity; DIP Order Events of Default; Remedies**

60.    The DIP Facility shall mature (the "***DIP Maturity Date***"), and the Debtors' ability to utilize cash shall terminate, upon the expiration of five (5) business days' prior written notice (a "***DIP Remedies Notice***" and the "***DIP Remedies Notice Period***") to each of (a) the Debtors, (b) lead restructuring counsel to the Debtors, (c) counsel to the Prepetition Agents, (d) counsel for any Committee, (e) counsel to the DIP Agent, and (f) the U.S. Trustee, after the occurrence and continuation of any of the following events (each, a "***DIP Maturity Event***"), unless waived by the DIP Agent or cured by the Debtors during the DIP Remedies Notice Period:

        (a)    March 31, 2020;

(b)     the date which is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Court on or prior to such date;

(c)     the failure of the Debtors to adhere to the Approved Budget, including any failure to maintain Excess Availability at the levels required hereunder;

(d)     the date on which the DIP Agent accelerates the DIP Obligations outstanding under the terms of the DIP Facility after the occurrence of an Event of Default (as defined in the DIP Credit Agreement and the passage of any applicable cure period) in accordance with the terms of the DIP Credit Agreement;

(e)     the occurrence of  DIP Order Event of Default (as defined below);

(f)     the consummation of a sale of all or substantially all of the Debtors' assets;

(g)     any stay, reversal, vacatur, rescission or other modification of the terms of this Second Interim Order not consented to by the DIP Parties;

(h)     the failure of the Debtors to provide all financial reports as well as any budget variance report required under the DIP DocumentsFinancing Agreements;

(i)     the dismissal of any of the Chapter 11 Cases, the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee with expanded powers in any of the Chapter 11 Cases;

(j)     the failure of the Debtors to comply with any of the budget covenants or Milestones as set forth in the DIP Documents;Financing Agreements; or

(k)     the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Court.

61.     Immediately upon the occurrence of the DIP Maturity Date, notwithstanding any automatic stay otherwise applicable to the DIP Parties pursuant to section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Second Interim Order, the DIP Parties may exercise their rights and remedies in accordance with this Second Interim Order upon the expiration of the DIP Remedies Notice Period following delivery of a DIP Remedies Notice, in each case such DIP Remedies Notice being given to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel for any Committee, (iv) counsel to the DIP Agent, and (vi) the U.S. Trustee.

62.     Following the giving of a DIP Remedies Notice, the Debtors and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than two (2) business days' notice to the Committee and the DIP Agent;

provided, that if a hearing to consider any relief in connection with the delivery of a DIP Remedies Notice or continued use of cash is requested to be heard within such DIP Remedies Notice Period but is scheduled for a later date by the Court, the DIP Remedies Notice Period shall be automatically extended to the date of such hearing. If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Maturity Event and/or the right of the DIP Parties to exercise their remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Maturity. Event and/or the right of the DIP Parties to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the DIP Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Parties, shall automatically terminate at the end of the DIP Remedies Notice Period.

63.    Subject to the provisions of Paragraphs 53-54[61-62] hereof, upon the expiration of the DIP Remedies Notice Period, the DIP Parties are authorized to exercise their remedies and proceed under or pursuant to the DIP DocumentsFinancing Agreements; except that with respect to any of the Debtors' leasehold locations, the DIP Parties can only enter upon a leased premises following the DIP Maturity Date in accordance with (i) a separate written agreement by and between the DIP Agent and any applicable landlord, (ii) pre-existing rights of the DIP Parties and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the DIP Parties on such notice to the landlord, the Debtors, any Committee, and the U.S. Trustee as shall be required by this Court.

64.    Unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Agent, in its sole and exclusive discretion have been made,), and all DIP Commitments have been irrevocably terminated, the protections afforded to the DIP Agent and the DIP Lenders pursuant to this Second Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "*Plan*") or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens and the DIP Superpriority Claim shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective

2

42

priorities as provided by this ~~Interim Order.~~Second Interim Order.  Unless and until the Indemnity Termination Date has occurred, the protections afforded to the Prepetition Secured Parties pursuant to this Second Interim Order and under the Prepetition Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any plan of reorganization or liquidation (a "*__Plan__*") or converting the Chapter 11 Cases into a Successor Case, and the Prepetition Indemnity Obligations, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and the Prepetition Indemnity Account Lien shall continue in these Chapter 11 Cases and in any Successor Case, and such Prepetition Indemnity Obligations, Prepetition Liens, Adequate Protection Liens, Adequate Protection Superpriority Claims and Prepetition Indemnity Account Lien shall maintain their respective priorities as provided by this Second Interim Order.

65.    Each of the following, unless waived by the DIP Agent or cured by the Debtors, shall constitute a "*__DIP Order Event of Default__*":

(a)    the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement;

(b)    the failure of the Debtors to obtain entry of the Final Order on or before the date that is thirty (30) days after the Petition Date, unless such date has been extended by consent of the ~~Prepetition Agents and~~ DIP Agent, ~~each~~ in ~~their~~its sole and absolute discretion;

(c)    the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Credit Agreement (including, without limitation, the Milestones (as defined therein), and after giving effect to any notice or cure periods provided therein) or this Second Interim Order; ~~or~~

(d)    the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, the dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(e)    termination of the exclusivity period for the Debtors to file a chapter 11 plan in the Chapter 11 Cases;

(f)    other than as contemplated by this Second Interim Order, entry of an order granting any lien or claim which is senior to or *pari passu* with the DIP Agent''s lien and claims under the DIP Facility without the prior written consent of the DIP Agent (or the filing of any motion by the Debtors seeking such relief), unless the

~~2~~

obligations owing to the DIP Agent and DIP Lenders are indefeasibly paid in full in cash and the DIP Lenders'' commitment to make loans is terminated ;

(g)    entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or liquidation that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

(h)    payment of or granting adequate protection with respect to prepetition debt (other than as set forth in this Second Interim Order or as may be agreed by the DIP Agent);

(i)    the failure of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable with the priority described herein;

(j)    the entry of one or more orders of the Court lifting the automatic stay under section 362 of the Bankruptcy Code with respect to assets of the Debtors having a value in excess of $500,000 in the aggregate; andor

(k)    the Interim Order or Final Order, as applicable, shall be amended, modified, stayed or vacated without the written consent of the DIP Agent.

66.    Upon the service of a DIP Remedies Notice, to the extent the DIP Agent, as and to the extent provided for by the DIP Credit Agreement, determines in its sole and absolute discretion to exercise its rights and remedies in accordance with this Second Interim Order:

(a)    any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion;

(b)    the Debtors shall continue to deliver and cause the delivery of the proceeds of the DIP Collateral to the DIP Agent, as provided in this Second Interim Order and in the DIP Financing Agreements;

(c)    the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Second Interim Order and the DIP Financing Agreements, as applicable; and

(d)    the Debtors shall have no right to use any of such proceeds, nor any cash that constitutes DIP Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out, as provided in the DIP Financing Agreements and this Second Interim Order; provided, however, that during the DIP Remedies Notice Period the Debtors may use cash (excluding any amounts in the Prepetition Indemnity Account) solely to meet accrued but unpaid payroll obligations (other than severance) and trust fund obligations strictly in accordance with the Approved Budget.

2

(e)    [Upon the occurrence of either (a) an Event of Default and, subject to the DIP Remedies Notice Period and other terms of this Second Interim Order, the exercise by the Agent or the DIP Lenders of their rights and remedies under the Financing Orders or the other DIP Documents, or (b) the failure of any Loan Party to comply with the October 24, 2019 Milestone under Section 14(h)(6), each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition, and the Loan Parties shall immediately commence all liquidation processes in the manner contemplated by the Store Closure Motion.]

67.    Upon expiration of the DIP Remedies Notice Period, the DIP Agent ~~and the DIP Lenders~~, the DIP Lenders, and the Prepetition Secured Parties (subject to the subordination agreement and other limitations contained herein) are authorized to exercise their remedies and proceed under or pursuant to the DIP Credit Agreement or the Prepetition Financing Documents, as applicable; except that, with respect to any of the Debtors' leasehold locations, the DIP Agent and/or DIP Lenders can only enter upon a leased premises after expiration of the DIP Remedies Notice Period in accordance with (i) the rights of the Prepetition Agents where the DIP Agent succeeds to such rights under this Second Interim Order, or (ii~~i~~) entry of an order of this Court obtained by motion of the applicable DIP Agent or DIP Lender on such notice to the landlord as shall be required by this Court.

68.    Nothing included herein shall prejudice, impair or otherwise affect either the DIP Agent's rights to seek any other or supplemental relief from the Court in respect of the Debtors, nor the DIP Lenders' rights, as provided herein and in the DIP Financing Agreements, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

69.    The delay in or the failure of the DIP Agent and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's ~~and/or,~~ DIP Lenders' and/or Prepetition Secured Parties' rights and remedies.  Notwithstanding anything herein, the entry of this Second Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the DIP Agent ~~or the,~~ DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Agent ~~to: (i)~~, DIP Lenders, Prepetition Agents, and/or the Prepetition Secured Parties to: (i) request conversion of the Chapter 11 Cases to cases under chapter 7 of

~~2~~

the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the DIP Agent, DIP Lenders, and/or Prepetition Secured Parties may have.

### IV. Certain Limiting Provisions

#### A.    Section 506(c) Claims and Waiver

70.    Nothing contained in this Second Interim Order shall be deemed a consent by the DIP Agent or, the DIP Lenders, or the Prepetition Secured Parties to any charge, Lien, assessment, or claim against the DIP Collateral or, the DIP Liens, the Prepetition Collateral, the Adequate Protection Liens, Prepetition Indemnity Account (and the funds therein), or the Prepetition Indemnity Account Lien under section 506(c) of the Bankruptcy Code or otherwise, including for any amounts set forth in the Approved Budget; provided, however, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

71.    As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Credit Agreement, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the DIP Agent, the DIP Lenders, and the DIP Collateral. the Prepetition Secured Parties, the DIP Collateral, the Prepetition Collateral, and the Prepetition Indemnity Account (and the funds therein).

#### B.    Proceeds of Subsequent Financing

72.    If at any time prior to the irrevocable repayment in full in cash of all DIP Obligations and the Prepetition Secured Obligations, and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement, then all of the cash proceeds

2

derived from such credit or debt shall immediately be turned over <u>first</u>, to the DIP Agent to be applied in reduction of the DIP Obligations, and after payment in full of the DIP Obligations, ~~and~~ second, <u>to the Prepetition Secured Parties to be applied in reduction of the remaining Prepetition Secured Obligations (including any accrued Adequate Protection), if any, and third,</u> solely to the extent that the DIP Obligations <u>and the Prepetition Secured Obligations (including any accrued Adequate Protection)</u> have been irrevocably paid in full, to the Debtors.

## C.    <u>No Priming of DIP Facility</u>

73.    In entering into the DIP Financing Agreements, ~~and as consideration therefor,~~ each of the Debtors hereby agrees that until such time as all DIP <u>Obligations and all Prepetition Secured</u> Obligations have been irrevocably paid in full in cash (or other arrangements for payment of thereof satisfactory to the DIP Lenders <u>and Prepetition Secured Parties, as applicable,</u> in their sole and exclusive discretion<u>,</u> have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to in writing by the DIP Agent and <u>the</u> DIP Lenders, each in their sole respective discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Agent ~~under this Interim Order~~ by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.  For the avoidance of doubt, <u>nothing contained herein shall prejudice</u> the ~~agreement~~<u>rights</u> of ~~the Debtors set forth in this Paragraph 63 shall apply in all circumstances, including~~ any ~~potential refinancing of all or any portion of of~~ the Prepetition Secured ~~Debt~~<u>Parties to contest the adequacy of any adequate protection offered, or to seek any other form of protection, in connection with any such priming postpetition financing</u>.

## <u>V.</u><u>Other Rights and Obligations</u>

## A.    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this <u>Second</u> Interim Order**

74.    Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this <u>Second</u> Interim Order, any claim or protection granted to the DIP Agent<u>, DIP Lenders</u> and/or the ~~DIP Lenders~~<u>Prepetition Secured Parties</u> hereunder arising prior to the effective date of such modification,

2

47

amendment, or vacation of any such claim or protection granted to the DIP Agent or, the DIP Lenders, or Prepetition Secured Parties shall be governed in all respects by the original provisions of this Second Interim Order, the DIP Agent and the DIP Agent, the DIP Lenders, and Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections and Adequate Protection granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.    Prepetition Secured Parties', DIP Agent's, and DIP Lenders' Expenses**

75.    All reasonable out-of-pocket costs and expenses of the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses (whether incurred prior to, on or after the Petition Date), whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget), shall promptly be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtors, the U.S. Trustee, or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Agent or, the DIP Lenders, and/or the other Prepetition Secured Parties be required to comply with the Court's and/or U.S. Trustee's fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges; provided, however, the DIP Agent, the DIP Lenders, and/or the DIP Lenders Prepetition Secured Parties shall provide the Debtors, the U.S. Trustee, and any Committee with a copy of the invoice summary, for professional fees and expenses incurred during the pendency of the Chapter 11 Cases.  Each such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the

2

extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine.  If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the invoice summary submitted by the DIP Agent or, the DIP Lenders, and/or the Prepetition Secured Parties, and the parties cannot resolve such objection within ten (10) days of receipt of such invoice summary, the Debtors, U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the applicable DIP Agent or, DIP Lender, or Prepetition Secured Party an objection (a "*Fee Objection*") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall promptly pay the amounts set forth in any submitted invoice summary after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely received, the Debtors shall promptly pay the undisputed amount only of any invoice summary that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice summary if the parties are unable to resolve the Fee Objection.  Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination or disgorgement.  Notwithstanding anything to the contrary contained herein, the aggregate amount of reasonable and documented fees and expenses paid to or for the benefit of the Prepetition Secured Parties pursuant to Paragraphs 12 and 21 hereof shall not exceed $1.1 million (inclusive of the amounts held in the Prepetition Indemnity Account), irrespective of whether there is a Challenge Proceeding.

**C.    Binding Effect**

76.    The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs 41-4546-52 hereof), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

2

### D.   No Third Party Rights

77.    Except as explicitly provided for herein, this Second Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.

### E.   No Marshaling

78.    Upon entry of the Final Order, the DIP Agent and, the DIP Lenders, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral. or Prepetition Collateral, as applicable; provided, that the Prepetition Secured Parties hereby waive any such "marshaling" or rights under any other similar doctrine with respect to any of the DIP Collateral unless and until the DIP Obligations are indefeasibly paid in full..

### F.   Section 552(b) of the Bankruptcy Code

79.    Upon entry of the Final Order, the Prepetition Secured Parties (and, to the extent applicable, the DIP Parties) shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors and/or any successors thereto shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the Prepetition Secured Parties (and, to the extent applicable, the DIP Parties) with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

### G.   Amendments

80.    The Debtors and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of this Court; provided, however, (a) that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court, and any Committee or the U.S. Trustee or the Prepetition Secured Parties each shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; provided, further, that if any Committee or the U.S. Trustee or any Prepetition Secured Party timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court

2

after notice and a hearing.  For purposes of this Paragraph 70 80, a "material" amendment means: any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the committed amounts under the DIP Credit Agreement, (iii) changes the maturity date of the DIP Facility to a date sooner than that which is provided under the DIP Credit Agreement and this Second Interim Order as of the date hereof, (iv) amends any Event of Default under the DIP Credit Agreement to make same more restrictive than exists as of the date hereof, (v) revises any Milestone set forth in the DIP Credit Agreement in a manner that reduces or shortens the time periods provided for in the DIP Credit Agreement, or (vi) otherwise modifies any of the DIP Financing Agreements in a manner adverse and/or less favorable to the Debtors. All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors, the DIP Agent and, if required, approved by this Court.  Notwithstanding anything in this Paragraph 80 to the contrary, the Debtors and the DIP Agent shall not amend, modify, supplement, or waive any provision of the DIP Financing Agreements that provides for repayment in full of the Prepetition Secured Debt on or before August 15, 2019 at 2:00 pm (New York time).

**H.    Limits on Lender Liability**

81.    Nothing in this Second Interim Order, any of the DIP Financing Agreements, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses, whether before or after the Petition Date, or in connection with the administration of these Chapter 11 Cases.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not, solely by reason of having made, or consented to the making of, loans under the DIP Facility, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Second Interim Order or the DIP Financing Agreements, shall in any way

2

be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors.

**I.      Survival of Interim Order**

82.     The provisions of this Second Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

      (a)      confirming any Plan in the Chapter 11 Cases,

      (b)      converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

      (c)      dismissing the Chapter 11 Cases,

      (d)      withdrawing of the reference of the Chapter 11 Cases from this Court, or

      (e)      providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

83.     The terms and provisions of this Second Interim Order, including any protections granted the DIP Parties and the Prepetition Secured Parties and the DIP Protections granted pursuant to this Second Interim Order, shall continue in full force and effect notwithstanding the entry of any order described in Paragraph 72[82] hereof, and such DIP Protections and protections for the DIP Parties and the Prepetition Secured Parties shall maintain their priority as provided by this Second Interim Order until all of the DIP Obligations of the Debtors to the DIP Lenders pursuant to the DIP Credit Agreement have indefeasibly been paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).) and, with respect to any protections granted to the Prepetition Secured Parties herein, until the Indemnity Termination Date has occurred.

**J.      Inconsistency**

84.     InUp to the entry of this Second Interim Order, in the event of any inconsistency between thisthe First Interim Order, on the one hand, and the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, and the First Interim Order, or the other DIP Financing Agreements, on the

2

other hand, the provisions of ~~this~~the First Interim Order shall govern and control. Upon the entry of this Second Interim Order, in the event of any inconsistency between this Second Interim Order, on the one hand, and the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, or the other DIP Financing Agreements, on the other hand, the provisions of this Second Interim Order shall govern and control.

**K.    Enforceability**

85.    This Second Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable ~~nunc pro tunc to the Petition Date~~ immediately upon ~~execution hereof~~entry by the Court of this Second Interim Order. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed and vice versa.

**L.    Objections Overruled**

86.    All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

**M.    Waiver of Any Applicable Stay**

87.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Second Interim Order.

**N.    Proofs of Claim**

88.    ~~The~~The Prepetition Secured Parties and the DIP Parties will not be required to file proofs of claim or any request for payment of an administrative expense in the Chapter 11 Cases or in any Successor Case in order to maintain their respective claims for payment of the Prepetition Secured Obligations under the Prepetition Financing Documents, for payment and performance of the Adequate Protection, for payment of any claim granted in this Second Interim Order and/or the Final Order, and/or for payment of the DIP Obligations under the DIP Financing Agreements. The statements of claim in respect of the Prepetition Secured Obligations, Adequate Protection, and DIP Obligations set forth in this Second Interim Order, together with the evidence accompanying the DIP Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim (and requests for payment of an

~~2~~

administrative expense) in respect of such obligations and such secured status. Notwithstanding any order entered by this Court in relation to the establishment of a bar date for filing a claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or in any Successor Case to the contrary, the Prepetition ABL Agent, on behalf and for the benefit of the Prepetition Secured Parties, (i) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a single, master consolidated proof of claim in respect of the Prepetition Secured Obligations (including, without limitation, in respect of all guarantees by any of the Debtors of such Prepetition Secured Obligations), the Adequate Protection, and any claim granted in this Second Interim Order and/or the Final Order, in the Debtors' lead Chapter 11 Case, *In re Barneys New York, Inc., et al.* (Case No. 19- 36300 (CGM)), which master proof of claim shall be deemed a valid, timely and properly filed proof of claim against each applicable Debtor in the Chapter 11 Cases and/or in any Successor Case and (ii) shall not be required to file any agreements, documents, or other instruments evidencing such Prepetition Secured Debt, Adequate Protection and/or any claim granted in this Second Interim Order and/or the Final Order with such master proof of claim. Any master proof of claim filed by the Prepetition ABL Agent shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any of the other Prepetition Secured Parties at such party's election; provided that no such Prepetition Secured Party is required to file any such proof of claim. Notwithstanding anything to the contrary herein, the Debtors reserve the right to estimate or object to the quantum of any contingent, unliquidated Prepetition Secured Obligation, including the Prepetition Indemnity Obligations (if any), or Adequate Protection.

**O.** **Provisions Regarding Certain Leases**

89. With respect to those certain real property leases related to the Madison Avenue and Beverly Hills store locations, the Debtors shall either (x) assume both of the leases or (y) reject both of the leases contemporaneously, as the case may be.

**P.** **Headings**

90. The headings in this Second Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Second Interim Order.

2

**Q.**     **Retention of Jurisdiction**

91.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation, and enforcement of this Second Interim Order.

**VI.** **Final Hearing**

92.     The Final Hearing on the DIP Motion shall be held before this Court on September 4, 2019,

at 10:30 a.m. (prevailing Eastern time) before the Honorable Cecelia G. Morris United States Bankruptcy

Judge, at the United States Bankruptcy Court, Southern District of New York, located at 355 Main Street,

Poughkeepsie, NY 12601.

93.     The Debtors shall, within three (3) business days of the entry of this Second Interim Order,

serve a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order

upon: (A) the U.S. Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia

Leonhard, Esq.); (B) counsel to the Prepetition ABL Agent, Riemer & Braunstein LLP (Attn: Donald

Rothman, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New

York, NY 10036 (Email: drothman@riemerlaw.com; and sfox@riemerlaw.com); (C) counsel to the

Prepetition Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn:

Kevin J. Simard, Esq. and Mark D. Silva, Esq.) (Email: ksimard@chaote.com and msilva@choate.com);

(D) counsel to TPG Specialty Lending, Inc., Schulte Roth & Zabel, 919 Third Avenue, New York, NY

10022 (Attn: Adam Harris, Esq., Kristine Manoukian, Esq. and Kelly V. Knight, Esq.) (Email:

adam.harris@srz.com adam.harris@srz.com, Kristine.manoukian@srz.com, and kelly.knight@srz.com);

(E) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York

10281, Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans (Email:

slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com); (F) holders of the

thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (G) any and all parties

known to the Debtors to assert a lien or security interest in any of the Prepetition Collateral and/or DIP

Collateral, including, without limitation, any party that holds an asserted Permitted Prior Lien; (H) the

Internal Revenue Service; (I) all appropriate state taxing authorities; (J) all landlords, owners, and/or

2

operators of premises at which any of the Debtors' operate their businesses; and (K) any other party that files a request for notices with the Court as of the date of such service.

