Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
John A. Morris, Esq.
Colin R. Robinson, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

Maxim B. Litvak, Esq.
Shirley S. Cho, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Related to Docket Nos. 49, 127** |

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO ENTRY OF FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) AUTHORIZING PAYMENT OF PREPETITION SECURED OBLIGATIONS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (V) <u>MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819). The location of the Debtors' service address is 575 Fifth Avenue, New York, New York 10017.

## TABLE OF CONTENTS

Introduction .................................................................................................................... 1

Factual Background ......................................................................................................... 7

    A.    General Background ........................................................................................ 7

    B.    Prepetition Funded Indebtedness .................................................................... 9

        i     ABL Facility .......................................................................................... 9

        ii    Term Loan Facility ............................................................................... 11

    C.    The Proposed Final Order / DIP Facility ...................................................... 12

Objections to DIP Facility and Proposed Final Order ................................................ 17

    A.    The DIP Facility Should Not Be Approved in Its Current Form Because It Primarily Benefits the Prepetition Lenders and DIP Lenders at the Expense of These Estates. .................................................................................... 18

    B.    Unencumbered Assets Must Not Become Collateral for the DIP Lenders or Prepetition Lenders and Should Be Preserved for Unsecured Creditors. ........ 23

    C.    The Challenge Deadline Must Be Extended, the Investigation Budget and Committee Carve Out Must Be Increased, and the Committee Must Be Granted Standing to Pursue All Available Claims Against the Prepetition Lenders. .................................................................................................... 25

    D.    The Estates Should Retain Section 506(c) Surcharge Rights,  Section 552(b) "Equities of the Case" Rights, and Marshalling Rights. ........................ 29

    E.    Other Miscellaneous Issues with the Proposed Final Order. ........................... 32

Reservation of Rights ..................................................................................................... 33

Conclusion ..................................................................................................................... 34

DOCS_SF:101743.5 07982/002

## CASES

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*,
229 F.3d 245 (3d Cir. 2000) ............................................................................ 23

*Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*,
104 B.R. 824 (E.D. Mich. 1989) ...................................................................... 30

*In re Aqua Assocs.*,
123 B.R. 192 (Bankr. E.D. Pa. 1991) .............................................................. 19

*In re Aralez Pharmaceuticals US Inc.*,
Case No. 18-12425 (MG), Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y.
Sept. 14, 2018) ................................................................................................ 23

*In re Atari, Inc.*,
Case No. 13-10176 (JMP), at p. 7, ln. 15-18 (Bankr. S.D.N.Y. January 24,
2013) ................................................................................................................ 21

*In re Bearing Point, Inc.*,
No. 09-10691 (REG) (Bankr. S.D.N.Y. April 20, 2009) .................................. 28

*In re Big Rivers Elec. Corp.*,
233 B.R. 726 (Bankr. W.D. Ky. 1998) ............................................................ 18

*In re Chief Executive Officers Clubs*,
359 B.R. 527 (Bankr. S.D.N.Y. 2007) ............................................................ 18

*In re Ciena Capital LLC*,
No. 08-13783 (AJG) (Bankr. S.D.N.Y. Nov. 21, 2008) ................................... 28

*In re Codesco, Inc.*,
18 B.R. 225 (Bankr. S.D.N.Y. 1982) .............................................................. 29

*In re Colad Group, Inc.*,
324 B.R. 208 (Bankr. W.D.N.Y. 2005) ........................................................... 30

*In re Crouse Group, Inc.*,
71 B.R. 544 (Bankr. E.D. Pa. 1987) ............................................................... 18

*In re Defender Drug Stores*,
145 B.R. 312 (B.A.P. 9th Cir. 1992) .......................................................... 21, 22

*In re FCX, Inc.*,
54 B.R. 833 (Bankr. E.D.N.C. 1985) .............................................................. 19

*In re Frank Theatres Bayonne/South Cove, LLC*,
Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c) (Bankr. D. N.J. Jan.
28, 2019) .................................................................................................... 24, 32

*In re Free Lance-Star Publishing*,
512 B.R. 798 (Bankr. E.D. Va. 2014) ............................................................. 33

*In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No. 348 at ¶¶ 15,
18 (Bankr. E.D. Va. Feb. 15, 2019) ................................................................ 24

*In re Lenox Sales, Inc.*,
No. 08-14679 (ALG) (Bankr. S.D.N.Y. Dec. 16, 2008) ................................... 28

*In re Metaldyne Corp.*,
No. 09-13412 (MG), 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23,
2009) ................................................................................................................ 31

ii

*In re Muma Servs.*,
322 B.R. 541 (Bankr. D. Del. 2005) ............................................................... 30

*In re Nine West Holdings, Inc.*,
Case No. 18-10947 (SCC), Docket No. 450 at ¶ 10(f) (Bankr. S.D.N.Y. June
28, 2018) ......................................................................................................... 32

*In re Philadelphia Newspapers*,
599 F.3d 298 n.14 (3d Cir. 2010) .................................................................... 33

*In re Promise Healthcare Group, LLC*,
Case No. 18-12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec.
4, 2018) ............................................................................................................ 24

*In re Roblin Industries, Inc.*,
52 B.R. 241 (Bankr. W.D.N.Y. 1985) ......................................................... 18, 19

*In re Samuel's Jewelers, Inc.*,
Case No. 18-11818 (KJC), Docket No. 252 at ¶ 5 (Bankr. D. Del. Sept. 18,
2018) ................................................................................................................ 32

*In re SFX Entertainment, Inc.*,
Case No. 16-10238 (MFW), Docket No. 203 at ¶ 11(a)(i)-(ii) (Bankr. D. Del.
Mar. 8, 2016) ................................................................................................... 24

*In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985)
*aff'd and rev'd, in part, on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ....... 23

*In re Tenney Village Co.*,
104 B.R. 562 (Bankr. D.N.H. 1989) ......................................................... 18, 19, 24

*In re Texlon*,
596 F.2d 1092 (2d Cir. 1979) ......................................................................... 19

*In re The Bon-Ton Stores, Inc.*,
Case No. 18-10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. Mar. 12,
2018) ................................................................................................................ 32

*In re The Weinstein Company Holdings LLC*,
Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e)(Bankr. D. Del.
Apr. 19, 2018) ............................................................................................ 23, 32

*In re Vanguard Diversified, Inc.*,
31 B.R. 364 (Bankr. E.D.N.Y. 1983) ............................................................... 19

*In re Westmoreland Coal Co.*,
Case No. 18-35672 (DRJ), Docket No. 520 at ¶ 37 (Bankr. S.D. Tex. Nov. 15,
2018) ................................................................................................................ 32

*Official Comm. v. Hudson United Bankr. (In re America's Hobby Center)*,
223 B.R. 275 (Bankr. S.D.N.Y. 1998) .............................................................. 31

*Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*,
57 F.3d 321 (3d Cir. 1995) .............................................................................. 29

*Ramette v. United States (In re Bame)*,
279 B.R. 833 (8th Cir. BAP 2002) ................................................................... 31

*Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*,
457 B.R. 254 (Bankr. S.D.N.Y. 2011) .............................................................. 31

**STATUTES**

11 U.S.C. § 1102 ................................................................................................ 26, 27

11 U.S.C. § 1114 .................................................................................................... 27

11 U.S.C. § 503(b) ................................................................................................. 29

11 U.S.C. § 552(b) ................................................................................................. 30

**RULES**

Local Rule 4001-2 ............................................................................................ passim

DOCS_SF:101743.5 07982/002

The Official Committee of Unsecured Creditors (the "Committee") of Barneys

New York, Inc., *et al.*, the above-captioned debtors and debtors in possession (collectively, the

"Debtors"), hereby files this objection (this "Objection")[1] to the entry of a *Final Order Pursuant*

*to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9104 (i)*

*Authorizing Debtors and Debtors-in-Possession to Obtain Post-Petition Financing, (ii) Granting*

*Liens and Super-Priority Claims, (iii) Authorizing Payment of Prepetition Secured Obligations,*

*(iv) Granting Adequate Protection to Prepetition Secured Parties, (v) Modifying the Automatic*

*Stay, and (vi) Granting Related Relief* (the "Proposed Final Order"),[2] pending the resolution of

the objections set forth herein.  The Committee is currently conducting discovery with respect to

the DIP Facility (as defined below) and reserves all rights to amend or supplement this Objection

as necessary.  For now, in support of this Objection, the Committee respectfully states as

follows:

## Introduction

1.      The Committee consists of the Debtors' major trade vendors, landlords,

and a union.  The members of the Committee represent all of the people and businesses that have

done business with Barney's and hope to continue to do business with Barney's in the future –

their own businesses, livelihoods, and families depend on the future of Barney's.  This fact is

driving the overarching goal of the Committee in these cases, which quite simply is to have

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Second Interim Order (as defined below).

[2]  The Committee was not provided with a form of Proposed Final Order until August 29, 2019, and reserves all rights with respect thereto.  For purposes herein, the Committee has assumed that the Proposed Final Order follows along with the provisions of the Second Interim Order.

1

Barney's survive as a going concern retailer that is well-capitalized and with the maximum

possible physical footprint.  The Committee appreciates that the Debtors desperately need rescue

financing given the liquidity crises that the Debtors have endured over this past year.

Unfortunately, the rescue financing that the Debtors have proposed mostly consists of "smoke

and mirrors" with insufficient fresh capital to conduct a fulsome sale process or even to replenish

inventory in the ordinary course, and excessive fees that will quickly swallow any benefit of such

financing to these estates.  The Debtors need a true lifeline and not a lead balloon that will only

serve to weigh down the possibility of a going concern sale.  In the end, the most likely outcome

here under the proposed rescue financing is a forced liquidation of the Debtors and their valuable

intellectual property – something that the Committee (and hopefully the Debtors) want to avoid.

The Committee believes that a financing package with appropriate market terms will increase the

chances of a successful going concern sale to preserve this iconic company.  The Committee has

been ready and willing to consider a consensual resolution of these difficult issues and will

continue to endeavor to reach a settlement with the Debtors and the DIP Lenders.

    2.  As currently proposed, the Debtors seek approval of up to $217 million in

debtor in possession financing (the "DIP Facility") (all of which is now available on an interim

basis) from Brigade Capital Management, LP, B. Riley Financial, Inc., and GACP Finance Co.,

LLC, directly or through their affiliates (together, the "DIP Lenders"), with GACP Finance as

administrative agent.  The DIP Facility is primarily a refinancing or roll-up of the Debtors'

prepetition secured debt owed to the Prepetition Lenders (as defined below) in the aggregate

principal amount of approximately $192 million (without any evidence that such prepetition debt

2

is oversecured),[3] plus payment of various fees and interest.  The Committee estimates that only $14.9 million of actual new money advances (net of fees) will be available to the Debtors under the DIP Facility, which is not enough liquidity for the Debtors to even replenish inventory in the ordinary course and could lead to administrative insolvency.  In consideration of this modest amount of fresh capital, the DIP Facility requires the Debtors to incur an astounding amount of fees, including ***perhaps the most egregious and value-depleting "Enhancement Fee" that the Committee's professionals, who collectively have more than a century of experience, have ever seen***.  In addition to a commitment fee of 5%, a monthly fee of $100,000, an exit fee of 5%, and high annual interest rates, all of which total approximately $12.6 million over a three-month period and will yield a generous ***32.8% annualized rate of return***, the DIP Lenders, subject to entry of the Proposed Final Order, seek 37.5% of all net proceeds (after payment of secured, administrative, and priority claims) generated by the Debtors' estates from a sale of their assets, whether that be through a going concern or liquidation sale.[4]  Such "Enhancement Fee" is payable only after the DIP Facility has been paid in full, inclusive of the refinanced Prepetition ABL & Term Loan Facility (as defined below) and various other exorbitant fees and interest charges.  In other words, when the DIP Lenders are fully paid after making a ***32.8% annualized return*** and there is no more secured, administrative, or priority debt, they want 37.5% of the

---

[3]  The Committee reserves all rights to argue at the appropriate time that the Prepetition Lenders were undersecured as of the Petition Date (as defined below) and, as such, the DIP Facility should be partially unwound and all amounts disgorged by the Prepetition Lenders to the extent of such undercollateralization.

[4]  The Committee recognizes that the Enhancement Fee sought by the DIP Lenders is less than the original 50% enhancement fee sought by Hilco Global and Gordon Brothers, as reflected in the Debtors' Original DIP Motion (as defined below), but such reduced fee does not make it any more palatable from the Committee's perspective.  If the DIP Lenders seek a form of equity interest, then they should forego the high interest rates and fees under the DIP Facility that are already at the top of the market and are designed to protect them for the standard risks associated with lending to a debtor in possession.

remaining value of these estates. That is not market and it would have the further adverse effect

of chilling the bidding on the Debtors' assets. The Enhancement Fee also cannot be justified on

account of the DIP Lenders' risk because it is payable only *after* the DIP Facility, inclusive of

approximately $12.6 million of fees and interest charged thereunder, and all other administrative

and priority claims have been paid in full. The Enhancement Fee is an outrageous and offensive

"profit" or "participation" interest that is designed to take unfair and undue advantage of the

Debtors at the expense of general unsecured creditors.

        3.     The Committee also objects to the grant of cross-collateralizing liens on

unencumbered assets, such as commercial tort claims, certain potentially valuable leaseholds,

avoidance claims, liquor licenses, and the proceeds thereof (together, the "Unencumbered

Assets"), which would primarily secure the $192 million of refinanced obligations under the

Prepetition ABL & Term Loan Facility. At least with respect to this refinanced debt (which

remains subject to challenge and possible disgorgement), the Unencumbered Assets should

remain unencumbered and free of the DIP Lenders' superpriority claims. Further, the Debtors'

assets should be marshaled such that the DIP Lenders are only permitted to turn to the

Unencumbered Assets to the extent that their new money claims up to $14.9 million (net of fees)

are not otherwise satisfied from the proceeds of other assets that constitute the DIP Collateral (as

defined in the Second Interim Order). In this way, the Unencumbered Assets will be preserved

primarily for the benefit of unsecured creditors.

        4.     The Challenge Period Termination Date (as defined in the Second Interim

Order) of September 4, 2019, with respect to the Prepetition ABL & Term Loan Facility, is

unreasonably short and substantially less than the sixty (60) days after entry of the final order

provided under Local Rule 4001-2(g)(4), and the investigation budget of $25,000 provided for

the Committee's professionals is ridiculously small.  The DIP Lenders chose to step into this

case and to refinance the Debtors' prepetition secured debt.  The DIP Lenders now have to wait

for a reasonable period of time for the Committee to conclude its investigation of the prepetition

liens and claims of the Prepetition Lenders.  There is also no urgency here that would necessitate

an extremely short challenge deadline.  The DIP Lenders are not about to sponsor a chapter 11

plan for the Debtors, and stalking horse bids are not due until October 22, 2019.  Further, the

Committee must have an adequate budget to fulfill its statutory duties, including no less than

$200,000 to conduct its investigation.  To the extent that the Debtors' professionals have the

benefit of a Carve Out that is uncapped by any budget, the Committee's professionals should

have the same right.  The Carve Out must also expressly include expenses of the members of the

Committee.  And the Committee should be granted standing to pursue any and all available

claims that are within the scope of a Challenge Proceeding (as defined in the Second Interim

Order), especially given that the Debtors have already stipulated that there are no claims against

the Prepetition Lenders and their liens are valid and perfected.  Along these lines, the Proposed

Final Order needs to include language reserving this Court's authority to disgorge amounts paid

to the Prepetition Lenders as part of the refinancing of the Prepetition ABL & Term Loan

Facility and to unwind the DIP Facility to the extent of a successful challenge to the liens or

claims of the Prepetition Lenders or a determination that such lenders were undersecured as of

the Petition Date.  *See* Local Rule 4001-2(g)(5).

5

5.      Finally, the Debtors' estates should retain all available section 506(c) surcharge rights, section 552(b) "equities of the case" rights, and marshalling rights against the DIP Lenders and the Prepetition Lenders until such time that all administrative expenses have been paid or adequately provided for, including any unpaid postpetition "stub" rent and claims arising under section 503(b)(9) of the Bankruptcy Code.

6.      In sum, the Debtors entered these cases with little, if any, leverage in negotiations with their existing Prepetition Lenders or new DIP Lenders.  The Debtors literally found themselves at the mercy of lenders who have become increasingly aggressive in their "asks" – from shortened sale timelines, excessive fees, large reserves, tight covenants, hair trigger defaults, and so on.  Now, we have seen a next level of "ask" for over one-third of the general unsecured creditors' recovery – a truly unprecedented demand.  As this Court is well aware, chapter 11 was designed to give distressed companies a "breathing spell" to try to reorganize and to save businesses, jobs, a customer for vendors, and a tenant for landlords. Filing chapter 11 is often described as seeking bankruptcy "protection."  If ever there was a debtor in need of protection right now, it is Barney's, a viable, iconic business that entered chapter 11 to revive itself.  That chance should not be quashed right out of the gate by overreaching and predatory DIP Lenders who see no realistic limit to what they can ask from a company in distress.  Why stop at 37.5%?  Why not 95%?

