| | |
|---|---|
| Edward O. Sassower, P.C. | Steven J. Reisman |
| Joshua A. Sussberg, P.C. | **KATTEN MUCHIN ROSENMAN LLP** |
| **KIRKLAND & ELLIS LLP** | 575 Madison Avenue |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | New York, New York 10022 |
| 601 Lexington Avenue | Telephone:  (212) 940-8800 |
| New York, New York 10022 | Facsimile:   (212) 940-8776 |
| Telephone:  (212) 446-4800 | |
| Facsimile:   (212) 446-4900 | |

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF**
**THE DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**APPROVING THE DEBTORS' SALE MAXIMIZATION INCENTIVE PLAN**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit

this reply (this "Reply")[2] and the *Declaration of Moshin Y. Meghji in Support of the Debtors'*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 575 Fifth Avenue, New York, New York 10017.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Debtors' Motion for Entry of an Order Approving the Debtors' Sale Maximization Incentive Plan* [Docket No. 218] (the "Motion").

KE 64014525

*Omnibus Reply in Support of Debtors' Motion for Entry of an Order Approving the Debtors' Sale Maximization Incentive Plan* (the "Supplemental Declaration"), filed contemporaneously herewith, in further support of the Incentive Plan and in response to the objections thereto (the "Objections" and, the parties raising the Objections, the "Objectors"),[3] and respectfully state as follows.

### Preliminary Statement

1.  The Debtors commenced these chapter 11 cases to pursue a value-maximizing, going concern restructuring of their businesses. Every major stakeholder—the Committee, the DIP Parties, and even the Objectors—supports that outcome. The likely alternative is imminent liquidation. The Incentive Plan is a low cost, high impact means to incentivize senior management to achieve that collective objective. It aligns the interests of the very individuals who are speaking to potential purchasers with those of the Debtors' estates and their stakeholders. ***There is no incentive payment unless and until the Plan Participants have facilitated a going concern transaction and created value for general unsecured creditors***. And it is a stretch. The prepetition *and* postpetition marketing efforts demonstrate that there is no assurance the Debtors will achieve a result that satisfies all funded debt and administrative and priority claims. While there are some parties interested in investing in Barneys' future, it is imperative to optimize the limited opportunities with every potential bidder to create a competitive dynamic that drives value.

---

[3] The following parties filed Objections: (a) The United States Trustee (the "U.S. Trustee") [Docket No. 247]; (b) the New York-New Jersey Regional Board of Workers United (the "Union") [Docket No. 246]; and (c) the Amalgamated Retail Retirement Fund (the "Retirement Fund") [Docket No. 249].

The Debtors have engaged each of the Objectors to discuss their Objections and the modifications to the Incentive Plan in an effort to present consensual relief requested or at least narrow the contested issues for the Court. The Debtors will continue to do so in advance of the hearing.

Implementing the Incentive Plan now, in advance of the September 25 deadline to submit indications of interest, is critical to maximizing value in these chapter 11 cases.

2. The Debtors' disinterested directors undertook a robust review, including in relation to comparable market programs, before adopting the Incentive Plan. The DIP Parties and the Committee likewise each had significant engagement with the Debtors and, subject to the modifications described herein, support the Incentive Plan. These stakeholders reached the same conclusion as the Debtors: the Incentive Plan is reasonable and an important tool to drive outperformance in the marketing and sale process.

3. The Debtors and the Committee have agreed to certain modifications to the Incentive Plan:[4]

- *Going-Concern Transaction*. No incentive payment unless there is a going-concern transaction that preserves at least two stores and the digital platform.

- *Floor Value*. The Committee and the Debtors' board of directors shall each have consent rights over the determination of the Floor Value. In the absence of agreement, the Court will determine Floor Value.

- *Severance Waiver*. If the Plan Participants receive any amount under the Incentive Plan, they waive any rights to severance from the Debtors.

- *Incentives for Store Preservation*. If the winning bidder purchases more than four stores, the Bonus Pool will be funded with $150,000 for each additional store above that threshold (*i.e.*, not to exceed $450,000).

