Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) | Chapter 11 |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) ) ) | Case No. 19-36300 (CGM) |
| Debtors. | ) ) ) | (Jointly Administered) |

**NOTICE OF ENTRY INTO STALKING HORSE PURCHASE**
**AGREEMENT AND RELATED DEADLINES UNDER THE BIDDING PROCEDURES**

On August 22, 2019, the United States Bankruptcy Court for the Southern District of New

York (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling the*

*Bid Deadlines and the Auction, (III) Approving the Form and Notice Thereof, and (IV) Granting*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819). The location of the Debtors' service address is 575 Fifth Avenue, New York, New York 10017.

*Related Relief* [Docket No. 156] (the "<u>Bidding Procedures Order</u>"),[2] approving procedures authorizing the Debtors to market the Assets and to conduct an Auction for their Sale.

**PLEASE TAKE FURTHER NOTICE** that, on October 16, 2019, consistent with the Bidding Procedures Order and the Bidding Procedures, and in consultation with the Consultation Parties, the Debtors designated the Stalking Horse Bidders and entered into a Stalking Horse Purchase Agreement (the "<u>Stalking Horse Purchase Agreement</u>").    A copy of the proposed Stalking Horse Purchase Agreement is attached hereto as **<u>Exhibit A</u>** and the material terms of which are set forth in the table below.[3]

| | |
|---|---|
| *Purchasers* | ABG-Barneys, LLC and B. Riley Financial, Inc. |
| *Acquired Assets* | Substantially all of the Debtors' assets, subject to certain exclusions set forth in the Stalking Horse Purchase Agreement (which may include certain leases). |
| *Purchase Price* | Estimated to be approximately $271,400,000 in cash.<br><br>Purchase price is equal to the sum of the DIP Obligations, the Wind Down Amount, the Prepaid Expenses Amount, the Seller Proration Amount, minus the Buyer Proration Amount, the Post-Closing Royalty Payment Amount, the Pre-Closing Royalty Payment Amount, and the Pre-Closing, Proceeds Credit. |
| *Wind Down Amount* | $27,000,000, to be advanced by B. Riley from time to time pursuant to the Wind Down Budget. |
| *Bid Protections* | The Break-Up Fee and Expense Reimbursement, to the extent both are payable, are equal to three percent of the Purchase Price—i.e., $8,142,000. |

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3]    Capitalized terms used in the table but not otherwise defined herein shall have the meaning set forth in the Stalking Horse Purchase Agreement.  The descriptions set forth in the table are solely for summary purpose.  In event of a discrepancy between the summary herein and the terms of the Stalking Horse Purchase Agreement, the terms of the Stalking Horse Purchase Agreement shall control in all respects.

| *Agency Agreement* | The Debtors shall enter into an Agency Agreement pursuant to which B. Riley and/or Great American may undertake store closings and monetize inventory and other Acquired Assets. |
|---|---|
| *Fiduciary Out* | The Debtors and their respective officers, directors, or members are entitled to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. The Debtors retain the right to terminate the Stalking Horse Purchase Agreement and/or pursue any transaction or restructuring strategy that, in the Debtors' business judgment, will maximize the value of their estates, subject to the Bid Protections. |

**PLEASE TAKE FURTHER NOTICE** that consummation of transactions contemplated under the Stalking Horse Purchase Agreement is subject to Court approval and any higher or better offers.

**PLEASE TAKE FURTHER NOTICE** that all Bids must be received no later than **October 22, 2019, at 5:00 p.m.** prevailing Eastern Time (the "Bid Deadline"). Parties interested in submitting Bids may contact the Debtors' investment banker, Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, New York, 10167, Attn: Steven Tishman (STishman@hl.com), Saul Burian (SBurian@HL.com), and Jason Feintuch (JFeintuch@HL.com).

**PLEASE TAKE FURTHER NOTICE** that if the Debtors receive any additional Qualified Bids prior to the Bid Deadline, the Debtors may conduct an Auction no later than **October 24, 2019, at 9:00 a.m.** prevailing Eastern Time at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022.

**PLEASE TAKE FURTHER NOTICE** that the Debtors may seek approval of the Sale at the Sale Hearing scheduled to commence on **October 31, 2019 at 10:00 a.m.** prevailing Eastern Time (the "Sale Hearing") before the Honorable Cecelia G. Morris, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States

Bankruptcy Court for the Southern District of New York, 355 Main Street, Poughkeepsie, New York 12601.

**PLEASE TAKE FURTHER NOTICE** that the deadline to object to approval of the proposed Sale is **October 29, 2019 at 12:00 p.m.** prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Bidding Procedures Order may be obtained free of charge by visiting the website of Stretto at http://case.stretto.com/barneys.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

| | |
|---|---|
| Dated:  October 16, 2019<br>New York, New York | */s/ Joshua A. Sussberg, P.C.*<br>Edward O. Sassower, P.C.<br>Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 |

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

-and-

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Stalking Horse Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BARNEY'S NEW YORK, INC.,**

**THE OTHER SELLERS PARTY HERETO,**

**ABG-BARNEYS, LLC,**

**AND**

**B. RILEY FINANCIAL, INC.**

**October 16, 2019**

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................ 2

Section 1.1    Definitions ............................................................................ 2
Section 1.2    Interpretations ................................................................... 21
Section 1.3    Consummation of the Agency Agreement Transactions .................. 22

ARTICLE II PURCHASE AND SALE ............................................................ 22

Section 2.1    Purchase and Sale of Assets .................................................. 22
Section 2.2    Assumed Liabilities ............................................................. 22
Section 2.3    Consideration; Deposit; Escrow Amount ................................. 23
Section 2.4    Closing ............................................................................. 24
Section 2.5    Closing Payments and Deliveries .......................................... 24
Section 2.6    Reserved ........................................................................... 25
Section 2.7    Post-Closing Purchase Price Adjustment ................................ 25
Section 2.8    Assumption/Rejection of Certain Contracts and Leases and
               Designation Rights ............................................................. 27
Section 2.9    Allocation ......................................................................... 30
Section 2.10   Proration .......................................................................... 31
Section 2.11   Removal of Excluded Assets ................................................. 32
Section 2.12   Withholding ...................................................................... 32

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ................. 32

Section 3.1    Organization of Sellers; Good Standing .................................. 32
Section 3.2    Authorization of Transaction ................................................ 32
Section 3.3    Noncontravention; Government Filings ................................... 33
Section 3.4    Title to Assets ................................................................... 33
Section 3.5    Transferred Contracts ......................................................... 33
Section 3.6    Real Property .................................................................... 34
Section 3.7    Litigation; Decrees ............................................................. 34
Section 3.8    Data Privacy ..................................................................... 34
Section 3.9    Brokers' Fees .................................................................... 34
Section 3.10   Taxes ............................................................................... 35
Section 3.11   Tangible Personal Property .................................................. 35
Section 3.12   Employee Benefits ............................................................. 35
Section 3.13   Intellectual Property .......................................................... 36
Section 3.14   Compliance with Laws; Permits ............................................ 39
Section 3.15   Environmental Matters ....................................................... 39
Section 3.16   Related Party Transactions .................................................. 40
Section 3.17   Disclaimer of Other Representations and Warranties .................. 40
Section 3.18   Inventory .......................................................................... 40
Section 3.19   File ................................................................................. 40
Section 3.20   Royalties .......................................................................... 40

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES .................. 41

Section 4.1    Organization of Buyer; Good Standing .................................... 41

## TABLE OF CONTENTS

**Page**

Section 4.2        Authorization of Transaction ........................................................... 41
Section 4.3        Noncontravention............................................................................ 41
Section 4.4        Litigation; Decrees.......................................................................... 41
Section 4.5        Brokers' Fees .................................................................................. 42
Section 4.6        Sufficient Funds; Adequate Assurances ........................................... 42

ARTICLE V PRE-CLOSING COVENANTS ................................................................. 42

Section 5.1        Efforts; Cooperation........................................................................ 42
Section 5.2        Conduct of the Business Pending the Closing .................................. 43
Section 5.3        Bankruptcy Court Matters................................................................ 44
Section 5.4        Notices and Consents ...................................................................... 46
Section 5.5        Notice of Developments .................................................................. 46
Section 5.6        Access ............................................................................................. 46
Section 5.7        Bulk Transfer Laws.......................................................................... 47

ARTICLE VI OTHER COVENANTS ........................................................................... 47

Section 6.1        Further Assurances........................................................................... 47
Section 6.2        Access; Enforcement; Record Retention .......................................... 48
Section 6.3        Covered Employees ......................................................................... 48
Section 6.4        [reserved]. ....................................................................................... 50
Section 6.5        Certain Tax Matters ......................................................................... 50
Section 6.6        Insurance Matters ............................................................................ 52
Section 6.7        Acknowledgements.......................................................................... 53
Section 6.8        Press Releases and Public Announcements ...................................... 54
Section 6.9        Personally Identifiable Information .................................................. 55
Section 6.10       No Successor Liability...................................................................... 56
Section 6.11       Change of Name .............................................................................. 56

ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE............................................ 57

Section 7.1        [Reserved]. ...................................................................................... 57
Section 7.2        Conditions to Buyer's Obligations.................................................... 57
Section 7.3        Conditions to Sellers' Obligations .................................................... 57
Section 7.4        No Frustration of Closing Conditions................................................ 58

ARTICLE VIII TERMINATION ................................................................................. 58

Section 8.1        Termination of Agreement................................................................ 58
Section 8.2        Effect of Termination....................................................................... 60

ARTICLE IX MISCELLANEOUS ............................................................................... 61

Section 9.1        Survival ........................................................................................... 61
Section 9.2        Expenses.......................................................................................... 61
Section 9.3        Entire Agreement............................................................................. 61
Section 9.4        Incorporation of Exhibits and Disclosure Schedule.......................... 61
Section 9.5        Amendments and Waivers ............................................................... 61
Section 9.6        Succession and Assignment .............................................................. 62

# TABLE OF CONTENTS

**Page**

Section 9.7        Notices .......................................................................... 62
Section 9.8        Governing Law ............................................................. 64
Section 9.9        Submission to Jurisdiction; Service of Process ................................ 64
Section 9.10      Waiver of Jury Trial..................................................... 64
Section 9.11      Specific Performance ................................................... 64
Section 9.12      Severability ................................................................ 65
Section 9.13      No Third Party Beneficiaries (other than Agent).............................. 65
Section 9.14      Non-Recourse .............................................................. 65
Section 9.15      Mutual Drafting ........................................................... 66
Section 9.16      Disclosure Schedule..................................................... 66
Section 9.17      Fiduciary Obligations................................................... 67
Section 9.18      Headings; Table of Contents.......................................... 67
Section 9.19      Counterparts; Facsimile and Electronic Signatures ......................... 67

Exhibit A1 – Form of Bill of Sale and Assignment and Assumption Agreement for Buyer Acquired Assets

Exhibit A2 – Form of Bill of Sale and Assignment and Assumption Agreement for Agent Acquired Assets

Exhibit B – Form of Copyright Assignment Agreement

Exhibit C – Form of Trademark Assignment Agreement

Exhibit D– Form of Domain Name Assignment Agreement

Exhibit E – Agency Agreement

Exhibit F – Form of Consignor Bill of Sale for Purchased Consignment Goods

Schedule A – Inbound Licenses

Schedule B – Closing Stores

Schedule C – Other Excluded Assets

Schedule D – File

Schedule E – Excluded Stores

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of October 16, 2019 by and among (i) BARNEYS NEW YORK, INC., a Delaware corporation ("Barneys" or the "Company"), and the other direct and indirect wholly-owned Subsidiaries of Barneys that are signatory hereto (together with Barneys, "Sellers"), (ii) ABG-BARNEYS, LLC, a Delaware limited liability company ("Buyer"), and (iii) for purposes of Section 2.1, Section 2.3(b), Section 2.7, Section 2.12, Section 5.1, Section 6.2, Section 6.5(d), Section 6.5(e), Section 9.11 and obligations related to the Wind Down Amount only, B. Riley Financial, Inc. ("B. Riley"). Sellers and Buyer are referred to collectively herein as the "Parties".

WITNESSETH

WHEREAS, on August 6, 2019 (the "Petition Date"), Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Sellers engage in (a) the business of designing, marketing, licensing, distributing and selling apparel and accessories, (b) the operation of stores and the retail sale of clothing and accessories at such stores and through e-commerce platforms, and (c) the Sellers' international licensing business (collectively, the "Business");

WHEREAS, Sellers operate the retail department stores set forth in Section 3.6 of the Disclosure Schedule (as defined below) under the names "Barneys" or "Barneys Warehouse" (each a "Store" and, collectively, the "Stores"); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, certain of the Acquired Assets (as defined below) and assume the Assumed Liabilities (as defined below), and Sellers and Buyer desire to designate for sale by B. Riley (or its Affiliates) (i) the Designated Assets (as defined below) pursuant to Section 2.1 and the Agency Agreement (as defined below), and (ii) the Closing Store Leases, all as more specifically provided herein; and

WHEREAS, substantially concurrent with the closing of the transactions contemplated herein, Buyer intends to enter into a license agreement pursuant to which a licensee (the

1

"Licensee") shall license from Buyer certain intellectual property of the Sellers purchased by Buyer under this Agreement, for the purposes of operating certain portions of the Business.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

# ARTICLE I
# DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"Acquired Assets" means, subject to Section 6.1(d), all of Sellers' right, title and interest, free and clear of all Liens (other than Permitted Liens), in and to all of the properties, rights, interests and other tangible and intangible assets of Sellers (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by Sellers after the date hereof but prior to the Closing; provided, however, that the Acquired Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Acquired Assets shall, subject to Section 6.1(d), include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    subject to Section 2.1, and clause (n) of the definition of Excluded Assets, the Inventory;

(b)    subject to Section 2.1, and clauses (n) and (o) of the definition of Excluded Assets, the Furnishings and Equipment owned by Sellers;

(c)    the Assumed Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(d)    all rights under the Transferred Contracts;

(e)    all of Sellers' prepaid expenses relating to any of the Transferred Contracts (collectively, the "Prepaid Expenses");

(f)    subject to Section 2.1, the Store Cash Amount;

(g)    all Intellectual Property, including all Intellectual Property related to the Barneys, Barneys Warehouse, Barneys New York, Barneys Shop, and Barneys Co-op brands as well as Sellers' private brands, including FiveSeventyFive, Connor, Fred's, Fred's Food, Harris, Chelsea Passage, and the High End;

(h)    to the extent transferable, all Outbound Licenses, which shall be Transferred Contracts;

2

(i)      to the extent transferable, only those certain Inbound Licenses set forth on Schedule A hereto, which shall be Transferred Contracts;

(j)      to the extent transferable, all warranties related to any of the foregoing;

(k)      all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records of any Seller that relate in any way to the Business or Acquired Assets (collectively, "Books and Records");

(l)      all marketing, advertising and promotional materials and product samples and designs;

(m)      financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of the Sellers in whatever media retained or stored, including computer programs and disks, in each case related to the Acquired Assets or the Assumed Liabilities; including files in the possession of Sellers;

(n)      all goodwill associated with the Business or the Acquired Assets;

(o)      all right of publicity and all similar rights, including, all commercial merchandising rights;

(p)      product designs, design rights, tech packs, artwork, archival materials and advertising materials, copy, commercials, images and artwork;

(q)      insurance proceeds received by Sellers and insurance awards received by Sellers with respect to any of the Acquired Assets which are not in respect of any Excluded Liabilities;

(r)      all causes of action of the Sellers and their estates, including avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state law (the "Avoidance Actions") and commercial tort claims, and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable Laws, including all actions relating to vendors and service providers used in the Business (collectively, the "Causes of Action"); provided, however, that, notwithstanding the foregoing, any Cause of Action (other than claims for actual fraud) against any current or former officer, director, employee, manager, contractor, agent, advisor, or representative of the Sellers shall be deemed an Excluded Asset;

(s)      all customer lists, data, and information (including all lists of current and past customers of Seller, and any information derived from branded loyalty promotion programs), and any and all information relating thereto (including personal information, such as name, address, telephone number, email address, website and any other database information), and customer purchase history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card

3

numbers or related customer payment source, social security numbers, or other information prohibited by Law) relating to (i) customers of any Seller, (ii) any catalog sales, other online or print mailing or similar distribution channels, or (iii) any other customer lists, in each case, to the extent held in databases of Sellers (collectively, "Customer Lists"); provided, however, that Sellers may retain a copy of any such information that is stored in the information technology systems included in the Excluded Assets;

(t)    payment processor receivables for sales made before, on, and after the Sale Commencement Date;

(u)    royalty payments and licensing receivables generated by the Business and attributable to the period from and/or after the Closing;

(v)    all Sellers' telephone, fax numbers and email addresses;

(w)    causes of action, lawsuits, judgments, claims and demands of any nature, whether arising by way of counterclaim or otherwise, in each case to the extent arising from the Intellectual Property owned by the Sellers, the Acquired Assets or the Assumed Liabilities;

(x)    the E-Commerce Platform, including data files, source code, object code, application programming interfaces, and software-related specifications and documentation owned by the Sellers; and

(y)    the right to enforce and to represent to third parties that Buyer is the successor of the Buyer Acquired Assets.

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Additional Agent Goods" has the meaning set forth in the Agency Agreement.

"Additional Employee Severance Fund" means an escrow fund to be established by the Sellers in which the following amounts will be paid by Buyer to Sellers for deposit into such fund: (i) if net sales from the Sale equal $303,000,000, the next $2,000,000 of net sales; *plus* (ii) if net sales from the Sale equal $307,000,000, the next $2,000,000 of net sales *plus* (iii) if net sales from the Sale equal $311,000,000, the next $2,000,000 of net sales. For the avoidance of doubt, the maximum amount to be deposited in the Additional Employee Severance Fund is $6,000,000. For purposes of this definition, the term "net sales" means all net proceeds, exclusive of sales tax, of Merchandise and Additional Agent Goods sold through the Sale during the Sale Term.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

4

"Agency Agreement" means the Agency Agreement, dated as of the date hereof, by and among Sellers, Buyer and Agent and attached hereto as Exhibit F.

"Agent" means B. Riley, *provided* that for purposes of the Agency Agreement and the Sale of the Designated Assets pursuant thereto, "Agent" has the meaning given thereto in the Agency Agreement.

"Agent Acquired Assets" means all Acquired Assets that are not Buyer Acquired Assets.

"Agent Designation Rights" has the meaning set forth in Section 2.8(i).

"Agreement" has the meaning set forth in the preamble.

"Allocation Principles" has the meaning set forth in Section 2.9.

"Allocation Schedule" means the schedule of the delivery of Distribution Centers Merchandise and E-Commerce Merchandise (if any) from the Distribution Centers to the Stores to be mutually agreed upon by the Company, Buyer and Agent no later than three (3) Business Days after the date hereof, taking into account each Distribution Centers's maximum weekly shipping capacity; provided, however, that if Agent operates the E-Commerce Platform as a sales channel, all E-Commerce Merchandise remaining after the Sale on the E-Commerce Platform is complete shall be delivered to the Closing Stores as promptly as possible in accordance with a schedule mutually agreed upon by the Company, Buyer, and Agent during the Sale Term. Agent's operation of the E-Commerce Platform as a sales channel for the Sale must be completed no later than January 31, 2020.

"Assumed CBA" has the meaning set forth in the definition of "Excluded Liabilities".

"Assumed Leases" has the meaning set forth in Section 2.8(b) and shall include, for the avoidance of doubt, the Designated Leases assumed and assigned to Buyer pursuant to Section 2.8(c).

"Assumed Liabilities" means only the following Liabilities of each of the Sellers incurred exclusively in the operation of the Business as of the Closing (to the extent not paid prior to the Closing), and to the extent set forth in the following clauses (a), (c) and (d):

(a)    all Liabilities under the Transferred Contracts, Assumed Leases and Assumed CBAs to the extent such liabilities arise from and after the assumption date of such contract or lease;

(b)    all amounts allocated to Buyer or Agent, as the case may be, under Section 2.10 and all Transfer Taxes and other Taxes allocated to Buyer or Agent, as the case may be, pursuant to Section 6.5;

(c)    all Liabilities relating to or arising out of the ownership or operation of the any Acquired Asset as of and after the Closing; provided, however, that, for the avoidance of doubt, ownership of the Designated Assets shall not and do not transfer to Buyer at

5

Closing and, as such, Buyer shall not be responsible for any Liabilities associated with the Designated Assets after the Closing; and

(d)        all Cure Costs.

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Cases" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Sellers and certain of their Affiliates on August 6, 2019, and continuing immediately thereafter, in the Bankruptcy Court and styled *In re Barneys New York, Inc., et al.*, Case No. 19-36300 (CGM).

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Barneys" has the meaning set forth in the preamble.

"Bidding Procedures Order" means the order entered in the Bankruptcy Cases on August 22, 2019 [Dkt. No. 156], as amended from time to time.

"Bills of Sale and Assignment and Assumption Agreements" has the meaning set forth in Section 2.5(c).

"Break-Up Fee", means an amount equal to $8,142,000 (3.0% of the estimated Purchase Price) to compensate Buyer and Agent for serving as the "stalking horse" and subject this Agreement and the Related Agreements to higher and better offers.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer Acquired Assets" means the Acquired Assets set forth in the following clauses within the definition of Acquired Assets: (c) (to the extent assigned to Buyer), (d) (to the extent assigned to Buyer), (e) (to the extent relating to any Transferred Contracts assigned to Buyer), (g), (h), (i), (j) (to the extent relating to the Buyer Acquired Assets), (k), (l), (m), (n), (o), (p), (q) (to the extent relating to the Buyer Acquired Assets), (s), (u), (v), (w) (to the extent relating to the Buyer Acquired Assets), (x), and (y).

"Buyer Escrow Agreement" means that certain Escrow Agreement, dated as of October 9, 2019, by and between the Escrow Agent and the Company.

"Buyer Proration Amount" has the meaning set forth in Section 2.10(a).

6

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Cash Purchase Price" has the meaning set forth in Section 2.3(a).

"Claim" means any claim within the meaning of section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.4.

"Closing Date" has the meaning set forth in Section 2.4.

"Closing Statement" shall mean the calculations as of the Closing Date of (i) the Cash Purchase Price, (ii) the Prepaid Expenses Amount, (iii) the Seller Proration Amount, (iv) the Buyer Proration Amount, (v) the Post-Closing Royalty Payment Amount, (vi) the Pre-Closing Royalty Amount, and (vii) the Pre-Closing Proceeds Credit.

"Closing Stores" means those Stores set forth on Schedule C, which Buyer hereby designates as Stores that will close on a Store-by-Store basis effective no later than the Sale Termination Date; provided, however, that, on or before the date that is one day prior to the Closing Date, Buyer may notify Agent in writing that Buyer desires to remove one or more Stores from Schedule C; provided, however, further, upon receipt of such notice, Agent shall provide Buyer in writing with the amount of the reduction in the portion of the Purchase Price to be paid by Agent at Closing and instead paid by Buyer at Closing; provided that the foregoing shall not release Buyer of any portion of its obligation to pay the Purchase Price.

"Closing Store Leases" means the Leases for the Closing Stores.

"Collected Proceeds" has the meaning set forth in Section 1.3.

"Company" has the meaning set forth in the preamble.

"Company Benefit Plan" has the meaning set forth in Section 3.12(a).

"Competing Bid" has the meaning set forth in Section 5.3(a).

"Confidentiality Agreement" means with respect to Buyer, and each holder of ownership interests therein, the confidentiality agreement entered into by and between Barneys and such holder or an Affiliate of such holder.

"Consignor" means B. Riley Financial, Inc.

"Consignor Bill of Sale" has the meaning set forth in Section 2.5(c).

"Contract" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby (other than any Leases).

"Contracting Parties" has the meaning set forth in Section 9.14.

"Contract Procedures Order" means the order entered in the Bankruptcy Cases on September 4, 2019 [Dkt. No. 215], as amended from time to time.

"Covered Employee" means an employee of Company or any of its Subsidiaries as of the date hereof whose duties relate primarily to the operation of any of the Business, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of executory Contracts and Leases.

"Cure Notice" has the meaning set forth in the Bidding Procedures Order.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Designated Assets" has the meaning set forth in Section 2.1.

"Designated Contract" has the meaning set forth in Section 2.8(c).

"Designated Lease" has the meaning set forth in Section 2.8(c).

"Designation Counterparty" has the meaning set forth in Section 2.8(c).

"Designation Notice" has the meaning set forth in Section 2.8(c).

"Designation Rights Period" means, with respect to any Contracts or Leases to be assumed and assigned or rejected pursuant to Section 2.8(c), the period from the Closing Date through the earlier of (i) the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning the Company in the Bankruptcy Cases, (ii) the Vacate Date, and (iii) the Sale Termination Date; provided, that the expiration of the Designation Rights Period may be extended with the consent of Buyer, Sellers and the applicable Designation Counterparty.

"DIP Agent" means GACP Finance Co., LLC, as agent under the DIP Financing Agreement.

"DIP Collateral" shall have the meaning used in the DIP Order.

"DIP Financing Agreement" means that certain Second Amended and Restated Debtor in Possession Secured Term Promissory Note dated September 4, 2019.

"DIP Lenders" means the lenders under the DIP Financing Agreement.

"DIP Obligations" shall have the meaning used in the DIP Order.

"DIP Order" means that certain Final Order Authorizing Debtor and Debtor in Possession to Obtain Post Petition Financing dated September 5, 2019 [Dkt. No. 222], as amended from time to time.

"Disclosure Schedule" has the meaning set forth in Article III.

"Distribution Centers Merchandise" means those items of inventory identified by SKU in the File, that are located in the Distribution Centers as of the Sale Commencement Date and, which goods, to the extent not delivered to the Closing Stores prior to the Sale Commencement Date, shall be delivered by Merchant to the Closing Stores in accordance with the Allocation Schedule; provided, however, that "Distribution Centers Merchandise" excludes E-Commerce Merchandise.

"Distribution Centers" means the distribution facilities leased by the Sellers and located at Distribution Center 1201 Valleybrook Avenue, Lyndhurst, NJ 07071, Barneys.com 1201 Valleybrook Avenue, Lyndhurst, NJ 07071, and BarneysWarehouse.com 1201 Valleybrook Avenue, Lyndhurst, NJ 07071.

"E-Commerce Merchandise" means all items of inventory located at the Distribution Centers Barneys.com 1201 Valleybrook Avenue, Lyndhurst, NJ 07071 and BarneysWarehouse.com 1201 Valleybrook Avenue, Lyndhurst, NJ 07071 as of the Sale Commencement Date.

"E-Commerce Platform" means the series of software and hardware applications integrated into and used in the operation of, and through which Sellers sell inventory to consumers who place orders for such inventory through, the Barneys.com, and Barneyswarehouse.com (and similar permutations thereof) websites and related internet or "app" based sales, marketing, advertising, and social media channels, including the Contracts pursuant to which such software and hardware applications are owned or licensed by Sellers.

"Encumbrances" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

"Environmental Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation relating to the protection of the environment or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Citibank, N.A.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

"Excluded Assets" means the following assets of Sellers as of the Closing, and only the following assets:

(a)      (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to (1) Taxes paid or payable by Sellers or (2) any obligations or liabilities not included in Assumed Liabilities; and (C) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset or Tax receivable for Taxes that are the responsibility of Sellers under Section 6.5;

(b)      capital stock of any of Barneys' Subsidiaries;

(c)      all insurance policies and binders;

(d)      all of Sellers' rights under this Agreement or any Related Agreement;

(e)      all of Sellers' rights under any Excluded Asset;

(f)      any records, documents or other information relating to Sellers' employees;

(g)      all Contracts other than the Transferred Contracts;

(h)      all Leases other than Assumed Leases;

(i)      all Merchandise and other Inventory (provided that Merchandise and other Inventory (other than Inventory located at Excluded Stores) shall be sold by Agent subject to and in accordance with Section 2.1 and the terms of the Agency Agreement and the proceeds thereof shall constitute Agent Acquired Assets);

(j)      all Furnishings and Equipment (provided that Furnishings and Equipment (other than the Furnishings and Equipment located at the Excluded Stores shall be sold by Agent subject to and in accordance with Section 2.1 and the terms of the Agency Agreement) and the proceeds thereof shall constitute Agent Acquired Assets);

(k)      all Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto) and collective bargaining agreements, other than collective bargaining agreements related to any Store that will be continuing operations after the Closing Date and that is not part of the Sale, if any (an "Assumed CBA");

(l)      all Cash in the Funded Reserve Account;

(m)      those items set forth on Schedule C; and

(n)      Surplus Cash Amount;

provided, however, that Agent may, in its sole discretion and at any time, notify Sellers in writing of its election to reclassify any Excluded Asset set forth in clauses (j) or (k) above as an Agent Acquired Asset effective as of the Closing Date, and upon receipt of such

10

notice, Sellers shall take all steps necessary to convey title to such Excluded Asset to Agent or its designee at no additional cost to Agent or Buyer.

"Excluded Liabilities" means any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstances taking place prior to the Closing, other than the Assumed Liabilities.  Without limiting the foregoing, the Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any of the Sellers or of any predecessor of any of the Sellers, whether incurred or accrued before or after the Closing:

(a)    any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability exclusively relating to or primarily arising out of the Excluded Assets;

(b)    any Liability of Sellers for Taxes (except as provided for in Section 2.9 and Section 6.5);

(c)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(d)    any Liability associated with any and all indebtedness including any guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit of any Seller;

(e)    any Liabilities in respect of any Contracts or Leases that are not Transferred Contracts or Assumed Leases, respectively;

(f)    all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Case (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, (ii) the negotiation, execution and consummation of the DIP Financing Agreement, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith, other than the Excess Employee Payments;

(g)    all Liabilities (i) related to the WARN Act, to the extent applicable, with respect to the termination of employment of Sellers' employees;

(h)    all Liabilities with respect to the termination of employment of the Company "insiders" (as such term is defined under the Bankruptcy Code);

(i)      all Liabilities with respect to any terminated employees with respect to sections 601 through 608 of ERISA and section 4980B of the IRC (also known as "COBRA");

(j)      all Liabilities of Sellers to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Affiliate Agreement;

(k)      all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers;

(l)      except for any Assumed Liabilities, all Liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, the Company, or any assets or properties of Sellers;

(m)      except for any Assumed Liabilities, all obligations of the Sellers arising from or related to the Business or the Acquired Assets;

(n)      all Liabilities arising under Environmental Laws;

(o)      all accounts payable Liabilities;

(p)      Liabilities to any employees;

(q)      all Liabilities of Sellers or its predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Buyer as part of the Acquired Assets or, is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer; and

(r)      all Liabilities for gift cards and gift certificates, membership programs, and coupons.

"Excluded Stores" means those Stores set forth on Schedule F.

"Expense Reimbursement" means an amount equal to $1,500,000 to reimburse Buyer and Agent for all costs and expenses incurred in connection with due diligence and the negotiation, execution, approval, participation in the auction, and related matters.

"Express Representations" has the meaning set forth in Section 6.7(b).

"File" means the files set forth on Schedule E together with updates, if any, to such files received by Buyer or Agent on or prior to the Closing Date.

"Final Purchase Price" shall mean the Purchase Price as finally determined in the Closing Statement pursuant to Section 2.7.

12

"Funded Reserve Account" has the meaning set forth in the DIP Order.

"Furnishings and Equipment" means all fixtures, trade fixtures, store models, shelving, racking, sample inventory, artwork, decorations, rolling stock, vehicles, and refrigeration equipment owned by Sellers and located at the Closing Stores, Distribution Centers, and corporate offices.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Inbound Licenses" means any grant to the Sellers of a right to use a third Person's Intellectual Property rights.

"Insurance Order" means the final order entered in the Bankruptcy Cases on September 4, 2019 [Dkt. No. 210], as amended from time to time,

"Intellectual Property" means any and all intellectual property rights or assets and other similar proprietary rights, in any jurisdiction in the world (whether arising under statutory or common law, contract, or otherwise), which includes rights or assets pertaining to or arising from: (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) Patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) Trademarks (whether registered, unregistered or pending), historical trademark files, trade dress, service marks, service names, trade names, brand names, product names (including private label product names), logos, domain names, internet rights (including, IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law but subject to Section 6.1(d)) any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (d) work specifications, tech specifications, databases and artwork, prototypes, molds, models, copy, commercials, and images; (e) technical, scientific and other know-how and information (including promotional material and tech packs and blocks), trade secrets, confidential information, methods, processes, practices, formulas, product or other designs, patterns, assembly procedures, specifications; (f) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works; (g) work for hire; (h) the name "BARNEYS" or any derivation thereof; (i) customer lists and databases, websites, social media sites and accounts (including the content contained therein, user names and passwords), diagrams, drawings, domain names, and all archival materials and advertising and marketing materials and collateral (including all physical, digital, or electronic imagery and design

files), samples, product catalogs, product designs and specifications (including tech specifications) vendor and merchandise supplier data and information, and archival collections of apparel, garments, and other accessories; (j) all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, know how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software and firmware, software code (in any form, including data files, source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all specifications and documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing; (k) all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records; (l) financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files in whatever media retained or stored, including computer programs and disks; (m) all tangible embodiments of, and all intangible rights in, the foregoing; (n) all goodwill related to the foregoing; (o) the right to sue for infringement and other remedies against infringement of any of the foregoing; and (p) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"Interest" means any interest within the meaning of section 363(f) of the Bankruptcy Code, including any interest of a Governmental Authority, and all other interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of the Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges, obligations, or claims granted, allowed or directed in any order.

"Inventory" means all of Sellers' inventory and goods now owned or hereinafter acquired, wherever located, relating to the Business, including all Merchandise, Returned Merchandise, inventory and goods that (a) are leased by Sellers as lessor, (b) are held by Sellers for sale or lease or to be furnished by Sellers under a Contract of service, or (c) consist of raw materials, work in process, finished goods, supplies, or material used or consumed in connection with the Business maintained or held by, stored by or on behalf of, or in transit to, any of the Sellers.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Japan Trademark Filings" has the meaning set forth in Section 5.1.

14

"Knowledge" of Sellers or the Company (and other words of similar import) means the actual knowledge of Daniela Vitale, Sandro Risi and Grace Fu.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Closing Store.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Licensee" shall have the meaning set forth in the preamble.

"Lien" means any lien (statutory or otherwise), Claim, Encumbrance, Interest, Liability, deed of trust, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity and whether by or before any Governmental Authority.

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Closing Stores operate; (b) any condition or occurrence affecting retail clothing stores generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military, terrorist or cyber attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence

15

of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the consent of the other Party (other than any action taken pursuant to Section 5.2(a)); (h) any effects or changes as a result of the announcement or pendency of this Agreement; (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (j) the closing of any stores not acquired by Buyer or the sale of any other assets or stores to any third parties by any Seller or any of its Affiliates; (k) any effects or changes arising from or related to the breach of the Agreement by Buyer; (l) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; (m) any items set forth in the Disclosure Schedule; or (n) any effect resulting from the filing of the Bankruptcy Cases.

"Merchandise" shall mean (A) all finished goods inventory that is owned by the Company as of the Closing Date; (B) Distribution Centers Merchandise; (C) the E-Commerce Merchandise (D) Purchased Consignment Goods; and (E) On Order Merchandise.  Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment (other than the Purchased Consignment Goods), or as bailee; or (3) Furnishings and Equipment or improvements to real property.

"Merchant" has the meaning set forth in the Agency Agreement.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Objection Deadline" has the meaning set forth in Section 2.8(c).

"On Order Merchandise" means goods that are on order and in transit to Distribution Centers as of the Sale Commencement Date.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice and taking into account the commencement of the Bankruptcy Cases.

"Outbound Licenses" means any grant to a third Person of any right to use any Intellectual Property owned by the Sellers.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Owned Intellectual Property" means all Intellectual Property owned or purported to be owned by the Sellers.

"Parties" has the meaning set forth in the preamble.

"Patents" means all inventions and discoveries, whether or not patentable, and all statutory invention registrations, patents, patent applications, provisional patent applications, industrial designs and industrial models, including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for utilities and Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and arising or incurred in the Ordinary Course of Business; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto which are customary; (d) with respect to real property, usual and customary zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) usual and customary easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects provided that they do not materially detract from the property; and (f) for purposes of the representations and warranties set forth in Article III, any Liens that will be released by operation of the Sale Order.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Information" has the meaning set forth in Section 3.8.

"Personal Property Leases" has the meaning set forth in Section 3.11.

"Petition Date" has the meaning set forth in the recitals.

"Post-Closing Royalty Payment Amount" means the aggregate cash proceeds received by Sellers prior to the Closing Date from royalty payments and licensing receivables generated by the Business and attributable to the period from and/or after the Closing Date; provided that any such payments received by Sellers for time periods which began prior to the Closing Date and ended after the Closing Date, shall be allocated to pre-closing and post-closing periods pro rata based on the number of days in such payment period, with such pro rata portion of such payments attributable to the period after the Closing Date being determined based on the ratio of (i) the number of calendar days from the Closing Date to the end of such period, to (ii) the total number of days in such period.

"Pre-Closing Period" has the meaning set forth in Section 6.5(c).

"Pre-Closing Proceeds Credit" has the meaning set forth in Section 1.3.

"Pre-Closing Royalty Payment Amount" means the aggregate cash proceeds received by Buyer after the Closing Date from royalty payments and licensing receivables generated by the Business and attributable to the period prior to the Closing Date; provided that any such payments received by Buyer for time periods which began prior to the Closing Date and ended after the Closing Date, shall be allocated to pre-closing and post-closing periods pro rata based on the number of days in such payment period, with such pro rata portion of such payments attributable to the period prior to the Closing Date being determined based on the ratio of (i) the number of

calendar days from the beginning of such period through the day prior to the Closing Date, to (ii) the total number of days in such period.

"<u>Prepaid Expenses</u>" has the meaning set forth in the definition of Acquired Assets.

"<u>Prepaid Expenses Amount</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Proceeds</u>" has the meaning set forth in the Agency Agreement.

"<u>Professional Fees Amount</u>" means an amount equal to all fees and expenses incurred on or prior to the Closing Date (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of the Closing Date) by any professional retained by the Sellers; <u>provided, however</u> that with respect to any "success fees" or other fees that are payable based solely upon the consummation of the transactions contemplated hereunder, such fees shall be included in the Professional Fees Amount only if they have been approved by the Bankruptcy Court prior to, and earned as of, the Closing Date.

"<u>Proposed Cure Costs</u>" has the meaning set forth in <u>Section 2.8(a)</u>.

"<u>Prorated Charges</u>" has the meaning set forth in <u>Section 2.10(a)</u>.

"<u>Proration Period</u>" has the meaning set forth in <u>Section 6.5(b)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Purchase Price Allocation</u>" has the meaning set forth in <u>Section 2.9</u>.

"<u>Purchased Consignment Goods</u>" means those goods owned by Consignor and held by Sellers for sale at Closing Stores, or available for sale through the E-Commerce Platform, on a consignment basis.

"<u>Related Agreements</u>" means the Bills of Sale, the Agency Agreement, the Assignment and Assumption Agreement, the Copyright Assignment Agreement, the Trademark Assignment Agreement, and the Domain Name Assignment Agreement.

"<u>Representative</u>" means, when used with respect to a Person, the Person's controlled and controlling Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"<u>Requesting Party</u>" has the meaning set forth in <u>Section 6.2</u>.

"<u>Returned Merchandise</u>" means goods sold by Sellers prior to the Sale Commencement Date and returned by a customer within thirty (30) days after the Sale Commencement Date in compliance with Sellers' return policy in effect immediately prior to the Sale Commencement Date.

18

"<u>Sale</u>" means the transactions contemplated by the Agency Agreement.

"<u>Sale Commencement Date</u>" means the date that is the Closing Date, but in no event later than November 1, 2019.

"<u>Sale Hearing</u>" means the hearing for approval of, among other things, this Agreement and the transactions contemplated herein before the Bankruptcy Court.

"<u>Sale Order</u>" means the sale order or orders in form and substance reasonably agreed by Buyer, Sellers, Agent, and the DIP Agent; <u>provided</u> that such sale order or orders shall provide for the sale proceeds to be used to make an indefeasible payment at Closing to the DIP Agent, for the benefit of the DIP Lenders, in cash and in full to satisfy all DIP Obligations (as defined in the DIP Order) as mandated in <u>Section 2.5(b)</u> hereunder.

"<u>Sale Term</u>" has the meaning set forth in the Agency Agreement.

"<u>Sale Termination Date</u>" has the meaning set forth in the Agency Agreement, but in no event later than February 29, 2020.

"<u>SEC</u>" has the meaning set forth in <u>Article III</u>.

"<u>Seller Proration Amount</u>" has the meaning set forth in <u>Section 2.10(a)</u>.

"<u>Sellers</u>" has the meaning set forth in the preamble.

"<u>Store Cash Amount</u>" means the Sellers' cash located at the Closing Stores as of the Sale Commencement Date, which cash shall be counted by the Sellers and Agent at the start of business on the Sale Commencement Date.

"<u>Store Lease Proceeds</u>" has the meaning set forth in <u>Section 2.8(e)</u>.

"<u>Stores</u>" has the meaning set forth in the recitals.

"<u>Subsidiary</u>" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"<u>Successful Bidder Notice</u>" shall have the meaning set forth in the Bidding Procedures Order.

"<u>Surplus Cash Amount</u>" means (i) an amount equal to 50% of the amount by which the actual cash balance on the Closing Date exceeds the cash balance budgeted on the Closing Date as per the DIP Budget (as defined in the DIP Order), if any plus (ii) an amount equal to 100% of the

Cash remaining in the Funded Reserve Account after payment of the Professional Fees Amount by the Sellers; with such Surplus Cash Amount to be used by the Sellers in their discretion, including to pay administrative expenses, priority claims, employee-related claims or such other claims as the Sellers may determine from time to time.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trademarks" means all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names and social media accounts, and all associated goodwill, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world, all rights therein provided by multinational treaties, conventions or applicable Law, and all social media addresses and accounts.

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Contracts" has the meaning set forth in Section 2.8(b) and shall include, for the avoidance of doubt, the Designated Contracts assumed and assigned to Buyer pursuant to Section 2.8(c).

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Vacate Date" has the meaning set forth in the Agency Agreement.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

"Wind Down Amount" means an amount of Cash equal to $27,000,000, to be advanced by Agent from time to time pursuant to the Wind Down Budget; provided that Agent shall have no obligation to disburse any portion of the Wind Down Amount during any period that Sellers are in breach of this Agreement; provided, further that $2,000,000 of the Wind Down Amount plus the amounts in the Additional Employee Severance Fund, if any, shall be used for purposes of an employee severance plan to be established by the Company and approved by the Bankruptcy Court after the date of this Agreement.  The initial funding of the Wind Down Amount shall be through the Cash Equivalents (excluding, for the avoidance of doubt, the Store Cash Amount), which shall remain in the possession of Seller at Closing plus an incremental amount of Cash necessary to

ensure $15,000,000 of the Wind Down Amount has been advanced as of the Closing Date to be used solely pursuant to the Wind Down Budget or to pay Expenses (as defined in the Agency Agreement).

"Wind Down Budget" means a budget, in form and substance mutually acceptable to Sellers and Agent in its sole discretion, for the expenditures comprising the Wind Down Amount from the Closing Date to the Sale Termination Date at the last Store.  For the avoidance of doubt, the expenditures set forth in the Wind Down Budget shall not include (a) any post-Closing costs associated with the Buyer Acquired Assets (b) any costs incurred by Sellers before the Closing Date or after the Sale Termination Date or (c) any costs associated with the operation of the Distribution Centers after the Closing except for actual, out-of-pocket costs associated with the operation of the Distribution Center in connection with the Sale from the Closing until November 30, 2019.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

21

(j)      Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)      References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information.

Section 1.3    Consummation of the Agency Agreement Transactions.  If the Closing Date is after the Sale Commencement Date, the Parties agree that the Agent shall commence the Sale at the Closing Stores on the Sale Commencement Date.  During the period on and after the Sale Commencement Date and ending on the day immediately prior to the Closing Date, all Proceeds from the sale of Merchandise during such period shall be paid to Sellers on a daily basis for distribution to Merchant, with a subsequent reconciliation, if any, to be performed pursuant to the Agency Agreement (the "Collected Proceeds").  On the Closing Date at Closing, the Buyer shall receive a Dollar for Dollar credit in respect of the Collected Proceeds from the Sellers (the "Pre-Closing Proceeds Credit"), which Pre-Closing Proceeds Credit shall be applied by Sellers against the Purchase Price due from the Buyer.  If the Closing does not take place, Merchant shall reimburse Agent for all Expenses (as defined in the Agency Agreement) incurred by Agent on or prior to the Outside Date.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, (i) effective as of the date hereof, Sellers hereby designate Agent to serve as their exclusive agent for purposes of selling the Merchandise, the Purchased Consignment Goods, the Returned Merchandise, and the Furnishings and Equipment at the Closing Stores, Distribution Centers, and corporate offices (the "Designated Assets") subject to and in accordance with the terms and conditions of the Agency Agreement, (ii) Agent will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Agent at the Closing all of the Agent Acquired Assets (other than the Designated Assets), and (iii) Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer at the Closing all of the Buyer Acquired Assets.  From and after the Closing, Sellers shall hold the Designated Assets strictly in trust for the benefit of Agent.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms

thereof, including paying all Cure Costs.  For the avoidance of doubt, Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid, any Cure Costs.

Section 2.3    Consideration; Deposit; Escrow Amount.

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) (i) the payoff amount for Merchant's postpetition financing facility under the DIP Financing Agreement and DIP Order, *plus* (ii) the payoff amount for Merchant's postpetition consignment facility under the DIP Financing Agreement and DIP Order (the "Cash Purchase Price"),[1] *plus* (B) the Wind Down Amount, *plus* (C) the amount of the Prepaid Expenses transferred to Buyer at Closing (the "Prepaid Expenses Amount"), *plus* (D) the Seller Proration Amount, if any, *minus* (E) the Buyer Proration Amount, if any, *minus* (F) the Post-Closing Royalty Payment Amount, if any *plus* (G) the Pre-Closing Royalty Payment Amount, if any *minus* (H) the Pre-Closing Proceeds Credit, if any (such sum, the "Purchase Price"), (ii) Buyer's assumption of the Assumed Liabilities, and (iii) the Agency Agreement. Without limiting any of Buyer's obligations hereunder, including with respect to the payment of the Purchase Price, the Parties acknowledge and agree that Agent is funding a portion of the Cash Purchase Price in consideration of the Agency Agreement. At Closing, the Professional Fees Amount escrow maintained by Sellers will be deposited into a professional fee escrow account designated by the Sellers in writing to Buyer prior to Closing. The aggregate value of the Purchase Price is estimated to be approximately $271.4 million.

(b)    Prior to or upon the execution of this Agreement, pursuant to the terms of the Buyer Escrow Agreement, Buyer shall immediately deposit with the Escrow Agent an amount equal to $48,800,000 (the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Buyer Escrow Agreement and, if applicable, this Section 2.3(b).  The Escrow Account shall constitute DIP Collateral to secure payment of the DIP Obligations (as defined in the DIP Order).  Pursuant to the Buyer Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows (and Buyer and

---

[1]    The Cash Purchase Price to be paid at Closing is currently estimated to be approximately $244 million as of the Closing Date.

Sellers shall deliver any joint written instructions required to effect the distribution of such portion of the Escrow Amount that is held pursuant to the Buyer Escrow Agreement):

        (i)      if the Closing shall occur, the Escrow Amount shall be transferred in accordance with Section 2.5(a);

        (ii)      if this Agreement is terminated by Sellers pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; or

        (iii)      if this Agreement is terminated for any reason other than by a Seller pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer.

Section 2.4    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kirkland & Ellis located at 601 Lexington Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 AM local time on a date (the "Closing Date") that is the first (1st) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto; provided that in no event shall the Closing take place on a date that is later than November 1, 2019 without the prior written consent of Buyer and Agent.

Section 2.5    Closing Payments and Deliveries.

        (a)      On the Closing Date, Buyer shall (i) pay the Cash Purchase Price (less the Escrow Amount) to Sellers, which shall be paid by wire transfer of immediately available funds into an account designated by Sellers), and (ii) cause the Escrow Agent to transfer the Escrow Amount to the Sellers.

        (b)      At the Closing, the Sellers shall indefeasibly pay, to the DIP Agent for the benefit of the DIP Lenders, proceeds in an amount sufficient to pay, in cash and in full, all DIP Obligations, including without limitation any unpaid principal, interest, expenses, and fees, including the Original Exit Fee, the Additional Exit Fee, the Additional Facility Fee, the Consent Fee and, to the extent payable under the DIP Financing Agreement and the DIP Order, any Enhancement Fee (each as defined in the DIP Order or the DIP Financing Agreement, as applicable).

        (c)      At the Closing, Sellers will deliver to Buyer and Agent, as applicable: (i) a bill of sale and assignment and assumption agreement, substantially in the form of Exhibit A1, duly executed by the Sellers, conveying title to the Buyer Acquired Assets to Buyer, and a bill of sale and assignment and assumption agreement, substantially in the form of Exhibit A2, duly executed by the Sellers, conveying title to the Agent Acquired Assets to the Agent (collectively, the "Bills of Sale and Assignment and Assumption Agreements"); (ii) the Agency Agreement duly executed by the Sellers; (iii) a Copyright Assignment

24

Agreement, substantially in the form of Exhibit C (the "Copyright Assignment Agreement") duly executed by the Sellers; (iv) a Trademark Assignment Agreement, substantially in the form of Exhibit D (the "Trademark Assignment Agreement") duly executed by the Sellers; (v) a Domain Name Assignment Agreement, substantially in the form of Exhibit E (the "Domain Name Assignment Agreement") duly executed by the Sellers; (vi) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.3(a) and Section 7.3(b) is satisfied; (vii) a non-foreign affidavit from each Seller that is organized in or under the Laws of the United States or any state thereof, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the IRC; (viii) a joint written direction to the Escrow Agent directing the Escrow Agent to transfer the Escrow Amount to the Sellers duly executed by the Sellers and, to the extent necessary, the Escrow Agent, and (ix) a Consignor Bill of Sale in the form of Exhibit G (the "Consignor Bill of Sale") duly executed by the Consignor and the Sellers.

(d)    At the Closing, Buyer and Agent, as applicable, will deliver to Sellers: (i) the Bills of Sale and Assignment and Assumption Agreements duly executed by Buyer and Agent; (ii) the Copyright Assignment Agreement duly executed by Buyer; (iii) the Trademark Assignment Agreement duly executed by Buyer; (iv) the Domain Name Assignment Agreement duly executed by Buyer; (v) the Agency Agreement duly executed by the Buyer and the Agent; (vi) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied; (vii) a joint written direction to the Escrow Agent directing the Escrow Agent to transfer the Escrow Amount to the Sellers duly executed by the Buyer and the Agent.

(e)    No later than the Closing Date, Seller shall purchase all Purchased Consignment Goods from Consignor and shall have received a duly executed Consignor Bill of Sale.

Section 2.6    Reserved.

Section 2.7    Post-Closing Purchase Price Adjustment.

(a)    Determination of Final Purchase Price After Closing.  No later than sixty (60) calendar days after Closing, the Sellers shall deliver a draft of the Closing Statement to the Buyer and Agent.

(b)    Examination and Review.

(i)    Examination.  After receipt of the Closing Statement, the Buyer and Agent shall have thirty (30) days (the "Review Period") to review the Closing Statement.  During the Review Period, the Buyer, Agent and their accountants shall have reasonable access to the books and records of the Sellers, the personnel of, and work papers prepared by, the Sellers or the Sellers' accountants to the extent that they relate to the Closing Statement and to such historical financial information (to the extent in the Sellers' possession) relating to the Closing Statement as the

25

Buyer and Agent may reasonably request for the purpose of reviewing the Closing Statement and to prepare a Dispute Notice (as defined below).

(ii)    Objection.  If, on or prior to the last day of the Review Period, the Buyer or Agent disputes any item in the Closing Statement as delivered by the Sellers, the Buyer and Agent may object to the Closing Statement by delivering to the Sellers a written statement setting forth the Buyer's or Agent's objections in reasonable detail, indicating each disputed item or amount and what the Buyer or Agent believes to be the correct value of the disputed item or amount and the reasons for the Buyer's or Agent's disagreement therewith (the "Dispute Notice"). If the Buyer or Agent fails to deliver the Dispute Notice before the expiration of the Review Period, the Closing Statement as delivered by the Sellers shall become final and binding on the Parties.

(iii)    Resolution of Disputes.  If the Parties cannot agree on an item(s) set out in a Dispute Notice within twenty (20) days after the Sellers' receipt of the Dispute Notice, either Party may refer the disputed item(s) to an independent accountant mutually agreed between Sellers, Buyer, and Agent other than Sellers' accountants, the Buyer's accountants, or Agent's accountants ("Independent Accountant") who, acting as experts and not arbitrators, shall resolve the specific items under dispute by the Parties in accordance with the terms and conditions of this Agreement and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Statement.  The Independent Accountant shall only decide the specific items under dispute by the Parties and their decision for each disputed amount must be within the range of values assigned to each such item in the Closing Statement and the Dispute Notice, respectively.  The Independent Accountant shall decide the procedural rules in connection with its hearing of the Parties' positions on the disputed item and shall ensure that a decision can be reached as quickly as possible.  Each Party shall give the Independent Accountant access to all information which in the reasonable opinion of the Independent Accountant is necessary to decide on the disputed item and shall cause that such information is provided promptly.  The decisions of the Independent Accountant shall be final and binding on the Parties and neither Sellers, Buyer, nor Agent shall seek further recourse through courts or other tribunals other than to enforce decision of the Independent Accountant.

(c)    Purchase Price Adjustment After Closing.  (i) the Agent shall pay to the Sellers the Prepaid Expenses Amount related to any Transferred Contracts assigned to Agent, and Buyer shall pay to Sellers the Prepaid Expenses Amount related to Transferred Contracts assigned to Buyer, the Seller Proration Amount and the Pre-Closing Royalty Payment Amount; and (ii) the Sellers shall pay to Agent the Pre-Closing Proceeds Credits, and Sellers shall pay to Buyer, the Buyer Proration Amount and the Post-Closing Royalty Payment Amount (the adjustments in (i) or (ii), as applicable, the "Post-Closing Adjustment").

(d)    Payments of Post-Closing Adjustment.  Any payment under this Section 2.7 shall be made within five (5) Business Days after the Final Purchase Price has been

determined whether by agreement, by the Independent Accountant or by arbitration, as applicable.  Payment shall be made in immediately available funds by wire transfer to an account designated by the recipient in writing.   For the avoidance of doubt, the process provided for in this <u>Section 2.7</u> shall be Buyer's sole and exclusive recourse with respect to the subject matter of this <u>Section 2.7</u>.

(e)      <u>Adjustments for Tax Purposes</u>. Any payments made pursuant to this <u>Section 2.7</u> shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law

Section 2.8      <u>Assumption/Rejection of Certain Contracts and Leases and Designation Rights</u>.

(a)      <u>Schedule 2.8(a)</u> sets forth a list, as of the date hereof, of all executory Contracts and unexpired Leases to which any Seller is a party. The provisions of this <u>Section 2.8</u> and this Agreement generally are subject to the Decree of the Bankruptcy Court approving the DIP Financing Agreement. Within three (3) Business Days of the date hereof, Sellers shall update <u>Schedule 2.8(a)</u> to include the proposed Cure Costs associated with each such Contract and unexpired Lease set forth therein (the "<u>Proposed Cure Costs</u>"). Notwithstanding the foregoing, in the event that the Cure Costs are more than the Proposed Cure Costs, then the Buyer shall have the right to exclude such applicable Contracts from the Transferred Contracts.

(b)      From and after the date hereof until the Sale Hearing, Buyer may, (i) in its sole discretion, designate a Contract listed on <u>Schedule 2.8(a)</u> for assumption and assignment to Buyer, effective on and as of the Closing (such Contracts, the "<u>Transferred Contracts</u>"), (ii) in its sole discretion, designate a Lease listed on <u>Schedule 2.8(a)</u> for assumption and assignment to Buyer, effective on and as of the Closing (such Leases, the "<u>Assumed Leases</u>"), or (iii) in its reasonable discretion, designate any Contract or Lease listed on <u>Schedule 2.8(a)</u> for rejection.  The Transferred Contracts and Assumed Leases as of the date hereof are set forth on <u>Schedule 2.8(b)</u> hereto, which will be supplemented as additional Leases and Contracts are (y) designated for assumption and assignment or rejection prior to the Sale Hearing as set forth in this <u>Section 2.8(b)</u>, <u>provided</u> that additional Contracts or Leases may be designated for assumption and assignment prior to the Sale Hearing but after the filing of the Successful Bidder Notice only with the written consent of the counterparty to such Contract or Lease, or (z) assumed and assigned or rejected as set forth in <u>Section 2.8(c)</u>.

(c)      During the Designation Rights Period, the Buyer may, in its sole discretion, designate any Contract (a "<u>Designated Contract</u>") or Lease (a "<u>Designated Lease</u>") listed on <u>Schedule 2.8(a)</u> that has not previously been assumed and assigned or rejected pursuant to <u>Section 2.8(b)</u> or otherwise rejected or terminated for either (x) assumption and assignment to Buyer or a third party designee, or (y) rejection, in each case by providing written notice to Sellers (the "<u>Designation Notice</u>"); <u>provided</u>, <u>however</u>, that Sellers may request that Buyer delay the designation of a Contract for rejection or the effective date of rejection of a Designated Contract, subject to <u>Section 2.8(d)</u>; <u>provided further</u> that Buyer shall determine whether any Designated Contract or Designated Lease will be assumed and

assigned or rejected and shall provide Sellers with a Designation Notice in respect thereof at least ten (10) days prior to expiration of the applicable Designation Rights Period. Within three (3) Business Days of Sellers' receipt of a Designation Notice, Sellers shall provide written notice to the counterparty to such Designated Contract or Designated Lease (such counterparty, the "Designation Counterparty") of Sellers' intent to assume and assign or reject such Designated Contract or Designated Lease, which notice shall, with respect to any Designated Contract or Designated Lease to be assumed and assigned, include (i) the proposed Cure Costs associated with such Designated Contract or Designated Lease, (ii) information supplied by Buyer intended to provide such Designation Counterparty with adequate assurance of future performance, and (iii) the deadline to object to the assumption and assignment of such Designated Contract or Designated Lease (the "Objection Deadline"), which shall be no less than ten (10) calendar days from service of such notice. The assumption and assignment of a Designated Contract or Designated Lease shall be effective without further order of the Bankruptcy Court upon expiration of the applicable Objection Deadline unless the Designation Counterparty timely serves an objection in accordance with the Contract Procedures Order; provided, however, that a Designation Counterparty may only object to the proposed assumption and assignment of a Designated Contract or Designated Lease to the extent such objection relates to such Designated Contract Counterparty's rights under section 365 of the Bankruptcy Code than a cure issue that could have been raised in an objection to the applicable Cure Notice prior to the Sale Hearing and pertains to matters arising after the Closing. If the Buyer, Sellers and Designation Counterparty are unable to resolve such objection, Sellers shall schedule the matter for hearing on no less than seven (7) Business Days' notice. The rejection of any Designated Contract or Designated Lease shall be effective without further order of the Bankruptcy Court unless the Designation Counterparty timely serves an objection in accordance with the Contract Procedures Order. The Sellers shall file the necessary notice(s) and/or motion, as applicable, to reject effective nunc pro tunc to the date that is the date of the expiration of the Designation Rights Period, any Contract or Lease that is (a) not assumed and assigned before the expiration of the Designation Rights Period or (b) determined by the Sellers in their sole discretion to be necessary to the Sellers' wind-down. For the avoidance of doubt, all Designated Contracts assumed and assigned to Buyer pursuant to this Section 2.8(c) shall be Transferred Contracts, and all Designated Leases assumed and assigned to Buyer pursuant to this Section 2.8(c) shall be Assumed Leases.

(d)    Buyer shall be responsible for any amounts due and payable under the Designated Contracts and Designated Leases after Closing through the effective date of such Designated Contract's or Designated Lease's assumption and assignment or rejection in accordance with the Sale Order; provided, however, that if Buyer, at Sellers' request, delays the designation of a Contract for rejection or the effective date of rejection of a Designated Contract, then Sellers shall be responsible for any amounts due and payable under such Contract from the date on which Buyer would have otherwise designated such Contract for rejection or the date on which such rejection would have been effective, as applicable, through the effective date of such Contract's rejection.

(e)    Sellers shall take all actions reasonably required to assume and assign the Transferred Contracts and Assumed Leases to Buyer, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts

28

or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(f)      Buyer shall take all actions reasonably required for Sellers to assume and assign the Transferred Contracts and Assumed Leases to Buyer (including the payment of Cure Costs, if any), including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(g)      Buyer shall as promptly as reasonably practicable (but in any event within five (5) Business Days) pay all Cure Costs (if any) in connection with such assumption and assignment.

(h)      During the Designation Rights Period, Sellers shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Contract or Lease, or take any affirmative action not required thereby, without the prior written consent of Buyer (not to be unreasonably withheld or delayed) unless Buyer has provided written notice to Sellers designating such Contract or Lease for rejection pursuant to this Section 2.8.

(i)      Subject to Buyer's rights in Section 2.8(c) to designate a Contract or Lease to the Buyer itself, Agent (or its Affiliates) shall have the exclusive right to act as Sellers' and Buyer's exclusive agent for the purposes of (a) marketing and selling, assigning, transferring, licensing, designating, or otherwise disposing of the Closing Store Leases beginning as of the Sale Commencement Date and continuing through and including the Designation Rights Period and (b) designating the ultimate purchaser, acquirer, assignee, transferee, licensee, or designee (including a lessor of a Closing Store Lease) (collectively the "Agent Designation Rights").  Buyer and Sellers shall take such actions as may be reasonably required to effectuate all Agent Designation Rights.  In that regard, during the Designation Rights Period, Buyer and Sellers agree to cooperate with Agent to arrange for the sale or other disposition of the Closing Store Leases (at no cost to Sellers), with such sales or other dispositions on such terms as Agent shall determine in consultation with Buyer.  Without limiting the generality of the foregoing, Buyer and Sellers agree (at no cost to Sellers): (i) to provide Agent with all due diligence materials and information in its possession as Agent shall reasonably request in connection with Sellers' pre-existing efforts to market and attempt to sell or otherwise dispose of the Closing Store Leases, (ii) cooperate with Agent and Agent's agents or Representatives and any potential purchasers, acquirers, assignees, transferees, licensees, or designees of any of the Closing Store Leases, and (iii) provide Agent with copies of all offers or bids or expressions of interest in any Closing Store Leases received by Sellers or their Representatives prior to or after the Sale Commencement Date and, thereafter Sellers shall direct all bids or expressions of interest regarding any Closing Store Leases to Agent, including any bids or expressions of interest received by an end user or a landlord or any agent thereof.  It is further agreed that Sellers shall cooperate with any proposed auction or private sales which Agent may, in its

reasonable discretion, elect to utilize in order to sell or otherwise dispose of the Closing Store Leases, and Agent shall have the right in its reasonable discretion to remove any Closing Store Leases from a public auction and to have such Closing Store Lease assigned to Agent or to a third party through a private sale in accordance with sections 363 and 365 of the Bankruptcy Code, subject to Bankruptcy Court approval and Buyer's consent rights as set forth herein. Buyer shall determine at least ten (10) days prior to expiration of the applicable Designation Rights Period whether Buyer will designate any Closing Store Leases for assumption and assignment to Buyer, and Buyer will as soon as reasonably practicable provide written notice of such determination to Agent; provided, however, that nothing herein shall in any way limit or restrict Buyer's right to, in its sole discretion, designate any Closing Store Leases for assumption and assignment to Buyer pursuant to Section 2.8(c) at any time during the Designation Rights Period (subject to the time restrictions for determining any such designation and delivering a Designation Notice in respect thereof pursuant to Section 2.8(c)) at no additional cost or expense to Buyer. All proceeds from the sale, assignment, transfer, license, designation, or other disposition of the Closing Store Leases (the "Store Lease Proceeds") shall be retained by the Agent for Agent's sole and exclusive benefit (subject to the terms of the Agency Agreement or other written agreement relating thereto), and the Sellers shall have no right, title, or interest in or to the Store Lease Proceeds.

Section 2.9    Allocation. For U.S. federal and applicable state and local income Tax purposes, Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities treated as part of the purchase price for applicable income Tax purposes, and all other items required under the Code among the assets treated as acquired pursuant to this Agreement and the Agency Agreement for Tax purposes in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate) (the "Allocation Principles"). As soon as commercially practicable, but no later than forty five (45) days after the date on which the Final Purchase Price is finally determined pursuant to Section 2.7, Buyer shall in good faith prepare and deliver to Sellers a proposed allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) as of the Closing Date determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Sellers' review and approval (such approval not to be unreasonably withheld, conditioned or delayed). Any reasonable comments provided by Sellers to the Buyer under this Section 2.9 shall be considered by the Buyer in good faith. The Purchase Price Allocation (inclusive of any reasonable comments accepted by the Buyer) shall be conclusive and binding on the parties unless Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Purchase Price Allocation, and specify the reasonable basis for such objection, within thirty (30) days after delivery to Sellers of the Purchase Price Allocation. In the case of such an objection, Sellers and Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by Sellers and Buyer shall be conclusive and binding on the parties once set forth in writing. If Sellers and Buyer are unable to resolve all disputed items within twenty (20) days after the delivery of Sellers' written objection to Buyer, any such disputed items remaining in dispute shall be resolved by an impartial nationally-recognized firm of independent certified public accountants (the "Accounting Firm") mutually appointed by Sellers and Buyer. The Accounting Firm shall render a written decision as to the disputed items, which decision shall be conclusive and binding on the parties. All fees and expenses relating to the work, if any, to be performed by the Accounting Firm shall be borne 50% by the Buyer and 50% by the

Sellers. Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation, as finally determined hereunder. None of the Parties will take any position inconsistent with the Purchase Price Allocation, as finally determined hereunder, on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority. Notwithstanding the foregoing, the Parties recognize that certain allocations may be necessary prior to the above time schedule, such as in the case of any Transfer Tax filings, and agree to reasonably cooperate in determining the appropriate allocation in a timely manner.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.9 shall survive the Closing without limitation.

Section 2.10    Proration.

(a)    Upon the effective date of an assignment of any Assumed Lease, if any, all monthly payments for the month in which the assignment occurs (including base rent, common area maintenance fees, and utility charges) under the Leases transferred at such assignment (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the effective date of an assignment with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the lease month in which the assignment occurs, times (B) the number of days in such lease month following the day that immediately precedes the effective date of an assignment and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the assignment, and (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers).  The net amount of all Prorated Charges owed to Buyer and Sellers under this shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers. Except as set forth in this Section 2.10 and in Section 6.5, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.

(b)    As to all non-monthly real estate related payments, the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the effective date of an assignment.  If any amounts are payable in installments, all installments due through the effective date of an assignment together with the accrued but unpaid portion of any other installments not yet due as of the effective date of an assignment shall be prorated based on the periods of time covered by such installments occurring before and after the effective date of an assignment (for the avoidance of doubt, with Buyer being responsible for all amounts for the period beginning as of 12:01 a.m. on the effective date of an assignment).

(c)    As to real estate taxes and assessments, if the effective date of an assignment shall occur before a new real estate or personal property tax rate is fixed for the applicable property for the period in which the effective date of an assignment occurs, the apportionment of such taxes for such property at the effective date of an assignment shall be upon the basis of the old tax rate for the preceding fiscal year applied to the latest

31

assessed valuation; provided, however, that there will be no re-apportionment or re-computation of such Taxes for any property following the effective date of an assignment as a result of any error, omission, recalculation or other change in any applicable real estate or personal property tax rate or otherwise.

(d)    If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the effective date of an assignment because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the effective date of an assignment are discovered subsequent to the effective date of an assignment, then such item shall be reapportioned and such errors and omissions corrected, solely pursuant to the procedures and subject to the terms of Section 2.7.

Section 2.11    Removal of Excluded Assets.  As promptly as practicable following the Closing Date (and in any event within ten (10) Business Days), Sellers shall remove at their expense all of the Excluded Assets (other than those set forth in clause (m) of the definition thereof) that are located at the Closing Stores and, if requested by Sellers, Buyer shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' expense.

Section 2.12    Withholding.  Buyer and Agent shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement and the Agency Agreement, except to the extent resulting from a change in Law after the date hereof or a Seller's failure to satisfy its obligation under Section 2.5(c)(ix). Buyer, Agent, and each of the Sellers shall cooperate in good faith to reduce or otherwise eliminate any such withholding obligation to the extent permitted by applicable Law.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date of this Agreement, except as (i) set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule") or (ii) disclosed in any documents filed by or on behalf of Sellers with the United States Securities and Exchange Commission (the "SEC") since December 31, 2014 to the date hereof and publicly available prior to the date of this Agreement (excluding any disclosures in any risk factors section, in any section related to forward-looking statements, and any other disclosures that are predictive or forward-looking in nature).

Section 3.1    Organization of Sellers; Good Standing.  Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    Authorization of Transaction.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power

and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Noncontravention; Government Filings</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order, violate any law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract or Lease to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Other than as required by, or pursuant to, the Bankruptcy Code, the Bidding Procedures Order, or the Sale Order, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except (i) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (ii)  where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    <u>Title to Assets</u>.  At the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, except to the extent the failure to have such title or right to use would not be expected to be material to the Business or the Acquired Assets. Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    <u>Transferred Contracts</u>.

(a)    True and complete copies of all Contracts and Leases set forth on <u>Schedule 2.8(a)</u> have been made available to Buyer in the data room prepared by Sellers.

(b)    The Sellers have not received any written notice of any default, notice of termination or intent to terminate, or notice regarding payment delinquency, and there has not been an event that with notice or lapse of time or both would constitute a default by

Sellers under any Transferred Contract or Assumed Lease set forth on <u>Schedule 2.8(b)</u>, except for defaults that would not be reasonably likely to be material to the Business.

Section 3.6     <u>Real Property</u>.  <u>Section 3.6</u> of the Disclosure Schedule sets forth the location of each Closing Store, each of which is leased to a Seller by a third party, and a list of all Leases.  Sellers have made available to Buyer a true and complete copy of each Lease to the extent in their possession.  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect.

Section 3.7     <u>Litigation; Decrees</u>.  Except as set forth in <u>Section 3.7</u> of the Disclosure Schedule and other than the Bankruptcy Case, there is no Litigation pending that (a) would reasonably be expected to be material to the Business or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Other than the Bankruptcy Case, no Seller is subject to any outstanding Decree that would (a) reasonably be expected to be material to the Business or the Acquired Assets or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.8     <u>Data Privacy</u>.  In connection with its collection, storage, transfer (including transfer across national borders) and/or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively "<u>Personal Information</u>"), to the Knowledge of Sellers, each Seller is and, during the last three (3) years, has been in compliance in all material respects with all applicable Laws in all relevant jurisdictions.  Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure in accordance with applicable Law.  To the Knowledge of Sellers, each Seller is and, during the last three (3) years, has been in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations.

Section 3.9     <u>Brokers' Fees</u>.  Other than the fees and expenses payable to Houlihan Lokey in connection with the transactions contemplated hereby, which shall be borne by Sellers, no Seller has entered into any Contract to pay any fees or commissions to any broker,

34

finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.10    Taxes.

(a)    Except for matters that would not be reasonably expected to result in a Material Adverse Effect, (i) Sellers have timely filed all Tax Returns with respect to the assets treated as having been acquired by Buyer or another person pursuant to this Agreement and the Agency Agreement required under applicable Law to be filed by the Sellers with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained by or on behalf of Sellers); and (ii) all Taxes shown as due from the Sellers on such Tax Returns with respect to such assets have been paid, except to the extent nonpayment of which is permitted or required by the Bankruptcy Code.

(b)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.11    Tangible Personal Property.    Section 3.11 of the Disclosure Schedule sets forth all Contracts on Schedule 2.8(a) that constitute leases of personal property ("Personal Property Leases") involving annual payments in excess of $100,000 relating to personal property used by Sellers in the Business.  To the Knowledge of Sellers, Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any of the Personal Property Leases.

Section 3.12    Employee Benefits.

(a)    Section 3.12(a) of the Disclosure Schedule lists all material Company Benefit Plans.  Company Benefit Plans shall mean all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their Subsidiaries with respect to Covered Employees in effect as of the date hereof.

(b)    The Company has made available to Buyer summaries of all Company Benefit Plans.

(c)    Each of the Company Benefit Plans sponsored by Sellers and its Subsidiaries that is intended to qualify under section 401 of the IRC has received a

favorable determination letter from the IRS or may rely on a favorable opinion letter issued by the IRS.

(d)    Each of the Company Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

(e)    For the avoidance of doubt, the Sellers' obligations under the Company Benefit Plans shall not constitute Assumed Liabilities for any reason.

Section 3.13    Intellectual Property.

(a)    Except as set forth in Section 3.13(a) of the Disclosure Schedule, Sellers own all right, title and interest in and to the Owned Intellectual Property, free and clear of all Liens other than Permitted Liens. Except as set forth in Section 3.13(a) of the Disclosure Schedule or as otherwise contemplated by this Agreement, the Owned Intellectual Property (and the other Acquired Assets) constitutes all product-related Intellectual Property owned by any Seller and used or held for use by Sellers in the Business. Except for Contracts relating to Intellectual Property (i.e., that is used for the branding of a product or with respect to the design, features, functionality or material of a product) that is not owned by Sellers, but is used by Sellers in the Business, and except as set forth in Section 3.13(a)(i) of the Disclosure Schedule, there are no Contracts that require the payment of any money or giving of other consideration solely for the use of such Intellectual Property by Sellers.

(b)    Trademarks

(i)    Schedule 3.13(b) of the Disclosure Schedule contains a complete and accurate list and summary description of all registered and applied for Trademarks included in the Owned Intellectual Property, including for each the applicable trademark or service mark, application numbers, filing dates, trademark registration numbers and registration dates, as applicable.

(ii)    Except as set forth on Schedule 3.13(b) of the Disclosure Schedule, all of the registered Trademarks included in the Owned Intellectual Property are subsisting and in full force and effect.  Each of the United States registered Trademarks included in the Owned Intellectual Property for which filings based on continuous use have been made by a Seller have been in continuous use in the United States or had been in continuous use in the United States at the time such filings were made. Except as set forth on Schedule 3.13(b) of the Disclosure Schedule, none of the trademark registrations included in the Owned Intellectual Property  are subject to any maintenance fees or renewal actions from the date hereof to December 31, 2019.

(iii)    No Trademark included in the Owned Intellectual Property has been or is now the subject of in any opposition, invalidation or cancellation proceeding, in each case which is pending and unresolved, and, to the Knowledge of Sellers, no such action is threatened.

(iv)    All products and materials containing a U.S. federal Trademark bear the proper federal registration notice where required by Law.

(c)    <u>Copyrights</u>

(i)    <u>Schedule 3.13(c)</u> of the Disclosure Schedule contains a complete and accurate list and summary description of all registered copyrights included in the Owned Intellectual Property, including title, registration number and registration date.

(ii)    All of such registered copyrights included in the Owned Intellectual Property are in full force and effect.

(iii)    All works encompassed by the registered copyrights included in the Owned Intellectual Property have been marked with the copyright notice to the extent required by applicable Law.

(d)    <u>Patents</u>

(i)    <u>Schedule 3.13(d)</u> of the Disclosure Schedule contains a complete and accurate list and summary description of all issued Patents included in the Owned Intellectual Property, including name, patent number and issuance date.

(ii)    To the Knowledge of Sellers, all of the issued Patents included in the Owned Intellectual Property are subsisting and in full force and effect.  Except as set forth in <u>Schedule 3.13(d)</u> of the Disclosure Schedule, none of the issued Patents included in the Owned Intellectual Property are subject to any maintenance fees or renewal actions from the date hereof to December 31, 2019.

(iii)    All products made, used or sold under the Patents included in the Owned Intellectual Property have been marked with a patent notice to the extent required by applicable Law.

(e)    During the past three (3) years, Sellers have not brought any actions or lawsuits alleging: (i) infringement, misappropriation or other violation of any of the Owned Intellectual Property; or (ii) breach of any agreement authorizing another party to use the Owned Intellectual Property.  Except as set forth on <u>Schedule 3.13(e)</u> of the Disclosure Schedule, to the Knowledge of Sellers, there do not exist any facts or dispute, including any claim or threatened claim, that could form the basis of any such action or lawsuit.

(f)    To the Knowledge of Sellers, there is no pending dispute, including any claim or threatened claim, with respect to the Owned Intellectual Property: (i) contesting the right of Sellers to use, exercise, sell, license, transfer or dispose of any of the Owned Intellectual Property or any Business products or services; or (ii) challenging the ownership, validity or enforceability of any of the Owned Intellectual Property.

(g)    <u>Schedule 3.13(g)</u> of the Disclosure Schedule contains a listing of all Contracts to which Sellers are a party and pursuant to which any third party is licensed to

37

use any Owned Intellectual Property, other than Contracts (*e.g.*, information technology, e-commerce, marketing) entered into in the Ordinary Course of Business pursuant to which Intellectual Property is licensed to any counterparty to such Contracts in the performance of such counterparty's services to Sellers and/or their Subsidiaries thereunder. Schedule 3.13(g) of the Disclosure Schedule also contains a listing of all Contracts to which Sellers are a party that relates to the settlement of any claims related to the Owned Intellectual Property (such as a co-existence agreement). To the Knowledge of Sellers, except in connection with the Bankruptcy Case, there is no pending dispute, including any claim or threatened claim or the existence of any facts, indicating that Sellers or any other party thereto is in breach of any terms or conditions of such Contracts.

(h)     Except as set forth on Schedule 3.13(h) of the Disclosure Schedule, to the Knowledge of Sellers, the operation and conduct of the Business as currently conducted by Sellers, including the manufacture, marketing, license, sale or use of any products or services anywhere in the world in connection with the Business has not, in the last three (3) years, and does not as of the Closing Date, (i) violate any license or agreement with any third party to which a Seller is bound; or (ii) infringe, misappropriate or violate any intellectual property right of any third party.  To the Knowledge of Sellers, there is no dispute, including any claim or threatened claim or the existence of any facts, to the effect that the manufacture, marketing, license, sale or use of any product or service of the Business as currently conducted by Sellers infringes, misappropriates or otherwise violates any Intellectual Property of any third party or violates any license or agreement with any third party to which a Seller is bound. Sellers have not received service of process or been charged in writing as a defendant, in the last three (3) years, in any claim, suit, action or proceeding that alleges that any of the Owned Intellectual Property infringes any Intellectual Property right of any third party, which has not been finally adjudicated prior to the Closing Date.

(i)     Except as set forth on Schedule 3.13(i) of the Disclosure Schedule, Sellers have the full right, power and authority to sell, assign, transfer and convey all of their right, title and interest in and to the Intellectual Property to Buyer, and upon Closing, Buyer will acquire from Sellers good and marketable title to the Owned Intellectual Property, free of Liens (other than Permitted Liens).  Neither the execution and delivery of this Agreement and the other Related Agreements to which any Seller is a party, nor the performance by Sellers of their respective obligations hereunder and thereunder, nor the consummation by Sellers of the transactions contemplated hereby and thereby (i) violate, conflict with or result in a violation or breach of or default under (either immediately or upon notice, lapse of time or both), or constitute a default (with or without due notice or lapse of time or both) under the terms, conditions or provisions of any Contract with respect to any Intellectual Property to which any Sellers is a party or give rise to any obligation to pay an assignment or transfer fee or right of termination, cancellation or result in the acceleration of any obligation under any Assumed Contract relating to Intellectual Property, or (ii) result in the

creation or imposition of any Lien on any of the Owned Intellectual Property (other than any Permitted Liens).

(j)     No domain names have been, during the past three (3) years, or are now involved in any dispute, opposition, invalidation or cancellation proceeding and, to the Knowledge of Sellers, no such action is threatened with respect to any domain names.

Section 3.14    Compliance with Laws; Permits.

(a)     Sellers are in compliance with all Laws applicable to the Business, except where the failure to be in compliance would not be reasonably expected to result in a Material Adverse Effect.  Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to result in a Material Adverse Effect.

(b)     Sellers have all material Permits which are required for the operation of the Business as presently conducted.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which they are parties, except where such default or violation would not be reasonably expected to be material to the Business.

Section 3.15    Environmental Matters.    The representations and warranties contained in this Section 3.15 are the sole and exclusive representations and warranties of the Sellers and their Subsidiaries with respect to environmental matters, including matters relating to Environmental Laws.  Except as would not be reasonably likely to result in a Material Adverse Effect:

(a)     the operations of the Sellers and their Subsidiaries are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business;

(b)     neither the Sellers nor any of their Subsidiaries is the subject of any outstanding Litigation with any Governmental Authority with respect to Environmental Laws;

(c)     neither the Sellers nor any of their Subsidiaries is the subject of any pending, or to the Knowledge of the Sellers, threatened Litigation alleging that the Sellers or any of their Subsidiaries may (i) be in violation of any Environmental Law, or any Permit issued pursuant to Environmental Law, or (ii) have any liability under any Environmental Law; and

(d)     to the Knowledge of the Sellers, there are no pending or threatened investigations of the Sellers or their Subsidiaries, or currently or previously owned, operated or leased property of the Sellers or their Subsidiaries, which would reasonably be

39

expected to result in the Sellers or their Subsidiaries incurring liability pursuant to any Environmental Law.

Section 3.16    Related Party Transactions.  Except as set forth on Section 3.16 of the Disclosure Schedule and other than the Company Benefit Plans, no officer, director or executive committee member of any Seller or any member of their immediate family or any Affiliate of the Company or such Seller (a) is a party to any Contract or Lease set forth on Schedule 2.8(b) of the Disclosure Schedule or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, the Company or any actual competitor, vendor or licensor of the Company (each such Contract, Lease or business arrangement, an "Affiliate Agreement"), (b) to the Knowledge of the Sellers, none of the foregoing Persons have any cause of action or other claim whatsoever against or related to the Business or the Acquired Assets, and (c) to the knowledge of Sellers, the Company does not have any direct or indirect business arrangement with or financial obligation to the foregoing Persons.

Section 3.17    Disclaimer of Other Representations and Warranties.  Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, no Seller nor any other Person makes, or shall be deemed to have made, and none of Buyer or any of its Representatives is relying on, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any of the Sellers, any Acquired Assets, any Assumed Liabilities or any other matter.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NO SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  Except as expressly set forth in this Agreement, Sellers disclaim all Liability and responsibility for, and none of Buyer or any of its Representatives is relying on, any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or Representative of Sellers or any of their Affiliates).

Section 3.18    Inventory.  The Inventory as a whole is of a quantity and quality historically useable or saleable in the conduct of the Business.  All Inventory other than Excluded Inventory is free from defects in materials and workmanship (normal wear and tear excepted), except as would not be material to the Business.

Section 3.19    File.  The Sellers have maintained their pricing files (including the File) in the Ordinary Course of Business. All pricing files and records are accurate in all material respects as to the actual cost to the Sellers for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts.

Section 3.20    Royalties.  Section 3.20 of the Disclosure Schedule sets forth a summary, true and correct in all material respects, without duplication, of all royalty payments generated by the licensee under the Business's international license and distribution agreements

for each quarter in the calendar years ended December 31, 2017 and 2018 and for each quarter in the nine-month period ended September 30, 2019.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement.

Section 4.1    <u>Organization of Buyer; Good Standing</u>.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    <u>Authorization of Transaction</u>.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer.  This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of formation, limited liability company agreement or other organizational documents, of Buyer, (b) violate any law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract or Lease to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except (i) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (ii)  where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    <u>Litigation; Decrees</u>.  There is no Litigation pending or, to the Buyer's knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent

41

or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.  Buyer has, and will have at Closing, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and Assumed Leases and the related Assumed Liabilities.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.  Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.4(a)), each of the Parties and the Agent shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties and Agent in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.4.  Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.3 that are within its control or influence to be satisfied or fulfilled.

Sellers shall use commercially reasonable efforts to make filings to renew the following US trademark registrations prior to Closing: (i) BARNEYS NEW YORK WAREHOUSE Reg. No. 4343133 for retail store services in Class 35, and (ii) BARNEYS WAREHOUSE Reg. No. 4343134 for retail store services in Class 35.

Sellers shall make filings to renew the following trademark to meet the renewal deadline (with grace period) of October 28, 2019 ("Japan Trademark Filings"):

| COUNTRY | TRADEMARK | REGISTRATION NO | INT. CLASSES | TRADEMARK STATUS | RENEWAL DEADLINE with GRACE PERIOD |
|---------|-----------|-----------------|--------------|------------------|-------------------------------------|
| Japan | BARNEY'S | 2131984 | 20, 22, 24, 25 (clothing) | Registered | October 28, 2019 |

42

Section 5.2    <u>Conduct of the Business Pending the Closing</u>.

(a)    During the period prior to the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code, an Order of the Bankruptcy Court, the DIP Financing Agreement, applicable Law or this Agreement, to operate the Business in the Ordinary Course of Business. Sellers shall use commercially reasonable efforts to except as related to or the result of the filing or pendency of the Bankruptcy Cases or as limited by the Bankruptcy Code or the DIP Financing Agreement, (A) preserve intact their business organizations, (B) maintain the Business and the Acquired Assets consistent with past practice (normal wear and tear excepted), (C) keep available the services of its officers and Covered Employees, (D) except as related to or the result of the filing or pendency of the Bankruptcy Cases, maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, vendors and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) continue to operate the Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Business and Sellers consistent with past practice.

(b)    Except (i) as set forth on <u>Section 5.2(b)</u> of the Disclosure Schedule, (ii) as required by applicable Law, order of the Bankruptcy Court or the DIP Financing Agreement, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller shall, solely as it relates to the Business:

(i)    other than in the Ordinary Course of Business or as required by any applicable collective bargaining agreement or Law, (A) materially increase the annual level of compensation of any Covered Employee or (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    terminate, permit to expire, amend or fail to renew, obtain or preserve any material Permit;

(iv)    make any material loans or material advances;

(v)    enter into any Contract that limits or restricts the conduct or operations of the business of the Company, including the use of the Intellectual Property;

(vi)    incur, create, assume, guarantee or become liable for any indebtedness, in each case, other than Excluded Liabilities or pursuant to or as permitted by the DIP Financing Agreement;

(vii)    use "liquidation" sales or use "brand sale", "going out of business", "out of business", "going out of business sale", "we quit", "quitting business", or "liquidation/liquidating", "store closing", "sale on everything", "everything must go", or similar language or theme, except as being used by the Excluded Stores as of the date hereof;

(viii)    except as previously disclosed to or known by Buyer, materially modify, amend (other than by automatic extension or renewal), supplement or terminate (other than by expiration) any Contract or Lease set forth on Schedule 2.8(a) (other than any purchase orders);

(ix)    fail to maintain in full force and effect any filings necessary to maintain the material Owned Intellectual Property, other than in the Ordinary Course of Business;

(x)    reject any Contracts or Leases other than as set forth on Section 5.2(b)(x) of the Disclosure Schedule;

(xi)    other than through Sellers' E-Commerce Platform until such time as Sellers, using commercially reasonable efforts, may be able to discontinue the issuance thereof and except for issuances through third-party vendors, issue any gift cards or gift certificates;

(xii)    seek to accelerate the receipt of any royalty payments or licensing receivables generated by the Business, by way of discount or otherwise;

(xiii)    terminate any Covered Employee unless such termination is for "cause" as determined consistent with past practice;

(xiv)    agree to do anything prohibited by this Section 5.2; or

(xv)    offer any discount or promotion that is not reflected on Schedule 5.2(b)(xv) of the Disclosure Schedule.

Section 5.3    Bankruptcy Court Matters.

(a)    Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (whether through cash, assumed liabilities or credit bid) in respect of all or any part of the Acquired Assets (whether in combination with other assets of the Sellers or their Affiliates or otherwise) (each a "Competing Bid").

(b)    Bankruptcy Court Filings.

44

(i)    Sale Order.  Sellers shall seek entry of the Sale Order and any other necessary orders to close the sale and approve the transactions contemplated by the Agency Agreement by the Bankruptcy Court as soon as reasonably practicable following the Auction.  Buyer and Sellers understand and agree that the transaction is subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(ii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and Assumed Leases and to determine the amount of the Cure Costs; provided that nothing herein shall preclude Sellers from filing such motions to reject any Contracts or Leases that are not Transferred Contracts or Assumed Leases.

(c)    If this Agreement is terminated pursuant to Section 8.1 (other than pursuant Section 8.1(a) or 8.1(d)), then (i) Buyer shall be entitled to payment of the Expense Reimbursement and (ii) if Sellers enter into or consummate a Competing Bid, then Buyer shall be entitled to the payment of the Break-Up Fee less any Expense Reimbursement amount previously paid.

(d)    Payment of (i) the Expense Reimbursement contemplated by clause (i) of Section 5.3(c) shall be made in cash, without further order of the Bankruptcy Court, promptly following such termination, and (ii) the Break-Up Fee in accordance with clause (ii) of Section 5.3(c) shall be made solely from the proceeds of and only upon consummation of the Competing Bid and shall be administrative expense of the Bankruptcy Case.  The obligations of Sellers to pay the Break-Up Fee and/or the Expense Reimbursement shall survive the termination of this Agreement in accordance with Section 8.2; provided, however, the Break-Up Fee and/or the Expense Reimbursement shall be deemed earned upon entry of the Sale Order.

(e)    If an Auction is conducted, and Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Buyer shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated.  If the Successful Bidder fails to consummate the applicable Competing Bid as a result of a breach or failure to perform on the part of such Successful Bidder, or as otherwise provided for in the Bidding Procedures, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the transactions contemplated

by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(f)      Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable Order of the Bankruptcy Court.

Section 5.4      Notices and Consents.   Prior to the Closing and as necessary following the Closing:

(a)      Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.4(a) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby; provided, however, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters, (ii) neither Company nor any Subsidiary of Company shall be required to pay any consideration therefor or incur any expenses in connection therewith, (iii) Sellers shall not be obligated to initiate any Litigation or legal proceedings to obtain such consent or approval, and (iv) Buyer shall pay any reasonable costs, or bear any reasonable effects as a result of amendments or modifications to any Transferred Contract, in either case as is necessary to obtain such consent or sublicense, and if Buyer refuses to pay such costs, such Acquired Asset shall be excluded from the transactions hereunder and there shall be no adjustment to the Purchase Price on account of such exclusion and Buyer will indemnify Sellers for any Damages as a result thereof, including any Damages from any inability of any Seller (including any Subsidiary of any Seller) to perform under a Contract that otherwise would be a Transferred Contract as a result of the other transactions contemplated hereby.

(b)      In no event will the obtaining or receipt of any consent or approval, including any matter contemplated by Section 5.4(a) be a condition to Closing.

Section 5.5      Notice of Developments.   Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6      Access.   Upon the reasonable request of Buyer or Agent, Sellers will permit Buyer, Agent, and their Representatives to have, upon reasonable advance written notice, access to all premises, properties, books and records and Transferred Contracts and Assumed Leases included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; provided, however,

that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto.  Buyer and Agent shall upon reasonable notice to, and with the prior written consent of, Sellers (which shall not be unreasonably withheld, delayed or denied) be permitted to contact vendors, suppliers, licensors and licensees. Sellers shall be entitled to be present at any such meetings.

Section 5.7    Bulk Transfer Laws.   Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

# ARTICLE VI
# OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.

(a)    In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

(b)    If, following the Closing, Buyer or any Seller becomes aware that Buyer or any of its Affiliates owns any asset or rights which is an Excluded Asset, such Party shall promptly inform the other party of that fact.  Thereafter, at the request of any Seller, Buyer shall execute, or cause the relevant Affiliate(s) of Buyer to execute, such documents as may be reasonably necessary to cause the transfer of and Buyer shall thereafter transfer any such asset or right to Seller or such other entities nominated by such Seller for no consideration and such Seller shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, Buyer receives any payments in respect of an Excluded Asset, Buyer shall promptly remit such payments to the applicable Seller or other entity nominated by such Seller.

(c)    If, following Closing, Buyer or any Seller becomes aware that a Seller or any of its Affiliates owns any asset or rights which is an Acquired Asset, such Party shall promptly inform the other Party of that fact.  Thereafter, at the request of Buyer, the applicable Seller shall execute or cause the relevant Affiliate(s) of such Seller to execute such documents as may be reasonably necessary to cause the transfer of and such Seller shall thereafter transfer any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Seller or its Affiliates receive any

47

payments in respect of the Acquired Assets, such Seller shall promptly remit such payments to Buyer or other entity nominated by Buyer.

(d)    With respect to any Acquired Asset (and any asset which is not an Acquired Asset solely as a result of a restriction on transfer or assignment) for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, from and after the Closing through March 31, 2020 (or the earlier closing of the Bankruptcy Cases), Sellers shall reasonably cooperate, at Buyer's sole cost and expense, with Buyer in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Acquired Assets (or assets that are not Acquired Assets solely as a result of a restriction on transfer or assignment) including taking actions reasonably required to enforce (for the avoidance of doubt, at no cost to Sellers), for the benefit of Buyer, any and all rights of Sellers against any party to the applicable Acquired Asset.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by any Party (the "Requesting Party"), the other Parties will permit such Requesting Party and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of such Party, to all premises, properties, personnel, books and records (including electronic records and access to the systems holding such materials), and Contracts or Leases of such Party for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations under this Agreement or any of the Related Agreements, (c) complying with the requirements of any Governmental Authority or (d) in the case of Sellers, the closing of the Bankruptcy Cases and the wind down of the Sellers' estates; provided, however, that, for avoidance of doubt, the foregoing shall not require a Party to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations.  Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing. From and after the Closing, Buyer will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

Section 6.3    Covered Employees.

(a)    Buyer may offer employment to any of the Covered Employees.  At least two (2) Business Days prior to the Closing Date, Buyer shall provide Sellers a list of any non-Store Covered Employees that Buyer would like to make an offer of employment. Any such offer of employment will be effective as of the Closing Date and contingent upon the Closing, and with respect to each of the Covered Employees who is then employed by Sellers or their respective Subsidiaries, Buyer shall make commercially reasonable efforts to keep such employment at the same location, at the same base wage or hourly rate, with employee benefits which are substantially comparable in the aggregate and on the same terms and conditions of employment (excluding, for the avoidance of doubt, severance) as

in effect immediately prior to the Closing. Each Covered Employee who accepts such offer of employment shall be deemed a "Transferred Employee"; provided that any Covered Employee who is on an approved leave of absence as of the Closing (an "Inactive Employee") shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status pursuant to the following sentence, and notwithstanding anything herein to the contrary, Buyer and its Affiliates shall only be responsible for Liabilities relating to such Inactive Employee from and after the date such Inactive Employee becomes a Transferred Employee.  The employment of any Inactive Employee with Buyer or one of its Affiliates, as applicable, shall be effective upon his or her return to active work, provided that the Inactive Employee reports to work with Buyer or one of its Affiliates, as applicable, within five (5) Business Days after the end of any such approved leave and, to the extent permitted by applicable Law, in no event later than six (6) months following the Closing Date, and, as of such date, such Inactive Employee shall be a Transferred Employee. Buyer, in its sole discretion shall also be permitted to offer employment to any Covered Employee that is not employed at a Closing Store and any such Covered Employee that accepts such offer of employment shall be a Transferred Employee. Transferred Employees shall be entitled to the same level of seniority as such employee had immediately prior to the Closing. Sellers will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.

(b)     Waiver of Pre-Existing Conditions; Crediting of Deductibles. Transferred Employees, in the commercially reasonable discretion of Buyer, shall be eligible to participate in welfare benefit plans of Buyer or its Affiliates and any other benefits offered to similarly situated employees and Buyer shall use commercially reasonable efforts to cause (i) the waiver of any limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to such Transferred Employees under such plans and (ii) for the plan year in which the Closing Date occurs (or, if later, in the calendar year in which such Transferred Employees and their dependents commence participation in the applicable welfare plans), the crediting of each such Transferred Employee with any co-payments and deductibles paid prior to participation in such welfare plans in satisfying any applicable deductible or out-of-pocket requirements thereunder. Notwithstanding anything in this Agreement to the contrary, (i) the terms and conditions of employment for any Transferred Employees covered by an Assumed CBA shall be governed by the applicable Assumed CBA until the expiration, modification or termination of such Assumed CBA in accordance with its terms or applicable Law and (ii) nothing in this Agreement shall violate section 1113 of the Bankruptcy Code. For the avoidance of doubt, for any circumstance in which Buyer is offering employment to Covered Employees and there is no Assumed CBA implicated, except as set forth in Section 6.3(a) or as required by Law, Buyer is not obligated to commit to any particular benefits, wage rates or other terms of employment.

(c)     401(k) Plan Rollovers.  Buyer shall use commercially reasonable efforts to cause the Buyer's 401(k) plan to accept a "direct rollover" to Buyer's 401(k) plan of each Transferred Employee's account balances (including promissory notes evidencing all

49

outstanding loans) under Sellers' 401(k) plans if such rollover is elected in accordance with applicable Law by such Covered Employee.

(d)        No Third Party Beneficiary Rights.  Without limiting the generality of this Section 6.3 or Section 6.4 below, no provision of this Agreement shall create any third party beneficiary rights in any current or former employee or service provider of any Seller, any Covered Employee or Transferred Employee (including any beneficiary or dependent thereof) in respect of continued employment by the Sellers or its Affiliates or Buyer or its Affiliates or otherwise.  Nothing herein shall (i) guarantee employment for any period of time or preclude the ability of Buyer or any of its Affiliates to terminate any Transferred Employee for any reason, (ii) require Buyer or any of its Affiliates to continue any Company Benefit Plans, employee benefit plans or arrangements or prevent the amendment, modification or termination thereof after the Closing, or (iii) constitute an amendment to any Company Benefit Plan, employee benefit plans or arrangements.

(e)        Offer of Employment.  Except for any Assumed Liabilities, Sellers will have the sole and absolute responsibility for any financial or other commitments to their employees for the period prior to Closing, including any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, any withdrawal liability) or any local, state or federal law, rule or regulation (including, the WARN Act). Other than as set forth in Section 6.3(a), Buyer shall have no contractual or other obligation with respect to hiring, offering to hire or employing any of Sellers' employees. Except as set forth in Section 6.3(a), in no event shall Buyer be obligated to commit to any particular usage of employees or to any particular benefits or wage rates. Nothing contained herein shall be deemed an admission that Sellers have any financial obligation to employees or that obligations, if any, are entitled to a particular treatment or priority under the Bankruptcy Code. Sellers' failure to pay an obligation, if any, under this Section 6.3 shall not be a default under this Agreement.

Section 6.4        [reserved].

Section 6.5        Certain Tax Matters.

(a)        Transfer Taxes.  Buyer shall timely pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge (a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby.  Accordingly, if any Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by such Seller (including any additional Transfer Taxes resulting from such reimbursement).  Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned.  The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties

hereto shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

(b)    Tax Adjustments.  Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against assets treated as having been acquired by Buyer or another person pursuant to this Agreement and the Agency Agreement (including real estate taxes (other than those subsumed in Section 2.8), personal property taxes and similar Taxes) for the tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the tax period immediately preceding the Proration Period, using the apportionment method described in Section 2.10(c).

(c)    Tax Refunds.  In furtherance of Sellers' right to retain those assets described in section (a)(C) of the definition of Excluded Assets, Sellers shall be entitled to receive from Buyer all refunds (or credits for overpayments) of Taxes, including any interest paid thereon, by a Governmental Authority, attributable to any tax period ending on or prior to the Closing Date (a "Pre-Closing Period") or the portion of any Proration Period ending on and including the Closing Date, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits).  Buyer and Sellers shall execute all documents, take reasonable additional actions and otherwise reasonably cooperate as may be necessary to obtain the Tax refunds (or credits) contemplated by this Section 6.5(c).  Buyer shall pay any such Tax refund (or the amount of any such credit) to the Sellers within five (5) calendar days after Buyer receives such Tax refund from a Governmental Authority or files a Tax Return claiming such credit.

(d)    Preparation of Tax Returns and Payment of Taxes.

(i)    Sellers shall prepare and timely file all Tax Returns for any Pre-Closing Period; provided, further, that to the extent Buyer or Agent is in possession or control of Books or Records necessary or appropriate for Sellers to file any such Tax Return, Buyer or Agent, as applicable, shall make such Books and Records available to Sellers in a complete and timely manner.

(ii)    Buyer shall prepare and file all Tax Returns solely and directly attributable to any assets treated as having been acquired by Buyer pursuant to this Agreement for all periods arising after the Closing Date and any Proration Period. Agent shall prepare and file all Tax Returns solely and directly attributable to the Agent Acquired Assets for all periods arising after the Closing Date and any Proration Period.

51

(iii)    Except as otherwise required by Section 6.5(a) or (b), each of Sellers, Buyer, and Agent, respectively, shall pay the Taxes owed with respect to the Tax Returns each party is obligated to file under this Section 6.5(d), as applicable.  With respect to any Proration Period addressed by Section 6.5(d)(ii), Seller and Buyer, or Agent, as applicable, shall each pay a proportional amount of the tax for the period of time that each party owned the assets treated as having been acquired by Buyer or Agent pursuant to this Agreement and the Agency Agreement, determined in a manner consistent with Section 2.10(c).

(iv)    Buyer or Agent shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any tax position that has the effect of increasing any Tax due for a Pre-Closing Period or portion of a Proration Period ending on the Closing, unless such position is determined to be required at a "should" or higher level of authority by a nationally recognized accounting firm or law firm. Upon such determination, Buyer or Agent, as applicable, shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Buyer, or Agent as applicable, and Seller. The determination of such independent national accounting firm or law firm shall be binding on all parties and any Tax Return shall be filed consistently with such resolution.

(v)    For so long as Sellers remain in existence, Buyer, and Agent to the extent applicable, and the Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; *provided*, that nothing in this paragraph shall be interpreted to require any Seller to extend its existence.

(e)    Tax Treatment of Transactions.  The Buyer, Agent, and Sellers shall work in good faith to agree on the proper tax treatment of the transactions contemplated by this Agreement and the Agency Agreement (including, for this purpose, the implications of the Agency Agreement), including with respect to whether the Designated Assets have, as a result this Agreement and the Agency Agreement, been acquired by the Buyer or the Agent for applicable Tax purposes.  In the event the Buyer, Agent, and Sellers cannot agree on the proper characterization of such transactions, the issue will be submitted for resolution to a mutually agreeable nationally recognized accounting firm or law firm, with the cost of such resolution to be proportionately borne by the party or parties advocating a position that is contrary to the position taken by such accounting firm or law firm, and all parties shall take the position adopted by such accounting firm or law firm for all applicable Tax purposes, unless otherwise required by applicable Law.

Section 6.6    Insurance Matters.  From and after the Closing through February 29, 2020 (or the earlier closing of the Bankruptcy Cases), Sellers shall maintain in full force and effect (at Buyer's expense, if any), as property of Sellers, all of Sellers' Liability Insurance Policies and Casualty Insurance Policies (in each case, as defined in the Agency Agreement) providing

coverage in relation to Sellers, the Stores (other than closed Stores), or the Acquired Assets (whether such policies are maintained with third party insurers or with such Seller or its Affiliates).  On or prior to the Closing Date, Sellers shall (at Buyer's expense, if any), subject to the consent of the applicable insurer, amend such policies, effective as of the Closing Date, to include Buyer as an additional named insured, provided that Sellers shall notify Buyer no less than two (2) Business Days prior to the Closing Date of any applicable insurer consents that have not been so obtained.  The Parties understand and agree that, subject to the terms of the Insurance Order, Sellers shall have the right to cancel such policies on or after March 1, 2020 (or the earlier closing of the Bankruptcy Cases), and to recover and retain any premiums thereunder allocable to the period from cancellation of each such policy through the scheduled expiration date thereof (collectively, "Return Premiums"), subject to the terms and conditions of such policies.  Any loss, cost or expense suffered or incurred by Sellers in connection with the foregoing obligations (including any inability to recover full payment of the Return Premiums) arising as a result of Buyer's acts or omissions shall be promptly paid by Buyer to Sellers.  From and after the Closing, Sellers shall reasonably cooperate with Buyer (at Buyer's expense) to process and collect any claims made by Buyer under any such Liability Insurance Policies and Casualty Insurance Policies (in each case, as defined in the Agency Agreement).

Section 6.7    Acknowledgements.

(a)    Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against any Seller or any of their Affiliates or any of their respective directors, officers, employees, stockholders, members, managers, partners, Affiliates, agents, or other Representatives with respect thereto.  Accordingly, without limiting the generality of Section 3.16 or Section 9.1, Buyer acknowledges that none of the Sellers nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)    Buyer acknowledges that, except for the representations and warranties expressly set forth in Article III, as modified by the Disclosure Schedule (which representations and warranties shall terminate and be of no further force or effect as of the Closing), or expressly contained in any Related Agreement (collectively, the "Express Representations"), and without limiting the generality of Section 3.16, none of the Sellers nor any other Person has made, or shall be deemed to have made, any representation or warranty, express or implied, whether in written, electronic or oral form, including (A) as to the accuracy or completeness of any information regarding any of the Sellers, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, including in the data room, any projections or in any meetings, calls or correspondence with management of the Company and its Subsidiaries or any other Person on behalf of the Company, its Subsidiaries or any of their respective Affiliates or advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of

53

operations, assets, liabilities, properties, contracts, and prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, and, in each case, such matters are specifically disclaimed by the Sellers and that Buyer has not relied on any such representations, warranties or statements. No Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters described in the immediately preceding sentence or the distribution to Buyer, or the use of, any such information. Buyer acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, liabilities, properties, contracts and prospects of the Company and its Subsidiaries, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, any Subsidiary, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or advisors in the data room or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Company, its Subsidiaries or any of their respective Affiliates or advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer has relied only on the Express Representations). BUYER FURTHER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH OR SAFETY MATTERS). Further, without limiting any representation, warranty, or covenant of any Seller expressly set forth herein, Buyer acknowledges that it has waived and hereby waives, as a condition to the Closing, any further due diligence reviews, inspections, or examinations with respect to any Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.8    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity

to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.9    Personally Identifiable Information.

(a)    Buyer acknowledges that the Acquired Assets include "personally identifiable information" within the meaning of section 363(b) of the Bankruptcy Code, along with associated information about Sellers' customers (the "Customer Information").

(b)    Buyer shall: (i) employ appropriate security controls and procedures (technical, operational, and managerial) to protect the Customer Information; (ii) abide by all applicable laws and regulations with respect to the Customer Information; and (iii) take any such actions as may be agreed between Sellers and Buyer.

(c)    Buyer shall abide by the Sellers' privacy policies, and privacy-related covenants made in Sellers' terms of service, governing the Customer Information and in effect as of the petition date.

(d)    Buyer shall honor all prior requests by any individual who has opted out of receiving marketing messages from Sellers to the extent Buyer is aware of such requests.

(e)    Buyer may use the Customer Information solely for the purpose of continuing Sellers' business operations and continuing to provide similar goods and services to individuals or as otherwise permitted under Sellers' privacy policies and not in violation of any privacy-related covenants made in Sellers' terms of service or in violation of applicable Law. Buyer shall not contact any individual derived from the Customer Information other than with respect to a transaction with Sellers already initiated by such individual except as otherwise permitted under Sellers' privacy policies and not in violation of any privacy-related covenants made in Sellers' terms of service or in violation of applicable Law.

(f)    Buyer may use the Customer Information collected in connection with all "Barneys" brands solely for the purpose of marketing and advertising in connection with the "Barneys" brands or as otherwise permitted under Sellers' privacy policies and not in violation of any privacy-related covenants made in Sellers' terms of service or in violation of applicable Law.

(g)    Buyer may use mobile telephone numbers collected as part of the Mobile Alerts Program solely for the purpose of marketing and advertising, subject to the terms of the existing Mobile Alerts Program.

(h)    Within a reasonable time frame following the Closing and prior to the use of any of the Customer Information, Buyer shall arrange for an email communication that shall contain a clear and conspicuous notification advising the recipients that Buyer has purchased certain assets of the Business and providing an opt-out opportunity for such recipients regarding the future use of any of their information contained in the Customer Information (the "Opt-Out").  Buyer shall not utilize any Customer Information for any purpose not already contemplated by Sellers' existing privacy policies unless Buyer obtains

55

express consent to the future use of their information (the "Opt-In"). Any notice (a "Notice") distributed to obtain such consent shall provide such customer with the official name and trade name for Buyer, the effective date of the transactions contemplated by this Agreement, and a copy of the privacy policy that will be applicable with respect to all go-forward transactions and communications (the foregoing information collectively the "Notice Information"). For the avoidance of doubt, a "click-through" webpage or pop-up that discloses the Notice Information shall be an effective Opt-In mechanism for users of the website and is sufficient to constitute a Notice. Any such "click-through" Notice shall also provide a clear and prominent option allowing for a customer to "opt-out" of such future marketing purposes if not otherwise provided.

(i)     To the extent the Customer Information contains social security numbers ("SSNs"), Buyer shall limit the use of SSNs to tax reporting purposes and should purge that information from its database when any such SSN is no longer required for any such tax reporting purpose.

Section 6.10    No Successor Liability. The Parties intend that upon the Closing, the Buyer, Agent and their respective Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Sellers, including, a "successor employer" for the purposes of the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or other applicable laws; (b) have any responsibility or liability for any obligations of Sellers, or any affiliate of Sellers based on any theory of successor or similar theories of liability; (c) have, de facto or otherwise, merged with or into any of Sellers; (d) be an alter ego or a mere continuation or substantial continuation of any of Sellers (and there is no continuity of enterprise between the Buyer and any Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to Sellers' liability under such law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of Sellers or their respective estates.

Section 6.11    Change of Name.  No later than March 1, 2020, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Barneys", and/or "BNY" without the prior written consent of Buyer; provided, further, that prior to discontinuing such use, Sellers and their Subsidiaries may only continue to use their current names and any other names or DBA's currently utilized by such Seller or Subsidiary) solely for purposes of winding down the affairs of each Seller.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    [Reserved].

Section 7.2    <u>Conditions to Buyer's Obligations</u>.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in <u>Article III</u> shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(e)    duly executed counterparts to the Agency Agreement shall have been delivered to Buyer;

(f)    duly executed written confirmation from Sellers' Japanese trademark counsel (which for the avoidance of doubt shall be a Japanese law firm) that the Japan Trademark Filings have been made timely, shall have been delivered to Buyer;  and

(g)    each delivery contemplated by <u>Section 2.5(c)</u> to be delivered to Buyer shall have been delivered.

Section 7.3    <u>Conditions to Sellers' Obligations</u>.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in <u>Article IV</u> shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof

and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)      the Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)      no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement;

(e)      duly executed counterparts to the Agency Agreement for Buyer and Agent shall have been delivered to Sellers; and

(f)      each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(c) to be delivered to Sellers shall have been delivered.

Section 7.4      No Frustration of Closing Conditions.   Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.2 or Section 7.3, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or such other applicable efforts standard expressly contemplated hereby) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

Section 7.5      DIP Parties Closing Conditions.   Absent the written consent of each of the DIP Agent and the DIP Lenders, no Closing shall occur unless (a) the Bankruptcy Court shall have entered the Sale Order, and no order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date and (b) Sellers shall, at Closing, make the payment to the DIP Agent for the benefit of the DIP Lenders as required by Section 2.5(b) hereof and the Sale Order.

## ARTICLE VIII
## TERMINATION

Section 8.1      Termination of Agreement.   The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)      by the mutual written consent of the Parties, the DIP Agent and the DIP Lenders;

(b)      by any Party by giving written notice to the other Parties if:

(i)      any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any

other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement; or

(ii)    the Closing shall not have occurred prior to November 1, 2019 (the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii).

(c)    by Buyer by giving written notice to each Seller if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) thirty (30) days after receipt of Buyer's notice of such breach and (B) the Outside Date; provided, that Buyer shall not have a right of termination pursuant to this Section 8.1(c) if Seller could, at such time, terminate this Agreement pursuant to Section 8.1(d);

(d)    by any Seller by giving written notice to Buyer and the other Seller if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.3(a) and Section 7.3(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) thirty (30) days after receipt of such Seller's notice of such breach and (B) the Outside Date; provided, that Sellers shall not have a right of termination pursuant to this Section 8.1(d) if Buyer could, at such time, terminate this Agreement pursuant to Section 8.1(c);

(e)    by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid with one or more Persons other than Buyer or the Successful Bidder or the Backup Bidder at the Auction, or (y) the Bankruptcy Court enters an order approving a Competing Bid other than with the Successful Bidder or the Backup Bidder or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement;

(f)    by Buyer, if (i) Buyer is not the Successful Bidder or the Backup Bidder at the Auction, (ii) the Bankruptcy Court has entered an order authorizing and approving a Competing Bid with the Successful Bidder or Backup Bidder at the Auction, and (iii) such order shall have become a final order;

(g)      by Sellers, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that, nothing contained in this Section 8.1(g) shall modify the Sellers' obligations under Section 5.3(c); or

(h)      by Sellers or Buyer, if the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Cases.

(i)      Notwithstanding anything contained herein to the contrary, in the event that the Sellers terminate this Agreement pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers in accordance with Section 2.3(b)(ii) (within one (1) Business Day following the date of any such termination). Without limiting Sellers' rights pursuant to Section 9.11, the Sellers' receipt of the Escrow Amount, together with all accrued investment income thereon, if any, shall constitute liquidated damages (and not a penalty) in a reasonable amount that will compensate Sellers in the circumstances in which this Agreement is terminated pursuant to Section 8.1(d) (or, if at the time of such other termination, Sellers could terminate this Agreement pursuant to Section 8.1(d)) which amount would otherwise be impossible to calculate with precision, and be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of the Sellers against the Buyer, and any of its former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents for any loss suffered as a result of any breach of any covenant, representation, warranty or agreement in this Agreement by Buyer or the failure of the transactions contemplated hereby to be consummated, and upon payment of such amounts, none of Buyer nor any of its former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. Without limiting Sellers' rights pursuant to Section 9.11, in no event shall Buyer's Liability under this Agreement exceed an amount equal to the Escrow Amount.

Section 8.2      Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.16, Section 5.3(c), Section 6.6,  Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 2.3(b)(ii) and Section 5.3) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that

notwithstanding anything to the contrary herein, the maximum Liability of Sellers under this Agreement shall be equal to the Expense Reimbursement and Break-Up Fee to the extent payable.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Survival.    Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(c) or Section 2.5(d) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort, or at law or in equity) may be brought with respect thereto after the Closing.  Any obligations to be performed post-Closing shall survive until completion.

Section 9.2    Expenses.    Whether or not the Closing takes place, except as otherwise expressly set forth herein or in the Agency Agreement, each Party will bear its own costs and expenses incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and consummation of the transactions contemplated hereby and thereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.    This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.    The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.    No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party (and, in the case of any amendment or waiver extending the Outside Date or that would prevent or result in the failure of Sellers to indefeasibly repay all amounts owing under the DIP Financing Agreement and DIP Order at Closing or any other material amendment or waiver that could reasonably be expected to adversely affect the DIP Agent or the DIP Lenders), except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement

purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.

(a)    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.  Notwithstanding the foregoing, Buyer may assign (in whole or in part) either this Agreement or any of its rights, interests, or obligations hereunder to an Affiliate of Buyer without the prior written consent of the other Parties; provided that such assignment shall not relieve Buyer of its obligations hereunder.

(b)    In connection with the Closing, Buyer may, without the consent of Sellers, designate, in accordance with the terms of this paragraph and effective as of the Closing, one or more Persons to acquire all, or any portion of, the Acquired Assets and assume the Assumed Liabilities or any rights or obligations of the Buyer hereunder; provided further that such designee shall be required to satisfy all applicable representations and obligations set forth in this Agreement relating to the provision of adequate assurance of future performance. The above designation may be made by Buyer by written notice to Sellers no later than five (5) Business Days prior to the Closing Date.  The parties agree to modify any Closing deliverables in accordance with the foregoing designation

Section 9.7    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller:        Barneys, Inc.
575 Fifth Avenue
11th Floor
New York, New York 10017
Attention:  Grace Fu
Sandro Risi
Email:      gfu@barneys.com
srisi@barneys.com

With a copy (which shall not constitute notice to Sellers) to:

62

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:  Chad J. Husnick, P.C.
               Steve Toth
Email:      chad.husnick@kirkland.com
               steve.toth@kirkland.com

If to Buyer:

Authentic Brands Group
1411 Broadway
New York, New York 10001
Attention:  Jay Dubiner
General Counsel
Phone:  (212) 760-2418
E-mail:  jdubiner@abg-nyc.com

With a copy (which shall not constitute notice to Buyer) to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Attention: Richard Chesley
E-mail:  Richard.Chesley@dlapiper.com

If to Agent:

Great American Group, LLC
21255 Burbank Blvd., Suite 400
Woodland Hills, CA 91367
Attention:  Scott K. Carpenter and Marina Fineman
Tel: (818) 746-9309
Email: scarpenter@greatamerican.com and
mfineman@greatamerican.com

With a copy (which shall not constitute notice to Agent) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Attn: Andrew Behlmann
Tel:   (908) 235-1040
Facsimile: (973) 597-2400
Email: abehlmann@lowenstein.com

63

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 9.7</u>.

Section 9.8    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    <u>Submission to Jurisdiction; Service of Process</u>.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.7</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.9</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>.    The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 9.9</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an

64

injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.11 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Sellers pursuant to this Section 9.11 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with this Section 9.11, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 9.11 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

Notwithstanding the foregoing, (i) the Sellers' right to specific performance against Buyer shall be limited to specifically enforce the sale of the Buyer Acquired Assets, including any portion of the Purchase Price attributable thereto, under this Agreement, (ii) the Sellers' right to specific performance relating to the Designated Assets, including any portion of the Purchase Price attributable to the Designated Assets, may only be asserted against the Agent, which agrees to be bound to the terms of this Section 9.11, and (iii) in addition to foregoing clause (ii), the Sellers' right to specific performance against Agent under this Agreement shall be limited to specifically enforce the sale of the Agent Acquired Assets, including the portion of the Purchase Price attributable thereto.

Section 9.12    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    No Third Party Beneficiaries (other than Agent).  Except to the extent terms and conditions of this Agreement relate to the Agent, the Agency Agreement, or the transactions contemplated by the Agency Agreement or contemplate the terms and conditions of the Agency Agreement or vice versa (the "Third Party Rights"), this Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.  With respect to the Agent, this Agreement shall confer the Third Party Rights and related remedies upon Agent and its successors and permitted assigns. Notwithstanding anything to the contrary in this Agreement, the DIP Agent and DIP Lenders shall be third party beneficiaries of all provisions of this Agreement that expressly relate to the DIP Agent or DIP Lenders, as applicable, including Sections 2.5(b), 7.5, 8.1(a), 9.5, and 9.13.

Section 9.14    Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In no event shall any

65

Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15    Mutual Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedule, and any disclosure in the Disclosure Schedule will be deemed a disclosure against any representation or warranty set forth in this Agreement. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.

66

The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17    Fiduciary Obligations.  Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, the Sellers retain the right to pursue any transaction or restructuring strategy that, in the Sellers' business judgment, will maximize the value of their estates.  Notwithstanding the foregoing, nothing contained in this Section 9.17 shall modify the Seller's obligations under Section 5.3(c).

Section 9.18    Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.19    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**SELLERS**:

**BARNEYS NEW YORK, INC.**

By: _____
Name: Grace Fu
Title: Authorized Signatory

*Signature Page to Asset Purchase Agreement*

**BARNEY'S, INC.**


By:
Name: Grace Fu
Title: Authorized Signatory

*Signature Page to Asset Purchase Agreement*

**BNY CATERING INC.**

By: _____

Name: Grace Fu

Title: Authorized Signatory

*Signature Page to Asset Purchase Agreement*

**BNY LICENSING CORP.**

By:

Name: Grace Fu

Title: Authorized Signatory

*Signature Page to Asset Purchase Agreement*

**BARNEYS ASIA CO. LLC**

By:

Name: Grace Fu

Title: Authorized Signatory

*Signature Page to Asset Purchase Agreement*

**BUYER**:

**ABG-BARNEYS, LLC**

By: _____

Name: JAMIE SALTER

Title: CHAIRMAN + CEO

[*Signature Page to Asset Purchase Agreement*]

**AGENT**:

**B. RILEY FINANCIAL, INC.**

By: _____

Name: Phillip J. Ahn

Title: CFO & COO

## BILL OF SALE FOR BUYER ACQUIRED ASSETS, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE FOR BUYER ACQUIRED ASSETS, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed as of [●], 2019 (the "Closing Date"), by and among Barneys New York, Inc., a Delaware corporation (the "Company"), and each of the Company's Subsidiaries listed on the signature pages hereto (each, along with the Company, an "Assignor" and collectively, "Assignors"), and ABG-Barneys, LLC ("Assignee"). Assignors and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, this Agreement is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 16, 2019, by and among the Agent, the Assignors, as Sellers, and Assignee, as Buyer (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from such Assignors, all of such Assignors' direct or indirect right, title and interest in, to and under certain assets, liabilities and contractual relationships;

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each Party to the other Parties effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained and intending to be legally bound hereby, Assignee and Assignors do hereby agree as follows:

**I.**

### BILL OF SALE; ASSIGNMENT AND ASSUMPTION

1.1.    Definitions.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Purchase Agreement.

1.2.    Assignment. In accordance with and subject to the terms of the Purchase Agreement, Assignors do hereby sell, transfer, assign, convey and deliver to Assignee, effective as of the Closing, all of Assignors' rights, titles and interests in, to and under the Buyer Acquired Assets, as provided in Section 2.1 of the Purchase Agreement, free and clear of all Liens other than Permitted Liens.

1.3.    Excluded Assets.  In accordance with and subject to the terms of the Purchase Agreement, Assignors except, reserve, and exclude all of Assignors' rights, titles and interests in, to and under the Excluded Assets. Without limiting the foregoing, Assignors do not hereby sell, transfer, assign, convey and deliver to Assignee any right, title or interest in any assets, properties and rights of Assignors that are not Buyer Acquired Assets.

1.4.    <u>Assumed Liabilities</u>.  In accordance with and subject to the terms of the Purchase Agreement, Assignee, effective as of the Closing and only to the extent provided in Section 2.2 of the Purchase Agreement, does hereby assume, and does hereby agree to discharge and perform when due, the Assumed Liabilities, with respect to or relating to the ownership, assumption or operation of the Buyer Acquired Assets.

1.5.    <u>Excluded Liabilities</u>.  In accordance with and subject to the terms of the Purchase Agreement, Assignee shall not assume, be deemed to have assumed or be liable or obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for the Excluded Liabilities.

## II.

## MISCELLANEOUS

2.1.    <u>Purchase Agreement</u>.  This Agreement is expressly made subject to the terms of the Purchase Agreement.  The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, terms or provisions of the Purchase Agreement or any of the rights, remedies or obligations of any Assignor or Assignee provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms.  The representations, warranties, covenants, terms and provisions contained in the Purchase Agreement shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement (including the schedules hereto), the terms of the Purchase Agreement shall control.

2.2.    <u>Successors and Assigns</u>.  The provisions of this Agreement shall bind and inure to the benefit of Assignors and Assignee and their respective successors and permitted assigns.

2.3.    <u>Amendment and Waiver</u>.  Any provision of this Agreement may be (a) amended only in a writing signed by Assignors and Assignee or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

2.4.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.  Upon such a determination, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

2.5.    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without regards to conflict of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or the transactions contemplated hereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7 of the Purchase Agreement; provided, however, that nothing in this <u>Section 2.5(b)</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

2.6.    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

2.7.    <u>Captions</u>.  The captions and article and section numbers in this Agreement are for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to articles and sections are to articles and sections of this Agreement unless otherwise specified.

2.8.    <u>Counterparts and PDF</u>.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manners and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof

delivered in person. At the request of any Party, each other Party hereto will re-execute original forms of this Agreement and deliver them to all other parties. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

[*Signature Pages Follow*]

EXECUTED on the Closing Date, to be EFFECTIVE as of the Closing Date.

**<u>ASSIGNORS:</u>**

**BARNEYS NEW YORK, INC.**

By: _____
Name: _____
Title: _____

**BARNEY'S, INC.**

By: _____
Name: _____
Title: _____

**BNY CATERING, INC.**

By: _____
Name: _____
Title: _____

**BNY LICENSING CORP.**

By: _____
Name: _____
Title: _____

**BARNEYS ASIA CO. LLC**

By: _____
Name: _____
Title: _____

**<u>ASSIGNEE</u>:**

**ABG-BARNEYS, LLC**

By: _____
Name: _____
Title: _____

## BILL OF SALE FOR AGENT ACQUIRED ASSETS, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE FOR AGENT ACQUIRED ASSETS, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed as of [●], 2019 (the "Closing Date"), by and among Barneys New York, Inc., a Delaware corporation (the "Company"), and each of the Company's Subsidiaries listed on the signature pages hereto (each, along with the Company, an "Assignor" and collectively, "Assignors"), and Great American Group LLC ("Assignee").  Assignors and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, this Agreement is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 16, 2019, by and among the Agent, the Assignors, as Sellers, and Assignee, as Purchaser (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from such Assignors, all of such Assignors' direct or indirect right, title and interest in, to and under certain assets, liabilities and contractual relationships;

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each Party to the other Parties effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained and intending to be legally bound hereby, Assignee and Assignors do hereby agree as follows:

## I.

## BILL OF SALE; ASSIGNMENT AND ASSUMPTION

1.1.    Definitions.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Purchase Agreement.

1.2.    Assignment. In accordance with and subject to the terms of the Purchase Agreement, Assignors do hereby sell, transfer, assign, convey and deliver to Assignee, effective as of the Closing, all of Assignors' rights, titles and interests in, to and under the Agent Acquired Assets, other than the Designated Assets, as provided in Section 2.1 of the Purchase Agreement, free and clear of all Liens other than Permitted Liens.

1.3.    Excluded Assets.  In accordance with and subject to the terms of the Purchase Agreement, Assignors except, reserve, and exclude all of Assignors' rights, titles and interests in, to and under the Excluded Assets. Without limiting the foregoing, Assignors do not hereby sell, transfer, assign, convey and deliver to Assignee any right, title or interest in any assets, properties and rights of Assignors that are not Agent Acquired Assets.

1.4.    <u>Assumed Liabilities</u>.  In accordance with and subject to the terms of the Purchase Agreement, Assignee, effective as of the Closing and only to the extent provided in Section 2.2 of the Purchase Agreement, does hereby assume, and does hereby agree to discharge and perform when due, the Assumed Liabilities with respect to or relating to the ownership, assumption or operation of the Agent Acquired Assets.

1.5.    <u>Excluded Liabilities</u>.  In accordance with and subject to the terms of the Purchase Agreement, Assignee shall not assume, be deemed to have assumed or be liable or obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for the Excluded Liabilities.

## II.

## MISCELLANEOUS

2.1.    <u>Purchase Agreement</u>.  This Agreement is expressly made subject to the terms of the Purchase Agreement.  The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, indemnities, terms or provisions of the Purchase Agreement or any of the rights, remedies or obligations of any Assignor or Assignee provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms.  The representations, warranties, covenants, indemnities, terms and provisions contained in the Purchase Agreement shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement (including the schedules hereto), the terms of the Purchase Agreement shall control.

2.2.    <u>Successors and Assigns</u>.  The provisions of this Agreement shall bind and inure to the benefit of Assignors and Assignee and their respective successors and permitted assigns.

2.3.    <u>Amendment and Waiver</u>.  Any provision of this Agreement may be (a) amended only in a writing signed by Assignors and Assignee or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

2.4.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.  Upon such a determination, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

2.5.    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without regards to conflict of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or the transactions contemplated hereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7 of the Purchase Agreement; provided, however, that nothing in this <u>Section 2.5(b)</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

2.6.    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

2.7.    <u>Captions</u>.  The captions and article and section numbers in this Agreement are for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to articles and sections are to articles and sections of this Agreement unless otherwise specified.

2.8.    <u>Counterparts and PDF</u>.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manners and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any Party, each other Party hereto will re-execute original forms of this Agreement and

deliver them to all other parties. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

[*Signature Pages Follow*]

EXECUTED on the Closing Date, to be EFFECTIVE as of the Closing Date.

**<u>ASSIGNORS:</u>**

**BARNEYS NEW YORK, INC.**

By: _____
Name: _____
Title: _____

**BARNEY'S, INC.**

By: _____
Name: _____
Title: _____

**BNY CATERING, INC.**

By: _____
Name: _____
Title: _____

**BNY LICENSING CORP.**

By: _____
Name: _____
Title: _____

**BARNEYS ASIA CO. LLC**

By: _____
Name: _____
Title: _____

**<u>ASSIGNEE</u>:**

**GREAT AMERICAN GROUP LLC**

By: _____

Name:_____

Title: _____

**Exhibit B**

COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT (this "Assignment"), is entered into as of [●] by and between ABG-Barneys, LLC, a Delaware limited liability company ("Assignee") and each other Person that is a signatory hereto (each, an "Assignor" and collectively, "Assignors").

WHEREAS, this Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 16, 2019 (as amended, restated, supplemented and/or otherwise modified from time to time in accordance with the terms thereof, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of Assignors' direct or indirect right, title and interest in, to and under certain assets, including, without limitation, all of Assignors' rights associated with any works of authorship, including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works, including, without limitation, the registered copyrights identified on Schedule A attached hereto (collectively, the "Assigned Copyrights");

WHEREAS, this Assignment is being executed and delivered by the parties hereto contemporaneously with the Closing under the Purchase Agreement;

WHEREAS, in accordance with the Purchase Agreement, Assignors desire to assign and Assignee desires to acquire the Assigned Copyrights, including all goodwill associated therewith and symbolized thereby.

NOW THEREFORE, in consideration of the premises and the mutual warranties, representations, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.      Definitions.  Unless otherwise defined herein, each capitalized term used herein shall have the meaning assigned thereto in the Purchase Agreement.

2.      Assignment.  Assignors do hereby sell, assign, convey, transfer and deliver to Assignee, its successors and assigns, free and clear of all Liens, (a) all of Assignors' worldwide rights, title and interest in and to the Assigned Copyrights, including, without limitation, any related registrations, applications, renewals and extensions therefor, together with the ongoing and existing business of Assignors to which the Assigned Copyrights pertain and the goodwill associated with the Assigned Copyrights and symbolized thereby, effective as of the date hereof; and (b) all other rights accruing thereunder or pertaining thereto in any jurisdiction throughout the world for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors and assigns, as full and entirely as the same would have been held and enjoyed by Assignors if this Assignment had not been made, including: (i) causes of actions and

rights to pursue and collect damages, costs, injunctive relief and other remedies for past, current or future infringement, misappropriation, dilution, conflict with or other violation of any of the foregoing, and all income, royalties or payments due or payable as of the date hereof or hereafter in respect of any of the foregoing, including, without limitation, damages and payments for past or future infringements thereof, and (ii) rights to apply in any or all countries of the world for copyright protection for the Assigned Copyrights, in each case, effective as of the date hereof. Together with Assignors' worldwide right, title and interest in and to each of the Assigned Copyrights are the rights to police, monitor and enforce said Assigned Copyrights against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this present Assignment, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Assigned Copyrights.

3.    Authorization and Recordation.    Assignors hereby authorize and request the Register of Copyrights of the United States and any other applicable governmental authority or registrar in any other country to record and register Assignee as the owner of the Assigned Copyrights, and to issue any and all Assigned Copyrights and registrations, amended registrations and renewals that have been or may be granted upon any application or petition for the same, to Assignee and Assignee's successors and/or assigns, as assignee of all of Assignors' rights, title and interest in and to the Assigned Copyrights.    Assignee shall have the right to record this Assignment with all applicable governmental authorities and registrars so as to perfect ownership of the Assigned Copyrights.

4.    Governing Law. All issues and questions concerning the formation, existence, termination, construction, validity, enforcement and interpretation of this Assignment will be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

5.    Counterparts.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Such counterparts may be delivered in electronic format (including by fax and electronic mail).

6.    Purchase Agreement.  This Assignment is being executed and delivered pursuant to the Purchase Agreement. Notwithstanding anything in this Assignment to the contrary, nothing in this Assignment, express or implied, is intended or shall be construed to modify, expand or limit in any way the terms and conditions of the Purchase Agreement, all of which shall survive the delivery of this Assignment to the extent provided in the Purchase Agreement.  To the extent that any provision of this Assignment conflicts or is inconsistent with the terms and conditions of the Purchase Agreement, the Purchase Agreement will govern.

7.    Further Assurances.  In accordance with the Purchase Agreement, without further consideration, each Assignor hereby agrees, for itself and its successors and assigns, to promptly execute and deliver, or promptly cause to be executed and delivered, all such further

documents or perform all affirmative acts which may be necessary or desirable to record or perfect the above-described transfer of the Assigned Copyrights, or to secure registration before the United States Copyright Office or any foreign copyright office, as well as to cooperate with Assignee in obtaining and/or providing information required in any proceedings relating to the Assigned Copyrights, and any other acts as Assignee may reasonably request (including executing, acknowledging and delivering to Assignee such further assurances, deeds, assignments, powers of attorney, bills of sale, consents and other instruments and documents as Assignee may reasonably request) in order to more fully consummate the transactions contemplated herein and in order to more effectively vest, transfer, and confirm the right, title and interest of Assignee in the Assigned Copyrights. Assignors hereby grant to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the United States Copyright Office or the copyright office of any other country throughout the world, provided that Assignee has given Assignors prior notice of the insertion of such further identification.

8. <u>Closing</u>. This Assignment is effective as of the Closing.

9. <u>Severability; Amendment</u>. Any provision in this Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof. This Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of Assignee and Assignors on behalf of Assignee and Assignors, respectively.

10. <u>Notices</u>. Any notice given pursuant to this Assignment shall be given in the same manner and addressed to the intended recipient as set forth in Section 9.7 of the Purchase Agreement.

*[Remainder of page intentionally left blank; signature page to follow.]*

**IN WITNESS WHEREOF**, each of the parties hereto has executed and delivered this Assignment as of the date first above written.

<u>**ASSIGNORS:**</u>

**BARNEYS NEW YORK, INC.**

By: _____
Name: _____
Title: _____

**BARNEY'S, INC.**

By: _____
Name: _____
Title: _____

**BNY CATERING, INC.**

By: _____
Name: _____
Title: _____

**BNY LICENSING CORP.**

By: _____
Name: _____
Title: _____

**BARNEYS ASIA CO. LLC**

By: _____
Name: _____
Title: _____

**<u>ASSIGNEE</u>:**

**ABG-BARNEYS, LLC**


By: _____
Name: _____
Title: _____

**SCHEDULE A**

**Copyright Registrations**

See attached.

Barney's Inc
US Copyrights
As of October 9, 2019

| COPYRIGHT TITLE | COUNTRY | REG. NO. | STATUS |
|---|---|---|---|
| Copyright: Barneys New York (Book) | United States | TX0008416685 | REGISTERED |

**Exhibit C**

## TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT (this "Assignment"), is entered into as of [●] by and between ABG-Barneys, LLC, a Delaware limited liability company ("Assignee") and each other Person that is a signatory hereto (each, an "Assignor" and collectively, "Assignors").

WHEREAS, this Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 16, 2019 (as amended, restated, supplemented and/or otherwise modified from time to time in accordance with the terms thereof, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, this Assignment is being executed and delivered by the parties hereto contemporaneously with the Closing under the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of Assignors' direct or indirect right, title and interest in, to and under certain assets, including, without limitation, rights associated with Trademarks (whether registered, unregistered or pending), historical trademark files, trade dress, service marks, service names, trade names, brand names, product names (including private label product names), logos, domain names, internet rights (including, IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law but subject to Section 6.1(d) of the Purchase Agreement) any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing, including, without limitation, the registered trademarks and trademark applications identified on Schedule A attached hereto (collectively, the "Assigned Trademarks");

WHEREAS, in accordance with the Purchase Agreement, Assignor desires to assign and Assignee desires to acquire the Assigned Trademarks, including all goodwill associated therewith and symbolized thereby.

NOW THEREFORE, in consideration of the premises and the mutual warranties, representations, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    Definitions.  Unless otherwise defined herein, each capitalized term used herein shall have the meaning assigned thereto in the Purchase Agreement.

2.    Assignment.  Assignors do hereby sell, assign, convey, transfer and deliver to Assignee, its successors and assigns, free and clear of all Liens, (a) all of Assignor's worldwide right, title and interest in, to and under, including any and all common law rights thereto, the Assigned Trademarks, including, without limitation, any registrations, applications,

renewals and extensions therefor, together with the ongoing and existing business of Assignor to which the Assigned Trademarks pertain and the goodwill associated with the Assigned Trademarks and symbolized thereby, effective as of the date hereof; and (b) all other rights accruing thereunder or pertaining thereto in any jurisdiction throughout the world for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors and assigns, as full and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, including: (i) claims, causes of actions and rights to pursue and collect damages, costs, injunctive relief and other remedies for past, current or future infringement, misappropriation, dilution, conflict with or other violation of any of the foregoing, and all income, royalties or payments due or payable as of the date hereof or hereafter in respect of any of the foregoing and (ii) rights to apply in any or all countries of the world for trademark protection for the Assigned Trademarks, in each case, effective as of the date hereof. Together with Assignors' worldwide right, title and interest in and to each of the Assigned Trademarks, as well as the goodwill of the business associated with said Assigned Trademarks being assigned to Assignee, are the rights to police, monitor and enforce said Assigned Trademarks against any and all past, current and future infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement) which may have occurred at any time in the unlimited past, up to the date of this Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and registration of the Assigned Trademarks.

3.    <u>Authorization and Recordation</u>.  Assignors hereby authorize and request the Commissioner for Patents and Trademarks and any other applicable governmental authority or registrar to record and register Assignee as the owner of the Assigned Trademarks, and to issue any and all Assigned Trademarks to Assignee, as assignee of all of Assignor's right, title and interest in and to the Assigned Trademarks.  Assignee shall have the right to record this Assignment with all applicable governmental authorities and registrars so as to perfect ownership of the Assigned Trademarks.

4.    <u>Governing Law</u>. All issues and questions concerning the formation, existence, termination, construction, validity, enforcement and interpretation of this Assignment will be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

5.    <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Such counterparts may be delivered in electronic format (including by fax and electronic mail).

6.    <u>Purchase Agreement</u>.  This Assignment is being executed and delivered pursuant to the Purchase Agreement. Notwithstanding anything in this Assignment to the contrary, nothing in this Assignment, express or implied, is intended or shall be construed to modify, expand or limit in any way the terms and conditions of the Purchase Agreement, all of which shall survive the delivery of this Assignment to the extent provided in the Purchase

Agreement.  To the extent that any provision of this Assignment conflicts or is inconsistent with the terms and conditions of the Purchase Agreement, the Purchase Agreement will govern.

7.      Further Assurances.  In accordance with the Purchase Agreement, without further consideration, each Assignor hereby agrees, for itself and its successors and assigns, to promptly execute and deliver, or promptly cause to be executed and delivered, all such further documents or perform all affirmative acts which may be necessary or desirable to record or perfect the above-described transfer of Assigned Trademarks, or to secure registration before the United States Patent and Trademark Office or any foreign trademark office (including executing, acknowledging and delivering to Assignee such further assurances, deeds, assignments, powers of attorney, bills of sale, consents and other instruments and documents as Assignee may reasonably request) in order to more fully consummate the transactions contemplated herein and in order to more effectively vest, transfer, and confirm the right, title and interest of Assignee in the Assigned Trademarks. Assignors hereby grant to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the United States Patent and Trademark Office or the trademark office of any other country throughout the world, provided that Assignee has given Assignors prior notice of the insertion of such further identification.

8.      Closing.  This Assignment is effective as of the Closing.

9.      Severability; Amendment.   Any provision in this Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.   This Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of Assignee and Assignors on behalf of Assignee and Assignors, respectively.

10.     Notices.  Any notice given pursuant to this Assignment shall be given in the same manner and addressed to the intended recipient as set forth in Section 9.7 of the Purchase Agreement.

*[Remainder of page intentionally left blank; signature page to follow.]*

**IN WITNESS WHEREOF**, each of the parties hereto has executed and delivered this Assignment as of the date first above written.

<u>**ASSIGNORS:**</u>

**BARNEYS NEW YORK, INC.**

By: _____
Name: _____
Title: _____


**BARNEY'S, INC.**

By: _____
Name: _____
Title: _____


**BNY CATERING, INC.**

By: _____
Name: _____
Title: _____


**BNY LICENSING CORP.**

By: _____
Name: _____
Title: _____


**BARNEYS ASIA CO. LLC**

By: _____
Name: _____
Title: _____

**ASSIGNEE**:

**ABG-BARNEYS, LLC**

By: _____
Name: _____
Title: _____

**SCHEDULE A**

**Trademark Registrations and Applications**

See attached.

| COUNTRY | MARK | STATUS | APP. NO. | DATE FILED | REG. NO. | REG. DATE | OWNER |
|---------|------|--------|----------|------------|----------|----------|-------|
| CANADA | FIVESEVENTYFIVE | PENDING | 1938069 | 12/25/2018 | | | Barney's, Inc. |
| CANADA | LOCKED IN BARNEYS | REGISTERED | 1728727 | 5/19/2015 | tma957769 | 12/13/2016 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 663885 | 9/19/1992 | 663885 | 10/28/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 664723 | 9/19/1992 | 664723 | 11/7/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 663808 | 9/19/1992 | 663808 | 10/28/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 92061026 | 9/19/1992 | 664760 | 11/7/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 92079397 | 11/28/1992 | 675785 | 1/28/1994 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 662948 | 9/19/1992 | 662948 | 10/21/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 8968181 | 12/20/2010 | 8968181 | 12/28/2011 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 96066690 | 6/4/1996 | 1097745 | 9/7/1997 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 96066691 | 6/4/1996 | 1097445 | 9/7/1997 | Barney's, Inc. |
| CHINA | FIVESEVENTYFIVE | PENDING | 35554989 | 12/26/2018 | | | Barney's, Inc. |
| EUROPEAN UNION (EUTM & RCD) | BARNEYS | REGISTERED | 010004711 | 5/27/2011 | 010004711 | 7/31/2015 | Barney's, Inc. |
| EUROPEAN UNION (EUTM & RCD) | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 004846721 | 12/28/2005 | 004846721 | 12/14/2007 | Barney's, Inc. |
| FRANCE | BARNEYS | REGISTERED | 4234950 | 5/27/2011 | 4234950 | 4/8/2016 | Barney's, Inc. |
| HONG KONG | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 199912269 | 1/5/1998 | 199912269 | 10/11/1999 | Barney's, Inc. |
| HONG KONG | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 199912270AA | 1/5/1998 | 199912270AA | 10/11/1999 | Barney's, Inc. |
| HONG KONG | FIVESEVENTYFIVE | REGISTERED | 304783375 | 12/26/2018 | 304783375 | 06/20/2019 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536893 | 9/13/1990 | 212882 | 9/13/1990 | Barney's, Inc. |

| INDIA | BARNEYS | REGISTERED | 536891 | 9/13/1990 | 215272 | 9/13/1990 | Barney's, Inc. |
|---|---|---|---|---|---|---|---|
| INDIA | BARNEYS | REGISTERED | 536892 | 9/13/1990 | 223928 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 537050 | 9/17/1990 | 215634 | 9/17/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536888 | 9/13/1990 | 209332 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536894 | 9/13/1990 | 223001 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536889 | 9/13/1990 | 223010 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536890 | 9/13/1990 | 207278 | 9/13/1990 | Barney's, Inc. |
| ITALY | BARNEYS | REGISTERED | 2015000080373 | 12/4/2015 | 302015000080373 | 6/23/2017 | Barney's, Inc. |
| JAPAN | B (Within a C) (Logo) | REGISTERED | 2016-081849 | 8/1/2016 | 5935202 | 3/24/2017 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-105038 | 9/14/1989 | 2426232 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096253 | 8/24/1989 | 2385046 | 2/28/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096257 | 8/24/1989 | 2423787 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096254 | 8/24/1989 | 2423786 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096260 | 8/24/1989 | 2429666 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-057967 | 6/10/1994 | 3234686 | 12/25/1996 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-057968 | 6/10/1994 | 3250070 | 1/31/1997 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-088498 | 8/31/1994 | 4021432 | 7/4/1997 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-088499 | 8/31/1994 | 3296543 | 4/25/1997 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | 2007-031169 | 4/2/2007 | 5255202 | 8/7/2009 | Barney's, Inc. |

| | | | | | | |
|---|---|---|---|---|---|---|
| JAPAN | BARNEYS | REGISTERED | 2007-013857 | 2/20/2007 | 5066567 | 7/27/2007 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | 2006-119202 | 12/25/2006 | 5190672 | 12/19/2008 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | S56-099906 | 12/1/1981 | 2131984 | 4/28/1989 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | S56-099907 | 12/1/1981 | 1932216 | 2/25/1987 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | 2302529 | 11/29/1988 | 2302529 | 2/27/1991 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | S63-134470 | 11/29/1988 | 2345246 | 10/30/1991 | Barney's, Inc. |
| JAPAN | BARNEYS CAFE | REGISTERED | 2016-081848 | 8/1/2016 | 5935201 | 3/24/2017 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003565 | 1/21/2010 | 5337596 | 7/9/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003566 | 1/21/2010 | 5362562 | 10/22/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003567 | 1/21/2010 | 5362563 | 10/22/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003568 | 1/21/2010 | 5362564 | 10/22/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003569 | 1/21/2010 | 5327795 | 6/4/2010 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095895 | 9/20/1993 | 3320653 | 6/13/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095896 | 9/20/1993 | 3330933 | 7/11/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095897 | 9/20/1993 | 3265540 | 2/24/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095898 | 9/20/1993 | 3345087 | 9/5/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | 2007-031170 | 4/2/2007 | 5282133 | 11/20/2009 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095892 | 9/20/1993 | 3273487 | 4/4/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095894 | 9/20/1993 | 3234685 | 12/25/1996 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | H05-095891 | 9/20/1993 | 3231024 | 11/29/1996 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | H05-095893 | 9/20/1993 | 3273488 | 4/4/1997 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003555 | 1/21/2010 | 5371949 | 11/26/2010 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003556 | 1/21/2010 | 2370313 | 11/19/2010 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003562 | 1/21/2010 | 5370315 | 11/19/2010 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003557 | 1/21/2010 | 5370314 | 11/19/2010 | Barney's, Inc. |
| SINGAPORE | BARNEYS | REGISTERED | T9102344E | 3/1/1991 | T9102344E | 9/30/1993 | Barney's, Inc. |
| SINGAPORE | BARNEYS | REGISTERED | T9105908C | 6/19/1991 | T9105908C | 6/15/2001 | Barney's, Inc. |
| SINGAPORE | BARNEYS | REGISTERED | T9105907E | 6/19/1991 | T9105907E | 6/15/2001 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010929 | 5/4/1989 | 40-0195072-0000 | 6/29/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010926 | 5/4/1989 | 40-199446-0000 | 8/31/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010927 | 5/4/1989 | 40-0199586-0000 | 9/3/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010930 | 5/4/1989 | 40-0199696-0000 | 9/3/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 41-1989-0001192 | 5/4/1989 | 41-0012978-0000 | 11/27/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 4520070000565 | 2/8/2007 | 4500228230000 | 4/1/2008 | Barney's, Inc. |
| SPAIN | BARNEYS | REGISTERED | M3576519 | 8/25/2015 | M3576519/4 | 1/28/2016 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TAIWAN | BARNEYS | REGISTERED | 078033385 | 7/18/1989 | 00479715 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033386 | 7/18/1989 | 00481485 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033387 | 7/18/1989 | 00478052 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033388 | 7/18/1989 | 00481894 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033390 | 7/18/1989 | 00478411 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033391 | 7/18/1989 | 00476988 | 3/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033392 | 7/18/1989 | 00478716 | 3/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033393 | 7/18/1989 | 00480528 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033394 | 7/18/1989 | 00483398 | 5/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033395 | 7/18/1989 | 00487664 | 6/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 7833396 | 7/18/1989 | 00487733 | 6/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033397 | 7/18/1989 | 00044347 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033398 | 7/18/1989 | 00044460 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033399 | 7/18/1989 | 00044237 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033389 | 7/18/1989 | 00480266 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 7833396 | 7/18/1989 | 487733 | 6/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 7833397 | 7/18/1989 | 44347 | 4/16/1990 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389643 | 6/15/1989 | TM96015 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389644 | 6/15/1989 | TM96006 | 6/15/1989 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| THAILAND | BARNEYS | REGISTERED | 389645 | 6/15/1989 | TM99718 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389646 | 6/15/1989 | TM96038 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389647 | 6/15/1989 | TM37798 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389648 | 6/15/1989 | TM96039 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389649 | 6/15/1989 | TM115683 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389650 | 6/15/1989 | TM106729 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389651 | 6/15/1989 | TM96040 | 6/15/1989 | Barney's, Inc. |
| TURKEY | BARNEY'S NEW YORK | REGISTERED | 2013/19111 | 2/28/2013 | 2013/19111 | 2/28/2013 | Barney's, Inc. |
| UNITED KINGDOM | BARNEYS | REGISTERED | UK00003127499 | 5/27/2011 | UK00003127499 | 3/4/2016 | Barney's, Inc. |
| UNITED STATES | B3 | REGISTERED | 85/936415 | 5/20/2013 | 4573445 | 7/22/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS | REGISTERED | 73/397425 | 9/30/1982 | 1371828 | 11/19/1985 | Barney's, Inc. |
| UNITED STATES | BARNEYS | REGISTERED | 73/397428 | 9/30/1982 | 1337912 | 5/28/1985 | Barney's, Inc. |
| UNITED STATES | BARNEY'S | REGISTERED | 72/136187 | 1/22/1962 | 740068 | 10/30/1962 | Barney's, Inc. |
| UNITED STATES | BARNEYS BEAUTY BOX | PENDING | 88/017852 | 6/27/2018 | | | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 74/698082 | 7/6/1995 | 2073088 | 6/24/1997 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 73/397427 | 9/30/1982 | 1332229 | 4/23/1985 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 75/273941 | 4/14/1997 | 2571696 | 5/21/2002 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 76/471826 | 11/26/2002 | 2766664 | 9/23/2003 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK FREE STUFF (and Design) | REGISTERED | 76/050007 | 5/17/2000 | 2608036 | 8/13/2002 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK INFLUENCER | REGISTERED | 88/016156 | 6/26/2018 | 5860038 | 09/17/2019 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNITED STATES | BARNEYS NEW YORK MADE TO MEASURE | REGISTERED | 86/163693 | 1/13/2014 | 4736252 | 5/12/2015 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK WAREHOUSE | REGISTERED | 85/368485 | 7/11/2011 | 4343133 | 5/28/2013 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (and Design - Lion - Stacked) | REGISTERED | 76/570839 | 1/20/2004 | 3088046 | 5/2/2006 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (and Design - Lion) | REGISTERED | 76/580230 | 3/10/2004 | 2963769 | 6/28/2005 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (and Design - Lion) | REGISTERED | 75/981426 | 3/22/2000 | 2583246 | 6/18/2002 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | 73/792604 | 3/28/1989 | 1620003 | 10/30/1990 | Barney's, Inc. |
| UNITED STATES | BARNEYS UNIVERSITY | REGISTERED | 85/056323 | 6/7/2010 | 4508768 | 4/8/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS UNIVERSITY (and Design) | REGISTERED | 85/051483 | 6/1/2010 | 4475496 | 1/28/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS UNIVERSITY WHERE LEARNING IS STYLISH! (and Design) | REGISTERED | 85/056459 | 6/7/2010 | 4478388 | 2/4/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS WAREHOUSE | REGISTERED | 85/368495 | 7/11/2011 | 4343134 | 5/28/2013 | Barney's, Inc. |
| UNITED STATES | BASCO | REGISTERED | 85/291849 | 4/12/2011 | 4760492 | 6/23/2015 | Barney's, Inc. |
| UNITED STATES | BASCO BARNEYS SPORTSWEAR COMPANY | REGISTERED | 85/497799 | 12/16/2011 | 4790842 | 8/11/2015 | Barney's, Inc. |
| UNITED STATES | CHELSEA PASSAGE | REGISTERED | 74/139558 | 2/15/1991 | 1793956 | 9/21/1993 | Barney's, Inc. |
| UNITED STATES | CHELSEA PASSAGE | REGISTERED | 78/556950 | 1/31/2005 | 3070632 | 3/21/2006 | Barney's, Inc. |
| UNITED STATES | CONNOR | REGISTERED | 85/545867 | 2/17/2012 | 4233033 | 10/30/2012 | Barney's, Inc. |
| UNITED STATES | CO-OP | REGISTERED | 75/983558 | 12/7/1999 | 2983421 | 8/9/2005 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNITED STATES | CO-OP | REGISTERED | 75/983420 | 12/7/1999 | 2847734 | 6/1/2004 | Barney's, Inc. |
| UNITED STATES | CO-OP | REGISTERED | 75/983287 | 12/7/1999 | 2847733 | 6/1/2004 | Barney's, Inc. |
| UNITED STATES | CO-OP BARNEYS NEW YORK | REGISTERED | 75/983316 | 12/7/1999 | 2802702 | 1/6/2004 | Barney's, Inc. |
| UNITED STATES | FIVESEVENTYFIVE | REGISTERED | 88/015994 | 6/26/2018 | 5675074 | 2/12/2019 | Barney's, Inc. |
| UNITED STATES | FREDS AT BARNEY'S NEW YORK | REGISTERED | 85/477858 | 11/21/2011 | 4182469 | 7/31/2012 | Barney's, Inc. |
| UNITED STATES | FRED'S AT BARNEYS NEW YORK | REGISTERED | 75/172667 | 9/26/1996 | 2144170 | 3/17/1998 | Barney's, Inc. |
| UNITED STATES | FREDS AT BARNEYS NEW YORK (Stylized - Stacked) | REGISTERED | 85/417225 | 9/7/2011 | 4243203 | 11/13/2012 | Barney's, Inc. |
| UNITED STATES | GET DOWN TO BUSINESS | REGISTERED | 85/225017 | 1/24/2011 | 4332323 | 5/7/2013 | Barney's, Inc. |
| UNITED STATES | GET IT RIGHT | REGISTERED | 76/084625 | 7/6/2000 | 2501785 | 10/30/2001 | Barney's, Inc. |
| UNITED STATES | GIVE GOOD GIFT | REGISTERED | 76/086488 | 7/11/2000 | 2479769 | 8/21/2001 | Barney's, Inc. |
| UNITED STATES | INCLUSIVELY YOURS | ALLOWED | 87/603105 | 9/11/2017 | | | Barney's, Inc. |
| UNITED STATES | LOCKED IN BARNEYS | REGISTERED | 85/890333 | 3/29/2013 | 4422006 | 10/22/2013 | Barney's, Inc. |
| UNITED STATES | MADE TO MEASURE BARNEYS NEW YORK | REGISTERED | 86/163689 | 1/13/2014 | 4827758 | 10/6/2015 | Barney's, Inc. |
| UNITED STATES | Miscellaneous Design (Lion) | REGISTERED | 76/579728 | 3/8/2004 | 3088067 | 5/2/2006 | Barney's, Inc. |
| UNITED STATES | Miscellaneous Design (Lion) | REGISTERED | 75/981502 | 3/22/2000 | 2559933 | 4/9/2002 | Barney's, Inc. |
| UNITED STATES | Miscellaneous Design (Lion) | REGISTERED | 76/579727 | 3/8/2004 | 2927627 | 2/22/2005 | Barney's, Inc. |
| UNITED STATES | MOST LOVED | REGISTERED | 85/630656 | 5/21/2012 | 4404251 | 9/17/2013 | Barney's, Inc. |
| UNITED STATES | MOST LOVED (and Design - V shaped Hearts) | REGISTERED | 85/630777 | 5/21/2012 | 4401191 | 9/10/2013 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNITED STATES | MY BARNEYS BAG | REGISTERED | 85/451602 | 10/19/2011 | 4235176 | 10/30/2012 | Barney's, Inc. |
| UNITED STATES | N (and Design - Diamond) | REGISTERED | 85/631113 | 5/21/2012 | 4444648 | 12/3/2013 | Barney's, Inc. |
| UNITED STATES | N NEW ARRIVAL (and Design - Diamond) | REGISTERED | 85/631150 | 5/21/2012 | 4951545 | 5/3/2016 | Barney's, Inc. |
| UNITED STATES | PURPLE CARD | REGISTERED | 85/860425 | 2/26/2013 | 4439121 | 11/26/2013 | Barney's, Inc. |
| UNITED STATES | SELECT, DON'T SETTLE. | REGISTERED | 74/030677 | 2/16/1990 | 1678142 | 3/3/1992 | Barney's, Inc. |
| UNITED STATES | TASTE, LUXURY, HUMOR | REGISTERED | 76/283654 | 7/12/2001 | 2552600 | 3/26/2002 | Barney's, Inc. |
| UNITED STATES | THE BOOK OF KNOWLEDGE | REGISTERED | 75/555824 | 9/21/1998 | 2294407 | 11/23/1999 | Barney's, Inc. |
| UNITED STATES | THE FOUNDATION | REGISTERED | 76/368542 | 2/8/2002 | 2744455 | 7/29/2003 | Barney's, Inc. |
| UNITED STATES | THE FOUNDATION (Stylized) | REGISTERED | 76/389133 | 4/1/2002 | 2782869 | 11/11/2003 | Barney's, Inc. |
| UNITED STATES | THE WINDOW | REGISTERED | 85/236974 | 2/8/2011 | 4068621 | 12/6/2011 | Barney's, Inc. |
| UNITED STATES | V FAVORITES (and Design) | REGISTERED | 85/630757 | 5/21/2012 | 4411833 | 10/1/2013 | Barney's, Inc. |
| UNITED STATES | XO (and Design - In a circle) | REGISTERED | 85/498555 | 12/19/2011 | 4247329 | 11/20/2012 | Barney's, Inc. |
| UNITED STATES | XO EXCLUSIVELY OURS (and Design - In a circle) | REGISTERED | 85/499590 | 12/20/2011 | 4247333 | 11/20/2012 | Barney's, Inc. |
| UNITED STATES | COOP BARNEYS NEW YORK | Registered | 76/976,610 | 02/05/03 | 2,867,636 | 07/27/04 | Barney's, Inc. |

## DOMAIN NAME ASSIGNMENT AGREEMENT

This DOMAIN NAME ASSIGNMENT AGREEMENT (this "Assignment"), is entered into as of [●] by and between ABG-Barneys, LLC, a Delaware limited liability company ("Assignee") and each other Person that is a signatory hereto (each, an "Assignor" and collectively, "Assignors").

WHEREAS, this Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 16, 2019 (as amended, restated, supplemented and/or otherwise modified from time to time in accordance with the terms thereof, the "Purchase Agreement"), by and among Assignee and each other Person that is a signatory thereto, including, without limitation, Assignors;

WHEREAS, this Assignment is being executed and delivered by the parties hereto contemporaneously with the Closing under the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Assignors have agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of Assignors' direct or indirect right, title and interest in, to and under certain assets, including, without limitation, all of Assignors' rights associated with the internet domain names identified on Schedule A attached hereto (collectively, the "Assigned Domain Names");

WHEREAS, in accordance with the Purchase Agreement, Assignors desire to assign and Assignee desires to acquire the Assigned Domain Names, including all goodwill associated therewith and symbolized thereby.

NOW THEREFORE, in consideration of the premises and the mutual warranties, representations, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.     Definitions. Unless otherwise defined herein, each capitalized term used herein shall have the meaning assigned thereto in the Purchase Agreement.

2.     Assignment. Assignors hereby transfer, assign, convey and deliver to Assignee, its successors and assigns, free and clear of all Liens, (a) all of Assignors' worldwide right, title and interest in and to the Assigned Domain Names and the goodwill associated with the Assigned Domain Names and symbolized thereby, effective as of the date hereof; and (b) all other rights accruing thereunder or pertaining thereto in any jurisdiction throughout the world for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors and assigns, as full and entirely as the same would have been held and enjoyed by Assignors if this Assignment had not been made, including: claims, causes of actions and rights to pursue and collect damages, costs, injunctive relief and other remedies for past, current or future infringement, misappropriation, dilution, conflict with or other violation of any of the foregoing, and all income, royalties or payments due or payable as of the date hereof or hereafter in respect of any of the foregoing.

3.      <u>Authorization and Recordation</u>.  Assignors hereby authorizes and request the applicable domain name registrar to transfer the Assigned Domain Names to Assignee, and Assignee's successors and/or assigns.  Assignee shall have the right to record this Assignment with all applicable governmental authorities and registrars so as to perfect ownership of the Assigned Domain Names.

4.      <u>Governing Law</u>. All issues and questions concerning the formation, existence, termination, construction, validity, enforcement and interpretation of this Assignment will be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

5.      <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Such counterparts may be delivered in electronic format (including by fax and electronic mail).

6.      <u>Purchase Agreement</u>.  This Assignment is beign executed and delivered pursuant to the Purchase Agreement.  Notwithstanding anything in this Assignment to the contrary, nothing in this Assignment, express or implied, is intended or shall be construed to modify, expand or limit in any way the terms and conditions of the Purchase Agreement, all of which shall survive the delivery of this Assignment to the extent provided in the Purchase Agreement.  To the extent that any provision of this Assignment conflicts or is inconsistent with the terms and conditions of the Purchase Agreement, the Purchase Agreement will govern.

7.      <u>Further Assurances</u>.   In accordance with the Purchase Agreement, Assignors hereby agree to perform all affirmative acts which may be necessary or desirable to record or perfect the above-described transfer of the Assigned Domain Names, or to secure registration before the applicable domain name registrar, at Assignee's expense, as well as to cooperate with Assignee in obtaining and/or providing information required in any proceedings relating to the Assigned Domain Names, at Assignee's expense, including, without limitation, cooperation in effectuating the transfer of the Assigned Domain Names, including in connection with the transmission of the necessary Registrant Name Change Agreements (RNCAs) or other written authorizations and instructions and/or to correspond with the applicable registrars to instruct and authorize transfer of the Assigned Domain Names, including, without limitation, by providing to Assignee a functioning user name and password, where available, or issuing corresponding transfer codes, sufficient for Assignee to administer the Assigned Domain Names. Assignors hereby grant to the designated attorneys of Assignee the authority and power to insert on this instrument any further identification which may be necessary or desirable for purposes of recordation by the applicable domain name registrar.

8.      <u>Closing</u>.  This Assignment is effective as of the Closing.

9.      <u>Severability; Amendment</u>.  Any provision in this Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.   This

Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of Assignee and Assignors on behalf of Assignee and Assignors, respectively.

10.    Notices.  Any notice given pursuant to this Assignment shall be given in the same manner and addressed to the intended recipient as set forth in Section 9.7 of the Purchase Agreement.

*[Remainder of page intentionally left blank; signature page to follow.]*

**IN WITNESS WHEREOF**, each of the parties hereto has executed and delivered this Assignment as of the date first above written.

<u>**ASSIGNORS:**</u>

**BARNEYS NEW YORK, INC.**

By: _____
Name: _____
Title: _____

**BARNEY'S, INC.**

By: _____
Name: _____
Title: _____

**BNY CATERING, INC.**

By: _____
Name: _____
Title: _____

**BNY LICENSING CORP.**

By: _____
Name: _____
Title: _____

**BARNEYS ASIA CO. LLC**

By: _____
Name: _____
Title: _____

**<u>ASSIGNEE</u>:**

**ABG-BARNEYS, LLC**

By: _____

Name: _____

Title: _____

**SCHEDULE A**

**Assigned Domain Names**

See attached.

**SCHEDULE AB 51 ATTACHMENT**
Internet Domain Names and Websites

| General Description | Net Book Value | Valuation Method | Current Value |
|---|---|---|---|
| barneys.cn | | N/A | Undetermined |
| barneys.com | | N/A | Undetermined |
| barneys.com.cn | | N/A | Undetermined |
| barneys.sucks | | N/A | Undetermined |
| barneys.xxx | | N/A | Undetermined |
| barneysbeautyguru.xxx | | N/A | Undetermined |
| barneyschelseapassage.xxx | | N/A | Undetermined |
| barneyscoop.com | | N/A | Undetermined |
| barneysco-op.com | | N/A | Undetermined |
| barneysdna.com | | N/A | Undetermined |
| barneysgenie.com | | N/A | Undetermined |
| barneysgenome.com | | N/A | Undetermined |
| barneysnewyork.com | | N/A | Undetermined |
| barneysnewyork.net | | N/A | Undetermined |
| barneysnewyork.org | | N/A | Undetermined |
| barneysnewyork.sucks | | N/A | Undetermined |
| barneysnewyork.xxx | | N/A | Undetermined |
| barneysnewyorkcoop.com | | N/A | Undetermined |
| barneysnewyorkco-op.com | | N/A | Undetermined |
| barneysnewyorkfreestuff.xxx | | N/A | Undetermined |
| barneysnewyorkoutlet.com | | N/A | Undetermined |
| barneysnewyorkoutlets.com | | N/A | Undetermined |
| barneysnewyorkwarehouse.com | | N/A | Undetermined |
| barneysnewyorkwarehousesale.com | | N/A | Undetermined |
| barneysny.com | | N/A | Undetermined |
| barneysny.net | | N/A | Undetermined |
| barneysonline.net | | N/A | Undetermined |
| barneysoutlets.com | | N/A | Undetermined |
| barneyspersonalshopper.com | | N/A | Undetermined |
| barneyswarehouse.com | | N/A | Undetermined |
| barneyswarehousesale.com | | N/A | Undetermined |
| barneyswearhouse.com | | N/A | Undetermined |
| bnycoop.com | | N/A | Undetermined |
| bnyco-op.com | | N/A | Undetermined |
| b-sides.xxx | | N/A | Undetermined |
| b-social.xxx | | N/A | Undetermined |
| callingallmensince1923.xxx | | N/A | Undetermined |
| chelseapassage.xxx | | N/A | Undetermined |
| coopbarneys.com | | N/A | Undetermined |

In re: Barney's, Inc.
Case No. 19-36299

**SCHEDULE AB 61 ATTACHMENT**
Internet Domain Names and Websites

| General Description | Net Book Value | Valuation Method | Current Value |
|---------------------|----------------|------------------|---------------|
| co-opbarneys.com | | N/A | Undetermined |
| coopbarneysnewyork.com | | N/A | Undetermined |
| co-opbarneysnewyork.com | | N/A | Undetermined |
| coopbarneysnewyork.xxx | | N/A | Undetermined |
| coopbny.com | | N/A | Undetermined |
| co-opbny.com | | N/A | Undetermined |
| couturedna.com | | N/A | Undetermined |
| couturegenome.com | | N/A | Undetermined |
| ebarneys.com | | N/A | Undetermined |
| ebarneys.net | | N/A | Undetermined |
| exclusivelyours.com | | N/A | Undetermined |
| exclusivelyoursxo.asia | | N/A | Undetermined |
| exclusivelyoursxo.biz | | N/A | Undetermined |
| exclusivelyoursxo.cn | | N/A | Undetermined |
| exclusivelyoursxo.com | | N/A | Undetermined |
| exclusivelyoursxo.info | | N/A | Undetermined |
| exclusivelyoursxo.net | | N/A | Undetermined |
| exclusivelyoursxo.org | | N/A | Undetermined |
| exclusivelyoursxo.xxx | | N/A | Undetermined |
| fashiongenomics.com | | N/A | Undetermined |
| fredsatbarneysnewyork.xxx | | N/A | Undetermined |
| getitright.xxx | | N/A | Undetermined |
| givegoodgift.xxx | | N/A | Undetermined |
| madetomeasuresuite.xxx | | N/A | Undetermined |
| mystylegenome.com | | N/A | Undetermined |
| ourbestlabelmaybeourown.xxx | | N/A | Undetermined |
| selectdontsettle.com | | N/A | Undetermined |
| selectdontsettle.xxx | | N/A | Undetermined |
| tasteluxuryhumor.xxx | | N/A | Undetermined |
| thebookofknowledge.xxx | | N/A | Undetermined |
| thefoundation.xxx | | N/A | Undetermined |
| virtualbarneys.com | | N/A | Undetermined |
| xoexclusivelyours.com | | N/A | Undetermined |

In re: Barney's, Inc.
Case No. 19-36299

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement"), effective upon the closing (the "Closing") of the transactions contemplated by the APA (as defined below), is made as of October 16, 2019, by and among Barneys, Inc. a New York corporation ("Barneys"), and the other direct and indirect wholly-owned Subsidiaries of Barneys that are signatory hereto (together with Barneys, "Merchant"), Great American Group, LLC ("GA" or "Agent"), and ABG-Barneys, LLC ("Buyer"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA.

Section 1.  Recitals.

WHEREAS, on August 6, 2019, Merchant filed a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court");

WHEREAS, on September 10, 2019, the Bankruptcy Court entered the *Amended Final Order (I) Authorizing the Debtors to Enter Into and Perform Under the Consultant Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Continuation of Related Non-Insider Severance Programs, and (IV) Granting Related Relief* [Docket No. 230] (the "Store Closing Order");

WHEREAS, simultaneously with the execution hereof, Buyer, Merchant, and certain other entities affiliated with Merchant entered into an Asset Purchase Agreement (the "APA") pursuant to which Buyer will acquire certain assets of the Merchant and its subsidiaries, as set forth more particularly therein, and designate certain assets to be sold by Agent pursuant to this Agreement;

WHEREAS, currently, Merchant operates seven (7) retail stores (each a "Store" and collectively, the "Stores"); and

WHEREAS, Merchant and Buyer desire that Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as defined in the APA) from (i) the Closing Stores (as defined below) by means of a "store closing", "sale on everything", "everything must go", or similar sale, but expressly excluding "going out of business" and "total inventory liquidation" sales at the Closing Stores and (ii) through the E-Commerce Platform by means of a "sale on everything", "everything must go", or similar sale, but expressly excluding "store closing", "going out of business" and "total inventory liquidation" sales on the E-Commerce Platform (together, Closing Store Advertising") in accordance with the terms of this Agreement; and (b) disposing of the Designated F&E (as defined below) (the foregoing and as further described below, the "Sale").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent, Buyer, and Merchant hereby agree as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)    Upon the Closing, Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)    Upon Closing, Agent shall be authorized to use Closing Store Advertising with respect to Closing Stores and the E-Commerce Platform, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances,

including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that the Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and the Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

(c)    Closing Stores.  As used in this Agreement, "Closing Stores" shall mean the Closing Stores under and as defined in the APA.

Section 3.    Proceeds.

3.1    Intentionally Omitted.

3.2    Intentionally Omitted:

3.3    Proceeds; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service and shipping revenue, in each case during the Sale Term and exclusive of Sales Taxes; and (ii) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term.  For purposes of this Agreement, "Other Proceeds" shall mean (i) the total amount (in dollars) of all sales of Designated F&E made under this Agreement; and (ii) the total amount (in dollars) of all sales of Additional Agent Goods made under this Agreement.  Subject to the terms and conditions of that certain letter agreement between Agent and Buyer (the "Letter Agreement"), the Merchant and Buyer hereby irrevocably agree that, as compensation for Agent's services hereunder, Agent shall receive and retain for its sole and exclusive benefit all Proceeds and Other Proceeds.

(b)    Intentionally Omitted.

(c)    Upon Closing, all Proceeds and Other Proceeds shall be controlled by Agent in the manner provided for below.

(1)    Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and Other Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant, shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts (at Agent's sole cost and expense, with any such costs and expenses constituting Expenses hereunder); provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds and Other Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder.  Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Neither Merchant nor Buyer, as applicable, shall be responsible

2

for, and Agent shall pay as an Expense hereunder, any bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant and Buyer of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and Other Proceeds of the Sale (including processor receivables and credit card Proceeds and Other Proceeds) shall be deposited into the Agency Accounts.

(2)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's, as applicable, credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's reasonable request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds and Other Proceeds for Agent's account.  Neither Merchant nor Buyer, as applicable, shall be responsible for, and Agent shall pay as an Expense hereunder, any credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(3)    Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds, Other Proceeds, and other amounts contemplated by this Agreement (including processor receivables and credit card Proceeds and Other Proceeds), shall be collected by Merchant, and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant, for the Stores, which accounts shall be designated solely for the deposit of Proceeds and Other Proceeds and other amounts contemplated by this Agreement (including processor receivables and credit card Proceeds and Other Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").  The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds, Other Proceeds, or other amounts contemplated hereunder, and  Merchant, subject to the security interests liens of the DIP Lenders until the DIP Obligations (as defined in the DIP Order) are paid in full, hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds and Other Proceeds) in such accounts from and after the Sale Commencement Date.  If requested by Agent, each account shall be subject to a agreement between and among Agent and Merchant (subject to the reasonable consent of Merchant), and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of Merchant (a "Control Agreement").  If, notwithstanding the provisions of this Section 3.3(c), Merchant receives or otherwise has dominion over or control of any Proceeds, Other Proceeds, or other amounts due to Agent under this Agreement, Merchant, shall be deemed to hold such Proceeds, Other Proceeds, and other amounts "in trust" for Agent and shall not commingle Proceeds, Other Proceeds, or other amounts due to Agent with any of Merchant's other funds or deposit such Proceeds, Other Proceeds, or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(4)    On each Business Day, Merchant, shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds

3

(including from credit card sales), Other Proceeds, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall.

        (d)    The Store Cash Amount (as defined in the APA) shall be an Agent Acquired Asset (as defined in the APA).

        3.4    <u>Bulk Sales</u>.  Agent shall be authorized to sell Merchandise in bulk to one or more purchasers, in which case Merchant shall execute any such documents of transfer prepared by Agent at Agent's sole cost and expense.

Section 4.  <u>Expenses of the Sale</u>.

        4.1    <u>Expenses</u>.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent hereby agrees to pre-fund any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing (the "<u>Prefunding Obligations</u>"); <u>provided</u>, <u>however</u>, that to the extent the actual Expenses related to the Prefunding Obligations are less than the Prefunding Obligations, Agent shall be entitled to a dollar for dollar credit against other Expenses or entitled to a refund of such overfunding.  As used herein, "<u>Expenses</u>" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

        (a)    actual payroll (including overtime) with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term (including hours worked by those employees performing the Inventory Taking) as well as payroll (including overtime) for any temporary employees/labor engaged for the Sale;

        (b)    any amounts payable by Merchant or Buyer for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 20.6% of the base payroll for each Retained Employee in the Stores (the "<u>Payroll Benefits Cap</u>");

        (c)    the actual Occupancy Expenses categorized on <u>Exhibit 4.1(c)</u> in all cases limited on a per Store, per category, and per diem basis not to exceed the respective categories and amounts shown on <u>Exhibit 4.1(c)</u>;

        (d)    Retention Bonuses for Retained Employees, as provided for in <u>Section 9.4</u> below;

        (e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

        (f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

        (g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, wire transfer costs, and bad check expenses to the extent attributable to the Sale;

4

(h)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all costs and expenses associated with Agent's on-site supervision of the Stores, Merchant's distribution centers (the "Distribution Centers"), and corporate offices, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, Distribution Centers, and corporate offices, and costs and expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)    Agent's actual cost of capital (including letter of credit fees) and insurance;

(n)    Agent's costs and expenses associated with this Agreement, the APA, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale, and further including all costs and expenses associated with Additional Agent Goods included in the Sale, if any;

(o)    third party payroll processing expenses associated with the Sale;

(p)    costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of Section 8.1(e);

(q)    actual costs and expenses (including (without limitation) payroll and payroll benefits, occupancy, shipping costs for customer orders, advertising at historical levels, in each case attributable to the E-Commerce Platform) attributable to the operation of the E-Commerce Platform in an amount up to $1,750,000 per week (prorated for partial weeks) until the date on which the E-Commerce Platform ceases operating as a sales channel;

(r)    actual costs and expenses associated with the Gift Certificates; and

(s)    the actual costs and expenses of Agent providing such additional services as Agent deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in Section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category or are payable to Merchant and Buyer.  For the avoidance of doubt, to the extent any Expenses are incurred by either Agent or Merchant, Agent shall reimburse Merchant for such Expenses in accordance with Section 4.2.

5

As used herein, the following terms have the following respective meanings:

(1)    "<u>Central Service Expenses</u>" means costs and expenses for Merchant's or Buyer's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology and E-Commerce Platform operations, updates, maintenance and other services related thereto, and accounting (collectively, "<u>Central Services</u>").

(2)    "<u>Excluded Payroll Benefits</u>" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including without limitation, any payments due under the WARN Act.

(3)    "<u>Occupancy Expenses</u>" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, common area maintenance ("CAM"), storage costs, real estate and use taxes, Merchant's/Buyer's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(4)    Notwithstanding any other provision of this Agreement to the contrary, "<u>Expenses</u>" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses unrelated to the Sale, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under <u>Section 4.1(c)</u> above to the extent actually incurred and unrelated to the Sale; (iv) any expenses of any kind relating to or arising from Buyer's corporate office; (v) any item other than the Expenses specifically listed in <u>Sections 4.1(a)-(s)</u> (including, for the avoidance of doubt, any costs and expenses in excess of any monetary caps set forth in <u>Sections 4.1(a)-(s)</u>) that are unrelated to the Sale; and (vi) any other costs, expenses or  unrelated to the Sale payable by Merchant or Buyer not provided for herein,  all of which shall be paid solely by Merchant or Buyer, as applicable, promptly when due, subject to the provisions of the Bankruptcy Code, the APA, and the Approval Order.  For the avoidance of doubt, all costs, expenses and liabilities incurred in connection with the Sale and the transactions contemplated hereby after Closing shall be the obligation of Agent.

4.2    <u>Payment of Expenses.</u>

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds).  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant or Buyer, as the case may be, or paid by Merchant or Buyer, as the case may be, and thereafter reimbursed by Agent on a dollar for dollar basis and as provided for herein, immediately following the Weekly Sale Reconciliation; <u>provided, however</u>, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent or Buyer and Agent, as the case may be, shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent, Buyer, and/or Merchant may review or audit the Expenses at any time.

4.3    <u>Distribution Center Expenses</u>

6

All Distribution Center Merchandise shall be delivered from the Distribution Centers to the Stores in accordance with the Allocation Schedule. From the Closing until November 30, 2019, all costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations, and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Centers (the "Distribution Center Expenses"), shall be the obligation of Merchant. Starting on December 1, 2019, the Distribution Center Expenses shall be the obligation of the Agent. For the avoidance of doubt, costs of transferring unsold E-Commerce Merchandise, if any, from the Distribution Centers to the Stores after the conclusion of the Sale through the E-Commerce Platform shall not be Expenses or Distribution Center Expenses and shall be borne by Merchant as part of the Wind Down Amount.

Section 5.  Intentionally Omitted.

      5.1     Intentionally Omitted.

      5.2     Intentionally Omitted.

      5.3     Intentionally Omitted

      5.4     Intentionally Omitted.

Section 6.  Sale Term.

      6.1     Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence on the Closing Date, but in no event later than November 1, 2019 (such date, the "Sale Commencement Date"). Agent shall complete the Sale at each Closing Store no later than February 28, 2020 (the "Sale Termination Date", and the period from the Sale Commencement Date to the applicable Sale Termination Date as to each such Store being the "Sale Term"). Agent shall complete the Sale on the E-Commerce Platform no later than January 31, 2020. Notwithstanding the foregoing, Agent may, in its discretion, terminate the Sale earlier on a store-by-store basis upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant and Buyer (the "Vacate Date"), provided, that Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store.

      6.2     Vacating the Stores.  At the conclusion of the Sale at each Closing Store, Agent agrees to leave each Closing Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Designated F&E and other assets or property of the Merchant or Buyer, as applicable, which be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below. Agent shall vacate each Closing Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Closing Store premises, and Closing Store keys, to Merchant. Agent's obligations to pay all Expenses for the Closing Stores shall continue until the applicable Expenses through the Sale Termination Date for each Closing Store are paid in full.

Section 7.  FF&E.

      7.1     Designated F&E.  Agent shall sell all Furnishings and Equipment at the Closing Stores, the Distribution Centers, and the corporate offices (collectively, "Designated F&E") and shall be responsible for the costs and expenses incurred in connection with the disposition of the Designated F&E.

7

7.2     <u>Abandonment of Designated F&E</u>.  Upon five days prior written notice to Merchant and Buyer, Agent shall be authorized to abandon any and all unsold Designated F&E in place without any cost or liability to any party.

Section 8.  <u>Conduct of the Sale</u>.

8.1     <u>Rights of Agent</u>.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale at the Closing Stores and through the E-Commerce Platform by means of Closing Store Advertising throughout the Sale Term without compliance with any Liquidation Sale Laws. Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as <u>Exhibit 8.1</u> (the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the Sale, Agent, in the exercise of its reasonable discretion shall have the right, subject to the limitations set forth herein:

(a)     to establish Sale prices and discounts and Store hours;

(b)     except as otherwise expressly included as an Expense, to reasonably use without charge during the Sale Term all Furnishings and Equipment and all personal property subject to the Personal Property Leases, computer hardware and software, existing Supplies, intangible assets (including Intellectual Property), Closing Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Closing Stores, and any other assets of the Merchant or Buyer, as applicable, located at the Closing Stores (whether owned, leased, or licensed);

(c)     (i) to be provided by Merchant or Buyer, as applicable, (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's or Buyer's, as applicable, central office facility to effect the Sale; and (iii) to use all Intellectual Property (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant and/or Buyer in order for Merchant and/or Buyer to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data and the Letter Agreement);

(d)     to establish and implement (i) advertising, signage and promotion programs consistent with this Agreement, consistent with the advertising materials annexed hereto as <u>Exhibit 8.1(d)(i)</u>, including without limitation by means of media advertising, (ii) interior and exterior signs and banners, in accordance with the sign package annexed hereto as <u>Exhibit 8.1(d)(ii)</u>, and (iii) the use of sign walkers consistent with the provisions herein;

(e)     to transfer Merchandise  between and among the Closing Stores at Agent's expense; and

(f)     subject to the provisions of <u>Section 8.10</u> below, to include Additional Agent Goods as part of the Sale.

8.2     <u>Terms of Sales to Customers; Final/As Is Sales</u>.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank

8

debit and credit cards, or Gift Certificates.  Agent shall accept and honor Merchant's or Buyer's coupons during the Sale Term, including, but not limited to, Merchant's or Buyer's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term (collectively, "Discount Items").  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  For Discount Items accepted during the Sale Term, the Merchant shall reimburse Agent in cash for all amounts related to such Discount Items during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3    Sales Taxes.

(a)    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant, and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  For the avoidance of doubt, Merchant will have payment authority on the Sales Tax Account from inception until Merchant no longer has any obligation with respect to the payment of Sales Taxes hereunder.  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities with respect to Sales Taxes incurred prior to the Closing, and Merchant shall promptly pay all such Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, any taxing authority, or any other party, and Merchant , as applicable, shall each indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by such party to promptly pay such Sales Taxes to the proper taxing authorities and/or the failure by such party to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant, comply with their obligations hereunder, Agent shall indemnify and hold harmless Merchant and/or Buyer, as applicable, from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant and/or Buyer, as applicable, sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant, to file any requisite returns with such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement and the Letter Agreement contemplate that one party may make to the other party do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant prior to Closing and from and after Closing agree to promptly provide the same to Agent at Merchant's, cost therefor, if available, for which Agent shall promptly reimburse Merchant, as applicable.

9

8.5    <u>Returns of Merchandise</u>.  During the first seven (7) days of the Sale Term (the "<u>Return Deadline</u>") Agent shall accept Returned Merchandise, provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date. For refunds issued in respect of each item of Returned Merchandise, that is first quality finished goods capable of being sold at normal retail price, Merchant shall promptly reimburse Agent in cash for the difference between (x) the refund Agent is required to issue to customers in respect of each such item of Returned Merchandise and (y) the Cost Value of each such item of Returned Merchandise.  For refunds issued in respect of each item of Returned Merchandise that is NOT first quality finished goods capable of being sold at normal retail price, but nonetheless capable of being resold, Merchant shall promptly reimburse Agent in cash the difference between (x) the refund Agent is required to issue to customers in respect of each such item of Returned Merchandise and (y) a Cost Value mutually agreed upon by Agent for each such item of Returned Merchandise.  Merchant shall reimburse Agent on account of refunds issued by Agent in accordance with the previous two sentences during each Weekly Sale Reconciliation provided for in Section 8.7.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6    <u>Gift Certificates; Membership Program.</u>

(a)    During the first  seven (7) days of Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "<u>Gift Certificates</u>").  Agent shall not sell any Gift Certificates.  For Gift Certificates redeemed during the Sale Term, Merchant shall reimburse Agent in cash, from the Wind Down Amount, for redeemed Gift Certificates during the Weekly Sale Reconciliation provided for in <u>Section 8.7</u>.

(b)    During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "<u>Discounts</u>"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis.

8.7    <u>Sale Reconciliation</u>.  On each Wednesday during the Sale Term, Agent, and Merchant shall cooperate (in reasonable consultation with the DIP Agent) to reconcile Expenses of the Sale, Proceeds and Other Proceeds of the Sale, and reconcile such other Sale-related items as any party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures reasonably agreed upon by  Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent, and Merchant shall (in reasonable consultation with the DIP Agent) complete a final reconciliation of the Sale (the "<u>Final Reconciliation</u>"), the written results of which shall be certified by representatives of each of the Merchant, and Agent as a final settlement of accounts between the Merchant, and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, all unpaid amounts pursuant to the Final Reconciliation shall be paid to and by the appropriate parties.  Once executed by Merchant, and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).  During the Sale Term, and thereafter until all of Merchant's, and Agent's obligations under this Agreement have been satisfied, Merchant, and Agent shall have reasonable access to Merchant's,  and Agent's records with respect to the Sale (including, but not limited to, Merchandise, Expenses, and Proceeds and Other Proceeds) to review and audit such records.

10

8.8    <u>Force Majeure</u>.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores for a period of five (5) consecutive days, the Merchandise located at such Closing Store shall, in Agent's reasonable discretion (after consultation with the Merchant and Buyer), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent, Buyer, and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder.

8.9    <u>Right to Monitor</u>.  Merchant, Buyer and the DIP Agent shall have the right to monitor the Sale and activities attendant thereto and to be present in the Closing Stores during the hours when the Closing Stores are open for business; <u>provided</u> that Merchant's, Buyer's and the DIP Agent's presence does not unreasonably disrupt the conduct of the Sale.  Merchant and Buyer shall also have a right of access to the Closing Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    <u>Additional Agent Goods.</u>

(a)    Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("<u>Additional Agent Goods</u>").  The Additional Agent Goods shall be purchased by Agent as part the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense).  Sales of Additional Agent Goods shall be run through Merchant's  cash register systems, <u>provided</u> <u>however</u>, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and/or Merchant, as applicable, shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

(b)    Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(c)    Merchant shall until the Sale Termination Date, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(d)    Merchant, and the DIP Agent acknowledge, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Merchant, and DIP Agent further acknowledge and agree that Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's

11

interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

Section 9.  Employee Matters.

For purposes of this Section 9, all references to employees shall be deemed references to employees of Merchant.

9.1    Merchant's Employees.  Agent may use all of Merchant's, Store level employees in the conduct of the Sale to the extent Agent deems reasonably necessary for the Sale (each such employee, a "Retained Employee"), and Agent may select and schedule the number and type of Retained Employees.  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant, and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's, obligations relating to any of Merchant's, employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Closing Store employees prior to the Sale Termination Date.  Other than in the ordinary course of business, Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant, at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant, of the basis for such "cause."  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant). Merchant shall be entitled to terminate any Retained Employee so long as Merchant has reasonably determined, after reasonable consultation with Agent, that Merchant shall be able to continue to fulfill its obligations under this Agreement following such termination.

9.3    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4     Employee Retention Bonuses.  Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion.  The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date and shall be processed through Merchant's.

Section 10.  Conditions Precedent and Subsequent.

(a)     The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent (except that with respect to paragraph (2) below, such condition can only be waived with the consent of both Agent and Merchant):

(1)     All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(2)     No later than November 1, 2019  (such date, the "Approval Order Deadline"), the Bankruptcy Court shall have entered an order in a form reasonably satisfactory to Buyer, Merchant, Agent, and DIP Agent (the "Approval Order") that authorizes Buyer, Merchant, and Agent to enter into this Agreement and authorizes Merchant to conduct the Sale in accordance with the terms of this Agreement and provides, *inter alia,* that subject to the Closing, (i) this Agreement is in the best interest of the Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant, Buyer, and Agent shall be authorized to continue to take any and all actions deemed necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Purchase Price, Agent shall be entitled to sell all Merchandise and Designated F&E hereunder free and clear of all liens, claims or encumbrances thereon; (v) Agent shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of the Merchant or Buyer, as applicable, as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale consistent with the Closing Store Advertising, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined above), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited, non-exclusive license and right to use until the Sale Termination Date all Intellectual Property in connection with the Sale; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant, Buyer, and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Designated F&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant or Buyer other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this

Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") senior to all other superpriority claims; (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest for the obligations of Merchant as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale uninterrupted; (xv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchant, Buyer, and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(b)       The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

(1)       All representations and warranties of Agent and Buyer hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date;

(2)       the entry by the Bankruptcy Court of the Approval Order;

(3)       the payment in full of the Purchase Price under the APA; and

(4)       On or before October 21, 2019, Agent shall have adopted an incentive program, reasonably acceptable to Merchant, for the benefit of Merchant's employees that assist in the Sale process with incentive payments measured by reference to the amount of Proceeds realized from such Sale processes.

Section 11.   Representations, Warranties and Covenants.

11.1   Merchant's Representations, Warranties and Covenants.   Merchant hereby represents, warrants and covenants in favor of Agent and Buyer as follows:

(a)       Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of New York (except as may be a result of the commencement and/or pendency of the Bankruptcy Cases); (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including, prior to the Closing, all jurisdictions in which the Stores are located, except, in each case, to the

14

extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable against it in accordance with its terms.

(c)     Merchant owns, and will own at all times prior to the Closing, good and marketable title to all of the Merchandise and Designated F&E to be included in the Sale, free and clear of all Liens (other than Permitted Liens and Liens granted to Agent hereunder).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Designated F&E or Other Proceeds) other than as provided herein (including the Permitted Liens).

(d)     The Sellers have maintained their pricing files (including the File) in the Ordinary Course of Business. All pricing files and records are accurate in all material respects as to the actual cost to the Sellers for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law with respect to the Merchandise, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant shall continue to ticket or mark all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since October 1, 2019, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and has not raised, and will not raise, prices of any Merchandise, in each case, in contemplation of the Sale.

(f)     Since October 1, 2019, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Closing Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Closing Stores without Agent's consent from and after the date hereof other than replenishing goods in the Closing Stores in the ordinary course of business prior to the Sale Commencement Date or pursuant to the Allocation Schedule.

(g)     To Sellers' Knowledge, all Merchandise is in compliance in all material respects with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall

15

provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)        Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Closing Stores, the assets currently located at the Stores, and the utilities and other services provided at the Closing Stores. Merchant shall, until the Closing, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the Sale at the Store.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, until the Sale Termination Date, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale (other than those relating to any period prior to the commencement of the Bankruptcy Cases).

(i)        Subject to approval by the Bankruptcy Court or the Approval Order, Merchant will continue to pay throughout the Sale Term all self-insured or Merchant-funded employee benefit programs for Retained Employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)        Since October 1, 2019, Merchant has not intentionally taken, and shall not take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees, except to the extent an employee was due an annual raise in the ordinary course or in an effort to encourage one or more employees to remain in Merchant's employ (such action not being taken with any intent to increase any expense in anticipation of the Sale).

(k)        Except as otherwise restricted by the Bankruptcy Code, in connection with any "store closing", "inventory liquidation" or similar sales conducted by Merchant at the Excluded Stores in connection with the Bankruptcy Cases or as provided herein and absent a bona fide dispute, from the date hereof, through the Sale Commencement Date Merchant covenants to continue to operate through the Sale Commencement Date, the Closing Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Closing Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(l)        Other than filing the Bankruptcy Case, as of the date of this Agreement, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Sellers' Knowledge, is threatened against or affects Merchant, which questions the validity of this Agreement, or that, if adversely determined, would have a material adverse effect on the ability of Merchant to perform its obligations under this Agreement.

(m)        At the Closing Stores on the E-Commerce Platform, from and after the date hereof, Merchant shall not offer, promote, advertise, or market any (i) storewide promotion or storewide discount or offer or (ii) implement or continue any promotion or discount that is equal to or greater than what the Company offered last year during the same time period, in connection with any "store closing," liquidation or similar sales at the Excluded Stores commenced prior to the Sale Commencement Date.

16

(n)    Since October 1, 2019, Merchant has not and, from and after the date hereof through and including the Sale Termination Date, Merchant shall not transfer any goods from the Excluded Stores to the Closing Stores or the Distribution Centers.

11.2    <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant and Buyer as follows:

(a)    Each entity comprising Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's Knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)    The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)    Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)    To the best of Agent's Knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise or Inventory under Open Purchase Orders located in the Stores.

17

11.3    <u>Buyer's Representations, Warranties, and Covenants</u>.  Buyer hereby represents, warrants and covenants in favor of Merchant and Agent as follows:

(a)    Buyer:  (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its organization; and (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby.

(b)    Buyer has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Buyer has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Buyer for Buyer to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Buyer and, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Buyer's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Buyer is a party or by which Buyer is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Buyer, or has been settled or resolved, or to Buyer's Knowledge, has been threatened against or affects Buyer, which questions the validity of this Agreement or any action taken or to be taken by Buyer in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Buyer's ability to perform its obligations under this Agreement.

Section 12.    <u>Insurance</u>.

12.1    <u>Merchant's Liability Insurance</u>.  Merchant shall continue until the Sale Termination Date, in each case, in such amounts as it currently has in effect, all of its respective liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Closing Stores and E-Commerce Platform, in each case, in effect on the date hereof (collectively, the "<u>Liability Insurance Policies</u>"); and Merchant, shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder (to be reimbursed on a dollar for dollar basis by Agent), unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to Sale Termination Date without Agent's prior written consent.

12.2    <u>Merchant's Casualty Insurance</u>.  Merchant shall continue until the Sale Termination Date fire, flood, theft and extended coverage casualty insurance, in each case, in effect on the

18

date hereof (collectively, the "Casualty Insurance Policies") covering the Merchandise  in a total amount equal to no less than the Cost Value thereof.  From and after the date of this Agreement until the Sale Termination Date, as applicable, all such policies will also name Agent as loss payee (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming Agent as loss payee, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant or Buyer, as applicable, to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant or Buyer, as applicable, certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant or Buyer, as applicable, as an additional insured, in form and substance reasonably satisfactory to Merchant or Buyer, as applicable.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Buyer or Merchant's or Buyer's employees, as applicable, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's or Buyer's, as applicable, prior written consent.

12.4    Worker's Compensation Insurance.  Merchant shall continue to maintain, in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.   Indemnification.

13.1    Merchant's and Buyer's Indemnification.  Merchant and Buyer shall, severally as to themselves only,  indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's or Buyer's, as applicable, material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant (for which Merchant shall have the indemnity obligations hereunder) to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise or Inventory under Open Purchase Orders (in the case of Merchant, with respect to any such claims that arose prior to the Closing); (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation ), claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents

19

of Agent by Merchant, or any of their respective representatives (other than Agent); (vii) any failure of Merchant to pay any Occupancy Expenses or Central Services Expenses during the Sale Term that are unrelated to the Sale; (viii) any breach of this Agreement by Buyer or Merchant; and (ix) the gross negligence (including omissions) or willful misconduct of the Merchant or Buyer, as applicable, or their respective officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.  Agent shall indemnify and hold the Merchant and Buyer and their officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant or Buyer, as applicable, by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Goods; (v) as set forth in Section 8.3 above; (vi) any breach of this Agreement by Agent; and (vii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)    Merchant, Buyer or Agent shall fail to perform any material obligation hereunder if such failure remains uncured ten (10) days after receipt of written notice thereof;

(b)    Any representation or warranty made by Merchant, Buyer or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured ten (10) days after written notice to the defaulting party;

(c)    The entry of an order converting the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the entry of an order appointing a chapter 11 trustee;

(d)    The transactions contemplated by the APA are not consummated by November 1, 2019; or

(e)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), Agent (in the case of (c) above), or Merchant (in the case of (d) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15.  Agent's Security Interest.

(a)    Subject to entry of the Approval Order and payment of the Purchase Price at Closing, each of Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) the Additional Agent Goods; (iii) all Proceeds (including, without limitation, processor receivables and credit card Proceeds); (iv) the Designated F&E; (v) Other Proceeds; and (vi) all

20

"proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "<u>Agent Collateral</u>").  Upon entry of the Approval Order, but subject to the Closing and payment of the Purchase Price and to the preceding sentence, the security interests and liens granted to Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)      Subject to entry of the Approval Order and payment of the Purchase Price at Closing, Merchant shall not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of the Agent Collateral other than in favor of Agent.

(c)      In the event of an occurrence of an Event of Default other than by Agent, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)      "<u>Code</u>" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of New York.

Section 16.  <u>Intentionally Omitted.</u>

Section 17.  <u>Miscellaneous</u>.

17.1    <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

If to Agent:            Great American Group, LLC
                        21255 Burbank Blvd., Suite 400
                        Woodland Hills, CA 91367
                        Attention:  Scott K. Carpenter and Marina Fineman
                        Tel: (818) 746-9309
                        Email: scarpenter@greatamerican.com and
                        mfineman@greatamerican.com

                        With a copy (which shall not constitute notice to
                        Agent) to:

                        Lowenstein Sandler LLP
                        One Lowenstein Drive
                        Roseland, New Jersey 07068
                        Attn: Andrew Behlmann
                        Tel:   (908) 235-1040
                        Facsimile: (973) 597-2400
                        Email: abehlmann@lowenstein.com

If to Merchant:         Barney's, Inc.
                        575 Fifth Avenue
                        New York, New York 10017
                        Attention: Grace Fu
                        Email:  gfu@barneys.com

21

With a copy (which shall not constitute notice to Sellers) to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:  Chad J. Husnick, W. Benjamin Winger, and Steve Toth
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com, benjamin.winger@kirkland.com, steve.toth@kirkland.com

– and –

Kirkland & Ellis LLP
601 Lexington Avenue,
New York, New York 10022
Attention:  Joshua A. Sussberg
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com

If to Buyer:        Authentic Brands Group
1411 Broadway
New York, New York 10001
Attention:  Jay Dubiner
General Counsel
Phone:  (212) 760-2418
E-mail:   jdubiner@abg-nyc.com

With a copy (which shall not constitute notice to Buyer) to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Attention: Richard Chesley
E-mail: richard.chesley@dlapiper.com

17.2    Governing Law; Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments; Third Party Rights.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto; provided, however, that, (a) until the DIP Agent has received payment in full of all DIP Obligations, the DIP Agent's consent shall be required to amend provisions of this Agreement pertaining to either or both of the DIP Agent.  Additionally, the DIP

22

Agent and DIP Lenders shall be third party beneficiaries with respect to those provisions of this Agreement that expressly reference them.

17.4    <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    <u>Currency</u>.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent, Buyer and Merchant and their respective successors and permitted assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by Merchant, Buyer, or Agent to any party without the prior written consent of the other; further provided, however, that Agent shall have the right to syndicate this Agreement with notice to (but without the requirement of obtaining the written consent of) Buyer and Merchant, but Agent shall remain liable under this Agreement not withstanding such syndication.[1]

17.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9    <u>Wiring of Funds</u>.  All amounts required to be paid by Merchant, Agent under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Merchant, Agent, no later than 2:00 p.m. (Eastern Time) on the date that such payment is due;

---

[1]  The parties hereto understand and agree that (a) Hilco Merchant Resources, LLC ("<u>Hilco</u>") and Gordon Brothers Retail Partners, LLC ("<u>GB</u>") will be offered the opportunity to participate in GA's interest as Agent hereunder, and (b) Tiger Capital Group LLC ("<u>Tiger</u>") will be offered the opportunity to participate in GA's interest as Agent hereunder.  If Hilco, GB, and/or Tiger elect to participate as Agent, their participation will be structured as a further contractual joint venture with GA, all instances of "Agent" in this Agreement shall refer to such joint venture, and each member of Agent shall be subject to the terms and conditions of this Agreement applicable to Agent.

provided, however, that all of the information necessary to complete the wire transfer has been received by Merchant or Agent, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    <u>Nature of Remedies</u>.  No failure to exercise and no delay in exercising, on the part of Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

17.11    <u>Effectiveness</u>.  For the avoidance, unless otherwise agreed to by the Merchant, Buyer, and Agent in writing, this Agreement shall only become effective upon the Closing.

17.12    <u>APA Obligations</u>.  Agent hereby covenants and agrees to comply with the provisions of the APA applicable to Agent, including, without limitation, to comply with its obligations under <u>Section 2.7(b)(iii)</u> and <u>Section 9.11</u> of the APA.

17.13    <u>Tax Treatment of Transactions</u>.  The Buyer, Agent, and Merchant shall work in good faith to agree on the proper tax treatment of the transactions contemplated by this Agreement and the APA, including with respect to whether the Designated Assets (as defined in the APA) have, as a result of this Agreement and the APA, been acquired by the Buyer or the Agent for applicable Tax purposes.  In the event the Buyer, Agent, and Merchant cannot agree on the proper characterization of such transactions, the issue will be submitted for resolution to a mutually agreeable nationally recognized accounting firm or law firm, with the cost of such resolution to be proportionately borne by the party or parties advocating a position that is contrary to the position taken by such accounting firm or law firm, and all parties shall take the position adopted by such accounting firm or law firm for all applicable Tax purposes, unless otherwise required by applicable Law.

17.14    <u>Entire Agreement</u>.  This Agreement and the APA contain the entire agreement between the Merchant and Agent, and this Agreement, the APA, the Letter Agreement, and such other written agreements executed between Buyer and Agent contain the entire agreement between Buyer and Agent with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.  In the event of any ambiguity, conflict or inconsistency between the terms of this Agreement and the terms of the APA, the applicable terms of the Agency Agreement will govern and control in all respects, except that in the event of any ambiguity, conflict or inconsistency between the terms of this Agreement and <u>Section 2.7(b)(iii)</u> or <u>Section 9.11</u> of the APA, the applicable provisions of the APA will govern and control in all respects.

IN WITNESS WHEREOF, Agent, Merchant and Buyer hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

GREAT AMERICAN GROUP, LLC

By: _____

Print Name and Title:

Scott K. Carpenter
President

[*Signature Page to Agency Agreement*]

**MERCHANT**:
**BARNEYS NEW YORK, INC.**

By: _____

Grace Fu, Authorized Signatory

*Signature Page to Agency Agreement*

**BARNEY'S, INC.**

By: _____
Grace Fu, Authorized Signatory

*Signature Page to Agency Agreement*

**BNY CATERING INC.**

By: _____
Grace Fu, Authorized Signatory

*Signature Page to Agency Agreement*

**BNY LICENSING CORP.**

By: _____
Grace Fu, Authorized Signatory

*Signature Page to Agency Agreement*

**BARNEYS ASIA CO. LLC**

By: _____

Grace Fu, Authorized Signatory

*Signature Page to Agency Agreement*

**ABG-BARNEYS, LLC**

By:_____
Print Name and Title:

JAMIE SALTER
CHAIRMAN + CEO

[*Signature Page to Agency Agreement*]

**Barney's**

**Exhibit 4.1(c)**

| Occupancy |
| --- |

| Store # | Store Name | BASE RENT | CAM | CRT/BUS LICENSE/PER MITS | FASB 13 MINIMUM RENT | OTHER PROPERTY RENT | PERCENTAGE RENT | PROPERTY/RE AL ESTATE TAXES | Security | Telephone | Equip Leases | Utilities | R&M | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Per Diem | | | | | | | |
| 1 | Downtown | 12,363 | 109 | 514 | 1,723 | - | - | 339 | 746 | 230 | 23 | 995 | 1,962 | 19,003 |
| 3 | Madison | 76,648 | 14,571 | 2,575 | - | - | - | 19,240 | 643 | 426 | 12 | 6,628 | 4,628 | 125,371 |
| 7 | Beverly Hills | 19,385 | - | 29 | - | 851 | - | 2,550 | 510 | 167 | 29 | 2,519 | 2,399 | 28,439 |
| 254 | Copley | 2,077 | - | - | - | - | - | - | 50 | 81 | 14 | 762 | 783 | 3,767 |
| 256 | San Francisco | 11,835 | 165 | 195 | 276 | 234 | - | 1,615 | 339 | 104 | 20 | 1,034 | 1,412 | 17,230 |
| 401 | Woodbury | 3,857 | 560 | - | - | - | - | 495 | 274 | 25 | - | 82 | 88 | 5,381 |
| 423 | Livermore | 659 | - | 2 | - | 2 | 32 | 94 | 13 | 2 | - | 37 | 28 | 870 |
| 7 | Total | 126,824 | 15,406 | 3,315 | 1,999 | 1,087 | 32 | 24,333 | 2,574 | 1,036 | 99 | 12,058 | 11,299 | 200,061 |
| | Per Week | 887,769 | 107,839 | 23,204 | 13,995 | 7,607 | 222 | 170,331 | 18,019 | 7,249 | 691 | 84,404 | 79,095 | 1,400,426 |
| | Per Store Week | 126,824 | 15,406 | 3,315 | 1,999 | 1,087 | 32 | 24,333 | 2,574 | 1,036 | 99 | 12,058 | 11,299 | 200,061 |

**EXHIBIT 8.1**
**Store Closing Procedures[1]**

1.      The Store closings will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease.

2.      The Store closings will be conducted in accordance with applicable state and local "Blue Laws," and thus, where such a law is applicable, no Store closings will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

3.      On "shopping center" property, Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Sale at each Closing Store, Agent shall to leave each Closing Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Designated F&E and other assets or property of the Merchant or Buyer, as applicable, which are abandoned by Agent in place in a neat and orderly manner, without any cost or liability to any party. All Designated F&E left in a Closing Store or Distribution Centers, or Merchant's other corporate offices after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, Agent may abandon, in place and without further responsibility or liability of any kind, any Designated F&E or Furnishings and Equipment located at a Store or, Distribution Centers, or Merchant's other corporate offices.

5.      Agent may, but are not required to, advertise all of the Store closings as "store closing," "sale on everything," "everything must go," or similarly themed sales. Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Store Closing Procedures or as may be dictated by the Approval Order.

6.      Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed

---

[1] Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Agency Agreement.

1

mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon Agent any additional restrictions not contained in the applicable lease agreement.

7.      Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or inStore signage and banners shall not constitute an alteration to a Store.

8.      Affected landlords will have the ability to negotiate with Agent any particular modifications to the Store Closing Procedures. Agent and the landlord of any Store are authorized to enter into Side Letters without further order of the Court; *provided*, that the Merchant shall have a reasonable consent right (not to be unreasonably withheld or delayed) with respect to any modification or provision that impacts its rights or obligations.

9.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final." G. Except with respect to the hanging of exterior banners, Agent shall not make any alterations to the storefront or exterior walls of any Stores.

10.     Agent will keep store premises and surrounding areas clear and orderly, consistent with past practices.

11.     Subject to the provisions of the Agency Agreement, Agent shall have the right to sell all Designated F&E at the Closing Stores and the Distribution Centers, and Merchant's corporate offices and (subject to any side letter between Agent and Buyer, which shall not in any way affect Merchant's rights under the Agency Agreement). Agent may advertise the sale of the Designated F&E in a manner consistent with these guidelines at the Closing Stores. The purchasers of any Designated F&E sold during the sale shall be permitted to remove the Designated F&E either through the back shipping areas at any time, or through other areas after applicable business hours. For the avoidance of doubt, as of the Sale Termination Date, Agent may abandon, in place and without further responsibility, any Designated F&E at the Stores, the Distribution Centers, and Merchant's other corporate offices.

12.     Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Approval Order and the Agreement.

13.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, Agent and their agents and representatives shall continue to have access to the Stores as provided for in the Agreement.

14.     Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility to the landlords therefor.

15.    The rights of landlords against the Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

16.    If and to the extent that the landlord of any Store affected hereby contends that Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant and Agent and Buyer as follows:

If to Debtors:

Barneys, Inc.
575 Fifth Avenue
11th Floor
New York, New York 10017
Attention:        Grace Fu
                      Sandro Risi
Email:            gfu@barneys.com
                      srisi@barneys.com

With a copy (which shall not constitute notice to Debtors) to

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:        Chad J. Husnick, P.C.
                      Steve Toth
Email:            chad.husnick@kirkland.com
                      steve.toth@kirkland.com

If to Buyer:

Authentic Brands Group
1411 Broadway
New York, New York 10001
Attention: Jay Dubiner General Counsel
Phone: (212) 760-2418
E-mail: jdubiner@abg-nyc.com

With a copy (which shall not constitute notice to Buyer) to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Attention: Richard Chesley
E-mail: Richard.Chesley@dlapiper.com

If to Agent:

    Great American Group, LLC
    21255 Burbank Blvd., Suite 400
    Woodland Hills, CA 91367
    Attention:  Scott K. Carpenter and Marina Fineman
    Tel: (818) 746-9309
    Email:scarpenter@greatamerican.com
    and    mfineman@greatamerican.com

With a copy (which shall not constitute notice to Agent) to:

    Lowenstein Sandler LLP
    One Lowenstein Drive
    Roseland, New Jersey 07068 Attn: Andrew Behlmann
    Tel:   (908) 235-1040
    Facsimile: (973) 597-2400
    Email: abehlmann@lowenstein.com









36X60 WINDOW SIGNS



PUSH PIN BANNERS

      

      

11X7 DISCOUNT TOPPERS

  

14X22 POLICY SIGNS

     

11X14 SALE HOURS            5X7 BLANK BURST            11X7 YOU PAY TOPPER            5X7 , 3X4 , 2X3 YOU PAY HANG TAGS

**BARNEYS**

**Sign Package**

**Exhibit 8.1 (d) (ii)**

| S&D FORMAT | 5 K | 10K | 40K | 50K | 60K | 133K | 265 |
|---|---|---|---|---|---|---|---|
| **RACK TOPPERS  7X11** | | | | | | | |
| 5% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 10% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 20% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 25% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 30% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 40% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 50% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 60% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 70% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| 80% | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| **28X28 S/F** | | | | | | | |
| EVERYTHING 10-30% OFF D/F | 5 | 10 | 40 | 50 | 60 | 130 | 260 |
| OVERLAYS | 1 | 2 | 8 | 10 | 12 | 26 | 52 |
| **22X28 D/F** | | | | | | | |
| STORE CLOSING | 5 | 8 | 30 | 30 | 38 | 84 | 168 |
| EVERYTHING MUST GO | 3 | 4 | 20 | 30 | 34 | 72 | 144 |
| NOTHING HELD BACK | 3 | 4 | 20 | 30 | 34 | 72 | 144 |
| LAST 10 DAYS | 2 | 3 | 6 | 10 | 13 | 29 | 58 |
| OVERLAYS | 2 | 3 | 6 | | 3 | 9 | 18 |
| **HARDWARE** | | | | | | | |
| 12" WIRE | 50 | 100 | 200 | 600 | 700 | 1500 | 3000 |
| CLIPS | 50 | 100 | 200 | 600 | 700 | 1500 | 3000 |
| **POLICY** | | | | | | | |
| ALL SALES FINAL 14X22 | 3 | 6 | 12 | 24 | 30 | 40 | 60 |
| NO CHECKS (c-v-mc-d-ae) 14X22 | 3 | 6 | 12 | 24 | 30 | 40 | 60 |
| WARRANTIES 14X22 | 2 | 2 | 12 | 24 | 24 | 40 | 60 |
| SALE HOURS 11X14 | 1 | 2 | 36 | 12 | 14 | 30 | 60 |
| DO NOT OPEN CARTONS 7X11 | 1 | 2 | 6 | 12 | 14 | 20 | 30 |
| BLANK BURST 5X7 | 12 | 25 | 100 | 100 | 100 | 200 | 400 |
| ____ % BURST 5X7 | 12 | 25 | 100 | 100 | 100 | 200 | 400 |
| **YOU PAYS** | | | | | | | |
| 7"X11" | 100 | 200 | 300 | 600 | 800 | 1800 | 3600 |
| 5"X7" TAGS | 200 | 400 | 600 | 1200 | 1600 | 3600 | 7200 |
| 3"X4" TAGS | 200 | 400 | 400 | 600 | 1000 | 2400 | 4800 |
| 2"X3" TAGS | 200 | 400 | 600 | 600 | 1000 | 2400 | 4800 |
| **36X60 D/F** | | | | | | | |
| STORE CLOSING | 1 | 2 | 6 | 10 | 12 | 26 | 52 |
| EVERYTHING MUST GO | 1 | 2 | 6 | 10 | 12 | 26 | 52 |
| NOTHING HELD BACK | 1 | 2 | 6 | 10 | 12 | 26 | 52 |
| STORE CLOSING (PUSH PIN) | 1 | 1 | 1 | 1 | 2 | 5 | 10 |
| EVERYTHING ON SALE (PUSH PIN) | 1 | 1 | 1 | 1 | 2 | 5 | 10 |
| **BANNER** | | | | | | | |
| 3X30 STORE CLOSING | 0 | 0 | 1 | 1 | 1 | 2 | 2 |
| **MISC** | | | | | | | |
| WAS/NOW JEWLERY STICKER | 5 | 10 | 20 | 30 | 40 | 90 | 180 |
| JEWELRY TENT SIGN | 50 | 100 | 500 | 600 | 700 | 1500 | 3000 |
| **FIXTURES** | | | | | | | |
| 22X28 FIXTURES FOR SALE | 2 | 3 | 6 | 8 | 11 | 25 | 50 |
| "FIXTURES FOR SALE" ROLL | 1 | 2 | 3 | 4 | 6 | 14 | 28 |
| "SOLD" ROLL | 1 | 2 | 3 | 5 | 7 | 16 | 32 |
| INVOICE BOOK | 1 | 1 | 2 | 3 | 4 | 9 | 18 |
| BALLOT PAD | 1 | 1 | 2 | 3 | 4 | 9 | 18 |
| BALLOT BOX | 1 | 1 | 1 | 1 | 1 | 3 | 6 |

CONSIGNOR BILL OF SALE FOR PURCHASED CONSIGNMENT GOODS

    This CONSIGNOR BILL OF SALE FOR PURCHASED CONSIGNMENT GOODS (this "Bill of Sale") is executed as of [●], 2019 (the "Closing Date"), by and among Barneys New York, Inc., a Delaware corporation (the "Company"), and each of the Company's Subsidiaries listed on the signature pages hereto (each, along with the Company, a "Seller" and collectively, "Sellers"), and B. Riley Financial, Inc. (the "Consignor"). Sellers and Consignor may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

    WHEREAS, this Bill of Sale is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 16, 2019, by and among the Consignor, the Sellers and ABG-BARNEYS, LLC, a Delaware limited liability company, as Buyer (the "Purchase Agreement");

    WHEREAS, pursuant to the Purchase Agreement, Consignor has agreed to sell, transfer, assign, convey and deliver to Sellers, and Sellers have agreed to purchase, acquire and accept from Consignor, all of such Consignor's direct or indirect right, title and interest in, to and under certain Purchased Consignment Goods (as defined in the Purchase Agreement);

    WHEREAS, this Bill of Sale, as duly executed by Consignor and each Seller, is being delivered as of the date hereof by each Party to the other Parties effective as of the Closing.

    NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained and intending to be legally bound hereby, Consignor and Sellers do hereby agree as follows:

## I.

## BILL OF SALE; ASSIGNMENT AND ASSUMPTION

    1.1.   Definitions. Capitalized terms used but not defined in this Bill of Sale have the meanings given to such terms in the Purchase Agreement.

    1.2.   Assignment of Purchased Consignment Goods. In accordance with and subject to the terms of the Purchase Agreement, Consignor does hereby sell, transfer, assign, convey and deliver to Sellers, and Seller does hereby accept from Consignor, effective as of the Closing, all of Consignor's right, title and interest in, to and under the Purchased Consignment Goods, as provided in Section 2.5(e) of the Purchase Agreement, free and clear of all Liens other than Permitted Liens.

    1.3.   Excluded Assets. Consignor does not hereby sell, transfer, assign, convey and deliver to Sellers any right, title or interest in any assets, properties and rights of Consignor that are not Purchased Consignment Goods.

    1.4.   Excluded Liabilities. Sellers shall not assume, be deemed to have assumed or be liable or obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of the Consignor.

1.5.   <u>Cooperation</u>.  In furtherance of the foregoing and upon the terms and subject to the conditions of the Purchase Agreement, the parties hereto agree to do such things and to promptly execute, acknowledge, and deliver any such further assurances, documents and instruments of transfer or assignment, in each case that the other party may reasonably request in order to transfer, assign, convey and deliver to Sellers all of Consignor's rights, title and interest in and to the Purchased Consignment Goods.

## II.

## MISCELLANEOUS

2.1.   <u>Purchase Agreement</u>.  This Bill of Sale is expressly made subject to the terms of the Purchase Agreement.  The delivery of this Bill of Sale shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, terms or provisions of the Purchase Agreement or any of the rights, remedies or obligations of any Seller or Consignor provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms.  The representations, warranties, covenants, terms and provisions contained in the Purchase Agreement shall not be merged with or into this Bill of Sale but shall survive the execution and delivery of this Bill of Sale to the extent, and in the manner, set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Bill of Sale (including the schedules hereto), the terms of the Purchase Agreement shall control.

2.2.   <u>Successors and Assigns</u>.  The provisions of this Bill of Sale shall bind and inure to the benefit of Sellers and Consignor and their respective successors and permitted assigns.

2.3.   <u>Amendment and Waiver</u>.  Any provision of this Bill of Sale may be (a) amended only in a writing signed by Sellers and Consignor or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

2.4.   <u>Severability</u>. Whenever possible, each provision of this Bill of Sale will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Bill of Sale is held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.  Upon such a determination, the Parties hereto shall negotiate in good faith to modify this Bill of Sale so as to effect the original intent of the Parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

2.5.   <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code, this Bill of Sale, and any Action that may be based upon, arise out of or relate to this Bill of Sale or the negotiation, execution or performance of this Bill of Sale or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without regards to conflict of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Bill of Sale or the transactions contemplated hereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Bill of Sale or the transactions contemplated hereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7 of the Purchase Agreement; provided, however, that nothing in this <u>Section 2.5(b)</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Bill of Sale or any Related Agreement or the transactions contemplated hereby or thereby.

2.6.    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

2.7.    <u>Captions</u>.    The captions and article and section numbers in this Bill of Sale are for convenience only and do not constitute a part of this Bill of Sale and shall not affect in any way the meaning or interpretation of this Bill of Sale.    References in this Bill of Sale to articles and sections are to articles and sections of this Bill of Sale unless otherwise specified.

2.8.    <u>Counterparts and PDF</u>.    This Bill of Sale and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manners and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any Party, each other Party hereto will re-execute original forms of this Bill of Sale and deliver them to all other parties. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was

3

transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

[*Signature Pages Follow*]

EXECUTED on the Closing Date, to be EFFECTIVE as of the Closing Date.

## SELLERS:

## BARNEYS NEW YORK, INC.

By: _____
Name: _____
Title: _____

## BARNEY'S, INC.

By: _____
Name: _____
Title: _____

## BNY CATERING, INC.

By: _____
Name: _____
Title: _____

## BNY LICENSING CORP.

By: _____
Name: _____
Title: _____

## BARNEYS ASIA CO. LLC

By: _____
Name: _____
Title: _____

**CONSIGNOR:**

**B. RILEY FINANCIAL, INC.**


By: _____

Name: _____

Title: _____

Schedule A: Inbound Licenses

None.

<u>Schedule B: Closing Stores</u>

See attached.

**Barney's**
**Schedule B**

| Closing Stores |
|---|

| Store # | Location Type | Name | Address | City | State | Zip | Landlord | # of Floors | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Full-Price | Downtown | 101 7th Avenue | New York | NY | 10011 | Equity One | 5 | 55,400 |
| 3 | Full-Price | Madison | 660 Madison | New York | NY | 10022 | AAC - Flagship 660 LLC | 10 | 265,000 |
| 7 | Full-Price | Beverly Hills | 9570 Wilshire Blvd | Beverly Hills | CA | 90212 | AAC - Flagship Partners II LLC | 6 | 133,000 |
| 254 | Full-Price | Copley | Copley Place | Boston | MA | 02116 | SIMON Properties | 2 | 40,839 |
| 256 | Full-Price | San Francisco | 77 O'Farrell Street | San Francisco | CA | 94108 | Stockton Properties (Madison Marquette) | 3 | 63,200 |
| 401 | Outlet | Woodbury | Woodbury Common | Central Valley | NY | 10917 | SIMON Properties | 1 | 9,600 |
| 423 | Outlet | Livermore | 2626 Livermore Outlets Drive | Livermore | CA | 94551 | SIMON Properties | 1 | 5,500 |
| **7** | | | | | | | | *Average Sq. Ft.* | **81,791** |

Schedule C: Other Excluded Assets

None.

<u>Schedule D: File</u>

See attached.

Schedule E: Excluded Stores

See attached.

**Barney's**
**Schedule E**

| | Excluded Stores |
|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Landlord | # of Floors | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 151 | Full-Price | Seattle | 600 Pine Street | Seattle | WA | 98101 | Stockton Properties (Madison Marquette) | 2 | 16,400 |
| 252 | Full-Price | Chicago | 15 East Oak Street | Chicago | IL | 60611 | Thor Equities (ASB ) | 6 | 91,602 |
| 255 | Full-Price | Las Vegas | The Shops at Palazzo | Las Vegas | NV | 89109 | Brokkfiels Properties => SIMON Properties | 3 | 80,665 |
| 331 | Full-Price | The Grove | 189 The Grove Drive | Los Angeles | CA | 90036 | CARUSO Management | 2 | 9,266 |
| 333 | Full-Price | Glendale | The Americana at Brand | Glendale | CA | 91210 | CARUSO Management | 1 | 8,200 |
| 335 | Full-Price | Philadelphia | 1811 Walnutt Street | Philadelphia | PA | 19103 | ADR 1811 Walnut Street | 2 | 9,970 |
| 338 | Full-Price | Santa Monica | 395 Santa Monica Place | Santa Monica | CA | 90401 | Macerich Santa Monica | 1 | 5,385 |
| 339 | Full-Price | Brooklyn | 194 Atlantic Avenue | Brooklyn | NY | 11201 | Two Trees Management | 2 | 10,000 |
| 404 | Outlet | Cabazon | 48650 Seminole Drive | Cabazon | CA | 92230 | SIMON Properties | 1 | 4,718 |
| 406 | Outlet | Camarillo | 850 East Ventura Boulevard | Camarillo | CA | 93010 | SIMON Properties | 1 | 7,500 |
| 410 | Outlet | Riverhead | 200 Tanger Mall Drive | Riverhead | NY | 11901 | TANGER Properties | 1 | 7,500 |
| 411 | Outlet | Waikele | 94-790 Lumiana Street | Waipahu | HI | 96797 | SIMON Properties | 1 | 6,300 |
| 413 | Outlet | Carlsbad | 5620 Paseo Del Norte | Carlsbad | CA | 92008 | SIMON Properties | 1 | 6,823 |
| 420 | Outlet | Sawgrass | 1840 Sawgrass Mills Circle | Sunrise | FL | 33323 | SIMON Properties | 1 | 5,500 |
| 425 | Outlet | Rosemont | 5220 Fashion Outlet Way | Rosemont | IL | 60018 | Fashion Outlets of Chicago | 1 | 7,800 |
| **15** | | | | | | | | *Average Sq. Ft.* | **18,509** |

**FINAL &
CONFIDENTIAL**

**DISCLOSURE SCHEDULES**

**TO THAT CERTAIN**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BARNEY'S NEW YORK, INC.,**

**THE OTHER SELLERS PARTY HERETO,**

**AND**

**ABG-BARNEYS, LLC**

**OCTOBER 16, 2019**

THIS DOCUMENT IS INTENDED SOLELY TO FACILITATE DISCUSSIONS AMONG THE PARTIES IDENTIFIED HEREIN.  IT IS NOT INTENDED TO CREATE, AND IT WILL NOT BE DEEMED TO CREATE, A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT OF ANY TYPE OR NATURE PRIOR TO THE ACTUAL EXECUTION OF THIS DOCUMENT BY ALL SUCH PARTIES AND THE DELIVERY OF AN EXECUTED COPY OF THIS DOCUMENT BY ALL SUCH PARTIES TO ALL OTHER PARTIES.

THIS DOCUMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BY THE RECIPIENT HEREOF WITH RESPECT TO THE SUBJECT MATTER HEREOF.

Reference is made to that certain Asset Purchase Agreement, dated as of October 16, 2019, (the "Agreement"), by and among ABG-BARNEYS, LLC, a Delaware limited liability company ("Buyer"), Barneys New York, Inc., a Delaware corporation (the "Company"), and the Subsidiaries of the Company (together with the Company, each a "Seller" and collectively "Sellers").  Buyer and Sellers shall be referred to herein from time to time collectively as the "Parties". Capitalized terms used in these Schedules but not otherwise defined herein shall have the meanings given to such terms in the Agreement.

These Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of the Agreement; however, each section of these Schedules will be deemed to incorporate by reference all information disclosed in any other section of these Schedules, and any disclosure in this Disclosure Statement will be deemed a disclosure against any representation or warranty set forth in the Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in the Agreement, these Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course or consistent with past practice, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in the Agreement, these Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in the Agreement, these Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in these Schedules are not necessarily limited to matters required by the Agreement to be reflected in these Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in these Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of the Agreement. The information contained in the Agreement, in these Schedules and exhibits hereto is disclosed solely for purposes of the Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

## TABLE OF CONTENTS

**Section 2.8: Assumption/Rejection of Certain Contracts and Leases and Designation Rights** ................................................................................................................................ **4**

**Schedule 2.8(b): Transferred Contracts and Assumed Leases** ................................................ **28**

**Section 3.3: Noncontravention; Government Filings** .................................................................. **29**

**Section 3.5: Transferred Contracts Default or Termination Notices** ..................................... **30**

**Section 3.6: Real Property** ............................................................................................................ **31**

**Section 3.7: Litigation; Decrees** ................................................................................................... **33**

**Section 3.10: Taxes** ......................................................................................................................... **34**

**Section 3.11: Tangible Personal Property** .................................................................................... **35**

**Section 3.12: Employee Benefits** ................................................................................................... **36**

**Section 3.13: Intellectual Property** ............................................................................................... **37**

**Section 3.14: Compliance with Laws; Permits** ............................................................................ **39**

**Section 3.15: Environmental Matters** .......................................................................................... **40**

**Section 3.16: Related Party Transactions** ................................................................................... **41**

**Section 3.20: Royalties** ................................................................................................................... **42**

**Section 5.2: Conduct of the Business Pending the Closing** ........................................................ **43**

**Section 5.4(a): Notices and Consents** ........................................................................................... **44**

Section 2.8(a): Executory Contracts and unexpired Leases

Contracts

1. Vendor Agreement, by and between Barney's, Inc., and ZitSticka Inc., dated as of May 13, 2019.

2. Terms and Conditions Governing Online Activities of Zegna Partners, by and between Barney's Inc. and Zegna, dated as of July 2016.

3. Consignment Agreement, by and between Barney's, Inc. and Zadeh New York, dated as of November 4, 2015.

4. Consignment Agreement, by and between Barney's, Inc. and Will Hanigan, dated as of August 4, 2017.

5. Wholesale Guidelines Letter, by and between Barney's, Inc. and Prada USA Corp., dated as of November 8, 2018.

6. Vendor Agreement, by and between Barney's, Inc. and Welle Pty Ltd, dated as of December 15, 2017.

7. Consignment Agreement, by and between Barney's, Inc. and VRAM, Inc., dated as of June 16, 2016.

8. Consignment Agreement, by and between Barney's, Inc. and Vintage Lux, dated as of November 14, 2012.

9. Consignment Agreement, by and between Barney's, Inc. and ViewPoint Sales & Marketing Inc., dated as of September 20, 2006.

10. Consignment Agreement, by and between Barney's, Inc. and Vicente Gracia Vino 418H s.l, dated as of January 15, 2009.

11. Agreement, by and between Barney's, Inc. and Vertly LLC, dated as of January 25, 2019.

12. Consignment Agreement, by and between Barney's, Inc. and Vernissage, dated as of January 31, 2008.

13. Letter, by and between Barney's, Inc. and Good Patch, dated as of January 25, 2019.

14. Letter, by and between Barney's, Inc. and FLORA + BAST, dated as of January 25, 2019.

15. Letter, by and between Barney's, Inc. and GP Nutrition, dated as of February 26, 2019.

16. Consignment Agreement, by and between Barney's, Inc. and Treliss Worldwide Inc., dated as of September 26, 2018.

17. Consignment Agreement, by and between Barney's, Inc. and Tracey Zabar, dated as of November 25, 2003.

18. Consignment Agreement, by and between Barney's, Inc. and Tilda Biehn, dated as of March 18, 2015.

19. Consignment Agreement, by and between Barney's, Inc. and Thom Browne, Inc., dated as of August 28, 2018.

20. Letter, by and between Barney's, Inc. and The Nue Co, dated as of January 25, 2019.

21. Consignment Agreement, by and between Barneys, Inc. and Tess Giberson Design Corp., dated as of October 20, 2010.

22. Consignment Agreement, by and between Barney's, Inc. and Tasaki & Co., Ltd., dated as of July 31, 2014.

23. Trademark Authorization Letter, by and between Barney's, Inc. and Sportswear Company S.P.A., dated as of March 8, 2019.

24. Consignment Agreement, by and between Barney's, Inc. and Stephanie Windsor Antiques, dated as of April 23, 2018.

25. Consignment Agreement, by and between Barney's, Inc. and Stazia Loren, dated as of April 10, 2015.

26. Letter, by and between Barney's, Inc. and Standard Dose, dated as of June 24, 2019.

27. Terms and Condition of Purchase, by and between Barney's, Inc. and Spirit Clothing Company, dated as of February 15, 2018.

28. Consignment Agreement, by and between Barney's, Inc. and Spinelli Kilcollin, dated as of March 25, 2014.

29. Consignment Agreement, by and between Barney's, Inc. and Sonya Ooten, dated as of November 17, 2003.

30. Letter, by and between Barney's, Inc. and Solaris Laboratories LLC, dated as of June 27, 2018.

31. Letter, by and between Barney's, Inc. and Slip Silk Pillowcase LLC, dated as of June 8, 2018.

32. Letter, by and between Barney's, Inc. Renita LLC, dated as of April 15, 2019.

33. Consignment Agreement, by and between Barney's, Inc. and Shay Accessories Inc. dba Shay Jewelry, dated as of April 1, 2019.

34. Consignment Agreement, by and between Barney's, Inc. and Sharon Khazzam Inc., dated as of November 21, 2008.

35. Consignment Agreement, by and between Barney's, Inc. and Shamballa Visvavajra, dated as of April 26, 1997.

36. Letter, by and between Barney's, Inc. and Sevan Kuyumculuk San. ve Tic. Sti, dated as of March 3, 2009.

37. Consignment Agreement, by and between Barney's, Inc. and Sara Weinstock Inc., dated as of November 5, 2009.

38. Consignment Agreement, by and between Barney's, Inc. and Samira 13 Jewelry, dated as of May 31, 2015.

39. Consignment Agreement, by and between Barney's, Inc. and Sally Sohn Group, dated as of May 11, 2018.

40. Letter, by and between Barney's, Inc. and Sally Hershberger Professional. Hair Care, dated as of January 24, 2018.

41. Letter, by and between Barney's, Inc. and Jane Street, LLC, dated as of February 4, 2019.

42. Consignment Agreement, by and between Barney's, Inc. and Sabbadini of America, Inc., dated as of May 14, 2018.

43. Consignment Agreement, by and between Barney's, Inc. and Ingrid Samboochi, dated as of December 30, 2003.

44. Consignment Agreement, by and between Barney's, Inc. and Ingrid, dated as of April 26, 1997.

45. Consignment Agreement, by and between Barney's, Inc. and Rosanne Pugliese, LLC, dated as of March 30, 2009.

46. Consignment Agreement, by and between Barney's, Inc. and Rettore s.a.s, dated as of March 15, 2011.

47. Consignment Agreement, by and between Barney's, Inc. and Repossi Diffusion, dated as of May 10, 2011.

48. Consignment Agreement, by and between Barney's, Inc., Renee M. Lewis and Michael J. Spiritos, dated as of April 25, 1996.

49. Consignment Agreement, by and between Barney's, Inc. and Red Cactus Jewels LLC, dated as of December 6, 2013.

50. Consignment Agreement, by and between Barneys New York, Inc. and PUSH, Inc., dated as of October 31, 2000.

51. Letter, by and between Barney's, Inc. and Pure Elixir, dated as of November 8, 2017.

52. Consignment Agreement, by and between Barney's, Inc. and Prince Dimitri, dated as of December 17, 2003.

53. Consignment Agreement, by and between Barney's, Inc. and Prasi, dated as of April 30, 2019.

54. Letter of Authorization, by and between Barney's, Inc. and Petra & Esteban Saba, LLC d/b/a Handvaerk, dated as of November 27 2016.

55. Consignment Agreement, by and between Barney's New York and Pantone, Inc., dated as of August 4, 2005.

56. Letter, by and between Barney's, Inc. and OSKIA Skincare Limited, dated as of December 12, 2017.

57. Consignment Agreement, by and between Barney's, Inc. and Orduna Design, dated as of December 17, 2003.

58. Consignment Agreement, by and between Barney's, Inc. and Kazuko Oshima, undated.

59. Consignment Agreement, by and between Barney's, Inc. and Olivia Collings, dated as of December 17, 2003.

60. Combined Power of Attorney dated as of February 4, 2019.

61. Managed Services Order Form, by and between WP Engine, Inc. and Barneys New York, November 4, 2016.

62. Letter Agreement for Public Relations Services, by and between Barney's, Inc. and Wagstaff Worldwide, Inc., dated as of July 16, 2014.

63. Letter, by and between Vitality Staffing Solutions, LLC and Barney's, Inc., dated as of May 31, 2011.

64. Parking Service Agreement, by and between Barney's, Inc. d/b/a Barneys New York and 1431/168 Investors, LLC d/b/a Valet Parking Service, effective as of March 1, 2008.

65. UberEATS Platform Order Form, by and between Portier, LLC and Fred's Restaurant, dated as of June 12, 2018.

66. Production Services Agreement, by and between Barney's, Inc. and Transmitter Media LLC, dated as of March 1, 2018.

67. Online Training Usage Agreement, by and between Barney's, Inc. and Long Island Productions, Inc. d/b/a Training Network, dated as of April 5, 2018.

68. License Agreement, by and between Barney's, Inc. d/b/a Barneys New York and Tracy Anderson Mind and Body LLC, dated as of May 16, 2019.

69. Private Property Towing Agreement, by and between Barney's, Inc. dba Barneys New York and Nick's Towing Service, Inc., dated as of February 25, 2019.

70. Profile Agreement, by and between Daily Muse Inc. and Barney's, Inc., dated as of November 16, 2016.

71. Letter, by and between Barney's, Inc. and The Director's Bureau, dated as of July 14, 2014.

72. Oracle Services Renewal Order, by and between Barneys New York and Oracle America, Inc., dated as of July 31, 2018.

73. Project Agreement, by and between Barney's, Inc. d/b/a Barneys New York and Stone Set Studio, LLC, dated as of July 12, 2018.

74. StellaService Master Services Agreement, by and between StellaSource, Inc. and Barney's, Inc., dated as of January 31, 2019.

75. Card Services Agreement, by and between Barney's, Inc. and CardFact XXXIII, dated as of May 1, 2010.

76. Shutterstock License Agreements, by and between Barney's, Inc. and Shutterstock, Inc., effective as of August 17, 2016.

77. Service Agreement, by and between Barney's, Inc. and No More Dirt, Inc., dated as of December 6, 2018.

78. Elevator Maintenance Contract, by and between Schindler Elevator Corporation and JSRE, LLC, dated as of August 1, 2011, as amended by that certain Addendum, dated as of January 7, 2016.

79. Letter, by and between Barneys New York and Risk Management Consulting LLC, dated as of May 10, 2018.

80. Exhibit A - SOW #2 for Inventory Services - Barneys New York Physical Inventories, by and between Barney's, Inc. and RGIS, LLC, dated as of January 1, 2019.

81. Exhibit 4 - Merchant Participation Form - Form American Express Campaign, undated.

82. Addendum to Master Services Agreement, by and between Rakuten Marketing LLC and Barney's, Inc., dated as of October 13, 2017.

83. Master Services Agreement, by and between Barney's, Inc. and Sapient Corporation d/b/a Publicis Sapient, dated as of July 22, 2019.

84. Master Services Agreement, by and between Barney's, Inc. and Sapient Corporation d/b/a Publicis Sapient, dated as of July 26, 2019.

85. Professional Services Agreement, by and between Barneys New York and Sapient Corporation d/b/a SapientRazorfish, dated as of February 19, 2019.

86. Change Order #1 to Professional Services Agreement No. 1, by and between Barney's, Inc. and Publicis Sapient, dated as of April 4, 2019.

87. Change Order #2 to Professional Services Agreement No. 1, by and between Barney's, Inc. and Publicis Sapient, dated as of June 17, 2019.

88. Change Order #3 to Professional Services Agreement No. 1, by and between Barney's, Inc. and Publicis Sapeint, dated as of June 5, 2019.

89. Release Agreement, by and between Barney's, Inc. and Gene Pressman, dated as of May 17, 2011.

90. Service Agreement, by and between Barney's, Inc. and Premium Security Services, LLC, dated as of March 9, 2019.

91. Preliminary Agreement in Regard to SessionM Loyalty Integration with Epsilon CRM, by and between Barney's, Inc. and Epsilon Data Management LLC, dated as of December 6, 2018.

92. Postmates Merchant Agreement, by and between Postmates, Inc. and Barney's, Inc. dated as of May 4, 2018,

93. Placement Services Agreement, by and between JBCStyle NY LLC and Barney's, Inc., dated as of March 4, 2019.

94. Master Services Agreement, by and between Pixelz Inc. and Barney's, Inc., dated as of April 6, 2018.

95. Statement of Work, by and between Barney's, Inc. and Pixelz Inc., dated as of April 11, 2018.

96. Agreement between Owner and Contractor for a Residential or Small Commercial Project, by and between Barneys New York and Petore Associates, Inc., dated as of February 3, 2015.

97. Client Services Agreement, by and between Barney's, Inc. and Ovative Group, LLC, dated as of October 1, 2018.

98. Schedule A, Services Statement of Work #1, by and between Barney's Inc. and Ovative Group, LLC, dated as of October 31, 2018, as amended by that certain Schedule A Amendment #1 to Statement of Work #1, dated as of October 1, 2019.

99. Written Authorization to Authorize Consent to Screen All Cargo, by and between Barney's, Inc. and OTX Logistics Inc., dated as of January 30, 2018.

100. Otis Elevator Contract, by and between Barney's New York and Otis Elevator Company, dated as of June 22, 2016.

101. RFP & Analytics Agreement, by and between Barney's, Inc. and Optimized Payments Consulting, dated as of October 10, 2014.

102. Security Service Agreement, by and between One Security Group, LLC and Barney's, Inc., dated as of February 13, 2019.

103. Master Services Agreement, by and between Barney's, Inc. and National Retail Transportation, Inc., dated as of February 26, 2015.

104. Personnel Staffing Services Proposal.

105. Security Services Agreement, by and between Barneys New York and Metro One Loss Prevention Services Group, Inc., dated as of November 29, 2012.

106. Truck Lease and Service Agreement, by and between Barney's, Inc. and MTLR Corp. d/b/a Mendon Truck Leasing & Rental, dated as of May 16, 2013.

107. Letter, by and between Barney's New York and Loyal Building Services, Inc., dated as of January 2, 2014.

108. Service Agreement, by and between Barney's, Inc. and Loomis Armored US, LLC, dated as of February 2, 2016.

109. License Agreement, by and between Barney's, Inc. and lp style, llc, dated as of February 4, 2016.

110. Consignment Agreement, by and between Barney's, Inc., and Ohne Titel, dated as of December 9, 2009.

111. Vendor Agreement, by and between Barney's, Inc. and NUORI, Inc., dated as of November 8, 2017.

112. Vendor Agreement, by and between Barney's, Inc. and Norma Kamali, Inc., dated as of June 14, 2019.

113. Consignment Agreement, by and between Barney's, Inc. and Nomade Exquis, Inc., dated as of September 1, 2009.

114. Consignment Agreement, by and between Barney's, Inc. and Nina Kastens, dated as of March 29, 2019.

115. Vendor Agreement, by and between Barney's, Inc. and Nécessaire Inc., dated as of January 25, 2019.

116. First Amendment to Consignment Agreement, by and between Barney's Inc. and Dracan, Inc. d/b/a Nak Armstrong, dated as of April 17, 2019.

117. Consignment Agreement, by and between Barney's, Inc. and Monique Pean Fine Jewelry LLC, dated as of May 17, 2012.

118. Vendor Agreement, by and between Barney's, Inc. and LDAG LTD, dated as of January 24, 2018.

119. Consignment Agreement, by and between Barney's, Inc. and Miami Beach Watch Repairs, Inc., dated as of November 1, 2004.

120. Consignment Agreement, by and between Barney's, Inc. and Me + Ro, dated as of November 18, 2003.

121. Consignment Agreement, by and between Barney's, Inc. and MASK, dated as of August 24, 2015.

122. Consignment Agreement, by and between Barney's, Inc. and Mark Henry Corp. d/b/a Khai Khai Jewelry, dated as of May 17, 2018.

123. Consignment Agreement, by and between Barney's, Inc. and Mark Davis, dated as of February 9, 2004.

124. Consignment Agreement, by and between Barney's, Inc. and Manju Jasty, dated as of August 6, 2007.

125. Consignment Agreement, by and between Barney's, Inc. and Mallary Marks Inc., dated as of December 31, 2003.

126. Consignment Agreement, by and between Barney's, Inc. and Makri SA, dated as of March 16, 2009.

127. Trademark License Agreement, by and between Barney's, Inc. and Maiyet, dated as of March 17, 2015.

128. Temporary Consignment Agreement, by and between Barney's, Inc. and Maison Kitsuné France, dated as of August 6, 2010.

129. Vendor Agreement, by and between Barney's, Inc. and MAGICSTRIPES GmbH, dated as of June 27, 2018.

130. Consignment Agreement, by and between Barney's, Inc. and Lynn Ban, dated as of November 6, 2003.

131. Consignment Agreement, by and between Barney's, Inc. and Lydia Courteille, dated as of May 16, 2019.

132. Consignment Agreement, by and between Barney's, Inc. and L'Wren Scott LTD, dated as of January 8, 2010.

133. Vendor Agreement, by and between Barney's, Inc. and Lockwood New York LLC, dated as of February 21, 2018.

134. Consignment Agreement, by and between Barney's, Inc. and Blest Ventura PTE. LTD., dated as of May 17, 2017.

135. Consignment Agreement, by and between Barney's, Inc. and vT concept GmbH, dated as of April 12, 2019.

136. Consignment Agreement, by and between Barney's, Inc. and Lena Wald, dated as of December 23, 2003.

137. Consignment Agreement, by and between Barney's, Inc. and Lauren Pierce LLC, dated as of February 24, 2010.

138. Consignment Agreement, by and between Barney's, Inc. and Laksvim Gems, LLC, dated as of June 4, 2009.

139. Consignment Agreement, by and between Barney's, Inc. and Reference Watch LLC d/b/a/ laCalifornienne, dated as of September 15, 2017.

140. Vendor Agreement, by and between Barney's, Inc. and Lab to Beauty LLC, dated as of October 3, 2018.

141. Demonstration and Commission Agreement, by and between Barney's Inc. and Kiehl's, Luxury Products Division, L'Oreal USA S/D, Inc., dated as of September 8, 2010.

142. Consignment Agreement, by and between Barney's, Inc. and Khiry LLC, dated as of August 8, 2017.

143. Consignment Agreement, by and between Barney's, Inc. and Kazuko Oshima, dated as of May 28, 1997.

144. Consignment Agreement, by and between Barney's, Inc. and Kazuko, dated as of November 13, 2003.

145. Consignment Agreement, by and between Barney's, Inc. and J. Warner, Inc., dated as of August 18, 2003.

146. Consignment Agreement, by and between Barney's, Inc. and Chronometrie, dated as of March 17, 2006.

147. Consignment Agreement, by and between Barney's, Inc. and Julie Wolfe, dated as of March 16, 2009.

148. Consignment Agreement, by and between Barney's, Inc. and Julie Bauer Design, dated as of January 7, 2004.

149. Consignment Agreement, by and between Barney's, Inc. and Judy Geib Plus Alpha, dated as of November 17, 2003.

150. Consignment Agreement, by and between Barney's, Inc. and Jill Platner, dated as of November 5, 2003.

151. Consignment Agreement, by and between Barney's, Inc. and Jennie Kwon Designs, dated as of April 12, 2015.

152. Consignment Agreement, by and between Barney's, Inc. and Jeanine Payer, Inc., dated as of November 7, 2003.

153. Consignment Agreement, by and between Barney's, Inc. and Jamie Wolfe Inc., dated as of November 13, 2003.

154. Consignment Agreement, by and between Barney's, Inc. and Jacqueline Rabun, dated as of June 21, 2017.

155. Trademark License Agreement, by and between Barney's, Inc. and Irene Neuwirth Inc., dated as of April 24, 2013.

156. Consignment Agreement, by and between Barney's, Inc. and Irene Neuwirth Inc., dated as of April 8, 2009.

157. Consignment Agreement, by and between Barney's, Inc. and Inez and Vinoodh, dated as of August 1, 2013.

158. Consignment Agreement, by and between Barney's, Inc. and Renfro Hot Sox LLC, dated as of August 18, 2017.

159. Consignment Agreement, by and between Barney's, Inc. and Holmes & Yang, dated as of November 24, 2010.

160. Online Sales Authorization, by and between Barney's, Inc. and Herno, dated as of August 13, 2018.

161. Consignment Agreement, by and between Barney's, Inc. and Hermes of Paris, dated as of January 7, 2013.

162. Consignment Agreement, by and between Barney's, Inc. and Heritage Auctioneers & Galleries, Inc. d/b/a Heritage Auctions, dated as of April 18, 2013.

163. Manufacturing and Exporting Agreement, by and between Barney's, Inc. and Harvest Creation Development Limited, dated as of October 6, 2016.

164. Consignment Agreement, by and between Barney's, Inc. and Gurhan New York Inc., dated as of February 20, 2009.

165. Vendor Agreement, by and between Barney's, Inc. and Glo Laser Facial, dated as of February 5, 2019.

166. Consignment Agreement, by and between Barney's, Inc. and Gabrielle Sanchez, Inc., dated as of March 13, 2009.

167. Consignment Agreement, by and between Barney's, Inc. and Gabriela de la Vega, dated as of January 21, 2004.

168. Consignment Agreement, by and between Barney's, Inc. and Finn New York LLC, dated as of March 13, 2009.

169. Consignment Agreement, by and between Barney's, Inc. and Filigrana Byzan, LLC, dated as of August 6, 2018.

170. Consignment Agreement, by and between Barney's, Inc. and Fernando Jorge Ltd., dated as of July 9, 2013.

171. Support Services & Maintenance Agreement, by and between Barney's, Inc. and Kronos Inc., dated as of October 12, 2017.

172. Sales, Software License and Services Agreement, by and between Barney's, Inc. and Kronos Inc., dated as of April 8, 2008.

173. Depot Exchange Support Agreement, by and between Barney's, Inc. and Kronos Inc., dated as of April 7, 2008.

174. Public Relations and Promotion Agreement, by and between Barney's, Inc. and Key Group Worldwide, LLC, dated as of November 16, 2017.

175. Permanent IT Staffing Services Agreement, by and between Barney's, Inc. and Keystrata, Inc., dated as of November 3, 2010.

176. Project Management Agreement, by and between Barney's, Inc. and Jones Lang LaSalle Americas, Inc., dated as of June 9, 2014.

177. Recruiting Services Agreement, by and between Barney's, Inc. and JBC Style NY LLC, dated as of June 28, 2011.

178. Secure Shredding Services Agreement, by and between Barney's, Inc. and Iron Mountain Secure Shredding, Inc., dated as of May 31, 2018.

179. Application License and Consulting Services Agreement, by and between Barney's, Inc. and InterTrade Systems Inc., dated as of July 16, 2013.

180. Talent Assessment Subscription, by and between Barney's, Inc. and Infor (US), Inc., dated as of August 1, 2016.

181. Ice Machine Rental Agreement, by and between Barney's, Inc. and Icesurance, a division of Arctic Glacier U.S.A. Inc., dated as of October 30, 2018.

182. Storage Services Agreement, by and between Barney's, Inc. and GRM Information Management Services, dated as of November 25, 2013.

183. Addendum to Affiliate Marketing Services Agreement, by and between Barney's, Inc. and Google, Inc., dated as of August 3, 2012.

184. Web Access License Agreement, by and between Barney's, Inc. and Innsight Reports, LLC d/b/a GoConcierge.net, dated as of August 21, 2011.

185. Cleaning Services Agreement for Sunrise, FL Store, by and between Barney's, Inc. and Global Services, Inc., dated as of May 26, 2017.

186. OpenTable Client Agreement, by and between Barney's, Inc. and OpenTable, Inc., dated as of August 11, 2009.

187. Cleaning Services Agreement, by and between Barney's, Inc. and No More Dirt, Inc., dated as of December 6, 2018.

188. Hair Salon License Agreement, by and between Barney's, Inc. and Foxy Bowie, LLC, dated as of December 18, 2017.

189. Transportation Service Agreement, by and between Barney's, Inc. and FMI Inc., dated as of April 1, 2011.

190. Security Services Agreement for 1201 Valley Brook Avenue, by and between Barney's, Inc. and FJC Security Services, Inc., dated as of May 20, 2011.

191. Undercover Security Agreement for 1201 Valley Brook Avenue, by and between Barney's, Inc. and and FJC Security Services, Inc., dated as of March 14, 2013.

192. Customer Supply Agreement and Fixed Price Pricing Attachment, by and between Barney's, Inc. and FirstEnergy Solutions Corp., dated as of June 14, 2011.

193. International Trade and Customer Services Agreement, by and between Barney's, Inc. and FiftyOne Inc. d/b/a FiftyOne Global Ecommerce, dated as of October 29, 2010, as amended by that certain Amendment dated as of June 27, 2011, as further amended by that certain Addendum Agreement, by and between Barney's Inc. and Borderfree, Inc. d/b/a FiftyOne, Inc., dated as of August 30, 2017, as further amended by that certain Second Amendment to Services Agreement, dated as of May 18, 2018, as further amended by that certain Amendment to Addendum, dated as of September 5, 2018, as further amended by that certain Third Amendment to Services Agreement, dated as of August 28, 2019.

194. Google Offline-Online Conversion Tracking SOW, by and between Barney's, Inc. and Epsilon Data Management, LLC, dated as of March 23, 2018.

195. Data Processor Agreement, by and between Barney's, Inc., Epsilon Data Management, LLC, and Comenity LLC, dated as of September 1, 2015.

196. Database Implementation and Ongoing Management SOW, by and between Barney's, Inc. and Epsilon Data Management, LLC, dated as of June 5, 2015.

197. Cleaning Services Agreement for Beverly Hills location, by and between Barney's, Inc. and EasyKlean, Inc., dated as of March 23, 2017.

198. Marketing Subscription Services Agreement, by and between Barney's, Inc. and Pathmata Networks Inc., d/b/a Dash Hudson, dated as of May 16, 2018.

199. Digital Marketing Services Agreement, by and between Barney's, Inc. and Ovative Group, LLC, dated as of October 1, 2018.

200. Vendor Agreement, by and between Barneys, Inc., and EyeJust LLC, dated as of February 28, 2019.

201. Vender Agreement, by and between Barneys, Inc., and Eve Lom Complexions Co. Limited, effective as of December 14, 2014.

202. Consignment Agreement, by and between Barneys, Inc., and Gorga Fehren Fine Jewelry LLC, dated as of July 29, 2019.

203. Consignment Agreement, by and between Barneys, Inc., and Erickson Beaman, dated as of as November 18, 2003.

204. Consignment Agreement, by and between Barneys, Inc., and Elyssa B. Design, dated as of November 3, 2003.

205. Vendor Agreement, by and between Barneys, Inc., and Dr. Barbara Sturm Molecular Cosmetic GMBH, effective as of August 1, 2018.

206. Vendor Agreement, by and between Barneys, Inc., and DNAEGF Renewal, effective as of January 1, 2018.

207. Consignment Agreement, by and between Barneys, Inc., and Bulgari Corporation of America, dated as of June 1, 2016.

208. Consignment Agreement, by and between Barneys, Inc., and Devon Page McCleary, dated as of as November 28, 2003.

209. Vendor Agreement, by and between Barneys, Inc., and Dermstore, effective as of April 4, 2019.

210. Vendor Agreement, by and between Barneys, Inc., and de Mamiel Ltd., effective as of January 1, 2018.

211. Consignment Agreement, by and between Barneys, Inc., and Dauphin CDLR Studio Ltd, dated as of March 12, 2018.

212. Consignment Agreement, by and between Barneys, Inc., and CVC Stones LLC, dated as of August 5, 2015.

213. Consignment Agreement, by and between Barneys, Inc., and McTeigue & McCleelland, dated as of June 30, 2016.

214. Consignment and Security Interest Agreement, by and between Barneys, Inc., and Sidney Garber Jewelers, Inc., dated as of July 29, 2019.

215. Consignment Agreement, by and between Barneys, Inc., and Miansai, Inc., dated as of December 1, 2016.

216. Consignment and Security Interest Agreement, by and between Barneys, Inc., and Eli Halili LLC, dated as of March 2019.

217. Consignment Agreement, by and between Barneys, Inc., and Diamond Quasar Jewelry, Inc., d/b/a/ Jacob & Co, dated as of October 22, 2018.

218. Consignment Agreement, by and between Barneys, Inc., and Moynat, Inc., dated as of December 8, 2016.

219. Amended and Restated Concession Agreement, by and between Barneys, Inc. and Goyard New York 660 Madison, LLC, dated as of September 1, 2019.

13

220. Consignment Agreement, by and between Barneys, Inc., and Colette Jewelry, dated as of June 30, 2015.

221. Consignment Agreement, by and between Barneys, Inc., and Chronometrie, dated as of March 17, 2006.

222. Consignment Agreement, by and between Barneys, Inc., and Chartreuse, dated as of April 7, 2009.

223. Consignment Agreement, by and between Barneys, Inc., and Charlotte Bjorlin D'Elia, dated as of November 8, 2007.

224. Consignment Agreement, by and between Barneys, Inc., and Cathy Waterman Inc., dated as of April 20, 2005.

225. Consignment Agreement, by and between Barneys, Inc., and Cathy Waterman, Inc., dated as of May 3, 2018.

226. Renovation Agreement, by and between Barneys, Inc., and Byredo USA Inc., dated as of May 21, 2018.

227. Vendor Agreement, by and between Barneys, Inc., and Brown Butter Beauty LLC, effective as of June 1, 2018.

228. Consignment Agreement, by and between Barneys, Inc., and Brian Reyes, LLC, dated as of January 6, 2010.

229. Consignment Agreement, by and between Barneys, Inc., and Brent Neale, LLC, dated as of 17 July, 2019.

230. Consignment Agreement, by and between Barneys, Inc., and Bontime Watches, LLC, dated as of April 17, 2019.

231. Vendor Agreement, by and between Barneys, Inc., and BodyVibes, effective as of May 15, 2018.

232. Consignment Agreement, by and between Barneys, Inc., and Becky Kelso, dated as of November 11, 2003.

233. Certificate of Analysis Beboe Serum, Wellness MGMT, LLC, tested March 15, 2019, Quality Control Chemist signed March 28, 2019.

234. Certificate of Analysis Beboe Sheet Mask Serum, Wellness MGMT, LLC, tested March 8, 2019, Quality Control Chemist signed May 24, 2019.

235. Vendor Agreement, by and between Barneys, Inc., and and Wellness MGMT, LLC, dated as of March 27, 2019.

236. Vendor Agreement, by and between Barneys, Inc., and Bear Limited, effective as of August 1, 2018.

237. Distribution Agreement, by and between Barneys, Inc., and Dyson Inc., dated as of October 27, 2016.

238. Internet Rights Agreement, by and between Barneys, Inc., and Van Noten Adries N.V., effective as of May 6, 2019.

239. Product Development and License Agreement, by and between Barneys, Inc., and Crocs, Inc., effective as of January 1, 2019.

240. Vendor Agreement, by and between Barneys, Inc., and ASC Regenity Ltd., dated as of December 13, 2018.

241. Vendor Agreement, by and between Barneys, Inc., and Aurelia Probiotic Skincare, effective as of January 1, 2018.

242. Agreement, by and between Barneys, Inc., and Aude Lechere Sarl, dated as of December 29, 2003.

243. Consignment Agreement, by and between Barneys, Inc., and Ateshi Inc. d/b/a Zoe, dated as of August 12, 2015.

244. Consignment Agreement, by and between Barneys, Inc., and Ateliers Jean Grisoni, dated as of August 28, 2006.

245. Consignment Agreement, by and between Barneys, Inc., and Anne Fischer, dated as of April 23, 2009.

246. Consignment Agreement, by and between Barneys, Inc., and Goldin-Feldman, LLC, dated as of June 30, 2005.

247. Consignment Agreement, by and between Barneys, Inc., and ISE Jewelry, LLC, dated as of March 20, 2009.

248. Consignment Agreement, by and between Barneys, Inc., and Andrea Fohrman LLC, dated as of December 17, 2003.

249. Consignment Agreement, by and between Barneys, Inc., and Ambre Dahan, dated as of September 21, 2015.

250. Consignment Agreement, by and between Barneys, Inc., and Alchemy Simya, Inc., d/b/a Gurhan, dated as of January 15, 2007.

251. Consignment Agreement, by and between Barneys, Inc., and Alabama Chanin, dated as of January 26, 2010.

252. Vendor Agreement, by and between Barneys, Inc., and Aesop USA, Inc., dated as of August 13, 2010.

253. Trademark License Policy, by and between Barneys, Inc., and Shinto LLC, dated as of October 13, 2017.

254. Consignment Agreement, by and between Barneys, Inc., and ABCG Corp., dated as of Sept 1, 2003.

255. Vendor Agreement, by and between Barneys, Inc., and 111 Skin LLC, dated as of February 20, 2014

256. Security Services Agreement, by and between Barneys New York and Corr Protective Services dated as of April 2, 2014.

257. License Agreement, by and between Barneys, Inc., and Connor Papers LLC, effective as of on or about September 11, 2011.

258. License Agreement, by and between Barneys, Inc., and Connor Papers LLC, dated as of July 12, 2013.

259. License Agreement, by and between Barneys, Inc., and Comenity Servicing LLC, effective as of June 1st, 2013.

260. Amendment To Client Agreement, Conversion To Guest Center Month-To-Month, by and between Barneys, Inc., and OpenTable, dated as of February 7, 2019.

261. Protection Service Agreement, by and between Barneys, Inc., and Cardinal Point Homeland Security Group, effective as of June 26, 2019.

262. Second Amendment to License Agreement, by and between Barneys, Inc., LLC, and Blind Barber, LLC, effective as of March 13, 2019.

263. License Agreement, by and between Barneys, Inc., LLC, and Blind Barber, LLC, dated as of June 25, 2015.

264. First Amendment to the License Agreement, by and between Barneys, Inc., LLC, and Blind Barber, LLC, effective as of August 24, 2016.

265. Master Services Agreement, for Placement of Staffing Personnel, by and between Barneys, Inc., and Total Staffing Solutions, LLC, effective as of November 8, 2016.

266. Amendment to "General Conditions of Assignment and Terms of Payment", by and between Barneys, Inc., and Robert Half International through its division OfficeTeam, effective as of October 10, 2016.

267. Power of Attorney Intellectual Property Matters in Japan, by and between Barneys, Inc., and Registered Patent Professional Corporation of Japan, dated as of June 18, 2019.

268. Order Form, by and between Barneys, Inc., and Stella Pulse, effective as of February 5, 2019.

269. Services Agreement, by and between, Barneys, Inc., with Socialyte LLC, effective as of August 9, 2016.

270. LinkShare Master Services Agreement, by and between Barneys, Inc., and LinkShare, effective as of April 16, 2013.

271. Letter Agreement, by and between Barneys, Inc., and Barneys Japan Co., effective as of July 14, 2016.

272. Amended and Restated License Agreement, by and between Barney's, Inc., BNY Licensing Corp., Barneys Japan Co., Ltd., dated August 21, 2008, as amended by that certain First Amendment to Amended and Restated License Agreement, dated as of September 18, 2015.

273. Exhibits to Amended & Restated License Agreement, by and between BNY Licensing Corp., and Barneys Japan Co. Ltd., dated as of August 21, 2008.

274. Master Services Agreement, by and between Barneys, Inc., and Epsilon Data Management LLC, effective as of June 5, 2015.

275. Limousine Contract, by and between Barneys New York and Diamond Limousine, dated as of November 15, 2016.

276. Customer Services Agreement, by and between Barneys, Inc., and Kelly Services, Inc., effective as of July 14, 2016.

277. Change Order Microstrategy, by and between Barneys, Inc., and Epsilon Data Management LLC, dated as of February 13, 2019.

278. Change Order Loyalty Integration, by and between Barneys, Inc., and Epsilon Data Management LLC, dated as of January 25, 2019.

279. Service Order Form, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of August 31, 2013.

280. Confirmation Letter, by and between Barneys, Inc., and SS Designs [HK] Ltd., effective as of January 1, 2019.

281. License Agreement, included with Confirmation Letter, by and between Barneys, Inc., and American Society of Composers, Authors and Publishers, dated as of November 25, 2014.

282. Statement of Work, by and between Barneys New York and Aptos Canada Inc., dated as of April 3, 2018.

283. Security Agreement, by and between Barneys, Inc., and Alarm and Security Corporation, dated as of March 15, 2018.

284. Amendment to American Express Card Acceptance Agreement, by and between Barneys, Inc., and American Express Travel Related Services Company, Inc., effective as of January 1, 2003.

285. Akamai Terms and Conditions.

286. Statement of Work, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of June 29, 2017.

287. Service Order Form, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of June 01, 2017.

288. Service Order Form, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of August 1, 2019.

289. Service Order Form CloudTest, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of December 13, 2018.

290. Addendum Deferment of Termination Clause, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of August 29, 2017.

291. Letter of Agreement, by and between Barneys, Inc., and Equinox Holdings, Inc., dated as of November 17, 2017.

292. Rental Agreement, by and between Barneys, Inc., Advanced Pure Water Rental Conditions, effective as of November 5, 2018.

293. Addendum to National Account Services Master Services Agreement, by and between ADP, Inc. and Barneys, Inc., dated as of November 10, 2008.

294. Parking Use Agreement, by and between Barneys, Inc., and ABM Industry Groups, LLC, effective as of May 25, 2018.

295. Addendum to the Hardware Purchase and Software License Agreement, by and between Barneys New York, and NSB Retail Solutions Inc., effective as of February 19, 2008.

296. FedEx Pricing Agreement Amendment, by and between Barneys New York, Inc., on the one hand, and Federal Express Corporation and FedEx Ground Package System, Inc., on the other, dated as of October 1, 2018.

297. Oracle Technical Support Services Renewal Order, dated as of August 21, 2019.

298. Oracle Technical Support Services Renewal Order, dated as of August 2, 2019.

299. Oracle Technical Support Services Renewal Order, dated as of August 31, 2019.

300. Statement of Work, Omnichannel Gift Registry, prepared for Barneys New York, dated as of April 12, 2019.

301. Master Services Agreement, by and between Barneys New York and Adapty Inc., dated as of December 31, 2015.

302. Oracle Ordering Document, dated as of August 1, 2019.

303. Stibo Software License and Services Agreement with Professional Services, by and between Stibo Systems, Inc. and Barney's, Inc., dated as of October 22, 2015.

304. CCH Sales and Use Tax Master Product Agreement, by and between CCH Incorporated and Barney's, Inc., dated as of April 6, 2016.

305. Client Agreement Bright River, by and between Bright River USA LLC and Barneys Inc., dated as of July 18, 2019.

306. Mi9 Sales Order.

307. First Amendment to the Package License Agreement, by and between Barneys New York and MI9 Business Intelligence Systems Inc., dated as of July 17, 2012.

17

308. Dynamic Yield MSA, by and between Dynamic Yield and Barneys New York, dated as of April 4, 2019.

309. RemoteRelief Quotation, by and between Remote Relief and Barney's, Inc., dated as of March 6, 2019, as amended by that certain Purchase Order, dated as of March 7, 2019.

310. Hawaii Sales Agreement, by and between Omnyway, Inc. and Barney's, Inc., dated as of December 18, 2018.

311. Renewal to Narvar Service Order, dated as of March 1, 2019.

312. Master Services Agreement, by and between WorkCentive Incorporated and Barney's, Inc., dated as of October 5, 2015.

313. Master Subscription Service Agreement, by and between The Nielsen Company and Barney's, Inc., dated as of May 1, 2018.

314. Services Agreement, by and between Visionet Systems, Inc. and Barney's, Inc., dated as of March 7, 2014, as amended by that certain Work Order BNY2018-005, dated as of January 1, 2019, as further amended by that certain Work Order BNY-2018-03: EDI Support, dated as of January 9, 2019, as further amended by that certain Work Order BNY-2018-04: .Net Development, dated as of January 9, 2019, as further amended by that certain Work Order BNY-2019-08: Onsite QA Analyst, dated as of March 19, 2019, as further amended by that certain Work Order BNY-2019-06: Quality Assurance Services, dated as of March 19, 2019, as further amended by that certain Change Request Form, dated as of February 7, 2019.

315.  Maintenance and Assistance Services, by and between Barneys New York and TXT North America Inc., dated as of November 21, 2016.

316. Agreement for Supplying Technical Services, by and between Barney's, Inc. and The Connors Group, Inc., dated as of January 16, 2019, as amended by that certain Fee Agreement, dated as of January 16, 2019.

317. Statement of Work, between Barney's, Inc. and Testingxperts Inc., dated as of July 29, 2019.

318. Statement of Work, between Barney's, Inc. and Testingxperts Inc., dated as of August 23, 2019.

319. Statement of Work, between Barney's, Inc. and Testingxperts Inc., dated as of September 5, 2019.

320. Master Services Agreement, by and between Barney's, Inc. and Damcosoft Inc., dated as of August 17, 2017.

321. User Agreement and Software License Terms, by and between Barney's, Inc. and SunView Software, Inc., dated as of February 11, 2019.

322. SunView Quote, dated as of February 1, 2019.

323. Customer Service Order, by and between Barneys New York and Charter Communications Operating, LLC, dated as of December 11, 2018.

324. Spectrum Enterprise Service Agreement, by and between Barneys New York and Charter Communications Operating, LLC, dated as of December 11, 2018.

325. Spectrotel IOA Service Agreement, by and between Barney's, Inc. and Spectrotel, dated as of January 29, 2019.

326. Master Services Agreement, by and between Barneys New York and Spectrotel, June 15, 2017.

327. Spring Brand Agreement, by and between Barney's Inc. and Shopspring, Inc., dated as of August 15, 2017, as amended by that certain Amendment No. 1, dated as of September 21, 2018.

18

328. Lease Agreement, by and between Barney's, Inc. and SHI International Corp, dated as of October 11, 2018.

329. Master Software Subscription and Services Agreement, by and between Shape Security Inc. and Barney's, Inc., dated as of June 28, 2018.

330. Product Schedule No. 2 - Blackfish, by and between Shape Security, Inc. and Barney's, Inc., dated as of August 22, 2018.

331. Master Services Agreement, by and between Session M, Inc. and Barney's, Inc., dated as of April 16, 2018.

332. Sauce Labs Order Form, by and between Barneys New York and Sauce Labs, Inc., dated as of December 7, 2018.

333. Master Subscription Agreement, by and between Barney's, Inc. and Salesforce.com, dated as of February 28, 2018.

334. Saba Order Form, by and between Barneys Inc. and Saba Software, Inc., dated as of March 27, 2019.

335. Managed Hosting Services Terms and Conditions, by and between Barney's, Inc. and Rackspace US, Inc., dated as of July 1, 2015.

336. Master Services Agreement, by and between Barney's, Inc. and Rackspace, dated as of February 25, 2019.

337. Service Order, by and between Barney's, Inc., and Rackspace US, Inc., dated as of August 5, 2019.

338. Subscription Agreement, by and between Barneys New York, Inc. and Wombat Security Technologies, Inc., dated as of August 1, 2016, as amended by that certain Amendment to the Subscription Agreement, by and between Barneys New York, Inc. and Proofpoint, Inc., dated as of August 15, 2018.

339. Master Information Technology Services Agreement, by and between Barney's, Inc. and Primoko Inc., dated as of September 22, 2015.

340. Statement of Work, by and between Barney's, Inc. and Primoko, dated as of August 7, 2019.

341. General Terms and Conditions, by and between Barney's, Inc. and Park Place Technologies, LLC, dated as of April 23, 2018, as amended by that Renewal, dated February 20, 2019.

342. Oracle General Terms, by and between Oracle America, Inc. and Barney's, Inc., dated as of May 20, 2015, as amended by that certain Oracle Master Agreement Amendment One, dated as of May 20, 2015.

343. Oracle Cloud Services Agreement, by and between Oracle America, Inc. and Barney's, Inc., undated.

344. Consulting Agreement, by and between Barney's, Inc. and On The Mark Solutions, LLC, dated as of May 20, 2019.

345. Master Consulting Services Agreement, by and between Barney's, Inc. and Newmine LLC, dated as of September 22, 2015, as amended by that certain Statement of Work Exhibit D2, dated as of February 28, 2019, as further amended by that certain Statement of Work Exhibit 2D, dated as of August 15, 2019.

346. Statement of Work Change Request #21, by and between Barney's, Inc. and New Elevation, dated as of June 14, 2019.

347. New Elevation Professional Services Agreement, by and between Barney's, Inc. and Joe Garcia Consulting, Inc., dated as of March 16, 2017.

348. Consulting Statement of Work, by and between Barney's, Inc. and Joe Garcia Consulting, Inc., dated as of March 16, 2017.

349. MuleSoft Renewal Order, by and between Barney's, Inc. and MuleSoft, Inc., dated as of March 24, 2019.

350. Master Subscription Agreement, by and between Barney's, Inc. and MuleSoft, Inc., dated as of August 19, 2015.

351. Master Services Agreement, by and between Barney's, Inc. and MSD Technologies, dated as of October 17, 2016.

352. Statement of Work, by and between Barney's, Inc. and MSD Technologies, dated as of February 20, 2019.

353. Master Services Agreement, by and between Barney's, Inc. and IKIGAI Inc., dated as of October 19, 2018.

354. Standard Technical Support Services Agreement, by and between Barney's, Inc. and MicroStrategy Services Corporation, dated as of August 1, 2019.

355. Service Maintenance Agreement, by and between Barney's, Inc. and MICROS Retail Systems, Inc., dated as of November 1, 2017.

356. Microsoft Bing Ads Agreement, by and between Barney's, Inc. and Microsoft Online, Inc., dated as of October 1, 2015.

357. Intellectual Property License and Maintenance Agreement, by and between Barney's, Inc. and Datavantage Corporation d/b/a MICROS-Retail, dated as of March 29, 2013.

358. Master Services Agreement, by and between Barney's, Inc. and Datavantage Corporation d/b/a MICROS-Retail, dated as of March 29, 2013.

359. Master Services Agreement, by and between Barney's, Inc. and Maxymiser Inc., dated as of February 20, 2015.

360. Digital Cooperative Advertising Agreement, by and between Barney's, Inc. and La Prairie, dated as of August 2019.

361. Engagement Agreement, by and between Barney's, Inc., on one hand, and Kirkland & Ellis LLP and Kirkland & Ellis International LLP, on the other, dated as of December 21, 2018.

362. Engagement Agreement, by and between Barney's New York, Inc., Barney's, Inc., BNY Catering, Inc., BNY Licensing Corporation, and Barney's Asia Co. LLC, on the one hand, and Katten Muchin Rosenman LLP, on the other, dated as of July 29, 2019.

363. End User License Agreement, by and between Barney's, Inc. and Inflectra Corporation, dated as of July 20, 2018.

364. Master Services Agreement, by and between Barney's, Inc. and Ignitiv, Inc., dated as of November 3, 2014.

365. Letter of Agreement, by and between Barneys New York Foundation and Institute of Contemporary Art (Boston), dated as of January 30, 2019.

366. Letter Agreement, by and between Barneys New York, Inc. and Houlihan Lokey Capital, Inc., dated as of July 1, 2019.

367. License Agreement, by and between Barney's, Inc. and GearsCRM, Inc., dated as of April 23, 2018.

368. Master Services Agreement, by and between Barney's, Inc. and Fuze, Inc., dated as of July 16, 2018, as amended by Order Form, dated as of July 16, 2018.

369. Client Requirements Document, by and between Barneys NYC and Caremark, LLC/CaremarkPCS Health, LLC, dated as of September 17, 2019.

370. Service Agreement, by and between Barney's, Inc. and Custora, Inc., dated as of June 1, 2018, as amended by that Custora, Inc. Order Form, dated as of June 1, 2018.

371. Credit Card Program Agreement, by and between Barney's, Inc. and Comenity Capital Bank, dated as of March 8, 2013.

372. Master License and Service Agreement, by and between Barney's, Inc., on the one hand, and Coresite One Wilshire, LLC, Coresite 1275 K Street, LLC, Coresite Real Estate 55 S. Market Street, LLC, Coresite Real Estate 12100 Sunrise Valley Drive, LLC, Coresite 32 Avenue Of The Americas, LLC, Coresite Real Estate 70 Innerbelt, LLC, Coresite Real Estate 427 S. LaSalle, LLC, Coresite Real Estate 2 Emerson Lane, LLC, Coresite Real Estate 2115 NW 22nd Street, LLC, Coresite Real Estate Sunrise Technology Park, LLC, Coresite Real Estate 2972 Stender, L.P., Coresite Real Estate 1656 McCarthy, LP, Coresite Real Estate 3032 Coronado, LP, Coresite Real Estate 900 N. Alameda, LP, and Coresite Denver, LLC, on the other, dated as of July 3, 2018.

373. License Agreement, by and between Barney's, Inc. and Connor Papers LLC, dated as of September 1, 2011.

374. Compliance Sheriff Annual Hosted License (Renewal), by and between Barney's, Inc. and Cyxtera, dated as of February 12, 2019.

375. License Agreement, by and between Barney's, Inc. and Citrix, dated as of March 1, 2018, as amended by that certain Renewal Quote, dated as of August 6, 2018.

376. Client Terms of Use, by and between Barney's, Inc. and Catalant Technologies, Inc., dated as of May 31, 2019.

377. Master Terms and Conditions, by and between Barney's, Inc. and Capgemini America, Inc., dated as of October 31, 2018.

378. Box Service Agreement, by and between Barney's, Inc. and Box, Inc., dated as of March 7, 2013.

379. Master Platform Agreement, by and between Barney's, Inc. and Bounce Exchange, Inc., dated as of October 29, 2018, as amended by that certain BounceX Order Form #2, dated as of June 30, 2019.

380. Business Internet Service Agreement, by and between Barneys New York and Bel Air Internet, LLC, dated as of April 10, 2018, as amended by that certain BAI Statement of Work, dated as of April 20, 2018.

381. Asset Purchase Agreement, by and between Barney's, Inc., on the one hand, and Connor Digital, LLC, Connor Papers, LLC, Justin Felber, and Henri Richter-Werner, on the other, dated as of July 11, 2016.

382. Safe Harbor Express Plus On Site Shredding Agreement, by and between Barney's Inc. and Back Thru The Future Computer Recycling, Inc., dated as of October 1, 2018.

383. Renewal of Onsite Service Agreement, by and between Barneys New York and Avery Dennison, dated as of May 4, 2019.

384. Master Service Agreement, by and between Barneys New York and AT&T Corp., dated as of May 30, 2008.

385. Master Software as a Service Agreement, by and between Barney's New York and FivePals, Inc., d/b/a ALICE, dated as of May 14, 2018.

386. Staffing Services Letter Agreement, by and between Barney's, Inc. and Addison Group, LLC, dated as of July 20, 2018.

387. Engagement Letter, by and between Barney's, Inc. and Sard Verbinnen & Co., LLC, dated as of September 4, 2019.

388. Engagement Agreement, by and between Barney's Inc. and M-III Advisory Partners, LP, dated as of June 26, 2019.

389. Criteo Service Agreement, by and between Barney's, Inc. and Criteo SA, dated as of December 19, 2018.

390. Master Subscription Agreement, by and between Barney's, Inc., on the one hand, and Answers Corporation and Answers Affiliated Companies, on the other, dated as of February 25, 2015, as assigned by that certain Contract Assignment to Verint Americas Inc., acknowledged by Barney's, Inc., dated as of April 3, 2019.

391. Subcontractor Agreement, by and between Barney's, Inc. and Apex Technology Group, Inc., dated as of February 28, 2019.

392. Payment Solutions Agreement, by and between Barneys New York and CyberSource Corporation, dated as of November 1, 2011.

393. Order Form and Terms of Service, by and between Barney's, Inc. and Narvar, Inc., dated as of December 28, 2016.

394. Master Order Form, by and between Barney's, Inc. and Precognitive, Inc., dated as of July 26, 2017.

395. SaaS Services Agreement, by and between Barney's, Inc. and RichRelevance, Inc., dated as of July 9, 2015.

396. Consulting Services Agreement, by and between Barney's, Inc. and XTGlobal, Inc., dated as of November 5, 2018.

397. Rakuten Card Linked Offer Network Merchant Agreement, by and between Barney's, Inc. and Rakuten Card Linked Offer Network, Inc., dated as of October 12, 2017.

398. Subscription Agreement, by and between Barney's, Inc. and Mouseflow, Inc., dated as of April 26, 2017, as amended by that certain Amendment to Subscription Agreement, dated as of May 26, 2017.

399. Adobe Sales Order, by and between Barney's Inc. and Adobe Inc., dated as of May 15, 2019.

400. Software and Service Purchase Agreement, by and between Barney's, Inc. and Strophe America Inc., dated as of November 29, 2007.

401. Liquor License Purchase and Sale Agreement, by and between Barney's, Inc. and SVRE, LLC, dated as of June 5, 2019.

402. Rate/Service Agreement for Barneys New York, by and between Barneys New York and Brinks Global Services USA, Inc., dated as of February 18, 2014.

403. Special Rate for Barneys New York, by and between Barneys New York and Brinks Global Services USA, Inc., dated as of February 18, 2014.

404. Brink's Global Services U.S.A., Inc. Valuables Transport Contract, March 2019.

405. Order Form and Pricing Schedule, by and between Barney's, Inc. and LinkShare Corporation, dated as of April 16, 2013, as amended by that certain Amendment to the Order Form and Pricing Schedule, by and between Barney's Inc. and Rakuten Marketing LLC, dated as of May 15, 2019.

406. AT&T Enterprise Routing Services Pricing Schedule - Resale Version, by and between Barneys New York, Inc. and AT&T Corp, dated as of May 6, 2016.

407. AT&T Network Integration Change Order Request, by and between Barneys Inc. and AT&T Corp., dated as of May 2, 2016.

408. AT&T Business Network Service Pricing Schedule, by and between Barneys New York and AT&T Corp., dated December 8, 2015.

409. AT&T Network Integration Change Order Request, by and between Barneys New York Inc. and AT&T Corp., dated as of April 9, 2018.

410. Customer Software Development Agreement, by and between Barney's, Inc. and On the Mark Solutions, LLC, dated as of February 10, 2016, as amended by Exhibits E and F.

411. Support Agreement, by and between Barneys New York and On The Mark Solutions, LLC, dated as of November 20, 2017.

412. Compliance Validation Services Agreement, by and between Barneys New York and Trustwave Holdings, Inc., dated as of July 2, 2010, as amended by that certain Purchase Order/Invoice, dated as of September 30, 2019.

413. Consignment Agreement, by and between Barney's, Inc. and Carole Shashona Modern Designs, dated as of January 22, 2013.

414. Consignment Agreement, by and between Barney's, Inc. and Stephanie Windsor Antiques, dated as of April 23, 2018.

415. Consignment Agreement, by and between Barney's, Inc. and Retrouval, dated as of November 22, 2016.

416. Consignment Agreement, by and between Barney's, Inc. and Jennifer Meyer, Inc., dated as of March 26, 2015.

417. Quest Renewal Invoice, by and between Barney's New York Inc. and Quest Software Inc., dated as of March 29, 2019.

418. Consulting Agreement, by and between Barney's, Inc. and Noah Leiter, dated as of July 22, 2019.

419. Consignment Agreement, by and between Barney's, Inc. and T&T Tardia Textile Project srl, dated as of September 30, 2019.

420. Consignment Agreement, by and between Barney's, Inc. and Sealup srl, dated as of September 18, 2019.

421. Consignment Agreement, by and between Barney's, Inc. and GICA Textile Group srl, dated as of August 1, 2019.

422. Purchase Order/Invoice, by and between Barneys New York and Zones, dated as of May 14, 2019.

423. Invoice, by and between Barney's, Inc. and Microsoft Corporation, dated as of July 1, 2019.

424. Technical Services Ordering Document, by and between Barneys New York and Oracle America, Inc., dated as of February 12, 2019.

425. Master Service Agreement, by and between Barneys New York and STIGroup, Ltd., dated as of March 4, 2019.

426. Business Consignment Agreement, by and between Barney's, Inc. and The RealReal, Inc., dated as of April 15, 2019.

427. Agreement, by and between Barney's, Inc. and Beboe LLC, dated as of March 11, 2019.

428. Consulting Agreement, by and between Barney's, Inc., on the one hand, and LeFort Corp. and Mark Strausman, on the other, as amended by that Third Amendment, dated as of December 2015.

429. Software Purchase and License Agreement, by and between Barney's, Inc. and AJB Software Design Inc., dated as of May 29, 2015.

430. Gateway+ Platform Master Services Agreement, by and between Barney's, Inc. and Voyage One Group, Inc., dated as of September 19, 2019.

431. Master Logistics Services Agreement, by and between Barney's, Inc. and Voyage One Group, Inc., dated as of September 19, 2019.

432. Master Subscription Service Agreement, by and between Barney's, Inc. and The Nielsen Company (US), LLC, dated as of May 1, 2018.

433. Enterprise Support Renewal Invoice, by and between Barneys New York and Tripwire, dated as of March 27, 2019.

434. SolarWinds Annual Maintenance Renewal, by and between Barneys New York and Solarwinds, dated as of May 7, 2019.

435. Master Service, License, and Professional Services Agreement, by and between Barney's, Inc. and Secret Sauce Partners, Inc., dated as of December 20, 2013.

436. Service Level Agreement, by and between Barney's, Inc. and Secret Sauce Partners, Inc., dated as of December 20, 2013, as amended by that certain Statement of Work, dated as of December 21, 2013.

437. Master Service Agreement, by and between Barneys, Inc. and 360i LLC, dated as of November 1, 2010.

438. Adobe Online Marketing Suite Service Order, by and between Barney's, Inc. and Adobe Systems Incorporated, dated as of January 20, 2012.

439. Agreement between Owner and Architect, by and between Barney's, Inc. and Lalire March Architects LLP, dated as of November 7, 2018.

440. Agreement between Owner and Architect, by and between Barney's, Inc. and Lalire March Architects LLP, dated as of March 4, 2019.

441. Data Protection Addendum, by and between Barney's, Inc. and Akamai Technologies, Inc., dated as of May 25, 2018.

442. Service Order Form, by and between Barneys, Inc., and Akamai Technologies Incorporated, effective as of October 13, 2017.

443. Service Order, by and between Barney's, Inc. and Algolia, Inc., dated as of April 20, 2019.

444. Agreement, by and between Barneys and Alarm & Security Corporation, dated as of March 15, 2018.

445. Letter Agreement, by and between Barney's Inc. and ASCAP, dated as of November 25, 2014.

446. SureTax Order Form, by and between Barney's Inc. and SalesTax.com, dated as of April 5, 2016, as amended by that certain Statement of Work, dated as of April 5, 2016.

447. Addendum to the Hardware Purchase and Software License Agreement, by and between Barneys New York, and NSB Retail Solutions Inc., effective as of April 25, 2007.

448. Addendum to the Hardware Purchase and Software License Agreement, by and between Barneys New York, and NSB Retail Solutions Inc., effective as of December 22, 2006.

449. Authorization Form, by and between Barneys New York, Inc., and Hootsuite Inc., effective as of March 26, 2019.

450. Statement of Work C4-VHHHZLT for Post Implementation Consulting Support, by and between Barneys Inc. and IBM, dated as of January 18, 2019.

451. Agreement, by and between Barney's, Inc. and Hirsch Construction, dated as of May 2019.

452. Amended and Restated Employment Agreement between Barneys New York, Inc. and Daniella Vitale, dated as of October 16, 2015.

453. Letter Agreement between Barneys New York, Inc. and Jennifer Sunwoo, dated as of March 14, 2016, as amended.

454. Agreement between Barneys New York, Inc. and Sandro Risi, dated as of February 17, 2017.

455. Agreement between Barneys New York, Inc. and Grace Fu, dated as of January 19, 2016.

456. Agreement between Barneys New York, Inc. and Tony Mauro, dated as of February 14, 2017.

457. Agreement between Barneys New York, Inc. and Katherine Monasebian, dated May 30, 2018.

458. Agreement between Barneys New York, Inc. and Matthew Mazzucca, dated February 22, 2017.

459. Agreement, by and between Barney's Clothes, Inc. and Bruno Piattelli, dated as of January 8, 1970, as amended by that certain letter dated as of May 14, 2008.

460. Amended and Restated License Agreement, by and between Barney's, Inc., BNY Licensing Corp., Barneys Japan Co., Ltd., dated August 21, 2008, as amended by that certain First Amendment to Amended and Restated License Agreement, dated as of September 18, 2015.

461. Chargeback Settlement Letter, by and between Barney's Inc. and Eres US Inc., dated October 17, 2017.

462. National Settlement Agreement, by and between Barney's, Inc. and Workers United, A/W SEIU, dated as of February 15, 2016.

463. FortiCare and FortiGuard Renewal, by and between Barney's, Inc. and Fortinet Services, dated as of September 27, 2019.

464. Fortigate Renewal, by and between Barney's, Inc. and STIGroup, Ltd., dated as of July 29, 2019.

465. Software License Agreement, by and between Barneys New York and Maple Lake Limited, dated as of March 31, 2006.


Leases

466. Amended and Restated Lease Agreement, by and between Barney's, Inc., Madneer Corp. and Flagship Partners, LLC, dated as of January 28, 1999, as amended by that certain First Amendment to Amended and Restated Lease, dated as of June 14, 1999, as further amended by that certain Second Amendment to Amended and Restated Lease, dated as of February 11, 2000, as further amended by that certain Third Amendment to Amended and Restated Lease, dated as of November 1, 2000, as further amended by that certain Amendment to Lease, dated as of March 13, 2009, as further amended by that certain Amendment to Lease, dated as of July 23, 2009.

467. Amended and Restated Lease Agreement, by and between Barney's, Inc. and Flagship Partners II LLC, dated as of January 28, 1999, as amended by that certain Amendment to Lease, dated as of March 13, 2009, as further amended by that certain Amendment to Lease, dated as of July 23, 2009, as further

amended by that certain Third Amendment to Amended and Restated Lease, dated as of October 12, 2018.

468. Retail Lease, by and between Barney's, Inc. and Stockton Street Properties, Inc., dated as of June 23, 2006, as amended by that certain First Amendment to Retail Lease, dated as of May 18, 2009, as further amended by that certain Second Amendment to Retail Lease and Limited Release, dated as of April 16, 2013, as further amended by that certain Third Amendment to Retail Lease, dated as of June 12, 2015.

469. Retail Lease, by and between Barney's, Inc. and Stockton Street Properties, Inc., dated as of June 12, 2015.

470. Lease, by and between Barney's, Inc. and Equity One (Northeast Portfolio) Inc., dated as of September 12, 2013, as amended by that certain letter agreement, dated as of October 31, 2013, as further amended by that certain First Amendment of Lease, dated as of December 3, 2013, as further amended by that certain Second Amendment of Lease, dated as of February 10, 2015.

471. Indenture of Lease, by and between Barney's, Inc. and Copley Place Associates, LLC, dated as of April 11, 2005, as amended by that certain Lease Amendment, dated as of July 31, 2006, as further amended by that certain Lease Amendment, dated as of April 30, 2010, as further amended by that certain Third Amendment to Lease, dated as of September 28, 2011, as further amended by that certain Fourth Amendment to Lease, dated as of March 16, 2012, as further amended by that certain Fifth Lease Amendment, dated as of November 18, 2013, as further amended by that certain Sixth Lease Amendment, dated as of April 16, 2019.

472. Lease, by and between Barney's, Inc. and The Crystals Las Vegas, LLC, dated as of May 22, 2019, as amended by that Letter Agreement, dated as of June 6, 2019.

473. Lease, by and between Barney's, Inc. and AMEREAM LLC, dated as of January 25, 2019.

474. Lease, by and between Barney's, Inc. and Bal Harbour Shops, LLLP, dated as of December 1, 2017, as amended by that certain Amendment to Lease, dated as of May 10, 2019.

475. Lease Agreement, by and between Barneys, Inc., and Plastic Center, Inc., dated as of December 23, 2014, as amended by that certain Rider, also dated as of December 23, 2014.

476. Lease Agreement, by and between Barneys, Inc., by and between Barneys, Inc., and CityView Plaza, LLC, dated as of November 8, 2011, as amended by that certain First Amendment, dated as of December 4, 2015.

477. Lease Agreement, by and between Barneys, Inc., and Bany Distribution Services, Inc., and JLM Lyndhurst, LLC., dated as of March 31, 1992, as amended by that certain First Amendment, dated as of March 14, 2005, as further amended by that certain Second Amendment, dated as of October 13, 2009, as further amended by that certain Third Amendment, dated as of November 5, 2012, as further amended by that certain Fourth Amendment to Lease, dated as of July 2, 2014, as further amended by the certain Signed Notice of Option to Renew, dated as of July 25, 2018.

478. Lease Agreement, by and between Barney's, Inc. and The Building At 575 Fifth LLC, dated as of October 5, 1998, as amended by that certain First Amendment, dated as of March 31, 2008, as further amended by that certain Second Amendment, dated as of November 15, 2015, as further amended by that certain Side Letter, also dated as of November 15, 2015, as further amended by that certain Expansion Space Inclusion Date Agreement, dated as of August 16, 2016.

479. Lease, by and between Barney's Inc. and Sawgrass Mills Phase IV L.L.C., dated as of December 3, 2015.

480. Lease, by and between Barney's Inc. and Carlsbad Premium Outlets, LLC, dated as of March 19, 2012, as amended by that certain First Amendment to Lease, dated as of March 1, 2017.

481. Lease, by and between Barney's Inc. and Premium Outlet Partners, L.P., dated as of March 19, 2012, as amended by that certain First Amendment to Lease, dated as of March 1, 2017 (Cabazon).

482. Lease, by and between Barney's Inc. and CPG Partners, L.P., dated as of March 19, 2012 (Camarillo).

483. Lease Agreement, by and between Barney's Inc. and Paragon Outlets Livermore Valley LLC, dated as of August 25, 2008, as amended by that certain First Amendment to Lease Agreement, dated as of February 24, 2011, as further amended by that certain Second Amendment to Lease Agreement, dated as of March 20, 2012.

484. Lease, by and between Barney's Inc. and Tanger Properties Limited Partnership, dated as of May 12, 1997, as amended by that certain First Lease Modification Agreement, dated as of December 31, 2011.

485. Shopping Center Lease, by and between Barney's Inc. and Fashion Outlets of Chicago LLC, dated as of August 26, 2011, as amended by that certain First Amendment of Lease Agreement, dated as of June 14, 2016, as further amended by that certain Second Amendment of Lease Agreement, dated as of October 26, 2017.

486. Lease, by and between Barney's Inc. and CPG Partners L.P., dated as of March 19, 2012 (Waikele).

487. Lease, by and between Barney's Inc. and CPG Partners L.P., dated as of March 19, 2012 (Woodbury).

488. Amended and Restated Sublease, by and between Barney's, Inc. and IHMS LLC, dated as of March 12, 2012.

<u>Schedule 2.8(b): Transferred Contracts and Assumed Leases</u>

1. Letter Agreement, by and between Barneys, Inc., and Barneys Japan Co., effective as of July 14, 2016.

2. Amended and Restated License Agreement, by and between Barney's, Inc., BNY Licensing Corp., Barneys Japan Co., Ltd., dated August 21, 2008, as amended by that certain First Amendment to Amended and Restated License Agreement, dated as of September 18, 2015.

3. Exhibits to Amended & Restated License Agreement, by and between BNY Licensing Corp., and Barneys Japan Co. Ltd., dated as of August 21, 2008.

<u>Section 3.3: Noncontravention; Government Filings</u>

(c)

1. Collective Bargaining Agreement, by and between Barney's, Inc. and New York New Jersey Regional Joint Board Workers United, dated as of January 1, 2016 (Fred's Restaurants and Gene's Café).

2. Collective Bargaining Agreement, by and between Barney's, Inc. and Local 340, New York-New Jersey Regional Joint Board, Workers United, dated as of April 1, 2014 (Master Agreement for 660 Madison Avenue and Seventh Avenue Locations).

3. Collective Bargaining Agreement, by and between Barney's, Inc. and Local 340, New York-New Jersey Regional Joint Board, Workers United, dated as of April 1, 2014 (Supplemental Agreement for 660 Madison Avenue).

4. Agreement, by and between Barneys Inc. and New York/New Jersey Joint Regional Board, Workers United, an SEIU Affiliate, Local 25/Alterations Unit, dated December 1, 2015.

5. Agreement, by and between Barneys Inc. and New York/New Jersey Joint Regional Board, Workers United, an SEIU Affiliate, Local 400/Clerical Unit, dated as of December 1, 2015.

6. Agreement, by and between Barneys, Inc. and New York New Jersey Regional Joint Board, Workers United a/w SEIU, dated as of March 1, 2016, as amended by that certain Extension Agreement, dated as of March 22, 2019 (New Jersey Distribution Center).

7. Debtor in Possession Secured Multi-Draw Term Promissory Note, by and between Barney's, Inc. and Gordon Brothers and Hilco Global, with Retail Funding (BNY), LLC as administrative agent, dated as of August 6, 2019.

8. License Agreement, by and between Barney's, Inc. and lp style, llc, dated as of February 4, 2016.

9. Amended and Restated License Agreement, by and between Barney's, Inc., BNY Licensing Corp., Barneys Japan Co., Ltd., dated August 21, 2008, as amended by that certain First Amendment to Amended and Restated License Agreement, dated as of September 18, 2015.

10. Letter Agreement, by and between Barneys Japan Co. and Barney's, Inc., dated as of July 11, 2016.

<u>Section 3.5(b): Transferred Contracts Default or Termination Notices</u>

None.

Section 3.6: Real Property

1.  Amended and Restated Lease Agreement, by and between Barney's, Inc., Madneer Corp. and Flagship Partners, LLC, dated as of January 28, 1999, as amended by that certain First Amendment to Amended and Restated Lease, dated as of June 14, 1999, as further amended by that certain Second Amendment to Amended and Restated Lease, dated as of February 11, 2000, as further amended by that certain Third Amendment to Amended and Restated Lease, dated as of November 1, 2000, as further amended by that certain Amendment to Lease, dated as of March 13, 2009, as further amended by that certain Amendment to Lease, dated as of July 23, 2009.

2.  Amended and Restated Lease Agreement, by and between Barney's, Inc. and Flagship Partners II LLC, dated as of January 28, 1999, as amended by that certain Amendment to Lease, dated as of March 13, 2009, as further amended by that certain Amendment to Lease, dated as of July 23, 2009, as further amended by that certain Third Amendment to Amended and Restated Lease, dated as of October 12, 2018.

3.  Retail Lease, by and between Barney's, Inc. and Stockton Street Properties, Inc., dated as of June 23, 2006, as amended by that certain First Amendment to Retail Lease, dated as of May 18, 2009, as further amended by that certain Second Amendment to Retail Lease and Limited Release, dated as of April 16, 2013, as further amended by that certain Third Amendment to Retail Lease, dated as of June 12, 2015.

4.  Retail Lease, by and between Barney's, Inc. and Stockton Street Properties, Inc., dated as of June 12, 2015.

5.  Lease, by and between Barney's, Inc. and Equity One (Northeast Portfolio) Inc., dated as of September 12, 2013, as amended by that certain letter agreement, dated as of October 31, 2013, as further amended by that certain First Amendment of Lease, dated as of December 3, 2013, as further amended by that certain Second Amendment of Lease, dated as of February 10, 2015.

6.  Indenture of Lease, by and between Barney's, Inc. and Copley Place Associates, LLC, dated as of April 11, 2005, as amended by that certain Lease Amendment, dated as of July 31, 2006, as further amended by that certain Lease Amendment, dated as of April 30, 2010, as further amended by that certain Third Amendment to Lease, dated as of September 28, 2011, as further amended by that certain Fourth Amendment to Lease, dated as of March 16, 2012, as further amended by that certain Fifth Lease Amendment, dated as of November 18, 2013, as further amended by that certain Sixth Lease Amendment, dated as of April 16, 2019.

7.  Lease, by and between Barney's, Inc. and The Crystals Las Vegas, LLC, dated as of May 22, 2019, as amended by that Letter Agreement, dated as of June 6, 2019.

8.  Lease, by and between Barney's, Inc. and AMEREAM LLC, dated as of January 25, 2019.

9.  Lease, by and between Barney's, Inc. and Bal Harbour Shops, LLLP, dated as of December 1, 2017, as amended by that certain Amendment to Lease, dated as of May 10, 2019.

10. Lease Agreement, by and between Barneys, Inc., and Plastic Center, Inc., dated as of December 23, 2014, as amended by that certain Rider, also dated as of December 23, 2014.

11. Lease Agreement, by and between Barneys, Inc., by and between Barneys, Inc., and CityView Plaza, LLC, dated as of November 8, 2011, as amended by that certain First Amendment, dated as of December 4, 2015.

12. Lease Agreement, by and between Barneys, Inc., and Bany Distribution Services, Inc., and JLM Lyndhurst, LLC., dated as of March 31, 1992, as amended by that certain First Amendment, dated as of March 14, 2005, as further amended by that certain Second Amendment, dated as of October 13, 2009, as further amended by that certain Third Amendment, dated as of November 5, 2012, as further

amended by that certain Fourth Amendment to Lease, dated as of July 2, 2014, as further amended by the certain Signed Notice of Option to Renew, dated as of July 25, 2018.

13. Lease Agreement, by and between Barney's, Inc. and The Building At 575 Fifth LLC, dated as of October 5, 1998, as amended by that certain First Amendment, dated as of March 31, 2008, as further amended by that certain Second Amendment, dated as of November 15, 2015, as further amended by that certain Side Letter, also dated as of November 15, 2015, as further amended by that certain Expansion Space Inclusion Date Agreement, dated as of August 16, 2016.

14. Lease, by and between Barney's Inc. and Sawgrass Mills Phase IV L.L.C., dated as of December 3, 2015.

15. Lease, by and between Barney's Inc. and Carlsbad Premium Outlets, LLC, dated as of March 19, 2012, as amended by that certain First Amendment to Lease, dated as of March 1, 2017.

16. Lease, by and between Barney's Inc. and Premium Outlet Partners, L.P., dated as of March 19, 2012, as amended by that certain First Amendment to Lease, dated as of March 1, 2017 (Cabazon).

17. Lease, by and between Barney's Inc. and CPG Partners, L.P., dated as of March 19, 2012 (Camarillo).

18. Lease Agreement, by and between Barney's Inc. and Paragon Outlets Livermore Valley LLC, dated as of August 25, 2008, as amended by that certain First Amendment to Lease Agreement, dated as of February 24, 2011, as further amended by that certain Second Amendment to Lease Agreement, dated as of March 20, 2012.

19. Lease, by and between Barney's Inc. and Tanger Properties Limited Partnership, dated as of May 12, 1997, as amended by that certain First Lease Modification Agreement, dated as of December 31, 2011.

20. Shopping Center Lease, by and between Barney's Inc. and Fashion Outlets of Chicago LLC, dated as of August 26, 2011, as amended by that certain First Amendment of Lease Agreement, dated as of June 14, 2016, as further amended by that certain Second Amendment of Lease Agreement, dated as of October 26, 2017.

21. Lease, by and between Barney's Inc. and CPG Partners L.P., dated as of March 19, 2012 (Waikele).

22. Lease, by and between Barney's Inc. and CPG Partners L.P., dated as of March 19, 2012 (Woodbury).

Section 3.7: Litigation; Decrees

3.   Onward Luxury Group, et al., v. Barney's New York Inc. Complaint filed July 30, 2019.

4.   CP Fashion Group, Inc. v.  Barney's, Inc. Complaint filed August 5, 2019.

<u>Section 3.10: Taxes</u>

(a)

1. ████████████████████████████████████████████████████

<u>Section 3.11: Tangible Personal Property</u>

None.

<u>Section 3.12: Employee Benefits</u>

(a)

1.  Aetna Health Insurance

2.  CVS Caremark (pharmacy/prescriptions)

3.  Aetna Vision

4.  Metlife Dental

5.  WageWorks FSA

6.  PayFlex HSA

7.  TransitChek (Transit Benefit)

8.  Charles Schwab - 401(k)

9.  MetLife Long-term Disability / Life Insurance

10. MetLife (Critical Illness, Accident, Legal Assistance – MetLaw, and Identity Theft)

11. Lincoln Financial Critical Illness / Accident Insurance

12. Provident Life and Accident Insurance (Unum) – Short-term Disability and Whole Life Insurance

13. Agreement and Declaration of Trust - The Amalgamated Retail Retirement Fund, dated as of August 1996, as amended

14. Amalgamated (AliCare) – Madison, Downtown, Distribution Center's union health insurance

15. Health & Welfare Fund – Restaurants' union health insurance (Madison & Downtown)

16. HMSA (Hawaii Medical Service Association) – Hawaii medical insurance[1]

17. Agreement and Declaration of Trust - The Amalgamated Retail Retirement Fund, dated as of August 1996, as amended

---

[1]    <u>Note to Buyer</u>: Waikele location set to close end of November.

## Section 3.13: Intellectual Property

(a)

1. License Agreement, by and between Barney's, Inc. and lp style, llc, dated as of February 4, 2016.

2. Agreement, by and between Barney's Clothes, Inc. and Bruno Piattelli, dated as of January 8, 1970, as amended by that certain letter dated as of May 14, 2008.

(a)(i)

None.

(b)

See attached for domain names, social media handles and active trademark filings.

(c)

See attached for US copyrights.

(d)

None.

(e)

None.

(g)

███████████████████████████████████████████████
███████████████████████████████████████████

███████████████████████████████████████████████
██████████

(h)

███████████████████████████████████████████████

(i)

None.

(j)

None.

SCHEDULE AB 61 ATTACHMENT
Internet Domain Names and Websites

| General Description | Net Book Value | Valuation Method | Current Value |
|---|---|---|---|
| barneys.cn | | N/A | Undetermined |
| barneys.com | | N/A | Undetermined |
| barneys.com.cn | | N/A | Undetermined |
| barneys.sucks | | N/A | Undetermined |
| barneys.xxx | | N/A | Undetermined |
| barneysbeautyguru.xxx | | N/A | Undetermined |
| barneyschelseapassage.xxx | | N/A | Undetermined |
| barneyscoop.com | | N/A | Undetermined |
| barneysco-op.com | | N/A | Undetermined |
| barneysdna.com | | N/A | Undetermined |
| barneysgenie.com | | N/A | Undetermined |
| barneysgenome.com | | N/A | Undetermined |
| barneysnewyork.com | | N/A | Undetermined |
| barneysnewyork.net | | N/A | Undetermined |
| barneysnewyork.org | | N/A | Undetermined |
| barneysnewyork.sucks | | N/A | Undetermined |
| barneysnewyork.xxx | | N/A | Undetermined |
| barneysnewyorkcoop.com | | N/A | Undetermined |
| barneysnewyorkco-op.com | | N/A | Undetermined |
| barneysnewyorkfreestuff.xxx | | N/A | Undetermined |
| barneysnewyorkoutlet.com | | N/A | Undetermined |
| barneysnewyorkoutlets.com | | N/A | Undetermined |
| barneysnewyorkwarehouse.com | | N/A | Undetermined |
| barneysnewyorkwarehousesale.com | | N/A | Undetermined |
| barneysny.com | | N/A | Undetermined |
| barneysny.net | | N/A | Undetermined |
| barneysonline.net | | N/A | Undetermined |
| barneysoutlets.com | | N/A | Undetermined |
| barneyspersonalshopper.com | | N/A | Undetermined |
| barneyswarehouse.com | | N/A | Undetermined |
| barneyswarehousesale.com | | N/A | Undetermined |
| barneyswearhouse.com | | N/A | Undetermined |
| bnycoop.com | | N/A | Undetermined |
| bnyco-op.com | | N/A | Undetermined |
| b-sides.xxx | | N/A | Undetermined |
| b-social.xxx | | N/A | Undetermined |
| callingallmensince1923.xxx | | N/A | Undetermined |
| chelseapassage.xxx | | N/A | Undetermined |
| coopbarneys.com | | N/A | Undetermined |

In re: Barney's, Inc.
Case No. 19-36299

Internet Domain Names and Websites

| General Description | Net Book Value | Valuation Method | Current Value |
|---|---|---|---|
| co-opbarneys.com | | N/A | Undetermined |
| coopbarneysnewyork.com | | N/A | Undetermined |
| co-opbarneysnewyork.com | | N/A | Undetermined |
| coopbarneysnewyork.xxx | | N/A | Undetermined |
| coopbny.com | | N/A | Undetermined |
| co-opbny.com | | N/A | Undetermined |
| couturedna.com | | N/A | Undetermined |
| couturegenome.com | | N/A | Undetermined |
| ebarneys.com | | N/A | Undetermined |
| ebarneys.net | | N/A | Undetermined |
| exclusivelyours.com | | N/A | Undetermined |
| exclusivelyoursxo.asia | | N/A | Undetermined |
| exclusivelyoursxo.biz | | N/A | Undetermined |
| exclusivelyoursxo.cn | | N/A | Undetermined |
| exclusivelyoursxo.com | | N/A | Undetermined |
| exclusivelyoursxo.info | | N/A | Undetermined |
| exclusivelyoursxo.net | | N/A | Undetermined |
| exclusivelyoursxo.org | | N/A | Undetermined |
| exclusivelyoursxo.xxx | | N/A | Undetermined |
| fashiongenomics.com | | N/A | Undetermined |
| fredsatbarneysnewyork.xxx | | N/A | Undetermined |
| getitright.xxx | | N/A | Undetermined |
| givegoodgift.xxx | | N/A | Undetermined |
| madetomeasuresuite.xxx | | N/A | Undetermined |
| mystylegenome.com | | N/A | Undetermined |
| ourbestlabelmaybeourown.xxx | | N/A | Undetermined |
| selectdontsettle.com | | N/A | Undetermined |
| selectdontsettle.xxx | | N/A | Undetermined |
| tasteluxuryhumor.xxx | | N/A | Undetermined |
| thebookofknowledge.xxx | | N/A | Undetermined |
| thefoundation.xxx | | N/A | Undetermined |
| virtualbarneys.com | | N/A | Undetermined |
| xoexclusivelyours.com | | N/A | Undetermined |

In re: Barney's, Inc.
Case No. 19-36299

### Barneys New York, Inc. Social Media Handles

<u>**Actively Managed:**</u>
- Facebook:
    - https://www.facebook.com/BarneysNY

- Instagram:
    - http://instagram.com/barneysny
    - http://instagram.com/barneysman
    - http://instagram.com/FredsAtBarneys
    - http://instagram.com/barneyswarehouse
    - http://instagram.com/BarneysWHS

- Twitter:
    - https://twitter.com/BarneysNY

<u>**Inactive:**</u>
- Facebook:
    - https://www.facebook.com/BarneysWarehouse
    - https://www.facebook.com/fredsatbarneysNYC

- Instagram:
    - https://www.instagram.com/barneysnyofficial
    - http://instagram.com/FredsAtBarneysNY
    - http://instagram.com/FredsAtBNY
    - http://instagram.com/FredsAtBarneysNewYork
    - https://www.instagram.com/lockedinbarneys/
    - http://instagram.com/barneysWH
    - http://instagram.com/BarneysWHS

- Pinterest:
    - http://www.pinterest.com/barneysny/
    - http://www.pinterest.com/barneysWH/

- Snapchat:
    - @Barneysny
    - @Fredsatbarneys
    - @Barneysman

- Tumblr:
    - http://barneysny.tumblr.com/

- Twitter:
    - https://twitter.com/BarneysWH
    - https://twitter.com/FredsAtBarneys
    - https://twitter.com/lockedinbarneys
    - https://twitter.com/BarneysNY_Freds

| COUNTRY | MARK | STATUS | APP. NO. | DATE FILED | REG. NO. | REG. DATE | OWNER |
|---|---|---|---|---|---|---|---|
| CANADA | FIVESEVENTYFIVE | PENDING | 1938069 | 12/25/2018 | | | Barney's, Inc. |
| CANADA | LOCKED IN BARNEYS | REGISTERED | 1728727 | 5/19/2015 | tma957769 | 12/13/2016 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 663885 | 9/19/1992 | 663885 | 10/28/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 664723 | 9/19/1992 | 664723 | 11/7/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 663808 | 9/19/1992 | 663808 | 10/28/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 92061026 | 9/19/1992 | 664760 | 11/7/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 92079397 | 11/28/1992 | 675785 | 1/28/1994 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 662948 | 9/19/1992 | 662948 | 10/21/1993 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 8968181 | 12/20/2010 | 8968181 | 12/28/2011 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 96066690 | 6/4/1996 | 1097745 | 9/7/1997 | Barney's, Inc. |
| CHINA | BARNEYS | REGISTERED | 96066691 | 6/4/1996 | 1097445 | 9/7/1997 | Barney's, Inc. |
| CHINA | FIVESEVENTYFIVE | PENDING | 35554989 | 12/26/2018 | | | Barney's, Inc. |
| EUROPEAN UNION (EUTM & RCD) | BARNEYS | REGISTERED | 010004711 | 5/27/2011 | 010004711 | 7/31/2015 | Barney's, Inc. |
| EUROPEAN UNION (EUTM & RCD) | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 004846721 | 12/28/2005 | 004846721 | 12/14/2007 | Barney's, Inc. |
| FRANCE | BARNEYS | REGISTERED | 4234950 | 5/27/2011 | 4234950 | 4/8/2016 | Barney's, Inc. |
| HONG KONG | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 199912269 | 1/5/1998 | 199912269 | 10/11/1999 | Barney's, Inc. |
| HONG KONG | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 199912270AA | 1/5/1998 | 199912270AA | 10/11/1999 | Barney's, Inc. |
| HONG KONG | FIVESEVENTYFIVE | REGISTERED | 304783375 | 12/26/2018 | 304783375 | 06/20/2019 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536893 | 9/13/1990 | 212882 | 9/13/1990 | Barney's, Inc. |

| INDIA | BARNEYS | REGISTERED | 536891 | 9/13/1990 | 215272 | 9/13/1990 | Barney's, Inc. |
|---|---|---|---|---|---|---|---|
| INDIA | BARNEYS | REGISTERED | 536892 | 9/13/1990 | 223928 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 537050 | 9/17/1990 | 215634 | 9/17/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536888 | 9/13/1990 | 209332 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536894 | 9/13/1990 | 223001 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536889 | 9/13/1990 | 223010 | 9/13/1990 | Barney's, Inc. |
| INDIA | BARNEYS | REGISTERED | 536890 | 9/13/1990 | 207278 | 9/13/1990 | Barney's, Inc. |
| ITALY | BARNEYS | REGISTERED | 2015000080373 | 12/4/2015 | 302015000080373 | 6/23/2017 | Barney's, Inc. |
| JAPAN | B (Within a C) (Logo) | REGISTERED | 2016-081849 | 8/1/2016 | 5935202 | 3/24/2017 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-105038 | 9/14/1989 | 2426232 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096253 | 8/24/1989 | 2385046 | 2/28/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096257 | 8/24/1989 | 2423787 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096254 | 8/24/1989 | 2423786 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H01-096260 | 8/24/1989 | 2429666 | 6/30/1992 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-057967 | 6/10/1994 | 3234686 | 12/25/1996 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-057968 | 6/10/1994 | 3250070 | 1/31/1997 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-088498 | 8/31/1994 | 4021432 | 7/4/1997 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | H06-088499 | 8/31/1994 | 3296543 | 4/25/1997 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | 2007-031169 | 4/2/2007 | 5255202 | 8/7/2009 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JAPAN | BARNEYS | REGISTERED | 2007-013857 | 2/20/2007 | 5066567 | 7/27/2007 | Barney's, Inc. |
| JAPAN | BARNEYS | REGISTERED | 2006-119202 | 12/25/2006 | 5190672 | 12/19/2008 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | S56-099906 | 12/1/1981 | 2131984 | 4/28/1989 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | S56-099907 | 12/1/1981 | 1932216 | 2/25/1987 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | 2302529 | 11/29/1988 | 2302529 | 2/27/1991 | Barney's, Inc. |
| JAPAN | BARNEY'S | REGISTERED | S63-134470 | 11/29/1988 | 2345246 | 10/30/1991 | Barney's, Inc. |
| JAPAN | BARNEYS CAFE | REGISTERED | 2016-081848 | 8/1/2016 | 5935201 | 3/24/2017 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003565 | 1/21/2010 | 5337596 | 7/9/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003566 | 1/21/2010 | 5362562 | 10/22/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003567 | 1/21/2010 | 5362563 | 10/22/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003568 | 1/21/2010 | 5362564 | 10/22/2010 | Barney's, Inc. |
| JAPAN | BARNEY'S NEW YORK LAB | REGISTERED | 2010-003569 | 1/21/2010 | 5327795 | 6/4/2010 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095895 | 9/20/1993 | 3320653 | 6/13/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095896 | 9/20/1993 | 3330933 | 7/11/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095897 | 9/20/1993 | 3265540 | 2/24/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095898 | 9/20/1993 | 3345087 | 9/5/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | 2007-031170 | 4/2/2007 | 5282133 | 11/20/2009 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095892 | 9/20/1993 | 3273487 | 4/4/1997 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | H05-095894 | 9/20/1993 | 3234685 | 12/25/1996 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | H05-095891 | 9/20/1993 | 3231024 | 11/29/1996 | Barney's, Inc. |
| JAPAN | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | H05-095893 | 9/20/1993 | 3273488 | 4/4/1997 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003555 | 1/21/2010 | 5371949 | 11/26/2010 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003556 | 1/21/2010 | 2370313 | 11/19/2010 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003562 | 1/21/2010 | 5370315 | 11/19/2010 | Barney's, Inc. |
| JAPAN | THE LAB | REGISTERED | 2010-003557 | 1/21/2010 | 5370314 | 11/19/2010 | Barney's, Inc. |
| SINGAPORE | BARNEYS | REGISTERED | T9102344E | 3/1/1991 | T9102344E | 9/30/1993 | Barney's, Inc. |
| SINGAPORE | BARNEYS | REGISTERED | T9105908C | 6/19/1991 | T9105908C | 6/15/2001 | Barney's, Inc. |
| SINGAPORE | BARNEYS | REGISTERED | T9105907E | 6/19/1991 | T9105907E | 6/15/2001 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010929 | 5/4/1989 | 40-0195072-0000 | 6/29/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010926 | 5/4/1989 | 40-199446-0000 | 8/31/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010927 | 5/4/1989 | 40-0199586-0000 | 9/3/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 40-1989-0010930 | 5/4/1989 | 40-0199696-0000 | 9/3/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS | REGISTERED | 41-1989-0001192 | 5/4/1989 | 41-0012978-0000 | 11/27/1990 | Barney's, Inc. |
| SOUTH KOREA | BARNEYS NEWYORK (Stylized - Stacked) | REGISTERED | 4520070000565 | 2/8/2007 | 4500228230000 | 4/1/2008 | Barney's, Inc. |
| SPAIN | BARNEYS | REGISTERED | M3576519 | 8/25/2015 | M3576519/4 | 1/28/2016 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TAIWAN | BARNEYS | REGISTERED | 078033385 | 7/18/1989 | 00479715 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033386 | 7/18/1989 | 00481485 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033387 | 7/18/1989 | 00478052 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033388 | 7/18/1989 | 00481894 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033390 | 7/18/1989 | 00478411 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033391 | 7/18/1989 | 00476988 | 3/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033392 | 7/18/1989 | 00478716 | 3/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033393 | 7/18/1989 | 00480528 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033394 | 7/18/1989 | 00483398 | 5/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033395 | 7/18/1989 | 00487664 | 6/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 7833396 | 7/18/1989 | 00487733 | 6/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033397 | 7/18/1989 | 00044347 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033398 | 7/18/1989 | 00044460 | 4/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033399 | 7/18/1989 | 00044237 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 078033389 | 7/18/1989 | 00480266 | 4/1/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 7833396 | 7/18/1989 | 487733 | 6/16/1990 | Barney's, Inc. |
| TAIWAN | BARNEYS | REGISTERED | 7833397 | 7/18/1989 | 44347 | 4/16/1990 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389643 | 6/15/1989 | TM96015 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389644 | 6/15/1989 | TM96006 | 6/15/1989 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| THAILAND | BARNEYS | REGISTERED | 389645 | 6/15/1989 | TM99718 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389646 | 6/15/1989 | TM96038 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389647 | 6/15/1989 | TM37798 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389648 | 6/15/1989 | TM96039 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389649 | 6/15/1989 | TM115683 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389650 | 6/15/1989 | TM106729 | 6/15/1989 | Barney's, Inc. |
| THAILAND | BARNEYS | REGISTERED | 389651 | 6/15/1989 | TM96040 | 6/15/1989 | Barney's, Inc. |
| TURKEY | BARNEY'S NEW YORK | REGISTERED | 2013/19111 | 2/28/2013 | 2013/19111 | 2/28/2013 | Barney's, Inc. |
| UNITED KINGDOM | BARNEYS | REGISTERED | UK00003127499 | 5/27/2011 | UK00003127499 | 3/4/2016 | Barney's, Inc. |
| UNITED STATES | B3 | REGISTERED | 85/936415 | 5/20/2013 | 4573445 | 7/22/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS | REGISTERED | 73/397425 | 9/30/1982 | 1371828 | 11/19/1985 | Barney's, Inc. |
| UNITED STATES | BARNEYS | REGISTERED | 73/397428 | 9/30/1982 | 1337912 | 5/28/1985 | Barney's, Inc. |
| UNITED STATES | BARNEY'S | REGISTERED | 72/136187 | 1/22/1962 | 740068 | 10/30/1962 | Barney's, Inc. |
| UNITED STATES | BARNEYS BEAUTY BOX | PENDING | 88/017852 | 6/27/2018 | | | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 74/698082 | 7/6/1995 | 2073088 | 6/24/1997 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 73/397427 | 9/30/1982 | 1332229 | 4/23/1985 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 75/273941 | 4/14/1997 | 2571696 | 5/21/2002 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK | REGISTERED | 76/471826 | 11/26/2002 | 2766664 | 9/23/2003 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK FREE STUFF (and Design) | REGISTERED | 76/050007 | 5/17/2000 | 2608036 | 8/13/2002 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK INFLUENCER | REGISTERED | 88/016156 | 6/26/2018 | 5860038 | 09/17/2019 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNITED STATES | BARNEYS NEW YORK MADE TO MEASURE | REGISTERED | 86/163693 | 1/13/2014 | 4736252 | 5/12/2015 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEW YORK WAREHOUSE | REGISTERED | 85/368485 | 7/11/2011 | 4343133 | 5/28/2013 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (and Design - Lion - Stacked) | REGISTERED | 76/570839 | 1/20/2004 | 3088046 | 5/2/2006 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (and Design - Lion) | REGISTERED | 76/580230 | 3/10/2004 | 2963769 | 6/28/2005 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (and Design - Lion) | REGISTERED | 75/981426 | 3/22/2000 | 2583246 | 6/18/2002 | Barney's, Inc. |
| UNITED STATES | BARNEYS NEWYORK (Stacked - Stylized) | REGISTERED | 73/792604 | 3/28/1989 | 1620003 | 10/30/1990 | Barney's, Inc. |
| UNITED STATES | BARNEYS UNIVERSITY | REGISTERED | 85/056323 | 6/7/2010 | 4508768 | 4/8/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS UNIVERSITY (and Design) | REGISTERED | 85/051483 | 6/1/2010 | 4475496 | 1/28/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS UNIVERSITY WHERE LEARNING IS STYLISH! (and Design) | REGISTERED | 85/056459 | 6/7/2010 | 4478388 | 2/4/2014 | Barney's, Inc. |
| UNITED STATES | BARNEYS WAREHOUSE | REGISTERED | 85/368495 | 7/11/2011 | 4343134 | 5/28/2013 | Barney's, Inc. |
| UNITED STATES | BASCO | REGISTERED | 85/291849 | 4/12/2011 | 4760492 | 6/23/2015 | Barney's, Inc. |
| UNITED STATES | BASCO BARNEYS SPORTSWEAR COMPANY | REGISTERED | 85/497799 | 12/16/2011 | 4790842 | 8/11/2015 | Barney's, Inc. |
| UNITED STATES | CHELSEA PASSAGE | REGISTERED | 74/139558 | 2/15/1991 | 1793956 | 9/21/1993 | Barney's, Inc. |
| UNITED STATES | CHELSEA PASSAGE | REGISTERED | 78/556950 | 1/31/2005 | 3070632 | 3/21/2006 | Barney's, Inc. |
| UNITED STATES | CONNOR | REGISTERED | 85/545867 | 2/17/2012 | 4233033 | 10/30/2012 | Barney's, Inc. |
| UNITED STATES | CO-OP | REGISTERED | 75/983558 | 12/7/1999 | 2983421 | 8/9/2005 | Barney's, Inc. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNITED STATES | CO-OP | REGISTERED | 75/983420 | 12/7/1999 | 2847734 | 6/1/2004 | Barney's, Inc. |
| UNITED STATES | CO-OP | REGISTERED | 75/983287 | 12/7/1999 | 2847733 | 6/1/2004 | Barney's, Inc. |
| UNITED STATES | CO-OP BARNEYS NEW YORK | REGISTERED | 75/983316 | 12/7/1999 | 2802702 | 1/6/2004 | Barney's, Inc. |
| UNITED STATES | FIVESEVENTYFIVE | REGISTERED | 88/015994 | 6/26/2018 | 5675074 | 2/12/2019 | Barney's, Inc. |
| UNITED STATES | FREDS AT BARNEY'S NEW YORK | REGISTERED | 85/477858 | 11/21/2011 | 4182469 | 7/31/2012 | Barney's, Inc. |
| UNITED STATES | FRED'S AT BARNEYS NEW YORK | REGISTERED | 75/172667 | 9/26/1996 | 2144170 | 3/17/1998 | Barney's, Inc. |
| UNITED STATES | FREDS AT BARNEYS NEW YORK (Stylized - Stacked) | REGISTERED | 85/417225 | 9/7/2011 | 4243203 | 11/13/2012 | Barney's, Inc. |
| UNITED STATES | GET DOWN TO BUSINESS | REGISTERED | 85/225017 | 1/24/2011 | 4332323 | 5/7/2013 | Barney's, Inc. |
| UNITED STATES | GET IT RIGHT | REGISTERED | 76/084625 | 7/6/2000 | 2501785 | 10/30/2001 | Barney's, Inc. |
| UNITED STATES | GIVE GOOD GIFT | REGISTERED | 76/086488 | 7/11/2000 | 2479769 | 8/21/2001 | Barney's, Inc. |
| UNITED STATES | INCLUSIVELY YOURS | ALLOWED | 87/603105 | 9/11/2017 | | | Barney's, Inc. |
| UNITED STATES | LOCKED IN BARNEYS | REGISTERED | 85/890333 | 3/29/2013 | 4422006 | 10/22/2013 | Barney's, Inc. |
| UNITED STATES | MADE TO MEASURE BARNEYS NEW YORK | REGISTERED | 86/163689 | 1/13/2014 | 4827758 | 10/6/2015 | Barney's, Inc. |
| UNITED STATES | Miscellaneous Design (Lion) | REGISTERED | 76/579728 | 3/8/2004 | 3088067 | 5/2/2006 | Barney's, Inc. |
| UNITED STATES | Miscellaneous Design (Lion) | REGISTERED | 75/981502 | 3/22/2000 | 2559933 | 4/9/2002 | Barney's, Inc. |
| UNITED STATES | Miscellaneous Design (Lion) | REGISTERED | 76/579727 | 3/8/2004 | 2927627 | 2/22/2005 | Barney's, Inc. |
| UNITED STATES | MOST LOVED | REGISTERED | 85/630656 | 5/21/2012 | 4404251 | 9/17/2013 | Barney's, Inc. |
| UNITED STATES | MOST LOVED (and Design - V shaped Hearts) | REGISTERED | 85/630777 | 5/21/2012 | 4401191 | 9/10/2013 | Barney's, Inc. |

| UNITED STATES | MY BARNEYS BAG | REGISTERED | 85/451602 | 10/19/2011 | 4235176 | 10/30/2012 | Barney's, Inc. |
|---|---|---|---|---|---|---|---|
| UNITED STATES | N (and Design - Diamond) | REGISTERED | 85/631113 | 5/21/2012 | 4444648 | 12/3/2013 | Barney's, Inc. |
| UNITED STATES | N NEW ARRIVAL (and Design - Diamond) | REGISTERED | 85/631150 | 5/21/2012 | 4951545 | 5/3/2016 | Barney's, Inc. |
| UNITED STATES | PURPLE CARD | REGISTERED | 85/860425 | 2/26/2013 | 4439121 | 11/26/2013 | Barney's, Inc. |
| UNITED STATES | SELECT, DON'T SETTLE. | REGISTERED | 74/030677 | 2/16/1990 | 1678142 | 3/3/1992 | Barney's, Inc. |
| UNITED STATES | TASTE, LUXURY, HUMOR | REGISTERED | 76/283654 | 7/12/2001 | 2552600 | 3/26/2002 | Barney's, Inc. |
| UNITED STATES | THE BOOK OF KNOWLEDGE | REGISTERED | 75/555824 | 9/21/1998 | 2294407 | 11/23/1999 | Barney's, Inc. |
| UNITED STATES | THE FOUNDATION | REGISTERED | 76/368542 | 2/8/2002 | 2744455 | 7/29/2003 | Barney's, Inc. |
| UNITED STATES | THE FOUNDATION (Stylized) | REGISTERED | 76/389133 | 4/1/2002 | 2782869 | 11/11/2003 | Barney's, Inc. |
| UNITED STATES | THE WINDOW | REGISTERED | 85/236974 | 2/8/2011 | 4068621 | 12/6/2011 | Barney's, Inc. |
| UNITED STATES | V FAVORITES (and Design) | REGISTERED | 85/630757 | 5/21/2012 | 4411833 | 10/1/2013 | Barney's, Inc. |
| UNITED STATES | XO (and Design - In a circle) | REGISTERED | 85/498555 | 12/19/2011 | 4247329 | 11/20/2012 | Barney's, Inc. |
| UNITED STATES | XO EXCLUSIVELY OURS (and Design - In a circle) | REGISTERED | 85/499590 | 12/20/2011 | 4247333 | 11/20/2012 | Barney's, Inc. |
| UNITED STATES | COOP BARNEYS NEW YORK | Registered | 76/976,610 | 02/05/03 | 2,867,636 | 07/27/04 | Barney's, Inc. |

Barney's Inc.
US Copyrights
As of October 9, 2019

| COPYRIGHT TITLE | COUNTRY | REG. NO. | STATUS |
|---|---|---|---|
| Copyright: Barneys New York (Book) | United States | TX0008416685 | REGISTERED |

<u>Section 3.14: Compliance with Laws; Permits</u>

(a)



Section 3.15: Environmental Matters

None.

<u>Section 3.16: Related Party Transactions</u>

None.

Section 3.20: Royalties



<u>Section 5.2: Conduct of the Business Pending the Closing</u>

(b)(i)

<u>2020 Health Plan</u>: The Company is in the process of adopting a new health insurance plan for its employees. The Company's provider (Aetna) will remain the same, with marginal changes to the current plan structure and employer contributions expected.

(b)(x)

None.

(b)(xv)

1. Employee Seasonal Discount: 50% off (including cosmetics) (10/11-10/27)

2. Infinite Rewards 2 Issuance and Card Redemption (10/29-11/24)

3. Singles Day: Promotion of 11% Off Online (11/10-11/13)

4. Private Sale: Up to 40% Off Designer Fashion (11/14-11/18)

5. Holiday Gift Card Mailing (11/18-12/30)

6. Launch Holiday Campaign In-Store and Online: (11/21)

7. Presale (11/21-11/24)

8. Designer Break: Up to 40% Off Designer Fashion (11/24)

9. Designer Break Date (11/25)

10. Thanksgiving: Up to 40% Off Designer Fashion + Extra 20% Off (11/28)

11. Black Friday: Up to 40% Off Designer Fashion + Extra 20% Off (11/29)

12. Black Friday Weekend: Up to 40% Off Designer Fashion + Extra 20% Off (11/30)

13. Cyber Monday Preview: Up to 40% Off Designer Fashion + Earn a Gift Card up to $1,000 (includes beauty) (12/1)

14. Cyber Monday: Up to 40% Off Designer Fashion + Earn a Gift Card up to $1,000 (includes beauty) (12/2)

15. Cyber Tuesday: Up to 40% Off Designer Fashion + Earn a Gift Card up to $1,000 (includes beauty) (12/3)

16. Designer Break Date (12/5)

17. Second Markdowns (12/6)

18. Gem Card (12/6-12/25)

19. Free Shipping Day (12/16)

20. Infinite Rewards (12/10-12/16)

21. Holiday Cosmetic Bag Event (12/11-12/15)

22. Holiday Rewards Promotion (12/12-1/12)

See attached for additional promotional events and dates.

Section 5.4(a): Notices and Consents

None.