**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER AUTHORIZING (I) ENTRY INTO AND PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT AND AGENCY AGREEMENT, (II) SALE OF THE DEBTORS' ASSETS, AND (III) GRANTING RELATED RELIEF

Upon the Motion[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (a) approving the transactions pursuant to the Asset Purchase Agreement and Agency Agreement (each as defined below) and authorizing the Debtors to perform thereunder, (b) authorizing the sale of the Debtors' assets, and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated February 1, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819). The location of the Debtors' service address is 575 Fifth Avenue, New York, New York 10017.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Asset Purchase Agreement as applicable.

hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court on October 31, 2019 (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion, and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**THIS COURT HEREBY FINDS AND CONCLUDES THAT:[3]**

A.    The legal and factual bases set forth in the Motion and Sale Hearing establish just and sufficient cause to grant the relief requested therein.

B.    On August 9, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 91] (the "Motion").

C.    On August 22, 2019, the Court entered an order [Docket No. 156] (as amended, supplemented, or modified from time to time, the "Bidding Procedures Order"), which, among other things, (i) authorized and approved the Bidding Procedures, (ii) scheduled the Bid Deadlines and the Auction, (ii) approved the form and manner of notice of the Auction, and (iv) granted related relief.

D.    On September 3, 2019, the Debtors filed the *Notice of Filing Revised Bidding Procedures* [Docket No. 200] pursuant to which they modified the Bidding Procedures established under the Bidding Procedures Order.

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

E.      As evidenced by the certificates of service filed with the Court [Docket Nos. 342, 348], and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the *Notice of Cure Amounts and Potential Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases in Connection with Sale* [Docket No. 329] and *Supplemental Notice of Cure Amounts and Potential Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases in Connection with Sale* [Docket No. 339] (collectively, the "Cure Amount Notices" and cure amounts listed therein or as may be determined by subsequent order of this Court or agreement with the applicable counterparty to a Contract or Lease being assumed and assigned, the "Cure Amounts") on each non-debtor counterparty to a Contract and notice of the related proposed Cure Amounts.  The service of the Cure Amount Notices was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Amounts for the assumption or assumption and assignment of the Assumed Contracts. All non-Debtor parties to the Assumed Contracts have had a reasonable opportunity to object both to the Cure Amounts listed on the applicable Cure Amount Notice.  No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay the Cure Amounts, as may be required or such defaults that are not required to be cured.

F.      On October 16, 2019 the Debtors entered into that certain (a) Asset Purchase Agreement (together with all schedules, exhibits, and other ancillary documents related thereto, the "Asset Purchase Agreement") and (b) Agency Agreement (together with all schedules, exhibits, and ancillary documents related thereto, the "Agency Agreement" and together with the Asset Purchase Agreement, the "Agreements" and the transactions contemplated therein, including for the avoidance of doubt the use of the sale proceeds to indefeasibly pay, in full and in cash on

the Closing Date, all DIP Obligations, including without limitation any unpaid principal, interest, expenses, and fees, including the Original Exit Fee, the Additional Exit Fee, the Additional Facility Fee, the Consent Fee and to the extent payable under the DIP Financing Agreements and the Final DIP Order, any Enhancement Fee (each of the foregoing as defined in the Final DIP Order or the DIP Financing Agreement, as applicable), and including for the avoidance of doubt, all obligations under the Consignment Facility (as defined in the DIP Financing Agreements), including without limitation the Work Fee (as defined in Exhibit B to the DIP Financing Agreements), pursuant to Section 2.5(b) of the Asset Purchase Agreement and Paragraph 20 of this Order, collectively, the "Sale Transaction") by and among Barneys New York, Inc., and the other sellers party thereto (the "Sellers"), on the one hand, and ABG-Barneys, LLC ("Buyer") and B. Riley Financial, Inc. ("Agent" and collectively with Buyer, "Purchasers"),[4] on the other hand, subject to higher or better offers.

G.    In accordance with the Bidding Procedures Order, the Agreements were deemed a Qualified Bid and the Purchasers were eligible to participate in the Auction as a Qualified Bidder. The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures. The Debtors and their professionals adequately marketed the Acquired Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order. Based upon

---

[4]    As set forth below, pursuant to Section 17.6 and Footnote 6 of the Agency Agreement, a contractual joint venture comprised of (a) GA Retail, Inc., a wholly owned indirect subsidiary of B. Riley Financial, Inc., (b) Hilco Merchant Resources, LLC, and (c) Tiger Capital Group, LLC, is substituted for B. Riley Financial, Inc. and Great American Group LLC, as applicable, as a party to the Agreements.  All references to "Agent" herein and in the Agreements refer to such contractual joint venture.

the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Acquired Assets. The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity to make a higher or otherwise better offer for the Acquired Assets than that reflected in the Agreements.

H.      On October 24, 2019, the Debtors selected the Agreements as the Winning Bid pursuant to the Bidding Procedures.

I.      Subject to the entry of this Order, each Debtor: has (i) full requisite corporate or other organizational power and authority to execute, deliver, and perform its obligations under the Agreements and all other documents contemplated thereby and (ii) taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery and performance of its obligations under the Agreements and to consummate the Sale Transaction, including as required by their respective organizational documents, and, upon execution thereof, the Agreements and the related documents were or will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of such Debtor. No government, regulatory, or other consents or approvals, other than those expressly provided for in the Agreements, were required for the execution, delivery, and performance by the Debtors of the Agreements or the consummation of the Sale Transaction contemplated thereby.  No consents or approvals of the Debtors, other than those expressly provided for in the Agreements or this Order, are required for the Debtors to consummate the Sale Transaction.

J.      As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have adequately marketed and conducted the sale process in compliance with the Bidding Procedures and the Bidding Procedures Order, and the bidding process was conducted in a noncollusive, fair, and good faith manner. The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures and the Bidding Procedures Order and have afforded potential purchasers a full and fair opportunity to participate in the bidding process and to make higher or better offers. In accordance with the Bidding Procedures Order, the Agreements were deemed a Qualified Bid and the Purchasers were a Qualified Bidder eligible to participate at the Auction.  The Purchasers acted in compliance with the Bidding Procedures and the Bidding Procedures Order and conducted themselves in a noncollusive, fair, and good faith manner. In accordance with the Bidding Procedures and the Bidding Procedures Order, the Debtors determined that the bid submitted by the Purchasers and memorialized by the Agreements is the Winning Bid.

