19-36300-cgm    Doc 587    Filed 12/12/19    Entered 12/12/19 15:46:08    Main Document
Pg 1 of 11


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | ) |
|  | ) Chapter 11 |
| BARNEYS NEW YORK, INC., ET AL. | ) Case No. 19-36300 (CGM) |
|  | ) (Jointly Administered) |
| Debtor | ) |

### FEDEX CORPORATE SERVICES, INC.'S OBJECTION TO REVISED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF BARNEYS NEW YORK AND ITS DEBTOR AFFILIATES

FedEx Corporate Services, Inc. ("FedEx"), by and through its undersigned counsel, hereby objects to the approval of the *Revised Disclosure Statement for the Joint Chapter 11 Plan of Barneys New York and its Debtor Affiliates* [D.E. 579] (the "Disclosure Statement"). In support hereof, FedEx states as follows:

### Introductory Statement

It is beyond dispute that these chapter 11 cases are administratively insolvent. And the Disclosure Statement indicates that the administrative insolvency is massive. In the Debtors' own estimation, it is unlikely they will pay more than 40 cents on the dollar to administrative claim holders, effectively making the administrative claim holders involuntary DIP lenders holding bad debt. In spite of the crumbling estate, the Disclosure Statement fails to provide adequate information to enable creditors to determine whether to accept or reject the proposed plan (the "Plan"). The Plan itself cannot be confirmed, because it fails to comply with the most basic requirements for confirmation. At the December 18, 2019 hearing on the Disclosure Statement, the Debtors should be prepared to discuss alternative resolutions to these chapter 11 cases.

1

**Relevant Background**

1.     On August 6, 2019 (the "Petition Date"), each of the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors remain in possession of their estates, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. On November 15, 2019, the Debtors filed a plan and disclosure statement. [D.E. 527 and 528].

2.     Also on November 15th, the Debtors filed their October 2019 Monthly Operating Report [D.E. 532] (the "October MOR"). The October MOR indicates that the Debtors were operating at a large net loss of nearly $20 million in a single month, with "Chapter 11 Restructuring Charges" accounting for $21 million in expenses. See *October MOR*, p.12. The October MOR also indicates that the Debtors had delinquencies in post-petition payables. Id. at p.17. This suggests that "restructuring charges" rendered the Debtors administratively insolvent, and the Debtors have been aware of this since well before they filed their Plan.

3.     On December 19, 2019, FedEx filed its *Motion for Allowance and Payment of Chapter 11 Administrative Expense*, documenting its **$1,090,057.18** in unpaid post-petition shipping services.[1] In the time since FedEx filed its motion, other parties have filed similar motions, suggesting that numerous parties remain unpaid for post-petition goods or services. See D.E. 542 and 580. FedEx also holds a $2,263,805.82 general unsecured pre-petition claim. Claim No. 701.

4.     The Disclosure Statement describes a plan in which administrative expense claimants will receive 40% of their claims at most, and perhaps 10% or less. *Disclosure*

---

[1] As a result of the Debtor's conduct, additional post-petition shipping charges may become past-due prior to any hearing on that motion. FedEx reserves the right to provide an amended schedule of post-petition amounts due, including the applicable debtor-party.

2

1383314

*Statement*, Art. III, sec. E. While administrative creditors wait several months for what is likely to be a tiny payout on their claims, the Debtors and their professionals will continue to operate for the benefit of the Debtors' remaining employees, the DIP Lender, the purchaser of the Debtors' assets, and the Debtor's professionals. It appears that the Debtors' professionals will be paid in full. At base, the Plan proposes to conduct a wind-down of non-debtor, non-estate assets, but asks the Court to provide its imprimatur to that process and also approve non-debtor releases.

### Objection

5. To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, FedEx reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan. Furthermore, to the extent FedEx is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan, which may be filed after any Disclosure Statement or Plan confirmation objection deadline, FedEx reserves its rights to object thereto.

