Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:     (212) 940-8800
Facsimile:      (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) Case No. 19-36300 (CGM) |
| Debtors. | ) (Jointly Administered) |

**DEBTORS' REPLY TO OBJECTION TO**
**THE DEBTORS' DISCLOSURE STATEMENT**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply") to the objection of FedEx Corporate Services, Inc. ("FedEx") [Docket No. 587] (the "FedEx Objection") to the Disclosure Statement.[2]  Each of the issues raised in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 660 Madison Avenue, 9th Floor, New York, NY 10065.

[2] On November 15, 2019, the Debtors filed the *Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates* [Docket No. 527] (as amended, supplemented, or otherwise modified from time to time, the "Plan"), the *Disclosure Statement for the Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates*

the FedEx Objection, including (where applicable) requests for specific additions to the Disclosure Statement, are addressed in the chart annexed hereto as **Exhibit A** (the "Objection Chart").[3]

In support of this Reply and in further support of approval of the Disclosure Statement and the other relief requested in the Motion, the Debtors respectfully state as follows.

### Introduction

1.  The Disclosure Statement contains adequate information and describes a chapter 11 plan that is confirmable. The FedEx Objection should be overruled.

2.  Consummation of the Plan remains the most efficient, orderly, and value-maximizing way to conclude these chapter 11 cases. The Debtors are focused on confirming and consummating the Plan by the end of January 2020, with initial distributions to creditors occurring around that time. Stakeholders will do better under the Plan than any alternative, including conversion to chapter 7, something *no* party in interest has requested. Even structured dismissal—given the extended timing, incremental costs, potential impacts on the Debtors' ongoing obligations under the sale transaction documents, loss of the automatic stay and related trailing legal issues—is second choice to the Plan. The Debtors believe that adequately informed

---

[Docket No. 528] (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), and the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement; (II) Solicitation and Notice Procedures; (III) Forms of Ballots and Notices in Connection Therewith; and (IV) Certain Dates with Respect Thereto* [Docket No. 529] (as may be amended, modified, or supplemented, the "Motion"). On December 9, 2019, the Debtors filed a revised form of Disclosure Statement. *See Notice of Filing Revised Disclosure Statement For the Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates* [Docket No. 579]. Contemporaneously herewith, the Debtors filed a further revised form of Plan and Disclosure Statement prior to the hearing to consider approval of the Disclosure Statement. Capitalized terms used but not defined herein shall have the meanings given to them elsewhere in this Reply or as set forth in the Plan, the Disclosure Statement, or the Motion, as applicable.

[3]  The Committee also filed a reservation of rights [Docket No. 593]. The Debtors and the Committee are engaged in good faith, constructive discussions to resolve issues in relation to the Disclosure Statement and the Plan in advance of the hearing.

2

creditors acting in good faith will reach the same conclusion and support the Plan. That only one party in interest objected to the Disclosure Statement is instructive.[4]

3. FedEx nonetheless contends that the Plan is unconfirmable because it may not provide for payment in full in cash of its Allowed Administrative Claim. This is wrong—see, *e.g.*, *Toys "R" Us, ShopKo,* and *Sears*. To the extent FedEx actually has an Allowed Administrative Claim, nothing stands in the way of FedEx agreeing to support the Plan before Confirmation. Insofar as FedEx maintains that it will object to the treatment of Allowed Administrative Claims under ***any*** circumstances, the FedEx Objection should be seen for what it is: an attempt to hold up the Estates for FedEx's sole benefit.

4. FedEx also suggests that a structured dismissal would be a "better solution" than the Plan. If the Plan cannot be confirmed, that is precisely what the Plan already provides: the Plan shall serve as a motion seeking dismissal of the chapter 11 cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code. *See* Disclosure Statement Art. VIII.A.8; Plan Art. IX.C.

5. The Debtors proactively addressed FedEx's disclosure-based objections. In fact, the Debtors received and incorporated formal and informal comments from a host of stakeholders, including the U.S. Trustee, the Committee, FedEx, unions, landlords, and other trade vendors. The Disclosure Statement has been supplemented with additional information regarding the Debtors' assets, operations, these chapter 11 cases, the treatment of claims and composition of classes, the wind down budget, potential recovery ranges, the process for obtaining consent from

---

[4] For example, in *Toys "R" Us, Specialty Retail Holdings Corp.* ("ShopKo")*,* and *Sears Holding Corporation* ("Sears")—three recent cases where administrative creditors were not paid in full in cash yet the debtors confirmed chapter 11 plans—there were 8, 11, and 20 filed responses, respectively, objecting to or reserving rights in connection with the disclosure statement.