94.     If no objections to the relief sought in the DIP Motion are filed and served in accordance with this Second Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Agent and entered by this Court upon certification of counsel by the Debtors.

95.     Any party in interest objecting to the relief sought in the DIP Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than **August 28, 2019 at 4:00 p.m. (ET)** on the following parties: (A) the U.S. Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia Leonhard, Esq.); (B) counsel to the Prepetition ABL Agent, Riemer & Braunstein LLP (Attn: Donald Rothman, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: drothman@riemerlaw.com; sfox@riemerlaw.com); (C) counsel to the Prepetition Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: Kevin J. Simard, Esq. and Mark D. Silva, Esq.) (Email: ksimard@chaote.com and msilva@choate.com); (D) counsel to TPG Specialty Lending, Inc., Schulte Roth & Zabel, 919 Third Avenue, New York, NY 10022 (Attn: Adam Harris, Esq., Kristine Manoukian, Esq., and Kelly V. Knight, Esq.) (Email: adam.harris@srz.com, Kristine.manoukian@srz.com and kelly.knight@srz.com); kelly.knight@srz.com); (E) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York 10281, Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans (Email: slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com); and (F) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Edward O. Sassower, P.C., Joshua A. Sussberg, P.C., and Gene Goldmintz, and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, Attn: Chad J. Husnick, P.C., and W. Benjamin Winger.

Dated: _____ __, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit "1"**

**Approved Budget**

**[TO COME]**

## **EXHIBIT D**

**Third Revised DIP Credit Agreement**

**AMENDED AND RESTATED DEBTOR IN POSSESSION SECURED
TERM PROMISSORY NOTE**

$217,000,000                                                                          New York, New York
                                                                                      August 15, 2019

On August 6, 2019 (the "Petition Date"), BARNEY'S INC., (the "Borrower") and certain of its affiliates commenced Chapter 11 Case Nos. 19-36299, 19-36300, 19-36301, 19-36302 and 19-36303 respectively, which cases are being jointly administered under Chapter 11 Case No. 19-36300 (CGM) (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested that GACP Finance Co., LLC, as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Amended and Restated Debtor in Possession Secured Term Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make term loans  evidenced by this Note. Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent. The Borrower intends to utilize such Term Loans to (i) repay the Prepetition Secured Debt in full and in cash (other than any Obligations (as defined therein) relating to letters of credit issued under the Prepetition ABL Facility (the "LCs") and Prepetition Secured Contingent Indemnity Claims) and to cash collateralize the LCs (ii) fund general corporate needs, including without limitation working capital and other needs, and (iii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note. This Note is being executed and delivered as an amendment to and a full restatement of the Debtor in Possession Secured Multi-Draw Term Promissory Note dated as of August 6, 2019, among the parties hereto (the "Original Note"), and as so, the Original Note is amended and restated, replaced and superseded by the terms, conditions, agreements, covenants, representations and warranties set forth in this Note without the need for any further actions or notices.

1.      Term Loans.

(a)      (i) On the Closing Date, the DIP Lenders party thereto provided the Borrower with super-priority secured debtor-in-possession "Tranche A" loans under Section 364(c)(2) and (c)(3) of the Bankruptcy Code, which were made available to the Borrower on August 7, 2019, on the entry of the Interim Order, in the principal amount of $75,000,000 (the "Tranche A Term Loans"), (ii) subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with super-priority secured debtor-in-possession "Tranche B" loans under Section 364(c) and (d) of the Bankruptcy Code (collectively, the "Tranche B Term Loans"), each of which shall be made available upon the entry of the Second Interim Order, comprised of (A) "Tranche B-1" loans in the principal amount of $71,000,000 (the "Tranche B-1 Term Loans") and

(B) "Tranche B-2" loans in the principal amount of $50,000,000 Term Loans, and (iii) subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with super-priority secured debtor-in-possession "Tranche C" loans under Section 364(c) and (d) of the Bankruptcy Code, all of which shall be made available upon the entry of the Second Interim Order, in the principal amount of $21,000,000 (the "Tranche C Term Loans" and, together with the Tranche A Term Loans and the Tranche B Term Loans, the "Term Loans"). The parties hereto agree that upon the effectiveness of this Note, all term loans under the Original Note shall be reevidenced as Tranche A Term Loans made by the DIP Lenders hereunder, ratably based on the respective amounts advanced thereunder by each such DIP Lender. The Term Loans shall be subject to the priority set forth in the applicable Financing Order. Each DIP Lender shall provide the respective tranche of Term Loans in an amount equal to the proportion that such tranche represents of its respective Commitment and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several. The respective Commitment of each DIP Lender shall be permanently reduced upon the making of each tranche of Term Loan in an amount equal to such tranche of Term Loan. Additionally, at the Borrower's request, certain DIP Lenders and/or at their election, certain of their respective affiliates (collectively in such capacity, the "Consignor") will provide the Loan Parties with a consignment facility to support post-petition inventory purchases, subject to the terms and conditions set forth on Exhibit B attached hereto (the "Consignment Facility"). The Borrower and the Consignor may mutually agree upon new inventory purchases (collectively, the "Consigned Inventory") pursuant to which the Consignor will purchase new inventory from the applicable vendor at prices negotiated between the Loan Parties and such vendor. For the avoidance of doubt, (i) the Consigned Inventory are not assets of the Loan Parties and shall not constitute "Collateral" nor be subject to the liens of the Agent or DIP Lenders hereunder; (ii) upon the sale of any Consigned Inventory, the Loan Parties' share of the proceeds on the Consigned Inventory (less the amounts payable to the Consignor in Section 7(b)(1)) shall constitute "Collateral" hereunder and the other DIP Documents, and (iii) any fees paid to the Loan Parties described on Exhibit B shall constitute "Collateral" hereunder and under the other DIP Documents.

(b)     The aggregate principal amount of Terms Loans outstanding shall not exceed $217,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any borrowing request or similar notice believed by the Agent to be genuine. The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)     The Borrower shall utilize the proceeds of Term Loans to (i) repay the Prepetition Secured Debt in full and in cash (other than any Obligations (as defined therein) relating to the LCs and Prepetition Secured Contingent Indemnity Claims) and to cash collateralize the LCs, (ii) fund general corporate needs, including without limitation working capital and other needs, and (iii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders); provided, that (a) the Tranche A Term Loans were used on the Closing Date to repay a portion of the Prepetition Secured Debt under the Prepetition ABL Facility, (b) the Tranche B Term Loans shall be used to repay in full all remaining outstanding loans and other

-2-

obligations (other than in respect of the LCs and other than Prepetition Secured Contingent Indemnity Claims) under the Prepetition Credit Agreement, (c) the Tranche C Term Loans shall be used solely to cash collateralize the LCs in accordance with the terms thereof (and to pay reimbursement or other obligations in respect thereof under the Prepetition Credit Agreement, (d) the Term Loans may be used to pay interest, fees, and expenses that constitute DIP Obligations and (e) no portion of any Term Loan shall be used, directly or indirectly, to finance or make any Restricted Payment (except as described in clause (a) of this proviso), or to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Loan Parties.

(e)    Except to the extent expressly provided otherwise in the Financing Orders, the Obligations shall be deemed to (i) constitute a DIP Superpriority Claim and (ii) be secured pursuant to sections 364(c) and (d) of the Bankruptcy Code.

2.    <u>Certain Conditions to Effective Date, Each Tranche B Term Loan and Each Tranche C Term Loan</u>.  The Original Note shall not be amended and restated hereby on the Effective Date, and no DIP Lender shall be obligated to fund any Tranche B Term Loan or Tranche C Term Loan, if, as of the date thereof:

(a)    the Borrower shall not have paid any amount then payable hereunder, under the Original Note or under any other DIP Document;

(b)    [reserved];

(c)    the Loan Parties shall not have delivered, each in form and substance satisfactory to Agent, (i) guarantees of each of the Guarantors (or amendments or amendments and restatements of the guarantees entered into on the Closing Date with respect to the Original Note) with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby and (ii) an executed fee letter between the Borrower and the Agent (the "<u>Agent Fee Letter</u>");

(d)    any representation or warranty by any Loan Party contained herein, in the Original Note or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)    (i) the Bankruptcy Court shall not have entered the Second Interim Order; or (ii) the Interim Order or the Second Interim Order shall have been stayed, vacated, reversed, modified or amended, in each case, without Agent's consent;

(f)    the outstanding amount of the Prepetition Secured Debt (other than the LCs that will be cash collateralized with the proceeds of the Tranche C Term Loan and other Prepetition Secured Contingent Indemnity Claims) will not be paid in full with the proceeds of the Tranche B Term Loan or all Liens secured such Prepetition Secured Debt shall not have been terminated or been made junior or otherwise subordinated to the Liens securing the Obligations, other than as provided in the Financing Orders;

(g)    except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, the Store Closure Motion, the Sale Motion, this Note or the Financing Orders), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(h)    any Default or Event of Default shall have occurred and be continuing hereunder or under the Original Note or would result after giving effect to any Term Loan;

(i)    after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(j)    the Agent shall not have received and approved the applicable Budget for such period in accordance with this Note and the Financing Orders;

(k)    Mo Meghji shall no longer be retained as Chief Restructuring Officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent;

(l)    [reserved];

(m)    the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner that is adverse to the Agent and the DIP Lenders in any material respect, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(n)    the Bankruptcy Court shall have entered orders, which orders could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner adverse to the Agent and the DIP Lenders in any material respect, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.    Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided in this Note.

4.    Payment of Interest.

(a)    Tranche A Term Loans.

(1)     Subject to the terms of this Note, the Tranche A Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the Closing Date until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche A Term Loans (or such portion thereof) plus 12.00%.

(b)     Tranche B-1 Term Loans.

(1)     Subject to the terms of this Note, the Tranche B-1 Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche B-1 Term Loans (or such portion thereof) plus 2.25%.

(c)     Tranche B-2 Term Loans

(1)     Subject to the terms of this Note, the Tranche B-2 Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the one-month LIBOR Rate for the Interest Period in effect for the Tranche B-2 Term Loans (or such portion thereof) plus 7.00%.

(d)     Tranche C Term Loans

(1)     Subject to the terms of this Note, the Tranche C Term Loans or any portion thereof shall bear interest at the per annum rates equal to (x) until any LCs that are cash collateralized with the proceeds of the Tranche C Term Loans are drawn at any time after the Petition Date (and while the proceeds of such Tranche C Term Loans is being held as cash collateral therefor), an amount equal to the sum (if positive) of (i) the aggregate rates at which such undrawn LCs would have accrued fees under the Prepetition Credit Agreement (both to the issuing bank and the participating banks), absent cash collateralization, *minus* (ii) the rate at which such undrawn LCs would accrue fees while fully cash collateralized, and (y) from and after the drawing on any such LC from and after the Petition Date and solely with respect to any drawn amount under such LC, at the rate *per annum* otherwise applicable to the Tranche B-1 Loans.

(e)     Interest on the Term Loans shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(f)     All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

-5-

(g)        So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent or the Required Lenders, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(h)        It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(h) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section4(h).

(i)        The LIBOR Rate may be adjusted by the DIP Lenders on a prospective basis to take into account any additional or increased costs to the DIP Lenders of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law (other than change with respect to tax law, which are addressed in Section 10 hereof) occurring subsequent to the commencement of the then applicable Interest Period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate.  In any such event, the DIP Lenders shall give the Borrower notice of such a determination and adjustment and, upon its receipt of the notice from such DIP Lender, the Borrower may, by notice to such DIP Lender (1) request the DIP Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and

the method for determining the amount of such adjustment or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made.

(j)    Anything to the contrary contained herein notwithstanding, the DIP Lenders are not required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of Sections 4(i) through (k) shall apply as if the DIP Lenders had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

(k)    If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by any of the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

(l)    The Borrower may elect the Interest Period in effect for the Term Loans (or any portion thereof); provided, that (1) In no event will the Borrower have more than 6 Interest Periods outstanding at any time and (2) if the Agent reasonably determines that the LIBOR Rate is unavailable, then the Term Loans that would otherwise bear interest at the LIBOR rate shall bear interest, at a rate per annum equal to the Base Rate plus, (x) in the case of the Tranche A Term Loans, 11.00%, (y) in the case of the Tranche B-1 Term Loans (and, to the extent applicable, Tranche C Term Loans), 1.25%, and (z) in the case of the Tranche B-2 Term Loans, 6.00%, in each case on the principal amount thereof from the date that the LIBOR Rate became unavailable until such time the Agent or such DIP Lender determines that the LIBOR Rate is available.

5.    Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the following account:

Bank:            City National Bank
                 555 South Flower Street

Los Angeles, CA  90071
ABA/Routing:           122016066
Swift Number:          CINAUS6L   (International Wires Only)
Account Name:          GACP II, LP
Account Number:        210427139
Reference:             Barney's

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower.  Any payments of Term Loans shall be applied as follows: first, to the payment of all fees (excluding the Exit Fee and the Enhancement Fee), and all expenses, to the full extent thereof; second, to the payment of any accrued interest at the Default Rate, if any; third, to the payment of any accrued interest (other than Default Rate interest); fourth, to repay (x) to the extent such proceeds constitute amounts released from being held as cash collateral with the proceeds of Tranche C Term Loans with respect to LCs (other than to repay such reimbursement obligations), the Tranche C Term Loans, and (y) otherwise, pro rata to the Tranche B-1 Term Loans and Tranche C Term Loans (except to the extent that LCs that were cash collateralized by such Tranche C Term Loans remain outstanding and undrawn) to the full extent thereof; fifth, to repay the Tranche B-2 Term Loans to the full extent thereof; sixth, to repay the Tranche A Term Loans and the Exit Fee to the full extent thereof; seventh, to the payment in full of all other Obligations, including the Enhancement Fee (to the extent any Enhancement Fee is then due and payable); and eighth, upon satisfaction in full of all Obligations, to the Borrower or as otherwise required by law.  During the continuance of an Event of Default, the Agent shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

6.    Optional Prepayments.  Subject to the terms and conditions of the Financing Orders and the application of payments in Section 5 hereof, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to the Agent; provided that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

7.    Mandatory Prepayments.  In each case, subject to the terms and conditions of the Financing Orders and the application of payments in Section 5 hereof and reduced (with respect to clauses (b), (c), (d) and (e) of this paragraph 7), on a dollar for dollar basis, for any Exit Fee payable in connection with such repayment:

(a)    If at any time the aggregate outstanding principal amount of the Term Loans exceed the Maximum Amount, the Borrower shall immediately repay the aggregate outstanding Term Loans to the extent required to eliminate such excess.

(b)    Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, such Loan Party shall contribute such proceeds to the Borrower and the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes actually paid or payable by a Loan Party in connection with such disposition, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note.  Notwithstanding anything in this Note to the contrary, (i) the following shall not be subject to mandatory prepayment under this clause (b): proceeds of sales of Inventory or other sales in the ordinary course of business or in accordance with the Budget, the Store Closure Motion, or the Financing Orders, and (ii) if the Borrower or any Loan Party and the Consignor enter into a Consignment Facility, the proceeds of sales of Consigned Inventory shall be paid to Consignor as follows:

(1)    Upon the sale of an item of Consigned Inventory by or on behalf of the Borrower or any Loan Party, the Borrower or such Loan Party shall pay the Consignor the applicable invoice price plus the applicable Consignment Fee.

(c)    If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)    Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)    Upon release of any amounts being held as cash collateral with respect to LCs (other than to repay reimbursement and other obligations with respect to such LCs under the Prepetition Credit Agreement), the Borrower shall immediately prepay the outstanding principal amount of the Tranche C Term Loans in an amount equal to such released amounts.

(f)    No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.    Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)    Facility Fee.  On the Closing Date, the Borrower paid in cash to the Agent (under the Original Note) the Facility Fee (as defined in the Original Note) equal to 5% of the principal amount of the Tranche A Term Loans, which was fully earned upon the entry of the Interim Order and non-refundable when paid; I t being acknowledged and agreed that the Facility Fee (as defined in the Original Note) has been paid.

(b)    _Weekly Fee_.  On the Effective Date and on each weekly anniversary of the Effective Date thereafter on which any Tranche B Term Loans or Tranche C Term Loans shall remain outstanding, the Borrower shall pay to the Agent for the benefit of the Lenders holding Tranche B Term Loans and Tranche C Loans, a non-refundable fee of $100,000 (to be shared ratably among such Lenders based on the aggregate outstanding amount of Tranche B Term Loans and Tranche C Term Loans) to be paid in cash, which fee shall be fully earned on the Effective Date and on each weekly anniversary thereafter.

(c)    _Exit Fee_.  The Borrower shall pay to the Agent, for the benefit of the Lenders holding Tranche A Term Loans, a non-refundable exit fee (the "Exit Fee") equal to 5% of the amount of Tranche A Term Loans on the Closing Date, which was fully earned on the Closing Date, and when paid, shall be paid in cash on the earlier of (a) the Maturity Date and (b) the date of any repayment, satisfaction, distribution, reduction or other discharge of any such Tranche A Term Loans (in each case, based on the aggregate amount of the affected Tranche A Term Loans).

(d)    _Enhancement Fee_.  The Borrower shall pay to the Agent, for the benefit of the Lenders, upon the sale or liquidation of the Loan Parties pursuant to the Chapter 11 Cases, 37.5% (the "Enhancement Fee") of any proceeds remaining after repayment of all Obligations (including the Exit Fee) and after payment of administrative expenses and priority claims as more particularly described in the Financing Orders and in the manner set forth in the Financing Orders; it being agreed that the Enhancement Fee need not be approved until the Final Order.

9.    _Indemnity_.

(a)    The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the parties to any of the DIP Documents on the one hand and any Loan Party on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT**

**HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    <u>Adjustments for Withholding, Capital Adequacy Etc.</u>  All payments to the Agent by any Loan Party under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities, including any interest, additions to tax or penalties applicable thereto (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "<u>Taxes</u>") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If any applicable withholding agent shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable by the applicable Loan Party shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the applicable withholding agent shall be entitled to make such deductions or withholdings, and (C) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from any Loan Party but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower (on behalf of itself and the other Loan Parties) agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower (on behalf of itself and the other Loan Parties) agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "<u>Other Taxes</u>") which arise from any payment made by any Loan Party under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Loan Parties shall indemnify the Agent and each of the DIP Lenders, within 10 days after demand therefor, for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid or payable by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.  A

-11-

certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Loan Parties to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by a Loan Party pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware (in its sole discretion exercised in good faith) that it has received a refund of any Taxes with respect to which any Loan Party has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof. This paragraph shall not be construed to require any Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Form W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made. In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.    Priority of Obligations and DIP Lenders' Liens.

(a)    To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any Loan Party, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case (a "DIP Superpriority Claim"), (ii) with respect to the Tranche A Term Loans, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the Tranche B Term Loans and Tranche C Term Loans (in each case, including adequate protections liens), junior Liens in favor of the Prepetition Secured Parties, the Prepetition Indemnity Account Lien and any other Liens as set

forth in the Financing Orders, and (iii) with respect to the Tranche B Term Loans and Tranche C Term Loans, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, junior Liens in favor of the Prepetition Secured Parties, the Prepetition Indemnity Account Lien and any other Liens as set forth in the Financing Orders. The security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estates under Section 551 of the Bankruptcy Code, or (ii) except as set forth herein or in the Financing Orders, subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)    The priority of the Agent's Liens on the Collateral (including without limitation with respect to the Prepetition Indemnity Account) shall be as set forth in the Financing Orders.

(c)    Notwithstanding anything herein to the contrary, (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the prior payment of the Carve Out, and as otherwise set forth in the Financing Orders and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(d)    The Borrower (on behalf of itself and the other Loan Parties) agrees that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)    The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve Out, in accordance with the Financing Orders.

12.    Further Assurances.    The Borrower agrees that it shall, at the Borrower's reasonable expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents granting to the Agent, on behalf of the DIP Lenders, Liens (subject in all respect to the Financing Orders and the priorities set forth in Section 11 hereof) in the Collateral to secure the Obligations; provided that the "Collateral" shall not include (such assets "Excluded Assets") (a) leases not subject to a mortgage in favor of the Prepetition Agent as of the Petition Date (the "Unencumbered Leases"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case

limited as would have been provided in the Prepetition Financing Documents if such facility had remained in effect), (c) Prepetition Indemnity Account (until such time as is provided in the Financing Orders) and (d) claims under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions.

13.    Reports and Notices.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The Borrower agrees that no Subsidiary of the Borrower will change its fiscal year in a manner that would have been prohibited by the Prepetition Credit Agreement if such facility had remained in effect.  In addition, the Borrower agrees to, and to cause each of its Subsidiaries to, maintain a system of accounting that enables the Borrower and such Subsidiaries to produce financial statements in accordance with GAAP in all material respects.

14.    Affirmative Covenants.

The Borrower agrees that:

(a)    Upon the reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)    (A) Except as otherwise excused by the Bankruptcy Code, the Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or to the extent such failure could not reasonably be expected to have a Material Adverse Effect.

(c)    In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge promptly when due (x) the Borrower and its Subsidiaries will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good

-14-

faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary, (2) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (3) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)     (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion  or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances, and (iv) the Borrower and each of its Subsidiaries will ensure that the mix of Inventory not sold pursuant to the Store Closure Motion (together if applicable, with any Consigned Inventory), as to type, category, style, brand and description, shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix on the Petition Date.

(e)     The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as would have been required by the Prepetition ABL Facility had such facility remained in effect.  Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as would have been required by the Prepetition ABL Facility had such facility remained in effect, with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)     The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders.