7.      For these reasons and those set forth below, the Committee asks this Court to intercede to protect the debtors in possession and unsecured creditors from this kind of offensive over-reach.  The Committee requests that this Court deny final approval of the DIP

6

Facility and entry of the Proposed Final Order without the modifications necessary to address the Committee's objections herein.

## **Factual Background**

### A.    **General Background**

8.      On August 6, 2019 (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case with this Court under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

9.      On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors and Debtors in Possession to Obtain Junior Lien Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection to Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing and (G) Granting Related Relief* [Docket No. 20] (the "<u>Original DIP Motion</u>").  Pursuant to the Original DIP Motion, the Debtors sought approval of a debtor-in-possession financing facility with Hilco Global and Gordon Brothers that contemplated $75 million in total funding to be provided on a junior basis to the existing Prepetition ABL & Term Loan Facility, of which $50 million would be utilized to pay-down the existing prepetition obligations.

10.      Prior to the "first day" hearing on August 6, 2019, the Debtors decided to shift to the alternative $217 million DIP Facility to be provided by the DIP Lenders.  Under this

7

DIP Facility, the DIP Lenders were prepared to advance $75 million upon entry of an interim

order, with the remaining $142 million to be funded upon entry of a further interim order.  On

August 7, 2019, this Court entered its *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362,*

*363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9104 (i) Authorizing Debtors and*

*Debtors in Possession to Obtain Junior Lien Post-Petition Financing, (ii) Authorizing Use of*

*Cash Collateral, (iii) Granting Liens and Super-Priority Claims, (iv) Granting Adequate*

*Protection to Prepetition Secured Parties, (v) Modifying the Automatic Stay, (vi) Scheduling a*

*Final Hearing and (vii) Granting Related Relief* [Docket No. 49] (the "Original Interim Order").

11.     On August 9, 2019, the Debtors filed the *Debtors' Motion for Entry of an*

*Amended Interim DIP Order on Shortened Notice* [Docket No. 89] (the "Amended DIP

Motion").  Pursuant to the Amended DIP Motion, the Debtors sought entry of a second interim

order amending the Original Interim Order, approving the definitive terms of the DIP Facility,

and authorizing all borrowings thereunder up to $217 million.

12.     On August 15, 2019, this Court entered its *Second Interim Order Pursuant*

*to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9104*

*(i) Authorizing Debtors and Debtors-in-Possession to Obtain Post-Petition Financing,*

*(ii) Granting Liens and Super-Priority Claims, (iii) Authorizing Payment of Prepetition Secured*

*Obligations, (iv) Granting Adequate Protection to Prepetition Secured Parties, (v) Modifying the*

*Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief* [Docket No.

127] (the "Second Interim Order").  Pursuant to the Second Interim Order, the Debtors were

authorized to borrow the full $217 million in availability under the DIP Facility, including the

refinancing of the Prepetition ABL & Term Loan Facility. The payoff of the Prepetition ABL & Term Loan Facility has closed.

13.     Also on August 15, 2019, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 131]. The Committee consists of the following seven (7) members: (i) Simon Property Group, L.P., (ii) Flagship 660 Owner LLC & Flagship Partners II LLC, (iii) PRADA USA Corp., (iv) New York-New Jersey Regional Joint Board, affiliated with Workers United, (v) Hilldun Corporation, (vi) Chloe, a division of Richemont North America, Inc., and (vii) CSS Building Services.

14.     Since the Petition Date, the Debtors have closed all but seven (7) of their retail stores and are engaged in a going concern sale effort that is expected to last approximately three (3) months. If no buyer emerges for the Debtors' remaining business by October 22, 2019, the Debtors are required under the DIP Facility to flip to a full-scale liquidation sale of their assets.

15.     The final hearing on the Amended DIP Motion and to consider entry of the Proposed Final Order is currently set for hearing before this Court on September 4, 2019.

## B.     **Prepetition Funded Indebtedness**

### i     *ABL Facility*

16.     The Debtors are party to that certain *Amended and Restated Revolving Credit and Term Loan Facility Agreement*, dated as of June 5, 2012 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Credit Agreement") by and among Barney's Inc., as lead borrower, the remaining Debtors as guarantor

9

parties thereto, the lenders thereto (the "ABL Lenders"), and Wells Fargo Bank, National

Association, as administrative agent (in such capacities, together with its successors and assigns,

the "ABL Agent").  The Credit Agreement provides for a $225 million asset-based lending

facility (the "ABL Facility"), subject to a borrowing base composed primarily of inventory and

credit card receivables, with a maturity date of December 19, 2023.

      17.     The ABL Facility provides for LIBOR loans and Base Rate loans (each as

defined in the Credit Agreement).  The LIBOR loans bear interest at LIBOR plus an applicable

margin of (a) 2.00% if the Quarterly Average Excess Availability (as defined in the Credit

Agreement) exceeds $100,000,000 or (b) 2.25% if the Quarterly Average Excess Availability is

equal to or less than $100,000,000.  The Debtors may elect interest periods with respect to the

LIBOR loans; *provided* that interest payments under these loans occur at least every three

months.  The Base Rate loans bear interest at a Base Rate plus an applicable margin of (x) 1.00%

if the Quarterly Average Excess Availability exceeds $100,000,000 or (y) 1.25% if the Quarterly

Average Excess Availability is $100,000,000 or less.

      18.     According to the Debtors, the obligations under the ABL Facility are

secured by an all asset lien, including, without limitation, a first priority lien on the Debtors'

accounts (including receivables), inventory, deposit accounts, security accounts, cash and cash

equivalents, intellectual property, and all equity interests of the Debtors and their subsidiaries

(collectively, the "Prepetition Collateral").

      19.     As set forth in the Second Interim Order at ¶ 6(b)(i), the Debtors have

stipulated that, as of the Petition Date, the aggregate principal amount outstanding under the

ABL Facility was $121,307,911.10, *plus* letters of credit in the approximate stated amount of not less than $20,571,590.02, together with accrued and unpaid interest, any fees, expenses, and disbursements.

      ii    *Term Loan Facility*

      20.    About four months ago, in April 2019, the Credit Agreement was amended to provide for the issuance of a last-out term loan (the "Term Loan Facility") with Barney's, Inc., as borrower, the remaining Debtors as guarantor parties thereto, the lenders thereto (the "Term Loan Lenders"), and Wells Fargo Bank, National Association, as administrative agent. The Term Loan Facility was for a loan in an original principal amount of $50 million, with a maturity date of December 19, 2023. Obligations to the Term Loan Lenders under the Term Loan Facility are secured by the same Collateral as the ABL Facility. The ABL Facility and the Term Loan Facility are together referenced herein as the "Prepetition ABL & Term Loan Facility." The ABL Lenders and the Term Loan Lenders are together referenced herein as the "Prepetition Lenders."

      21.    The LIBOR loans bear interest at LIBOR plus 7.00%, and the Base Rate loans bear interest at Base Rate plus 6.00%. Interest on the Term Loan Facility is due on the first calendar day of each month. Upon an Event of Default and notice to the ABL Agent by the Requisite Lenders (as defined in the Credit Agreement) or upon an acceleration of the obligations in connection with an exercise of remedies under the Credit Agreement, the Term Loan Facility payments are subordinate to payment to the ABL Lenders until the ABL Facility

11

obligations are paid in full (other than Bank Products Obligations (as defined in the Credit Agreement) in excess of a $5 million cap).

22.    As set forth in the Second Interim Order at ¶ 6(b)(ii), the Debtors have stipulated that, as of the Petition Date, the aggregate principal amount outstanding under the Term Loan Facility was $50,212,500, together with accrued and unpaid interest, any fees, expenses, and disbursements.

## C.    The Proposed Final Order / DIP Facility

23.    Through the Amended DIP Motion, the Debtors sought, and obtained on an interim basis, approval of the DIP Facility in an amount up to $217 million, of which the sum of approximately $192 million was utilized to refinance the Prepetition ABL & Term Loan Facility.  None of the DIP Lenders – Brigade Capital Management, LP, B. Riley Financial, Inc., and GACP Finance Co., LLC – were parties to the Prepetition ABL & Term Loan Facility.

24.    The DIP Facility has four (4) different tranches of debt:  Tranche A in the amount of $75 million (the initial interim advance), Tranche B-1 in the amount of $71 million, Tranche B-2 in the amount of $50 million, and the remaining $21 million in Tranche C.

### The Cost of the DIP

25.    The DIP Facility bears interest according to the applicable tranche of debt:

Tranche A.  LIBOR[5] plus 12% per annum

Tranche B-1.  LIBOR plus 7.70% per annum

Tranche B-2.  LIBOR plus 2.25% per annum.

---

[5] There is no LIBOR floor rate under the DIP Facility.

Tranche C.  Accrues interest at a rate tied to the accrual of fees on letters of credit depending on whether they are cash collateralized.  Following a draw on a letter of credit that is cash collateralized with Tranche C proceeds, the obligation will accrue interest at 2.25% per annum.

26.    In addition to the foregoing interest charges, the DIP facility imposes the following fees on the Debtors' estates:

Facility Fee.  $3.75 million, 5% of Tranche A (which is $75 million).

Weekly Fee.  $100,000 per week so long as Tranche B or Tranche C remain outstanding.

Exit Fee.  $3.75 million, 5% of amounts outstanding under Tranche A (which is $75 million).

27.    The DIP Facility also contemplates a consignment facility to be provided by the DIP Lenders that would accrue interest at 7% per annum on the cost of financed consignment inventory.  The consignment facility has a work fee of $100,000 per week. Inventory purchased through the consignment facility will not constitute assets of the Debtors' estates until sold, pending payment of all applicable fees to the DIP Lenders.

28.    Collectively, the above interest and fees will generate approximately $12.6 million over a period of three (3) months and yield an annualized return of 32.8% to the DIP Lenders.  But this return on the DIP Lenders' investment is not enough for them.  They also want an "Enhancement Fee" equal to *37.5% of the amount of any sale proceeds* remaining *after* full satisfaction of the DIP Facility (inclusive of $192 million of obligations under the Prepetition ABL & Term Loan Facility), and payment of allowed administrative expenses and priority claims.  *See* Second Interim Order at ¶ 16.  With the Enhancement Fee in place, the DIP Lenders

have all the upside, while their downside risk is covered by the various other expensive fees and

interest charges payable to them under the DIP Facility.

29.     Hence, in the event that sale proceeds do not exceed the secured,

administrative, and priority claims in the case, the DIP Lenders will be getting a return for their

risk at the highest end of market.  Alternatively, in the event that sale proceeds are sufficient to

repay the secured, administrative, and priority claims in the case, the DIP Lenders will recover

the Enhancement Fee, which is a "profit" or "participation" share that is not merely at the high

end of market, but rather shocks the conscience and substantially depletes value beyond the risk

of a typical DIP loan.

30.     Other salient terms of the DIP Facility and the Proposed Final Order

include the following:

a)     <u>Stipulations, Waivers, Acknowledgments, Releases</u>:  The Debtors

will make various broad-ranging stipulations, waivers, and acknowledgments, including releases

of claims, subject to the Committee's challenge rights, regarding (a) the amount and nature of the

obligations under the Prepetition ABL & Term Loan Facility; (b) the validity, enforceability, and

priority of the interests of the Prepetition Lenders in the Prepetition Collateral; and (c) the lack of

any viable estate claims or defenses with respect to the Prepetition ABL & Term Loan Facility.

*See* Second Interim Order at ¶ 6.

b)     <u>Challenge</u>.  The Committee and other parties in interest will face

an unreasonably short Challenge Period Termination Date (as defined in the Second Interim

Order) of ***5:00 p.m. Eastern time on September 4, 2019***, in order to commence a Challenge

Proceeding (as defined in the Second Interim Order).[6]  Further, at least five (5) business days

prior to filing a motion seeking standing to commence a Challenge Proceeding, the Committee or

any other party seeking to commence a Challenge Proceeding must provide a Challenge

Statement (as defined in the Second Interim Order) to the Prepetition Lenders detailing the

claims or objections that such party intends to assert.[7]  The parties shall thereafter meet and

confer for purposes of attempting to resolve any issues or claims asserted in the Challenge

Statement.  *See* Second Interim Order at ¶ 46-47.  Under this timetable and taking into account

the interceding Labor Day holiday, the Committee would have needed to complete its challenge

investigation with respect to the Prepetition ABL & Term Loan Facility and deliver its Challenge

Statement to the Prepetition Lenders by August 27, 2019, which is merely twelve (12) days after

the Committee was formed and the Second Interim Order was entered.[8]

       c)     <u>DIP Liens/Superpriority Claims on Unencumbered Assets</u>:  The

DIP Lenders would be granted DIP liens and superpriority claims on all assets of the Debtors,

including previously Unencumbered Assets such as commercial tort claims, certain potentially

valuable leaseholds, avoidance claims, liquor licenses, and the proceeds thereof.  *See* Second

Interim Order at ¶¶ 35, 37.  The Prepetition Lenders also would be granted replacement liens and

---

[6]  Despite the Committee's request to extend the Challenge Period Termination Date to sixty (60) days following the Committee's formation, the DIP Lenders have not agreed to do so as yet.

[7]  The Second Interim Order also contains a deadline of ten (10) calendar days prior to the Challenge Period Termination Date (*i.e.*, Sunday, August 25, 2019) for the Committee or any other party in interest to make a formal request to the Prepetition Lenders for any information validating their prepetition liens and claims.

[8]  By contrast, the Original Interim Order contained a typical Challenge Period Expiration Date of the later of (x) for any committee, sixty (60) days from the date of entry of the Final Order, or (y) for any party-in-interest other than an official committee, seventy-five (75) days from the Petition Date.

superpriority claims payable from the DIP Collateral to the extent of any diminution in value tied

to potential indemnity claims that may arise in the future.  *See* Second Interim Order at ¶ 11.

d)    <u>Carve Out</u>:  In a patently discriminatory fashion, although the

Debtors' professional fees are *uncapped* by the Approved Budget, the Committee's professional

fees would be *capped* at the amount set forth in the Approved Budget, which amount remains

subject to negotiation.[9]  *See* Second Interim Order at ¶ 53.

e)    <u>Investigation Budget</u>:  Only up to $25,000 of the DIP Facility and

the DIP Collateral would be available to the Committee to fund an investigation into the

prepetition liens and claims of the Prepetition Lenders, and none of the Carve Out could be used

to challenge such lenders' liens or claims or to assert any affirmative claims against them.  *See*

Second Interim Order at ¶ 59.

f)    <u>Section 506(c) / Marshalling / Equities of the Case Waivers</u>:  The

DIP Lenders would be granted waivers that would insulate them from (i) any surcharge rights

that the Debtors' estates may have under section 506(c) of the Bankruptcy Code for the cost of

preserving the Prepetition Collateral or the DIP Collateral, (ii) application of the equitable

remedy of marshalling, and (iii) the "equities of the case" exception under section 552(b) of the

Bankruptcy Code, in each case with respect to the proceeds of any of the Prepetition Collateral

or the DIP Collateral.  *See* Second Interim Order at ¶¶ 29, 78, 79.

g)    <u>Credit Bidding</u>:  The DIP Lenders would be granted automatic

rights to credit bid their claims, inclusive of the Enhancement Fee, during the sale of all or

---

[9]  The Approved Budget filed following entry of the Second Interim Order at Docket No. 129 contains no
breakdown for Committee fees.

substantially all of the Debtors' assets, including in a sale under section 363 of the Bankruptcy

Code or as part of a plan. *See* Second Interim Order at ¶ 17. It is not entirely clear how the

Enhancement Fee is supposed to be calculated for purposes of a credit bid when the amount of

administrative and priority claims has yet to be determined and such fee is based on 37.5% of

excess proceeds that also have yet to be determined.

        h)    <u>Milestones</u>: The DIP Facility would be subject to the following

milestones:

| EVENT | DEADLINE[10] |
|---|---|
| Store closing/sale motion | Filed by August 9, 2019 |
| Order approving store closing motion | Entered by August 16, 2019 |
| Bid procedures order | Entered by August 27, 2019 |
| Final DIP order | Entered by September 5, 2019 |
| Deadline for qualified bid to pay in full the DIP obligations | October 22, 2019<br>*(if this condition is not met, the Debtors would immediately commence a full liquidation of their assets)* |
| Sale order | Entered by October 31, 2019 |
| Sale closing | November 24, 2019 |

## Objections to DIP Facility and Proposed Final Order

       31.    The Committee's objections to the terms of the DIP Facility and the

Proposed Final Order are set forth below.

---

[10] As modified by the bid procedures order entered by this Court on August 22, 2019 [Docket No. 156].