4. The Objectors misconstrue the Plan Participants' roles and responsibilities in connection with the marketing and sale process. Simply put, Plan Participants are irreplaceable because of their intimate understanding of the operational and financial turnaround that is necessary to position Barneys for long-term success. No other individual or advisor possess the

---

[4] The Debtors have filed a revised form of proposed order contemporaneously herewith.

knowledge, expertise, or credibility to speak to the customer experience, challenges and solutions with key suppliers and landlords, store-by-store performance, motivating employees, and positioning Barneys for long-term success in the current retail environment.

5. Outside advisors to a company alone cannot sell a business. Here, for example:

- Plan Participants, in consultation with their advisors, developed the business plan that is being "shopped" to potential bidders;

- Plan Participants are called upon daily to (i) engage with potential bidders, (ii) respond to extensive diligence requests, (iii) explain historical trends and current conditions, (iv) explore creative operational solutions (*e.g.*, the optimal balance as between digital and brick-and-mortar footprints), and (v) pitch the business plan;

- Ms. Vitale is the primary contact for potential bidders to hear details about the business, its historical and current operations, and its prospects and challenges (something no investment bank could learn and contextualize in the short timeframe available here); and

- Mr. Risi is the primary contact for the potential bidders' extensive questions regarding the Debtors' finances and business plan, about which Mr. Risi is intimately and uniquely knowledgeable.

As in any sale process, the extensive efforts of the Debtors' investment banker, Houlihan Lokey, to identify potential bidders, develop marketing materials, hold preliminary discussions with interested parties, facilitate the marketing and sale process, and negotiate the final, specific terms of the winning bid are ***complementary*** to the duties that are being required of the Plan Participants, ***not*** duplicative. The Plan Participants' efforts, if successful, might not only result in the Plan Participants working themselves out a job, they are incremental to the day-to-day obligations of a chief executive officer and chief financial officer for an iconic retail company with bi-coastal operations. Without Ms. Vitale's and Mr. Risi's robust engagement, few, if any, bidders will remain interested and there will be no going-concern sale process to facilitate. Bidders want and need to hear directly from top management before investing substantial sums in Barneys' future. The question is not whether these Plan Participants have fiduciary duties—they do. The question

is whether the Incentive Plan is a sound exercise of business judgment. Given the facts and circumstances of these chapter 11 cases and for the reasons set forth herein, the Debtors submit they have satisfied the applicable legal standard.

6. The Debtors do not take lightly the hardships, challenges, and uncertainty imposed on their stakeholders by these chapter 11 cases—particularly their employees. The Debtors respectfully submit that *all* of their stakeholders, especially employees, will benefit if key executives are incentivized to meet the Enterprise Value targets established by the Incentive Plan. If the Bonus Pool funds, it is because the Plan Participants succeeded in generating a going-concern transaction that preserves both stores and the e-commerce business, saving jobs at Barneys and protecting future revenue streams for suppliers and vendors. And if there is a going concern transaction, the Objectors (other than the U.S. Trustee) are likely unimpaired because the relevant obligations (*e.g.*, collective bargaining agreements, pension) likely would be assumed by an acquiring party.

7. Ms. Vitale and Mr. Risi will be required to energetically drive discussions with potential bidders and deliver a compelling case in support of Barneys' future. In return, Ms. Vitale and Mr. Risi will have the opportunity to participate in a Bonus Plan that is consistent with precedent and reasonable given the targets and the scope of work required to achieve them. A going concern transaction would be a homerun outcome given the current challenges facing retail companies industrywide.

8. The Incentive Plan balances two goals that are equally important to the Debtors and their stakeholders: incentivizing key leadership to maximize sale proceeds and consummate a going-concern transaction and ensuring the company's stakeholders receive the vast majority of the benefits generated by such transaction. Plan Participants will not merely "show up" for work

5

each day and earn an incentive. As the Committee recognizes, all the Debtors' general unsecured creditors (including landlords, vendors, suppliers, and employees) will suffer if the Debtors do not outperform in the sale process. Market-based incentives are a customary—if not essential—tool to achieve such performance. At the same time, the Incentive Plan structure diverts only tiny slivers of sale proceeds toward funding the Bonus Pool:



9. The Debtors submit that the record here, including the Meghji Declaration and the Supplemental Declaration, and as the Debtors are prepared further to establish at the Court's hearing on this matter, justifies the relief requested. The Debtors therefore submit that approval of the Incentive Plan is warranted by the facts and circumstances of these chapter 11 cases.