K.      The total consideration provided by the Purchasers for the Acquired Assets as reflected in the Agreements is the highest and best offer received by the Debtors for the Acquired Assets. No other person or entity or group of Persons has submitted a Qualified Bid prior to the Bid Deadline. Therefore, in accordance with the Bidding Procedures Order, (i) the Debtors did not conduct the Auction and (ii) the Debtors determined that the Agreements constituted the highest and best offer and selected the Agreements as the Winning Bid. The Debtors' determination that the Agreements constitute the highest and best offer and the Debtors' selection of the Agreements as the Winning Bid each constitute a valid and sound exercise of the Debtors' business judgment and the Debtors' decision to enter into the Agreements and the Sale Transaction constitutes a

proper exercise of the fiduciary duties of the Debtors and their officers and managers. The offer of

the Purchasers, upon the terms and conditions set forth in the Agreements, including the total

consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received by

the Debtors after extensive marketing, including through the Bidding Procedures and (ii) is in the

best interests of the Debtors, their creditors, their estates and other parties in interest. Taking into

consideration all relevant factors and circumstances, no other entity has offered to purchase the

Acquired Assets for greater economic value to the Debtors or their estates.

L.      The Debtors have articulated good and sufficient business reasons for the Court to

authorize (i) the Debtors' entry into the Agreements and consummation of the Sale Transaction

including the sale of the Acquired Assets to Purchasers, pursuant to the terms of the Agreements,

(ii) the assumption and assignment of the Assumed Leases and Transferred Contracts as set forth

herein and in the Agreements (collectively, the "Assumed Contracts"), and (iii) the assumption of

the Assumed Liabilities as set forth herein and in the Agreements.  Entry into the Agreements and

consummation of the Sale Transaction are sound exercises of business judgment, and such acts are

in the best interests of the Debtors, their estates and creditors, and all parties in interest.

M.      Sound business justifications also exist for the deposit of the Professional Fees

Amount escrow into a professional fee escrow account (the "Professional Fee Escrow Account"),

entry into that certain Professional Escrow Agreement (the "Professional Fee Escrow Agreement",

and together with the Agreements, the "Transaction Documents") and the funding of the Wind

Down Amount as provided in section 2.3 of the Asset Purchase Agreement.  The Professional Fee

Escrow Agreement provides for the funding of certain accrued and unpaid professional fees and

expenses incurred prior to the Closing Date consistent with the Final DIP Order and the "Funded

Reserve Amount" and "Funded Reserve Account," each as defined therein.   The Wind Down

Amount will avoid a freefall shutdown of the Debtors' remaining estates, provide for, among other things and in accordance with the Agreements, the payment of payroll, withholding taxes, and other related expenses accrued and unpaid as of the Closing Date, the payment of certain professional fees and expenses incurred after the Closing Date, and funding to implement an orderly and responsible wind-down of the Debtors' estates. Furthermore, the Debtors may use the $2,000,000 of the Wind Down Amount set aside for the benefit of employee severance (as detailed under the definition of Wind Down Amount in the Asset Purchase Agreement) as the Debtors determine in their business judgment.

N.     The Debtors may sell the Acquired Assets free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Liens) because, with respect to each creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of claims, liens, interests or encumbrances that did not object to or that withdrew their objections to the sale of the Acquired Assets or the Motion, are deemed to have consented to the Motion, the Sale, and the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of claims, liens, interests, or encumbrances that did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code or are adequately protected.

O.     None of the Purchasers or their respective affiliates, successors, assigns, equity holders, officers, directors, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Agreements and the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in the Agreements and this Order.

P.      The Transaction Documents were negotiated in good faith and at arm's length.  The Purchasers participated in good faith in the Chapter 11 Cases.

Q.      The Sale Transaction does not constitute a *sub rosa* chapter 11 plan. The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a Chapter 11 plan for any of the Debtors.

R.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Agreements and the other transactions contemplated by the Transaction Documents. The Purchasers, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transaction contemplated by the Agreements at any time after entry of this Order.

S.      On August 26, 2019, the notice of the Motion [Docket No. 173] (the "Notice") was served by first class mail on the parties listed on the proof of service of the Notice filed with this Court.  Notice of the Motion is sufficient notice of the Sale Transaction and no other notice is required.

T.      Parties-in-interest were afforded a full opportunity to participate in the hearing on the Motion and the Sale Hearing.

U.    The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Agreements and other Transaction Documents should be approved.

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted to the extent set forth herein.

2.    Any Objection to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived, or withdrawn or previously overruled, and all reservations of rights included therein, is hereby overruled and denied on the merits.

3.    The Agreements and the Sale Transaction are hereby approved and the Debtors are authorized to enter into and perform under the Agreements and the other Transaction Documents, pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable.  Each of the Debtors and the Purchasers are hereby authorized to take any and all actions necessary or appropriate to consummate the transactions contemplated therein without further order of the Court.

4.    Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the Purchasers or their designees, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchasers or the Debtors as a result of the assumption and assignment of the Assumed Contracts.  The Purchasers or their designees shall have assumed the Assumed Contracts, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed

Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amount (if applicable), neither the Debtors, their bankruptcy estates nor the Purchasers shall have any further liabilities to the non-Debtor counterparties to the Assumed Contracts, other than the Purchasers' obligations under the Assumed Contracts that accrue or become due and payable on or after the Closing Date.

5.    During the Designation Rights Period (as defined in the Asset Purchase Agreement), Purchasers may, in their sole discretion and subject to any agreements between them, designate an executory contract or lease ("Designated Contract" or "Designated Lease"), that has not previously been assumed and assigned or rejected pursuant, or otherwise rejected or terminated for either (x) assumption and assignment to Purchasers or a third party designee, or (y) rejection, in each case by providing written notice to Sellers, pursuant to the Asset Purchase Agreement and the procedures thereunder, and the applicable contract counterparties. So long as such Designated Contracts are properly assumed pursuant to the Asset Purchase Agreement, such assumption shall be effective without further order of this Court.  For the avoidance of doubt, nothing in the Stalking Horse APA or this Order shall supersede, contradict, modify, or override applicable deadlines under section 365(d)(4) of the Bankruptcy Code.