6. Section 1125 of the Bankruptcy Code prohibits the solicitation of votes on a reorganization plan prior to court approval of a written disclosure statement that contains "adequate information." See 11 U.S.C. § 1125(b). "Of prime importance in the reorganization process is the principle of disclosure." *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).

7. The requirement of "adequate information" is designed to help creditors in their negotiations with debtors over the plan. See *Century Glove, Inc. v. First American Bank*, 860 F.2d 94, 100 (3d Cir. 1988); *In re Ferretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991) (a disclosure statement

1383314

must provide "adequate information" to creditors to enable them to determine whether to accept or reject a proposed plan). The Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan" 11 U.S.C. § 1125(a)(1).

8. A disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives so that they can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Put simply, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *Ferretti*, 128 B.R. at 19.

9. A disclosure statement must also describe a confirmable plan. *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). "If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile." Id. at 115-16.

10. The Disclosure Statement is deficient in the following ways:

   a. <u>It fails to provide any detailed financial information about the Debtors' past operations in chapter 11</u>. This information would explain how the Debtors' estates became deeply administratively insolvent in a short period of time, and provide a clue as to whether the continued operation of the estates by the same parties who brought them into insolvency would be in the best interests of administrative creditors (who are essentially the "fulcrum security" in these cases).[2]

---

[2] The Plan proposes that the Plan Administrator will be M-III Advisory Partners, LP, the Debtors' pre- and post-petition financial advisor. *Disclosure Statement*, Art. II.

4

1383314

   b. <u>It fails to provide any information on the Debtors' current cash positions, broken out by Debtor</u>. That information would include an explanation of whether or not each Debtors' cash is encumbered, by whom, and on what basis. The estates are not substantively consolidated, so the Debtors cannot simply offer consolidated information in the Disclosure Statement.

   c. <u>It fails to project the Debtors' future cash receipts</u>. That information would include an explanation of the source of future receipts and disbursements up to the closure of the case, such that a creditor could determine whether the Debtors' projections are reasonable or feasible. The Debtors' "Corporate Wind Down Budget," attached to the Disclosure Statement, is less of a budget and more of a wish-list of nearly $25 million in costs and fees the Debtors would like permission to favor over chapter 11 administrative creditors. It is worth noting here that the Debtors' own press release announcing its DIP financing, stated that the Debtors "will pay trade vendors, manufacturing partners and suppliers for goods and services provided on or after the filing date, August 6, 2019." <u>See</u> Stretto Barneys New York website: http://case.stretto.com/barneys.

   d. <u>It fails to explain, in simple terms, why administrative creditors should agree to be paid a small, perhaps nonexistent dividend on their claims, while the Debtors' professionals are paid separately</u>. That information would include, as above, why portions of the Debtors' remaining assets, including the future proceeds from continuing wind-down operations and liquidation sales, are earmarked for professionals. If the explanation is that those assets now belong to the DIP Lender, the Purchasers of the Debtors' assets, and/or the Debtor's pre-petition secured creditors, the Disclosure Statement should further explain why an administratively

5

insolvent bankruptcy estate should be allowed to continue in chapter 11 for the benefit of those parties with no additional benefit to the administrative creditors, let alone the unsecured creditors.

   e. <u>It fails to explain the source of funding for the Professional Fee Escrow Account</u>. Specifically, the Plan proposes that:

> ***the Debtors shall fund*** the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. ***Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors***. <u>See</u> *Plan*, Art. II, sec. B(2) (emphasis added).