3

administrative creditors like FedEx, and other Plan terms as a result. The Disclosure Statement easily meets section 1125's standard for adequate information.

6. For all of these reasons and those set forth in the Motion, the FedEx Objection should be overruled.

## Reply

### I. The Disclosure Statement Contains Adequate Information.

7. As more fully set forth in the Motion and herein, the Disclosure Statement contains "adequate information" for section 1125 purposes. *See Ionosphere Clubs, Inc. v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995) ("The determination of what is adequate information is subjective and made on a case by case basis.") (citing *In re Texas Extrusion Corp.*, 844 F.2d 1152, 1155–56 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988)). Among other things, the Disclosure Statement contains information regarding projected recoveries, alternatives to the Plan, and key events in these chapter 11 cases, including the sale process, proposed releases and the process by which third parties can "opt out," the process by which consent from administrative and priority claim holders will be sought, various risk factors, and tax considerations.[5] In addition, a summary chart attached hereto as **Exhibit A** identifies information that has been incorporated into or already was contained in the Disclosure Statement in relation to the FedEx Objection. The Debtors believe that such additions resolve the disclosure-based aspects of the FedEx Objection.

---

[5] *See, e.g.*, Disclosure Statement Arts. IV.D (projected recoveries), X.B (alternatives), VI (events leading to chapter 11 cases), VII (key events in the chapter 11 cases), III.L (third-party release and "opt out" process), III.E (administrative and priority claimant consent), VIII (risk factors), and XI (tax considerations).

4

## II.    The Plan Is Confirmable.    Confirmation Objections Should Be Heard at Confirmation.

8.     FedEx asserts that the Plan cannot be confirmed as a matter of law because (a) the Plan does not provide for payment in full, in cash to Holders of Administrative Claims, (b) the Plan unfairly discriminates between similarly-situated creditors, and (c) it is "unlikely that non-debtor releases are allowed in a liquidating Plan." *See* FedEx Objection ¶ 12.  Each of these arguments are issues for the Court to consider at the Confirmation Hearing and should be overruled on that basis alone.[6]  In the event the Court considers any of these arguments on the merits, they should each be overruled because the Plan complies with the Bankruptcy Code's requirements.

9.     The existence of disputed issues related to confirmation—*e.g.*, issues bearing on claims treatment, releases, and other requirements under section 1129 of the Bankruptcy Code—is no bar to finding that a disclosure statement contains "adequate information." *See, e.g.*, *In re Quigley Co., Inc.*, 377 B.R. 110, 112 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-debtor former parent "implicate several confirmation issues" regarding the rights and incentives of certain claimants under the proposed plan); *In re Ellipso, Inc.*, No. 09-00148, 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (holding certain objections to disclosure statement were confirmation issues "more appropriately dealt with at a confirmation hearing.").

10.    In fact, the ***only*** time a court may entertain plan objections at a disclosure statement hearing is when any subsequent solicitation would be futile because the proposed plan is fatally flawed such that confirmation is impossible.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 153–54 (3d Cir. 2012) ("Ordinarily, confirmation issues are reserved for the confirmation hearing,

---

[6]   For the avoidance of doubt, the Debtors reserve the right to respond to any and all objections asserted in connection with Confirmation of the Plan.

5

and not addressed at the disclosure statement stage," but the court may consider and resolve defects that would make the plan "patently unconfirmable.") (internal citations omitted). Specifically, "[a] plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 155 (citing *In re Monroe Well Service, Inc.*, 80 B.R. 324, 333 n. 10 (Bankr. E.D. Pa. 1987)). As a matter of law, any argument that the Plan is patently unconfirmable because it *might* not comply with section 1129 of the Bankruptcy Code is not properly before the Court, and the appropriate time to test such compliance will be at the Confirmation Hearing. In any event, FedEx's confirmation-based contentions lack merit.