(g)     The Borrower and its Subsidiaries shall, from and after September 4, 2019, at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)     The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(1)    no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court (which Milestone the parties hereto agree has occurred);

(2)    no later than August 9, 2019, the Loan Parties shall have filed one or more motions seeking entry of orders authorizing and approving (x) store closure and inventory transfer procedures for certain of the Loan Parties' store locations with such store closings to be conducted by affiliates of the Agent and/or the DIP Lenders who shall have been hired by the Loan Parties pursuant to Section 363 of the Bankruptcy Code to perform such services on a "fee-for-service" basis (the "Store Closure Motion"), and (y) bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in each case in form and substance reasonably acceptable to the Agent (which Milestone the parties hereto agree has occurred);

(3)    as soon as reasonably practicable but in no event later than August 16, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Store Closure Motion, which order shall provide, among other things, that the Borrower may designate, or the DIP Lenders may elect in the event the Milestones in subsections (6), (7), or (8) below are not achieved, additional store locations to be closed pursuant thereto on the same terms and conditions set forth therein and that any store closings conducted thereby shall be binding on any chapter 7 or 11 trustee;

(4)    no later than 21 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Agent, establishing bidding procedures in connection with the Sale Motion, which order, shall provide, among other things, that bids for any, or all, of the Loan Parties' assets shall be considered in connection therewith (such order, the "Bid Procedures Order");

(5)    no later than 30 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(6)    by October 24, 2019, the Loan Parties shall receive a binding Qualified Bid (as defined by the Bid Procedures Order) that provides sufficient cash consideration to indefeasibly pay in full all of the Obligations under this Note (such bid, the "Acceptable Bid");

(7)    no later than October 30, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, (i) granting the relief requested in the Sale Motion and (ii) approving the binding Acceptable Bid; and

(8)    no later than by November 2, 2019, a closing of the Acceptable Bid shall have occurred.

(i)    [Reserved].

-16-

(j)    The gross margin earned on the sale of Inventory shall not be more than 2% less than the gross margin forecasted in the file named "190804 - BNY DIP Budget (Hilco Pivot at 60 Days  ~$2mm Merch per Week).xlsm" on the "Direct Cash Flow Tab" in row "198" (other than in connection with store closure sales and consignments) tested weekly and calculated in accordance with the Loan Parties' inventory ledgers, in the aggregate, for sales occurring in the Cumulative Three-Week Period prior to such test.

15.    Negative Covenants.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent and other than in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or as would have been permitted by the Prepetition ABL Facility had such facility remained in effect (assuming that all dollar baskets were $0 and that any conditions relating to availability, liquidity or Payment Conditions (as defined therein) were not satisfied):

(a)    Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld).

(b)    Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness for borrowed money in an amount in excess of $500,000 in the aggregate, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)    [Reserved].

(d)    Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien securing obligations in an amount in excess of $500,000 in the aggregate on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)    Neither the Borrower nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders.

(f)    Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)    Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned

-17-

or hereinafter acquired, or engage any third party provider to assist in disposition of the foregoing, whether pursuant to Sections 327, 328, or 363 of the Bankruptcy Code, other than (a) the sale of Inventory (or in the event applicable, Consigned Inventory) in the ordinary course of business and or in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (b) the sale or disposition of obsolete equipment and (c) the sale of other property on terms acceptable to the Agent.

(h)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to (a) the Financing Orders or (b) the Prepetition Secured Debt, except as otherwise provided in the Financing Orders.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(l)(A) of the Bankruptcy Code, (iii) utility deposits made in accordance with Section 366 of the Bankruptcy Code, (iv) payments permitted by the Financing Orders and the Budget and (v) payments permitted under Section 15(e), neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)     Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

(j)     The Borrower shall maintain Excess Availability at all times at least equal to 10% of the Borrowing Base, as further provided in the Financing Orders.

(k)     Neither the Loan Parties nor any of their Subsidiaries shall permit any unspent amounts on Inventory line items in the Budget to instead be spent on any non-inventory line item in the Budget.

16.     <u>Events of Default; Rights and Remedies</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.     Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e), 14(f), of this Note and such failure shall remain uncured for a period of one (1) Business Day after notice from the Agent, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days after notice from the

Agent, or (iii) Sections 14(g), 14(h), 14(j), or 15 of this Note or any material provision of the Guaranty.

C.      Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D.      Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $500,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $500,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.      Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.      Any Loan Party shall bring a motion in any Chapter 11 Case: (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full in cash all of the Obligations under this Note, including without limitation the Exit Fee and the Enhancement Fee (if any); (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions materially adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.      Any Loan Party permits a plan or plans of reorganization to be filed, or permits the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization, that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note on or before the effective date of such plan or plans.

H.      The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section

-19-

506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.      The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations, including without limitation the Exit Fee and the Enhancement Fee (if any).

J.      [Reserved].

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claims or Liens permitted by Section 11 hereof and the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations (including the Exit Fee and the Enhancement Fee (if any)) are paid in full in cash.

O.      The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $500,000.

P.      The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.      There shall commence any suit or action against the Agent or any DIP Lender or any lenders or agents under the Prepetition ABL Facility by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.      [Reserved]

-20-

S.       Any material provision of any material DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any material Lien created under any DIP Document shall cease to be a valid and perfected Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

T.       In the event the accrued amount of professional fees for case professionals for the applicable Cumulative Two -Week Period exceed by greater than 10.0% the "Total Professional Fee Disbursements" line item as set forth in the Budget for the applicable Cumulative Two Week Period.

U.       Assets of any Loan Party with a fair market value of $500,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

V.       A breach by any Loan Party of the terms of any of the Financing Order.

W.       A Material Adverse Deviation shall have occurred.

X.       Entry of an order authorizing and/or directing the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Loan Party.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of (a) an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders or (b) the failure of any Loan Party to comply with the October 24, 2019 Milestone under Section 14(h)(6), each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition, and the Loan Parties shall immediately commence all liquidation processes in the manner contemplated by the Store Closure Motion.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights,

documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

For the avoidance of doubt, the Agent or any DIP Lender may be a qualified bidder and the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of DIP Lenders (or any DIP Lender or the DIP Lenders in its or their respective individual capacities unless the DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such private or public sale (other than any sale in the ordinary course of business), to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent (or any DIP Lenders) at such sale.

17.    <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $217,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Additional Liquidity Amount</u>" shall mean (a) on the Effective Date, $500,000, (b) from and after the day that is one week after the Effective Date, $1,000,000, (c) from and after the day that is two weeks after the Effective Date, $1,500,000, (d) from and after the day that is three weeks after the Effective Date, $2,000,000, (e) from and after the day that is four week after the Effective Date, $2,500,000, (f) from and after the day that is five weeks after the Effective Date, $3,000,000, (g) from and after the day that is six weeks after the Effective Date, $3,500,000, (h) from and after the day that is seven weeks after the Effective Date, $4,000,000, (i) from and after the day that is eight weeks after the Effective Date, $4,500,000 and (j) from and after the day that is nine weeks after the Effective Date, $5,000,000.

"<u>Agent Fee Letter</u>" shall have the meaning given to such term in Section 2(c) of

this Note.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Base Rate" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "Base Rate" hereunder shall be no less than zero percent (0.00%) per annum.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Borrowing Base" means (a) the Borrowing Base (as defined in the Prepetition Credit Agreement as if it was in effect), including, for the avoidance of doubt, the Term Loan Borrowing Base (as defined in the Prepetition Credit Agreement as if it was in effect) and without giving effect to any Reserves (as defined in the Prepetition Credit Agreement as if it was in effect), *plus* (b) the then-applicable Additional Liquidity Amount, calculated in a manner consistent with the Budget.

"Budget" means a 13-week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 13 weeks after the Petition Date, which shall be in substantially the form as the Initial Budget or otherwise in form and substance acceptable to the Agent and shall be approved by the Agent, in its sole discretion. The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means August 7, 2019.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations; provided that Excluded Assets shall in no event constitute "Collateral." Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including,

without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Commitment Letter" means the Commitment Letter relating to this Note and the Term Loans hereunder, among the parties thereto, dated as of August 9. 2019.

"Consigned Inventory Proceeds" means gross proceeds from the sale of Consigned Inventory, less applicable sales taxes.

"Consignment Facility" shall have the meaning given to such term in Section 1(a) of this Note.

"Consignment Fee" means the fees payable to the Consignor in exchange for providing the Consignment Facility calculated at a rate of 7% per annum of outstanding amounts under the Consignment Facility, payable only with Consigned Inventory Proceeds.

"Consignor" shall have the meaning given to such term in Section 1(a) of this Note.

"Cumulative Three-Week Period" means the three-week period up to and through the Saturday of the most recent week then ended, or if a three-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(g) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, the Agent Fee Letter, the Financing Orders and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with the Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements,

supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Effective Date" means the Business Day when each of the conditions applicable to the Tranche B Term Loans and Tranche C Term Loans and listed in Section 2 of this Note shall have been satisfied or waived in a manner reasonably satisfactory to the Agent.

"Enhancement Fee" shall have the meaning given such term in Section 8 of this Note.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excess Availability" means, at any time, (a) the Borrowing Base *minus* (b) the principal amount of all Term Loans outstanding at such time reduced on a dollar for dollar basis by the Liquidity Credit.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extraordinary Receipts" means any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof or of any cash proceeds provided for in the Budget), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent in its sole discretion, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order, the Second Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial DIP Lenders" means GACP Finance Co., LLC, BRF Finance Co., LLC, and Brigade Capital Management, LP, on behalf of its managed funds and accounts.

"Interest Payment Date" shall mean the first Business Day of each month to occur while such Term Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan and ending 1 month thereafter; provided, however, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" means that certain Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief entered by the Bankruptcy Court on August 7, 2019 (ECF No. 49).

"Inventory" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate" means "LIBO Rate" as such term is defined in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "LIBOR Rate" hereunder shall not be less than zero percent (0.00%) per annum.

"LIBOR Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Liquidity Credit" means $25,000,000.

"Liquidity Forecast" means a rolling 13-week forecast of projected liquidity for the consecutive 13-week period immediately following the date of delivery of such forecast as certified in a certificate delivered by the Borrower.

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, from and after September 4, 2019, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the following line items of the Budget: "Operating Disbursements" and "Net Cash Flow", in each case, for such Cumulative Three-Week Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Borrower or the Loan Parties as a whole to perform any of their material obligations under any material DIP Document to which it is a party, (iii) the legality, validity or enforceability of this Note or any other material DIP Document, (iv) the rights and remedies of the Agent and DIP Lenders taken as a whole under the DIP Documents, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any material portion of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents, including the Exit Fee and the Enhancement Fee.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 20 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being

contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date, to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code; (i) other Liens granted pursuant to the Financing Order (including the Carve-Out, junior liens securing the Prepetition Secured Contingent Indemnity Claims and the Prepetition Indemnity Account Lien) and (j) Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) deferred taxes and other expenses incurred in the ordinary course of business; (d) any Indebtedness existing on the Petition Date; and (e) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall have the meaning given such term in the Financing Orders.

"Permitted Variance" means (a) a variance of up to (x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual disbursements for the applicable Cumulative Three-Week Period and the "Operating Disbursements" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than professional fees and disbursements in connection with store closure sales and consignments), (b) a negative variance of up to (x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual net cash flow for the applicable Cumulative Three-Week Period and the "Net Cash Flow" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than receipts in connection with store closure sales and consignments), and (c) a negative variance of up to (x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case,  between the actual receipts for the applicable Cumulative Three-Week Period and the "Total Cash Receipts" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than disbursements in connection with store closure sales and consignments).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city,

municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" means that certain senior secured asset based revolving credit facility and term loan facility pursuant to the Prepetition Financing Documents.

"Prepetition Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Financing Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Indemnity Account" shall have the meaning given such term in the Financing Orders.

"Prepetition Indemnity Account Lien" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Contingent Indemnity Claims" means the contingent indemnity obligations due or that may become due to the Prepetition Secured Parties under the Prepetition Financing Documents subject to and in accordance with, the Financing Orders.

"Prepetition Secured Debt" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Parties" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 20 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Required Lenders" shall mean, collectively, 100% of the DIP Lenders who are the Initial DIP Lenders or any of their affiliates that become DIP Lenders.

"Restricted Payment" shall mean, with respect to any Person:  (a) the declaration or

payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Person's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any subordinated debt of such Person; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Person now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Person's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Person other than payment of compensation in the ordinary course to Stockholders who are employees of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Person to any Stockholder of such Person or its affiliates.

"Second Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents

"Stock" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Tranche A Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $75,000,000 of the Term Loans that were advanced on the Closing Date, which is and shall be secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B Term Loans" shall mean the Tranche B-1 Term Loans and the Tranche B-2 Term Loans.

"Tranche B-1 Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $71,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B-2 Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $50,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche C Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $21,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

19.    Representations and Warranties.  The Borrower and each of its Subsidiaries represent as follows:

(a)    the Borrower and each of its Subsidiaries are duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders and subject to the terms thereof, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders and subject to the terms thereof, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)    the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)    no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein

or therein not misleading in light of all of the circumstances under which they were made;

(g)    the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to the Permitted Prior Liens, the Prepetition Indemnity Account Lien or other Liens permitted to have such priority under Section 11 of this Note and the Financing Orders;

(h)    except for proceedings in the Chapter 11 Cases in connection with the entry of the Financing Orders, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)    the Borrower and its Subsidiaries are and will be at all times the owners of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)    [reserved]; and

(k)    except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or, to the knowledge of the Borrower, threatened against or in any way affecting (i) any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other DIP Document.

20.    Agent.

(a)    Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including: (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees

necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.

(b)    <u>Nature of Duties</u>.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.  The Agent shall not exercise any discretion, make any determination, grant any consent or approval or take any action (including, without limitation, the exercise of any right or remedy) under any DIP Document, or in connection with the Chapter 11 Cases, except upon the instructions of the Required Lenders (or such greater proportion of the DIP Lenders required hereby or by the Bankruptcy Code, as applicable).

(c)    <u>Rights, Exculpation, Etc</u>.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d)    <u>Reliance</u>.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)    <u>Indemnification</u>.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)    <u>Collateral Matters</u>.

(1)    The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release

Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.    <u>Miscellaneous</u>.

(a)    All notices, demands, requests or other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

| | |
|---|---|
| If to Borrower: | BARNEY'S INC.<br>C/O Barney's New York, Inc.<br>575 Fifth Avenue<br>New York NY 10017<br>Attn: Chief Executive Officer and Chief Financial Officer<br>Email: gfu@barneys.com<br>sfisi@barrneys.com |
| with copies to: | KIRKLAND & ELLIS<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:  Josh Sussberg; and Chad Husnick<br>Email: jsussberg@kirkland.com<br>chusnick@kirkland.com |
| If to Agent or any Lender: | GACP FINANCE CO., LLC<br>21255 Burbank Blvd, Suite 400<br>Woodland Hills, California 91367<br>Attn: John Ahn, Robert Louzan and Alex Zuckerman<br>Email: jahn@gacapitalpartners.com<br>rlouzan@gacapitalpartners.com<br>azuckerman@gacapitalpartners.com |
| with copies to: | JONES DAY<br>250 Vesey Street<br>New York, New York 10281 |

Attn:  Sidney P. Levinson, Michael Schneidereit and
Jeremy Evans

Email:  slevinson@jonesday.com
mschneidereit@jonesday.com
jevans@jonesday.com

All such notices, demands, requests or other communications shall, when mailed or sent by overnight courier, be effective two Business Days after being deposited in the mails, with adequate postage prepaid, and sent by registered or certified mail with return receipt requested by such sending party, or the next Business Day after being sent by an overnight courier to a party at its address set forth above, as the case may be, or when sent by email be effective the day when sent.

(b)    The Borrower shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of one firm of outside counsel for Agent and DIP Lenders, taken as a whole, all of their respective special local counsel limited to one firm in any material jurisdiction to the extent necessary to obtain the Liens contemplated by the DIP Documents, reasonable financial advisory fees for one financial advisor for the Agent hereunder and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).   The Borrower shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of one firm of outside counsel for advice, assistance, or other representation, including, in connection with:

(1)    any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)    the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the DIP Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4) any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5) any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6) any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales in connection with store closures or other sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to Section 11 hereof and the Financing Orders).

(c) No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d) Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e) If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining

provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(h)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)    The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or

interpreted most strongly against the party responsible for the drafting thereof.

(j)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lenders may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon owing to each DIP Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)     Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)     A Term Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such Term Loan may be effected only by registration of such assignment or sale on the Register. Prior to the registration of assignment or sale of any Term Loan, the Agent shall treat the Person in whose name such Term Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)     In the event that a DIP Lender sells participations in a Term Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Term Loans held by it and the principal amount (and stated interest thereon) of the portion of the Term Loan that is the subject of the participation (the "Participant Register").  A Term Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Term Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent (acting on the instructions of the Required Lenders).

(p)       Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)       This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)       THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(s)       This Note may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.  Delivery of an executed counterpart to this Note by facsimile transmission or electric transmission in "pdf" or other imaging format shall be as effective as delivery of a manually signed original.

(t)       In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

*       *       *       *       *

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BARNEY'S, INC., as Debtor and Debtor in Possession

By: _____

    Name:
    Title

Acknowledged and Agreed

GACP FINANCE CO., LLC, as Agent

By: _____

    Name:
    Title:

GACP II, L.P., as a DIP Lender

By:  GREAT AMERICAN CAPITAL PARTNERS, LLC
Its:  General Partner

By:_____
Its:  Authorized Signatory

    Commitment Amount: $100,000,000

BRF FINANCE CO., LLC, as a DIP Lender

By: _____

    Name:
    Title:

    Commitment Amount: $42,000,000 (of which $37,500,000 has already been advanced as Tranche A Term Loans)

BRIGADE CAPITAL MANAGEMENT, LP, on behalf of its managed funds and accounts, as a DIP Lender

By: _____
    Name:
    Title:


Commitment Amount: $75,000,000 (of which $37,500,000 has already been advanced as Tranche A Term Loans)

EXHIBIT A

(attach Initial Budget)

[TO COME]

**(AMENDED) EXHIBIT B TO DIP TERM NOTE**
**CONSIGNMENT FACILITY TERMS**

Effective as of August 9, 2019, the following terms and conditions shall govern the Consignment Facility, as defined in the *Amended and Restated Debtor in Possession Secured Term Promissory Note* to which this Exhibit B is annexed (the "Note") and shall supersede in all respects the terms and conditions set forth in Exhibit B to all prior instances of the Note.  Capitalized terms used but not defined herein have the meanings given thereto in the Note.

1.  Consignor shall be B. Riley Financial, Inc. ("BR") and/or an affiliate thereof, as BR may designate in its sole discretion.

2.  Consignor shall have a first-priority senior Lien pursuant to 11 U.S.C. § 364(d) (with respect to the DIP Lenders and Prepetition Secured Parties upon entry of the Second Interim Order, and with respect to all parties asserting Liens against the Consigned Inventory Proceeds upon entry of the Final Order) on all Consigned Inventory Proceeds and other amounts, in each case, due to Consignor in connection with the Consigned Inventory (including but not limited to the Work Fee (defined below) and the Consignment Fee defined in Section 18 of the Note), which amounts shall remain subject to the Lien of Consignor until indefeasibly paid to Consignor pursuant to paragraph 7(b)(ii) of the Note.

3.  Borrower has opened, or shall promptly open, a new, segregated bank account (the "Consignment Facility Account") for the exclusive purposes of (a) receiving funds in trust from Consignor pursuant to the Consignment Facility and (b) using such funds to pay vendors' invoices for Consigned Inventory.  Borrower shall not use the Consignment Facility Account or any funds therein for any other purpose, and shall have no interest in any funds on deposit in the Consignment Facility Account at any time, which funds shall be held in trust at all times for the payment of vendors' approved invoices for Consigned Inventory pursuant to the terms of the Consignment Facility.  To the extent all or any portion of the funds on deposit in the Consignment Facility Account at any time are ever deemed property of Borrower's bankruptcy estate, Consignor shall have a first-priority senior Lien on such funds, and such funds shall be DIP Priority Collateral of Consignor. At Consignor's request, Borrower shall take all steps reasonably necessary to obtain a deposit account control agreement providing Consignor control over the Consignment Facility Account.

4.  Items of Consigned Inventory identified by the same SKUs ("Consigned Overlap Inventory") as similar goods in Borrower's existing inventory ("Existing Overlap Inventory") shall be accounted for on a "last-in-first-out" basis, whereby all Consigned Overlap Inventory identified by a particular SKU is treated as sold before the corresponding Existing Overlap Inventory, with all proceeds of Consigned Overlap Inventory constituting Consigned Inventory Proceeds.

5. The Consignment Facility is not a revolving credit line. Amounts advanced under the Consignment Facility to purchase Consigned Inventory may not be re-advanced once repaid unless approved in advance in writing by Consignor in its sole discretion. Borrower shall hold the Consigned Inventory in trust for the benefit of Consignor and shall insure the Consigned Inventory against loss. To the extent all or any portion of the Consigned Inventory is ever deemed property of Borrower's bankruptcy estate, such Consigned Inventory shall be DIP Priority Collateral of Consignor.

6. The maximum aggregate landed cost of all Consigned Inventory that may be purchased under the Consignment Facility is $30,000,000 (the "Consigned Inventory Cap"). Borrower may request funds from Consignor under the Consignment Facility to pay invoices for Consigned Inventory once per Business Day (each such request, a "Consignment Funding Request"). In connection with each Consignment Funding Request, Borrower shall provide Consignor with (a) a list of all purchase orders (which purchase orders shall be approved by at least one of Borrower's Chief Executive Officer, Chief Financial Officer, or Chief Merchant) for Consigned Inventory comprising such Consignment Funding Request and (b) copies of all invoices for such Consigned Inventory. Subject to the Consigned Inventory Cap, Consignor will fund the aggregate landed cost of all approved invoices and/or purchase orders for Consigned Inventory in a given Consignment Funding Request via a single wire transfer into the Consignment Facility Account. Immediately upon receipt of such wire transfer, Borrower, in consultation with Consignor's on-site personnel, shall initiate wire or ACH transfers, as applicable, to each vendor for the approved invoices and/or purchase orders and provide Consignor with wire or ACH transfer confirmations (including Fed Reference Numbers for wire transfers) for each such payment.