A.     **The DIP Facility Should Not Be Approved in Its Current Form Because It Primarily Benefits the Prepetition Lenders and DIP Lenders at the Expense of These Estates.**

32.     Any proposed financing must be "fair, reasonable, and adequate." *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).  Additionally, a financing proposal that contemplates a delegation or compromise of the debtor's fiduciary responsibilities is especially problematic.  *See In re Chief Executive Officers Clubs*, 359 B.R. 527, 540 n.6 (Bankr. S.D.N.Y. 2007) (a debtor cannot excuse its fiduciary duties to its chapter 11 estate and its creditors for the sake of prompt DIP financing); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (agreements requiring a debtor to breach its fiduciary duties are illegal under the Bankruptcy Code and applicable state law); *In re Tenney Village Co.*, 104 B.R. 562, 569 (Bankr. D.N.H. 1989) (denying approval of proposed debtor-in-possession financing that was so onerous as to violate the debtors' fiduciary obligations to the estate); *In re Roblin Indus.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying approval of proposed debtor-in-possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties).

33.     Here, the Debtors are the victims of an overpriced and predatory DIP Facility that would require the estates to incur millions of dollars of fees and interest charges, while pledging away their unencumbered assets and literally "gifting" 37.5% of any remaining estate assets that otherwise would be available to general unsecured creditors.  All this in consideration for a mere $14.9 million in actual new money advances (net of fees) to fund a going concern sale process for the Debtors' remaining seven (7) stores over a period of three (3)

months.  Such limited new money will not provide enough liquidity to even allow the Debtors to

replenish inventory in the ordinary course and may leave the Debtors administratively insolvent.

34.    The Court should approve a proposed debtor-in-possession financing only

if such financing "is in the best interest of the general creditor body." *Roblin*, 52 B.R. at 244

(citing *In re Texlon Corp.*, 596 F.2d 1092, 1098-99 (2d Cir. 1979) and *In re Vanguard*

*Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also Tenney Village*, 104 B.R.

at 569  ("The Debtor's pervading obligation is to the Bankruptcy estate and, derivatively, to the

creditors who are its principal beneficiaries.").  Postpetition financing should not be authorized if

its primary purpose is to benefit or improve the position of a particular secured lender.  *See, e.g.,*

*In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be

approved when it is sought for the primary benefit of a party other than the debtor"); *Tenney*

*Village*, 104 B.R. at 568 (debtor-in-possession financing terms must not "pervert the

reorganizational process from one designed to accommodate all classes of creditors and equity

interests to one specially crafted for the benefit of [the secured creditor]").  Indeed, the law has

long acknowledged the unequal bargaining power inherent in negotiations leading to proposed

postpetition financing, as well as the very significant harm that can befall creditors if the

proposed lender is permitted to exploit its position.  *See, e.g., In re FCX, Inc.*, 54 B.R. 833, 838

(Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in

which the debtor, acting out of desperation, has compromised the rights of unsecured

creditors.").

35.     The Committee respectfully submits that the DIP Facility here is primarily

for the benefit of the Prepetition Lenders and the DIP Lenders.  Through the DIP Facility and

without any evidence that the Prepetition Lenders are oversecured,[11] the Prepetition ABL &

Term Loan Facility in the aggregate principal amount of $192 million is repaid in full, subject to

any potential indemnity claims that may arise, and the Prepetition Lenders receive broad-ranging

estate releases as part of an unreasonably short challenge deadline of September 4, 2019.  At the

same time, the DIP Lenders, who are otherwise new to the Debtors, enjoy the fruits of an

unjustifiably expensive DIP Facility that includes approximately $12.6 million in fees and

interest over a period of only three (3) months, plus an unprecedented Enhancement Fee that lops

off another 37.5% of value that would otherwise be available to general unsecured creditors.

36.     ***The Enhancement Fee is perhaps the most over-reaching and

prejudicial fee that the Committee's professionals have ever encountered.***  The Enhancement

Fee is unnecessary, unreasonable, and the farthest thing possible from a market-based standard

fee.  Indeed, the Debtors have offered no evidence that a fee of this type has been approved in

any other recent chapter 11 case in this or any other District.  In *In re Atari, Inc.*, the one case in

this District that the Committee's professionals have been able to find in which a contingent exit

fee was proposed on behalf of a DIP lender (the fee was based on a sliding scale tied to net sale

proceeds), Judge James Peck remarked that such DIP loan was "the single-most horrific term

sheet for a DIP I have ever seen, is not market standard, and is something that even if there had

---

[11]  The Committee reserves all rights to argue at the appropriate time that the Prepetition Lenders were undersecured and, as such, the DIP Facility should be unwound and all amounts disgorged to the extent of such undercollateralization.

been no objections, I would never approve." *In re Atari, Inc.*, Transcript of First Day Hearings,

Case No. 13-10176 (JMP), at 7, ln. 15-18 (Bankr. S.D.N.Y. January 24, 2013), attached hereto as

**Exhibit 1**.  In *Atari*, the initial fee-laden DIP proposal was replaced with an alternative proposal

from a different lender with minimal fees, so Judge Peck ultimately was not required to decide

the issue.

37.    In support of the Enhancement Fee here, the Committee has been referred

to one published decision, *In re Defender Drug Stores*, 145 B.R. 312 (B.A.P. 9th Cir. 1992).  In

that case, as a condition for extending the maturity date of postpetition financing to allow the

debtor to conduct a going concern sale (in lieu of foreclosure), the debtor agreed to pay the DIP

lender a 10% contingent enhancement fee over and above the amount of its indebtedness.  *Id*. at

313.  The enhancement fee consisted of an additional payment equal to ten percent (10%) of the

gross consideration received and/or realized by the debtor or its estate in excess of the amount

necessary to repay the existing DIP loan.  *Id*. at 314.  Hence, unlike the instant case, the

enhancement fee in *Defender Drug Stores* only came into existence because the debtor wanted

additional time to sell its assets *after the debtor had already defaulted on its DIP financing*.

Under those circumstances, the bankruptcy court concluded that the fee was appropriate for the

risk involved to the lender associated with delaying its foreclosure rights and was not a penalty

or otherwise an unreasonable cost of financing.  *Id*.  The fee was necessary to provide the debtor

with an opportunity to conduct an orderly sale.  On appeal, the court considered only whether the

bankruptcy court had the legal authority to approve the fee.  *Id*. at 315-316.  Without delving into

DOCS_SF:101743.5 07982/002

the reasonableness of the fee, the appellate court concluded that the bankruptcy court had the authority to approve the fee under section 364 of the Bankruptcy Code. *Id.* at 318.

38.     The enhancement fee in *Defender Drug Stores* is easily distinguishable from the case at hand. <u>First</u>, the enhancement fee in that case did not arise until ***after*** the debtor defaulted on its DIP financing. The lender agreed to provide an accommodation to the debtor by extending the maturity date and the parties negotiated some upside for the lender in order to make that deal. By contrast, in the instant case, the DIP Lenders want a huge slice of the upside in these cases as a commitment up-front, regardless of whether an event of default under the DIP Facility ever occurs. State another way, the fee in *Defender Drug Stores* was intended to compensate the lender for the risk associated with extending the maturity date; here, the Enhancement Fee is unconnected to any "risk" because it gets paid only after the DIP Lenders are paid in full, plus approximately $12.6 million in fees and interest over a mere three (3) month period. <u>Second</u>, the appellate court in *Defender Drug Stores* did not consider the reasonableness of the fee – only whether the bankruptcy court had the authority to approve such fee under section 364 of the Bankruptcy Code. Here, the Committee is not challenging this Court's authority under section 364 to approve the Enhancement Fee. Instead, the Committee submits that such fee is completely unreasonable under the circumstances and should not be approved because it will strip more than one-third of the excess value, if any, that may be available for general unsecured creditors in these cases. <u>Third</u>, the fee in *Defender Drug Stores* was 10% of the consideration received by the debtor from a sale. The DIP Lenders are looking for more than

3.7x that amount in these cases or, more specifically, the DIP Lenders are seeking 37.5% of the

net proceeds available after secured, administrative, and priority claimants have been paid.

39.     At its core, the DIP Facility, particularly as reflected in the Enhancement

Fee, is little more than a "gravy train" to enrich the DIP Lenders at the expense of the Debtors'

estates and their unsecured creditor constituents.  The Committee urges this Court to deny final

approval of the DIP Facility unless and until it is priced in a rational and market-appropriate

manner.

**B.**     **Unencumbered Assets Must Not Become Collateral for the DIP Lenders**
        **or Prepetition Lenders and Should Be Preserved for Unsecured Creditors.**

40.     Avoidance powers are intended to allow the debtor-in-possession to gain

recoveries for the benefit of all unsecured creditors.  *See Buncher Co. v. Official Comm. of*

*Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re*

*Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors

generally and promote equitable distribution among all creditors), *aff'd and rev'd, in part, on*

*other grounds*, 884 F.2d 1323 (10th Cir. 1989).  Further, bankruptcy courts across the country

routinely exclude unencumbered assets from the scope of adequate protection liens and

superpriority claims.  *See, e.g., In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG),

Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y. Sept. 14, 2018) (providing that adequate

protection liens only attach to prepetition collateral and further providing that adequate

protection claims cannot be paid out of the proceeds of avoidance actions); *In re The Weinstein*

*Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e)(Bankr. D.

Del. Apr. 19, 2018) (excluding avoidance actions and commercial tort claims from adequate

protection liens and claims); *In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No.

348 at ¶¶ 15, 18 (Bankr. E.D. Va. Feb. 15, 2019) (excluding avoidance actions, commercial tort

claims, and the proceeds thereof from adequate protection liens and claims); *In re Frank*

*Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c)

(Bankr. D. N.J. Jan. 28, 2019) (same); *In re Promise Healthcare Group, LLC*, Case No. 18-

12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec. 4, 2018) (excluding avoidance

actions and the proceeds thereof and commercial tort claims and the proceeds thereof, in part,

from adequate protection liens and claims); *In re SFX Entertainment, Inc.*, Case No. 16-10238

(MFW), Docket No. 203 at ¶ 11(a)(i)-(ii) (Bankr. D. Del. Mar. 8, 2016) (excluding avoidance

actions and the proceeds thereof from adequate protection liens and claims).

      41.    Yet, the Debtors propose to grant broad-reaching DIP liens, adequate

protection liens, and superpriority claims over their Unencumbered Assets in favor of the DIP

Lenders and, to the extent of any indemnity obligations, the Prepetition Lenders, so as to put

those secured parties ahead of the line for payment from previously unencumbered (or

underencumbered) sources.  To allow the Debtors, as fiduciaries, to effectively assign the

benefits of avoidance actions and other unencumbered estate assets and proceeds to a lender

rather than preserve them for the benefit of unsecured creditors turns bankruptcy law on its head.

*See Tenney Village*, 104 B.R. at 568 (debtor-in-possession financing terms must not "pervert the

reorganizational process from one designed to accommodate all classes of creditors and equity

interests to one specially crafted for the benefit" of the secured creditor).

42.    Particularly with respect to the $192 million of refinanced obligations

under the Prepetition ABL & Term Loan Facility, the Unencumbered Assets should remain

unencumbered and free of the DIP Lenders' liens and superpriority claims.  There is no basis to

cross-collateralize what is otherwise prepetition debt with Unencumbered Assets, including new

postpetition assets such as avoidance claims.  Further, the Debtors' assets should be marshaled

such that the DIP Lenders are only permitted to turn to the Unencumbered Assets to the extent

that their new money claims up to $14.9 million (net of fees) are not otherwise satisfied from the

proceeds of other assets that constitute the DIP Collateral (as defined in the Second Interim

Order).  In this way, the Unencumbered Assets can be preserved primarily for the benefit of

unsecured creditors.

## C.    The Challenge Deadline Must Be Extended, the Investigation Budget and Committee Carve Out Must Be Increased, and the Committee Must Be Granted Standing to Pursue All Available Claims Against the Prepetition Lenders.

43.    Under the proposed Final Order, the Committee and other parties in

interest will be subject to an unreasonably short Challenge Period Termination Date of *5:00 p.m.

Eastern time on September 4, 2019*, in order to commence a Challenge Proceeding.[12]  Further, at

least five (5) business days prior to filing a motion seeking standing to commence a Challenge

Proceeding, the Committee or any other party seeking to commence a Challenge Proceeding

must provide a Challenge Statement to the Prepetition Lenders detailing the claims or objections

that such party intends to assert.[13]  The parties shall thereafter meet and confer for purposes of

---

[12]  Despite the Committee's request to extend the Challenge Period Termination Date to sixty (60) days following the Committee's formation, the DIP Lenders have refused to do so as yet.

[13]  The Second Interim Order also contains a deadline of ten (10) calendar days prior to the Challenge Period Termination Date (*i.e.*, Sunday, August 25, 2019) for the Committee or any other party in interest to make a formal request to the Prepetition Lenders for any information validating their prepetition liens and claims.

25

attempting to resolve any issues or claims asserted in the Challenge Statement. *See* Second

Interim Order at ¶ 46-47. Under this timetable and taking into account the interceding Labor

Day holiday, the Committee would need to complete its challenge investigation with respect to

the Prepetition ABL & Term Loan Facility and deliver its Challenge Statement to the Prepetition

Lenders by August 27, 2019, which is merely twelve (12) days after the Committee was formed

and the Second Interim Order was entered.[14]

   44. There is no rational basis for the Proposed Final Order to impose a

Challenge Period Termination Date that is this short. The Committee needs a reasonable

opportunity of at least sixty (60) days from entry of a final order to fulfill its statutory duty of

analyzing the liens and claims under the Prepetition ABL & Term Loan Facility and any possible

defenses or affirmative claims arising therefrom. *See* Bankr. S.D.N.Y. Local Rule 4001-2(g)(4)

("[T]he committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code

shall have at least sixty (60) days from the date of entry of the final order authorizing the use of

cash collateral or the obtaining of credit (or such longer period as the Court orders for cause

shown before the expiration of such period) to investigate the facts and file a complaint or a

motion seeking authority to commence litigation as a representative of the estate"). There is also

no urgency here that would necessitate an extremely short challenge deadline. The DIP Lenders

are not about to sponsor a chapter 11 plan for the Debtors, and stalking horse bids are not due

until October 22, 2019.

---

[14] By contrast, the Original Interim Order contained a typical Challenge Period Expiration Date of the later of (x) for any committee, sixty (60) days from the date of entry of the Final Order, or (y) for any party-in-interest other than an official committee, seventy-five (75) days from the Petition Date.

45.     Much like an unreasonably short challenge deadline, an investigation budget of $25,000 in a case of this size and complexity hinders the Committee's ability to do its job.  If there needs to be any cap with respect to the Committee's investigation, the Committee submits that such cap must total no less than $200,000.  And there should be no discrimination with respect to the Committee's fees as part of the Carve Out.  To the extent that the Debtors' professionals are not limited to the amounts projected in the Approved Budget, then the Committee's professionals should not be so limited.  The Carve Out must also expressly include expenses of the members of the Committee.  Contrary to Local Rule, the Debtors provide no detailed explanation (and there can be no basis) for the disparate treatment of Committee professionals and the failure to include Committee member expenses in the Carve Out.  *See* Local Rule 4001-2(g)(11) ("If a provision relating to a carve-out provides disparate treatment for the professionals retained by a committee appointed under sections 1102 or 1114 of the Bankruptcy Code, when compared with the treatment for professionals retained by the trustee or debtor in possession, or if the carve-out does not include fees payable to either the Bankruptcy Court or the United States Trustee, reasonable expenses of committee members (excluding fees and expenses of professionals employed by such committee members individually), and reasonable post-conversion fees and expenses of a chapter 7 trustee, or if a carve-out does not include the costs of investigating whether any claims or causes of action against the lender exist, there shall be disclosure thereof under subdivision (a) of this Local Rule and the motion shall contain a detailed explanation of the reasons therefor.").

DOCS_SF:101743.5 07982/002

46.     Further, the Committee should be granted standing to pursue any available Challenge Proceeding.  Courts in this District have routinely granted standing to creditors' committees to pursue challenges and claims.  *See, e.g., In re Bearing Point, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. April 20, 2009), ECF No. 479 at 22 ("The Committee is hereby granted standing . . . without further motion seeking authority to bring such action and without further order of this Court."); *In re Lenox Sales, Inc*., No. 08-14679 (ALG) (Bankr. S.D.N.Y. Dec. 16, 2008), ECF No. 129 at 18 ("The Committee is hereby granted standing and the authority to file a Challenge . . . on behalf of the Debtors' estates . . . without further motion seeking authority to bring such action and without further order of this Court."); *In re Ciena Capital LLC*, No. 08-13783 (AJG) (Bankr. S.D.N.Y. Nov. 21, 2008), ECF No. 228 at 20 ("For the purpose of commencing a Challenge Action, the Committee shall specifically be granted standing to assert or commence any such adversary proceeding or contested matter").  Here, given the apparent short timing envisioned by the DIP Lenders and the Prepetition Lenders, there is no reason to require the Committee to go through the extra step of providing advance notice to the Prepetition Lenders through a Challenge Statement and then seeking standing from this Court to pursue those claims or objections that the Debtors have already stipulated away.