**Reply**

I.  **The Plan Participants Are Instrumental to a Successful Marketing and Sale Process.**

10.  The Plan Participants are an integral part of the Debtors' marketing and sale process and will be instrumental to maximizing the value of the bids received. To achieve an Enterprise Value that provides a recovery to general unsecured creditors, the Debtors' top management is required to work closely with the Debtors' financial and legal advisors to sell the Barneys brand in an extremely difficult environment for the retail industry. Suppl. Declaration ¶ 3. The Debtors are facing the same challenging macroeconomic environment as many other apparel and retail companies, brought on by increased competition and and a marked shift away from brick-and-mortar stores to online channels. Suppl. Declaration ¶ 3. Additive to those headwinds are the various challenges specific to Barneys. The Plan Participants are essential to convince potential bidders that Barneys can improve sales volumes, repair recently-strained vendor relationships in the face of widespread industry disruption, and execute on a go-forward business plan predicated on a rationalized retail footprint and lease terms together with an increased emphasis on digital sales—*i.e.*, an operational turnaround.. Suppl. Declaration ¶ 3. For the success of the marketing and sale process, it is imperative that Ms. Vitale and Mr. Risi actively participate in the operational and financial turnaround discussions that potential bidders will require as they consider whether to submit an indication of interest or bid. Suppl. Declaration ¶ 4.

11.  While the Debtors' outside advisors, including Houlihan in particular, are also necessary to the marketing and sales process, they alone are not sufficient. Outside advisors, without the support and direct involvement of a knowledgeable, engaged management team, cannot maximize value for the sale of a business like Barneys without substantial support from the company. Suppl. Declaration ¶ 4. The business plan made available to Barneys' potential bidders, for example, was prepared by the management team in consultation with its advisors. Suppl.

8

Declaration ¶ 4. In addition, it is customary and appropriate for bidders to engage directly with the Plan Participants because they know the Debtors' customers, employees, suppliers, landlords, and location-by-location performance intimately and can speak to the operational turnaround and financial commitments that are necessary to correct historical challenges, address the headwinds facing the industry, and realize on discrete opportunities for growing the business. Suppl. Declaration ¶ 4. During this sale and marketing process, Ms. Vitale and Mr. Risi have been and will continue to be called upon daily to participate in face-to-face or telephonic meetings with potential bidders, respond to extensive due diligence requests and follow-up questions, work with bidders to negotiate and develop qualified bids, advance potential solutions involving their landlords and operating store locations, and demonstrate a convincing business plan that will entice bidders to invest in creating a future for Barneys at an uncertain time for the business and the industry. Suppl. Declaration ¶ 4. Given the multinational profile of potential bidders, such commitments can occur at all hours of the day and involve substantial international travel. Suppl. Declaration ¶ 4. Specifically, Ms. Vitale and Mr. Sandro each have a unique and vital role to play in the marketing and sale process:

a. **Ms. Vitale** is the "spokesperson" for the Debtors and their brand. She has been and will continue to be the primary management contact for potential bidders. Ms. Vitale's nine-year tenure and position as chief executive officer of the Debtors brings unmatched depth and substance to the detailed discussions prospective buyers are seeking to have regarding multiple segments and functions of the business, from digital strategy to vendor and landlord relations to the increasingly important restaurant component. While department heads have comprehensive knowledge of their specific departments, Ms. Vitale is singularly positioned to discuss operations across departments and provide vital context regarding the interplay of the departments and a cohesive view of the enterprise and opportunities for improvement. Given the speed of the cases, including the prepetition planning period, no outside advisor is able to speak with comparable credibility or otherwise learn the business with a similar degree of intimacy.

b. **Mr. Risi** is the Debtors' subject-matter expert on the Debtors' finances and business plan—a topic of central interest to all potential purchasers. Mr.

9

>       Risi is responsible for responding to interested parties' financial diligence requests, both on a rolling basis and during on-site diligence session with interested parties. During diligence meetings, Mr. Risi fields the vast majority of the participants' questions and provides details, records, and reports on several topics. In addition, Mr. Risi was instrumental in developing the business plan now being "shopped" to prospective buyers and, therefore, continues to be essential in presenting and explaining the details thereof.