6.    The Debtors' assumption and assignment of the Assumed Contracts is subject to the consummation of the Sale.  To the extent that an objection by a counterparty to any Assumed Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date, the Debtors, with the consent of the Purchasers and in accordance with the Asset Purchase Agreement, may elect to: (a) not assume and assign to the Purchasers the Assumed Contract; (b) postpone the assumption of such Assumed Contract until the resolution of such objection; or (c) reserve the disputed portion of the Cure Amount and assume the Assumed Contract on the

Closing Date. So long as the claimed Cure Amount is held in reserve, and there are no other unresolved objections to the assumption and assignment of the applicable Assumed Contract, the Debtors can, without further delay, assume and assign the Assumed Contract that is the subject of the objection. Under such circumstances, the respective objecting counterparty's recourse would be limited to the funds held in reserve.

7.      For the avoidance of doubt, the Debtors have consensually agreed with the following cure objectors (collectively, the "Cure Notice Objectors") to adjourn the hearing to resolve their respective disputes to the later of (i) the date upon which the Purchasers actually seek to assume such contract or (ii) an omnibus hearing in November: 575 Fifth Office Owner LLC [Docket No. 372]; Precognitive, Inc. [Docket No. 379]; Schindler Elevator Corporation [Docket No. 380]; Epsilon Data Management, LLC [Docket No. 382]; AT&T Corp. [Docket No. 388]; Borderfree, Inc. [Docket No. 389]; Brinks Global Services U.S.A. Inc. [Docket No. 391]; Lalire March Architects LLP [Docket No. 394]; Testingxperts, Inc. d/b/a Damcosoft, Inc. [Docket no. 401]; Primoko, Inc. [Docket No. 408]; Algolia, Inc. [Docket No. 410]; Flagship 600 Owner LLC [Docket No. 412]; Sidney Garber Jewelers, Inc. [Docket No. 413]; Sapient Corp. [Docket No. 416]; Stockton Street Properties, Inc. [Docket No. 417]; Cityview Plaza LLC [Docket No. 419]; LAZ Parking California, LLC [Docket No. 420]; Van Noten Andries NV [Docket No. 424]; Spinelli Kilcollin [Docket No. 428]; Google, Inc. [Docket No. 464]; Oracle America, Inc. [Docket No. 415]; and Plastic Center, Inc. [Docket No. 371].  For the avoidance of doubt, all rights of the Cure Notice Objectors under section 2.8(c) of the Asset Purchase Agreement are reserved, with respect to their filed objections as listed above.

8.      The Purchaser shall assume and perform all obligations under the First Amendment to Amended and Restated License Agreement dated September 18, 2015 among Barney's, Inc.,

BNY Licensing Corp., and Barneys Japan Co., Ltd, including, without limitation, with respect to payments on account of ordinary course accruals and all amounts due thereunder.

9.       Upon assumption of the Assumed Contracts, Designated Contracts, or Designated Leases by the Debtors, and assignment of same to the Purchasers or their designee, the Assumed Contracts, Designated Contracts and Designated Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order. As of the Closing, subject to the provisions of this Order, the Purchasers or their designee shall succeed to the entirety of Debtors' rights and obligations in the Assumed Contracts first arising and attributable to the time period occurring on or after the date the assignment of the Assumed Contracts becomes effective and shall have all rights thereunder.

10.      Subject to paragraphs 4, 5, 7, and 9 of this Order, upon the Closing and entry of this Order, (a) all defaults (monetary and non-monetary) under the Assumed Contracts shall be deemed cured and satisfied through the payment of the Cure Amounts, (b) no other amounts will be owed by the Debtors, their estates, or the Purchasers with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Contracts, Designated Contracts or Designated Leases, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchasers or their designee that any additional amounts are due or defaults exist under the Assumed Contracts, Designated Contracts or Designated Leases that arose or accrued, or relate to or are attributable to the period before the Closing, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time on or prior to the Closing Date.  Assignment by the Debtors of any Assumed Contract, Designated Contract or Designated Lease to the Purchasers or

their designee shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contract, Designated Contract or Designated Lease occurring after such assignment. All counterparties to the Assumed Contracts, Designated Contracts and Designated Leases shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchasers, and at the Purchasers' reasonable cost and expense, any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets; *provided*, such instrument, application, consent, or other document does not alter or modify the terms of such Assumed Contracts, Designated Contracts, or Designated Leases, unless consented to by the applicable counterparty.

11.    Notwithstanding anything to the contrary in the foregoing, in the event of termination of the Program Agreement[5] Comenity Bank ("Comenity") shall be permitted to use the Debtors' trademarks and service marks through the later of (i) July 1, 2020 or (ii) nine (9) months after the last date on which Comenity is required to operate under the existing Program Agreement solely as necessary to administer the private label open-ended credit card accounts and collect the balances due on any accounts pursuant to the Program Agreement.

12.    Notwithstanding anything to the contrary in the foregoing, Comenity, or its successor in interest, shall be permitted to continue the use of the Debtors' un-stylized name in order to process, service, and collect any remaining balances on the private label open-ended credit card accounts until such time as the accounts are fully processed, collected and closed.

---

[5]    The Credit Card Program Agreement dated March 8, 2013 by and between Comenity and Barneys, as amended (the "Program Agreement").

13.     Unless otherwise agreed to by Comenity in a separate written agreement with the Agent and Buyer, the private label credit card offered by Comenity to qualifying Barneys' customers shall cease being accepted for the purchase or return of any merchandise, any Additional Agent Goods or any Designated F&E immediately following the Closing of the Sale.

14.     Notwithstanding anything to the contrary in this Order, the Stalking Horse APA or any other document, the Program Agreement is not being assumed or assigned pursuant to this Order and all rights, remedies, claims, defenses, and other relief arising from or related to the Program Agreement (including, but not limited to, those set forth in paragraphs (12) through (14) above) are expressly preserved and reserved.