The Disclosure Statement does not explain where the cash the Debtors will use to fund the account comes from. This information is key if creditors are to determine whether they are being treated fairly under the Plan (see below). While the Disclosure Statement explains that the "Purchasers . . . agreed to fund a $27 million wind down budget . . ." if this money never was and never will be property of the estate, there is no reason to accomplish the wind-down through a plan. The case can be dismissed and the Purchasers can spend their money however they see fit.

   f. <u>It fails to explain, in simple terms, how the Debtors can offer the release of certain claims, when the Debtors sold those claims to the purchaser of the Debtors' assets</u>. The Plan might benefit certain of the unsecured creditors (some of whom may also be administrative creditors) if they were granted releases from preference or fraudulent transfer liability. However, upon information and belief, the Purchasers acquired those claims, so the Debtors cannot release

6

1383314

them. And the same result could be accomplished by dismissing the cases. See 11 U.S.C. § 546(a)(2).

      g.    <u>It fails to explain in detail the value of the released claims</u>. The Plan proposes to release the following parties: "(a) the DIP Parties; (b) the Committee and each of its members; (c) the Plan Administrator; (d) each Holder of an Administrative Claim, Priority Tax Claim, Other Priority Claim, Prepetition Secured Claim, and General Unsecured Claim that votes to 8 accept or does not object to the Plan," as well as various officers, directs, board members, advisors, and other parties. See *Plan*, Art. I sec. A(44). However, nowhere in the Disclosure Statement do the Debtors provide any analysis for the value, viability, or recoverability of what may be numerous claims or causes of action on disparate legal theories (e.g., preferences, lender liability, breach of fiduciary duty, section 363(n) claims).

11.    Curing the above deficiencies would only be a step in the direction of sufficient disclosure.

12.    In addition to the above Disclosure Statement deficiencies, the Plan it proposes cannot be confirmed for the following reasons:

      a.    <u>The Plan proposes to pay administrative creditors less than 100% of their claims in cash on the effective date</u>. Section 1129(a)(9)(A) provides that a plan must, "with respect to a claim of a kind specified in section 507(a)(2)" unless holders of such claims agree otherwise, pay such claims in cash on the effective date. The Plan does not do so. It would be overly optimistic, based on the lack of information in the Disclosure Statement, to assume that not a single administrative creditor will object and every administrative creditor will agree to the Plan.

7

    b. <u>The Plan unfairly discriminates against creditors that are, or should be, in the same class</u>.  Section 1129(b) provides that if a plan complies with the requirements of section 1129(a) (which this Plan does not), it may be confirmed if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." "The purpose of the requirement is to ensure that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014)   The Plan fails to meet that requirement in several ways:

      i. <u>First</u>, it creates disparate treatment for claims *within* the Administrative Claim (and Priority Tax Claim) class. Only administrative claimants and priority tax claimants that *do not object* to the Plan will be "deemed a Released Party for all purposes" under the Plan.  <u>See</u> *Plan*, Art. IV, sec. B.

      ii. <u>Second</u>, the Plan creates disparate treatment for Administrative Claims and wind-down expenses, despite the fact that those expenses should have the same priority under the code.  In other words, the Debtors create an arbitrary distinction between past unpaid administrative expenses (which they propose to pay a small dividend), and future administrative expenses (which they deem "wind-down expenses" and propose to pay in full).

      iii. <u>Finally</u>, the Plan creates disparate treatment for Administrative Claims and Professional Fee Claims, despite the fact that those claims have the same priority under section 507(a)(2) and 503(b).  <u>See</u> <u>id.</u> at Art. II, sec. B(2).  The Plan even proposes to fund a "Professional Fee Escrow Account," with such funds inexplicably being deemed *not property of the estate or the wind-down debtors*, and exclusively available to the professional fee claimants until those claims are paid in full, at which point, again inexplicably, the remaining

funds come ***back into the estate*** as distributable cash. If these funds are not, never were, and likely never will be property of the estate, the Plan essentially has no bankruptcy purpose. See *supra*, ¶10(e).

        c.    <u>The non-debtor releases are likely prohibited in a liquidating plan</u>. The Plan proposes to release various non-debtor parties (*Plan*, Art. VIII, sec. E, "Third Party Release"), but fails to provide an adequate explanation of (*supra*, ¶10(e)) or basis for those releases. In the Second Circuit, it is unlikely that non-debtor releases are allowed in a ***liquidating*** plan, which the Debtors' Plan undoubtedly is. "[I]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's ***reorganization*** plan." <u>See</u> *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (<u>quoting</u> *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992)) (emphasis added). Moreover, non-debtor releases are only approved in special situations. <u>Id.</u> at 142 ("No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique."). While this case is administratively insolvent, it does not otherwise appear to be unique.