      **A.**    **The Treatment of Administrative Claims Complies with the Bankruptcy Code.**

          **i.**    **Any Holder of an Allowed Administrative Claims Can Consent to "Different Treatment" that Is Less Than Payment in Full in Cash.**

11.    The Debtors are well aware of section 1129(a)(9) of the Bankruptcy Code, which requires that all holders of administrative claims must be paid in full "*[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim*." (emphasis added) In other words, holders of claims may agree to different treatment all the way up until confirmation of a plan.

12.    The Plan provides that each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Administrative and Priority Tax Claims Recovery. Based on the amount of Distributable Cash that the Debtors estimate will be available to fund the Administrative and Priority Tax Claims Recovery, Holders of Allowed Administrative Claims will

6

likely receive less than full payment. *See* Disclosure Statement Art. III.E. The Debtors have endeavored to be as transparent as possible about this treatment and its likelihood.

13. The FedEx Objection is premised on at least three flawed assumptions. ***First***, FedEx erroneously suggests its asserted Administrative Claim in the amount of $1,090,057.18 is undisputed. That is false. The Debtors continue to analyze services provided by FedEx to determine whether they are the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The Debtors believe that these and other Claims may be overstated and, after accounting for offsets, allowances, and deductions, such Claims may be materially smaller than asserted. If FedEx's asserted Claim turns out to not be a valid Administrative Claim, the Debtors could confirm the Plan notwithstanding FedEx's objections to the treatment thereof. ***Second***, FedEx, as the recipient of $3,835,201.13 of cash transfers from the Debtors within 90 days of the Petition Date, is potentially subject to preference claims under section 547 of the Bankruptcy Code.[7] Such preference claims likewise may impact the quantum of any Allowed Administrative Claim. *See Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc. (In re Quantum Foods, LLC),* 554 B.R. 729, (Bankr. D. Del. 2016) (holding that an allowed administrative claim could be offset against a preference claim); *cf.* 11 U.S.C. § 502(d). ***Third***, even if FedEx has valid Administrative Claims, nothing stops FedEx from ultimately supporting the Plan. Any claimholder's assertion at this stage that they will never consent to alternative treatment is premature, and the factual question of whether all Holders of Administrative Claims have consented to less than full payment is an issue for Confirmation.

---

[7] FedEx has also received cash payments from the Debtors of $1,792,310.81 on a postpetition basis. For the avoidance of doubt, the Debtors expressly reserve all rights with respect to any transfer of cash to FedEx.

7

> ii. **Administrative Claims Can Receive Different Treatment. The Plan Complies with the Bankruptcy Code and the Court's Prior Final Orders Should Not Be Revisited.**

14. With respect to Allowed Administrative Claims, the ***only*** requirement for confirmation of a plan is contained in section 1129(a)(9) of the Bankruptcy Code. *See* Collier on Bankruptcy ¶ 1129.02[a] (16th 2019) ("With respect to these types of priority claims [*i.e.*, administrative claims], paragraph (9) thus constitutes the only essential confirmation requirement."). Again, any holder of an Allowed Administrative Claim can consent to "different treatment" in accordance with section 1129(a)(9). Moreover, contrary to FedEx's assertions, section 1129(b) of the Bankruptcy Code—which allows for a plan to be "crammed down" on a dissenting class of claims or interests if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan"—does not apply to Administrative Claims under ***any*** circumstance. This is consistent with the Bankruptcy Code's prohibition on designation of "classes" of administrative claims in a chapter 11 plan. *See* 11 U.S.C. § 1123(a)(1).

15. The Plan generally provides that Allowed Administrative and Priority Claims will share ratably in cash remaining in the Estates after satisfaction of expenses related to and obligations arising under the Asset Purchase Agreement and Agency Agreement. Holders of such Claims can also elect to give and receive mutual releases under the Plan. FedEx contends that this amounts to "disparate treatment" as between Administrative and Priority Tax Claims, wind-down expenses, and Professional Fee Claims.