7. In connection with any sale or liquidation of all or substantially all of Borrower's assets and subject to Section 12(ii) below, Consignor may, upon written notice to Borrower (e-mail being acceptable), elect to take title to, or designate another entity to take title to, all or any portion of the Consigned Inventory, provided that Borrower shall not be required to make the payment contemplated by section 7(b)(1) of the Note for any Consigned Inventory to which Consignor elects to take title or designate another entity to take title pursuant to this paragraph.

8. Consignor shall have access to information and reporting with respect to the Consigned Inventory and the purchases and sales thereof, the Consignment Facility, the Consignment Facility Account, and the Consigned Inventory Proceeds.

9. Consignor may have on-site representatives at Borrower to assist Borrower and the Loan Parties with the Consignment Facility and the procurement and sale of Consigned Inventory.

10. Consignor shall be entitled to a work fee in the amount of $100,000 per month or part thereof that any amounts are outstanding under the Consignment Facility (the "Work Fee"). Consignor shall pay the Consignment Fee defined in Section 18 of the Note (7% per annum of the average amount outstanding under the Consignment Facility during the preceding month) from Consigned Inventory Proceeds, along with the Work Fee, to Consignor via wire transfer within five days after the end of each month.

11. Borrower shall maintain insurance against loss of (whether by theft, fire, flood, natural disaster, or otherwise) and damage to Consigned Inventory consistent with Borrower's insurance for its own inventory.  In the event of any insured loss of or damage to Consigned Inventory in Borrower's possession and/or control, the insurance proceeds related thereto shall constitute Consigned Inventory Proceeds.  Borrower shall be responsible for any uninsured loss of or damage to any Consigned Inventory in Borrower's possession and/or control.

12. If Borrower's going concern sale process is successful, (i) Consignor shall have the right, in its sole discretion, to require the purchaser to purchase all or a portion of the Consigned Inventory remaining at the closing of the going concern sale, as reflected on Borrower's books and records, at 105% of landed cost, with payment due at the closing of the going concern sale, and (ii) a going concern purchaser shall have the right, in its sole discretion, to purchase any Consigned Inventory remaining at the closing of the going concern sale, as reflected on Borrower's books and records, at 105% of landed cost, with payment due at the closing of the going concern sale.

**ACKNOWLEDGED AND AGREED TO:**

BARNEY'S, INC., Debtor in Possession

By: _____
Name:  Sandro Risi
Title:    Executive Vice President and Treasurer

B. RILEY FINANCIAL, INC.

By: _____
Name:
Title:

<u>Schedule 13</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the Monthly Reports, Annual Reports and Compliance Certificates required by Sections 6.1(a) (c) and (d) of the Prepetition Credit Agreement (determined as if such agreement had remained in effect) and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| | |
|---|---|
| on Wednesday of each week beginning with the third full calendar week after the Petition Date | (a)    a weekly DIP variance report/reconciliation for the prior Cumulative Three-Week Period and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) liquidity and Excess Availability, (E) Term Loan balances and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer of Barney's, <br><br> (b)    to the extent received by a Loan Party, a weekly report of sales in connection with store closures results (including detail on gross recoveries and expenses) from the affiliates of the Agent and/or DIP Lenders retained by the Loan Parties, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (c)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its reasonable discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered Liquidity Forecast and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (d)    copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, | (e)    copies of all "Borrowing Base Certificates" (as such term is defined in the Prepetition Credit Agreement as if such agreement had remained in effect) that would have been delivered pursuant to the Prepetition ABL Facility had such agreement remained in effect, |

| | |
|---|---|
| promptly, but in any event within 5 Business Days after Borrower has knowledge of any event or condition that constitutes a Default (provided that the delivery of a notice of any such event of default at any time will cure any Event of Default arising from the failure to timely deliver such notice of such event of default), | (f)      notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |

## **EXHIBIT E**

**Redline to the Initial DIP Credit Agreement**

PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT
[EXECUTION VERSION]

## AMENDED AND RESTATED DEBTOR IN POSSESSION SECURED ~~MULTI-DRAW~~ TERM PROMISSORY NOTE

$~~75~~217,000,000

New York, New York

~~[    ],~~August 15, 2019

On ~~[    ],~~August 6, 2019 (the "Petition Date"), BARNEY'~~s~~S INC., (the "Borrower") and certain of its affiliates commenced Chapter 11 Case Nos. ~~[19-~~ ~~          ], [~~36299, 19-~~          ], [~~36300, 19~~          ], [~~36301, 19~~          ]36302 and ~~[19-~~ ~~          ]~~36303 respectively, which cases are being jointly administered under Chapter 11 Case No. ~~[19-~~ ~~          ]~~36300 (CGM) (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested that GACP Finance Co., LLC~~,~~, as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Amended and Restated Debtor in Possession Secured ~~Multi-Draw~~ Term Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make term loans ~~(the "Term Loans")~~ ~~from time to time~~ evidenced by this Note. Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent. The Borrower intends to utilize such Term Loans to (i) repay the Prepetition Secured Debt in full and in cash (other than any Obligations (as defined therein) relating to letters of credit issued under the Prepetition ABL Facility (the "LCs") and Prepetition Secured Contingent Indemnity Claims) and to cash collateralize the LCs (ii) fund general corporate needs, including without limitation working capital and other needs, and (ii~~i~~) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 ~~of this Note~~ of this Note. This Note is being executed and delivered as an amendment to and a full restatement of the Debtor in Possession Secured Multi-Draw Term Promissory Note dated as of August 6, 2019, among the parties hereto (the "Original Note"), and as so, the Original Note is amended and restated, replaced and superseded by the terms, conditions, agreements, covenants, representations and warranties set forth in this Note without the need for any further actions or notices.

1.    Term Loans.

(a)    ~~Subject to the terms and conditions hereof, the DIP Lenders agree to~~ ~~provide the Borrower with (i) Tranche A Term Loans in the principal amount of $50,000,000 and~~

~~DOC ID - 32321110.5~~

(ii) Tranche B Term Loans in the principal amount of $25,000,000 in each case on the Closing Date (the loans made pursuant to clauses (i) and (ii), "Initial Loan").    Each DIP Lender shall provide the respective Term Loans in an amount equal to(i) On the Closing Date, the DIP Lenders party thereto provided the Borrower with super-priority secured debtor-in-possession "Tranche A" loans under Section 364(c)(2) and (c)(3) of the Bankruptcy Code, which were made available to the Borrower on August 7, 2019, on the entry of the Interim Order, in the principal amount of $75,000,000 (the "Tranche A Term Loans"), (ii) subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with super-priority secured debtor-in-possession "Tranche B" loans under Section 364(c) and (d) of the Bankruptcy Code (collectively, the "Tranche B Term Loans"), each of which shall be made available upon the entry of the Second Interim Order, comprised of (A) "Tranche B-1" loans in the principal amount of $71,000,000 (the "Tranche B-1 Term Loans") and (B) "Tranche B-2" loans in the principal amount of $50,000,000 Term Loans, and (iii) subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with super-priority secured debtor-in-possession "Tranche C" loans under Section 364(c) and (d) of the Bankruptcy Code, all of which shall be made available upon the entry of the Second Interim Order, in the principal amount of $21,000,000 (the "Tranche C Term Loans" and, together with the Tranche A Term Loans and the Tranche B Term Loans, the "Term Loans").  The parties hereto agree that upon the effectiveness of this Note, all term loans under the Original Note shall be reevidenced as Tranche A Term Loans made by the DIP Lenders hereunder, ratably based on the respective amounts advanced thereunder by each such DIP Lender.  The Term Loans shall be subject to the priority set forth in the applicable Financing Order.  Each DIP Lender shall provide the respective tranche of Term Loans in an amount equal to the proportion that such tranche represents of its respective Commitment and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.    The respective Commitment of each DIP Lender shall be permanently reduced upon the making of sucheach tranche of Term Loan in an amount equal to such tranche of Term Loan.  Additionally, at the Borrower's request, thecertain DIP Lenders and/or at their election, certain of their respective affiliates (collectively in such capacity, the "Consignor") will provide the Loan Parties with a consignment facility to support post-petition inventory purchases, subject to the terms and conditions set forth on Exhibit B attached hereto (the "Consignment Facility").  The Borrower and the Consigneor may mutually agree upon new inventory purchases (collectively, the "Consigned Inventory") pursuant to which the Consignor will purchase new inventory from the applicable vendor at prices negotiated between the Loan Parties and such vendor.  For the avoidance of doubt, (i) the Consigned Inventory are not assets of the Loan Parties and shall not constitute "Collateral" nor be subject to the liens of the Agent or DIP Lenders hereunder, the Prepetition ABL Agent, or Prepetition Term Loan Parties; (ii) upon the sale of any Consigned Inventory, the Loan Parties' share of the proceeds on the Consigned Inventory (less the amounts payable to the Consignor in Section 7(b)(1)) shall constitute "Collateral" hereunder and the other DIP Documents, and (iii) any fees paid to the Loan Parties described on Exhibit CB shall constitute "Collateral" hereunder and under the other DIP Documents.

(b)    The aggregate principal amount of Terms Loans outstanding shall not exceed $75217,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)    The Agent shall be entitled to rely upon, and shall be fully protected in

relying upon, any ~~Borrowing Request~~borrowing request or similar notice believed by the Agent to be genuine. The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)    The Borrower shall utilize the proceeds of Term Loans to (i) repay the Prepetition Secured Debt in full and in cash (other than any Obligations (as defined therein) relating to the LCs and Prepetition Secured Contingent Indemnity Claims) and to cash collateralize the LCs, (ii) fund general corporate needs, including without limitation working capital and other needs, and (iii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders); provided, that (a) the Tranche A Term Loans ~~shall be~~were used on the Closing Date to repay a portion of the Prepetition Secured Debt under the Prepetition ABL Facility ~~on the Closing Date, and~~, (b) the Tranche B Term Loans shall be used to repay in full all remaining outstanding loans and other obligations (other than in respect of the LCs and other than Prepetition Secured Contingent Indemnity Claims) under the Prepetition Credit Agreement, (c) the Tranche C Term Loans shall be used solely to cash collateralize the LCs in accordance with the terms thereof (and to pay reimbursement or other obligations in respect thereof under the Prepetition Credit Agreement, (d) the Term Loans may be used to pay ~~adequate protection payments in the form of~~ interest, fees, and expenses ~~(excluding any other form of adequate protection payments) and (b~~that constitute DIP Obligations and (e) no portion of any Term Loan shall be used, directly or indirectly, to finance or make any Restricted Payment (except as described in clause (a) of this proviso), or to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the ~~Borrower~~Loan Parties.

(e)    Except to the extent expressly provided otherwise in the Financing Orders, the Obligations shall be deemed to (i) constitute a DIP Superpriority Claim and (ii) be secured pursuant to sections 364(c)~~(2)~~ and ~~(c)~~(3d) of the Bankruptcy Code.

2.    Certain Conditions to Effective Date, Each Tranche B Term Loan~~. No and~~ and Each Tranche C Term Loan. The Original Note shall not be amended and restated hereby on the Effective Date, and no DIP Lender shall be obligated to fund any Tranche B Term Loan or Tranche C Term Loan, if, as of the date thereof:

(a)    ~~T~~the Borrower shall not have paid any amount then payable hereunder, under the Original Note or under any other DIP Document;

(b)    [reserved];

~~(b)~~ (c)    ~~T~~the Loan Parties shall not have delivered ~~corporate resolutions, incumbency certificates and similar documents,~~ each in form and substance satisfactory to Agent ~~with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;~~

~~(c)~~ (d)    ~~The Loan Parties shall not have delivered,~~ (i) guarantees of each of the Guarantors~~, each in form and substance satisfactory to Agent~~ (or amendments or amendments

-3-

and restatements of the guarantees entered into on the Closing Date with respect to the Original Note) with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby; and (ii) an executed fee letter between the Borrower and the Agent (the "Agent Fee Letter");

(d)    (e)        any representation or warranty by any Loan Party contained herein, in the Original Note or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)    (f)        with respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Second Interim Order; or (ii) the Interim Order or the Second Interim Order shall have been stayed, vacated, reversed, modified or amended, in each case, without Agent's consent;

(f)    (g)        the outstanding amount of the Prepetition Secured Debt (other than the LCs that will be cash collateralized with the proceeds of the Tranche C Term Loan and other Prepetition Secured Contingent Indemnity Claims) will not be paid in full with the proceeds of the Tranche B Term Loan or all Liens secured such Prepetition Secured Debt shall not have been terminated or been made junior or otherwise subordinated to the Liens securing the Obligations, other than as provided in the Financing Orders;

(g)    (a)        [reserved];

(h)    except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, the Store Closure Motion, the Sale Motion, this Note or the Financing Orders), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(i)    any Default or Event of Default shall have occurred and be continuing hereunder or under the Original Note or would result after giving effect to any Term Loan;

(j)    after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(k)    the Agent shall not have received and approved the applicable Budget for such period in accordance with this Note and the Financing Orders;

(l)    Mo Meghji shall not have beenno longer be retained as Chief Restructuring Officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent;

(m)    [reserved];

(n)    the Loan Parties shall have filed pleadings with the Bankruptcy Court,

which pleadings could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner that is adverse to the Agent and the DIP Lenders in any material respect, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(o)    the Bankruptcy Court shall have entered orders, which orders could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner adverse to the Agent and the DIP Lenders in any material respect, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.    <u>Payment of Principal</u>.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided in this Note.

4.    <u>Payment of Interest</u>.

(a)    Tranche A Term Loans.

(1)    Subject to the terms of this Note, the Tranche A Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the ~~date of the Tranche A Term Loans~~Closing Date until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche A Term Loans (or such portion thereof) plus 12.~~0~~00%.

(b)    Tranche B-1 Term Loans.

(1)    Subject to the terms of this Note, the Tranche B-1 Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche B-1 Term Loans (or such portion thereof) plus ~~12.0~~2.25%.

(c)    Tranche B-2 Term Loans

(1)    Subject to the terms of this Note, the Tranche B-2 Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the one-month LIBOR Rate for the Interest Period in effect for the Tranche B-2 Term Loans (or such portion thereof) plus 7.00%.

-5-

(d)    Tranche C Term Loans

(1)    Subject to the terms of this Note, the Tranche C Term Loans or any portion thereof shall bear interest at the per annum rates equal to (x) until any LCs that are cash collateralized with the proceeds of the Tranche C Term Loans are drawn at any time after the Petition Date (and while the proceeds of such Tranche C Term Loans is being held as cash collateral therefor), an amount equal to the sum (if positive) of (i) the aggregate rates at which such undrawn LCs would have accrued fees under the Prepetition Credit Agreement (both to the issuing bank and the participating banks), absent cash collateralization, *minus* (ii) the rate at which such undrawn LCs would accrue fees while fully cash collateralized, and (y) from and after the drawing on any such LC from and after the Petition Date and solely with respect to any drawn amount under such LC, at the rate *per annum* otherwise applicable to the Tranche B-1 Loans.

(e)    Interest on the Term Loans shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(f)    All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(g)    So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent or the Required Lenders, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise payable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(h)    It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited

-6-

by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower). If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e)4(h) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).Section 4(h).

(i)    The LIBOR Rate may be adjusted by the DIP Lenders on a prospective basis to take into account any additional or increased costs to the DIP Lenders of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law (other than change with respect to tax law, which are addressed in Section 10 hereof) occurring subsequent to the commencement of the then applicable Interest Period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the DIP Lenders shall give the Borrower notice of such a determination and adjustment and, upon its receipt of the notice from such DIP Lender, the Borrower may, by notice to such DIP Lender (1) request the DIP Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made.

(j)    Anything to the contrary contained herein notwithstanding, the DIP Lenders are not required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate. The provisions of Sections 4(gi) through (ik) shall apply as if the DIP Lenders had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

(k)    If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by any of the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount

reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof. Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

(l)     The Borrower may elect the Interest Period in effect for the Term Loans (or any portion thereof); provided, that (1) In no event will the Borrower have more than 26 Interest Periods outstanding at any time and (2) if the Agent reasonably determines that the LIBOR Rate is unavailable, then the Term Loans that would otherwise bear interest at the LIBOR rate shall bear interest, at a rate per annum equal to the Base Rate plus, (x) in the case of the Tranche A Term Loans, 11.00% and %, (y) in the case of the Tranche B-1 Term Loans, 11 (and, to the extent applicable, Tranche C Term Loans), 1.25%, and (z) in the case of the Tranche B-2 Term Loans, 6.00%%, in each case on the principal amount thereof from the date that the LIBOR Rate became unavailable until such time the Agent or such DIP Lender determines that the LIBOR Rate is available.

5.     Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the following account:

| | |
|---|---|
| Bank: | City National Bank |
| | 555 South Flower Street |
| | Los Angeles, CA 90071 |
| ABA/Routing: | 122016066 |
| Swift Number: | CINAUS6L  (International Wires Only) |
| Account Name: | GACP II, LP |
| Account Number: | 210427139 |
| Reference: | Barney's |

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower. Any payments of Term Loans shall be applied as follows: first, to the payment of all fees, (excluding the Exit Fee and the Enhancement Fee), and all expenses, to the full extent thereof; second, to the payment of any accrued interest at the Default Rate, if any; third, to the payment of any accrued interest (other than Default Rate interest); fourth, to prepay the Tranche B repay (x) to the extent such proceeds constitute amounts released from being held as cash collateral with the proceeds of Tranche C Term Loans with respect to LCs (other than to repay such reimbursement obligations), the Tranche C Term Loans, and (y) otherwise, pro rata to the Tranche B-1 Term Loans and Tranche C Term Loans (except to the extent that LCs that were cash collateralized by such Tranche C Term Loans remain outstanding and undrawn) to the full extent thereof; fifth, to prepay the Tranche A B-2 Term Loans to the full extent thereof, ; sixth, to repay the Tranche A Term Loans and the Exit Fee to the full extent thereof; seventh, to the payment in

full of all other Obligations; and seventh, including the Enhancement Fee (to the extent any Enhancement Fee is then due and payable); and eighth, upon satisfaction in full of all Obligations, to the Borrower or as otherwise required by law. During the continuance of an Event of Default, the Agent shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

6. _Optional Prepayments._ Subject to the terms and conditions of the Financing Orders and the application of payments in Section 5 hereof, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to the Agent; provided that each such prepayment shall be in a minimum amount of $100,000. Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received. Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

7. _Mandatory Prepayments._ In each case, subject to the terms and conditions of the Financing Orders and the application of payments in Section 5 hereof and reduced (with respect to clauses (b), (c), (d) and (e) of this paragraph 7), on a dollar for dollar basis, for any Exit Fee payable in connection with such repayment:

(a) If at any time the aggregate outstanding principal amount of the Term Loans exceed the Maximum Amount, the Borrower shall immediately repay the aggregate outstanding Term Loans to the extent required to eliminate such excess.

(b) Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, such Loan Party shall contribute such proceeds to the Borrower and the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes actually paid or payable by a Loan Party in connection with such disposition, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note. Notwithstanding anything in this Note to the contrary, (i) the following shall not be subject to mandatory prepayment under this clause (b): proceeds of sales of Inventory or other sales in the ordinary course of business or in accordance with the Budget, the Store Closure Motion, or the Financing Orders, and (ii) if the Borrower or any Loan Party and the Consignor enter into a Consignment Facility, the proceeds of sales of Consigned Inventory shall be paid to Consignor as follows:

(1) Upon the sale of an item of Consigned Inventory by or on behalf of the Borrower or any Loan Party, the Borrower or such Loan Party shall pay the Consignor the applicable invoice price plus the applicable Consignment Fee.

(c) If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the

Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)    Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)    Upon release of any amounts being held as cash collateral with respect to LCs (other than to repay reimbursement and other obligations with respect to such LCs under the Prepetition Credit Agreement), the Borrower shall immediately prepay the outstanding principal amount of the Tranche C Term Loans in an amount equal to such released amounts.

(f)    No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.    Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

First Facility Fee.  On or prior to the date of funding of the Initial LoanClosing Date, the Borrower shall paypaid in cash to the Agent (or net such fee fromunder the Original Note) the proceeds of the Initial Loan) an initial facility fee (the "Facility Fee") (as defined in the Original Note) equal to 5% of the principal amount of the Initial LoanTranche A Term Loans, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.was fully earned

(a)    [Reserved].

(b)    Exit Fee.  On the Maturity Date, the Borrower shall pay in cash to the Agent an exit fee (the "Exit Fee") equal to five percent (5%) of the aggregate Commitments hereunder on the date hereof, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid; provided,It being acknowledged and agreed that, the Prepetition Secured Debt shall be paid in full prior to the payment of any portion of the Exit Fee the Facility Fee (as defined in the Original Note) has been paid.

(c)    Weekly Fee.  On the Effective Date and on each weekly anniversary of the Effective Date thereafter on which any Tranche B Term Loans or Tranche C Term Loans shall remain outstanding, the Borrower shall pay to the Agent for the benefit of the Lenders holding Tranche B Term Loans and Tranche C Loans, a non-refundable fee of $100,000 (to be shared ratably among such Lenders based on the aggregate outstanding amount of Tranche B Term Loans and Tranche C Term Loans) to be paid in cash, which fee shall be fully earned on the Effective Date and on each weekly anniversary thereafter.

(d)    Exit Fee.  The Borrower shall pay to the Agent, for the benefit of the Lenders holding Tranche A Term Loans, a non-refundable exit fee (the "Exit Fee") equal to 5% of the amount of Tranche A Term Loans on the Closing Date, which was fully earned on the Closing Date, and when paid, shall be paid in cash on the earlier of (a) the Maturity Date and (b) the date of any repayment, satisfaction, distribution, reduction or other discharge of any such Tranche A Term Loans (in each case, based on the aggregate amount of the affected Tranche A Term Loans).