47.     Consistent with the foregoing, the Proposed Final Order must include language reserving this Court's authority to disgorge amounts paid to the Prepetition Lenders as part of the refinancing of the Prepetition ABL & Term Loan Facility and to unwind the DIP Facility to the extent of a successful challenge to the liens or claims of the Prepetition Lenders or a determination that such lenders were undersecured as of the Petition Date.  *See* Local Rule

4001-2(g)(5) ("A proposed order approving cross-collateralization or a rollup shall include

language that reserves the right of the Court to unwind or partially unwind, after notice and

hearing, the postpetition protection provided to the prepetition lender or the pay down of the

prepetition debt, whichever is applicable, in the event that there is a timely and successful

challenge to the validity, enforceability, extent, perfection or priority of the prepetition lender's

claims or liens, or a determination that the prepetition debt was undersecured as of the petition

date, and the cross-collateralization or rollup unduly advantaged the lender.").

**D.      The Estates Should Retain Section 506(c) Surcharge Rights,**
**        Section 552(b) "Equities of the Case" Rights, and Marshalling Rights.**

48.      There should be no waiver of the estates' section 506(c) surcharge claims

against the DIP Lenders and the Prepetition Lenders unless and until all costs of administering

these estates have been adequately provided for, including any unpaid postpetition "stub" rent

and claims arising under section 503(b)(9) of the Bankruptcy Code.  The elimination of the right

to surcharge under section 506(c) of the Bankruptcy Code increases the risk that the costs of the

bankruptcy will be borne by unsecured creditors, including administrative claimants, rather than

the secured creditors that already are the primary or sole beneficiaries of the process.  This result

contravenes the essential purpose of section 506(c).  *See Precision Steel Shearing v. Fremont*

*Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed

to prevent a windfall to the secured creditor . . . The rule understandably shifts to the secured

party . . . the costs of preserving or disposing of the secured party's collateral, which costs might

otherwise be paid from the unencumbered assets of the bankruptcy estate . . .") (citation

omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The

29

underlying rationale for charging a lienholder with the costs and expenses of preserving or

disposing of the secured collateral is that the general estate and unsecured creditors should not be

required to bear the cost of protecting what is not theirs.").  Indeed, courts have rejected the

waiver of surcharge rights under section 506(c) under similar circumstances.  *See, e.g., In re*

*Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition

financing agreement to the extent that the agreement purported to modify statutory rights and

obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under

section 506(c)).

       49.     The Debtors also propose that the "equities of the case" exception under

section 552(b) not apply to the Prepetition Lenders with respect to proceeds or profits of any of

the Prepetition Collateral.  The "equities of the case" exception in section 552(b) of the

Bankruptcy Code allows a debtor, committee, or other party in interest to exclude postpetition

proceeds from prepetition collateral on equitable grounds, including to avoid having

unencumbered assets fund the cost of a secured lender's foreclosure.  "'The purpose of the equity

exception is to prevent a secured creditor from reaping benefits from collateral that has

appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the

estate (which normally would go to general creditors) to cause the appreciated value.'"  *In re*

*Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit*

*Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D. Mich. 1989)).  There is no reason to waive

such rights here, especially given that there has been no evidence offered that the Prepetition

Lenders are oversecured.[15]  *See, e.g., In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL

2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to

waive prospectively an argument that other parties in interest may make.  If, in the event, the

Committee or any other party [in] interest argues that the equities of the case exception should

apply to curtail a particular lender's rights, the Court will consider it."); *Sprint Nextel Corp. v.*

*U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y.

2011) (request for section 552(b) waiver was premature because factual record not fully

developed).

      50.    Further, the Proposed Final Order would restrict this Court's ability to

implement equitable marshaling as to the DIP Lenders and the Prepetition Lenders.  Equitable

marshalling in these cases may be important in order to enable asset values to be maximized for

these estates.  *See Official Comm. v. Hudson United Bankr. (In re America's Hobby Center)*, 223

B.R. 275, 287 (Bankr. S.D.N.Y. 1998); *Ramette v. United States (In re Bame)*, 279 B.R. 833 (8th

Cir. B.A.P. 2002) (marshaling doctrine invoked against taxing authorities to benefit of estate's

unsecured creditors).  As noted above, the Debtors' assets should be marshaled such that the DIP

Lenders are only permitted to turn to the Unencumbered Assets to the extent that their new

money claims up to $14.9 million (net of fees) are not otherwise satisfied from the proceeds of

other assets that constitute the DIP Collateral (as defined in the Second Interim Order).  Such

marshaling relief has been granted in various bankruptcy courts across the country.  *See, e.g., In*

---

[15]  The Committee reserves all rights to argue at the appropriate time that the Prepetition Lenders were undersecured and, as such, the DIP Facility should be unwound and all amounts disgorged to the extent of such undercollateralization.

*re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), Docket No. 450 at ¶ 10(f) (Bankr.

S.D.N.Y. June 28, 2018); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808

(SLM), Docket No. 212 at ¶ 9 (Bankr. D. N.J. Jan. 28, 2019) ; *In re Westmoreland Coal Co.*,

Case No. 18-35672 (DRJ), Docket No. 520 at ¶ 37 (Bankr. S.D. Tex. Nov. 15, 2018); *In re*

*Samuel's Jewelers, Inc.*, Case No. 18-11818 (KJC), Docket No. 252 at ¶ 5 (Bankr. D. Del. Sept.

18, 2018); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No.

267 at ¶ 11(c) (Bankr. D. Del. Apr. 19, 2018); *In re The Bon-Ton Stores, Inc.*, Case No. 18-

10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. Mar. 12, 2018).

**E.    Other Miscellaneous Issues with the Proposed Final Order.**

51.    A few additional miscellaneous issues with the Proposed Final Order are

highlighted below:

a)    DIP Remedies.  The Committee (as opposed to the Debtors) should

not be limited in any way with respect to the issues that it may raise at a hearing before this

Court following the occurrence of a DIP Maturity Event or during the DIP Remedies Notice

Period.  *See* Second Interim Order at ¶ 62.

b)    Milestones.  The Committee is continuing to review the milestones

under the DIP Facility and reserves all rights with respect thereto.

c)    Credit Bidding.  The DIP Lenders should not have an unfettered

right to credit bid in the context of any sale of the Debtors' assets, especially with reference to

the Enhancement Fee.  Courts have previously recognized that "[c]redit bidding . . . is not an

absolute right [and] 'a court may deny a lender the right to credit bid in the interest of any policy

advanced by the Code, such as to ensure the success of reorganization or to foster a competitive bidding environment.'" *In re Free Lance-Star Publishing*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) (quoting *In re Philadelphia Newspapers*, 599 F.3d 298, 316 n.14 (3d Cir. 2010). Here, credit bidding with respect to the Enhancement Fee makes no sense when the amount of administrative and priority claims to be paid ahead of such fee has yet to be determined and such fee is based on 37.5% of excess proceeds that also have yet to be determined.

d)    <u>Budget Modifications</u>.  The Debtors should not be permitted to modify the Approved Budget without advance notice to the Committee.

e)    <u>Reporting</u>.  The Committee should concurrently receive the same information and reporting as to the Debtors' operations as the DIP Lenders and the Prepetition Lenders.

## <u>Reservation of Rights</u>

52.    As noted, the Committee is currently conducting discovery with respect to the DIP Facility.  The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Amended DIP Motion and the form of Proposed Final Order, and to introduce evidence prior to or at any hearing regarding the Amended DIP Motion in the event that the Committee's objections are not resolved prior to such hearing.

**Conclusion**

53.     For all of the foregoing reasons, the Committee respectfully requests that

the Court deny approval of the DIP Facility and the Proposed Final Order in the form presented,

pending the resolution of the objections raised by the Committee herein.

Dated:  August 30, 2019

*/s/ Bradford J. Sandler*
Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
John A. Morris, Esq.
Colin R. Robinson, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY  10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

## **Exhibit 1**

*In re Atari, Inc.*, Transcript of First Day Hearings,
Case No. 13-10176 (JMP) (Bankr. S.D.N.Y. January 24, 2013)

```
          UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK
 1
 2    ------------------------------------
      In re:                              Case No. 13-10176-jmp
 3         ATARI, INC. et al.             New York, New York
                                          January 24, 2013
 4                            Debtor.     10:39 a.m. - 12:13 p.m.
      ------------------------------------
 5
          TRANSCRIPT OF CHAPTER 11 MATTER, CASE 13-10176-JMP
 6      - ATARI, INC., ATARI INTERACTIVE, INC., HUMONGOUS, INC.,
             AND CALIFORNIA U.S. HOLDINGS, INC. -
 7
                     FIRST DAY HEARINGS
 8
                        (Proposed)
 9                       AGENDA

10    MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
      AN ORDER (I) DIRECTING JOINT ADMINISTRATION OF THE CHAPTER II
11    CASES   UNDER   FED.   R.   BANKR.P.   1015(B),   (II)  WAIVING
      REQUIREMENTS OF 11 U.S.C. § 342(C)(L), FED. R. BANKR. P. 1005
12    AND FED. R. BANKR. P. 2002(N), AND (III) AUTHORIZING THE
      DEBTORS TO FILE REQUIRED MONTHLY OPERATING REPORTS ON A
13    CONSOLIDATED BASIS [DOCKET NO. 2];

14    MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
      AN ORDER GRANTING THE DEBTORS ADDITIONAL TIME WITHIN WHICH TO
15    FILE SCHEDULES AND STATEMENTS [DOCKET NO. 4];

16    MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
      AN ORDER ESTABLISHING NOTICE AND SERVICE PROCEDURES [DOCKET
17    NO. 5];

18    MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
      AN ORDER (I) APPROVING THE FORM AND MANNER OF NOTICE OF THE
19    COMMENCEMENT OF THEIR CHAPTER II CASES, (II) AUTHORIZING THE
      DEBTORS TO PREPARE A CONSOLIDATED LIST OF CREDITORS IN LIEU
20    OF A MAILING MATRIX, AND (III) AUTHORIZING THE DEBTORS TO
      FILE A CONSOLIDATED LIST OF TOP 30 UNSECURED CREDITORS
21    [DOCKET NO. 6];

22    MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
      AN ORDER (I) PROHIBITING UTILITY COMPANIES FROM ALTERING,
23    REFUSING OR DISCONTINUING SERVICES TO, OR DISCRIMINATING
      AGAINST, THE DEBTORS ON ACCOUNT OF PREPETITION INVOICES; AND
24    (II) DETERMINING THAT THE UTILITY COMPANIES ARE ADEQUATELY
      ASSURED OF POST PETITION PAYMENT [DOCKET NO. 7]
25
```

```
 1                              AGENDA
                              (cont'd)
 2
        MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR INTERIM
 3      AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF EXISTING
        CASH MANAGEMENT SYSTEM, (II) AUTHORIZING CONTINUED USE OF
 4      EXISTING  BUSINESS  FORMS,  (III)  ACCORDING  ADMINISTRATIVE
        EXPENSE STATUS FOR INTERCOMPANY RECEIVABLES, (IV) WAIVING THE
 5      INVESTMENT AND DEPOSIT REQUIREMENTS OF SECTION 345 OF THE
        BANKRUPTCY CODE, AND (V) GRANTING CERTAIN RELATED RELIEF
 6      [DOCKET NO. 8];

 7      MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
        AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF
 8      CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS; AND (II)
        AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND
 9      PROCESS RELATED CHECKS AND TRANSFERS [DOCKET NO. 9];

10      MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
        INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, THE
11      DEBTORS TO MAINTAIN A PREPETITION INSURANCE PREMIUM FINANCE
        AGREEMENT [DOCKET NO. 10];
12
        MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
13      AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO
        PAY   PREPETITION   WAGES,   SALARIES   AND   BENEFITS,   (II)
14      AUTHORIZING,  BUT  NOT  DIRECTING,  THE  DEBTORS  TO  PAY
        PREPETITION PAYROLL TAXES, WITHHOLDINGS AND REIMBURSABLE
15      EXPENSES; (III) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS
        TO CONTINUE EMPLOYEE BENEFIT PROGRAMS ON A POST PETITION
16      BASIS; AND (IV) AUTHORIZING ALL FINANCIAL INSTITUTIONS TO
        HONOR ALL RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS
17      [DOCKET NO. 11];

18      (CORRECTED)  MOTION  OF  DEBTORS  AND  DEBTORS-IN-POSSESSION
19      PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507 AND FED.
        R. BANKR. P. 2002, 4001 AND 9014 FOR ENTRY OF INTERIM AND
20      FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO INCUR POST-
        PETITION SECURED INDEBTEDNESS, (II) GRANTING FIRST PRIORITY
21      PRIMING LIENS AND PROVIDING SUPER PRIORITY ADMINISTRATIVE
        EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV)
22      MODIFYING AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING
        [DOCKET NO. 17];
23
                    BEFORE THE HONORABLE JAMES M. PECK
24                    UNITED STATES BANKRUPTCY JUDGE

25
```

```
 1   A P P E A R A N C E S :

 2   For Debtors:              MICHAEL P. RICHMAN, ESQ.
                               PETER P. PARTEE, ESQ.
 3                             Hunton & Williams LLP
                               200 Park Avenue
 4                             New York, New York 10166-0091
                               (212) 309-1000; (212) 309-1100 fax
 5
     For DIP Lenders:          ROBERT G. BURNS, ESQ.
 6                             Bracewell & Giuliani
                               1251 Avenue of the Americas, 49th Fl.
 7                             New York, New York 10020-1104
                               (212) 508-6155; (800) 404-3970 fax
 8
     For Atari SA and          KEN COLEMAN, ESQ.
 9   Atari Europe SA:          Allen & Overy LLP
                               1221 Avenue of the Americas
10                             New York, New York 10020-1104
                               (212) 610-6300; (212) 610-6399 fax
11
     For Blue Bay:             SCOTT GREISSMAN, ESQ.
12                             White & Case LLP
                               1155 Avenue of the Americas
13                             New York, New York 10038-2787
                               (212) 819-8567; (212) 354-8113 fax
14
     For Tenor Capital         HUGH M. MCDONALD, ESQ.
15   Management Corp. LP:      SNR Denton US LLP
                               1221 Avenue of the Americas
16                             New York, New York 10020-1089
                               (212) 768-6876; (212) 768-6800 fax
17
     For the U.S. Trustee:     RICHARD CHARLES MORRISSEY, ESQ.
18                             33 Whitehall Street, 21st Floor
                               New York, New York 10004-2112
19                             (212) 510-0500; (212) 668-2255 fax

20   Transcriber:             AAA Electronic Sound Reporters
                               1133 Broadway, Suite 706
21                             New York, New York 10010
                               (888) 866-5135; (888) 677-6131 fax
22                             electronicsound@court-transcripts.net

23        (Proceedings recorded by electronic sound recording)

24

25
```

1        THE COURT:  Be seated, please.  Good morning.  Mr.

2   Partee, how are you?

3        MR. PARTEE:  Good morning, Your Honor.  I am exhausted

4   but fine and I first of all want to say, may it please the

5   Court, for the record I am Peter Partee from Hinton & Williams,

6   LLP.  To my right is Michael Richman at the counsel table, also

7   with me from Hinton & Williams, LLP.

8        MR. RICHMAN:  Good morning, Your Honor.

9        THE COURT:  Good morning.

10       MR. PARTEE:  And we are proposed lead counsel for the

11  debtors and debtors-in-possession in these Chapter 11 cases.

12  Your Honor, first and foremost let me say thank you for the

13  indulgences this morning with the additional time.  I know that

14  the Court's time is limited this morning and I believe it has

15  borne fruit.

16       What we would like to do, Your Honor, with the Court's

17  permission, is go through a little bit of background leading up

18  to the change in DIP facilities that we effectuated last night.

19  We are effectively going to be changing from Tenor Capital as

20  our DIP lender to Alden Capital as our DIP lender on

21  substantially the same but vastly improved terms.

22       THE COURT:  That's good.  I'm interested in knowing

23  about that sooner rather than later, so rather than --

24       MR. PARTEE:  Understood, Your Honor.

25       THE COURT:  -- rather than start in the ordinary way

1  which is to give me the deep background, of which I think I

2  already know from --

3          MR. PARTEE:  Fair enough.

4          THE COURT:  -- having read the materials, I'm most

5  interested in knowing what the new DIP terms look like and how

6  they compare and I would also like to have a chance to reflect

7  on them.  So, the sooner I have that, the better.

8          MR. PARTEE:  Absolutely, Your Honor.  And Your Honor

9  to that end, we do have a blackline of changes to the term

10 sheet, as well as a blackline of changes to the interim order

11 and a revised DIP budget to go along with that that we can hand

12 up at this time, if the Court would like to have them to review

13 as I go through the presentation.