12. Sale processes require multiple parties to play different roles and act in concert. Houlihan's responsibilities are to identify potential bidders, develop marketing materials, hold preliminary discussions with interested parties, facilitate the marketing and sale process, and negotiate (along with the Debtors' legal advisors) the final, specific terms of the winning bid. Suppl. Declaration ¶ 5. These duties are complementary to the roles and responsibilities of the Plan Participants, *not* duplicative. Suppl. Declaration ¶ 5. As described by the Debtors' CRO in the Supplemental Declaration, bidders want and need to hear directly from management, who know the Debtors' business intimately and can speak to operational specifics and how the company will use this second chance to rectify historical mistakes and address the headwinds facing the industry. Suppl. Declaration ¶ 4.

13. Therefore, without the active participation of Barneys' CEO and CFO, prospective buyers will not be able to form a holistic picture of the company or its investment potential. Suppl. Declaration ¶ 5. Absent being able to develop a sound investment thesis, potential bidders will not convert to actual bidders, and the the marketing and sale process is unlikely to succeed, let alone achieve a price that allows for a meaningful distribution on general unsecured claims. Suppl. Declaration ¶ 5.

**II.    The Targets Set Forth in the Incentive Plan Require and Incentivize Plan Participants to "Stretch" for the Benefit of All Stakeholders.**

14. The Bankruptcy Code requires Incentive Plans to challenge eligible participants to "stretch" to reach a demanding goal. *See e.g.*, *In re Dana Corp.*, 358 B.R. 567, 584

(Bankr. S.D.N.Y 2006); *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). Requiring the Plan Participants to secure an Enterprise Value that pays in full all allowed DIP Facility, administrative, and priority claims will be a challenge despite Barneys' attractive attributes. It is not a foregone conclusion that the Debtors will be able to obtain a bid that clears the Incentive Plan's Floor Value. Suppl. Declaration ¶ 6. For example, prior to the commencement of these chapter 11 cases, the Debtors undertook certain efforts to market and sell their business to strategic and financial investors as a going concern. Suppl. Declaration ¶ 6. That process did not yield a result that would have exceeded the Floor Value. Suppl. Declaration ¶ 6. In addition, since the Petition Date until the date hereof, the Debtors and their advisors have continued to market the businesses for sale as a going concern. Suppl. Declaration ¶ 6. Although the Debtors' have now closed certain unprofitable store locations, potential buyers continue to express a need for additional rent concessions from landlords in order to reach Floor Value. Suppl. Declaration ¶ 6. Supplier relationships, and their willingness to ship merchandise, also continue to have an impact on realizing Floor Value. Suppl. Declaration ¶ 6. The Debtors continue to negotiate with vendors to ship on a postpetition basis which has taken some time post-filing. Suppl. Declaration ¶ 6. The Debtors submit that it will take considerable continued focus and attention from the Debtors, their advisors and Ms. Vitale and Mr. Risi to achieve a successful result from the sale process.[5] Suppl. Declaration ¶ 6. As such, the Incentive Plan aligns the interests of

---

[5] Contrary to the Objectors' assertions, see Union Obj. ¶ 13, a liquidation analysis is not required to evaluate whether the Incentive Plan's thresholds are a "reach" because there are no incentive payments unless and until the Plan Participants achieve a going concern transaction. Moreover, courts in this jurisdiction have approved incentive plans without reference to liquidation analyses. *See, e.g.*, *In re Achaogen, Inc.*, Case No. 19-10844 (Bankr. S.D.N.Y. 2019); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (Bank. S.D.N.Y. 2019).

11

Ms. Vitale and Mr. Risi with all stakeholders, including general unsecured creditors. Suppl. Declaration ¶ 6.

15. While the Debtors are hopeful that Barneys' longstanding brand recognition, international growth potential, customer loyalty, and world-renowned reputation will support bids at the Target Value, it is by no means certain in the current distressed retail environment and given the Debtors' particular hurdles. Suppl. Declaration ¶ 7. Convincing potential investors to sign on to help Barneys realize its go-forward potential will require management to expend substantial efforts far and above their ordinary course duties. Suppl. Declaration ¶ 7.