15.     Notwithstanding anything to the contrary in the Asset Purchase Agreement, the Agency Agreement, any cure notice or assumption notice, this Order or any document related to any of the foregoing, (i) none of the insurance policies or any related agreements (collectively, the "Chubb Insurance Contracts") issued at any time by any of Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Federal Insurance Company, Chubb Indemnity Insurance Company, Executive Risk Specialty Insurance Company, Great Northern Insurance Company, Vigilant Insurance Company, or their respective affiliates or successors, or any rights, benefits, claims, rights to payments and/or recoveries under the Chubb Insurance Contracts shall be sold, assigned or otherwise transferred to the Purchasers in connection with the Sale and (ii) nothing shall alter, modify or otherwise amend the terms or conditions of the Chubb Insurance Contracts.

16.     Notwithstanding any other provision of this Order or the Asset Purchase Agreement, if the Buyer determines to  designate for assumption a lease covering any of the stores or properties in New York or New Jersey covered by a collective bargaining agreement ("NY/NJ

CBA") with the New York New Jersey Regional Joint Board affiliated with Workers United (the "NY/NJ Union") or otherwise operates such stores or properties, and in the absence of an assumption of the relevant NY/NJ CBA by the Buyer or a consensual resolution between the Buyer and The NY/NJ Union of the employment terms applicable to to employees in such bargaining unit, the debtor will notice a hearing in order for the Court to determine if the designation may take effect in light of relevant successorship clauses in the NY/NJ CBAs and the NY/NJ Union shall retain all rights and remedies available against the Debtor if there is a breach of said successorship clause.

17.     At Closing, all of the Debtors' right, title, and interest in and to, and the possession of, the Acquired Assets shall be immediately vested in the Purchasers or their designees pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. The transfer to the Purchasers or their designees of the Debtors' rights, title, and interest in the Acquired Assets pursuant to the Asset Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Acquired Assets.  All person or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets, are directed to surrender possession of any and all portions of the Acquired Assets to the Purchasers or their respective designees on the Closing or at such time thereafter as the Purchasers may request.

18.     This Order (a) shall be effective as a determination that upon the Closing (i) no claims other than the Assumed Liabilities can be asserted against the Purchasers or any of their respective assets, (ii) the Acquired Assets shall have been transferred to the Purchasers free and clear of all liens, claims, interests, and encumbrances, other than Permitted Encumbrances, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

19.     Subject to the "RTV Rights" set forth in, and as defined in, those certain trade agreements between Sellers, Agent or its affiliates, and certain vendors, the Acquired Assets are sold free and clear of any reclamation rights.  All claims, liens, interests, and encumbrances on Merchandise subject to RTV Rights shall attach to the net available Proceeds of such Merchandise with the same validity, extent, and priority as existing immediately prior to the Closing, subject to the provisions of the Agreements and this Order, and any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.  For the avoidance of doubt, such Merchandise in the foregoing sentence is subject to the RTV Rights set forth in, and as defined in, the trade agreements between Sellers and certain vendors.

20.     The Debtors are authorized and directed, without further notice or relief from this Court and pursuant to Section 2.5(b) of the Asset Purchase Agreement, to, at the Closing, indefeasibly pay, to the DIP Agent for the benefit of the DIP Lenders, proceeds in an amount sufficient to pay, in cash and in full, all DIP Obligations, including without limitation any unpaid principal, interest, expenses, and fees, including the Original Exit Fee, the Additional Exit Fee, the Additional Facility Fee, the Consent Fee and, to the extent payable under the DIP Financing

Agreements and the DIP Order, any Enhancement Fee (each as defined in the DIP Order or the

DIP Financing Agreements, as applicable), and including for the avoidance of doubt all obligations

under the Consignment Facility (as defined in the DIP Financing Agreements), including without

limitation the Work Fee (as defined in Exhibit B to the DIP Financing Agreements).  Such proceeds

shall not constitute property of any Debtor's estate or be subject to claw back or disgorgement.

For the avoidance of doubt, the payment by the Debtors contemplated under this paragraph 20

shall be in full and final satisfaction, compromise, settlement, release, and discharge of all DIP

Obligations (other than any contingent indemnity obligations, expenses incurred but not yet

reimbursed, and any other DIP Obligations, to the extent such obligations by their terms survive

termination of the DIP Financing Agreements, if any) and further, upon the payment contemplated

under this paragraph 20, the DIP Obligations (including all obligations, and/or liabilities of the

Debtors with respect to the DIP Agent and DIP Lenders) shall be deemed satisfied in full,

extinguished on a final basis (other than any contingent indemnity obligations, expenses incurred

but not yet reimbursed, and any other DIP Obligations to the extent such obligations by their terms

survive termination of the DIP Financing Agreements, if any), and the DIP Financing Agreements

(as defined in the DIP Order), and all documents related thereto, shall terminate and be of no

further force and effect (other than any contingent indemnity obligations, expenses incurred but

not yet reimbursed, and any other provisions of the DIP Financing Agreements to the extent such

provisions and/or obligations by their terms survive termination of the DIP Financing Agreements,

if any).

21.    The creation and funding of the Professional Fee Escrow Account is approved

pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors and the other parties

thereto are authorized, without further notice or relief from this Court, to enter into the Professional

Fee Escrow Agreement, take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Professional Fee Escrow Agreement, including engaging applicable escrow agents and to make or authorize the payments contemplated in connection therewith. Funds deposited in accordance with the Professional Fee Escrow Agreement shall not constitute property of any Debtor's estate or be subject to claw back or disgorgement, and such funds (including any residual funds) may be released and applied in accordance with the terms thereof, upon entry of an order of this Court approving such fees and expenses on a final basis. For the avoidance of doubt, the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Sellers' retained professionals and those professionals retained by the Committee.

22.     The Asset Purchase Agreement has been entered into, and the Sale Transaction contemplated under the Asset Purchase Agreement is undertaken, by the Purchasers without collusion and in good faith, and the Purchasers are a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m). Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption and assignment of the Assigned Contracts), unless such authorization and consummation of such Sale Transaction are duly and properly stayed pending such appeal. The Purchasers are entitled to all of the protections afforded by Bankruptcy Code section 363(m).