### Relief Requested

13.    The common theme of the Disclosure Statement and Plan deficiencies is that the Plan benefits the DIP Lender, the Purchasers, and the Debtor's professionals and employees, without providing any additional material benefit to the administrative expense claimants or the unsecured creditors. While the Debtors warn of dire consequences if the cases were converted to chapter 7 liquidations,[3] the Disclosure Statement clearly states that, "[p]ursuant to the Sale

---

[3] The Disclosure Statement states:

Transaction, the Debtors already sold substantially all of their assets." *Disclosure Statement*, Art. X, sec. B. A liquidation of nothing can be neither large nor complex. What the Disclosure Statement and Plan actually describe is a liquidation of a non-debtor's assets by the Debtors. A better solution would be to pay the administrative expense claimants their pro rata share of unencumbered assets[4] and dismiss the cases. This solution would pay administrative creditors whatever is available as soon as practicable, and accomplish most of what the Debtors propose in their non-debtor releases. See 11 U.S.C. § 546(a)(2) (effectively terminating preference and fraudulent conveyance actions upon dismissal). To the extent the Debtors wish to continue the wind-down process for the Purchasers, they can do so outside of bankruptcy upon dismissal, with no interruption in their operations.

14. The Court should deny approval of the Disclosure Statement and order the Debtor to propose an alternative to the Plan that is limited to actions that accomplish a bankruptcy purpose.

### Notice

15. Notice of this Objection has been provided to (i) the Debtors, Barneys New York, Inc., 575 Fifth Avenue, New York, New York 10017 (Attn: Grace Fu); (ii) co-counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Edward O. Sassower, P.C. and Joshua A. Sussberg, P.C.), Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654 (Attn: Chad J. Husnick, P.C. and W. Benjamin Winger),

---

If the Debtors' business were liquidated in a chapter 7 process, store closing processes likely would be stopped in their tracks, forcing locations to go dark and terminate employees until a trustee could turn the lights back on. Even then, important employees with institutional knowledge will be gone for good, leaving an extremely large and complex liquidation to be managed by new hires unfamiliar with the Debtors' business. *Disclosure Statement*, Art. II.

[4] This assumes there even are unencumbered assets. If there are not, the Disclosure Statement should explain how continuing the wind-down process will create unencumbered assets.

and Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, New York 10022 (Attn: Steven J. Reisman); (iii) the United States Trustee, 11A Clinton Avenue, Room 620, Albany, New York 12207 (Attn: Alicia Leonhard)(via U.S. mail and electronic transmission); (iv) counsel to the DIP Agent and the DIP Lenders, Jones Day, 250 Vesey Street, New York, New York 10281 (Attn: Sidney P. Levinson, Michael Schneidereit, and Jeremy Evans); and (v) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 via electronic transmission, unless otherwise noted.  FedEx submits that, in light of the nature of the relief requested, no other or further notice need be given.

## Prayer for Relief

16.    WHEREFORE, for the foregoing reasons, FedEx respectfully requests that the Court DENY approval of the Debtors' Disclosure Statement, and issue such other and further relief as the Court deems appropriate in the circumstances.

Dated: December 12, 2019

>                    Respectfully submitted,
>
>                    /s/ Brian K. Coleman
>                    Brian K. Coleman
>                    FEDERAL EXPRESS CORPORATION
>                    560 West 42nd Street, 3rd Floor
>                    New York, NY  10036
>                    Telephone: 901.434.8600
>                    brian.coleman@fedex.com
>
>                    **COUNSEL FOR MOVANT,**
>                    **FEDEX CORPORATE SERVICES, INC.**

1383314