16. As a threshold matter, no rule of law obligates a debtor to pay administrative claimants on a *pari passu* basis retroactively where circumstances have changed and/or secured lenders or a purchaser elect to carve out or fund certain but not all expenses of the estate. *See In re Quantum Foods, LLC*, 554 B.R. at 736 ("Inequality per se is not to be avoided; indeed,

8

reasoned and justified inequality sometimes prevails, usually based on what is in the best interest of the estate."). For example, the Purchasers have agreed to fund the Debtors' post-closing payroll and rent obligations while they continue to monetize inventory acquired in the Sale Transaction. The Debtors anticipate that these administrative claimants—namely employees and landlords—will be paid as and when due in full in cash on account of such wind down expenses (*i.e.*, payroll and rent obligations) in accordance with the Agency Agreement. And as a result, such administrative creditors will not share in the Administrative and Priority Claims Recovery because such Administrative Claims will have been satisfied previously. The same could be said of the $1,792,310.81 that the Debtors paid to FedEx earlier in these chapter 11 cases for postpetition services rendered. Neither section 1123 nor 1129 of the Bankruptcy Code require a different result.

17.    With respect to Professional Fee Claims, the treatment of such Claims in the Plan accords with the priority and treatment approved by the Court in the DIP Order. The DIP Order makes abundantly clear that the Debtors were required to fund and maintain the Funded Reserve Account (as defined in the DIP Order) in a segregated account to hold, at all times, ***in trust*** for the benefit of Professional Persons (as defined in the DIP Order), amounts to pay the Professional Fee Claims. *See* DIP Order ¶ 54. Section 364(e) of the Bankruptcy Code prohibits collateral attacks on final DIP orders. Absent a stay pending appeal (not applicable here), reviewing courts do not entertain challenges to the validity of DIP order terms. *See In re Gen. Growth Properties, Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010) (dismissing appeal from an un-stayed DIP order as "moot" under 364(e)); *In re Clinton St. Food Corp.*, 170 B.R. 216, 220 (S.D.N.Y. 1994) (same). It is worth noting that Professional Persons—unlike trade creditors such as FedEx—do not have the ability to simply refuse to transact further with the Debtors. Indeed, FedEx has refused to transact with the Debtors on a go-forward basis while its asserted Administrative Claims remain unpaid.

18.     Professional Fee Claims are secured and superpriority under the DIP Order. *See* DIP Order ¶ 55. In other words, amounts that have been allocated for payment of Professional Fee Claims were carved out from the collateral of secured creditors and granted a superior priority to *all* Claims, including, without limitation, DIP Superpriority Claims, Adequate Protection Superpriority Claims (each as defined in the DIP Order), administrative expenses, secured claims, and unsecured claims, and funds in the Funded Reserve Account that will be used to satisfy Professional Fee Claims are not available to satisfy other Claims in these chapter 11 cases. In fact, the Funded Reserve Amount is not even property of the Debtors' estates. *See In re Licking River Mining, LLC*, 911 F.3d 806, 812 (6th Cir. 2018) ("A carve-out serves in effect to give a higher-priority security interest to the professionals over the secured creditors."). The time to object to the carve out of and priority given to Professional Fee Claims was in connection with the Debtors' request for entry of the DIP Order—not now—and the DIP Order is *res judicata* to such objections. *See* 11 U.S.C. § 364(e) (requiring stay pending appeal to reverse or modify postpetition financing orders); *see also In re Revco D.S., Inc.*, 901 F.2d 1359, 1364 (6th Cir. 1990) ("Courts . . . reviewing financing orders subject to section 364(e) have been reluctant to sever individual provisions, whether legal or not, in the absence of a stay pending appeal"). The treatment of Professional Fee Claims pursuant to the DIP Order is merely being incorporated into the Plan. *See In re U.S. Flow Corp.*, 332 B.R. 792, 796 (Bankr. W.D. Mich. 2005) ("The carve-out was consented to by the Secured Creditors to be paid to a specified category of professionals.").

19.     The Purchasers likewise agreed to fund certain Professional Fee Claims in accordance with the Asset Purchase Agreement and Agency Agreement, including the Wind Down Budget. The Wind Down Budget was negotiated in good-faith with the Purchasers to ensure that the Debtors' stakeholders were not unnecessarily harmed in a free-fall liquidation following

10

closing of the Sale Transaction.  The Court approved the Sale Transaction with the Sale Order. *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 578 (6th Cir. 2008) (holding that bankruptcy court sale orders are final orders entitled to *res judicata* effect); *see also In re Gibraltar Res., Inc.*, 210 F.3d 573, 576 (5th Cir. 2000) (citations omitted) (nothing that a bankruptcy court's final orders are appealable as of right and holding that a bankruptcy court's settlement order was "entitled to full res judicata effect"); *U.S. Dept. of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1473 (4th Cir. 1990) (noting that the "normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts" and affirming that the terms of final confirmation orders were entitled to res judicata effect).  But if the Plan process is terminated, and the cases converted or dismissed without proper coordination, the Debtors may be unable to satisfy their obligations in relation to the Sale Transaction.  In that scenario, potential disputes may arise with the Purchasers that could jeopardize the Debtors' and their wind down creditors' continued access to funds contemplated under the Asset Purchase Agreement and Agency Agreement.