(e)    Enhancement Fee.  The Borrower shall pay to the Agent, for the benefit of the Lenders, upon the sale or liquidation of the Loan Parties pursuant to the Chapter 11 Cases, 37.5% (the "Enhancement Fee") of any proceeds remaining after repayment of all Obligations (including the Exit Fee) and after payment of administrative expenses and priority claims as more particularly described in the Financing Orders and in the manner set forth in the Financing Orders; it being agreed that the Enhancement Fee need not be approved until the Final Order.

9.    Indemnity.

(a)    The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the parties to any of the DIP Documents on the one hand and any Loan Party on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    Adjustments for Withholding, Capital Adequacy Etc.  All payments to the Agent by ~~the Borrower~~any Loan Party under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities, including any interest, additions to tax or penalties

applicable thereto (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld. If the Borrower If any applicable withholding agent shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable by the applicable Loan Party shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower applicable withholding agent shall be entitled to make such deductions or withholdings, and (C) the Borrower applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower any Loan Party (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower (on behalf of itself and the other Loan Parties) agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower (on behalf of itself and the other Loan Parties) agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower any Loan Party under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower Loan Parties shall indemnify the Agent and each of the DIP Lenders, within 10 days after demand therefor, for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid or payable by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income. Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower Loan Parties to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a

receipt evidencing any payment of Taxes made by ~~the Borrower~~a Loan Party pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware (in its sole discretion exercised in good faith) that it has received a refund of any Taxes with respect to which ~~the Borrower~~any Loan Party has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof. This paragraph shall not be construed to require any Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Form W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made. In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.    Priority of Obligations and DIP Lenders' Liens.

(a)    To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any Loan Party, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case (a "DIP Superpriority Claim"), ~~and~~ (ii) with respect to the Tranche A Term Loans, pursuant to Sections 364(c)~~(2)~~ and ~~364(c)(3~~(d) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the ~~Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) (including adequate protections liens) and any other Liens as set forth in the Financing Orders.~~Tranche B Term Loans and Tranche C Term Loans (in each case, including adequate protections liens), junior Liens in favor of the Prepetition Secured Parties, the Prepetition Indemnity Account Lien and any other Liens as set forth in the Financing Orders, and (iii) with respect to the Tranche B Term Loans and Tranche C

Term Loans, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, junior Liens in favor of the Prepetition Secured Parties, the Prepetition Indemnity Account Lien and any other Liens as set forth in the Financing Orders. The security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estates under Section 551 of the Bankruptcy Code, or (ii) except as set forth herein or in the Financing Orders, subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral (including without limitation with respect to the Prepetition Indemnity Account) shall be as set forth in the Financing Orders.

(c)     Notwithstanding anything herein to the contrary, (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the prior payment of the Carve Out, and the superpriority claims granted to the Prepetition ABL Agent (for the benefit of the Prepetition Secured Parties) underas otherwise set forth in the Financing Orders and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(d)     EachThe Borrower (on behalf of itself and the other Loan Parties) agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)     The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve Out, in accordance with the Financing Orders.

12.     Further Assurances.  The Borrower agrees that it shall, at the Borrower's reasonable expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents granting to the Agent, on behalf of the DIP Lenders, Liens (subject in all respect to the Financing Orders and the priorities set forth in Section 11 hereof) in the Collateral to secure the Obligations; provided that the "Collateral" shall not include (such assets "Excluded Assets") (a) leases not subject to a mortgage in favor of the Prepetition Agent as of the Petition Date (the "Unencumbered Leases"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case

limited as would have been provided in the Prepetition Financing Documents), if such facility had remained in effect), (c) Prepetition Indemnity Account (until such time as is provided in the Financing Orders) and (cd) claims under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions.

13.     Reports and Notices.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The Borrower agrees that no Subsidiary of the Borrower will change its fiscal year in a manner that would have been prohibited by the Prepetition Credit Agreement if such facility had remained in effect.  In addition, the Borrower agrees to, and to cause each of its Subsidiaries to, maintain a system of accounting that enables the Borrower and such Subsidiaries to produce financial statements in accordance with GAAP in all material respects.

14.     Affirmative Covenants.

The Borrower agrees that:

(a)     Upon the reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     (A) Except as otherwise excused by the Bankruptcy Code, the Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or to the extent such failure could not reasonably be expected to have a Material Adverse Effect.

(c)     In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge promptly when due (x) the Borrower and its Subsidiaries will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good

faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary, (2) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (3) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)      (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion  or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances, and (iv) the Borrower and each of its Subsidiaries will ensure that the mix of Inventory not sold pursuant to the Store Closure Motion (together if applicable, with any Consigned Inventory), as to type, category, style, brand and description, shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix on the Petition Date.

(e)      The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as ~~may be~~would have been required by the Prepetition ABL Facility ~~(whether or not~~had such facility remain~~s~~ed in effect~~).~~.  Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as ~~may be~~would have been required by the Prepetition ABL Facility ~~(whether or not~~had such facility remain~~s~~ed in effect~~),~~, with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)      The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders.

(g)      The Borrower and its Subsidiaries shall, from and after September 4, 2019, at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)      The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

-16-

(1) no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court; (which Milestone the parties hereto agree has occurred);

(2) no later than August 79, 2019, the Loan Parties shall filehave filed one or more motions seeking entry of orders authorizing and approving (x) store closure and inventory transfer procedures for certain of the Loan Parties' store locations with such store closings to be conducted by affiliates of the Agent and/or the DIP Lenders who shall have been hired by the Loan Parties pursuant to Section 363 of the Bankruptcy Code to perform such services on a "fee-for-service" basis in accordance with the terms and conditions set forth on Exhibit C (the "Store Closure Motion"), and (y) bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in each case in form and substance reasonably acceptable to the Agent; (which Milestone the parties hereto agree has occurred);

(3) as soon as reasonably practicable but in no event later than August 16, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Store Closure Motion, which order shall provide, among other things, that the Borrower may designate, or the DIP Lenders may elect in the event the Milestones in subsections (6), (7), or (8) below are not achieved, additional store locations to be closed pursuant thereto on the same terms and conditions set forth therein and that any store closings conducted thereby shall be binding on any chapter 7 or 11 trustee;

(4) no later than 21 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Agent, establishing bidding procedures in connection with the Sale Motion, which order, shall provide, among other things, that bids for any, or all, of the Loan Parties' assets shall be considered in connection therewith (such order, the "Bid Procedures Order");

(5) no later than 30 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(6) by September 25October 24, 2019, the Loan Parties shall receive a binding Qualified Bid (as defined by the Bid Procedures Order) that provides sufficient cash consideration to indefeasibly pay in full all of the Obligations under this Note and all of the Obligations under the Prepetition ABL Facility and Prepetition Term Loans (such bid,(such bid, the "Acceptable Bid");

(7) no later than October 130, 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, (i) granting the relief requested in the Sale Motion and (ii) approving the binding Acceptable Bid; and

(8) no later than by October 4November 2, 2019, a closing of the Acceptable Bid shall have occurred.

(i)      [Reserved].~~the Loan Parties shall (i) use commercially reasonable efforts to provide the Agent and the DIP Lenders with reasonable access to, and reasonably cooperate with, Berkeley Research Group, as financial advisor to the Prepetition ABL Agent (it being understood that the Prepetition ABL Agent and Berkeley Research Group may share all applicable information with the Agent) or any other financial advisor engaged by the Agent of the DIP Lenders and (ii) compensate Berkeley Research Group, as financial advisor to the Prepetition ABL Agent, in strict accordance with the Budget.~~

(j)      ~~the~~

(k)      The gross margin earned on the sale of Inventory shall not be more than 2% less than the gross margin forecasted in the file named "190804 - BNY DIP Budget (Hilco Pivot at 60 Days ~$2mm Merch per Week).xlsm" on the "Direct Cash Flow Tab" in row "198" (other than in connection with store closure sales and consignments) tested weekly and calculated in accordance with the ~~Borrower's books and records~~Loan Parties' inventory ledgers, in the aggregate, for sales occurring in the Cumulative Three-Week Period prior to such test.

15.    Negative Covenants.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent and other than in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or as would have been permitted ~~under~~by the Prepetition ABL Facility had such facility remained in effect (assuming that all dollar baskets were $0 and that any conditions relating to availability, liquidity or Payment Conditions (as defined therein) were not satisfied):

(a)      Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld).

(b)      Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness for borrowed money in an amount in excess of $500,000 in the aggregate, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)      [Reserved].

(d)      Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien securing obligations in an amount in excess of $500,000 in the aggregate on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)      Neither the Borrower nor any of its Subsidiaries shall (a) make any

Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders and the Prepetition ABL Facility.

(f)    Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)    Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired, or engage any third party provider to assist in disposition of the foregoing, whether pursuant to Sections 327, 328, or 363 of the Bankruptcy Code, other than (a) the sale of Inventory (or in the event applicable, Consigned Inventory) in the ordinary course of business and or in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (b) the sale or disposition of obsolete equipment and (c) the sale of other property on terms acceptable to the Agent.

(h)    Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (a) the Financing Orders or (b) the Prepetition Secured Debt, except as otherwise provided in the Financing Orders.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(l)(A) of the Bankruptcy Code, (iii) utility deposits made in accordance with Section 366 of the Bankruptcy Code, (iv) payments permitted by the Financing Orders and the Budget and (v) payments permitted under Section 15(e), neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)    Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

(j)    The Loan Parties borrowings under the Prepetition ABL FacilityBorrower shall comply with Minimummaintain Excess Availability Amount (as defined in the Interim Order), after giving effectat all times at least equal to the DIP Tranche A Term Loan Reserve10% of the Borrowing Base, as further provided in the Financing Orders.

(k)    Neither the Loan Parties nor any of their Subsidiaries shall permit any unspent amounts on Inventory line items in the Budget to instead be spent on any any non-inventory line item in the Budget.

-19-

16. <u>Events of Default; Rights and Remedies</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A. The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B. Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e), 14(f), of this Note and such failure shall remain uncured for a period of one (1) Business Day after notice from the Agent, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days after notice from the Agent, or (iii) Sections 14(g), 14(h), 14(j), or 15 of this Note or any material provision of the Guaranty.

C. Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section ~~16)~~16) and the same, if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D. Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $500,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $500,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E. Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F. Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full in cash all of the Obligations under this Note, including without limitation the Exit Fee and

-20-

the Enhancement Fee (if any); (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions materially adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.      Any Loan Party permits a plan or plans of reorganization to be filed, or permits the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization, that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note and the obligations under the Prepetition ABL Facility on or before the effective date of such plan or plans.

H.      The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.      The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and the obligations under the Prepetition ABL Facility and termination of the DIP Lenders' commitment to make Term Loans., including without limitation the Exit Fee and the Enhancement Fee (if any).

J.      [Reserved].

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claims or Liens permitted by Section 11 hereof and the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations (including the Exit Fee and the obligations under the Prepetition ABL Facility and Term LoansEnhancement Fee (if any)) are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

O.      The entry of an order by the Bankruptcy Court granting relief from

or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $500,000.

P.    The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.    There shall commence any suit or action against the Agent or any DIP Lender or any lenders or agents under the Prepetition ABL Facility by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.    ~~Failure of the Loan Parties to comply in all material respects with any Milestone set forth in Section 14(h).~~

S.    [Reserved]

T.    Any material provision of any material DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any material Lien created under any DIP Document shall cease to be a valid and perfected Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

U.    In the event the accrued amount of professional fees for case professionals for the applicable Cumulative Two -Week Period exceed by greater than 10.0% the "Total Professional Fee Disbursements" line item as set forth in the Budget for the applicable Cumulative Two Week Period.

V.    Assets of any Loan Party with a fair market value of $500,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

W.    A breach by any Loan Party of the terms of any of the Financing Order.

X.    A Material Adverse Deviation shall have occurred.

Y.    Entry of an order authorizing and/or directing the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any

prepetition indebtedness) to any creditor of any Loan Party.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of (a) an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, or (b) the failure of any Loan Party to comply with the October 24, 2019 Milestone under Section 14(h)(6), each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.  The, and the Loan Parties shall immediately commence all liquidation processes asin the manner contemplated by the Store Closure Motion upon the acceleration of the Term Loans.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

For the avoidance of doubt, the Agent or any DIP Lender may be a qualified bidder and the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of DIP Lenders (or any DIP Lender or the DIP Lenders in its or their respective individual capacities unless the DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such private or public sale (other than any sale in the ordinary course of business), to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent (or any DIP Lenders) at such sale.

17.     Reference Agreements.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $~~75~~217,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.     Definitions.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"Additional Liquidity Amount" shall mean (a) on the Effective Date, $500,000, (b) from and after the day that is one week after the Effective Date, $1,000,000, (c) from and after the day that is two weeks after the Effective Date, $1,500,000, (d) from and after the day that is three weeks after the Effective Date, $2,000,000, (e) from and after the day that is four week after the Effective Date, $2,500,000, (f) from and after the day that is five weeks after the Effective Date, $3,000,000, (g) from and after the day that is six weeks after the Effective Date, $3,500,000, (h) from and after the day that is seven weeks after the Effective Date, $4,000,000, (i) from and after the day that is eight weeks after the Effective Date, $4,500,000 and (j) from and after the day that is nine weeks after the Effective Date, $5,000,000.

"Agent Fee Letter" shall have the meaning given to such term in Section 2(c) of this Note.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Base Rate" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "Base Rate" hereunder shall be no less than zero percent (0.00%) per annum.

"Borrower" shall have the meaning given such term in the recital to this Note.

~~"Budget" means a (8)~~ "Borrowing Base" means (a) the Borrowing Base (as defined in the Prepetition Credit Agreement as if it was in effect), including, for the avoidance of doubt, the Term Loan Borrowing Base (as defined in the Prepetition Credit Agreement as if it was in effect) and without giving effect to any Reserves (as defined in the Prepetition Credit Agreement as if it was in effect), *plus* (b) the then-applicable Additional Liquidity Amount, calculated in a manner consistent with the Budget.

"Budget" means a 13-week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive ~~8~~13 weeks after the Petition Date, which shall be in substantially the form as the Initial Budget or otherwise in form and substance acceptable to the Agent and shall be approved by the Agent, in its sole discretion.  The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

~~"Closing Date" means the Business Day when each of the conditions applicable to the Initial Loans and listed in Section 2 of this Note shall have been satisfied or waived in a manner reasonably satisfactory to the Agent.~~

"Closing Date" means August 7, 2019.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations; provided that Excluded Assets shall in no event constitute "Collateral." Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Commitment Letter" means the Commitment Letter relating to this Note and the Term Loans hereunder, among the parties thereto, dated as of August 9. 2019.

"Consigned Inventory Proceeds" means gross proceeds from the sale of Consigned Inventory, less applicable sales taxes.

"Consignment Facility" shall have the meaning given to such term in Section 1(a) of this Note.

"Consignment Fee" means the fees payable to the Consignor in exchange for providing the Consignment Facility calculated at a rate of 7% per annum of outstanding amounts under the Consignment Facility, payable only with Consigned Inventory Proceeds.

"Consignor" shall have the meaning given to such term in Section 1(a) of this Note.

"Cumulative Three-Week Period" means the three-week period up to and through the Saturday of the most recent week then ended, or if a three-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(eg) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, the Agent Fee Letter, the Financing Orders and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with the Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"DIP Tranche A Term Loan Reserve" shall mean a reserve against the Borrowing Base (as defined in the Prepetition Credit Agreement) in the amount of the Tranche A Term Loan.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Effective Date" means the Business Day when each of the conditions applicable to the Tranche B Term Loans and Tranche C Term Loans and listed in Section 2 of this Note shall have been satisfied or waived in a manner reasonably satisfactory to the Agent.

"Enhancement Fee" shall have the meaning given such term in Section 8 of this Note.

"Event of Default" shall have the meaning given such term in Section 1616 of this Note.

"Excess Availability" means, at any time, (a) the Borrowing Base *minus* (b) the

principal amount of all Term Loans outstanding at such time reduced on a dollar for dollar basis by the Liquidity Credit.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extraordinary Receipts" means any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof or of any cash proceeds provided for in the Budget), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

~~"Facility Fee" shall have the meaning given such term in Section 8 of this Note.~~

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent in its sole discretion, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order, the Second Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial DIP Lenders" means GACP Finance Co., LLC, BRF Finance Co., LLC, and Brigade Capital Management, LP, on behalf of its managed funds and accounts.

"Interest Payment Date" shall mean the first Business Day of each month to occur while such Term Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan and ending 1 month thereafter; provided, however, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interest Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed

in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Interim Order" means that certain Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief entered by the Bankruptcy Court on August 7, 2019 (ECF No. 49).

"Inventory" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate" means "LIBO Rate" as such term is defined in the Prepetition Credit Agreement whether or not such agreement remains in effect.; provided, that, notwithstanding the foregoing, the "LIBOR Rate" hereunder shall not be less than zero percent (0.00%) per annum.

"LIBOR Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Liquidity Credit" means $25,000,000.

"Liquidity Forecast" means a rolling 8 13-week forecast of projected liquidity for the consecutive 8 13-week period immediately following the date of delivery of such forecast as certified in a certificate delivered by the Borrower.

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, from and after September 4, 2019, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the following line items of the Budget: "Operating Disbursements" and "Net Cash Flow", in each case, for such Cumulative Three-Week Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Borrower or the Loan Parties as a whole to perform any of their

material obligations under any material DIP Document to which it is a party, (iii) the legality, validity or enforceability of this Note or any other material DIP Document, (iv) the rights and remedies of the Agent and DIP Lenders taken as a whole under the DIP Documents, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any material portion of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents, including the Exit Fee and the Enhancement Fee.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 20 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made

in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date, to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code; (i) ~~Liens in favor of the Prepetition Secured Parties and~~ other Liens granted pursuant to the Financing Order (including the Carve-Out, junior liens securing the Prepetition Secured Contingent Indemnity Claims and the Prepetition Indemnity Account Lien) and (j) Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) ~~Prepetition Secured Debt; (d)~~ deferred taxes and other expenses incurred in the ordinary course of business; (~~e~~d) any Indebtedness existing on the Petition Date; and (~~f~~e) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall have the meaning given such term in the Financing Orders.

"Permitted Variance" means (a) a variance of up to ~~the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis)~~(x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual disbursements for the applicable Cumulative Three-Week Period and the "Operating Disbursements" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than professional fees and disbursements in connection with store closure sales and consignments), (b) a negative variance of up to ~~the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis)~~(x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual net cash flow for the applicable Cumulative Three-Week Period and the "Net Cash Flow" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than receipts in connection with store closure sales and consignments), and (c) a negative variance of up to ~~the applicable Weekly Permitted Variance Percentage (calculated on a cumulative basis)~~(x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual receipts for the applicable Cumulative Three-Week Period and the "Total Cash Receipts" line item as set forth in the Budget for the applicable Cumulative Three-Week Period ~~-~~(other than disbursements in connection with store closure sales and consignments).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or

department thereof).

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" means that certain senior secured asset based revolving credit facility and term loan facility pursuant to the Prepetition Financing Documents.

"Prepetition Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Financing Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Indemnity Account" shall have the meaning given such term in the Financing Orders.

"Prepetition Indemnity Account Lien" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Contingent Indemnity Claims" means the contingent indemnity obligations due or that may become due to the Prepetition Secured Parties under the Prepetition Financing Documents subject to and in accordance with, the Financing Orders.

"Prepetition Secured Debt" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Parties" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 2020 of this Note.

"Registered Loan" shall have the meaning given such term in Section 20 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Required Lenders" shall mean, collectively, 100% of the DIP Lenders who are the

Initial DIP Lenders or any of their affiliates that become DIP Lenders.

"Restricted Payment" shall mean, with respect to any Person: (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Person's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any subordinated debt of such Person; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Person now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Person's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Person other than payment of compensation in the ordinary course to Stockholders who are employees of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Person to any Stockholder of such Person or its affiliates.

"Second Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents

"Stock" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section ~~10~~10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Tranche A Term Loans" "~~"~~shall ~~mean~~have the ~~$50~~meaning given to such term in Section 1 of this Note and refers to the $75,000,000 of the ~~DIP Loan to applied to the Prepetition Secured Debt under~~Term Loans that were advanced on the ~~Prepetition ABL Facility in accordance with Section 2.13(g) of the Prepetition Credit Agreement (the amount of~~Closing Date, which is

and shall be at all times maintained as the DIP Tranche A Term Loan Reserve), and will be secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B Term Loans" shall mean the $25 Tranche B-1 Term Loans and the Tranche B-2 Term Loans.

"Tranche B-1 Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $71,000,000 of the DIP Loan Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Weekly Permitted Variance Percentage" means

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 and thereafter |
|---|---|---|---|---|---|
| Weekly Perm. Var. % | 12.5% | 12.5% | 10.0% | 10.0% | 7.5% |

"Tranche B-2 Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $50,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche C Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $21,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

19.    <u>Representations and Warranties</u>.  The Borrower and each of its Subsidiaries represent as follows:

(a)    the Borrower and each of its Subsidiaries are duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders and subject to the terms thereof, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties, except in respect of Prepetition Secured Debt;

(c)       the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)       upon entry of the Financing Orders and subject to the terms thereof, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)       the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)       no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)       the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to the Permitted Prior Liens, the Prepetition Indemnity Account Lien or other Liens permitted to have such priority under Section 11 of this Note and the Financing Orders;

(h)       except for proceedings in the Chapter 11 Cases in connection with the entry of the Financing Orders, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)       the Borrower and its Subsidiaries are and will be at all times the owners of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)       [reserved]; and

(k)       except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or, to the knowledge of the Borrower, threatened against or in any way affecting (i) any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other DIP Document.

20.    <u>Agent</u>.

(a)    <u>Appointment</u>.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.