14         THE COURT:  Sure.

15         MR. PARTEE:  We also have additional copies for

16 anybody who might be interested in the courtroom that hasn't

17 already received them with my paralegal on the end.  May I

18 approach, Your Honor?

19         THE COURT:  Sure.

20         MR. PARTEE:  Your Honor to characterize, first and

21 foremost, I think it's important to understand the process by

22 which all this occurred.  The company with -- essentially ran

23 into a liquidity crisis and that's explained in the first day

24 declaration commencing in early December therefore.  They

25 realized they would no longer be receiving financial support

1  from their publicly traded French parent and could no longer

2  move money within the consolidated corporate structure as and

3  where needed, as they previously had.

4          Therefore, the Atari U.S. subsidiaries, the four U.S.

5  subsidiaries were caught in a position where they had a finite

6  amount of money with which to find new financing and otherwise

7  solve on a more permanent basis their liquidity issues and those

8  liquidity issues historically had prevented them from fully

9  monetizing the historic gaming franchises that are owned by

10 Atari.  So this has been a continuing issue and it became acute

11 only in December when it became apparent no further funds would

12 be flowing from upstream from the French publicly traded parent.

13         As a result, the company went through a fairly

14 significant process, signed NDA's with a number of different DIP

15 lenders, gave due diligence deposits to two; Counsel RB Capital

16 and Tenor Capital, both of which went through due diligence.

17 Counsel RB Capital issued a commitment subject to due diligence

18 but it did not survive due diligence.  They did not make a final

19 offer.

20         As a result, the only offer of financing that the

21 debtors had available to them at the time they filed was the

22 Tenor Capital Management DIP.  That DIP gave the debtors exactly

23 the flexibility that they requested to effectively spend

24 approximately thirty days in bankruptcy, determining whether

25 there would be a stalking horse bidder for the company's assets

In re Atari, Inc. et al - 1/24/13                    7

1   or a plan sponsor, locking them up and commencing that process

2   and then having sufficient funds with which to complete that

3   process, whether it's a plan or a sale.

4           The Tenor Capital DIP on the downside was

5   extraordinarily expensive and that's obvious from the face of

6   it, Your Honor.  Multiple different kinds of fees, as well as a

7   contingent back-in exit fee that was a sliding scale of

8   percentages based upon the sale price -- the net sales proceeds.

9           THE COURT:  Has that term sheet, which I understand

10  became the model for what you're now going to be presenting with

11  Alden, been withdrawn?  Is it no longer an option or is the

12  Alden an alternative to a Tenor transaction which is available

13  if we lead to resort to such extraordinary and offensive terms?

14          MR. PARTEE:  Well, understood, Your Honor.  I --

15          THE COURT:  By the way, it is the single-most horrific

16  term sheet for a DIP I have ever seen, is not market standard,

17  and is something that even if there had been no objections, I

18  would never approve.

19          MR. PARTEE:  We suspected that might be the Court's

20  position, Your Honor, and again but for the fact that it was the

21  only game in town --

22          THE COURT:  Sometimes as I said to my clerks, rescue

23  financing that looks like this is not rescue financing at all.

24  The patient should die.

25          MR. PARTEE:  We understand that, Your Honor.  I'm sure

In re Atari, Inc. et al - 1/24/13                    8

1   to be candid that the employees at Atari and parties interested

2   in buying their assets substantially as a going concern perhaps

3   would disagree but fortunately, we're not presented with that

4   issue today.

5           THE COURT:  Good.

6           MR. PARTEE:  So, let's take it off the table.

7           THE COURT:  What I would really like to know is if the

8   Alden Global Distressed Opportunities Master Fund and Alden

9   Global Value Recovery Master Fund LP Turnpike, Ltd. --

10          MR. PARTEE:  I don't even know the name enough -- well

11  enough, Your Honor.  They surfaced last night at about 10

12  o'clock, so --

13          THE COURT:  I don't know if that's the right name.

14  I'm just reading the words I'm seeing on a page but I would like

15  to know what the terms are.

16          MR. PARTEE:  Yes, Your Honor.

17          THE COURT:  And I'm also concerned for notice purposes

18  that parties-in-interest have had an opportunity to examine and

19  react to these revised terms.

20          MR. PARTEE:  And, Your Honor, I think when we go

21  through them you'll understand that there probably is no notice

22  issue.  It's simply the Tenor DIP with absolutely no fees

23  whatsoever; none.  No origination.  No commitment.  No exit.  No

24  takeout, nothing; no fees at all.  So, it is a tremendous

25  improvement.  It is basically the Tenor DIP.  Instead of having

1   three tranches of two million, one million and a final two

2   million available upon the filing of a sale or plan, it's simply

3   two million up front and three million at final approval

4   availability, subject to a DIP budget with no fees at all.  It

5   is the first time in my career we've swung 180 degrees, Your

6   Honor, from perhaps the most expensive DIP that I've ever been

7   presented with to the least expensive DIP that I've ever been

8   presented with.

9          The quid pro quo, Your Honor, you might ask, why in

10   the world would a DIP lender do such a thing?  It raises the

11   question of motive; why -- what is their takeaway from this?

12          THE COURT:  Perhaps it's a charitable organization.

13          MR. PARTEE:  Well, perhaps so, Your Honor.  I doubt it

14   for some reason.  I have a sneaking suspicion it's not.  Your

15   Honor, they are, we understand, considering if they have not

16   already, purchased the Blue Bay secured claim against the parent

17   which is secured or at least purportedly by a pledge of the

18   stock of each of the U.S. subsidiaries and also purportedly

19   secured by a lien on the Test Drive Unlimited Gaming franchise

20   owned by Atari, Inc.  And as part of the DIP, they are requiring

21   that the debtor waive any and all rights that the debtor, but

22   not a committee, might have to challenge that lien or any of the

23   collateral related to that lien.  That lien purportedly also

24   includes a lien on the intercompany accounts, the unsecured

25   claims purportedly owed by the U.S. subsidiaries to the French

1    parent.

2          Again, the debtor is being asked, as a quid pro quo

3    for this feeless DIP to effectively delegate its fiduciary duty

4    to challenge those positions and they may or may not be subject

5    to challenge to a committee and to give the committee the

6    standard rights to use proceeds of the DIP up to a cap of I

7    believe it's 50,000 dollars that's been proposed, to investigate

8    those liens, to investigate those positions but not to use the

9    DIP to challenge them and to give them the standard, I believe

10   it's sixty days to perform that investigation and to determine

11   whether to challenge those positions.

12         We felt after the company went through a literally

13   agonizing six to seven hour process of determining whether on

14   the one hand a very expensive Tenor debtor that did not require

15   a delegation of these fiduciary responsibilities to a committee

16   was superior or a feeless DIP that did require the delegation of

17   these responsibilities to a DIP was superior.  And we

18   respectfully submit made a good faith business judgment and the

19   right one that the feeless DIP, the least expensive DIP I've

20   ever seen, combined with a standard delegation of responsibility

21   to a committee, the part -- the real fulcrum constituency here,

22   the party on the bubble, to investigate these liens and claims

23   and determine whether there is a challenge available to them.

24         THE COURT:  Let me as you a question in reference to

25   the terms of the Tenor DIP facility and what's been picked up by

In re Atari, Inc. et al - 1/24/13                           11

1   Alden as it relates to certain aggressive timing milestones in

2   the bankruptcy case itself.  There are some events that were to

3   have taken place on a schedule that I view as anywhere between

4   ambitious to wholly unrealistic and an investigation of liens

5   may or may not be possible, even with a 50,000 budget that to me

6   sounds incredibly lean, in the time that's available if the

7   milestones are still part of the transaction.  Have those

8   milestones been retained or modified?

9           MR. PARTEE:  They've been modified but retained;

10  retained in concept but with modified numbers, Your Honor.

11  Essentially we have a full 180 day DIP here and so we have a

12  plan that must be consummated within 150 days if we go the plan

13  route.  We think that's realistic.  120 is very doable in this

14  case; 150 gives us a little bit of land, yeah, a little bit of

15  leeway.

16          When it comes to a sale process, we have 105 days

17  effectively to get that done and I think that that is a

18  reasonable period of time and I would simply draw, for example,

19  a contrast to the somewhat comparable case of In Re: THQ in

20  Delaware which has received some notoriety about trying to

21  accomplish a sale on a very expedited time frame.  We are

22  obviously not pushing for anything remotely close to that here,

23  nor does the DIP require it.

24          THE COURT:  Okay.

25          MR. PARTEE:  So again -- and, Your Honor, we have, you

1  know, for example 75 days to get a bidding procedures order

2  entered, as opposed to 45.  So, we really feel like we have a

3  full, you know, even, you know, it could be sixty day period to

4  look for a stalking horse if we choose to use a stalking horse.

5  There may be so much appetite in these assets that we don't want

6  to set the market with a stalking horse offer.  That is one of

7  the considerations that we're going to be determining over the

8  course of the next thirty days.  This DIP gives us substantial

9  additional flexibility to make that determination.

10      The other thing that I am going to draw to the Court's

11  attention that the DIP does, Your Honor, is give us the full

12  flexibility to pursue a plan process because we are the licensee

13  under a lot of licenses of copyrighted intellectual property and

14  as a result, if we do a sale here, we may have to get consents

15  from the licensors.  Whereas, under a plan, with just an

16  assumption and no assignment corresponding to that, we probably

17  would not.

18      And so there may be a significant advantage to the

19  plan process or at least knowing that that is an option in

20  negotiating those consents with licensors.

21      So again, this is -- neither the Tenor DIP nor the

22  Alden DIP is something that has gone without a substantial

23  amount of input from the debtor in terms of what the debtor's

24  minimum needs are.  Essentially, what Alden has done at our

25  request is to take the Tenor DIP and modify it in ways that are

1   only beneficial to the debtor with the one glaring exception

2   that I've indicated to the Court previously and that is the

3   waiver or the delegation is the better way to put it, of the

4   fiduciary duties to challenge the insider positions to a

5   committee and then funds under the DIP to investigate -- lean,

6   as the Court characterized them but still there, but without any

7   ability to use the proceeds of the DIP to challenge; a

8   relatively standard bargain struck in this context.

9        THE COURT:  What's the status of the Blue Bay claim at

10   this point?  Blue Bay through counsel filed objections to both

11   the Tenor DIP, now probably mooted by virtue of the new

12   transaction and also to the putative certain critical vendor

13   claims?  Are those objections all mooted?  Does Blue Bay

14   continue to have independent standing in the case or has Alden

15   picked up that position as part of their arrangement, presumably

16   to try to acquire this business?

17        MR. PARTEE:  I know that I am authorized to -- and Mr.

18   Greissman, who represents Blue Bay is in the courtroom here to

19   my left, to authorize -- to represent that those objections will

20   be withdrawn contingent upon approval of the Alden DIP.  I will

21   let Mr. Burns, who represents Alden speak for himself with

22   respect to whether the acquisition of the Blue Bay claim has

23   already occurred.  With that, I'll tender the podium.

24        THE COURT:  If it has, it's lightening speed but let

25   me find out what's going on.

1    MR. BURNS:  Good morning, Your Honor.  Robert Burns,

2    Bracewell & Giuliani.  I'm here on behalf of Alden, the proposed

3    DIP lender.  I can confirm that my client has acquired the Blue

4    Bay debt that was referenced in the debtor's first day papers,

5    the signature pages for that acquisition were exchanged this

6    morning between the parties here in France.  If you have any

7    other questions, I'm happy to answer them, Your Honor.

8        THE COURT:  No, that's fine.

9        MR. PARTEE:  Thank you.  So, Your Honor, lightening

10   speed.  Sometimes these things happen that way.

11       I want to take two minutes of the Court's time to make

12   a few comments about Tenor and the role that they played in the

13   case.  Tenor -- without Tenor, we would be in a Chapter 7 case

14   and I recognize that the Court thinks that perhaps if that was

15   the only financing available to us, perhaps that would have been

16   the right approach.

17       THE COURT:  There was a risk that if you proceeded

18   with the Tenor DIP that there's where you would have ended up.

19       MR. PARTEE:  Understood, Your Honor.  We would have

20   been there anyway and we would not have had what was effectively

21   a stalking horse for a better DIP without them.  And as a result

22   of discussions with the current DIP lender this morning, as well

23   as Tenor who obviously feels relatively aggrieved at where they

24   wound up, the debtor and the DIP lender have agreed to support

25   and we will be filing a motion seeking this relief, to award

In re Atari, Inc. et al - 1/24/13                    15

1   Tenor a substantial contribution claim and I can allow, you

2   know, Mr. Burns or the Tenor Capital representatives that are in

3   the courtroom to describe the precise deal that has been struck

4   in that regard.  It's obviously subject to this Court's review

5   and approval but I simply wanted to express the debtor's support

6   -- strong support for that substantial contribution claim on the

7   record because I will say again without qualification, we would

8   not have gotten the Alden DIP on the terms that we did without

9   Tenor Capital standing there as a stalking horse on the terms

10  that it had.

11         THE COURT:  Okay.  This is the first day of a case

12  that we'll have more days to follow.

13         MR. PARTEE:  Yes, indeed.

14         THE COURT:  We're not sure yet how many.  I think it's

15  premature for us to be talking about substantial contribution to

16  a case that is in its infancy and I will simply note without

17  making any comments that should be viewed as indicative on how

18  the Court might rule with respect to this request for

19  substantial contribution, that in the ordinary course of

20  distressed lending in this community, it is a foreseeable

21  outcome that parties who overreach may be exposed to the risk of

22  losing a deal because the deal is simply not market standard.

23  This was not a market standard deal; offensive to the Court in

24  its terms and to ask for substantial contribution for bidding it

25  big is frankly another example of being a pig.

In re Atari, Inc. et al - 1/24/13                           16

1       MR. PARTEE:  I understand the Court's position, Your

2  Honor, and obviously it is premature to consider the issue and I

3  simply --

4       THE COURT:  And I am nothing, if not blunt.

5       MR. PARTEE:  This I know, Your Honor.

6       THE COURT:  Okay.

7       MR. PARTEE:  This I remember.  Your Honor, with that,

8  again the terms of the Alden Capital debtor are more lenient in

9  terms of their timelines.  They are -- it is a feeless DIP.  It

10 is not in any way negative relative to the Tenor DIP in any way,

11 except one and that is the delegation to a committee on the

12 terms that I've described of the right to challenge the Blue Bay

13 and parent positions.

14      Now that is a major give but with a committee around

15 to perform that fiduciary function, we believe it's an

16 appropriate one in this case.  And with that, Your Honor, again

17 we have gone through with the United States Trustee the interim

18 order and have resolved all of the U.S. Trustee's comments to

19 the order.  It is -- there are some changes to the blackline

20 that the U.S. Trustee requested but otherwise, I believe we have

21 a fully consensual interim DIP and as a result, Your Honor, I

22 can proffer -- obviously, Mr. Robert Mattes, who is the chief

23 financial offer of the company, his testimony in support of this

24 DIP.  I can proffer Mr. James Wilson, the CEO who is also in the

25 courtroom, both of whom would testify to everything that I have

In re Atari, Inc. et al - 1/24/13                                    17

1   represented to the Court this morning about the process by which

2   the Alden DIP was negotiated and obtained and how much more

3   favorable it is to the debtor and its estate -- the debtors and

4   their respective estates than the Tenor Capital.

5           THE COURT:  We've taken all of this out of order --

6           MR. PARTEE:  Yes, we have.

7           THE COURT:  -- and it's because of the importance of

8   this to the case as a whole and the late-breaking development

9   that changed the nature of the hearing from the Court's

10  perspective.

11          MR. PARTEE:  Yes.

12          THE COURT:  But I think given the importance of the

13  case and its visibility --

14          MR. PARTEE:  Certainly.

15          THE COURT:  -- its visibility may actually be greater

16  than the importance of the case, that we --

17          MR. PARTEE:  That had occurred to me, Your Honor.

18          THE COURT:  -- that we give you an opportunity to set

19  the stage that you were trying to do when I interjected and

20  changed the order of play.

21          MR. PARTEE:  Fair enough.

22          THE COURT:  And so, before we get into offers of proof

23  in support of the DIP, I think we should restart the clock on

24  this and go to the beginning and give you an opportunity to put

25  this all in context.  In doing so, I had some particular concern

In re Atari, Inc. et al - 1/24/13                               18

1   and it may be misplaced because I don't fully understand the

2   nature of the business dealings between the U.S. entities that

3   are in Chapter 11 and the French parent and the French

4   affiliates.

5          I think it would be of some value for me to have a

6   better understanding, to the extent you can portray that --

7          MR. PARTEE:  Certainly.

8          THE COURT:  -- as to the prepetition structures at

9   issue here and allay some of my concerns which may be

10  misplaced --

11         MR. PARTEE:  Okay.

12         THE COURT:  -- that there are issues that may be

13  visited upon this court later in which representatives of

14  foreign creditors may say we're here.  We have claims.  This was

15  all one business.  The structure should be disregarded and

16  whatever is to be distributed should be distributed equally and

17  ratably as if this were just one business.