16. Keeping the facts and circumstances of these cases in mind, the Debtors were careful to design a Bonus Pool that ensures that achieving an Enterprise Value equal to the Threshold Value and Target Value—or anywhere in between or above—will maximize value for all stakeholders. If the Threshold Value is reached, *100 percent* of all value created up to that point goes directly to holders of secured, administrative, and priority claims (holders that include employees and trade claimants). In exchange for reaching that critical threshold, the next million in value created is used to fund a Bonus Pool that is sufficiently incentivizing. Thereafter, *99 percent* of the next $25 million and *97 percent* of all further incremental value goes directly to satisfying *creditors*. Suppl. Declaration ¶ 8.

17. Though the Floor Value is the minimum at which the Bonus Pool funds, it is *not* the minimum possible Enterprise Value in a winning bid. Obtaining a sale price that pays DIP Facility, administrative, and priority claims in full will be an achievement that provides real benefits to the Debtors and their stakeholders in the form of a 100 percent recovery on such claims (many of which are held by employees and trade creditors) and the ability to avoid liquidation. The Committee, in its support of the Incentive Plan, recognizes the import of this threshold and,

now, will have input into and consent rights over the determination of the Floor Value—directly addressing and resolving a concern raised by the Union in its objection. Union Obj. ¶ 11.

18.    Now, after consulting with the Committee, the Debtors have agreed to modify the Incentive Plan to include an additional mechanism to encourage a going-concern transaction. The Incentive Plan structure now features an additional incentivizing mechanism that explicitly encourages a going-concern sale, for the present and future benefit of the Debtors' employees and trade creditors:  if the winning bid provides for more than four stores to remain open, the Bonus Pool will be funded with an additional $150,000 for each additional store in excess of that amount. As there are seven stores currently open, the maximum additional funding achievable for the Bonus Pool would be $450,000 if all seven stores are preserved. Suppl. Declaration ¶ 8.

19.    Moreover, the changes to the Proposed Order, as agreed upon with the Committee, clarify that the Bonus Pool funds only in the event of a going-concern sale that preserves both brick-and-mortar locations and the e-commerce platform. These adjustments directly address and resolve concerns raised by the Union in its objection. Union Obj. ¶ 10. These adjustments also create additional hurdles that the Plan Participants will have to work hard to achieve—the winning bid must be not only large enough, but also commit to operating both stores and e-commerce, despite current trends away from brick-and-mortar shopping.

### III.    The Incentive Plan Is Consistent with Incentive Plans in Other Retail and Distressed Cases.

20.    The Incentive Plan falls within the range of reasonable market practice and is consistent with other court-approved incentive plans. Suppl. Declaration ¶ 11. In fact, the target Bonus Pool is *significantly* lower than the average target pool in other cases referenced by the Debtors and their advisors (set forth in <u>Exhibit 1</u> to the Supplemental Declaration):

| Target Bonus Pool as a Percent of Company Revenue | Target Bonus Pool as a Percent of Company Assets |
| --- | --- |

13

|  |  |  |
|---|---|---|
| Mean | 0.51 % | 0.94 % |
| Retail Mean | 0.68 % | 0.55 % |
| **Barneys** | **0.16 %** | **0.27 %** |

21.     The target Bonus Pool is also generally consistent with incentive plans with fewer than five participants, contrary to the Union's assertion (*see* Union Obj. ¶ 11):

|  | # of Participants | Target Bonus Pool as % of Company Revenue | Target Bonus Pool as % of Company Assets |
|---|---|---|---|
| Mean | 3 | 0.12 % | 1.36 % |
| Retail Mean | 3 | 0.12 % | 0.40 % |
| **Barneys** | **2** | **0.16 %** | **0.27 %** |

22.     The Incentive Plan's target Bonus Pool is also ***less*** than the target in *American Apparel*, where the incentive plan was intended to promote maximizing proceeds in a ***wind-down***. There, four participants were eligible to share in a $1.714 million target pool, representing 0.34 percent of the debtor's revenue and 0.57 percent of assets.