23.     Neither the Debtors nor the Purchasers have engaged in any action or inaction that would cause or permit the Sale Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. The consideration provided by the Purchasers for the Acquired Assets under the Asset Purchase Agreement shall be deemed for all purposes to

constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

24.    The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement does not have a material adverse effect on the Debtors' estates and the parties provide at least three (3) business days' notice to the Committee of any such modifications, amendments, supplements, or restatements.

25.    None of the Purchasers or any of their respective affiliates, members, successors, assigns, equity holders, officers, directors, employees or professionals (each such entity individually and taken together, the "Buyer Group") shall be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale Transaction contemplated by the Asset Purchase Agreement, or the transfer, operation, or use of the Acquired Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors, including a "successor employer" for the purposes of the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or other applicable laws (other than, for the Purchasers, with respect to obligations as an assignee under the Assigned Contracts arising after the Closing), (b) have any responsibility or liability for any obligations of Sellers, or any affiliate of Sellers based on any theory of successor or similar theories of liability, (c) have, de facto or otherwise,

20

merged with or into the Debtors, (d) be an alter ego or a mere continuation or substantial continuation of the Debtors (and there is no continuity of enterprise between the Purchasers and any Sellers) including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, ERISA, tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation, or (e) be holding itself out to the public as a continuation of any Sellers or their respective estates.

26.    The Purchasers shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets other than as expressly set forth in the Asset Purchase Agreement or (b) any claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Asset Purchase Agreement with respect to the Purchasers, the Purchasers shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets or the Agency Agreement Assets prior to the Closing. Except to the extent expressly included in the Assumed Liabilities with respect to the Purchasers, the Purchasers shall

have no liability or obligation under (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the "NLRA"), or (f) any foreign, federal, state, or local labor, employment (including any rights under any pension, multiemployer plan (as such term is defined in Section 3(37), or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability) or environmental law, by virtue of the Purchasers' purchase of the Acquired Assets, the conduct of the Sale, the consummation of the other Sale Transactions, the sale of the Agency Agreement Assets, or assumption of the Assumed Liabilities. Without limiting the foregoing, the Buyer Group shall have no liability or obligation with respect to any (and there is no continuity of enterprise between any Purchaser and any Seller) liabilities of the Debtors or any environmental liabilities associated with the Purchase Assets except to the extent they are expressly identified as Assumed Liabilities set forth in the Asset Purchase Agreement. The Purchasers shall have no liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets prior to the Closing.

27.    Each and every federal, state, and governmental agency, department, or official, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transactions contemplated by the Agreements.  Nothing in this Order or the Agreements releases, nullifies, precludes, or

enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.

28.    To the maximum extent permitted by applicable law, and in accordance with the Agreements, the Purchasers shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the Debtors with respect to the Acquired Assets and the Sale.  To the extent the Purchasers cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Purchasers, with assistance from the Debtors, work promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Purchasers.  The Debtors shall maintain the Licenses, at the sole cost and expenses of Purchaser, in good standing to the fullest extent allowed by applicable law for the Purchasers' benefit until equivalent new Licenses are issued to the Purchasers.

29.    Notwithstanding anything in this Order, subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets or the Agency Agreement Assets sold, transferred, or conveyed to the Purchasers on account of the filing or pendency of these Chapter 11 Cases, the conduct of the Sale, or the consummation of the Sale Transactions contemplated by the Agreements.

30.    The terms and provisions of the Agreements and this Order shall be binding in all respects on the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Acquired Assets, all counterparties to the Assigned Contracts, the Purchasers, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s),

examiner(s), or receiver(s) appointed in any of the Debtors' Chapter 11 Cases or upon conversion to Chapter 7 cases under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Agreements shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders or members, or any trustee(s), examiner(s), or receiver(s). Any trustee appointed in these cases (including a Chapter 7 trustee) shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and the Agent and any such trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of the trustee without the need for further order of this or any other Court.

31. Subject to the restrictions set forth in this Order and the Agreements, the Debtors and Purchasers hereby are authorized to take any and all actions as may be necessary or desirable to implement the Sale Transactions, and any actions taken by the Debtors and/or Purchasers necessary or desirable to implement the Sale Transactions prior to the date of this Order, hereby are approved and ratified.

32. The Agency Agreement and each of the transactions contemplated therein, including but not limited to conducting the Sale pursuant to the Agency Agreement and reaching an agreement and resolution regarding the Final Reconciliation contemplated by the Agency Agreement, which agreement and resolution shall be binding on all parties, is approved in its entirety and incorporated herein by reference. Following Closing, Agent shall be deemed to be the Debtors' exclusive agent for the purpose of conducting the Sale and selling the Merchandise, Designated F&E, and any other assets to be sold pursuant to the Agency Agreement ("Agency Agreement Assets"), free and clear of all claims, liens, interests or encumbrances thereon, except

as otherwise provided herein. The failure to include specifically any particular provision of the Agency Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Agency Agreement and all of its provisions, payments and transactions, be authorized and approved in their entirety.

33.    Subject to the provisions of this Order, the Debtors and Agent are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sale in accordance with the Agency Agreement and the Sale Guidelines annexed to the Agency Agreement as Exhibit 8.1, which Sale Guidelines are hereby approved in their entirety.

34.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors and Agent and each of their respective officers, employees, and agents are hereby authorized to execute such documents and to do such acts as are necessary or desirable to carry out the Sale in accordance with the Agency Agreement and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein. Any officer of the Debtors is authorized to act on behalf of the Debtors in connection with the Sale and no other consents or approvals are necessary or required for the Debtors to carry out the Sale and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

35.    Except as otherwise provided in the Agency Agreement and subject to any provision herein to the contrary, including pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtors and Agent (as applicable) are authorized to sell or cause to be sold or otherwise dispose of all Agency Agreement Assets free and clear of any and all claims, liens, interests or encumbrances, subject in all respects to the Agency Agreement and this Order. For the sake of clarity, however, nothing in this paragraph is intended to diminish the liens in favor of Agent, as

reflected in the Agency Agreement and this Order, that attach to, among other things, the Proceeds of the Sale.