20.    To be sure, dismissal or conversion would not entitle FedEx to the Professional Fee Escrow Account or the Wind Down Amount.  And so long as the Debtors remain in chapter 11, they are protected by the "automatic stay" of section 362 of the Bankruptcy Code from acts that would materially interfere with the Debtors' ability to fulfill their obligations under the Sale Transaction and operate in an orderly fashion notwithstanding their financial distress.  Absent the automatic stay, there is a material risk that the Debtors' operations would be severely disrupted—to the detriment of ***all*** stakeholders.  A disorderly dismissal and/or liquidation exposes FedEx and other creditors to likely face *lower* recoveries than that contemplated by the Plan.

**B.    The Plan's Releases Are Legally Permissible.**

21.    FedEx objects to the Plan's release provisions. *See* FedEx Objection ¶ 10(f)–(g). The Debtors can release any claims that were not acquired by the Purchasers and/or otherwise

agree not to prosecute claims going forward. That is precisely what the Plan provides. *See* Plan Art. VIII.D; Disclosure Statement Art. IV.20.C. Any such release, moreover, is subject to the Debtors' ongoing investigation into Estate claims and causes of action, which is nearly complete. *See* Plan Art. VIII.B; Disclosure Statement Art. III.M.[8]

22. With respect to the Third Party Release, it is entirely consensual.[9] Many courts in this district and others have held that nondebtor third-party releases are permissible where, as here, consent is given, ***including*** where eligible creditors fail to opt out of the release, so long as they receive adequate notice of the release on the ballot or such other applicable form. *See, e.g.*, *In re DBSD North America, Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (holding that creditors who abstained from voting and failed to opt out were deemed to have consented to the third party releases because the ballot contained, in bold font, notice of the release provisions and an opportunity to opt out), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010); *In re MPM Silicones, LLC*, No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) (finding that stakeholders who voted in favor of the plan, regardless of whether they checked the opt-out box on the voting ballot, were deemed to have consented to the third-party release); *In re Calpine Corp.*, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving consensual third-party releases by parties "who abstain from voting and choose not to opt out of

---

[8] FedEx insinuates that causes of action could exist under theories of lender liability or section 363(n) of the Bankruptcy Code. *See* FedEx Objection ¶ 10(g). This suggestion ignores the plain terms of the DIP Order (see ¶ 81) and the Sale Order (see ¶ 23), including express findings that the Purchasers and Debtors complied with section 363(n) of the Bankruptcy Code.

[9] Here, again, FedEx raises the quintessential confirmation objection. *See In re Drexel Burnham Lampert Group*, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992) (stating that objections to a plan of reorganization's releases and injunction provisions were in the nature of confirmation objections and therefore improperly raised as objections to the disclosure statement); *In re Specialty Equip. Cos., Inc.*, 1992 WL 279262 at *3 (N.D. Ill. Sept. 25, 1992) (noting that bankruptcy court below held that "the validity of releases [is] a plan confirmation issue" and overruling objections to the disclosure statement regarding the appropriateness of third-party releases). On that basis alone, the FedEx Objection to the Plan's third-party release provision (the "Third-Party Release") should be overruled.

the releases, or who have otherwise consented to give a release"); *but see In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 724–25 (Bankr. S.D.N.Y. 2019) (Wiles, J.).

23.     Here, the Third-Party Release is fully consensual and should be approved. All Holders of Claims and Interests are afforded the opportunity not to be bound by the Third-Party Release. The ballots and solicitation materials (including the Plan and Disclosure Statement) clearly set forth in bold font the terms of the proposed Third-Party Release and the Released Parties that benefit from them. Accordingly, the Third-Party Release does not render the Plan patently unconfirmable, and similar release structures have been approved in this district. *See, e.g.*, *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 3, 2019) (approving third-party releases for which consent was solicited via an opt-out mechanism); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) (same); *In re FULLBEAUTY Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) (same); *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) (same); *In re 21st Century Oncology Holdings, Inc.*, No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2018) (same).