(b)    <u>Nature of Duties</u>.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.—  The Agent shall not exercise any discretion, make any determination, grant any consent or approval or take any action (including, without limitation, the exercise of any right or remedy) under any DIP Document, or in connection with the Chapter 11 Cases, except upon the instructions of the Required Lenders (or such greater proportion of the DIP Lenders required hereby or by the Bankruptcy Code, as applicable).

(c)    <u>Rights, Exculpation, Etc</u>.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d)    <u>Reliance</u>.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)    <u>Indemnification</u>.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this

Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)    Collateral Matters.

(1)    The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph ((f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.    Miscellaneous.

(a)    All notices, demands, requests or other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

If to Borrower:            BARNEY'S INC.
                           C/O Barney's New York, Inc.
                           575 Fifth Avenue
                           New York NY 10017
                           Attn: Chief Executive Officer and Chief Financial Officer
                           Email: gfu@barneys.com
                                  sfisi@barrneys.com

with copies to:            KIRKLAND & ELLIS
                           601 Lexington Avenue
                           New York, New York 10022

|  | Attn:  Josh Sussberg; and Chad Husnick |
|---|---|
|  | Email: jsussberg@kirkland.com |
|  | chusnick@kirkland.com |

| If to Agent or any Lender: | GACP FINANCE CO., LLC |
|---|---|
|  | 21255 Burbank Blvd, Suite 400 |
|  | Woodland Hills, California 91367 |
|  | Attn: John Ahn, Robert Louzan and Alex Zuckerman |
|  | Email: jahn@gacapitalpartners.com |
|  | rlouzan@gacapitalpartners.com |
|  | azuckerman@gacapitalpartners.com |

| with copies to: | JONES DAY ~~LLP~~ |
|---|---|
|  | 250 Vesey Street |
|  |  |
|  | New York, New York 10281 |
|  | Attn:  Sidney P. Levinson, Michael Schneidereit~~,~~ and Jeremy Evans |
|  |  |
|  |  |
|  | Email: ~~slevinson@jonesday.com, mschneidereit@jonesday.com, jdevans@jonesday.com~~ |
|  | slevinson@jonesday.com |
|  | _____ mschneidereit@jonesday.com |
|  | _____ jevans@jonesday.com |

All such notices, demands, requests or other communications shall, when mailed or sent by overnight courier, be effective two Business Days after being deposited in the mails, with adequate postage prepaid, and sent by registered or certified mail with return receipt requested by such sending party, or the next Business Day after being sent by an overnight courier to a party at its address set forth above, as the case may be, or when sent by email be effective the day when sent.

(b)  The Borrower shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of one firm of outside counsel for Agent and DIP Lenders, taken as a whole, all of their respective special local counsel limited to one firm in any material jurisdiction to the extent necessary to obtain the Liens contemplated by the DIP Documents, reasonable financial advisory fees for one financial advisor ~~each for (i) the Agents (under and as defined in the Prepetition ABL Facility) and the Prepetition Secured Parties, subject to the Budget and (ii)~~for the Agent hereunder and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).  The Borrower shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of one firm of outside counsel for advice, assistance, or other

representation, including, in connection with:

      (1)    any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

      (2)    the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

      (3)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the DIP Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

      (4)    any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

      (5)    any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

      (6)    any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales in connection with store closures or other sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express

charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services. All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to Section 11 hereof and the Financing Orders).

(c)    No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)    Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(h)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS**

**NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.** The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE.** In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)    The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(j)    The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent. The DIP Lenders may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder. An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)    The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon ~~(the "Registered Loans")~~ owing to each DIP Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note. The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)      Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)      A ~~Registered~~Term Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such ~~Registered~~Term Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any ~~Registered~~Term Loan, the Agent shall treat the Person in whose name such ~~Registered~~Term Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)      In the event that a DIP Lender sells participations in a ~~Registered~~Term Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the ~~Registered~~Term Loans held by it and the principal amount (and stated interest thereon) of the portion of the ~~Registered~~Term Loan that is the subject of the participation (the "Participant Register").  A ~~Registered~~Term Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such ~~Registered~~Term Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)      No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent~~.~~ (acting on the instructions of the Required Lenders).

(p)      Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)      This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)      THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY

EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(s)    This Note may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.  Delivery of an executed counterpart to this Note by facsimile transmission or electric transmission in "pdf" or other imaging format shall be as effective as delivery of a manually signed original.

(t)    In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

*    *    *    *    *

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BARNEY'S, INC., as Debtor and Debtor in Possession

By: _____
    Name:
    Title

Acknowledged and Agreed

GACP ~~FINANCE CO~~ FINANCE CO., LLC, as Agent

By: _____
    Name:
    Title:

~~Brigade Capital Management, LP on behalf of its managed funds and accounts,~~ GACP II, L.P., as a DIP Lender

By:  GREAT AMERICAN CAPITAL PARTNERS, LLC
Its:   General Partner

By:_____
Its:  Authorized Signatory

    Commitment Amount: $100,000,000

BRF FINANCE CO., LLC, as a DIP Lender

By: _____
    Name:
    Title:

Commitment Amount: $42,000,000 (of which $37,500,000

BRF Finance Co., LLC, has already been advanced as DIP LenderTranche A Term Loans)

BRIGADE CAPITAL MANAGEMENT, LP, on behalf of its managed funds and accounts, as a DIP Lender

By: _____
    Name:
    Title:


Commitment Amount: $75,000,000 (of which $37,500,000 has already been advanced as Tranche A Term Loans)

<u>EXHIBIT A</u>

(attach <u>Initial</u> Budget)

<u>[TO COME]</u>

# (AMENDED) EXHIBIT B TO DIP TERM NOTE

Consignment Facility

<table>
<tr>
<td></td>
<td></td>
<td>

In addition to customary terms and conditions for a consignment relationship, the Consignment Facility shall include the following terms and conditions:

1. The Consignor will have access to information and reporting.
2. The Consignor may have onsite representatives at the Borrower to assist the Borrower and Loan Parties with the consignment program.
3. The Consignor shall have the right to use the stores and the e-commerce platform to liquidate the Consigned Inventory from the stores and through the e-commerce platform if the going concern sale process is not successful or an event of default occurs and is not cured in which case the Consignor shall be responsible for payment of a proportionate share of the four-wall operating expenses of the stores and costs associated with operating the e-commerce platform and, in light of such obligation, the Consignor shall be entitled to receive and retain for its sole and exclusive benefit all proceeds (other than sales taxes) from the sale of all Consigned Inventory.
4. The Consignor shall be entitled to a work fee in the amount of $100,000 per month.

If the going concern process is successful, (i) the Consignor shall have the right (exercised in the Consignor's sole discretion) to require the purchaser to purchase all or a portion of the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale; and (ii) a going concern purchaser shall have the right (exercised in the purchaser's sole discretion) to purchase the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale.
</td>
</tr>
</table>

Exhibit C

Store Closing Fees

For any stores for which affiliates of Agent and/or DIP Lender are engaged to conduct a "store closing" or similar themed sale, such affiliates in their capacity as "consultant" thereunder shall earn a fee equal to 1.25% of the aggregate gross proceeds from the sale of goods and 15.0% of the aggregate gross proceeds from the sale of FF&E.  The Loan Parties shall reimburse such consultant for its out of pocket costs and expenses, including costs of supervision.  Consultant shall have the right to supplement the inventory in such store closing sales with additional goods procured by consultant at its sole cost and expense and the consultant shall pay the Loan Parties 5.0% of the gross proceeds thereof (excluding sales taxes) and shall retain the remaining proceeds from the sale thereof.

## CONSIGNMENT FACILITY TERMS

Effective as of August 9, 2019, the following terms and conditions shall govern the Consignment Facility, as defined in the *Amended and Restated Debtor in Possession Secured Term Promissory Note* to which this Exhibit B is annexed (the "Note") and shall supersede in all respects the terms and conditions set forth in Exhibit B to all prior instances of the Note. Capitalized terms used but not defined herein have the meanings given thereto in the Note.

1. Consignor shall be B. Riley Financial, Inc. ("BR") and/or an affiliate thereof, as BR may designate in its sole discretion.

2. Consignor shall have a first-priority senior Lien pursuant to 11 U.S.C. § 364(d) (with respect to the DIP Lenders and Prepetition Secured Parties upon entry of the Second Interim Order, and with respect to all parties asserting Liens against the Consigned Inventory Proceeds upon entry of the Final Order) on all Consigned Inventory Proceeds and other amounts, in each case, due to Consignor in connection with the Consigned Inventory (including but not limited to the Work Fee (defined below) and the Consignment Fee defined in Section 18 of the Note), which amounts shall remain subject to the Lien of Consignor until indefeasibly paid to Consignor pursuant to paragraph 7(b)(ii) of the Note.

3. Borrower has opened, or shall promptly open, a new, segregated bank account (the "Consignment Facility Account") for the exclusive purposes of (a) receiving funds in trust from Consignor pursuant to the Consignment Facility and (b) using such funds to pay vendors' invoices for Consigned Inventory. Borrower shall not use the Consignment Facility Account or any funds therein for any other purpose, and shall have no interest in any funds on deposit in the Consignment Facility Account at any time, which funds shall be held in trust at all times for the payment of vendors' approved invoices for Consigned Inventory pursuant to the terms of the Consignment Facility. To the extent all or any portion of the funds on deposit in the Consignment Facility Account at any time are ever deemed property of Borrower's bankruptcy estate, Consignor shall have a first-priority senior Lien on such funds, and such funds shall be DIP Priority Collateral of Consignor. At Consignor's request, Borrower shall take all steps reasonably necessary to obtain a deposit account control agreement providing Consignor control over the Consignment Facility Account.

4. Items of Consigned Inventory identified by the same SKUs ("Consigned Overlap Inventory") as similar goods in Borrower's existing inventory ("Existing Overlap Inventory") shall be accounted for on a "last-in-first-out" basis, whereby all Consigned Overlap Inventory identified by a particular SKU is treated as sold before the corresponding Existing Overlap Inventory, with all proceeds of Consigned Overlap Inventory constituting Consigned Inventory Proceeds.

5. The Consignment Facility is not a revolving credit line. Amounts advanced under the Consignment Facility to purchase Consigned Inventory may not be re-advanced once repaid unless approved in advance in writing by Consignor in its sole discretion. Borrower shall hold the Consigned Inventory in trust for the benefit of Consignor and shall insure the Consigned Inventory against loss. To the extent all or any portion of the Consigned Inventory is ever deemed property of Borrower's bankruptcy estate, such Consigned Inventory shall be DIP Priority Collateral of Consignor.

6. The maximum aggregate landed cost of all Consigned Inventory that may be purchased under the Consignment Facility is $30,000,000 (the "Consigned Inventory Cap"). Borrower may request funds from Consignor under the Consignment Facility to pay invoices for Consigned Inventory once per Business Day (each such request, a "Consignment Funding Request"). In connection with each Consignment Funding Request, Borrower shall provide Consignor with (a) a list of all purchase orders (which purchase orders shall be approved by at least one of Borrower's Chief Executive Officer, Chief Financial Officer, or Chief Merchant) for Consigned Inventory comprising such Consignment Funding Request and (b) copies of all invoices for such Consigned Inventory. Subject to the Consigned Inventory Cap, Consignor will fund the aggregate landed cost of all approved invoices and/or purchase orders for Consigned Inventory in a given Consignment Funding Request via a single wire transfer into the Consignment Facility Account. Immediately upon receipt of such wire transfer, Borrower, in consultation with Consignor's on-site personnel, shall initiate wire or ACH transfers, as applicable, to each vendor for the approved invoices and/or purchase orders and provide Consignor with wire or ACH transfer confirmations (including Fed Reference Numbers for wire transfers) for each such payment.

7. In connection with any sale or liquidation of all or substantially all of Borrower's assets and subject to Section 12(ii) below, Consignor may, upon written notice to Borrower (e-mail being acceptable), elect to take title to, or designate another entity to take title to, all or any portion of the Consigned Inventory, provided that Borrower shall not be required to make the payment contemplated by section 7(b)(1) of the Note for any Consigned Inventory to which Consignor elects to take title or designate another entity to take title pursuant to this paragraph.

8. Consignor shall have access to information and reporting with respect to the Consigned Inventory and the purchases and sales thereof, the Consignment Facility, the Consignment Facility Account, and the Consigned Inventory Proceeds.

9. Consignor may have on-site representatives at Borrower to assist Borrower and the Loan Parties with the Consignment Facility and the procurement and sale of Consigned Inventory.

10. Consignor shall be entitled to a work fee in the amount of $100,000 per month or part thereof that any amounts are outstanding under the Consignment Facility (the "Work Fee"). Consignor shall pay the Consignment Fee defined in Section 18 of the Note (7% per annum of the average amount outstanding under the Consignment Facility during the preceding month) from Consigned Inventory Proceeds, along with the Work Fee, to Consignor via wire transfer within five days after the end of each month.

11. Borrower shall maintain insurance against loss of (whether by theft, fire, flood, natural disaster, or otherwise) and damage to Consigned Inventory consistent with Borrower's insurance for its own inventory.  In the event of any insured loss of or damage to Consigned Inventory in Borrower's possession and/or control, the insurance proceeds related thereto shall constitute Consigned Inventory Proceeds.  Borrower shall be responsible for any uninsured loss of or damage to any Consigned Inventory in Borrower's possession and/or control.

12. If Borrower's going concern sale process is successful, (i) Consignor shall have the right, in its sole discretion, to require the purchaser to purchase all or a portion of the Consigned Inventory remaining at the closing of the going concern sale, as reflected on Borrower's books and records, at 105% of landed cost, with payment due at the closing of the going concern sale, and (ii) a going concern purchaser shall have the right, in its sole discretion, to purchase any Consigned Inventory remaining at the closing of the going concern sale, as reflected on Borrower's books and records, at 105% of landed cost, with payment due at the closing of the going concern sale.

**ACKNOWLEDGED AND AGREED TO:**

BARNEY'S, INC., Debtor in Possession _____

By: _____
Name: Sandro Risi
Title:    Executive Vice President and Treasurer

B. RILEY FINANCIAL, INC.

By: _____
Name: _____
Title: _____

<u>Schedule 13</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the Monthly Reports, Annual Reports and Compliance Certificates required by Sections 6.1(a) (c) and (d) of the Prepetition Credit Agreement (determined as if such agreement had remained in effect) and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| on Wednesday of each week beginning with the ~~second~~third full calendar week after the Petition Date | (a)    a weekly DIP variance report/reconciliation for the prior Cumulative Three-Week Period and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) liquidity and ~~excess availability (as determined under the Prepetition ABL Facility),~~Excess Availability, (E) Term Loan balances ~~and outstanding loans under the Prepetition ABL Facility~~ and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer of Barney's, <br><br>(b)    to the extent received by a Loan Party, a weekly report of sales in connection with store closures results (including detail on gross recoveries and expenses) from the affiliates of the Agent and/or DIP Lenders retained by the Loan Parties, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (c)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its reasonable discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered Liquidity Forecast and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (d)    copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, | (e)    copies of all "Borrowing Base Certificates" (as such term is defined in the Prepetition Credit Agreement~~)~~ as if such agreement had remained in effect) that would have been delivered pursuant to the Prepetition ABL Facility~~),~~ had such agreement remained in effect, |

| | |
|---|---|
| promptly, but in any event within 5 Business Days after Borrower has knowledge of any event or condition that constitutes a Default (provided that the delivery of a notice of any such event of default at any time will cure any Event of Default arising from the failure to timely deliver such notice of such event of default), | (f)      notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |

## **EXHIBIT F**

**Redline to the First Revised DIP Credit Agreement**

**AMENDED AND RESTATED DEBTOR IN POSSESSION SECURED
TERM PROMISSORY NOTE**

$217,000,000                                                                    New York, New York
                                                                                August [15], 2019

On August 6, 2019 (the "Petition Date"), BARNEY'S INC., (the "Borrower") and certain of its affiliates commenced Chapter 11 Case No.sNos. 19-36299, 19-36300, 19-36301, 19-36302 and 19-36303 respectively, which cases are being jointly administered under Chapter 11 Case No. 19-36300 (CGM) (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that GACP Finance Co., LLC, as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Amended and Restated Debtor in Possession Secured Term Promissory Note (as amended, modified, or supplemented from time to time, this "Note"), make term loans   evidenced by this Note.  Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent.  The Borrower intends to utilize such Term Loans to (i) repay the Prepetition Secured Debt in full and in cash (other than any Obligations (as defined therein) relating to letters of credit issued under the Prepetition ABL Facility (the "LCs")) and Prepetition Secured Contingent Indemnity Claims) and to cash collateralize the LCs (ii) fund general corporate needs, including without limitation working capital and other needs, and (iii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders.  Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.  This Note is being executed and delivered as an amendment to and a full restatement of the Debtor in Possession Secured Multi-Draw Term Promissory Note dated as of August 6, 2019, among the parties hereto (the "Original Note"), and as so, the Original Note is amended and restated, replaced and superseded by the terms, conditions, agreements, covenants, representations and warranties set forth in this Note without the need for any further actions or notices.

1.      Term Loans.

(a)      (i) On the Closing Date, the DIP Lenders party thereto provided the Borrower with– super-priority secured debtor-in-possession "Tranche A" loans under Section 364(c)(2) and (c)(3) of the Bankruptcy Code, which were made available to the Borrower on August 7, 2019, on the entry of the Interim Order, in the principal amount of $75,000,000 (the "Tranche A Term Loans"), (ii) subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with super-priority secured debtor-in-possession "Tranche B" loans under Section 364(c)(2) and (d) of the Bankruptcy Code (collectively, the "Tranche B Term Loans"),

each of which shall be made available upon the entry of the Second Interim Order, comprised of (A) "Tranche B-1" loans in the principal amount of $71,000,000 (the "Tranche B-1 Term Loans") and (B) "Tranche B-2" loans in the principal amount of $50,000,000 Term Loans, and (iii) subject to the terms and conditions hereof, the DIP Lenders agree to provide the Borrower with super-priority secured debtor-in-possession "Tranche C" loans under Section 364(c)(2) and (d) of the Bankruptcy Code, all of which shall be made available upon the entry of the Second Interim Order, in the principal amount of $21,000,000 (the "Tranche C Term Loans" and, together with the Tranche A Term Loans and the Tranche B Term Loans, the "Term Loans"). The parties hereto agree that upon the effectiveness of this Note, all term loans under the Original Note shall be reevidenced as Tranche A Term Loans made by the DIP Lenders hereunder, ratably based on the respective amounts advanced thereunder by each such DIP Lender. The Term Loans shall be subject to the priority set forth in the applicable Financing Order. Each DIP Lender shall provide the respective tranche of Term Loans in an amount equal to the proportion that such tranche represents of its respective Commitment and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several. The respective Commitment of each DIP Lender shall be permanently reduced upon the making of ~~such~~each tranche of Term Loan in an amount equal to such tranche of Term Loan. Additionally, at the Borrower's request, ~~the~~certain DIP Lenders and/or at their election, certain of their respective affiliates (collectively in such capacity, the "Consignor") will provide the Loan Parties with a consignment facility to support post-petition inventory purchases, subject to the terms and conditions set forth on Exhibit B attached hereto (the "Consignment Facility"). The Borrower and the Consign~~e~~or may mutually agree upon new inventory purchases (collectively, the "Consigned Inventory") pursuant to which the Consignor will purchase new inventory from the applicable vendor at prices negotiated between the Loan Parties and such vendor. For the avoidance of doubt, (i) the Consigned Inventory are not assets of the Loan Parties and shall not constitute "Collateral" nor be subject to the liens of the Agent or DIP Lenders hereunder; (ii) upon the sale of any Consigned Inventory, the Loan Parties' share of the proceeds on the Consigned Inventory (less the amounts payable to the Consignor in Section 7(b)(1)) shall constitute "Collateral" hereunder and the other DIP Documents, and (iii) any fees paid to the Loan Parties described on Exhibit B shall constitute "Collateral" hereunder and under the other DIP Documents.

(b)    The aggregate principal amount of Terms Loans outstanding shall not exceed $217,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)    The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any borrowing request or similar notice believed by the Agent to be genuine. The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)    The Borrower shall utilize the proceeds of Term Loans to (i) repay the Prepetition Secured Debt in full and in cash (other than any Obligations (as defined therein) relating to the LCs and Prepetition Secured Contingent Indemnity Claims) and to cash collateralize the LCs, (ii) fund general corporate needs, including without limitation working capital and other needs, and (iii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, this Note, the Bankruptcy Code, and the Financing Orders); provided, that (a) the Tranche A Term Loans were used on the Closing

Date to repay a portion of the Prepetition Secured Debt  under the Prepetition ABL Facility, (b) the Tranche B Term Loans shall be used to repay in full all remaining outstanding loans and other obligations (other than in respect of the LCs and other than Prepetition Secured Contingent Indemnity Claims) under the Prepetition Credit Agreement, (c) the Tranche C Term Loans shall be used solely to cash collateralize the LCs in accordance with the terms thereof (and to pay reimbursement or other obligations in respect thereof under the Prepetition Credit Agreement, (d) the Term Loans may be used to pay interest, fees, and expenses that constitute DIP Obligations and (e) no portion of any Term Loan shall be used, directly or indirectly, to finance or make any Restricted Payment (except as described in clause (a) of this proviso), or to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the ~~Borrower~~Loan Parties.

(e)       Except to the extent expressly provided otherwise in the Financing Orders, the Obligations shall be deemed to (i) constitute a DIP Superpriority Claim and (ii) be secured pursuant to sections 364(c)~~(2)~~ and (e)~~(3~~d) of the Bankruptcy Code.