18         So part of what I am interested in knowing about is

19  the integrity of a capital structure that based upon the first

20  day papers appears to have been one in which funds freely flowed

21  from Europe to the U.S. from the U.S. to Europe and corporate

22  niceties may not have been fully observed.

23         MR. PARTEE:  Well, I think we can address that, Your

24  Honor, and I certainly understand the Court's concern in that

25  regard.  I think it's on the face of this case for anybody who

1  reads the first day declaration.

2         So, Your Honor, with that, I will simply give you the

3  background that the Court has requested and that I would have

4  had we not gone right into, appropriately, the DIP issues.

5         Your Honor, the debtors and debtors-in-possession in

6  these Chapter 11 cases are the U.S. subsidiaries, there are four

7  of them, of a publicly traded French parent, Atari SA.  The four

8  U.S. subsidiaries are the owners of and the operators of the

9  historic, iconic gaming franchises that go under the brand

10  Atari.  These include not only the iconic games that many of us

11  grew up playing; Asteroids, Pong, Centipede, et cetera, but also

12  a number of other franchises that some may not associate with

13  Atari such as the very valuable Backyard Sports franchise, or

14  the Test Drive Unlimited franchise.

15        The debtors monetize these franchises in a number of

16  different ways.  Historically, they've done so through retail

17  outlets, although that is a winnowing area of their business and

18  something they're shifting away from, as well as online, mobile

19  and then licensing.  Each of those different market segments

20  produces viable cash streams based on games produced out of each

21  of these franchises and new releases and every time there is a

22  new release, there's an uptick in cash and then it winnows down

23  and then there's a new release and then the cash winnows down.

24        Part of what we are in right now is in a position

25  where we're about to release some new games but we have winnowed

1  down before in the way of cash proceeds from the prior games.

2  That happened at the same time of the situation that I described

3  earlier and that is historically, the companies did keep

4  rigorous intercompany accountings of movements of cash.  In

5  fact, there are intercompany loan balances and some of them are

6  accruing interest between the U.S. subsidiaries, a separate

7  account for each one and with Atari SA, the upstream parent, and

8  then some of the European subsidiaries of the upstream parent.

9       There is no problem segregating the company's

10  respective assets and liabilities.  That is not the issue.

11  Functionally, as in the case with many companies, they were an

12  integrated, happy family and if there was a need for money in

13  Atari Europe and Atari Interactive had that cash, there would be

14  an intercompany loan booked to that company to effectively, you

15  know, pay the debt and/or vice versa.  So, in other words, they

16  kept rigorous accounting of where the cash flowed but where cash

17  was needed, that's where cash went.  And sometimes it would be

18  flowing downstream and sometimes it would be flowing upstream.

19       In the most recent months, there was -- it was not

20  flowing anywhere.  In the beginning of December, the companies I

21  think realized that they were maybe not insolvent but an

22  insolvency or near insolvency related positions and I think

23  everybody realized, all the officers and directors, realized

24  that it was no longer feasible from a fiduciary prospective to

25  move cash beyond where it sat at that moment.  Essentially,

In re Atari, Inc. et al - 1/24/13                    21

1   there was a cash freeze instituted.

2          That left the U.S. subsidiaries where all the

3   operations really are located and where all the valuable and

4   most of the intellectual property is owned, certainly the

5   historic stuff, without enough cash to continue for a period of

6   more than approximately six to eight weeks.  We projected that

7   we would make it to the middle of January without some form of

8   bridge financing and without some form of DIP.

9          The company then engaged in the search for DIP

10  financing or bridge financing by making inquiries with a number

11  of different lenders.  The issues presented were, Your Honor, as

12  the Court understands, this was a small loan.  We were

13  requesting five to ten million dollars in the form of a loan and

14  we -- you know, were in a lull cash-wise and were in a

15  distressed situation and as a result, not surprisingly, the

16  lenders we spoke to were universal in saying they would only be

17  willing to lend on a debtor-in-possession financing basis.  And

18  only as a bridge to either a sale or some of them were willing

19  to do so via a plan and then only after due diligence.

20         And as each of Mr. Mattes and Mr. Wilson would testify

21  if called, (a) everything I've just said is correct and (b) they

22  engaged in this process in good faith but did not have

23  sufficient funds to give more than a couple of the most

24  promising lenders, due diligence deposits.  If we had given

25  everybody due diligence deposits to do what they wanted to do,

1    we would have been out of cash that day.

2          So we chose the two most promising lenders and that

3    was Counsel RB Capital and Tenor Capital to do significant due

4    diligence.  We also at the same time were negotiating with a

5    particular strategic potential investor, one who believed that

6    they would and had expressed a desire to provide both DIP

7    financing, as well as be the stalking horse bidder, a typical

8    bargain.  And with a strategic fit, it seemed like a wonderful

9    thing.  So, simultaneously while we were in negotiations with

10   the strategic, the two DIP lenders were doing their due

11   diligence; one called in FTI to do their due diligence, one

12   called in Sherwood Partners, well-recognized financial advisory

13   firms to do significant due diligence.

14         One week before bankruptcy, the strategic potential

15   investor DIP lender walked away from both potential positions.

16   They said they did not want to provide the DIP financing and

17   even if someone else provided the DIP financing, they did not

18   want to be the stalking horse lender.

19         This left us in a bit of a lurch and only having two

20   DIP lenders spending their due diligence, trying to play one off

21   the other in order to get the best deal.  Unfortunately, Counsel

22   RB Capital who had issued the commitment earlier, subject to due

23   diligence, ultimately did not make a binding proposal based on

24   the results of their due diligence.  We were surprised and

25   unpleasantly so by that result.

1    As a result, we were left with negotiating with Tenor

2    and shockingly enough, what we wound up with, with Tenor was not

3    the initial ask.  We did actually make some progress negotiating

4    them downward to reach the DIP facility that we filed.  But it

5    was something that gave us the flexibility, which not too many

6    other lenders that we had spoken with gave us, to spend up to

7    thirty days or so in bankruptcy, trying to identify a stalking

8    horse lender, rather than simply commencing an immediate naked

9    auction.

10    As a result, the -- as Mr. Mattes in particular would

11    testify and as recounted in this first day declaration, the

12    company concluded that the tenor DIP was the only appropriate

13    route to follow.  It was the only game in town and that the

14    authorization to me was negotiate as best we can but get it,

15    cinch it, pay the commitment fee and get it done.  We didn't

16    have any money with which to pay the commitment fee, so they had

17    to accrue their commitment fee.  That was a negotiation.

18    It was done.  We did accrue the commitment fee by

19    signing the commitment outside of bankruptcy, Your Honor, and

20    that was 250,000 dollars, which is part of what relates to our

21    substantial contribution discussion earlier.

22    That being said, we proceeded into bankruptcy after

23    having received the, not only board votes in favor of the

24    filings and the Tenor DIP but also a shareholder resolution to

25    that effect.  So, we had the full support of the corporate

1   parent for doing what we were doing.  There were lots of last

2   second efforts to provide -- to obtain money at the French

3   parent company level, so as to forgive the colloquialism, drip

4   some down to the U.S. subsidiaries in a manner that would stave

5   off the necessity of filing for bankruptcy.  Those simply did

6   not come to fruition in sufficient time.

7            What is the compelling time?  We have payroll that we

8   have to fund no later than Monday, Your Honor and we lack

9   sufficient funds with which to do so.  That is the urgency, as

10  Mr. Mattes will testify if called, for funding the DIP.  We

11  would need up to the two million dollar mark for a six week

12  period.  If we go to a final hearing within two to three weeks,

13  we can live on 1.4 to 1.5 million of an initial interim

14  facility.  And we can have Mr. Mattes correspond that to the DIP

15  budget that we proposed but that's essentially what it provides.

16  I'm summarizing for the sake of expediency.

17           With that interim draw, Your Honor, we would be able

18  to both fund our payroll; get to a final hearing; as well as

19  make the critical vendor payments to which there is now no

20  objection from Blue Bay, as a result of taking the Alden DIP.

21  And obviously, we'll get to that motion.  Mr. Richman will

22  handle the proffer of evidence when it comes to that because we

23  understand the sensitivity, of course.  On that note, I will say

24  I absolutely detest critical vendor trade motions and I think

25  they're the enaphthma^34:20 of the Bankruptcy Code but in this

1   case, we were compelled to move for that relief here, simply

2   because of the importance of those vendors and the role that

3   they play in the value of the company's games.  Again, Mr.

4   Richman will elaborate on that when we get to that point in the

5   presentation, Your Honor.

6          THE COURT:  We'll get to that in just a little bit.  I

7   still have some more questions that relate to the French parent

8   and also to how that enterprise is being managed at this point,

9   if there is a bankruptcy trustee --

10         MR. PARTEE:  There is not, Your Honor.  There's not.

11  My --

12         THE COURT:  Let me just ask a couple of questions.

13         MR. PARTEE:  Certainly.

14         THE COURT:  Under the arrangements with Tenor, and it

15  may be that these were not imposed by Tenor but simply part of

16  the debtors own bankruptcy planning, I understood that officers

17  that had been common to the French parent and the U.S.

18  subsidiaries were going to resign their positions in France,

19  leaving, it seemed to me, the French parent without leadership.

20  Is there anybody leading the French parent at the moment?

21         MR. PARTEE:  Yes, Your Honor.  First and foremost, the

22  only resignation that has occurred -- they were tranched; the

23  chief financial officer, Robert Mattes, who actually was --

24  there was never an official appointment of him being the CFO of

25  the French parent but certainly performed that function has

1    resigned whatever position he may have had functionally or

2    otherwise with the French parent.

3              THE COURT:  By the way, that's just one of those facts

4    that doesn't help me very much --

5              MR. PARTEE:  I understand.

6              THE COURT:  -- when it comes to dealing with --

7              MR. PARTEE:  I understand that.

8              THE COURT:  -- the European creditors.

9              MR. PARTEE:  But it is what it is, Your Honor, and I

10   want to be candid about the facts.

11             THE COURT:  I understand.

12             MR. PARTEE:  But there is a controller that has been

13   placed into the CFO position in France.  Again, the French

14   parent company doesn't have -- it is a holding company.  It does

15   not have the kinds of operations on a day-to-day basis.  It does

16   not attempt to monetize games and market them and have an

17   ongoing day-to-day business in the way that the U.S.

18   subsidiaries do.  I'm sorry if that was not clear.

19             THE COURT:  There are French operating subsidiaries,

20   are there not?

21             MR. PARTEE:  There are French -- I believe there's one

22   Atari Europe SA and then there's something called Eden.  There

23   are a couple of different subsidiaries that are operating but

24   they have their own kind of sub-management groups.

25             THE COURT:  Okay.  So, just to get to it, what's

In re Atari, Inc. et al - 1/24/13                    27

1   happening in France?  Who is running the show?

2           MR. PARTEE:  And, Your Honor, right now Mr. Wilson,

3   Jim Wilson, is both the CEO of the U.S. subsidiaries, as well as

4   the French parent, although the contemplation is that a CRO will

5   be appointed and -- before the final hearing of the DIP in this

6   case and that at that point, Mr. Wilson will resign if that

7   doesn't occur earlier from that position.

8           THE COURT:  Just so the record is clear on this and so

9   that I am clear on this --

10           MR. PARTEE:  Yes.

11           THE COURT:  -- he'll resign from which position --

12           MR. PARTEE:  I'm sorry.

13           THE COURT:  -- and the CRO will be appointed in which

14   case?

15           MR. PARTEE:  In the -- he will resign from his

16   position with the French parent.

17           THE COURT:  And the CRO will be appointed in France?

18           MR. PARTEE:  A CRO will appointed in France to take

19   the position --

20           THE COURT:  I have no idea, what's French for CRO?

21           MR. PARTEE:  My apologies, Your Honor, chief

22   restructuring officer.

23           THE COURT:  No, I understand that.  I didn't know that

24   that --

25           MR. PARTEE:  Au francais.

1        THE COURT:  -- that function actually existed in

2    French bankruptcy.

3        MR. PARTEE:  You know, Your Honor, it's simply

4    somebody to come in and run the company during its process but I

5    don't know that there is a formal title in that respect but that

6    is the way it's being described to me.  And with that, Your

7    Honor, I mean, Mr. Ken Coleman, from Allen & Overy is here in

8    the courtroom, represents the parent and he may be much better

9    versed than I on these matters.

10       THE COURT:  I suspect he may be.

11       MR. COLEMAN:  Good morning, Your Honor.  Ken Coleman

12   of Allen & Overy.  And sorry to disappoint you, Your Honor, I'm

13   not that much better versed.  We haven't been involved for very

14   long in this process.  We represent Atari SA, the publicly

15   traded French company and Atari Europe SAS.  We've been involved

16   for less than a week.  I think Mr. Partee parties know a bit

17   more about what's been happening since his involvement predates

18   ours by some months.

19       What I do know is that Atari SA and Europe SAS have

20   filed applications for safeguard proceedings in Paris.  That

21   does not constitute the commencement of a case as we would know

22   it or as Your Honor would know it from other foreign proceedings

23   that you've had here.  The commencement would occur after the

24   entry of an order by the Court in Paris.  There was a hearing

25   scheduled for Monday of this week that was adjourned until I

1  believe Monday of next week and I'm not quite sure what is going

2  to happen today and tomorrow with respect to that.  So, the

3  company in France or the companies in France are still in that

4  period known conciliation.  There's a conciliator that has been

5  appointed that interfaces with the company and creditors in an

6  effort to reach some kind of arrangement.  That has not

7  occurred.  You know, there's been no plan as of yet.

8          As far as leadership of the company, Mr. Partee is

9  correct that the CEO is still on board at the parent company, as

10  well as in the U.S.  It is expected that he will resign in

11  France and there's a search underway for someone to replace him

12  that role in France.  I don't know that somebody has been

13  selected finally for that position but it is something that is

14  being dealt with as we speak in Paris.

15          THE COURT:  And that individual, once identified and

16  assuming such an individual is engaged, will then become your

17  client --

18          MR. COLEMAN:  Would then become --

19          THE COURT:  -- your client contact --

20          MR. COLEMAN:  Would then become the officer of our

21  client; correct.

22          THE COURT:  And while it may be premature to get into

23  this, is it contemplated that the French proceeding, assuming it

24  is -- it ripens into a full French insolvency case, will be the

25  basis for commencing a Chapter 15 case here?

1     MR. COLEMAN:  It's entirely possible, Your Honor.

2     THE COURT:  And --

3     MR. COLEMAN:  This is -- this whole thing has been

4  sort of a bankruptcy version of Pong in a lot of ways, you know,

5  at least from where we've been sitting.  You know, who is

6  providing the DIP?  We don't know.  You know, who is in charge

7  here?  We don't know.  So, it's been evolving at a fairly rapid

8  clip.

9     So, I don't want to make representations to this court

10 that I am not entirely comfortable with, so Chapter 15 has been

11 discussed but until we actually file it before Your Honor --

12    THE COURT:  Understood and I'm not asking you to make

13 representations as to what may not happen.  I'm simply asking

14 whether or not that's something that might happen.

15    MR. COLEMAN:  It may well, Your Honor, and to be

16 perfectly candid with Your Honor as we always try to do, it has

17 been discussed at length.

18    THE COURT:  Okay.  Now to get to what's really

19 bothering me about this and why I raised the issue in the first

20 place, I'm trying to get a sense and it may be premature to

21 derive any such sense, as to whether the French entity is friend

22 or foe in a U.S. proceeding.  I'm trying to get a sense as to

23 whether French creditors through a foreign representative

24 perhaps, might be taking positions with respect to distribution

25 rights in this case or whether or not they'll simply be watching

 1   from Paris.

 2           MR. COLEMAN:  I understand.  I heard Your Honor's

 3   question loud and clear earlier.  I don't really know the answer

 4   to that.  I do know that the French company and I think Mr.

 5   Partee's description was in very broad terms, accurate.  The

 6   French parent has supported the subsidiary in a fashion that I

 7   believe to be common to many corporate groups over the years.

 8   They have substantial claims, intercompany claims.  We believe,

 9   because there's a UCC-1 on file that at least a portion of those

10   claims are secured claims.  We did read in the cash management

11   order and, you know, we're looking at this in a lot of ways as

12   strangers to the situation as much as Your Honor is and some of

13   the other parties here, the -- you know, statements to the

14   effect that there are complex intercompany transactions, cash

15   moving throughout the network.

16           We have had some difficulty, given the activity that's

17   been taking place in France in terms of the safeguard

18   proceedings and the conciliation and really efforts to sure up

19   the parent's financings through third-parties, that we have not

20   been able to get our hands around necessary documents for us to

21   -- as Allen & Overy, to form a view on some of the issues that

22   are concerning Your Honor.