### IV.     The Incentive Plan Is Justified by the Facts and Circumstances of These Chapter 11 Cases.

23.     Given the challenge facing the Plan Participants, the Incentive Plan is justified by the "facts and circumstances" of these chapter 11 cases, as required by the Bankruptcy Code. 11 U.S.C. § 503(c)(3). Importantly, this test is not subject to a higher standard than the business judgment rule requirements of section 363, contrary to the Retirement Fund's assertion. Retirement Fund Obj. ¶ 17. The overwhelming majority of courts use the traditional business judgment standard in applying the "facts and circumstances" test of section 503(c)(3) of the Bankruptcy Code. *See, e.g.*, *In re Residential Capital*, LLC, 491 B.R. 73, 85 (Bankr. S.D.N.Y. 2013) (holding that incentive payments are justified by the facts and circumstances of the case under section 503(c)(3) of the Bankruptcy Code as they are within the "sound business judgment" of the Debtors); *In re Velo Holdings*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have

14

held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011) (finding that the legal standard under section 363(b) of the Bankruptcy Code is no different than section 503(c)(3), and the analysis is equally applicable to both statutory provisions); *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (incentive payments were seen as a valid exercise of the debtors' business judgment under section 363 of the Bankruptcy Code); *In re Glob. Home Prod., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (evaluating an incentive plan under the business judgment standard of section 363 of the Bankruptcy Code); *In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006) (incentive pay was an appropriate exercise of the Debtor's business judgment under section 363 of the Bankruptcy Code).

24.     The Debtors believe the success of these chapter 11 cases and creditor recoveries are dependent directly on the marketing and sale process, the success of which is, as detailed above, tied to the Plan Participants' engagement in the process. Incentive plans are a common and essential tool to motivate and elevate such engagement. Therefore, the Debtors determined it would be prudent to adopt an incentive plan as part of the pursuit of every avenue available to increase the value of bids submitted in the marketing and sale process.

25.     The Incentive Plan was crafted to balance the goal of incentivizing key leadership to maximize sale proceeds and consummate a going-concern transaction with ensuring the company's stakeholders receive the vast majority of the benefits generated by such transaction. This balancing is evident in the structure of the Incentive Plan, where incremental achievements are awarded with incremental funding of the Bonus Pool. ***First***, in exchange for obtaining a sale price that pays secured, administrative, and priority claims ***in full***, the Plan Participants will receive

up to the first million dollars of incremental value thereafter. This mechanic creates a Bonus Pool sufficiently large to be incentivizing, given the efforts that will be required to reach this threshold, and recognizes that an Enterprise Value that exceeds Floor Value creates real value for a significant number of the Debtors' creditors and the administration of the chapter 11 proceedings. Suppl. Declaration ¶ 13. Meeting the Threshold Value is likely to be a real achievement that facilitates a going-concern transaction, preserves jobs, and pays a significant amount of claims in full—none of which are a "given" outcome in these chapter 11 cases or other retail bankruptcies today. Suppl. Declaration ¶ 13. This feature will not unduly harm general unsecured claims. While $1 million represents a significant opportunity for the two Plan Participants, it is just 0.7 percent of the approximately $135 million in general unsecured claims reflected in the Debtors' books and records. Suppl. Declaration ¶ 14. This represents a fair exchange for (a) payment of administrative and priority claims in full (many of which are held by parties who are also general unsecured creditors, such as employees and trade claimants) and (b) contributing to an incentive to generate millions for recoveries on general unsecured claims.

26.     *Second*, each incremental dollar above the Threshold Value is split with creditors at an extremely reasonable rate—initially 99 percent to 1 percent, and then 97 percent to 3 percent for extraordinarily outsized achievement in the Enterprise Value. This ensures all parties will rise together as management stretches to realize each incremental dollar available and to protect as many stores as possible. While the vast majority of sale proceeds in excess of the Threshold Value will go to creditors, for every incremental $1 million that Plan Participants generate, they will receive $10,000 ($30,000 if they are able to exceed the Target Value). The Target Value of $1.125 million, represents approximately 54% of Ms. Vitale's gross salary and 96% of Mr. Risi's gross salary. In light of the Plan Participants' current compensation—*e.g.*, they are unlikely to receive

any compensation under the annual incentive plan and any equity-based awards would be worthless unless the marketing and sale process is a huge success—and the uncertainty that they may be "working themselves out of a job," those increments represent a valuable opportunity for Ms. Vitale and Mr. Risi. Furthermore, each Plan Participant has agreed to waive any severance to which they may be entitled if they receive payments under the Incentive Plan. Suppl. Declaration ¶ 10. While the Union criticizes that the Incentive Plan does not provide for a ceiling on the Bonus Pool (Union Obj. at 2), a ceiling would be in direct contradiction with the purposes of the Incentive Plan. It would be to no one's benefit to disincentivize the Plan Participants from reaching for every incremental dollar they can possibly attain.