36.     If any person or entity that has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreements evidencing claims, liens, interests or encumbrances, in or against the Acquired Assets or Agency Agreement Assets (other than the liens on Agency Agreement Assets and Proceeds granted to Agent pursuant to the Agency Agreement and this Order) shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Encumbrances which the person or entity has with respect to such assets, (a) each such person or entity is hereby directed to deliver all such statements, instruments and releases; (b) the Debtors and the Purchasers are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity asserting the same; and (c) the Purchasers are hereby authorized to file a copy of this Order, which, upon filing, shall be conclusive evidence of the release and termination of such claims, liens, interests or encumbrances, as applicable.  Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sale and related transactions contemplated by the Agreements and this Order.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

37.     Upon Closing, all entities that are presently in possession of some or all of the Acquired Assets or Agency Agreement Assets are directed to surrender possession of such Acquired Assets or Agency Agreement Assets to the applicable Purchaser.

38.     Unless otherwise ordered by this Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtors and Agent to consummate the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency Agreement, in accordance with the Agency Agreement, the Sale Guidelines, and this Order.

39.     Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit (as defined in section 101(27) of the Bankruptcy Code) under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or the Agency Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.  Nothing contained in this Order or in the Agency Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Purchaser or the Agent is an operator with respect to any environmental law or regulation.  Moreover, the Sale shall not be exempt from, and the Agent shall be required to comply with, all applicable federal, state, and local laws, regulations

and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws").  Nothing in this Order shall alter or affect the Debtors' and Agent's respective obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Order shall be deemed to bar any governmental unit from enforcing Applicable General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's rights to assert in that forum or before this Court that any such laws are not in fact Applicable General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise.  Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code, and nothing in this Order shall be deemed to have made any ruling on any such issues.

40.    To the extent that the Sale is subject to any applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting, including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to Sale (each a "Liquidation Sale Law" and, together, the "Liquidation Sale Laws"), the following provisions shall apply:

    a.   Provided that the Sale is conducted in accordance with the terms of this Order, the Agency Agreement, and the Sale Guidelines, and in light of the provisions in the laws of many governmental units that exempt court-ordered sales from their provisions, the Debtors and Agent shall be presumed to be in compliance with any Liquidation Sale

Laws and, subject to the limitations set forth herein, are authorized to conduct the Sale in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any Liquidation Sale Laws.

b. Within three (3) days of entry of this Order, the Debtors, at Purchasers' sole cost and expense, shall serve copies of this Order, the Agency Agreement and the Sale Guidelines via e-mail, facsimile, and/or regular U.S. mail, on (i) the Attorney General's office for each state where the Sale is being held, (ii) the county consumer protection agency or similar agency for each county where the Sale will be held, (iii) the division of consumer protection for each state where the Sale will be held; and (iv) the chief legal counsel for each local jurisdiction where the Sale will be held.

c. To the extent there is a dispute arising from or relating to the Sale, this Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), this Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtors and counsel for the Purchasers at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter. If the Debtors, the Purchasers, and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d. In the event a Dispute Resolution Motion is filed, nothing in this Order shall preclude the Debtors, a landlord, the Purchaser, the Agent or other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of this Order, nor the Debtors', the Purchaser's or the Agent's conduct pursuant to this Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sale pursuant to this Order and the Agency Agreement, absent further order of this Court. This Court grants authority for the Debtors and the Agent to conduct the Sale pursuant to the terms of this Order, the Agency Agreement, and/or the Sale Guidelines attached hereto and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e. If, at any time, a dispute arises between the Debtors, the Purchaser and/or the Agent and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Order related to Liquidation Sale Laws, then any party to that dispute may utilize the provisions of Subparagraphs (b) and (c) hereunder by serving a notice to the other party and proceeding thereunder in

accordance with those Paragraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made de novo.

f.  Any actual, reasonable, and necessary out-of-pocket costs or expenses incurred by the Debtors, in consultation with the Purchasers, in defense of, or related to, a Reserved Dispute, shall be fully reimbursed on a dollar for dollar basis by the Purchasers.  The Debtors and Agent shall consult with one another with respect to the defense of or other response to any Reserved Dispute.

41.    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Sale, to the extent that disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner advertising and the Debtors and the Agent are unable to resolve the matter consensually with the applicable governmental unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially within five (5) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

42.    Except to the extent of the reserved rights of governmental units expressly granted elsewhere in this Order, the Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Sale without necessity of further order of this Court as provided in the Agency Agreement or the Sale Guidelines, including, but not limited to, advertising the Sale as a "going out of business," "total liquidation," "store-closing" or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), and use of signwalkers and street signage, each subject to the Agency Agreement and Sale Guidelines.

43.    Except as expressly provided in this Order, the Agency Agreement, and any Side Letter (as defined below), the Sale shall be conducted by the Debtors and the Agent

notwithstanding any restrictive provision in any lease, sublease, license or other agreement relative to occupancy, abandonment of assets or "going dark" provisions or other provisions that purport to prohibit, restrict or otherwise interfere with the conduct of the Sale.  The Agent and landlords of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines, to the extent such modifications do not have an adverse economic effect on the Debtors, without further order of this Court, and such Side Letters shall be binding on the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 31 through 33 hereof.  In the event of any conflict between the Sale Guidelines and any Side Letter, or between this Order and any Side Letter, the terms of such Side Letter shall control.

44.    Except as expressly provided for herein or in the Sale Guidelines (as such Sale Guidelines may be modified by a Side Letter with an applicable landlord), and except with respect to any Governmental Unit (as to which Paragraphs 30 and 31 hereof shall apply), no person or entity, including but not limited to any landlord, licensor, or creditor shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such Sale, and all such parties and persons of every nature and description, including landlords, licensors, creditors and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise impeding, the conduct of the Sale and/or (ii) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the Stores

and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

45.    The Agent shall have the exclusive right to use the Stores and all related store services, furniture, fixtures, equipment and other assets of the Debtors, as set forth in the Agency Agreement, for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as such Sale Guidelines may be modified by a Side Letter with an applicable landlord), the Agency Agreement, and this Order.