### Conclusion

24.     For all the foregoing reasons and as set forth in the Motion, the Disclosure Statement contains adequate information and should be approved. Accordingly, the Debtors respectfully request that the Court overrule the FedEx Objection to the extent not resolved by modifications to the Disclosure Statement, grant the relief requested in the Motion, and grant such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: December 16, 2019<br>New York, New York | */s/ Joshua A. Sussberg, P.C.*<br>Edward O. Sassower, P.C.<br>Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br><br>-and-<br><br>Chad J. Husnick, P.C.<br>W. Benjamin Winger (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br><br>-and-<br><br>Steven J. Reisman<br>**KATTEN MUCHIN ROSENMAN LLP**<br>575 Madison Avenue<br>New York, New York 10022<br>Telephone: (212) 940-8800<br>Facsimile: (212) 940-8776<br><br>*Co-Counsel for the Debtors and Debtors in Possession* |

**Exhibit A**

**FedEx Objection Chart**

| | **Disclosure Issue** | **Additions to Disclosure Statement** |
|---|---|---|
| 1. | - The Disclosure Statement fails to provide any detailed information about the Debtors' past operations in chapter 11. FedEx Objection ¶ 10(a). | - Description of the Debtors' operations in chapter 11 at the beginning of the case, including:<br>  - lack of liquidity to purchase inventory<br>  - reluctant suppliers / imposition of onerous trade terms<br>  - DIP Amendments to avoid imminent liquidation and complete sale process<br><br>*See* Disclosure Statement Art. V.B. |
| 2. | - The Disclosure Statement fails to provide any information on the Debtors' current cash position, broken out by Debtor. FedEx Objection ¶ 10(b). | - Only one Debtor, Barneys, Inc., has any bank accounts.<br>- The Debtors' cash position is reflected in the monthly operating reports filed with the Court.<br>- The Disclosure Statement has been revised to explicitly state available cash as of November 30, 2019.<br><br>*See* Disclosure Statement Art. II. |

|   | **Disclosure Issue** | **Additions to Disclosure Statement** |
|---|---|---|
| 3. | • The Disclosure Statement fails to project the Debtors' future cash receipts. FedEx Objection ¶ 10(c). | • The Debtors do not anticipate future material future cash receipts separate and apart from the wind down process in respect of the Sale Transaction. The Wind Down Budget has been disclosed.<br><br>• The Debtors continue to explore avenues to generate incremental cash flows for the benefit of the estate.<br><br>*See* Disclosure Statement Art. II. |
| 4. | • The Disclosure Statement fails to explain why administrative creditors should agree to be paid a portion of their asserted claims, while the Debtors' professionals are paid separately. FedEx Objection ¶ 10(d). | • Professional Fees are paid from sources that are not property of the estate. *See* Disclosure Statement Art. III.E.<br><br>• Administrative Claim Holders will do better under the Plan than the alternatives. *See* Disclosure Statement Arts. X.B, III.E. |
| 5. | • The Disclosure Statement fails to explain the source of funding for the Professional Fee Escrow Account. FedEx Objection ¶ 10(e). | • This information is reflected in the definition of "Professional Fee Escrow Account" in the first-filed Plan and Disclosure Statement. *See* Plan Art. I.A.79.<br><br>• The Professional Fee Escrow Account is funded by the Professional Fee Escrow Account established under the Sale Order and any incremental amounts funded by the Purchasers in accordance with the Wind Down Budget.<br><br>*See* Disclosure Statement Art. III.E. |
| 6. | • The Disclosure Statement fails to explain the value of the released claims. FedEx Objection ¶ 10(g). | • The Debtors' investigation is ongoing. *See* Plan Art. VIII.B; Disclosure Statement Art. III.M.<br><br>• With respect to lenders, the Debtors have released claims under the DIP Order and payoff letters. *See* Disclosure Statement Art. III.M.<br><br>• With respect to the Purchasers, the Sale Order contains findings of good faith. *See* Disclosure Statement Art. III.M. |