2.       Certain Conditions to Effective Date, Each Tranche B Term Loan and Each Tranche C Term Loan.  The Original Note shall not be amended and restated hereby on the Effective Date, and no DIP Lender shall be obligated to fund any Tranche B Term Loan or Tranche C Term Loan, if, as of the date thereof:

(a)       the Borrower shall not have paid any amount then payable hereunder, under the Original Note or under any other DIP Document;

(b)       [reserved];

(c)       the Loan Parties shall not have delivered, each in form and substance satisfactory to Agent, (i) guarantees of each of the Guarantors (or amendments or amendments and restatements of the guarantees entered into on the Closing Date with respect to the Original Note) with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby and (ii) an executed fee letter between the Borrower and the Agent (the "Agent Fee Letter")~~[1]~~;");

(d)       any representation or warranty by any Loan Party contained herein, in the Original Note or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)       (i) the Bankruptcy Court shall not have entered the Second Interim Order; or (ii) the Interim Order or the Second Interim Order shall have been stayed, vacated, reversed, modified or amended, in each case, without Agent's consent;

(f)       the outstanding amount of the Prepetition Secured Debt (other than the LCs that will be cash collateralized with the proceeds of the Tranche C Term Loan and other ~~contingent~~

---

[1] ~~Subject to agreement on payment of any outstanding balance of annual fee upon payment of DIP Obligations in full and in cash.~~

~~indemnity obligations~~<u>Prepetition Secured Contingent Indemnity Claims</u>) will not be paid in full with the proceeds of the Tranche B Term Loan or all Liens secured such Prepetition Secured Debt shall not have been terminated <u>or been made junior or otherwise subordinated to the Liens securing the Obligations,</u> other than as provided in the Financing Orders;

(g)     except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto or arising therefrom (including any actions taken in accordance with the Budget, the Store Closure Motion, the Sale Motion, this Note or the Financing Orders), any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof;

(h)     any Default or Event of Default shall have occurred and be continuing hereunder or under the Original Note or would result after giving effect to any Term Loan;

(i)     after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(j)     the Agent shall not have received and approved the applicable Budget for such period in accordance with this Note and the Financing Orders;

(k)     Mo Meghji shall no longer be retained as Chief Restructuring Officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent;

(l)     [reserved];

(m)     the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner that is adverse to the Agent and the DIP Lenders in any material respect, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(n)     the Bankruptcy Court shall have entered orders, which orders could affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders in a manner adverse to the Agent and the DIP Lenders in any material respect, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.     <u>Payment of Principal</u>.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid

interest, fees and expenses to the extent provided in this Note.

4.    <u>Payment of Interest</u>.

(a)    Tranche A Term Loans.

(1)    Subject to the terms of this Note, the Tranche A Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the Closing Date until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche A Term Loans (or such portion thereof) plus 12.00%.

(b)    Tranche B-1 Term Loans.

(1)    Subject to the terms of this Note, the Tranche B-1 Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for the Tranche B-1 Term Loans (or such portion thereof) plus 2.25%.

(c)    Tranche B-2 Term Loans

(1)    Subject to the terms of this Note, the Tranche B-2 Term Loans or any portion thereof shall be a LIBOR Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Tranche B Term Loans until repaid, at a rate per annum equal to the one-month LIBOR Rate for the Interest Period in effect for the Tranche B-2 Term Loans (or such portion thereof) plus 7.00%.

(d)    Tranche C Term Loans

(1)    Subject to the terms of this Note, the Tranche C Term Loans or any portion thereof shall bear interest at the per annum rates equal to (x) until any LCs that are cash collateralized with the proceeds of the Tranche C Term Loans are drawn at any time after the Petition Date (and while the proceeds of such Tranche C Term Loans is being held as cash collateral therefor), an amount equal to the sum (if positive) of (i) the aggregate rates at which such undrawn LCs would have accrued fees under the Prepetition Credit Agreement (both to the issuing bank and the participating banks), absent cash collateralization, *minus* (ii) the rate at which such undrawn LCs would accrue fees while fully cash collateralized, and (y) from and after the drawing on any such LC from and after the Petition Date and solely with respect to any drawn amount under such LC, at the rate *per annum* otherwise applicable to the Tranche B-1 Loans.

(e)    Interest on the Term Loans shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be

payable at the then applicable rate during such extension.

(f)    All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(g)    So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent or the Required Lenders, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(h)    It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(h) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(h).

(i)    The LIBOR Rate may be adjusted by the DIP Lenders on a prospective basis to take into account any additional or increased costs to the DIP Lenders of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law (other than change with respect to tax law, which are addressed in Section 10

hereof) occurring subsequent to the commencement of the then applicable Interest Period, including changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the DIP Lenders shall give the Borrower notice of such a determination and adjustment and, upon its receipt of the notice from such DIP Lender, the Borrower may, by notice to such DIP Lender (1) request the DIP Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made.

(j)     Anything to the contrary contained herein notwithstanding, the DIP Lenders are not required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate. The provisions of Sections 4(i) through (k) shall apply as if the DIP Lenders had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

(k)     If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by any of the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof. Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

(l)     The Borrower may elect the Interest Period in effect for the Term Loans (or any portion thereof); provided, that (1) In no event will the Borrower have more than 6 Interest Periods outstanding at any time and (2) if the Agent reasonably determines that the LIBOR Rate is unavailable, then the Term Loans that would otherwise bear interest at the LIBOR rate shall bear interest, at a rate per annum equal to the Base Rate plus, (x) in the case of the Tranche A Term Loans, 11.00%, (y) in the case of the Tranche B-1 Term Loans (and, to the extent applicable, Tranche C Term Loans), 1.25%, and (z) in the case of the Tranche B-2 Term Loans, 6.00%, in each case on the principal amount thereof from the date that the LIBOR Rate became unavailable until such time the Agent or such DIP Lender determines that the LIBOR Rate is available.

5.      Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the following account:

|  |  |
|---|---|
| Bank: | City National Bank |
| | 555 South Flower Street |
| | Los Angeles, CA  90071 |
| ABA/Routing: | 122016066 |
| Swift Number: | CINAUS6L   (International Wires Only) |
| Account Name: | GACP II, LP |
| Account Number: | 210427139 |
| Reference: | Barney's |

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower.  Any payments of Term Loans shall be applied as follows: first, to the payment of all fees, (excluding the Exit Fee and the Enhancement Fee), and all expenses, to the full extent thereof; second, to the payment of any accrued interest at the Default Rate, if any; third, to the payment of any accrued interest (other than Default Rate interest); fourth, to repay (x) to the extent such proceeds constitute amounts released from being held as cash collateral with the proceeds of Tranche C Term Loans with respect to LCs (other than to repay such reimbursement obligations), the Tranche C Term Loans, and (y) otherwise, pro rata to the Tranche B-1 Term Loans and Tranche C Term Loans (except to the extent that LCs that were cash collateralized by such Tranche C Term Loans remain outstanding and undrawn) to the full extent thereof; fifth, to repay the Tranche B-2 Term Loans to the full extent thereof; sixth, to repay the Tranche A Term Loans and the Exit Fee to the full extent thereof; seventh, to the payment in full of all other Obligations, including the Enhancement Fee (to the extent any Enhancement Fee is then due and payable); and eighth, upon satisfaction in full of all Obligations, to the Borrower or as otherwise required by law.  During the continuance of an Event of Default, the Agent shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

6.      Optional Prepayments.  Subject to the terms and conditions of the Financing Orders and the application of payments in Section 5 hereof, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to the Agent; provided that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

7.      Mandatory Prepayments.  In each case, subject to the terms and conditions of the Financing Orders and the application of payments in Section 5 hereof and reduced (with

respect to clauses (b), (c), (d) and (e) of this paragraph 7), on a dollar for dollar basis, for any Exit Fee payable in connection with such repayment:

(a)      If at any time the aggregate outstanding principal amount of the Term Loans exceed the Maximum Amount, the Borrower shall immediately repay the aggregate outstanding Term Loans to the extent required to eliminate such excess.

(b)      Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, such Loan Party shall contribute such proceeds to the Borrower and the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes actually paid or payable by a Loan Party in connection with such disposition, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note.  Notwithstanding anything in this Note to the contrary, (i) the following shall not be subject to mandatory prepayment under this clause (b): proceeds of sales of Inventory or other sales in the ordinary course of business or in accordance with the Budget, the Store Closure Motion, or the Financing Orders, and (ii) if the Borrower or any Loan Party and the Consignor enter into a Consignment Facility, the proceeds of sales of Consigned Inventory shall be paid to Consignor as follows:

(1)      Upon the sale of an item of Consigned Inventory by or on behalf of the Borrower or any Loan Party, the Borrower or such Loan Party shall pay the Consignor the applicable invoice price plus the applicable Consignment Fee.

(c)      If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)      Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)      Upon release of any amounts being held as cash collateral with respect to LCs (other than to repay reimbursement and other obligations with respect to such LCs under the Prepetition Credit Agreement), the Borrower shall immediately prepay the outstanding principal amount of the Tranche C Term Loans in an amount equal to such released amounts.

(f)      <u>No Implied Consent</u>.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.      <u>Fees</u>.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)    Facility Fee.  On the Closing Date, the Borrower paid in cash to the Agent (under the Original Note) the Facility Fee (as defined in the Original Note) equal to 5% of the principal amount of the Tranche A Term Loans, which was fully earned upon the entry of the Interim Order and non-refundable when paid; I t being acknowledged and agreed that the Facility Fee (as defined in the Original Note) has been paid.

(b)    Weekly Fee.  On the Effective Date and on each weekly anniversary of the Effective Date thereafter on which any Tranche B Term Loans or Tranche C Term Loans shall remain outstanding, the Borrower shall pay to the Agent for the benefit of the Lenders holding Tranche B Term Loans and Tranche C Loans, a non-refundable fee of $100,000 (to be shared ratably among such Lenders based on the aggregate outstanding amount of Tranche B Term Loans and Tranche C Term Loans) to be paid in cash, which fee shall be fully earned on the Effective Date and on each weekly anniversary thereafter.

(c)    Exit Fee.  The Borrower shall pay to the Agent, for the benefit of the Lenders holding Tranche A Term Loans, a non-refundable exit fee (the "Exit Fee") equal to 5% of the amount of Tranche A Term Loans on the Closing Date, which was fully earned on the Closing Date, and when paid, shall be paid in cash on the earlier of (a) the Maturity Date and (b) the date of any repayment, satisfaction, distribution, reduction or other discharge of any such Tranche A Term Loans (in each case, based on the aggregate amount of the affected Tranche A Term Loans).

(d)    Enhancement Fee.  The Borrower shall pay to the Agent, for the benefit of the Lenders, upon the sale or liquidation of the Loan Parties pursuant to the Chapter 11 Cases, 37.5% (the "Enhancement Fee") of any proceeds remaining after repayment of all Obligations (including the Exit Fee) and after payment of administrative expenses and priority claims as more particularly described in the Financing Orders and in the manner set forth in the Financing Orders; it being agreed that the Enhancement Fee need not be approved until the Final Order.

9.    Indemnity.

(a)    The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the parties to any of the DIP Documents on the one hand and any Loan Party on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent

losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

   10. <u>Adjustments for Withholding, Capital Adequacy Etc.</u> All payments to the Agent by ~~the Borrower~~any Loan Party under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities, including any interest, additions to tax or penalties applicable thereto (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld. ~~If the Borrower~~If any applicable withholding agent shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable by the applicable Loan Party shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the ~~Borrower~~applicable withholding agent shall be entitled to make such deductions or withholdings, and (C) the ~~Borrower~~applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

   If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from ~~the Borrower~~any Loan Party (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower (on behalf of itself and the other Loan Parties) agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

   The Borrower (on behalf of itself and the other Loan Parties) agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by ~~the Borrower~~any Loan Party under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The ~~Borrower~~Loan Parties shall indemnify the Agent and each of the DIP Lenders, within 10 days after demand therefor, for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid or payable by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the ~~Borrower~~Loan Parties to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by ~~the Borrower~~a Loan Party pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware (in its sole discretion exercised in good faith) that it has received a refund of any Taxes with respect to which ~~the Borrower~~any Loan Party has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.  This paragraph shall not be construed to require any Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Form W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.      Priority of Obligations and DIP Lenders' Liens.

(a)      To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 363, 364, 365, 503, 506, 507, 546, 726, 1113 or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor

Case), and shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any Loan Party, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case (a "DIP Superpriority Claim"), (ii) with respect to the Tranche A Term Loans, pursuant to Sections 364(c)(2) and 364(c)(3)(d) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the Tranche B Term Loans and Tranche C Term Loans (in each case, including adequate protections liens)), junior Liens in favor of the Prepetition Secured Parties, the Prepetition Indemnity Account Lien and any other Liens as set forth in the Financing Orders, and (iii) with respect to the Tranche B Term Loans and Tranche C Term Loans, pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, junior Liens in favor of the Prepetition Secured Parties, the Prepetition Indemnity Account Lien and any other Liens as set forth in the Financing Orders. The security interests and Liens granted to the Agent hereunder shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estates under Section 551 of the Bankruptcy Code, or (ii) except as set forth herein or in the Financing Orders, subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)    The priority of the Agent's Liens on the Collateral (including without limitation with respect to the Prepetition Indemnity Account) shall be as set forth in the Financing Orders.

(c)    Notwithstanding anything herein to the contrary, (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the prior payment of the Carve Out-, and as otherwise set forth in the Financing Orders and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(d)    EachThe Borrower (on behalf of itself and the other Loan Parties) agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)    The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to the Carve Out, in accordance with the Financing Orders.

12.    Further Assurances.  The Borrower agrees that it shall, at the Borrower's reasonable expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be

necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents granting to the Agent, on behalf of the DIP Lenders, Liens (subject in all respect to the Financing Orders and the priorities set forth in Section 11 hereof) in the Collateral to secure the Obligations; provided that the "Collateral" shall not include (such assets "Excluded Assets") (a) leases not subject to a mortgage in favor of the Prepetition Agent as of the Petition Date (the "Unencumbered Leases"), (b) payroll, withholding tax and other fiduciary accounts and all amounts on deposit therein (in each case limited as would have been provided in the Prepetition Financing Documents if such facility had remained in effect), and (c)(c) Prepetition Indemnity Account (until such time as is provided in the Financing Orders) and (d) claims under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but shall include, subject to entry of a Final Order, proceeds of both the Unencumbered Leases and Avoidance Actions.

13.     Reports and Notices.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The Borrower agrees that no Subsidiary of the Borrower will change its fiscal year in a manner that would have been prohibited by the Prepetition Credit Agreement if such facility had remained in effect.  In addition, the Borrower agrees to, and to cause each of its Subsidiaries to, maintain a system of accounting that enables the Borrower and such Subsidiaries to produce financial statements in accordance with GAAP in all material respects.

14.     Affirmative Covenants.

The Borrower agrees that:

(a)     Upon the reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     (A) Except as otherwise excused by the Bankruptcy Code, the Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or to the extent such failure could not reasonably be expected to have a Material Adverse

Effect.

(c)    In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge promptly when due (x) the Borrower and its Subsidiaries will pay or discharge, when due, (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary, (2) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (3) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)    (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances, and (iv) the Borrower and each of its Subsidiaries will ensure that the mix of Inventory not sold pursuant to the Store Closure Motion (together if applicable, with any Consigned Inventory), as to type, category, style, brand and description, shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix on the Petition Date.

(e)    The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as would have been required by the Prepetition ABL Facility had such facility remained in effect.  Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as would have been required by the Prepetition ABL Facility had such facility remained in effect, with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 30 days of the Closing Date that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)    The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders.

-15-

(g)    The Borrower and its Subsidiaries shall, from and after September 4, 2019, at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)    The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(1)    no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court (which Milestone the parties hereto agree has occurred);

(2)    no later than August 9, 2019, the Loan Parties shall have filed one or more motions seeking entry of orders authorizing and approving (x) store closure and inventory transfer procedures for certain of the Loan Parties' store locations with such store closings to be conducted by affiliates of the Agent and/or the DIP Lenders who shall have been hired by the Loan Parties pursuant to Section 363 of the Bankruptcy Code to perform such services on a "fee-for-service" basis (the "Store Closure Motion"), and (y) bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in each case in form and substance reasonably acceptable to the Agent [((which Milestone the parties hereto agree has occurred)];);

(3)    as soon as reasonably practicable but in no event later than August 16, 2019,  the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Store Closure Motion, which order shall provide, among other things, that the Borrower may designate, or the DIP Lenders may elect in the event the Milestones in subsections (6), (7), or (8) below are not achieved, additional store locations to be closed pursuant thereto on the same terms and conditions set forth therein and that any store closings conducted thereby shall be binding on any chapter 7 or 11 trustee;

(4)    no later than 21 days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Agent, establishing bidding procedures in connection with the Sale Motion, which order, shall provide, among other things, that bids for any, or all, of the Loan Parties' assets shall be considered in connection therewith (such order, the "Bid Procedures Order");

(5)    no later than 30 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(6)    by October 24, 2019, the Loan Parties shall receive a binding Qualified Bid (as defined by the Bid Procedures Order) that provides sufficient cash consideration to indefeasibly pay in full all of the Obligations under this Note (such bid, the "Acceptable Bid");

(7)    no later than [October 30], 2019, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent,

(i) granting the relief requested in the Sale Motion and (ii) approving the binding Acceptable Bid; and

(8)     no later than by ~~[~~November 2~~],~~, 2019, a closing of the Acceptable Bid shall have occurred.

(i)     [Reserved].

(j)     The gross margin earned on the sale of Inventory shall not be more than 2% less than the gross margin forecasted in the file named "190804 - BNY DIP Budget (Hilco Pivot at 60 Days ~$2mm Merch per Week).xlsm" on the "Direct Cash Flow Tab" in row "198" (other than in connection with store closure sales and consignments) tested weekly and calculated in accordance with the ~~Borrower's books and records~~Loan Parties' inventory ledgers, in the aggregate, for sales occurring in the Cumulative Three-Week Period prior to such test.

15.     Negative Covenants.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent and other than in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders or as would have been permitted by the Prepetition ABL Facility had such facility remained in effect (assuming that all dollar baskets were $0 and that any conditions relating to availability, liquidity or Payment Conditions (as defined therein) were not satisfied):

(a)     Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld).

(b)     Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness for borrowed money in an amount in excess of $500,000 in the aggregate, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)     [Reserved].

(d)     Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien securing obligations in an amount in excess of $500,000 in the aggregate on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)     Neither the Borrower nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant

-17-

to the terms of the Financing Orders.

(f)     Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)     Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired, or engage any third party provider to assist in disposition of the foregoing, whether pursuant to Sections 327, 328, or 363 of the Bankruptcy Code, other than (a) the sale of Inventory (or in the event applicable, Consigned Inventory) in the ordinary course of business and or in accordance with the Budget, the Store Closure Motion, the Sale Motion or the Financing Orders, (b) the sale or disposition of obsolete equipment and (c) the sale of other property on terms acceptable to the Agent.

(h)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to (a) the Financing Orders or (b) the Prepetition Secured Debt, except as otherwise provided in the Financing Orders.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(l)(A) of the Bankruptcy Code, (iii) utility deposits made in accordance with Section 366 of the Bankruptcy Code, (iv) payments permitted by the Financing Orders and the Budget and (v) payments permitted under Section 15(e), neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)     Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise.

(j)     The Borrower shall maintain Excess Availability at all times at least equal to 10% of the Borrowing Base, as further provided in the Financing Orders.

(k)     Neither the Loan Parties nor any of their Subsidiaries shall permit any unspent amounts on Inventory line items in the Budget to instead be spent on any ~~any~~ non-inventory line item in the Budget.

16.    Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrower (i) shall fail to make any payment of principal of, or

interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.    Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e), 14(f), of this Note and such failure shall remain uncured for a period of one (1) Business Day after notice from the Agent, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days after notice from the Agent, or (iii) Sections 14(g), 14(h), 14(j), or 15 of this Note or any material provision of the Guaranty.

C.    Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section (i))16) and the same, if capable of being remedied, shall remain unremedied for ten (10) days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D.    Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $500,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $500,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.    Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.    Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full in cash all of the Obligations under this Note, including without limitation the Exit Fee and the Enhancement Fee (if any); (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions materially adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.    Any Loan Party permits a plan or plans of reorganization to be filed, or permits the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization, that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note on or before the effective date of such plan or plans.

H.    The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.    The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations, including without limitation the Exit Fee and the Enhancement Fee (if any).

J.    [Reserved].

K.    The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.    The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.    The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.    The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claims or Liens permitted by Section 11 hereof and the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations and Term Loans(including the Exit Fee and the Enhancement Fee (if any)) are paid in full in cash.

O.    The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $500,000.

P.    The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.    There shall commence any suit or action against the Agent or any DIP Lender or any lenders or agents under the Prepetition ABL Facility by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim

or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

   R.  [Reserved]

   S.  Any material provision of any material DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any material Lien created under any DIP Document shall cease to be a valid and perfected Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

   T.  In the event the accrued amount of professional fees for case professionals for the applicable Cumulative Two -Week Period exceed by greater than 10.0% the "Total Professional Fee Disbursements" line item as set forth in the Budget for the applicable Cumulative Two Week Period.

   U.  Assets of any Loan Party with a fair market value of $500,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

   V.  A breach by any Loan Party of the terms of any of the Financing Order.

   W.  A Material Adverse Deviation shall have occurred.

   X.  Entry of an order authorizing and/or directing the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Loan Party.

   If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of (a) an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, or (b) the failure of any Loan Party to comply with the October 24, 2019 Milestone under Section 14(h)(6), each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable

from such sale or other disposition. The, and the Loan Parties shall immediately commence all liquidation processes asin the manner contemplated by the Store Closure Motion upon the acceleration of the Term Loans.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

For the avoidance of doubt, the Agent or any DIP Lender may be a qualified bidder and the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of DIP Lenders (or any DIP Lender or the DIP Lenders in its or their respective individual capacities unless the DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such private or public sale (other than any sale in the ordinary course of business), to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent (or any DIP Lenders) at such sale.

17.    <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $217,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Additional Liquidity Amount</u>" shall mean (a) on the Effective Date, $500,000, (b) from and after the day that is one week after the Effective Date, $1,000,000, (c) from and after the day that is two weeks after the Effective Date, $1,500,000, (d) from and after the day that is three

weeks after the Effective Date, $2,000,000, (e) from and after the day that is four week after the Effective Date, $2,500,000, (f) from and after the day that is five weeks after the Effective Date, $3,000,000, (g) from and after the day that is six weeks after the Effective Date, $3,500,000, (h) from and after the day that is seven weeks after the Effective Date, $4,000,000, (i) from and after the day that is eight weeks after the Effective Date, $4,500,000 and (j) from and after the day that is nine weeks after the Effective Date, $5,000,000.