23           So, I don't know, is the answer to your question,

24   whether creditors elsewhere think this is a single enterprise

25   and therefore, they're entitled to assert claims in this

In re Atari, Inc. et al - 1/24/13                    32

1    proceeding.

2           The parent being a public company, does file publicly,

3    financial statements.  There is in that respect a publicly

4    available delineation between the French and other entities and

5    the U.S. operations.  Atari in the U.S. has a history that

6    predates French involvement.  And those are just sort of public

7    facts that are out there.  What they distill to ultimately, we

8    don't have an answer to that just yet, I am sorry to say.

9           THE COURT:  It's helpful.  Thanks for the summary.

10          MR. COLEMAN:  Okay.  You're welcome.

11          MR. PARTEE:  Your Honor, in terms of the friend or foe

12   question, which I think is the first and foremost concerning

13   driving the Court's questioning here, one of the advantages of

14   the Alden DIP is that it obviously resolves the hostilities with

15   Blue Bay and just to be clear, Blue Bay is the parent's secured

16   creditor and purports to have a lien on all of the shares of the

17   U.S. subsidiaries, all the common stock, as well as the Test

18   Drive Unlimited franchise owned by Atari, Inc.

19          By virtue of resolving the hostilities with Blue Bay,

20   we may very well have resolved any potential hostilities with

21   the French parent again, because Blue Bay holds this -- I think

22   it's a 21 million dollar -- excuse me, 21 million Euro claim

23   against the French parent, secured by its lien on these shares

24   and punitive lien on the Test Drive Unlimited franchise and that

25   facility is in default, albeit it they've I think put it in a

1  forbearance period.

2          So again, it may be that the real party-in-interest

3  perhaps used to be the parent company but is really now Blue

4  Bay, as a result of their secured position and again, we've

5  tried to through the current Alden DIP, chip away at that

6  potential expense creating hostility by choosing the Alden DIP.

7  Now creditors clearly are going to have a say about all of that

8  as well but again, we felt like it was an unnecessary level of

9  hostility and contentiousness in this case that we were able to

10 take away and we may have eliminated it vis-a-vis the parent is

11 the point, as well --

12         THE COURT:  Okay.

13         MR. PARTEE:  -- as a result of Blue Bay's claim.

14         THE COURT:  Well, I think we've probably dealt with my

15 international concerns enough at this point but I do have a

16 question about anticipated professional engagements and when

17 those are likely to occur.

18         MR. PARTEE:  Yes.

19         THE COURT:  And my understanding was that under the

20 Tenor DIP there was a requirement that an investment banker be

21 engaged within I think five days.

22         MR. PARTEE:  Yes.

23         THE COURT:  I assume that some professional support

24 will be required to market the assets and maximizes value and

25 that someone or some firm has been identified and not yet

In re Atari, Inc. et al - 1/24/13                 34

1    revealed.

2          MR. PARTEE:  We are conducting our interviews this

3    afternoon of the two finalists, Your Honor.  FTI is one and Duff

4    & Phelps is the other.  And we believe both have the media savvy

5    and expertise necessary to do the work, the rolodex, as it were.

6    And, you know, again we're going to be conducting interview.

7          Now we did, as the Court knows, just last night lock

8    up a new DIP lender and they may have a say about someone else

9    they would like us to interview and we have not yet had that

10   discussion honestly.

11         THE COURT:  Sure.  So, I assume this is going to be on

12   a fast track.

13         MR. PARTEE:  Yes, indeed.

14         THE COURT:  Is the five-day requirement still part of

15   the deal?

16         MR. PARTEE:  I mean, it is, Your Honor, but I think

17   that's simply because Alden adopted the form of Tenor DIP and I

18   suspect Mr. Burns would represent on the record that, in fact,

19   that five business day period is not necessarily part of the DIP

20   if we don't want it to be but I will leave that to him.

21         THE COURT:  And can we also confirm just because it's

22   I know, an important hot button issue, that the lien on

23   avoidance actions that have been part of the Tenor DIP is no

24   longer part of the DIP?

25         MR. PARTEE:  Well, I will let Mr. Burns speak to that.

In re Atari, Inc. et al - 1/24/13                    35

1      MR. BURNS:  Thank you, Your Honor.  On the first

2  point, Your Honor, the five-day, I believe is still in there in

3  terms of the requirement to retain an investment banker.  That

4  is not sacrosanct by any sense.  It was really meant to I think

5  indicate that we do want this to move forward quickly.  We're

6  happy to modify that but we'll certainly be working with the

7  debtors on that.

8      Your Honor, I am going to -- if you could allow me

9  just to take a look at the order, I believe under the interim

10 order as it relates to liens on avoidance actions that is not a

11 lien from the interim period to the entry of a final order but I

12 would like to confirm that.  We were working on this very late

13 last night and my partner, Mr. Schulter --

14     THE COURT:  Okay.

15     MR. BURNS:  So --

16     THE COURT:  Thank you.

17     MR. BURNS:  -- thank you, Your Honor.

18     MR. PARTEE:  And, Your Honor, I just --  I don't know

19 whether they're going to press the avoidance action issue at the

20 final hearing but for the interim hearing, it's not on the

21 table.

22     THE COURT:  Okay.  So that's a fight for another

23 day --

24     MR. PARTEE:  Precisely.

25     THE COURT:  -- if it's a fight at all.

1        MR. PARTEE:  Precisely.

2        THE COURT:  Okay.

3        MR. PARTEE:  So, with that, Your Honor, again I'll

4   simply re-proffer the testimony of Mr. Rob Mattes who is now the

5   CFO of the U.S. subsidiaries with respect to the representations

6   made by me here to the Court today.  He will --

7        THE COURT:  So, just so it's clear, Mr. Mattes has

8   already submitted a declaration in support of first day motions

9   including the original Tenor DIP.

10       MR. PARTEE:  Correct.

11       THE COURT:  And your proffer is to supplement that

12  declaration through testimony he would otherwise offer as a live

13  witness here today to indicate that what you've represented with

14  respect to the Alden DIP, in fact, would be his own testimony,

15  were he needed to be called as a witness.

16       MR. PARTEE:  Correct.  If called, he would testify to

17  what I have represented, perhaps in not exactly the same words

18  but the concepts and the meaning would be the same.

19       THE COURT:  Okay.  Is there any objection to my taking

20  Mr. Partee's representations of what Mr. Mattes would otherwise

21  have said as the functional equivalent of testimony in support

22  of today's DIP?

23       MR. MORRISSEY:  Good morning, Your Honor.  Richard

24  Morrissey for the U.S. Trustee.  The U.S. Trustee has no

25  objection.  I just wanted to point out as just a purely

1   technical matter, that there's no actual motion accompanying the

2   new DIP.  There is a motion for the Alden DIP but again, that's

3   a purely technical matter.  The U.S. Trustee has no objection to

4   the idea of a proffer in lieu of a new declaration for the first

5   day.

6          THE COURT:  All right.  I'm going to treat the events

7   of the last -- I'm not sure how many hours -- let's call them

8   twelve hours --

9          MR. PARTEE:  Twelve, yes.

10         THE COURT:  -- as sufficient cause to modify the

11  currently filed and noticed motion to approve the Tenor DIP as

12  functionally equivalent to a restated motion to approve the

13  improved Alden DIP and would find that there is no need to file

14  an amended motion for these purposes because the record today

15  speaks for itself.  The motion for DIP approval now only relates

16  to Alden and no longer relates to Tenor.

17         MR. PARTEE:  Correct, Your Honor, just for the record.

18         THE COURT:  All right.  There's no objection to the

19  proffer.  The proffer is accepted.  Is there any other proffer?

20         MR. PARTEE:  Not with respect to the interim DIP

21  borrowing request, Your Honor.  Again, we do need to tender Your

22  Honor a revised order that incorporates Mr. Morrissey's comments

23  and we will work to do so before we leave the courtroom today.

24         THE COURT:  Okay.  Now there are any number of people

25  in the courtroom.  Are there any parties who wish to be heard

1   with respect to the DIP facility?

2        MR. GREISSMAN:  Good morning, Your Honor.  Scott

3   Greissman, White & Case.  The representation made earlier that

4   the Blue Bay interests have been transferred to Alden are

5   generally correct.  The documents have been signed.  The

6   transaction has not yet closed.  It should close in the next day

7   or so.  So, hopefully, you won't be seeing me again but there

8   is, I guess some chance that if the deal doesn't close, I can't

9   imagine why that would be, but I just wanted to clarify the

10  representation made on the record in that regard.

11       And as far as the order is concerned, as a result of

12  the transaction not closing, we requested and the debtor's

13  agreed to as did the Bracewell firm that we could have an

14  opportunity this afternoon just to review it make sure if there

15  was anything problematic in it, we could alert them to any

16  changes and then the order would be filed.

17       THE COURT:  Okay.

18       MR. GREISSMAN:  Thank you.

19       THE COURT:  Fine.

20       MR. COLEMAN:  Your Honor, Ken Coleman, Allen & Overy.

21  Likewise with respect to the order, we've had a chance to look

22  through it a bit this morning.  We would like an opportunity

23  after the hearing to do so.  We noted just a couple of things in

24  terms of the identity of the French entities referenced in the

25  order.  Atari Europe SAS should be named in there as one of the

1    French affiliates.

2          The amounts stated, I think are roughly correct,

3    although they need to be allocated between the two entities.  I

4    think, you know, important but not critical changes to the

5    order.  We would like an opportunity to look at it and provide

6    comments to the company and the DIP lender.

7          THE COURT:  Okay.

8          MR. COLEMAN:  Thank you.

9          THE COURT:  I'm confident that everybody who requests

10   will have an opportunity to review the order.

11         MR. PARTEE:  We will make it so, Your Honor.

12         MR. COLEMAN:  Fine.

13         MR. MORRISSEY:  Your Honor, once again, Richard

14   Morrissey for the U.S. Trustee.  I don't know if the Court wants

15   to hear the comments that we had but since they're -- it's not

16   necessarily from my perspective because the debtor has agreed to

17   make the changes that I've requested.

18         My question for the Court though is it's all together

19   possible that the Court itself upon reviewing the documents, may

20   have its own comments to make and just procedurally, how -- what

21   I am guess I am asking is how would the Court like to handle

22   that in terms of exchanging that information among the parties?

23         THE COURT:  I'm not understanding you, Mr. Morrissey.

24   I assume that the parties will work out the form of order that

25   includes to the extent you're able to agree, all of your

1  | comments and I'll be receiving as I often do, an agreed form of

2  | order.  I will either enter the agreed form of order in that

3  | form or if I have tweaks of my own, I'll make those tweaks and

4  | once I enter the order, that's it.  And if it's not an order

5  | that the lender is prepared to lend under, that's too bad.

6  | MR. MORRISSEY:  Okay.  Very well, Your Honor.  Thank

7  | you.

8  | THE COURT:  By the way, I've never had a problem.

9  | I've never had an order in the form that I have chosen to enter

10 | it not be deemed acceptable by the lender.

11 | MR. PARTEE:  Funny how that works, isn't it, Your

12 | Honor?  Your Honor, with that, we would conclude our

13 | presentation with respect to the interim DIP order and

14 | respectfully request entry of the order that we tender later

15 | today after an opportunity to solicit comments from all

16 | interested parties.

17 | THE COURT:  That's fine.  This is, to say the least,

18 | an unusual procedure.  The DIP as modified in accordance with

19 | the representations made on the record is approved subject to

20 | language to be agreed upon and ultimately approved by me.

21 | MR. PARTEE:  Thank you very much, Your Honor, and with

22 | that, I'll tender the podium to Mr. Richman who will handle the

23 | balance of the agenda.

24 | THE COURT:  Fine.

25 | MR. PARTEE:  Thank you.

1    THE COURT:  Thank you very much, Mr. Partee.

2    MR. PARTEE:  Thank you very much.

3    MR. RICHMAN:  Good morning, Your Honor.

4    THE COURT:  Good morning.

5    MR. RICHMAN:  Michael Richman, Hinton & Williams,

6    proposed counsel for the debtors.  Your Honor, if it's

7    convenient for the Court, I'll just follow the order of the

8    agenda without --

9    THE COURT:  That would be fine.

10    MR. RICHMAN:  Okay.  The first motion on the agenda

11    for today is a standard motion for joint administration, Your

12    Honor.  I would proffer paragraphs 29 to 32 of Mr. Mattes' first

13    day declaration for relevant facts in support.  We did agree in

14    response to a request from Mr. Morrissey that while we propose

15    to file consolidated operating reports that disbursement reports

16    would be broken out separately.

17    THE COURT:  Mr. Morrissey, is it acceptable?

18    MR. MORRISSEY:  Yes, it is, Your Honor.

19    THE COURT:  Joint administration is approved.

20    MR. RICHMAN:  Thank you, Your Honor.  The second item

21    on the agenda is the debtor's motion for an order to grant

22    additional time to file schedules.  We're asking only for thirty

23    days beyond the normal fourteen days provided by the rule, Your

24    Honor, so that we can try to sort through and deal with the

25    complexities of the records with all the other case pressures

1    that we have and I would request that that be approved and also

2    just for the record, Mr. Mattes' declaration, paragraphs 40 to

3    42 speaks to that.

4              THE COURT:  Is there any objection to that?  I hear

5    nothing.  It's approved.

6              MR. RICHMAN:  Thank you, Your Honor.  The next motion,

7    number 3 on the agenda, is for the entry of an order to

8    establish notice and service procedures.  Paragraphs 33 to 35 of

9    Mr. Mattes' declaration, I would proffer in support.  This again

10   is what I would characterize as a standard motion in this

11   district to create a core service list and a master service list

12   of all parties who have requested notice and to authorize the

13   normal e-filing and e-service procedures, Your Honor.  And I

14   would ask that that be approved.

15             THE COURT:  Mr. Morrissey, is there any issue?

16             MR. MORRISSEY:  No issue, Your Honor.

17             THE COURT:  It's approved.

18             MR. RICHMAN:  Thank you, Your Honor.  Number 4 on the

19   agenda is another standard first day motion.  In order to have a

20   consolidated list of creditors using the debtor's electronic

21   information, rather than conforming strictly to the matrix

22   requirements of the rules, and to authorize the filing of a

23   consolidated list of top thirty creditors, paragraphs 36 to 39

24   of Mr. Mattes' declaration addressed this.  We also have set

25   forth proposed notice and hard copy and certain special cases

1   which again is standard, including things like plan of

2   disclosure statement and first meeting of creditors and we've

3   reviewed that with Mr. Morrissey.  I don't believe there was any

4   objection.

5              MR. MORRISSEY:  That's correct, Your Honor.  There's

6   no objection but this is where the issue that the Court raised

7   earlier about perhaps some European creditors coming to the fork

8   come in.  This is the debtor's representation as to who the top

9   thirty creditors are.  And hopefully that list will not be

10  amended as we are in the process of soliciting for a committee.

11  But no objection to the relief sought.

12             MR. RICHMAN:  Well, Your Honor, I can represent that

13  in putting the list of creditors together, the U.S. debtors

14  referred to their records and claims against those entities.  If

15  there are French creditors who assert on the basis of claims

16  against French entities that they have claims against U.S.

17  entities, that probably would have to be dealt with through a

18  motion.

19             THE COURT:  I don't need to deal with that particular

20  issue on this procedural motion and the motion is approved.

21             MR. RICHMAN:  Thank you, Your Honor.  Item 5 on the

22  agenda is a motion to provide adequate assurance to utilities

23  and prevent them from discontinuing service.  Mr. Mattes'

24  declaration, paragraphs 55 to 58 addresses those issues in the

25  nature of the need for relief.

1      It is interesting in this case that the kinds of

2   utilities that we usually see, electricity, gas and things like

3   that are all part of a triple net lease, so they're not even on

4   our list.  Instead, our critical vendors are internet service

5   providers and telephone service providers and the nature of the

6   business platform which is operated primarily out of New York is

7   such that if there were any interruption in those services, it

8   could cause huge damage to the business, given the internet base

9   that is used for so much of it.

10      And we have attached to the motion a proposal that

11   parties wanting adequate assurance can come and ask for a

12   deposit equivalent to what is reasonably expected for two weeks

13   of service and they have thirty days to request that in writing.

14   If they do request that, we will provide the deposit.  We have

15   the funds under the DIP if the DIP is approved to be able to do

16   that.  And that will be deemed adequate assurance.  Parties who

17   default or choose not to ask for adequate assurance within

18   thirty days will also be deemed to have been adequately assured

19   under the terms of the order.  And so, Your Honor, I would ask

20   that that be approved as well.

21      THE COURT:  Any issues?

22      MR. MORRISSEY:  Your Honor, generally, and Mr. Richman

23   and I had discussed this not today but earlier, it's not heard

24   on the first day of the case.  Mr. Richman said that this is a

25   special case because apparently someone has come calling on it.

1    Usually what we recommend in a case like that is that

2    money be held in escrow for the benefit of that person to give

3    special assurance but the notion that it's not generally a first

4    day hearing is not a U.S. Trustee issue, it's more a court issue

5    and if the Court is willing to go forward with that today, the

6    U.S. Trustee has no objection.

7        THE COURT:  The part that I heard was no objection.

8    It's approved.

9        MR. RICHMAN:  Thank you, Your Honor.  Item 6 on the

10   agenda is a motion for approval of the debtor's existing cash

11   management system.  Mr. Mattes' declaration, paragraphs 48 to 54

12   describes the system and Mr. Partee also addressed and provided

13   a number of relevant facts in response to Your Honor's questions

14   earlier.  I think the important point for purposes of this

15   motion and what we're asking the Court to allow us to continue

16   is that since early December, the accounts have been kept

17   strictly within the United States with a box around them, with

18   strict accounting to make sure that there isn't any movement

19   across borders and that that can all be tracked and we're asking

20   for that to be continued.

21       And the one change we did make from the order that was

22   submitted to Your Honor is we have agreed with the U.S. Trustee

23   that we will stamp debtor-in-possession or DIP on our checks.

24   We had asked for relief from that but we have withdrawn that

25   request.  So, I would ask with that, that Your Honor -- we've

1  also, I should make one other clarification, we decided after

2  discussion with the U.S. Trustee that we did not ask for a

3  waiver from Section 345 because what we were doing was in

4  compliance and we weren't -- we didn't want to suggest or imply

5  that we were trying prospectively to go around 345 or otherwise

6  get a waiver, so we've also withdrawn that request for a motion.

7  So with those changes, I would ask that that motion also be

8  approved, Your Honor.

9          THE COURT:  It's approved.

10         MR. RICHMAN:  Thank you, Your Honor.  Item number 7 on

11 the agenda is the motion to pay certain critical vendors.  Mr.

12 Mattes has addressed this in his declaration which I proffer at

13 paragraph 64 to 68.  There are, Your Honor, if I can describe

14 it, four different categories of parties that we are proposing

15 to pay under this motion.  There are game developers.  There's

16 American Express.  There's a warehouse that has a lien and is a

17 secured creditor and then there was a licensor, one of the most

18 valuable games that we have and that we make significant money

19 from.

20         It is not all the developers.  What we did was and I'm

21 going to describe this in a little more detail, we -- the

22 company's management had the greatest concern about business

23 interruption from small developers and foreign developers.  In

24 the case of relatively small developers, their work for Atari is

25 probably the only work they do.  And if they aren't paid, then

1    they will go and take their skills to some other game platform.

2    The gaming development is planned far in advance of release date

3    and this is the lifeblood in the video game industry  because

4    you just don't put out a game.  You have to put out version 2

5    and then you put out version 3 and every time you put out a new

6    version, which hopefully ahs improved over the old one, you

7    capture new sales from all the people who loved version 1 and

8    version 2 and then you pick up new customers.

9           So, it's very, very important in the company's

10   ordinary course of business to keep that development business

11   into the supply chain and into the product chain going and the

12   damage -- if we have a developer of one of our major games walk

13   because they don't understand United States law or because they

14   are small and they can't afford to go without the payment and

15   the payments by and large to each of the individuals is not

16   tremendous but if they walk, then we can't -- there isn't

17   somebody that we can just open the yellow pages and find a

18   replacement developer for.  These are almost like utilities in a

19   sense.  They are really unique and when you find somebody who is

20   good and they're locked into your system, you don't want to lose

21   them.

22          So, that's why the developers are so important and

23   management's opinion was that the developers that are on the

24   list that is part of the motion would be likely to leave and

25   take their services elsewhere and that this could cause

1  significant damage to the business and particularly to the value

2  of the games that are licensed and in the market.  Improvements

3  on several of the games are already in the works.  I believe

4  that's in the first day declaration.

5          The warehouse lien, the warehouse in particular, has a

6  lot of our inventory and product and we can't afford to get

7  involved in lift stay litigation with them over their lien and

8  we don't think there are any issues with their liens.  So we

9  just propose to pay them to make sure that there's no

10  interruption in shipments and product flow through that

11  warehouse.

12          In the case of American Express, we don't believe that

13  we can compel American Express to continue to provide their

14  services if they aren't paid and they aren't only significant in

15  the sense that there's a particular employee who -- employees

16  have American Express cards and then they become -- they get

17  reimbursed by the company when they incur expenses.  So if the

18  card services are cut off and we can't pay them, those employees

19  could be liable.

20          In addition to that, we have a number of significant

21  parties that we do business with who will only take payment

22  through American Express.  They won't accept checks.  They won't

23  accept other forms of payments.  So if we don't pay the American

24  Express bill again, that could lead and management was concerned

25  that that could lead to not only negative impact on certain

1    employees but to business interruption which could damage the

2    brand.

3         Lastly, in the critical vendor motion, there's a

4    licensor, Chris Sawyer (ph.), who is I guess the mastermind

5    behind Roller Coaster Tycoon which may be the most valuable

6    franchise of Atari and this is a license -- and by the way, I

7    should mention in the case of all the developers, many of them

8    are operating under executory contracts that most likely we

9    would assume in any event.  So, these critical vendor payments

10   would be paid in any event as cures when we get to the point of

11   assuming them.

12        Same is true for Chris Sawyer.  There's no question

13   that we would assume the Roller Coaster Tycoon license, given

14   its value and its conceivable that any purchaser wouldn't also

15   wish to have that contract assumed.  And we can't afford to have

16   him walk and -- or interrupt the support of that gaming

17   platform.  It's very, very valuable to us.

18        So that's the -- that is both my summary and proffer

19   and I believe that if Mr. Mattes were called would testify to

20   everything that I just said, as well as what's in his

21   declaration and with that, Your Honor, I would respectfully

22   request that the motion be approved.

23        THE COURT:  Let me just ask you this.  The Blue Bay

24   objection which is not being pressed, nonetheless has been read

25   and so, I am conscious of what argument was being presented last

1   evening and I would like you to deal with it, even though it's

2   not being prosecuted right now because part of what I read was

3   these may be payments that are appropriate critical vendor

4   payments to make but this is the first day of the case.  And

5   what's showing is there through your proffer from Mr. Mattes

6   that if this relief isn't granted today, that there will be the

7   kind of negative consequences you've described in your

8   presentation and I understand that small developers may go

9   elsewhere but they can also get an e-mail that says we're going

10  to pay you in three weeks.  And that's true for the warehouse

11  and that's true even for AmEx because AmEx while tough, doesn't

12  generally close the operations of a cardholder down because of a

13  twenty-one day late payment.  And we don't even know if the

14  payment's late yet.

15          And I don't know anything about Mr. Sawyer except he's

16  your number one unsecured creditor at 250,000 dollars --

17          MR. RICHMAN:  And he --

18          THE COURT:  -- and I assume that there's an ongoing

19  and close working relationship with him.  I'm assuming without

20  knowing this to be true that he's a reasonably sophisticated

21  gentleman.  I think there's a U.K. address but I am not

22  positive.  And that Mr. Sawyer could be told look, we went to

23  the mat on the first day of the case but there's this

24  requirement that the law has imposed that there be adequate

25  notice at the beginning of bankruptcy cases when significant

1  payments are leaving the company and even though we had the

2  money to pay you, you're going to have to wait a few weeks.  I

3  hope you'll understand.

4        I guess my question is this; if such a rational

5  presentation were made to these various creditors, it's only

6  three weeks, gentlemen, be a little patient.  You're still

7  getting money ahead of everybody else in the case.  Why isn't

8  that sufficient?  Why do we have to do this today?  That's

9  effectively what the Blue Bay objection was addressing and

10 frankly, I think it's just something you need to meet in order

11 to get over that hurdle.

12       MR. RICHMAN:  I appreciate the comments, Your Honor,

13 and I'm going to respond and then I would also like a minute to

14 talk with Mr. Mattes about this issue to see if there's

15 information that we should supplement.

16       THE COURT:  Do you know what I think may make some

17 sense?  Why don't we take a five minute break.  We'll -- you can

18 stretch until say noon and come back right about -- at high

19 noon, how's that?

20       MR. RICHMAN:  Thank you, Your Honor.

21       THE COURT:  Okay.

22       MR. PARTEE:  Thank you, Your Honor.

23       (Court recessed at 11:53 a.m. until 12:03 p.m.)

24       THE COURT:  Be seated, please.

25       MR. RICHMAN:  Your Honor, thank you.  The break was

1   productive because I was able to review Your Honor's questions

2   with management and management believes that they can try to

3   work persuasively with Mr. Sawyer and try to persuade him to

4   waive the twenty-one days, so that there can be a longer notice

5   period and that we could request the relief be granted at that

6   time.  And that cuts the relief we're seeking in half because he

7   was the largest payment on the list of about 250,000 dollars.

8            THE COURT:  Right.

9            MR. RICHMAN:  I want to offer Your Honor some

10  additional facts that would also be testified to that I learned

11  during the break about some of the other situations -- all the

12  other situations.  Amex is tricky.  It turns out it's just one

13  employee who has the card and it's in that employee's personal

14  name and the concern that management has expressed is the

15  difficulty of actually getting a decision maker at AmEx before

16  the bureaucracy just shuts you off.  And then that employee is

17  on the hook for that amount and it reflects on his personal

18  credit and it also impairs the ability of the company to make a

19  number of payments and to keep the business going.  So --

20           THE COURT:  Do you know where you are in the billing

21  cycle for that particular account?

22           MR. RICHMAN:  I believe it's overdue in about 40,000

23  dollars.  Can somebody help me with that?  Yes?  And when is the

24  bill due?

25           UNIDENTIFIED SPEAKER:  I do not recall.  I do not know

1    that.

2         MR. RICHMAN:  Okay.  But it's already one that's

3    overdue though; correct?

4         UNIDENTIFIED SPEAKER:  It's overdue.

5         MR. RICHMAN:  Yes, so that there is a roughly 40,000

6    bill that's already overdue.

7         THE COURT:  If it's overdue, that bill should be paid.

8    The individual's credit rating should not be affected.

9         MR. RICHMAN:  Thank you, Your Honor.  In the case of

10   the warehouse Symram (ph.), they have already put a hold on

11   shipments, I am told by management.  So, if the relief isn't

12   granted today to pay them their overdue amount, we would have to

13   bring a motion and bring other litigation against them which I

14   submit, Your Honor, on a cost-benefit basis given their secured

15   status, would be a waste of estate resources and on that basis,

16   I would renew my request that that payment be made.

17        THE COURT:  I think that's distinguishable in part

18   because of the lien and so, I have no problem with what you've

19   just said.

20        MR. RICHMAN:  Thank you, Your Honor.  Lastly, we have

21   the four developers that I mentioned and I was told that three

22   of them are located abroad including one in Lithuania, which is

23   the principal developer for Roller Coaster Tycoon, which is one

24   of the most valuable game franchises.

25        And management reiterated to me and they would also

1   testify that they made significant efforts to try to winnow down

2   their list of all game developers, there were roughly ten, to

3   those that they really felt created the greatest risk and they

4   have a sincere and good faith concern that these four are the

5   greatest risk of interrupting and some are right now working on

6   significant license amendments and improvements to games, so

7   that if there's an interruption and then one doesn't know if you

8   can get that person back, if they haven't gone somewhere else,

9   and even if you can get them back, the delay impairs the value

10  of the ongoing franchises.

11          So, Your Honor, I would request that with respect to

12  those four developers, that I would renew the request that hose

13  payments be permitted to be made today.

14          THE COURT:  I accept that representation and with the

15  understanding that the request for first day relief as to the

16  payment due to Mr. Sawyer has been withdrawn, the other requests

17  are granted.

18          MR. RICHMAN:  Thank you, Your Honor.  And what we'll

19  do with Mr. Sawyer is we'll make that part of -- I suppose we'll

20  file a new motion for payment after twenty-one days, so that the

21  record is clear.

22          THE COURT:  I think you can simply carry that portion

23  of the motion to the next hearing date and I haven't done the

24  math but we were thinking that we could have a hearing on

25  February 14th at 10 a.m.

1          MR. RICHMAN:  That would work, Your Honor.  Thank you.

2          MR. PARTEE:  That's consistent with our schedule, Your

3    Honor, yes.

4          MR. RICHMAN:  And it's also helpful to us to be able

5    to tell Mr. Sawyer that we have set that for a firm date, as

6    well.  So, thank you.

7          THE COURT:  And we can approve that payment at that

8    time and I am assuming that that will be a date well after the

9    appointment of the creditors committee.

10         MR. MORRISSEY:  Your Honor, I expect that that is

11   correct.

12         THE COURT:  Fine.  That would also be a date for the

13   final DIP hearing and for any other matters that are being

14   carried forward.

15         MR. RICHMAN:  Thank you, Your Honor.  We're good with

16   that.

17         THE COURT:  You could also conveniently use that as a

18   target date for your professional retentions.

19         MR. RICHMAN:  Thank you, Your Honor.  Before I move to

20   the next motion, just a small housekeeping matter.  During the

21   break, I also learned that in the notice procedures motion that

22   we submitted and the order, we had proposed that the core list

23   -- the smallest notice list include Blue Bay and in light of the

24   fact that their claim has now been sold, we don't think we need

25   to add them to the core list any longer.  So, I just wanted to

1  make Your Honor aware of that and we'll take that out of the

2  order.

3          THE COURT:  Fine.

4          MR. RICHMAN:  Continuing with the agenda to item

5  number 8, Your Honor, is a motion to approve insurance premium

6  finance agreement and payment that needs to be made.  As

7  explained in the Mattes' declaration at paragraphs 62 to 63, and

8  in the motion, the company has an arrangement with an outside

9  company called Premium Assignment Corporation where the Premium

10 Assignment Corporation takes care of their insurance premiums

11 and finances them under a financing agreement and the company

12 pays a monthly amount, so that helps the company's cash flow.

13 And the next payment is due January 31, I believe, in the motion

14 and if it's not paid, then the financing agreement can be

15 terminated and it's not executory, so we can't assume it and

16 compel performance with it.  It covers workers compensation, so

17 it's a very important policy that we're legally required to

18 maintaining.  So we would ask that that motion be approved, so

19 the premium can be paid.

20         THE COURT:  Is there any problem with that, Mr.

21 Morrissey?

22         MR. MORRISSEY:  No problem, Your Honor.

23         THE COURT:  It's approved.

24         MR. RICHMAN:  Thank you, Your Honor.  The last agenda

25 motion apart from the interim DIP which the Court has already

1   heard, is a motion to pay prepetition wages to employees and all

2   under the priority cap under the Bankruptcy Code.

3          What I want to emphasize to the Court on this is that

4   the employment base for Atari is relatively small.  There are

5   only forty-seven full-time employees and one part-time employee

6   and just as the stability of the gaming platform and the

7   development flow into that platform is vitally important, we

8   also think that given the small size of the employment base

9   here, that we do not want to risk losing anybody in that

10  employment base at this critical time, particularly as we look

11  at the potential for a sale.  Having people not going through a

12  revolving door, potentially interrupting other services could be

13  damaging to the company.  And so, we're asking that only several

14  days' worth of unpaid but accrued wages and expenses be

15  reimbursed.  This includes two independent contractors who work

16  virtually full-time at the company and are kind of like critical

17  vendors.  One does product development and the other graphic

18  design, which are very key to the games.

19         Now we did discuss this with Mr. Morrissey who had a

20  concern about the expense component that we were asking about

21  and also asked about payments to insiders and this motion does

22  include payments to officers of the company, again under the

23  cap.  So, I want to be clear about that on the record.  But Mr.

24  Morrissey did request that we make this an interim order such

25  that all the payments that we've requested could be paid today

1  but it would be subject to final approval in the event that the

2  trustee or committee or anybody else wants to have a closer look

3  at any of the numbers, including the expense numbers and we're

4  certainly prepared to discuss that with anybody who requests it

5  and come back at the final hearing if there's a need to do that.

6        So I would request respectfully, Your Honor, that this

7  be approved on an interim basis, so payments can be made

8  immediately in accordance with the motion but that we also set

9  it for final hearing.

10       THE COURT:  It's approved on an interim basis and

11  we'll hear it finally on February 14th.

12       MR. RICHMAN:  Thank you, Your Honor.  With that, I

13  believe we've concluded the agenda and unless Your Honor --

14       THE COURT:  One question, I noticed that there was an

15  application to formally retain your claims agent.  I would have

16  expected it to be on this morning's agenda.  Was that an

17  oversight or do you intend to simply heard at the same time that

18  other professional retentions will be heard?

19       MR. RICHMAN:  We intended it to be heard with the

20  other professional applications as part of a second day agenda.

21       THE COURT:  Okay.  Fine.  I guess with that, we're

22  done.  Thank you.  I'll see you next time.

23       ALL COUNSEL:  Thank you, Your Honor.

24                      - o0o -

25

59

CERTIFICATION

    I, Linda Ferrara, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated:  January 25, 2013

_____
Signature of Approved Transcriber