27.     The result is an Incentive Plan that preserves the majority of sale proceeds for creditors while also motivating Plan Participants to advocate vigorously for the highest attainable sale price, leading them to maximize value for all of the Debtors' stakeholders. Suppl. Declaration ¶ 15.

**V.     Requiring Plan Participants to Remain Employed at Closing Does Not Render the Incentive Plan a Retention Plan Subject to Section 503(c)(1) of the Bankruptcy Code.**

28.     The Incentive Plan directly ties the funding of the Bonus Pool to the outcome of the marketing and sale process and is, therefore, an incentive plan. Despite the clear connection, the Retirement Fund asserts that the requirement that Plan Participants remain continuously employed through the closing of the Change of Control transaction to be eligible to receive payouts under the Incentive Plan, renders the program a retention plan. Retirement Fund Obj. ¶¶ 10, 11. The Retirement Fund is incorrect. Court-approved incentive plans commonly require that participants remain employed by the debtor at the time of the scheduled payout. *See, e.g.*, *In re Achoagen, Inc.*, Case No. 19-10844 (Bankr. S.D.N.Y. 2019) (approving a KEIP that required participants to remain employed by the debtors until consummation of the sale); *In re Aeropostale,*

*Inc.*, Case No. 16-11275 (Bankr. S.D.N.Y. 2019) (same); *In re Brookstone Holding Corp.*, Case No. 18-11780 (Bankr. D. Del. 2018) (same); *In re Sun Edison, Inc.*, Case No. 16-10992 (Bankr. S.D.N.Y. 2016) (same). The alternative would be to permit plan participants to receive bonuses if they negotiate a sufficiently high enough bid, but leave a debtor's employment before helping to close the transaction. Surely the Retirement Fund is not arguing that a debtor should remit bonuses even when a key element of the job remains unfinished.

29. Importantly, Courts recognize that all compensation, to some degree, has a retentive element. The key is which feature is the dominant goal of the program. Plans that merely have retentive aspects that are incidental to the vesting of the incentive awards, or plan targets, are insufficient to render otherwise incentivizing plan as retentive. *See In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) ("[M]erely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature."); *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)"); *In re Velo Holdings, Inc.*, 472 B.R. 201, 209–10 (Bankr. S.D.N.Y. 2012) ("Although a purported KEIP may contain some retentive effect that "does not mean that the plan, overall, is retentive rather than incentivizing in nature.") (quoting *In re Dana Corp.*, 358 B.R. at 571); *In re Borders Grp. Inc.*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011) (same).

30. Because the Incentive Plan is not a retention plan subject to section 503(c)(1) of the Bankruptcy Code, the complaints by the Union and the Retirement Fund that the Debtors fail to disclose the Plan Participants' current compensation (Union Obj. ¶ 13, Retirement Fund Obj. ¶ 15), compare the Incentive Plan to historical bonus plans implemented by the Debtors (Union Obj. ¶ 14), or provide proof of bona fide job offers (Retirement Fund Obj. ¶ 15) are

18

inapplicable. As set forth in the Motion and this Reply, the Incentive Plan meets the required standards under section 363(b) and 503(c)(3) of the Bankruptcy Code for the use of estate funds and incentive payments to insiders.

## Conclusion

31. For the reasons set forth herein and in Motion, the Objections should be overruled and the Court should approve the Incentive Plan, as modified.

[*Remainder of page intentionally left blank*]

WHEREFORE, for the foregoing reasons and upon the Motion, the declaration filed in support therewith, the Debtors respectfully request that the Court overrule the objection and approve the Motion.

| | |
|---|---|
| Dated: September 16, 2019<br>New York, New York | */s/ Joshua A. Sussberg, P.C.*<br>Edward O. Sassower, P.C.<br>Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br><br>-and-<br><br>Chad J. Husnick, P.C.<br>W. Benjamin Winger (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200<br><br>-and-<br><br>Steven J. Reisman<br>**KATTEN MUCHIN ROSENMAN LLP**<br>575 Madison Avenue<br>New York, New York 10022<br>Telephone:   (212) 940-8800<br>Facsimile:    (212) 940-8776<br><br>*Proposed Co-Counsel for the Debtors and Debtors in Possession* |