46.    Except as otherwise provided in this Order or in the Sale Guidelines (as such Sale Guidelines may be modified by a Side Letter), nothing in the Agency Agreement shall in any way alter or affect any rights or obligations under the leases in accordance with the terms of the leases, the Bankruptcy Code, or any order of this Court; *provided* that the conduct of the Sale in accordance with the Sale Guidelines and this Order shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

47.    In connection with a motion by the Debtors to reject any lease, pursuant to section 554(a) of the Bankruptcy Code, the Debtors and the Agent are permitted to abandon property of the Debtors' estates in accordance with the terms and provisions of the Agency Agreement, without incurring liability to any person or entity; *provided however*, that the Debtors may only abandon property in any Store or Distribution Center with the consent of the Agent (such consent not to be unreasonably withheld). If the Debtors make a request to abandon property and the Agent fails to response within five (5) Business Days, such failure to respond shall be deemed consent to the abandonment of the applicable property  In the event of any such abandonment, all applicable landlords and the Agent shall be authorized to dispose of such property without any liability to any individual or entity that may claim an interest in such abandoned property, and such abandonment

shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtors or any other party in interest to object thereto.

48.    Before any sale, abandonment, or other disposition of the Debtors' computers (including software) and/or cash registers and any other point of sale Designated F&E located at the Stores (collectively, "POS Equipment") that may contain customer lists, identifiable personal and/or confidential information about the Debtors' employees and/or customers, or credit card numbers, ("Confidential Information") takes effect, Agent (in the case of a sale or other disposition of POS Equipment by Agent) or the Debtors (in the case of abandonment of POS Equipment) shall use commercially reasonable efforts to remove or cause to be removed the Confidential Information from the POS Equipment.

49.    Agent shall accept the Debtors' gift certificates, gift cards, return credits, and similar merchandise credits issued by the Debtors (collectively, "Gift Certificates") for a period of seven (7) days from and including the Sale Commencement Date; *provided*, *however*, the Agent shall not be required to accept any mall and/or landlord-issued gift cards, gift certificates, merchandise credits or other similar items unless satisfactory arrangements are made between and among the Agent, the Debtors, and the issuer of such items for reimbursement to the Agent and the Debtors for all such amounts honored during the Sale Term.  Thereafter, Agent shall have no obligation to accept Gift Certificates.  The Agent shall not sell any certificates or gift cards and the Agent shall not accept coupons or honor any other employee or other discounts.  During the Weekly Sale Reconciliation provided for in Section 8.7 of the Agency Agreement, the Debtors shall reimburse the Agent in cash, from the Wind Down Amount, for Gift Certificates redeemed during the Sale Term.

50.     The Agent shall accept returns of goods sold by the Debtors prior to the Closing for a period of seven (7) days from and including the Sale Commencement Date, *provided* that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by the Agent.  Thereafter, Agent shall have no obligation whatsoever to accept returns of goods sold by the Debtors prior to the Closing.  For refunds issued in respect of each item of Returned Merchandise, that is first quality finished goods capable of being sold at normal retail price, the Debtors shall promptly reimburse Agent in cash from the Wind Down Amount during the Weekly Sale Reconciliation for the difference between (x) the refund Agent is required to issue to customers in respect of each such item of Returned Merchandise and (y) a cost value to be mutually agreed upon by Agent and the Debtors for each such item of Returned Merchandise.  For refunds issued in respect of Returned Merchandise that is not first quality finished goods capable of being sold at normal retail price, but nonetheless capable of being resold, the Debtors shall promptly reimburse Agent in cash from the Wind Down Amount during the Weekly Sale Reconciliation the difference between (x) the refund Agent is required to issue to customers in respect of each such item of Returned Merchandise and (y) a cost value to be mutually agreed upon by Agent and the Debtors for each such item of Returned Merchandise.  Except to the extent that the Debtors and Agent agree that the Debtors' POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

51.     All sales of Merchandise, Designated F&E, and Additional Agent Goods pursuant to the Agency Agreement will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  All sales by Agent pursuant to the Agency Agreement will be made

only for cash or nationally recognized bank credit cards (or, only during the first seven days of the

Sale Term and subject in all respects to paragraph 40 above, Gift Certificates).  Notwithstanding

the foregoing, all state and federal laws relating to implied warranties for latent defects shall be

complied with and are not superseded by the sale of said goods or the use of the terms "as is" or

"final sales."  The Agent shall accept return of any goods purchased during the Sale that contain a

defect which the lay consumer could not reasonably determine was defective by visual inspection

prior to purchase for a full refund, *provided* that (i) the consumer must return the affected good(s)

within twenty-one (21) days of their purchase, (ii) the consumer must provide a receipt, and (iii)

the asserted defect must in fact be a "latent" defect.

52.      During the Sale Term, the Agent shall be granted a limited license and right to use

all Intellectual Property for purposes of conducting the Sale.

53.      The Agent shall be permitted to include Additional Agent Goods in the Sale in

accordance with the terms and provisions of the Agency Agreement.  Any transactions relating to

the Additional Agent Goods are, and shall be construed as, a consignment from Agent to Debtors.

Debtors acknowledge that the Additional Agent Goods shall be consigned to Debtors under Article

9 of the Uniform Commercial Code in effect in the State of New York (the "UCC").  Subject to

the terms set forth in the Agency Agreement, Agent is hereby granted a first priority security

interest (the "Agent Lien") in (i) the Additional Agent Goods and (ii) the proceeds realized upon

the sale or disposition of the Additional Agent Goods in the Sale, which security interest shall be

deemed perfected pursuant to this Order without the requirement of filing UCC financing

statements or providing notifications to any prior secured parties (*provided* that Agent is hereby

authorized to deliver any notices and file any financing statements and amendments thereof under

the applicable UCC identifying Agent's interest in the Additional Agent Goods (and any proceeds

from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Agent's security interest in such Additional Agent Goods and proceeds thereof).

54.     Except as expressly provided in the Agreements, nothing in this Order, and none of the Purchaser's or Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Purchaser or Agent of any of the Debtors' obligations relating to any of the Debtors' employees.    Moreover, unless provided for in the Asset Purchase Agreement or Agency Agreement, neither the Purchaser nor the Agent shall become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.   Neither Purchaser, Agent nor any entity comprising Purchaser or Agent is or shall be a mere continuation of the Debtors or otherwise subject to successor liability in connection with any of the Assets.

55.     During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Goods, as indicated on the Debtors' point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and Additional Agent Goods and collected by Agent, on the Debtors' behalf, at the time of sale, as set forth in the Agency Agreement.  Such Sales Taxes shall be paid to the Taxing Authorities by the Debtors as set forth in the Agency Agreement. All Sales Taxes shall be deposited into a segregated account designated by the Debtors and Agent solely for the deposit of such Sales Taxes. The Debtors are directed to remit all Sales Taxes arising from the Sale to the applicable taxing authorities as and when due, *provided* that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the taxing authority.  For the avoidance of doubt, Sales Taxes collected and held in trust by the Debtors

shall not be used to pay any creditor or any other party, other than the taxing authority for which the Sales Taxes are collected.  This Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

56.    Subject to the terms set forth in the Agency Agreement, the Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Assets among the Stores and the Distribution Center.  The Agent is authorized to sell or cause to be sold or otherwise dispose of the Designated F&E and abandon the same, in each case, as provided for and in accordance with the terms of the Agency Agreement.

57.    Upon the Closing and satisfaction of the conditions precedent in Section 10(b) of the Agency Agreement, the Debtors shall hold the Agency Agreement Assets, and all proceeds thereof that may be in the Debtors' possession and/or control from time to time, in trust for the benefit of Agent as required under the Asset Purchase Agreement and Agency Agreement.  To the extent that any Agency Agreement Assets or proceeds thereof are ever determined to constitute property of the Debtors' estates, Agent shall have, pursuant to section 364(d) of the Bankruptcy Code, a senior lien on such Agency Agreement Assets and all proceeds thereof.  The Designated Deposit Account and all funds on deposit therein from time to time after the Closing shall be held in trust for the benefit of Agent, and to the extent the Designated Deposit Account or any funds on deposit therein are deemed to be property of the Debtors' estates, Agent shall have a first priority senior security interest in each Designated Deposit Account and all funds on deposit in such accounts from and after the Closing.  The liens granted pursuant to this paragraph shall be automatically perfected pursuant to this Order and the Purchaser is expressly authorized to take

any action Purchaser deems appropriate to perfect and enforce such liens, without further order of this Court.

58.     Upon the Closing and satisfaction of the conditions precedent in Section 10(b) of the Agency Agreement, until all Agency Agreement Assets have been sold or otherwise disposed of, and solely to the extent that any Agency Agreement Assets or Proceeds are, notwithstanding the provisions of this Order, subsequently determined to constitute property of the Debtors' estates, Agent shall have a superpriority administrative expense claim against the Debtors to the extent of any amounts owing from the Debtors to Agent in connection with the Agency Agreement until all such amounts have been indefeasibly paid in full, subject to the right of any party in interest to object to the allowance of such claim if asserted.

59.     The Debtors shall use Wind Down Amount strictly in accordance with the Wind Down Budget or as otherwise agreed to with the Purchasers.  Purchasers shall neither have nor incur any obligation to advance or fund any amounts to or for the Debtors except as set forth in, and subject in all respects to, the Agency Agreement, Asset Purchase Agreement, and the Wind Down Budget.  Any amendment to or other modification of the Wind Down Budget shall only be effective upon approval by the Debtors and the Agent in their respective sole discretion.  For the avoidance of doubt, the Surplus Cash Amount shall not be subject to the Wind Down Budget.

60.     To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), Agent may, at its election and without further order of this Court, take title to such Merchandise in its own name or designate a party to take title to such Merchandise, without further consideration to the Debtors, free and clear of all liens, claims, and encumbrances. Agent and its affiliates or designees shall be authorized to sell or cause to be sold or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other Intellectual Property

intact, and shall be authorized to advertise the sale of the Remaining Merchandise using the Intellectual Property.

61.    Upon the Closing and satisfaction of the conditions precedent in Section 10(b) of the Agency Agreement, except as otherwise set forth in the Agency Agreement, all Proceeds of the Sale, including but not limited to all Proceeds arising from the sale, lease, licensing, assignment, or other disposition of any of the Agency Agreement Assets, shall be the sole property of Agent, and Agent shall be entitled to retain all Proceeds for its own account, subject to any agreements between or among any of the entities comprising Agent and any other Purchasers. Upon the Closing and satisfaction of the conditions precedent in Section 10(b) of the Agency Agreement, any Proceeds received by, or otherwise in the possession of, the Debtors at any time shall be segregated and held strictly in trust for the benefit of Agent, shall not be commingled with the Debtors' own assets, and, as such, shall not become property of the Debtors' bankruptcy estates pursuant to and consistent with 11 U.S.C. § 541(b)(1), and shall be paid over to Agent immediately.

62.    At the Closing, the Escrow Agent shall release the Escrow Amount from escrow for application to the Cash Purchase Price pursuant to Section 2.5(a)(ii) of the Asset Purchase Agreement.

63.    The Agreements and the Sale Transaction contemplated hereunder shall not be subject to any bulk transfer or any similar law of any state or jurisdiction.

64.    Pursuant to Section 17.6 and Footnote 6 of the Agency Agreement, a contractual joint venture comprised of (a) GA Retail, Inc., a wholly owned indirect subsidiary of B. Riley Financial, Inc., (b) Hilco Merchant Resources, LLC, and (c) Tiger Capital Group, LLC, is hereby substituted for B. Riley Financial, Inc. and Great American Group LLC as a party to the

Agreements.  All references to "Agent" herein and in the Agreements are hereby deemed to refer to such contractual joint venture.

65.     To the extent this Order is inconsistent with any prior order or pleading filed in the Chapter 11 Cases, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the Agreements, the terms of this Order shall govern.

66.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, the Agreements, and the other Transaction Documents, and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

67.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

68.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Order are immediately effective and enforceable upon its entry and the Debtors and the Purchasers are authorized to close the Sale Transaction upon entry of this Order.

69.     The Debtors, Buyer, and Agent are authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order, the Agreements, and the other Transaction Documents.

70.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, the Agreements, and the other Transaction Documents.



**Dated: November 1, 2019**
**        Poughkeepsie, New York**

**/s/ Cecelia G. Morris**
_____
**Hon. Cecelia G. Morris**
**Chief U.S. Bankruptcy Judge**