"Agent Fee Letter" shall have the meaning given to such term in Section 2(c) of this Note.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Base Rate" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "Base Rate" hereunder shall be no less than zero percent (0.00%) per annum.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Borrowing Base" means (a) the Borrowing Base (as defined in the Prepetition Credit Agreement as if it was in effect), including, for the avoidance of doubt, the ~~then-applicable Additional Liquidity Amount and the~~ Term Loan Borrowing Base (as defined in the Prepetition Credit Agreement as if it was in effect) and without giving effect to any Reserves (as defined in the Prepetition Credit Agreement as if it was in effect), *plus* (b) the then-applicable Additional Liquidity Amount, calculated in a manner consistent with the Budget.

"Budget" means a 13-week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 13 weeks after the Petition Date, which shall be in substantially the form as the Initial Budget or otherwise in form and substance acceptable to the Agent and shall be approved by the Agent, in its sole discretion.  The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means August 7, 2019.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations; provided that Excluded Assets shall in no event constitute "Collateral." Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Commitment Letter" means the Commitment Letter relating to this Note and the Term Loans hereunder, among the parties thereto, dated as of August 89. 2019.

"Consigned Inventory Proceeds" means gross proceeds from the sale of Consigned Inventory, less applicable sales taxes.

"Consignment Facility" shall have the meaning given to such term in Section 1(a) of this Note.

"Consignment Fee" means the fees payable to the Consignor in exchange for providing the Consignment Facility calculated at a rate of 7% per annum of outstanding amounts under the Consignment Facility, payable only with Consigned Inventory Proceeds.

"Consignor" shall have the meaning given to such term in Section 1(a) of this Note.

"Cumulative Three-Week Period" means the three-week period up to and through the Saturday of the most recent week then ended, or if a three-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(g)(g) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, the Agent Fee Letter, the Financing Orders and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with the Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Effective Date" means the Business Day when each of the conditions applicable to the Tranche B Term Loans and Tranche C Term Loans and listed in Section 2 of this Note shall have been satisfied or waived in a manner reasonably satisfactory to the Agent.

"Enhancement Fee" shall have the meaning given such term in Section 8 of this Note.

"Event of Default" shall have the meaning given such term in Section (i)16 of this Note.

"Excess Availability" means, at any time, (a) the Borrowing Base *minus* (b) the principal amount of all Term Loans outstanding at such time reduced on a dollar for dollar basis by the Liquidity Credit.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extraordinary Receipts" means any cash received by Borrower or any of its

-25-

Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof or of any cash proceeds provided for in the Budget), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent in its sole discretion, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order, the Second Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial DIP Lenders" means GACP Finance Co., LLC, BRF Finance Co., LLC,

and Brigade Capital Management, LP, on behalf of its managed funds and accounts.

"Interest Payment Date" shall mean the first Business Day of each month to occur while such Term Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan and ending 1 month thereafter; provided, however, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" means that certain Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief entered by the Bankruptcy Court on August 7, 2019 (ECF No. 49).

"Inventory" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"LIBOR Rate" means "LIBO Rate" as such term is defined in the Prepetition Credit Agreement whether or not such agreement remains in effect; provided, that, notwithstanding the foregoing, the "LIBOR Rate" hereunder shall not be less than zero percent (0.00%) per annum.

"LIBOR Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Liquidity Credit" means $25,000,000.

"Liquidity Forecast" means a rolling 13-week forecast of projected liquidity for the consecutive 13-week period immediately following the date of delivery of such forecast as certified in a certificate delivered by the Borrower.

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, from and after September 4, 2019, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the following line items of the Budget:  "Operating Disbursements" and "Net Cash Flow", in each case, for such Cumulative Three-Week Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Borrower or the Loan Parties as a whole to perform any of their material obligations under any material DIP Document to which it is a party, (iii) the legality, validity or enforceability of this Note or any other material DIP Document, (iv) the rights and remedies of the Agent and DIP Lenders taken as a whole under the DIP Documents, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any material portion of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020, (ii) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section (i).16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 1414 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents, including the Exit Fee and the Enhancement Fee.

"Other Taxes" shall have the meaning given such term in Section 1010 of this Note.

"Participant Register" shall have the meaning given such term in Section 20 of this

Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date, to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code; (i) other Liens granted pursuant to the Financing Order (including the Carve-Out, junior liens securing the Prepetition Secured Contingent Indemnity Claims and the Prepetition Indemnity Account Lien) and (j) Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) deferred taxes and other expenses incurred in the ordinary course of business; (d) any Indebtedness existing on the Petition Date; and (e) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall have the meaning given such term in the Financing Orders.

"Permitted Variance" means (a) a variance of up to (x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual disbursements for the applicable Cumulative Three-Week Period and the "Operating Disbursements" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than professional fees and disbursements in connection with store closure sales and consignments), (b) a negative variance of up to (x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter, in each case, between the actual net cash flow for the applicable Cumulative Three-Week Period and the "Net Cash Flow" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than receipts in connection with store closure sales and consignments), and (c) a negative variance of up to (x) 25% for the first Cumulative Three-Week Periods after the Petition Date and (y) 12.5%  thereafter,

in each case, between the actual receipts for the applicable Cumulative Three-Week Period and the "Total Cash Receipts" line item as set forth in the Budget for the applicable Cumulative Three-Week Period (other than disbursements in connection with store closure sales and consignments).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" means that certain senior secured asset based revolving credit facility and term loan facility pursuant to the Prepetition Financing Documents.

"Prepetition Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Financing Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Indemnity Account" shall have the meaning given such term in the Financing Orders.

"Prepetition Indemnity Account Lien" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Contingent Indemnity Claims" means the contingent indemnity obligations due or that may become due to the Prepetition Secured Parties under the Prepetition Financing Documents subject to and in accordance with, the Financing Orders.

"Prepetition Secured Debt" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Parties" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 2020 of this Note.

~~"Registered Loan" shall have the meaning given such term in Section 20 of this Note.~~

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Required Lenders" shall mean, collectively, 100% of the DIP Lenders who are the Initial DIP Lenders or any of their affiliates that become DIP Lenders.

"Restricted Payment" shall mean, with respect to any Person: (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Person's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any subordinated debt of such Person; (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Person now or hereafter outstanding; (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any shares of such Person's Stock or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission; (f) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder of such Person other than payment of compensation in the ordinary course to Stockholders who are employees of such Person; and (g) any payment of management fees (or other fees of a similar nature) by such Person to any Stockholder of such Person or its affiliates.

"Second Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents

"Stock" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section ~~10~~10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Tranche A Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $75,000,000 of the Term Loans that were advanced on the Closing Date, which is and shall be secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B Term Loans" shall mean the Tranche B-1 Term Loans and the Tranche B-2 Term Loans.

"Tranche B-1 Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $71,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche B-2 Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $50,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

"Tranche C Term Loans" shall have the meaning given to such term in Section 1 of this Note and refers to the $21,000,000 of the Term Loans that will secured by, among other things, Liens, and constitute a DIP Superpriority Claim, all to be set forth more fully in the Financing Orders.

19.    Representations and Warranties.  The Borrower and each of its Subsidiaries represent as follows:

(a)    the Borrower and each of its Subsidiaries are duly formed and/or organized, validly existing and in good standing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders and subject to the terms thereof, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders and subject to the terms thereof, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)        the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)        no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)        the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to the Permitted Prior Liens, the Prepetition Indemnity Account Lien or other Liens permitted to have such priority under Section 11 of this Note and the Financing Orders;

(h)        except for proceedings in the Chapter 11 Cases in connection with the entry of the Financing Orders, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)        the Borrower and its Subsidiaries are and will be at all times the owners of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note or any other DIP Documents and the other Permitted Encumbrances;

(j)        [reserved]; and

(k)        except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or, to the knowledge of the Borrower, threatened against or in any way affecting (i) any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other DIP Document.

20.    Agent.

(a)        Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term  Loans, and related matters

and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.

(b)    Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.  The Agent shall not exercise any discretion, make any determination, grant any consent or approval or take any action (including, without limitation, the exercise of any right or remedy) under any DIP Document, or in connection with the Chapter 11 Cases, except upon the instructions of the Required Lenders (or such greater proportion of the DIP Lenders required hereby or by the Bankruptcy Code, as applicable)  ).

(c)    Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d)    Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)    Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)    Collateral Matters.

(1)    The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified

in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

21.    <u>Miscellaneous</u>.

(a)    All notices, demands, requests or other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

| | |
|---|---|
| If to Borrower: | BARNEY'S INC.<br>C/O Barney's New York, Inc.<br>575 Fifth Avenue<br>New York NY 10017<br>Attn: Chief Executive Officer and Chief Financial Officer<br>Email: gfu@barneys.com<br>        sfisi@barrneys.com |
| with copies to: | KIRKLAND & ELLIS<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:  Josh Sussberg; and Chad Husnick<br> Email: jsussberg@kirkland.com<br>chusnick@kirkland.com |
| If to Agent or any Lender: | GACP FINANCE CO., LLC<br>21255 Burbank Blvd, Suite 400<br>Woodland Hills, California 91367<br>Attn: John Ahn, Robert Louzan and Alex Zuckerman |

                                                  Email: jahn@gacapitalpartners.com
rlouzan@gacapitalpartners.com
azuckerman@gacapitalpartners.com

with copies to:              JONES DAY
250 Vesey Street
New York, New York 10281
Attn:  Sidney P. Levinson, Michael Schneidereit and
Jeremy Evans

Email:  slevinson@jonesday.com
mschneidereit@jonesday.com
jevans@jonesday.com

All such notices, demands, requests or other communications shall, when mailed or sent by overnight courier, be effective two Business Days after being deposited in the mails, with adequate postage prepaid, and sent by registered or certified mail with return receipt requested by such sending party, or the next Business Day after being sent by an overnight courier to a party at its address set forth above, as the case may be, or when sent by email be effective the day when sent.

(b)     The Borrower shall reimburse the Agent and DIP Lenders for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of one firm of outside counsel for Agent and DIP Lenders, taken as a whole, all of their respective special local counsel limited to one firm in any material jurisdiction to the extent necessary to obtain the Liens contemplated by the DIP Documents, reasonable financial advisory fees for one financial advisor for the Agent hereunder and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).   The Borrower shall reimburse the Agent and DIP Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of one firm of outside counsel for advice, assistance, or other representation, including, in connection with:

(1)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the DIP Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the

DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)    any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)    any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)    any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales in connection with store closures or other sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to Section 11 hereof and the Financing Orders).

(c)    No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)    Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(h)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY**

**OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**. In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)    The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(j)    The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lenders may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)    The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)    Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)    A ~~Registered~~Term Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such ~~Registered~~Term Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any ~~Registered~~Term Loan, the Agent shall treat the Person in whose name such ~~Registered~~Term Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)    In the event that a DIP Lender sells participations in a ~~Registered~~Term Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the ~~Registered~~Term Loans held by it and the principal amount (and stated interest thereon) of the portion of the ~~Registered~~Term Loan that is the subject of the participation (the "Participant Register").  A ~~Registered~~Term Loan may

-39-

be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such ~~Registered~~Term Loan may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)    No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent (acting on the instructions of the Required Lenders ~~and, if such amendment or waiver by its terms affects any DIP Lender disproportionately adversely relative to other affected DIP Lenders, each such DIP Lender~~).

(p)    Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)    This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees. The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)    THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(s)    This Note may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. Delivery of an executed counterpart to this Note by facsimile transmission or electric transmission in "pdf" or other imaging format shall be as effective as delivery of a manually signed original.

(t)    In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

\*    \*    \*    \*    \*

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BARNEY'S, INC., as Debtor and Debtor in Possession

By: _____
        Name:
        Title

Acknowledged and Agreed

GACP FINANCE CO., LLC, as Agent

By: _____
        Name:
        Title:

GACP II, L.P., as a DIP Lender

By:  GREAT AMERICAN CAPITAL PARTNERS, LLC
Its:   General Partner

By:_____
Its:  Authorized Signatory

Commitment Amount: $71100,000,000

BRF FINANCE CO., LLC, as a DIP Lender

By: _____
        Name:
        Title:

Commitment Amount: $7142,000,000 (of which $37,500,000 has already been advanced as Tranche A Term Loans)

BRIGADE CAPITAL MANAGEMENT, LP, on behalf of its managed funds and accounts, as a DIP Lender

By: _____

    Name:

    Title:

Commitment Amount: $75,000,000 (of which $37,500,000 has already been advanced as Tranche A Term Loans)

EXHIBIT A

(attach Initial Budget)

[TO COME]

**(AMENDED) EXHIBIT B TO DIP TERM NOTE**

~~Consignment Facility~~



| | |
|---|---|
| | ~~In addition to customary terms and conditions for a consignment relationship, the Consignment Facility shall include the following terms and conditions:~~<br><br>1. ~~The Consignor will have access to information and reporting.~~<br>2. ~~The Consignor may have onsite representatives at the Borrower to assist the Borrower and Loan Parties with the consignment program.~~<br>3. ~~The Consignor shall have the right to use the stores and the e-commerce platform to liquidate the Consigned Inventory from the stores and through the e-commerce platform if the going concern sale process is not successful or an event of default occurs and is not cured in which case the Consignor shall be responsible for payment of a proportionate share of the four-wall operating expenses of the stores and costs associated with operating the e-commerce platform and, in light of such obligation, the Consignor shall be entitled to receive and retain for its sole and exclusive benefit all proceeds (other than sales taxes) from the sale of all Consigned Inventory.~~<br>4. ~~The Consignor shall be entitled to a work fee in the amount of $100,000 per month.~~<br><br>~~If the going concern process is successful, (i) the Consignor shall have the right (exercised in the Consignor's sole discretion) to require the purchaser to purchase all or a portion of the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale, and (ii) a going concern purchaser shall have the right (exercised in the purchaser's sole discretion) to purchase the Consigned Inventory at 105% of cost with payment due at the closing of the going concern sale.~~ |

**CONSIGNMENT FACILITY TERMS**

Effective as of August 9, 2019, the following terms and conditions shall govern the Consignment Facility, as defined in the *Amended and Restated Debtor in Possession Secured Term Promissory Note* to which this Exhibit B is annexed (the "Note") and shall supersede in all respects the terms and conditions set forth in Exhibit B to all prior instances of the Note. Capitalized terms used but not defined herein have the meanings given thereto in the Note.

1. Consignor shall be B. Riley Financial, Inc. ("BR") and/or an affiliate thereof, as BR may designate in its sole discretion.

2. Consignor shall have a first-priority senior Lien pursuant to 11 U.S.C. § 364(d) (with respect to the DIP Lenders and Prepetition Secured Parties upon entry of the Second Interim Order, and with respect to all parties asserting Liens against the Consigned Inventory Proceeds upon entry of the Final Order) on all Consigned Inventory Proceeds and other amounts, in each case, due to Consignor in connection with the Consigned Inventory (including but not limited to the Work Fee (defined below) and the Consignment Fee defined in Section 18 of the Note), which amounts shall remain subject to the Lien of Consignor until indefeasibly paid to Consignor pursuant to paragraph 7(b)(ii) of the Note.

3. Borrower has opened, or shall promptly open, a new, segregated bank account (the "Consignment Facility Account") for the exclusive purposes of (a) receiving funds in trust from Consignor pursuant to the Consignment Facility and (b) using such funds to pay vendors' invoices for Consigned Inventory.  Borrower shall not use the Consignment Facility Account or any funds therein for any other purpose, and shall have no interest in any funds on deposit in the Consignment Facility Account at any time, which funds shall be held in trust at all times for the payment of vendors' approved invoices for Consigned Inventory pursuant to the terms of the Consignment Facility.  To the extent all or any portion of the funds on deposit in the Consignment Facility Account at any time are ever deemed property of Borrower's bankruptcy estate, Consignor shall have a first-priority senior Lien on such funds, and such funds shall be DIP Priority Collateral of Consignor. At Consignor's request, Borrower shall take all steps reasonably necessary to obtain a deposit account control agreement providing Consignor control over the Consignment Facility Account.

4. Items of Consigned Inventory identified by the same SKUs ("Consigned Overlap Inventory") as similar goods in Borrower's existing inventory ("Existing Overlap Inventory") shall be accounted for on a "last-in-first-out" basis, whereby all Consigned Overlap Inventory identified by a particular SKU is treated as sold before the corresponding Existing Overlap Inventory, with all proceeds of Consigned Overlap Inventory constituting Consigned Inventory Proceeds.

5. The Consignment Facility is not a revolving credit line.  Amounts advanced under the Consignment Facility to purchase Consigned Inventory may not be re-advanced once repaid unless approved in advance in writing by Consignor in its sole discretion.  Borrower shall hold the Consigned Inventory in trust for the benefit of Consignor and shall insure the Consigned Inventory against loss.  To the extent all or any portion of the Consigned Inventory is ever deemed property of Borrower's bankruptcy estate, such Consigned Inventory shall be DIP Priority Collateral of Consignor.

6. The maximum aggregate landed cost of all Consigned Inventory that may be purchased under the Consignment Facility is $30,000,000 (the "Consigned Inventory Cap"). Borrower may request funds from Consignor under the Consignment Facility to pay invoices for Consigned Inventory once per Business Day (each such request, a

"Consignment Funding Request").  In connection with each Consignment Funding Request, Borrower shall provide Consignor with (a) a list of all purchase orders (which purchase orders shall be approved by at least one of Borrower's Chief Executive Officer, Chief Financial Officer, or Chief Merchant) for Consigned Inventory comprising such Consignment Funding Request and (b) copies of all invoices for such Consigned Inventory. Subject to the Consigned Inventory Cap, Consignor will fund the aggregate landed cost of all approved invoices and/or purchase orders for Consigned Inventory in a given Consignment Funding Request via a single wire transfer into the Consignment Facility Account.  Immediately upon receipt of such wire transfer, Borrower, in consultation with Consignor's on-site personnel, shall initiate wire or ACH transfers, as applicable, to each vendor for the approved invoices and/or purchase orders and provide Consignor with wire or ACH transfer confirmations (including Fed Reference Numbers for wire transfers) for each such payment.

7. In connection with any sale or liquidation of all or substantially all of Borrower's assets and subject to Section 12(ii) below, Consignor may, upon written notice to Borrower (e-mail being acceptable), elect to take title to, or designate another entity to take title to, all or any portion of the Consigned Inventory, provided that Borrower shall not be required to make the payment contemplated by section 7(b)(1) of the Note for any Consigned Inventory to which Consignor elects to take title or designate another entity to take title pursuant to this paragraph.

8. Consignor shall have access to information and reporting with respect to the Consigned Inventory and the purchases and sales thereof, the Consignment Facility, the Consignment Facility Account, and the Consigned Inventory Proceeds.

9. Consignor may have on-site representatives at Borrower to assist Borrower and the Loan Parties with the Consignment Facility and the procurement and sale of Consigned Inventory.

10. Consignor shall be entitled to a work fee in the amount of $100,000 per month or part thereof that any amounts are outstanding under the Consignment Facility (the "Work Fee"). Consignor shall pay the Consignment Fee defined in Section 18 of the Note (7% per annum of the average amount outstanding under the Consignment Facility during the preceding month) from Consigned Inventory Proceeds, along with the Work Fee, to Consignor via wire transfer within five days after the end of each month.

11. Borrower shall maintain insurance against loss of (whether by theft, fire, flood, natural disaster, or otherwise) and damage to Consigned Inventory consistent with Borrower's insurance for its own inventory.  In the event of any insured loss of or damage to Consigned Inventory in Borrower's possession and/or control, the insurance proceeds related thereto shall constitute Consigned Inventory Proceeds.   Borrower shall be responsible for any

uninsured loss of or damage to any Consigned Inventory in Borrower's possession and/or control.

12. If Borrower's going concern sale process is successful, (i) Consignor shall have the right, in its sole discretion, to require the purchaser to purchase all or a portion of the Consigned Inventory remaining at the closing of the going concern sale, as reflected on Borrower's books and records, at 105% of landed cost, with payment due at the closing of the going concern sale, and (ii) a going concern purchaser shall have the right, in its sole discretion, to purchase any Consigned Inventory remaining at the closing of the going concern sale, as reflected on Borrower's books and records, at 105% of landed cost, with payment due at the closing of the going concern sale.

**ACKNOWLEDGED AND AGREED TO:**

BARNEY'S, INC., Debtor in Possession

By: _____
Name: Sandro Risi
Title:    Executive Vice President and Treasurer

B. RILEY FINANCIAL, INC.

By: _____
Name: ___
Title: ___

Schedule 13

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the Monthly Reports, Annual Reports and Compliance Certificates required by Sections 6.1(a) (c) and (d) of the Prepetition Credit Agreement (determined as if such agreement had remained in effect) and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| | |
|---|---|
| on Wednesday of each week beginning with the third full calendar week after the Petition Date | (a)      a weekly DIP variance report/reconciliation for the prior Cumulative Three-Week Period and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) liquidity and Excess Availability, (E) Term Loan balances and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by the chief financial officer of Barney's,<br><br>(b)      to the extent received by a Loan Party, a weekly report of sales in connection with store closures results (including detail on gross recoveries and expenses) from the affiliates of the Agent and/or DIP Lenders retained by the Loan Parties, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (c)      a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its reasonable discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered Liquidity Forecast and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (d)      copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; provided that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, | (e)      copies of all "Borrowing Base Certificates" (as such term is defined in the Prepetition Credit Agreement as if such agreement had remained in effect) that would have been delivered pursuant to the Prepetition ABL Facility had such agreement remained in effect, |

| | |
|---|---|
| promptly, but in any event within 5 Business Days after Borrower has knowledge of any event or condition that constitutes a Default (provided that the delivery of a notice of any such event of default at any time will cure any Event of Default arising from the failure to timely deliver such notice of such event of default), | (f)      notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |