Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:      (212) 940-8800
Facsimile:      (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| BARNEYS NEW YORK, INC., *et al.*,[1] | Case No. 19-36300 (CGM) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING (I) REVISED DISCLOSURE STATEMENT**
**FOR THE JOINT CHAPTER 11 PLAN OF BARNEYS NEW YORK, INC.**
**AND ITS DEBTOR AFFILIATES AND (II) REVISED JOINT CHAPTER 11**
**PLAN OF BARNEY'S NEW YORK, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE** that, on November 15, 2019, the Debtors filed (i) the

*Disclosure Statement for the Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819). The location of the Debtors' service address is 660 Madison Avenue, 9th Floor, New York, NY 10065.

*Affiliates* [Docket No. 528] (the "<u>Initial Disclosure Statement</u>" and, as amended, supplemented, or otherwise modified from time to time, the "<u>Disclosure Statement</u>") and (ii) the *Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates* [Docket No. 527] (the "<u>Initial Plan</u>" and, as amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>").

**PLEASE TAKE FURTHER NOTICE** that on December 9, 2019, the Debtors filed the revised form of *Disclosure Statement for the Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates* [Docket No. 579] (the "<u>Initial Revised Disclosure Statement</u>").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a second revised form of Disclosure Statement, attached hereto as **<u>Exhibit A</u>**.  A redline showing changes relative to the Second Revised Disclosure Statement is attached hereto as **<u>Exhibit B</u>**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to further and/or materially alter, amend, or modify the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised form of Plan, attached hereto as **<u>Exhibit C</u>**.  A redline showing changes relative to the Initial Plan is attached hereto as **<u>Exhibit D</u>**.

**PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider approval of the Disclosure Statement (the "<u>Disclosure Statement Hearing</u>") will be held before the Honorable Cecelia G. Morris of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), 355 Main Street, Poughkeepsie, New York 12601, on **December 18, 2019, at 9:00 a.m. (prevailing Eastern Time)**.  The deadline to object to the Disclosure Statement, namely December 12, 2019, at 4:00 p.m. (prevailing Eastern Time), remains unchanged.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Disclosure Statement and Plan may be obtained free of charge by visiting the website of Stretto at http://case.stretto.com/barneys. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

| | |
|---|---|
| Dated:  December 16, 2019<br>New York, New York | */s/ Joshua A. Sussberg, P.C.* |
| | Edward O. Sassower, P.C. |
| | Joshua A. Sussberg, P.C. |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:    (212) 446-4800 |
| | Facsimile:    (212) 446-4900 |

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

-and-

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

# EXHIBIT A

**Second Revised Disclosure Statement**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile:  (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11**
**PLAN OF BARNEYS NEW YORK, INC. AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 660 Madison Avenue, 9th Floor, New York, NY 10065.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]**

---

THE DEADLINE TO VOTE ON THE PLAN IS
JANUARY 17, 2020 at 4:00 p.m. (prevailing Eastern Time)

THE DEADLINE TO OBJECT TO THE PLAN IS
JANUARY 17, 2020 at 4:00 p.m. (prevailing Eastern Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY
STRETTO ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF BARNEYS NEW YORK, INC. AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.[3]

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS AND/OR ARRANGEMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND

---

[2] Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

[3] The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their business, including, without limitation, Barneys New York, Inc. This Disclosure Statement may omit the registered trademark (®), trademark (™), and other similar symbols for such trademarks named herein.

THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

IF CONFIRMATION OR EFFECTIVENESS OF THE PLAN DOES NOT OCCUR, THE PLAN SHALL ACT AS A MOTION SEEKING A DISMISSAL OF THE CHAPTER 11 CASES IN ACCORDANCE WITH THE BANKRUPTCY CODE.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL

NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTORS' ABILITY TO SATISFY ALL CLAIMS TO BE PAID UNDER THE PLAN. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; AND ADVERSE TAX CHANGES.

# TABLE OF CONTENTS

Page

I.      **INTRODUCTION** ......................................................................................................................1

II.     **PRELIMINARY STATEMENT** ...........................................................................................1

III.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** ..........................................................................................................................4

    A.     What is chapter 11? ...................................................................................................4
    B.     Why are the Debtors sending me this Disclosure Statement? ...................................4
    C.     Am I entitled to vote on the Plan? ............................................................................5
    D.     What will I receive from the Debtors if the Plan is consummated? ..........................5
    E.     How are Administrative Claims treated under the Plan? ...........................................9
    F.     How are Priority Tax Claims treated under the Plan? .............................................11
    G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...................11
    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .....................................................................................................11
    I.     What are the sources of Cash and other consideration required to fund the Plan? .........12
    J.     Who are the Purchasers? ..........................................................................................12
    K.    Is there potential litigation related to Confirmation of the Plan? ...........................12
    L.     Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims under the Plan? ............................................................12
    M.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............13
    N.    What is the deadline to vote on the Plan? ...............................................................14
    O.    How do I vote for or against the Plan? ....................................................................14
    P.     Why is the Bankruptcy Court holding a Confirmation Hearing? ............................14
    Q.    When is the Confirmation Hearing set to occur? ....................................................14
    R.     What is the purpose of the Confirmation Hearing? .................................................14
    S.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ..........................................................................................................14
    T.     Do the Debtors recommend voting in favor of the Plan? ........................................15

IV.    **THE DEBTORS' PLAN** .......................................................................................................15

    A.     The Plan ...................................................................................................................16
    B.     Release of Liens .......................................................................................................22
    C.     Releases by the Debtors ...........................................................................................22
    D.     Third-Party Release ..................................................................................................23
    E.     Exculpation ..............................................................................................................24
    F.     Injunction ................................................................................................................24

V.     **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ..........27

    A.     Barneys' Corporate History .....................................................................................27
    B.     The Debtors' Business Operations ...........................................................................28
    C.     The Debtors' Cost Structure .....................................................................................29
    (i)     Supply Chain ...........................................................................................................29
    D.     Employee Compensation and Benefits ....................................................................29
    E.     Real Estate Obligations ...........................................................................................30
    F.     The Debtors' Prepetition Capital Structure ..............................................................30

VI.    **EVENTS LEADING TO THE CHAPTER 11 FILINGS** ...................................................32

    A.     Challenging Operating Environment and Increased Rent Obligations .....................32

|       | B.    | Supply Chain and Borrowing Base Challenges ........................................... | 32 |
|       | C.    | Board Exploration of Strategic Alternatives ............................................ | 33 |
|       | D.    | Operational Right-Sizing Initiatives ........................................................ | 33 |

**VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ............................................................................................................... 34**

|       | A.    | First Day Relief ......................................................................................... | 34 |
|       | B.    | Other Procedural and Administrative Motions .......................................... | 34 |
|       | C.    | Final Approval of Debtor-in-Possession Financing ................................. | 35 |
|       | D.    | Schedules and Statements .......................................................................... | 35 |
|       | E.    | Appointment of Official Committee .......................................................... | 35 |
|       | F.    | Litigation Matters ...................................................................................... | 35 |
|       | G.    | Rejection and Assumption of Executory Contracts and Unexpired Leases ............ | 35 |
|       | H.    | Collective Bargaining Agreements ............................................................ | 36 |
|       | I.    | Sale and Marketing Process ....................................................................... | 37 |
|       | J.    | Sale Transaction, the Wind-Down Debtors, and Wind Down ................... | 37 |
|       | K.    | Administrative Claims Bar Date ................................................................ | 38 |
|       | L.    | Exclusivity ................................................................................................. | 39 |
|       | M.    | Recommendation to Support Plan .............................................................. | 39 |

**VIII.    RISK FACTORS ........................................................................................................ 39**

|       | A.    | Bankruptcy Law Considerations ................................................................ | 39 |
|       | B.    | Risks Related to the Debtors' Businesses .................................................. | 43 |

**IX.    SOLICITATION AND VOTING PROCEDURES ................................................... 44**

|       | A.    | Holders of Claims Entitled to Vote on the Plan ........................................ | 44 |
|       | B.    | Voting Record Date .................................................................................... | 45 |
|       | C.    | Voting on the Plan ..................................................................................... | 45 |
|       | D.    | Ballots Not Counted .................................................................................. | 46 |
|       | E.    | Deadline for Returning Administrative Claim / Priority Claim Consent Forms and Release Election Forms ................................................................................ | 46 |

**X.    CONFIRMATION OF THE PLAN ........................................................................... 46**

|       | A.    | Requirements for Confirmation of the Plan ............................................... | 46 |
|       | B.    | Best Interests of Creditors ......................................................................... | 47 |
|       | C.    | Feasibility .................................................................................................. | 47 |
|       | D.    | Acceptance by Impaired Classes ............................................................... | 48 |
|       | E.    | Confirmation without Acceptance by All Impaired Classes ...................... | 48 |

**XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................................................................................................... 49**

|       | A.    | Introduction ............................................................................................... | 49 |
|       | B.    | Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors ...................................................................................................... | 50 |
|       | C.    | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 2 Other Priority Claims ............................................................... | 51 |
|       | (i)   | Character of Gain or Loss .......................................................................... | 52 |
|       | (ii)  | Accrued Interest ......................................................................................... | 52 |
|       | (iii) | Market Discount ......................................................................................... | 53 |
|       | D.    | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Class 2 Other Priority Claims ..................................................... | 53 |
|       | (i)   | Gain Recognition ....................................................................................... | 53 |
|       | (ii)  | Accrued but Untaxed Interest .................................................................... | 54 |

i

    (iii)     FATCA ................................................................................................................54

    E.       Information Reporting and Backup Withholding........................................................55

**XII.**      **RECOMMENDATION ...........................................................................................................56**

**EXHIBITS**

EXHIBIT A       Chapter 11 Plan

EXHIBIT B       Wind Down Budget

## I.       INTRODUCTION

Barneys New York, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), submit this disclosure statement (this "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests (each as defined in the Plan) in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates* [Docket No. 527], dated November 15, 2019 (as amended, supplemented, or modified from time to time, the "<u>Plan</u>").[1]  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES.  THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT

Barneys New York, Inc. (together with its Debtor affiliates, "<u>Barneys New York</u>") is an iconic luxury retailer and Manhattan staple since 1923.  Founded and headquartered in New York City, New York, over the course of the twentieth century Barneys New York grew from a small, downtown Manhattan-based men's retailer into an international arbiter of high style for both women and men and an iconic fashion institution.  Throughout the 1970s, Barneys New York became renowned for discovering and developing new and innovative design talent.  The once-local specialty retailer garnered acclaim for its ability to drive the frontier of the fashion industry by opening its doors to mesmerizing collections from the world's most forward-thinking designers.

Since prior to the Petition Date, however, Barneys New York, like many other retail and apparel-focused companies, has suffered from adverse macroeconomic and consumer spending trends as well as certain operational shortfalls.  More specifically, the general shift away from brick-and-mortar retail was further exacerbated by sharp increases in Barneys New York's lease obligations, including over ten million dollars in rent increases on an annualized basis and corresponding letter of credit obligations, which significantly constrained liquidity.  Due to these pressures, Barneys New York operated without sufficient liquidity throughout the summer of 2019.  Cash-on-delivery demands paralyzed the inventory stream, and efforts to raise incremental liquidity or implement an actionable holistic solution to these issues did not bear fruit.

As a result, the Debtors and their advisors worked tirelessly to solicit and develop various strategic alternatives throughout summer of 2019, including with respect to a potential sale transaction.  Several strategic and financial investors expressed an interest in acquiring Barneys New York as a going concern, and the Debtors' intellectual property, including their brand equity, also received meaningful market interest.  Several parties engaged in substantial due diligence and submitted indications of interest.  Despite substantial, around-the-clock efforts—and some very close calls—the Debtors ran out of time to execute an out-of-court transaction that would address their liquidity challenges and position Barneys New York for long-term success.  Consequently, the Debtors commenced the Chapter 11 Cases on August 6, 2019 to

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

conduct an operational right-sizing, including an evaluation and adjustment to their lease portfolio, explore value-maximizing transactions, including a going-concern sale, and obtain postpetition financing necessary to fund the Chapter 11 Cases and provide operating capital on a go-forward basis.

The Debtors' efforts have borne fruit. As described further herein, on October 16, 2019, the Debtors selected a bid submitted by the Purchasers as a "stalking horse" bid for substantially all of the Debtors' assets, the terms of which were memorialized in the Purchase Agreement.

When no other qualified bids were received by the bid deadline, the Debtors cancelled the auction but continued to discharge their fiduciary duties by exploring and developing alternative proposals, including a potential going concern transaction. Despite the Debtors' best efforts, no such indication of interest could be developed into a viable alternative, however. On October 31, 2019, the Bankruptcy Court approved the Sale Transaction. The Debtors consummated the Sale Transaction on November 1, 2019.

Under the Purchase Agreement and related documents, the Purchasers can assume certain costs and liabilities arising from and after the date of assumption of any contracts, leases, and collective bargaining agreements transferred or assumed and assigned pursuant to the terms of the Sale Transaction. The designation period generally continues until the earlier of the Confirmation Date or the Sale Termination Date (i.e., no later than February 29, 2020). The Purchasers also agreed to fund a $27 million wind down budget pursuant to which the Debtors intend to satisfy their post-closing obligations under the Purchase Agreement and other Sale Transaction documents and bring these chapter 11 cases to conclusion. Upon the closing of the Sale Transaction, the Purchasers funded approximately $250 million, which sale proceeds were used to indefeasibly pay, in full in cash, all DIP Obligations for the benefit of the DIP Parties and the Flagship Partners landers (see Docket No. 333 at ¶ 3), and approximately $15 million of the Wind Down Amount. As of November 23, 2019, the Debtors had utilized approximately $11.2 million of the Wind Down Amount in accordance with the Wind Down Budget. The Debtors do not anticipate material incremental cash receipts separate and apart from the Wind Down Amount and other Purchaser funding obligations. However, the Debtors continue to work with parties in interest to explore alternative arrangements that could generate incremental cash flows. Such net cash flows, if any, would inure to the benefit of the Estate's creditors and be distributed in accordance with the Plan.

As of November 30, 2019, the Debtors reported approximately $5 million of available cash. As set forth in that certain cash management motion [Docket No. 8] and the Debtors' schedules and statements [Docket Nos. 261–62], Debtor Barney's Inc. holds all of the bank accounts in its name. The Debtors estimate, based on current assumptions (including those set forth in Article III.E hereof), that the Distributable Cash as of the Effective Date will be between $2 million and $6 million. For more information on the Debtors' financial statements and information, please refer to the monthly operating reports filed by the Debtors from time to time with the Bankruptcy Court. *See, e.g.*, Docket Nos. 280, 349, 532, 562, and 591.

The Plan contemplates that a Plan Administrator will be appointed on the Effective Date to finalize the wind down the Debtors' estates, monetize any remaining assets, and make distributions to creditors in accordance with the Plan. The Plan Administrator will be M-III Advisory Partners, LP, the Debtors' financial advisor, or such other entity or individual appointed by the Debtors in consultation with the Committee. Upon completion of the Wind Down, the Plan Administrator will take steps to dissolve any remaining Debtor entity. One or more Debtor may continue to exist after the Effective Date only to facilitate the conclusion of the Wind Down process. Specifically, under the terms of the Plan, Holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and in exchange for, such Holders' Claims and Interests:

- Holders of Allowed Other Secured Claims will be paid in full, in cash on the Effective Date or otherwise provided treatment as to render such Claims unimpaired.

- All known Holders of Other Priority Claims have been sent an Administrative / Priority Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Other Priority Claims under the Plan is only available if each such Holder agrees to such treatment. **The failure to return the Administrative/ Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by Section 1129(a)(9), and such Holder shall receive its Pro Rata share of the Other Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter**.

- Each Holder of an Allowed Prepetition Secured Claim shall receive a Pro Rata distribution of $25,000 on the Effective Date or as soon as reasonably practicable thereafter.

- Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Recovery on the Effective Date or as soon as reasonably practicable thereafter.

- Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims.

- Intercompany Interests shall be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

- Each Allowed Interest in Barneys shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Barneys shall be entitled to any recovery or distribution under the Plan on account of such Interests.

- Allowed Section 510(b) Claims, if any, will be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

**All known Holders of Administrative Claims and Priority Tax Claims will be sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Administrative Claims and Priority Tax Claims under the Plan is only available if each such Holder agrees to such treatment. The failure of a Holder of an Administrative Claim or Priority Tax Claim to return the Administrative / Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment as required by Section 1129(a)(9), and such Holder shall receive its Pro Rata share of the Administrative/ and Priority Tax Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter.**

In addition, Holders of Administrative Claims, Priority Tax Claims, Other Priority Claims, Prepetition Secured Claims, and General Unsecured Claims that vote to accept or do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan or do not object to the Plan shall be deemed "Released

3

Parties" and benefit from the Debtor release. The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to swiftly emerge from chapter 11.

The Plan provides the best available alternative for the Debtors' estates and creditor recoveries. If the Debtors' business were liquidated in a chapter 7 process, store closing processes likely would be stopped in their tracks, forcing locations to go dark and terminate employees until a trustee could turn the lights back on. Even then, important employees with institutional knowledge will be gone for good, leaving an extremely large and complex liquidation to be managed by new hires unfamiliar with the Debtors' business. The needless loss of value to creditors and the Debtors' estates would be enormous. Creditors would receive lower recoveries in chapter 7 because the Debtors' estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.

If confirmation or effectiveness of the Plan does not occur, the Plan shall act as a motion seeking a dismissal of the chapter 11 cases in accordance with the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in these chapter 11 cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all Holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Stretto, the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by the Voting Deadline, i.e., January 17, 2020 at 4:00 p.m. prevailing Eastern Time. Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing. If the Bankruptcy Court does not confirm the Plan or the Plan is not consummated for any reason, the Plan shall serve as a motion to dismiss these chapter 11 cases in accordance with the Bankruptcy Code.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such

disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.      Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 3 | Prepetition Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in Barneys | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.      What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
|---|---|---|---|---|
| | | **SUMMARY OF EXPECTED RECOVERIES[2]** | | |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Plan Administrator:<br><br>(i)  payment in full in Cash of such Holder's Allowed Other Secured Claim;<br><br>(ii)  the collateral securing such Holder's Allowed Other Secured Claim;<br><br>(iii) Reinstatement of such Holder's Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $275,000 | 100% |
| 2 | Other Priority Claims | All known Holders of Other Priority Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan.  The treatment afforded to Holders of Other Priority Claims under the Plan is only available if each such Holder agrees to such treatment.<br><br>**The failure to return the Administrative/ Priority Claim Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code., and in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive its Pro Rata share of the Other Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter.**<br><br>If such Holder does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder. | Less than $1 million | Unimpaired / Impaired |

---

[2]  The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code. Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

| SUMMARY OF EXPECTED RECOVERIES[2] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | | | |
| 3 | Prepetition Secured Claims | Except as set forth in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Prepetition Secured Claim, each Holder thereof shall receive a Pro Rata distribution of $25,000.<br><br>If the amount of Allowed Prepetition Secured Claims is less than the amount of the Pro Rata distribution, any excess Cash shall promptly be transferred to the Post Effective Date Reserve and such funds shall be deemed Distributable Cash for all purposes hereunder.<br><br>If such Holder votes to accept and/or does not otherwise oppose the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.<br><br>Wells Fargo Bank, N.A., in its capacity as lender and agent under the Prepetition Credit Documents, is, upon information and belief, anticipated to be the only Holder of Prepetition Secured Claims that votes on the Plan. | To Be Determined | Impaired |

| SUMMARY OF EXPECTED RECOVERIES[2] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| 4 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall: <br><br> (i)  receive its Pro Rata share of the General Unsecured Claims Recovery; and <br><br> (ii)  if such Holder votes to accept and/or does not otherwise oppose the Plan, such holder shall be deemed a Released Party for all purposes hereunder. <br><br> As set forth herein, because the Debtors believe it is unlikely all Allowed Administrative and Priority Claims will be paid in full in Cash, they further believe that it is unlikely that Holders of Allowed General Unsecured Claims will receive a Cash recovery under the Plan on account of such Claims.  The Plan consideration for such Holders that vote to accept and/or do not oppose the Plan would be the mutual releases described herein. | $190 million | Less than 1% |
| 5 | Intercompany Claims | Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| 6 | Intercompany Interests | Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | N/A | N/A |
| 7 | Interests in Barneys | Each Allowed Interest in Barneys shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Barneys shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES[2] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| 8 | Section 510(b) Claims[3] | Allowed Section 510(b) Claims, if any, shall be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | 0% |

### E.    How are Administrative Claims treated under the Plan?

Most, if not all, Administrative Claims arising in the ordinary course during the Wind Down will be satisfied prior to or after the Effective Date pursuant to reimbursement obligations of the Purchasers under the Sale Transaction or Wind Down Funds in accordance with the Wind Down Budget.  Any unpaid Administrative Claim arising prior to the Wind Down or not otherwise satisfied prior to the Effective Date will receive the treatment set forth in Article II.A of the Plan.  It is likely that there will not be enough Distributable Cash[4] to satisfy all remaining Allowed Administrative Claims in full in Cash. Accordingly, it is likely that certain parties will be paid a higher percentage of their respective Administrative Claims incurred during these chapter 11 cases.

Moreover, the Plan provides that Allowed Professional Fee Claims will be paid in full in Cash from the Professional Fee Escrow Account without regard to the date incurred.  The Professional Fee Escrow Account which will consist of amounts funded by the Purchasers pursuant to the Wind Down Budget for that exact purpose as well as the Funded Reserve Amount established and funded pursuant to the DIP Order and escrowed into that certain professional fee escrow account as authorized by the Sale Order. In connection with negotiating the terms of the Purchase Agreement and Agency Agreement (as defined in the Sale Order), the Debtors bargained for and obtained, for the benefit of their Estates, the right to allocate any surplus from the Professional Fee Escrow Account to Holders of Allowed Claims.

The Debtors believe Holders of Administrative Claims will see a better recovery under the Plan than any other alternative path, including dismissal or conversion of these cases to proceedings under chapter 7 of the Bankruptcy Code.

**All known Holders of Administrative Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Administrative Claims under the Plan is only available if each such Holder agrees to such treatment. The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of an Administrative Claim prior to January 17, 2020 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in cash. If an**

---

[3]    The Debtors do not anticipate that there will be any Allowed Section 510(b) Claims, but have included Class 8 Section 510(b) Claims as part of the Plan out of an abundance of caution.

[4]    "*Distributable Cash*" means Cash in an amount equal to the Wind Down Funds, if any, available after giving effect to the Wind Down Budget, plus any excess Cash from the Professional Fee Escrow Account remaining after satisfaction of all Allowed Professional Fee Claims, plus any other Cash available in the Estates.

**administrative or priority creditor objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan. If the Plan cannot be confirmed for any reason, including, as a result of any such objections, the Plan shall act as a motion seeking dismissal of the chapter 11 cases in accordance with the Bankruptcy Code. It is possible that Holders of Administrative Claims may receive a smaller distribution on account of their Claims under any alternative to the Plan.**

The quantum of Allowed Administrative Claims and the related Administrative and Priority Tax Claims Recovery[5] available to satisfy such Administrative Claims are dependent on a number of variables and conditions subsequent that are outside the control of the Debtors. Those factors include, but are not limited to, the following:

- whether and to what extent the Purchasers (i) designate executory contracts and/or unexpired leases for assumption, and/or (ii) otherwise elect to assume liabilities of the Estates;

- the amount of proceeds generated pursuant to the store closing process, including satisfaction of certain performance metrics under the Purchase Agreement which could generate up to $6,000,000 of additional funds to satisfy employee severance obligations; and

- the ultimate timing and manner of the store closing process, employee separations, and closing of these chapter 11 cases.

Without limiting the variability of the foregoing and for illustrative purposes only, the Debtors estimate that Distributable Cash could be equal to $2.0 - $6.0 million, exclusive of $2.0 million already set aside to fund employee separation costs pursuant to the Sale Order. Assuming a mid-point of $4.0 million for Distributable Cash, potential, illustrative recoveries for Allowed Administrative Claims are set forth below. **THE ILLUSTRATIVE RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. ACTUAL RECOVERIES COULD MATERIALLY AND/OR SUBSTANTIALLY DIFFER FROM THE BELOW.**

| Illustrative Administrative Claims Recoveries Assuming $4.0 Million of Distributable Cash | | | | | | |
|---|---|---|---|---|---|---|
| **Total Allowed Claims** | $10.0mm | $15.0mm | $20.0mm | $25.0mm | $30.0mm | $35.0mm |
| **Recovery Percentage** | 40% | 26.7% | 20% | 16% | 13.3% | 11.4% |

The initial Administrative Claims Bar Date (as defined herein) for certain Administrative Claims that arose prior to December 15, 2019 is January 10, 2020. Pursuant to the Administrative Bar Date Order, any motion or like request for payment of such claims, including those relating to obligations not reimbursed by the Purchasers and/or contemplated under the Wind Down Budget, shall be held in abeyance

---

[5]    "*Administrative and Priority Tax Claims Recovery*" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Secured Claims as set forth in Article III of the Plan, and (b) Cash in an amount equal to the Allowed Administrative Claims and Allowed Priority Tax Claims.

pending the plan confirmation process. For more information please refer to Article VII.K of this Disclosure Statement.

### F.    How are Priority Tax Claims treated under the Plan?

**All known Holders of Priority Tax Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Priority Tax Claims under the Plan is only available if each such Holder agrees to such treatment.  The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of a Priority Tax Claim prior to January 17, 2020 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment of the full amount of such Claim. If an administrative or priority creditor objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan. If the Plan cannot be confirmed for any reason, including, as a result of any such objections, the Plan shall act as a motion seeking dismissal of the chapter 11 cases in accordance with the Bankruptcy Code.  It is possible that Holders of Priority Tax Claims may receive a smaller distribution on account of their Claims under any alternative to the Plan.**

### G.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions and the Plan shall serve as a motion to dismiss these chapter 11 cases in accordance with the Bankruptcy Code.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors".

The Debtors believe that liquidation under chapter 7 of the Bankruptcy—a very possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan.  Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority, and potential disputes with the Purchasers in relation to the Debtors' obligations under the Purchase Agreement, Sale Order, and Sale Transaction.

### H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (a) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (b) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all

or substantially all of the property dealt with by the Plan; and (c) commencement of distributions under the Plan.

### I.    What are the sources of Cash and other consideration required to fund the Plan?

The Wind-Down Debtors, through the Plan Administrator, will fund distributions under the Plan with Cash available on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining Sale Transaction Cash Proceeds after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors.  The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not object to the Plan.

### J.    Who are the Purchasers?

ABG-Barneys, LLC and B. Riley Financial, Inc. ("B. Riley").  B. Riley is a publicly traded, diversified financial services company which takes a collaborative approach to the capital raising and financial advisory needs of public and private companies and high net worth individuals.  Headquartered in Los Angeles with offices in major U.S. financial markets, B. Riley consists of over 900 employees whose cross-platform expertise is mobilized to provide a myriad of financial solutions.  In addition, Great American Group, LLC, an affiliate of B. Riley, is party to the related Agency Agreement pursuant to which Great American, as agent, monetizes certain purchased inventory.

### K.    Is there potential litigation related to Confirmation of the Plan?

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  In addition, if it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

### L.    Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims under the Plan?

The Debtors' estimate of aggregate amount of General Unsecured Claims that would be Allowed is up to approximately $190 million. Except to the extent there is any Distributable Cash in excess of amounts necessary to satisfy all Allowed Other Priority Claims, if any, and after giving effect to the Administrative and Priority Tax Claims Recovery and Other Priority Claims Recovery, each Allowed General Unsecured Claim against the Debtors shall receive no distribution on account of such Allowed General Unsecured Claim; however, Holders of General Unsecured Claims will receive their pro rata share of any such excess Distributable Cash.  In addition, Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Released Party for all purposes under the Plan.  Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

As set forth herein, because the Debtors believe it is unlikely all Allowed Administrative and Priority Claims will be paid in full in Cash, they further believe that it is unlikely that Holders of Allowed General Unsecured Claims will receive a Cash recovery under the Plan on account of such Claims.  The

Plan consideration for such Holders that vote to accept and/or do not oppose the Plan would be the mutual releases described herein.

The projected amount of Allowed General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors, the Plan Administrator, the Committee, or other parties in interest may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**M.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (a) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan, (b) all Holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and settled all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.20 of this Disclosure Statement, entitled "Releases."

The Debtors, at the direction of one of the Debtors' disinterested directors (the "Disinterested Director"), are conducting an independent investigation into certain potential claims and cause of action held by the Debtors' estates. The Disinterested Director has been working closely with Katten Muchin Rosenman LLP ("Katten") to analyze whether any colorable claims or causes of action exist that are worthy of pursuit on behalf of the Debtors. In that regard, Katten has (i) made over two dozen separate information requests of the Debtors, (ii) reviewed over 2,000 documents, and (iii) conducted numerous interviews. The release and related provisions set forth in the Plan remain subject to the completion of this investigation. Note also that certain claims against the Prepetition Secured Parties and DIP Lenders were previously released under the DIP Order (*see, e.g.*, DIP Order ¶ 81) and the related payoff letters. The Sale Order likewise contains findings of good faith on the part of the Debtors and the Purchasers that would likely be dispositive for section 363(n) purposes (*see, e.g.*, Sale Order ¶ 23).

**N.      What is the deadline to vote on the Plan?**

The Voting Deadline is January 17, 2020 at 4:00 p.m. (prevailing Eastern Time).

**O.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Solicitation Agent **on or before the Voting Deadline, *i.e.*, January 17, 2020 at 4:00 p.m. prevailing Eastern Time**. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**P.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for January 24, 2020 at 12:00 p.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than January 17, 2020 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

**S.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Stretto
Re: Barneys New York, Inc., *et al.*
8269 E. 23rd Avenue, Suite 275
Denver, CO 80238

*By electronic mail at:*
Barneys@stretto.com

*By telephone (toll free) at:*
(855) 202-8711 (toll-free) or (949) 346-3310 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at http://case.stretto.com/barneys (free of charge) or the Bankruptcy Court's website at http://ecf.nysb.uscourts.gov (for a fee).

**T.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.    THE DEBTORS' PLAN**

As discussed in Article III herein, the Plan contemplates, among other things, distributions to Holders of Allowed Claims in accordance with its terms, followed by the Wind Down of the Wind-Down Debtors.

Under the Plan, the remaining assets of the Debtors will be distributed to creditors in accordance with the waterfall priority payment scheme outlined therein and in accordance with the Bankruptcy Code. Furthermore, the Plan Administrator will take over as of the Effective Date and oversee the distributions under the Plan. Notably, the Plan contains certain releases for the Debtors and certain third-parties, as well as exculpation provisions as further discussed therein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Plan includes the following key terms, among others described herein and therein:

### A.    The Plan

#### 1.    Restructuring Transactions

On the Effective Date, to the extent not inconsistent with the Sale Transaction, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described in the Plan, including, as applicable, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include:  the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

#### 2.    Sale Transaction; Sources of Consideration for Plan Distributions

The Plan Administrator and/or the Wind-Down Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining Sale Transaction Cash Proceeds after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan or in the Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, enjoined or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.

#### 3.    Wind-Down Debtors

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each

case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any Estate non-Cash assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummating the Plan. Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

### 4.     Plan Administrator

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of the Sale Transaction; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

### 5. Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Debtors in consultation with the Committee and the Purchasers. The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

### 6. Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 7. Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

### 8. Post Effective Date Reserve

The Plan Administrator shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Distributable Cash it deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties thereunder. The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein, the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve. The Plan Administrator may create reserve specific amounts from the Post Effective Date Reserve in accordance with its business judgment. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

### 9. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

After completion of the Wind Down, any remaining cash of the Debtors shall be distributed in accordance with the priority scheme under the Plan.

### 10. Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

### 11. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 12. Dissolution of the Debtors and Wind-Down Debtors

On or after the Effective Date, the Plan Administrator may File a certification with the Bankruptcy Court that it has substantially administered the Plan for any Debtor, other than Debtor Barneys, and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor(s) are formed or any other jurisdiction. With respect to Debtor Barneys, the Plan Administrator may File a certification with the Bankruptcy Court that all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 13. Cancellation of Securities and Agreements

Upon the Effective Date: (1) the obligations of the Debtors under the Prepetition Credit Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors

19

(except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and settled.

### 14.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions and (2) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Wind-Down Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by Article IV.K of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 15.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 16.    Section 1146 Exemption

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any

such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 17.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 18.    Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of Debtor Barneys, shall be deemed closed, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Barneys.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Barneys in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 19.    Recoveries to Certain Holders of Claims and Interests

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

20.    **Releases**

The Plan contains certain releases, as described in Article III.M of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

B.    **Release of Liens**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.    **Releases by the Debtors**

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement,**

22

the DIP Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided that any right to enforce the Plan and Confirmation Order is not so released.  Notwithstanding anything herein, certain of the releases set forth above are subject to concluding an independent investigation undertaken by the Debtors' disinterested directors. Without limiting the foregoing, neither the Debtors nor the Wind-Down Debtors, as applicable, shall pursue any claims against the Released Parties other than those incurred in the ordinary course of business.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.    **Third-Party Release**

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission,

transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.E, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.E is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, cause of action or liability against any Released Party, or asserting any claim, cause of action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

## E.    Exculpation

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, the DIP Facilities, the DIP Credit Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## F.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property

24

or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; **(4)** asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and **(5)** commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.G of the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### 21. Administrative Claims

All known Holders of unpaid Administrative Claims (other than Professional Fee Claims) and Priority Tax Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan. The Plan provides that each Holder of an Allowed Administrative Claim and Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Administrative and Priority Tax Claims Recovery. The treatment afforded to Holders of Priority Tax Claims under the Plan is only available if each such Holder agrees to such treatment. The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of a Priority Tax Claim prior to January 17, 2020 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment of the full amount of such Claim. If such Holder of an Administrative Claim and Priority Tax Claim fails to return the Administrative / Priority Claim Consent Form or does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

The treatment of Administrative Claims under the Plan is consistent with applicable law and similar approaches have been adopted by other debtors facing administrative insolvency and have been approved by bankruptcy courts under such circumstances. *See e.g.*, *In re MSR Hotels & Resorts, Inc.*, Case No. 13-11512 (SHL) (Bankr. S.D.N.Y. Dec. 20, 2013) (approving a disclosure statement that provided in relevant part, "General Administrative Claims, Other Priority Claims, DIP Claims, and Priority Tax Claims are impaired under the Plan. Failure to object to the Plan will be deemed consent to such treatment under the Plan"); *In re Teligent*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) (confirming a plan where administrative and priority claims would be paid through a claim fund and provided notice to administrative creditors via a consent form); *In re Trans World Airlines, Inc. III*, Case No. 01-00056 (PJW) (D. Del. Feb. 15, 2002) (confirming a plan that provided that any administrative expense convenience claims (as defined in the plan) were entitled to 50 percent of their allowed claim and any such creditors that failed to object would be deemed to accept such treatment). The rights of these administrative claimants to object to this treatment have been fully preserved.

The provisions in this section have been specifically included to make sure that affected creditors are fully informed of their rights. The Debtors seek to be completely transparent about the treatment of Administrative Claims under the Plan and have made clear that if a party does not timely object to its treatment under the Plan or fails to return the Administrative / Priority Claim Consent Form (such forms and objections are due by January 17, 2020 consistent with the Debtors' solicitation procedures), such party will be deemed to have consented to the treatment contemplated by the Plan.

The notion of such implied consent by the failure to object to the Plan complies with the Bankruptcy Code. The plain language of Section 1129(a)(9) simply requires "agreement" to different treatment of a Priority Claim. There is nothing in Section 1129(a)(9) that requires *affirmative agreement*. Courts should, therefore, "properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'"[6] The ordinary and common meaning of "agree" is "consent or accede."[7] "Consent" may be stated expressly, or implied from one's conduct without any direct expression.[8] Thus, Congress's use of the word "agree" in section 1129(a)(9) of the Bankruptcy Code should be interpreted to include implied consent.

Indeed, the bankruptcy and plan solicitation, voting and objection process is replete with situations where courts have found such processes include implied consent. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260-62 (Bankr. S.D.N.Y. 2007) (noting the importance of allowing non-voting creditors to be deemed accepted in large cases); *In re Trans World Airlines, Inc.*, No. 01–0056, (Bankr. D. Del. 2002) (holding "agree" in section 1129(a)(9) should be interpreted to include implied consent) (June 14, 2002 Hr'g Tr.); *In re Teligent, Inc.*, 282 B.R. 765, 771-73 (Bankr. S.D.N.Y. 2002) (same); *In re Specialty Retail Shops Holding Corp.*, *et al.*, No. 19-80064 (TLS) (Bankr. D. Neb. 2019) (same); *In re Toys "R" Us, Inc.*, No. 17-34665 (Bankr. E.D.Va. 2018) (approving solicitation procedures that included implied consent).

Where Congress has intended that a creditor has the right to *affirmatively agree* to certain treatment, it has expressly stated so in the provision. For example, section 1129(a)(8) requires that each class under a plan "accepts" the plan or is unimpaired. In order to accomplish this, Rule 3018(c) governing acceptance or rejection of a plan by voting classes, provides that "[a]n acceptance or rejection *shall be* in *writing*, identify the plan or plans accepted or rejected, be *signed* by the creditor…."[9] Congress clearly specified that voting creditors must affirmatively agree to be bound by a plan by providing a signed writing (in conformance with the Official Forms).[10] Notably, there is no parallel Bankruptcy Rule for establishing how a party can "agree" to a different treatment under section 1129(a)(9). Rather, section 1129(a)(9) has none of the affirmative requirements of Rule 3018(c), simply providing that a holder of a claim "agree" to treatment other than the default standard under Section 1129(a)(9). Courts have recognized that the high bar set by the language in Rule 3018(c) in obtaining the agreement of voting creditors to a plan is not representative of other provisions of the Bankruptcy Code.[11] Accordingly, use of the word "agree" without

---

[6]   *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, et al.*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

[7]   Webster's New World College Dictionary 23 5th Ed. (2014); *see also* American Heritage Dictionary Of The English Language 5th Ed. (2011) ("to express consent; concur").

[8]   *See* Black's Law Dictionary 300 (10th ed. 2014).

[9]   Rule 3018(c) (emphasis added).

[10]   *See In re Vita Corp.*, 380 B.R. 525, 528 (C.D.Ill. 2008) ("[f]ailure on the part of creditors in impaired classes to cast ballots either accepting or rejecting the debtor's proposed Chapter 11 plan could not be deemed an 'acceptance' of the plan").

[11]   *See, e.g. In re Vita Corp.*, 380 B.R. at 528 ("The requirement for an affirmative writing [in Rule 3018(c)] is in sharp contrast to other provisions of the Code, during which the failure to act is expressly deemed an acceptance."); *In re*

reliance on a specific meaning in section 1129(a)(9) demonstrates a broader usage consistent with the ordinary definition of the word.

For more information on Administrative Claims, please see Article III.E of this Disclosure Statement. Please also refer to the Debtors' monthly operating reports [Docket Nos. 280, 349, 532, 562, 591], which are incorporated herein by reference, and the Wind Down Budget attached hereto as **Exhibit B**.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Barneys' Corporate History

Originally conceived in 1923 when Barney Pressman pawned his wife's engagement ring to lease a small Manhattan store with 200 feet of frontage at the corner of Seventh Avenue and 17th Street, Barneys has grown from a downtown Manhattan-based men's retailer into an international arbiter of high style for both women and men and an iconic fashion institution. Throughout the 1970s, Barneys became renowned for discovering and developing new and innovative design talent. The once-local specialty retailer garnered acclaim for its ability to push the fashion industry forward by opening its doors to mesmerizing collections from the world's top designers, including women's and men's ready-to-wear, accessories, shoes, jewelry, cosmetics, fragrances, and gifts for the home.

In the late 1980s, Barneys sought to expand its business outside Manhattan by developing a national chain of department stores. To secure the financing necessary for this endeavor, Barneys partnered with Isetan Co. ("Isetan"), one of Japan's largest retailers and a leading department store chain in Tokyo. Under this arrangement, Barneys was to provide Isetan with expertise in merchandising and store design in exchange for the financing needed to construct stores in New York, Chicago, and Beverly Hills. In 1993, Barneys achieved a corporate milestone when it opened its first store outside Manhattan, in Beverly Hills. By the mid-1990s, however, Barneys became entangled in a dispute with Isetan with respect to its capital investment in Barneys. The dispute culminated in Barneys' voluntary chapter 11 petition in 1996 and its contemporaneous lawsuit against Isetan to recoup millions in real estate payments.

When Barneys completed its chapter 11 reorganization in 1998, it received approximately $62 million in new capital from former unsecured creditors, Bay Harbour Management L.C. ("Bay Harbour") and Whippoorwill Associates Inc. ("Whippoorwill"), in exchange for over 70% of Barneys' reorganized equity. The reorganization plan also resolved Barneys' dispute with Isetan. Bay Harbour and Whippoorwill retained control of Barneys until 2004, when both controlling shareholders sold their interest in Barneys to Jones Apparel Group, Inc. ("Jones") for approximately $294 million in cash and Jones' assumption of approximately $106 million in debt.

Three years after purchasing Barneys, Jones sold its interest in Barneys to certain funds related to Istithmar World ("Istithmar") on August 8, 2007, pursuant to an amended and restated definitive stock purchase agreement for approximately $942 million in cash. Leveraged financing funded slightly over half of the purchase price. In early March 2012, Barneys, represented by Kirkland & Ellis LLP ("K&E") and Blackstone Group LP, completed a consensual out-of-court restructuring among Barneys, Perry Capital, LLC ("Perry Capital"), the Yucaipa Companies, LLC ("Yucaipa"), and Istithmar, designed to permit each class of creditors to receive a recovery consistent with their own view of the value of Barneys. In May 2012, Barneys struck a deal with Perry Capital that reduced its debt from approximately $590 million to

---

*Friese*, 103 B.R. 90, 91 (Bankr. S.D.N.Y. 1989) ("Rule 3018(c)...provides that "[a]n acceptance or rejection shall be in writing...the court cannot deem an impaired class to have accepted a plan if no creditors in that class have voted."); *In re Townco Realty, Inc.*, 81 B.R. 707, 708 (Bankr. S.D.Fl. 1987) ("there is no provision deeming a failure to vote as constituting acceptance").

approximately $50 million, and turned Perry Capital into its majority owner along with Yucaipa and Istithmar holding minority positions. As described below, these parties remain the Debtors' sole equity holders. The chart below depicts the Debtors' current corporate structure.



As of the date hereof, the Debtors' senior management includes Mohsin Y. Meghji, Chief Restructuring Officer and Grace Fu, Executive Vice President of Human Resources and General Counsel. The members of the board of directors for Barneys New York, Inc. include Richard Perry, Mark Lee, Robert C. Beyer, Stephanie Bond, Martin L. Edelman, and Simon Harland.

**B.     The Debtors' Business Operations**

Barneys operated a network of fine specialty retail stores and outlets across three business channels: (a) flagship stores; (b) warehouse stores; and (c) digital platforms.

As of the Petition Date, Barneys leased its flagship stores in New York City, Beverly Hills, Chicago, Boston, San Francisco, Seattle, and Las Vegas. Comprising well over half of total consolidated sales, the Debtors' thirteen flagship stores constituted the key component of Barneys' core business. In recent years, Barneys remodeled its legacy flagship stores with a focus on growing sales through a revamped merchandise assortment and improved shopping environment. Several flagship stores also featured a "Fred's" restaurant, which the Debtors owned and operated.

As of the Petition Date, Barneys operated approximately nine warehouse stores nationwide. The warehouse stores allow Barneys to efficiently transfer designer merchandise from its flagship stores to an off-price setting, thus attracting a lower price point customer base. Most of Barneys' peers utilize similar supply chain logistics to liquidate excess inventory.

As of the Petition Date, Barneys maintained two e-commerce websites, www.Barneys.com and www.BarneysWarehouse.com, and mobile applications across a variety of digital platforms. To keep apace of the rise of online retail, Barneys has historically invested significantly into its digital presence. Barneys' online business has steadily developed into a profitable and promising revenue channel. Most recently, Barneys achieved rapid digital sales growth of 12.4% in FY 2018, with e-commerce constituting approximately 30% of Barneys' revenue.

Since the Petition Date, the Debtors closed fifteen store locations. Following the Sale Transaction, the Purchasers have commenced store closing procedures with respect to the remaining stores. The Purchasers, however, reserve the right to continue operating such and/or certain remaining stores under the Purchase Agreement in their sole discretion.

The Debtors' liquidity profile was extremely limited immediately before and after the Petition Date. Their ability to negotiate terms and replenish inventory to normal, pre-restructuring levels likewise suffered. Many key suppliers imposed onerous trade terms or simply refused to transact. The Debtors' sale volumes suffered as a result, leading to noncompliance with certain financial covenants under the DIP Facility. In September and early October 2019, the Debtors successfully negotiated several amendments to the Final DIP Order with the DIP Lenders to avoid immediate value-destructive liquidation and allow the sale process to continue through the end of October 2019. *See* Docket Nos. 282, 303, and 333.

## C.    The Debtors' Cost Structure

### (i)    Supply Chain

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations. Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers. In limited circumstances, the Debtors contract with foreign manufacturers directly. Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a domestic warehouse that serves as the Debtors' distribution center.

## D.    Employee Compensation and Benefits

The Debtors employ approximately 1,600 employees, including approximately 1,450 full-time employees and approximately 150 part-time employees (collectively, the "Employees"). Approximately 800 of the Debtors' employees are members of a labor union (collectively, the "Union Employees").[12] The Debtors offer their employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, prescription drug, dental, and vision plans, flexible benefits plans, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, retirement plans, and other employee benefit plans. Pursuant to the transactions contemplated under the Sale Transaction, including a reduced if not eliminated physical store footprint, the Debtors anticipate further reductions to the workforce.

---

[12]    The Union Employees are members of one of the three following unions (collectively, the "Unions"): (a) New York New Jersey, Joint Board, Workers United; (b) Philadelphia Joint Board, Workers United; and (c) Western States Regional Board, Workers United. The Union Employees work at stores located in Brooklyn, New York City, Long Island City, Philadelphia, Las Vegas, Los Angeles, and the Lyndhurst Distribution Center. As of the Petition Date, the Debtors were party to collective bargaining agreements with local chapters of the Unions.

### E.    Real Estate Obligations

The Debtors leased all of their store locations.  The majority of the Debtors' leased premises resided in New York, consisting of (a) their corporate headquarters, (b) two New York City flagship stores, including their historic Madison Avenue location, (c) two warehouse stores, including their Central Valley, New York location, (d) a web studio, and (e) a visual arts studio.

Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors undertook an extensive analysis of the Debtors' existing store footprint to determine if (and how many) stores the Debtors should close in connection with their broader financial and operational restructuring initiatives.  Since the Petition Date, the Debtors' management team and advisors ultimately determined that it was appropriate to close fifteen unprofitable brick and mortar store locations.

In formulating the list of stores to close, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance.  Each of the stores identified for closing has historically operated at a loss.  Collectively, the stores closed generated approximately $14.2 million in losses for fiscal year 2018, which represents 98 percent of the Debtors' total losses from stores with negative contribution margin.

In addition, the Purchasers, following the Sale Transaction, likely will conduct store closing sales for the remaining stores, subject to their rights to continue operating certain store locations under the Purchase Agreement.

### F.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors were liable for approximately $190 million in principal amount of aggregate debt obligations.  The Debtors' prepetition capital structure is summarized as follows:

| Funded Debt | Lenders | Maturity | Interest Rates | Principal Amount |
|---|---|---|---|---|
| **ABL Facility** | Wells Citizens Bank TD Bank | Dec. 19, 2023 | Base Rate + Applicable Margin OR LIBOR + Applicable Margin | $141 million[13] |
| **Term Loan Facility** | Wells TPG | Dec. 19, 2023 | LIBOR + 7.00% OR Base Rate + 6.00% | $48.8 million |
|  |  |  |  | $189.8 million |

### 1.    The Prepetition Credit Agreement

Barneys, Inc., as lead borrower, the remaining Debtors, as guarantors, the lenders party thereto (the "ABL Lenders"), and Wells Fargo Bank, N.A.. (the "ABL Agent"), as administrative agent and collateral agent, are parties to the Prepetition Credit Agreement.  The Prepetition Credit Agreement provides for a $225 million ABL Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of December 19, 2023.  Obligations under the ABL Facility are secured by an all asset lien, including, without limitation, a first priority lien on the Debtors' accounts (including

---

[13]    This amount includes approximately $26 million in undrawn letter of credit obligations.

receivables), inventory, deposit accounts, security accounts, cash and cash equivalents, intellectual property, and all equity interests of the Debtors and their subsidiaries (collectively, the "Collateral"). As of the Petition Date, approximately $141 million remained outstanding under the ABL Facility.

The ABL Facility provides for LIBOR loans and Base Rate loans. The LIBOR loans bear interest at LIBOR plus an applicable margin of (a) 2.00% if the Quarterly Average Excess Availability (as defined in the Credit Agreement) exceeds $100,000,000 or (b) 2.25% if the Quarterly Average Excess Availability is equal to or less than $100,000,000. The borrower may elect interest periods with respect to the LIBOR loans; *provided* that interest payments under these loans occur at least every three months. The Base Rate loans bear interest at a Base Rate plus an applicable margin of (x) 1.00% if the Quarterly Average Excess Availability exceeds $100,000,000 or (y) 1.25% if the Quarterly Average Excess Availability is $100,000,000 or less.

Additionally, the Debtors have entered into deposit account control agreements in favor of the ABL Agent with respect to their bank accounts. Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the ABL Agent. Due to the non-payment of rental obligations and alleged events of default under the corresponding leases, the ABL Agent notified the Debtors of an alleged Event of Default under the Credit Agreement. As a result of this Event of Default, the Debtors are required to remit all cash receipts on a daily basis to a non-Debtor account maintained by the ABL Agent (the "Agent Account"). Accordingly, each day, any excess cash is swept to the Agent Account and applied to prepay loans in accordance with the ABL Facility. Due to the alleged Event of Default, there was no availability under the ABL Facility as of the Petition Date. On August 5, 2019, the ABL Lenders and the ABL Agent terminated the ABL Facility.

In April 2019, the Prepetition Credit Agreement was amended to provide for the issuance of a last-out term loan (the "Term Loan Facility") with Barney's, Inc., as borrower, the remaining Debtors as guarantor parties thereto, the lenders thereto (the "Term Loan Lenders"), and Wells, as administrative agent. The Term Loan Facility provides for a loan in an original principal amount of $50 million, with a maturity date of December 19, 2023. Obligations under the Term Loan Facility are secured by the Collateral.

The LIBOR loans bear interest at LIBOR plus 7.00%, and the Base Rate loans bear interest at Base Rate plus 6.00%. Interest on the Term Loan Facility is due on the first calendar day of each month. As of the Petition Date, approximately $48.8 million in aggregate principal amount remained outstanding under the Term Loan Facility. Upon an Event of Default and notice to the ABL Agent by the Requisite Lenders (as defined in the Prepetition Credit Agreement) or upon an acceleration of the obligations in connection with an exercise of remedies under the Credit Agreement, the Term Loan Facility payments are subordinate to payment to the ABL Lenders until the ABL Facility obligations are paid in full (other than Bank Products Obligations (as defined in the Prepetition Credit Agreement) in excess of a $5 million cap).

Under the terms of the Debtors' debtor-in-possession financing, as set forth in the *Second Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 364 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Authorizing Payment of Prepetition Secured Obligations, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 127] (the "Second Interim DIP Order") and the DIP Order, the Debtors and the DIP Lenders agreed to the use of proceeds of the DIP Facility to pay off the then-outstanding obligations under the Prepetition Credit Agreement. As of the date hereof, no debt obligations of the Debtors remain outstanding under the Prepetition Credit Agreement.

### 2. Ownership Interests

As of the Petition Date, the ownership interests of each Debtor is 100% held by its immediate parent. Common stock in Debtor Barneys New York, Inc., the ultimate parent entity, is held by certain funds related to Perry Capital (approximately 72%), Yucaipa (approximately 20%), and Istithmar (approximately 8%).

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

Since 2012, the Debtors opened four new locations, including New York, New York, San Francisco and Livermore, California, and Rosemont, Illinois to achieve their retail footprint as of the Petition Date of twenty-two flagship stores and warehouse locations. During this period, the Debtors also invested in renovating their legacy flagship stores, as described above, as well as their operational infrastructure and digital platforms to provide a top-of-class digital customer experience available across a variety of mobile and web platforms. In recent years, however, the Debtors have consistently experienced decreased EBITDA due to increased operating expenses and decreased sales revenue as a result of the challenging macro retail and promotional sales environment. In addition, recent rent increases and corresponding credit support obligations in key locations, coupled with an onerous debt load, have challenged the Debtors' operations. As described below, these factors came to a head in 2019.

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These include macroeconomic factors—including most significantly, the general downturn in the retail industry, which has led to a decrease in sales, competitive sales promotions resulting in reduced profit margins, and the marked shift away from brick-and-mortar retail to online channels. These also include microeconomic factors—primarily a sharp increase in lease and rental obligations and a downturn in spring 2019 sales volumes. Over time, these factors have tightened the Debtors' liquidity and complicated their vendor relationships. As described above and in further detail below, these factors culminated in a liquidity crisis by summer 2019, when Barneys faced dwindling cash flows, inaccessible inventory, the inability to access even incremental liquidity, and sales projections well below historical numbers.

### A.    Challenging Operating Environment and Increased Rent Obligations

The Debtors, along with many other apparel and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores. Given the Debtors' brick-and-mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. In particular, the Debtors experienced a sharp increase in rent obligations and corresponding credit support obligations of approximately $12 million and $6 million, respectively, as compared to FY 2018. The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their sale targets and depressed profitability performance.

### B.    Supply Chain and Borrowing Base Challenges

The Debtors' retail sales substantially underperformed expectations in the first half of 2019. This was especially true at the Debtors' locations outside of major metropolitan markets. In particular, the challenging sales performance from February to June 2019 resulted in a decrease of revenue of $34 million as compared to the same period for the prior fiscal year. In particular, the ABL Lenders under the Debtors' prepetition ABL Facility increased the discretionary reserve under the ABL Facility by approximately $5 million in response to the Debtors' weak sales performance, further constraining access to operating capital. These pressures led to a buildup in excess merchandise at unprofitable locations, while other, more

profitable locations were unable to meet demand. The ensuing lack of liquidity has made it difficult for the Debtors to appropriately allocate merchandise.

The historically low sales volume anticipated during July further complicated the liquidity shortage confronting the Debtors during the summer of 2019. Moreover, July is characterized by committed payments, such as rent, payroll, sales tax, and purchase card expenses totaling approximately $34.5 million, which leave minimal funds to satisfy the Debtors' vendor base. As the Debtors' liquidity tightened, supply chain vendors began to place pressure on the supply chain cost structure. During summer 2019, merchandise shipments and inventory receipts began to slow due to liquidity tightness and a lack of vendor and factor support. Prior the Petition Date, substantial numbers of vendors refused to ship inventory unless the Debtors paid cash on delivery, resulting in shelf-ready merchandise being stranded. The lack of fresh and sufficient inventory further tightened the Debtors' liquidity (including by reducing the borrowing base under the ABL Facility), creating a negative feedback loop. Without the flow of fresh inventory, the Debtors' retail business suffered greatly.

A critical component of the Debtors' postpetition financing DIP Facilities was securing approximately $25 million in incremental liquidity to fund the Debtors' operations and provide sufficient runway to canvas market interest in a going concern sale process. Maintaining operations in the ordinary course preserved the value of the Debtors' business as a going concern. The DIP Facilities balanced the Debtors' interest in pursuing a going concern transaction (*i.e.*, what the Debtors believed would maximize value) with the DIP Lenders' interest in monetizing their collateral package without incremental value leakage (*i.e.*, what the prepetition lenders were willing to finance).

### C.    Board Exploration of Strategic Alternatives

Recognizing the need to explore restructuring alternatives, the Debtors retained Kirkland & Ellis LLP, as legal advisor, in December of 2018. Then, in June of 2019, the Debtors retained M-III Advisory Partners, LP, as restructuring and financial advisor (including to provide a Chief Restructuring Officer to the Debtors), and the Debtors retained Houlihan Lokey Capital, Inc., as their investment banker, and Katten Muchin Rosenman LLP, as conflicts counsel, in July of 2019.

### D.    Operational Right-Sizing Initiatives

#### 1.    Landlord Engagement

In response to their lease pressures, the Debtors undertook efforts to obtain lease concessions and rent abatements from their landlords throughout spring 2019. For example, members of the Debtors' management team met with the landlord for the Debtors' Chicago flagship store during January 2019 in response to requested letter of credit obligation increases of approximately $6 million seeking (a) a rent reduction, (b) reduced letter of credit obligations to three months' rent (as compared to six months' rent), and (c) authorization for a partial sublease of the leased premises. With respect to its Madison Avenue flagship store, the Debtors sought a reduction in the rent increase for the first one to two years and a standstill on letter of credit obligations. The Debtors sought similar rent reductions with respect to their Las Vegas flagship store.

#### 2.    Sales Promotions

To increase sales revenue and generate traffic to their physical stores, the Debtors conducted in-store sales promotion throughout 2019. These promotions included merchandise markdown by approximately $70 million, an approximate 76% mark-down rate. These promotions generated approximately $6 million in incremental sale proceeds, an increase of approximately 2% compared to the same period for the prior fiscal year. Despite these efforts, the Debtors were unable to generate sufficient

revenue in light of their significant operating expenses. With a negative cash flow expected for most of the first half of FY 2019, the Debtors determined to explore financing initiatives to provide necessary liquidity to fund operations and unlock dormant inventory.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Barneys New York, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 22], filed on August 6, 2019.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://case.stretto.com/barneys.

### B.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On August 21, 2019, the Debtors filed the *Debtors' Motion Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 152] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On September 20, 2019, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 273].

- Retention Applications. On August 27, 2019, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP, Katten Muchin Rosenman LLP as conflicts counsel, Houlihan Lokey Capital, Inc. as investment banker, M-III Advisory Partners, LP as restructuring advisor, and Stretto[14] as administrative advisor (collectively, the "Retention Applications"). On September 19, 2019, the Bankruptcy Court approved the Retention Applications of Kirkland & Ellis LLP, Katten Muchin Rosenman LLP, and Stretto, and on September 20, 2019, the Bankruptcy Court approved the Retention Applications of Houlihan Lokey Capital, Inc. and M-III Advisory Partners, LP. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

---

[14]    "Stretto" is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

### C.    Final Approval of Debtor-in-Possession Financing

On September 5, 2019, the Bankruptcy Court entered the DIP Order approving the Debtors' proposed debtor-in-possession financing (the "DIP Financing") on a final basis [Docket No. 222]. Under the term loan component of the DIP Financing, the DIP Lenders funded a $217 million debtor-in-possession facility, which included $75 million in new money commitments.

Pursuant to the Second Interim DIP Order, the Debtors were authorized and directed to, using cash proceeds of the DIP Financing, pay off the outstanding amount of the Prepetition Secured Obligations in the amount of approximately up to $142 million.

As of the consummation of the Sale Transaction, each Holder of Allowed DIP Claims shall have been indefeasibly paid in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, pursuant to the Sale Order, from the Sale Transaction Cash Proceeds.

### D.    Schedules and Statements

On September 17, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 261–62].

### E.    Appointment of Official Committee

On August 15, 2019, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 131], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases. The Committee is currently composed of the following members: Simon Property Group Inc., Flagship 660 Owner LLC & Flagship Partners II LLC, PRADA USA Corp., New York-New Jersey Regional Joint Board (affiliated with Workers United), Hilldun Corporation, Chloe (a division of Richemont North America, Inc.), and CSS Building Services. The Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and AlixPartners, LLP as its financial advisor.

### F.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### G.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into over one thousand Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of

the remainder of their Executory Contracts and Unexpired Leases, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time. Indeed, on September 4, 2019, the Bankruptcy Court entered an order approving procedures for the assumption or rejection of Executory Contracts and Unexpired Leases [Docket No. 215]. Pursuant to the approved procedures, the Debtors have rejected approximately seventeen (17) Executory Contracts and Unexpired Leases as of the date hereof.

On October 10, 2019, the Debtors filed a *Notice of Cure Amounts and Potential Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases in Connection with Sale* [Docket No. 329] that informed certain of the Debtors' contract counterparties of the possibility that their contracts would be assumed and assigned as part of a potential sale and related cure amounts. On October 11, 2019, the Debtors supplemented this notice via the *Supplemental Notice of Cure Amounts and Potential Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases in Connection with Sale* [Docket No. 339].

Under the Sale Transaction, the Purchasers have certain rights to designate executory contracts for assumption for a certain period of time (the "Designation Rights Period"). The Designation Rights Period ends upon the earlier of (i) the date on which the Bankruptcy Court enters an order confirming the Plan, (ii) the date on which the Sale is terminated at a specific store, if applicable, and (iii) the Sale Termination Date (no later than February 29, 2020). The expiration of the Designation Rights Period can also be extended if consented to by the Purchasers, Debtors, and applicable executory contract counterparty.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

## H.    Collective Bargaining Agreements

To the extent any Collective Bargaining Agreement has not already been assumed and assigned to the Purchasers, terminated, or otherwise expired, such Collective Bargaining Agreements shall terminate in accordance with their terms as of or after the Effective Date. Such terminations shall not constitute a rejection of any Collective Bargaining Agreement or implicate section 1113 of the Bankruptcy Code. The Plan Administrator is authorized to take any action that it deems necessary or appropriate to terminate any Collective Bargaining Agreement. For the avoidance of doubt and notwithstanding the foregoing, to the extent section 1113 is applicable, the termination of the Collective Bargaining Agreements shall be deemed to satisfy such provisions.

### I.    Sale and Marketing Process

As described above, the Debtors conducted a marketing process for some or all of their assets or the equity interests in the Wind-Down Debtors.  The Debtors, working with their legal and financial advisors in consultation with representatives of the Committee and their secured lenders, contacted several interested parties, including both financial and strategic counterparties, a subset of which ultimately executed non-disclosure agreements for purposes of accessing a data room established in connection with the marketing and Auction process.  Each of these parties were also provided "teaser" materials and a process letter.

In furtherance of the Debtors' marketing process, the Debtors and the DIP Lenders thrice extended the milestones under the DIP Financing [Docket Nos. 282, 303, and 333] to avoid triggering a default under the DIP Facility while the Debtors were negotiating the terms of the Sale Transaction.

Under the bidding procedures (as modified from time to time, the "Bidding Procedures") approved by the Bankruptcy Court pursuant to the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 156],[15] the deadline for interested parties to submit Qualified Bids to participate in the auction was October 22, 2019 (as modified from time to time, the "Bid Deadline").  The Debtors' marketing efforts and the Bidding Procedures were ultimately successful, resulting in several proposals from interested parties.

On October 16, 2019, the Debtors reached agreement with the Purchasers on the terms of a "stalking horse" bid for substantially all of the Debtors' assets and filed notice of such bid with the Bankruptcy Court [Docket No. 356].

On October 22, 2019, the Debtors provided notice to parties in interest that the Bid Deadline would be extended to October 23, 2019 at 5:00 p.m. prevailing Eastern Time [Docket No. 377].  When no Qualified Bids (as defined in the Bidding Procedures) other than the Purchasers' bid were received by the Bid Deadline, the Debtors cancelled the auction [Docket No. 418].

The Debtors ultimately determined that the Sale Transaction with the Purchasers was the highest and otherwise best available alternative, and following the Bankruptcy Court's consideration of the Sale Transaction at a hearing held on October 31, 2019, the Bankruptcy Court entered the Sale Order approving the Sale Transaction.

### J.    Sale Transaction, the Wind-Down Debtors, and Wind Down

The Debtors consummated the Sale Transaction with the Purchaser on November 1, 2019.  The implied value of the Sale Transaction was approximately $271 million.

The Sale Transaction Cash Proceeds are equal to an aggregate dollar amount necessary to pay off the DIP Financing and the payoff amount for the postpetition consignment facility under the DIP Facility, estimated to be approximately $244 million.  The Debtors' ability to satisfy administrative and priority claims in accordance with the Plan depends on the Debtors' ability to adhere to the Wind Down Budget.  Such adherence is uncertain, and the Debtors' inability to meet the Wind Down Budget could materially impact the Debtors' ability to satisfy such administrative and priority claims.  The Sale Transaction Cash Proceeds, after giving effect to the wind down process contemplated under the Purchase

---

[15]    On September 3, 2019, the Debtors filed a *Notice of Filing of Revised Bidding Procedures* [Docket No. 200].

Agreement and Sale Order, together with the other cash proceeds and other Cash on hand may be insufficient to pay all administration and priority claims outstanding as of the Effective Date.

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### K.    Administrative Claims Bar Date

On November 25, 2019, the Bankruptcy Court entered the *Order (I) Setting a Bar Date For Filing Proofs of Administrative Claims Against Certain Debtors, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claim Bar Date, and (V) Granting Related Relief* [Docket No. 551] (the "Administrative Claims Bar Date Order").

Under the Administrative Claims Bar Date Order, the Bankruptcy Court established January 10, 2020 at 4:00 p.m. (prevailing Eastern Time) as the bar date (the "Administrative Claims Bar Date") for filing proofs of Administrative Claims arising prior to December 15, 2019 at 11:59 p.m. (prevailing Eastern Time). The Administrative Claims Bar Date Order also set forth certain requirements for filing Administrative Claims which are identified in paragraph six of the Administrative Claims Bar Date Order.

Additionally, under the Administrative Claim Bar Date Order, any requests for payment of such administrative expenses, whether already asserted or asserted after November 25, 2019, are held in abeyance pending the Plan confirmation process.  The Debtors requested the Administrative Claims Bar

Date to better understand the quantum and Holders of Administrative Claims and create an orderly process by which to address all Administrative Claims.

The Administrative Claims Bar Date Order exempts the following parties from having to file a proof of Administrative Claim by the Administrative Claims Bar Date:

- any person or entity whose postpetition claim has previously been allowed by order of the Bankruptcy Court and paid by the Debtors;

- any person or entity with a claim arising under section 503(b)(9) of the Bankruptcy Code, which claims must be filed pursuant to the previous order setting certain bar dates that was entered by the Bankruptcy Court [Docket No. 214];

- any person or entity whose claim has been paid in full by the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Bankruptcy Court;

- any Debtor having a claim against another Debtor; and

- any entity holding a claim for which a separate deadline is fixed by this Bankruptcy Court, including requests from professionals for payment under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 272].

### L.    Exclusivity

On November 25, 2019, the Bankruptcy Court entered the *Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 552] (the "Exclusivity Order"). Pursuant to the Exclusivity Order, the Debtors' exclusive period during which to file a chapter 11 plan was extended through and including April 2, 2020 and the Debtors' exclusive period to solicit acceptances of a chapter 11 plan was extended through and including June 1, 2020.

### M.    Recommendation to Support Plan

As described above, the Plan paves the way for an efficient, cost-effective confirmation process and consummation of the Plan and Wind Down process. The Debtors urge all Holders of Claims entitled to vote to accept or reject the Plan to vote to accept the Plan.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1. **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2. **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

3. **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

4. **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to fulfill their obligations related to the Sale Transaction and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently

provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

## 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

## 6. Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan as of the date hereof. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

## 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations, and (d) potential disputes with the Purchasers regarding the Debtors' obligations in respect of the Sale Transaction.

**8.    The Chapter 11 Cases Could Result in a "Structured Dismissal"**

If the Confirmation or Consummation of the Plan does not occur, (1) the Plan shall be null and void in all respects other than as set forth herein, (2) the Plan shall be deemed a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (3) nothing contained in the Plan or this Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect

**9.    The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**10.    Risk of Nonoccurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**11.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**12.    The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The Debtors believe that releases, injunctions, and exculpations set forth in the Plan comply with the requirements for approval of such provisions under applicable law. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 13. The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to Holders of Allowed Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 14. The Total Amount of Allowed Administrative and Priority Claims May Exceed the Amount of Distributable Cash and/or Be Higher Than Anticipated

The amount of Cash the Debtors' ultimately receive on account of the Sale Transaction and from other sources prior to and following the Effective Date may be lower than anticipated. Additionally Allowed Administrative Claims and Allowed Priority Claims may exceed the total amount of Distributable Cash and/or be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

### 15. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors and Holders of Claims and Interests.

### B.    Risks Related to the Debtors' Businesses

### 1.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue to satisfy their obligations in respect of the Sale Transaction, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition and ability to consummate the Sale Transaction. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity—including in respect of their obligations related to the Sale Transaction. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the bankruptcy process instead of focusing exclusively on fulfilling their obligations related to the Sale Transaction. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to support the Sale Transaction process.

### 3. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to satisfy their obligations in connection with the Sale Transaction.

### 4. The Wind Down Amount May Not Be Funded In Full

The Wind Down Amount was not fully funded at the closing of the Sale Transaction. Instead, it is funded via incremental disbursements by the Purchasers during the wind down process. It is possible that the Purchasers could attempt to withhold or otherwise delay funding the Wind Down Amount. Failure to fund the Wind Down Amount in a timely manner could adversely affect the Debtors' ability to fulfill their obligations related to the Sale Transaction and consummate the Plan.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each

Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 and Class 4 (the "<u>Voting Classes</u>"). The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, and 8, provided that each such Holder in an impaired or potentially impaired class shall receive a form on which to designate its election not to grant the releases under the Plan. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

All known Holders of unpaid Administrative Claims (other than Professional Fee Claims) and Priority Tax Claims will be sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan.

**B.      Voting Record Date**

**The Voting Record Date is December 11, 2019**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

**C.      Voting on the Plan**

**The Voting Deadline is January 17, 2020 at 4:00 p.m. (prevailing Eastern Time)**. To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the reply envelope enclosed with your ballot or to one of the below addresses.

<div style="border:1px solid black; text-align:center;">

**If sent by hand delivery or overnight mail:**

**Stretto**
**Re: Barneys New York, Inc., *et al.***
**Attn: Voting Department**
**8269 E. 23rd Avenue, Suite 275**
**Denver, CO 80238**

</div>

**OR**

**SUBMIT AN ELECTRONIC BALLOT TO THE
SOLICITATION AGENT VIA ELECTRONIC MAIL TO
BARNEYSBALLOTS@STRETTO.COM**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING
PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 202-8711
(TOLL-FREE) OR (949) 346-3310 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO
BARNEYS@STRETTO.COM.**

D.      **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or
contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it
was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that
is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent,
unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely
filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless
temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the
Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal
advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept
or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure
Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS
OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL
NOT BE COUNTED.**

E.      **Deadline for Returning Administrative Claim / Priority Claim Consent Forms and
Release Election Forms**

**The Deadline for returning Administrative Claim / Priority Claim Consent Forms and
Release Election Forms is January 17, 2020 at 4:00 p.m. (prevailing Eastern Time)**.  To be effective,
all Administrative / Priority Claim Consent Forms and Release Election Forms must be properly executed,
completed, and delivered as directed, so that it is **actually received** by the Solicitation Agent on or before
January 17, 2020 at 4:00 p.m. (prevailing Eastern Time).

X.      **CONFIRMATION OF THE PLAN**

A.      **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy
Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an
Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting
Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or
Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Pursuant to the Sale Transaction, the Debtors already sold substantially all of their assets. As a result, a chapter 7 proceeding will do nothing more than create additional costs associated with converting to a chapter 7 liquidation. These additional costs include a percentage fee based on disbursements, as well as additional professional fees associated with a chapter 7 trustee selecting advisors.

While information regarding the additional costs are speculative, the costs are clearly higher and more burdensome for the Debtors' estates than the current proposed Plan (which do not have such incremental costs).

With respect to conversion from chapter 11 to chapter 7 and the related increased costs, delays, and lower recoveries, one bankruptcy judge in the Southern District of New York recently observed:

- "[L]eaving the case in Chapter 11 would, in fact, avoid the diminution of the estate that would actually occur in a Chapter 7 case." (*In re Hostess Brands, Inc.*, No. 12-22052 (Bankr. S.D.N.Y. Nov. 21, 2012), Hr'g Tr. at 146:21-23).

- "[G]iven the loss in value no new fiduciary could be expected to come up to speed in this case … without a destructive delay … unless he or she were to immediately hire the people that are implementing the wind down, which would be a difficult task without doing any analysis on his or her part, the resulting delay would seriously affect the sale value and greatly diminish the likelihood of there being a recovery here for at least the administrative claimants in full." (*Id.* at 148:17-149:6).

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Feasibility

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all administrative and priority claims unless holders of such claim consent to other treatment. The Plan provides for the payment of priority and administrative obligations from Distributable Cash and/or pursuant to the Sale Transaction. It is likely there will not be sufficient Distributable Cash to satisfy all administrative and priority claims in full upon the Effective Date. The Debtors will be required to obtain consent from any such claim holder that is not otherwise paid in full in Cash. The Debtors believe that the Plan is feasible on these alternative bases.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

## 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Wind-Down Debtors, and certain beneficial owners of Claims (each, for purposes of this Article XI, a "Holder") entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in, or new interpretations of, Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not "U.S. Persons" (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor"

for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (2) that are deemed to reject the Plan.

The Debtors expect to treat the Sale Transaction as a taxable sale of assets for U.S. federal income tax purposes.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. Persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. Person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors**

**1.    Tax Consequences of Sale Transaction and Wind Down.**

The Sale Transaction is a taxable transaction for U.S. federal income tax purposes.  Gain or loss, if any, will be recognized based on the difference between the tax basis in the assets that were disposed of in that transaction and the sale price allocable to such assets.  To the extent any taxable income is generated in connection with such sale, the Debtors have certain tax attributes that will be available to offset any such taxable income.  The Debtors do not currently anticipate any material federal income tax liability as a result of the Sale Transaction.

To the extent the Debtors are treated, for tax purposes, as continuing to own any assets that are sold or otherwise collected upon following the implementation of the Sale Transaction (i.e., during the Wind Down), the sale or collection upon such assets will give rise to taxable income or loss, as the case may be, depending upon the Debtors' tax basis in such assets.  So long as such sales or collections occur prior to

the end of the tax year in which Claims against the Debtors are discharged, the Debtors' available tax attributes will be available to offset any resulting taxable income.  It is unclear whether the Debtors will incur any taxable income as a result of the sale of, or collection upon, any assets that were not disposed of in the Sale Transaction.

## 2. COD Income

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule described in the preceding sentence.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Debtors with respect to the sale of their assets).  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a general matter, the rules related to COD Income will only be relevant to the Debtors and Wind-Down Debtors to the extent that taxable income is realized following the conclusion of the current tax year. In that case, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable to offset any taxable income arising in, *e.g.*, the Wind Down, after the conclusion of the current tax year.

## C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 2 Other Priority Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

Class 2 U.S. Holders will receive in Cash their pro rata share of the Other Priority Claims Recovery, in exchange for full and final satisfaction, compromise, settlement, and release of its applicable Allowed

Other Priority Claim. Such U.S. Holders should recognize gain or loss equal to the difference between the adjusted issue price of the debt underlying their Claims and the amount of Cash received in exchange therefor.

### (i)    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Allowed Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the U.S. Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each U.S. Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

U.S. Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### (ii)    Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for U.S. Holders.

### (iii)    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Class 2 Other Priority Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

### (i)    Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).

In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### (ii)    Accrued but Untaxed Interest

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non U.S. Holder is not a bank that has made an extension of credit pursuant to a loan agreement entered into in the ordinary course of its trade or business, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W 8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax described in the preceding paragraph with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### (iii)    FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code. The IRS may make the information returns reporting withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless the Holder of such Allowed Claim: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally by, in the case of a U.S. Holder, such U.S. Holder providing a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder providing a properly executed applicable IRS Form W-8 (or otherwise establishing such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

[*Remainder of page intentionally left blank*]

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  December 16, 2019

BARNEYS NEW YORK, INC.
on behalf of itself and its debtor affiliates

*/s/ Mohsin Y. Meghji*

Mohsin Y. Meghji
Chief Restructuring Officer
Barneys New York, Inc.

COUNSEL:

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile:  (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

## EXHIBIT A

**(The Plan is attached hereto as Exhibit C to the Notice)**

## EXHIBIT B

**Wind Down Budget**

DRAFT SUBJECT TO MATERIAL CHANGE
SUBJECT TO ... EQUIVALENTS

*Corporate Wind Down Budget - Through WE 11/25/2019*

Barneys New York
Sale Closing Date:    11/1/19

| Week Ending:<br>($ in 000s) | Actual<br>11/2/19 | Actual<br>11/9/19 | Actual<br>11/16/19 | Actual<br>11/23/19 | Projection<br>11/30/19 | Projection<br>12/7/19 | Projection<br>12/14/19 | Projection<br>12/21/19 | Projection<br>12/28/19 | Projection<br>1/4/20 | Projection<br>1/11/20 | Projection<br>1/18/20 | Projection<br>1/25/20 | Projection<br>2/1/20 | Projection<br>2/8/20 | Projection<br>2/15/20 | Projection<br>2/22/20 | Total (114 Day) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Corporate Personnel** | | | | | | | | | | | | | | | | | | |
| Corporate Payroll | $0 | ($21) | ($409) | ($58) | ($298) | $0 | ($222) | $0 | ($210) | $0 | ($161) | $0 | ($161) | $0 | ($161) | $0 | ($161) | ($1,863) |
| Corporate Benefits - Normal Course | 0 | (4) | (84) | (12) | (60) | 0 | (44) | 0 | (42) | 0 | (32) | 0 | (32) | 0 | (32) | 0 | (32) | (376) |
| **Total Corporate Personnel** | $0 | ($25) | ($494) | ($70) | ($358) | $0 | ($266) | $0 | ($252) | $0 | ($193) | $0 | ($193) | $0 | ($193) | $0 | ($193) | ($2,239) |
| **Rent** | | | | | | | | | | | | | | | | | | |
| Total Corporate Rent | $0 | ($105) | $0 | ($175) | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ($280) |
| **Total Rent** | $0 | ($105) | $0 | ($175) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($280) |
| **Non-Merch Services** | | | | | | | | | | | | | | | | | | |
| Total Wind Down Services | $0 | $0 | ($5) | $0 | ($542) | ($6) | ($73) | $0 | ($562) | ($6) | ($73) | $0 | ($562) | ($6) | ($73) | $0 | $0 | ($1,906) |
| **Total Non-Merch Services** | $0 | $0 | ($5) | $0 | ($542) | ($6) | ($73) | $0 | ($562) | ($6) | ($73) | $0 | ($562) | ($6) | ($73) | $0 | $0 | ($1,906) |
| **Other Budget Expenses** | | | | | | | | | | | | | | | | | | |
| Logistics, Bank Fees & Other SG&A | $0 | $0 | ($38) | ($125) | ($100) | ($100) | ($455) | ($100) | ($100) | ($75) | ($75) | ($75) | ($75) | ($75) | ($75) | ($75) | ($75) | ($1,618) |
| Insurance Premiums | 0 | 0 | 0 | 0 | 0 | (584) | 0 | 0 | 0 | (584) | 0 | 0 | 0 | (584) | 0 | 0 | 0 | (1,751) |
| PTO/Sick Leave | 0 | (42) | (173) | (131) | (100) | (100) | (50) | (50) | (50) | (150) | (150) | (50) | (125) | (50) | (50) | (50) | (50) | (1,371) |
| Utilities and Repair | 0 | 0 | (3) | 0 | (25) | (25) | (25) | (25) | (25) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (208) |
| Contingency/Other | 0 | 0 | 0 | 0 | (50) | (50) | (50) | (50) | (50) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (450) |
| **Total Other Budget Expenses** | $0 | ($42) | ($214) | ($256) | ($275) | ($859) | ($580) | ($225) | ($225) | ($844) | ($260) | ($160) | ($235) | ($744) | ($160) | ($160) | ($160) | ($5,398) |
| **Total RemainCo Operating Costs** | $0 | ($172) | ($712) | ($501) | ($1,174) | ($864) | ($919) | ($225) | ($1,039) | ($849) | ($526) | ($160) | ($991) | ($749) | ($426) | ($160) | ($353) | ($9,823) |
| **Accrued Expenses** | | | | | | | | | | | | | | | | | | |
| Accrued Payroll | $0 | ($1,104) | ($582) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($48) | ($1,734) |
| Gift Cards[1] | 0 | (3,472) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (3,472) |
| Employee Discounts[1] | 0 | (1,986) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,986) |
| Accrued Sales Tax | 0 | 0 | 0 | 0 | (2,702) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2,702) |
| **Total Accrued Expenses** | $0 | ($6,561) | ($582) | $0 | ($2,702) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($48) | ($9,893) |
| **Fees** | | | | | | | | | | | | | | | | | | |
| Professional Fees | ($330) | ($365) | ($340) | ($345) | ($305) | ($265) | ($265) | ($240) | ($485) | ($105) | ($105) | ($105) | ($105) | ($15) | ($15) | ($15) | ($265) | ($3,670) |
| HL Restructuring Fee | (1,300) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,300) |
| **Total Fees** | ($1,630) | ($365) | ($340) | ($345) | ($305) | ($265) | ($265) | ($240) | ($485) | ($105) | ($105) | ($105) | ($105) | ($15) | ($15) | ($15) | ($265) | ($4,970) |
| **Total Costs** | ($1,630) | ($7,097) | ($1,634) | ($846) | ($4,181) | ($1,129) | ($1,184) | ($465) | ($1,524) | ($954) | ($631) | ($265) | ($1,096) | ($764) | ($441) | ($175) | ($667) | ($24,686) |
| **Remaining Wind Down Balance** | $23,370 | $16,273 | $14,638 | $13,792 | $9,610 | $8,481 | $7,297 | $6,832 | $5,308 | $4,354 | $3,722 | $3,457 | $2,362 | $1,598 | $1,156 | $981 | $314 | $314 |

**Footnotes**

1. Preliminary estimates. Subject to ongoing review and material revision. The Debtors reserve all rights.

## EXHIBIT B

**Redline to Revised Disclosure Statement**

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile:  (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11**
**PLAN OF BARNEYS NEW YORK, INC. AND ITS DEBTOR AFFILIATES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 660 Madison Avenue, 9th Floor, New York, NY 10065.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**[2]

THE DEADLINE TO VOTE ON THE PLAN IS
JANUARY 17, 2020 at 4:00 p.m. (prevailing Eastern Time)

THE DEADLINE TO OBJECT TO THE PLAN IS
JANUARY 17, 2020 at 4:00 p.m. (prevailing Eastern Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY
STRETTO ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF BARNEYS NEW YORK, INC. AND ITS DEBTOR AFFILIATES*.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.[3]

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS AND/OR ARRANGEMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

---

[2]   Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

[3]   The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their business, including, without limitation, Barneys New York, Inc.  This Disclosure Statement may omit the registered trademark (®), trademark (™), and other similar symbols for such trademarks named herein.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

IF CONFIRMATION OR EFFECTIVENESS OF THE PLAN DOES NOT OCCUR, THE PLAN SHALL ACT AS A MOTION SEEKING A DISMISSAL OF THE CHAPTER 11 CASES IN ACCORDANCE WITH THE BANKRUPTCY CODE.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTORS' ABILITY TO SATISFY ALL CLAIMS TO BE PAID UNDER THE PLAN.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; AND ADVERSE TAX CHANGES.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................... 1

II.     PRELIMINARY STATEMENT .................................................................................... 1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ................................................................................................................... ~~3~~4

        A.      What is chapter 11? ........................................................................................... ~~3~~4
        B.      Why are the Debtors sending me this Disclosure Statement? ............................... 4
        C.      Am I entitled to vote on the Plan? ..................................................................... ~~4~~5
        D.      What will I receive from the Debtors if the Plan is consummated? ...................... ~~4~~5
        E.      How are Administrative Claims treated under the Plan? ..................................... ~~7~~9
        F.      **How are Priority Tax Claims treated under the Plan?** ......................... **11**
        **G.**     What happens to my recovery if the Plan is not confirmed or does not go effective? .... ~~8~~11
        ~~G~~**H.**  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?" .............................................................................................. ~~9~~12
        ~~H~~**I.**   What are the sources of Cash and other consideration required to fund the Plan? ...... ~~9~~12
        ~~I~~**J.**   Who are the Purchasers? ..................................................................................... ~~9~~12
        ~~J~~**K.**  Is there potential litigation related to Confirmation of the Plan? ......................... ~~9~~12
        ~~K~~**L.**  Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of
                Allowed Unsecured Claims under the Plan? ...................................................... ~~10~~12
        ~~L~~**M.** Will there be releases and exculpation granted to parties in interest as part of the Plan? ... ~~10~~13
        ~~M~~**N.** What is the deadline to vote on the Plan? ........................................................... ~~11~~14
        ~~N~~**O.**  How do I vote for or against the Plan? ............................................................... ~~11~~14
        ~~O~~**P.**  Why is the Bankruptcy Court holding a Confirmation Hearing? ......................... ~~11~~14
        ~~P~~**Q.**  When is the Confirmation Hearing set to occur? ................................................. ~~11~~14
        ~~Q~~**R.**  What is the purpose of the Confirmation Hearing? ............................................. ~~11~~14
        ~~R~~**S.**  Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? ....................................................................................................... ~~12~~14
        ~~S~~**T.**  Do the Debtors recommend voting in favor of the Plan? .................................... ~~12~~15

IV.     THE DEBTORS' PLAN ............................................................................................. ~~12~~15

        A.      The Plan ............................................................................................................ ~~13~~15
        B.      Release of Liens ................................................................................................ ~~19~~21
        C.      Releases by the Debtors ..................................................................................... ~~19~~22
        D.      Third-Party Release ........................................................................................... ~~20~~23
        E.      Exculpation ....................................................................................................... ~~21~~24
        F.      Injunction .......................................................................................................... ~~21~~24

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ... ~~24~~27

        A.      Barneys' Corporate History ................................................................................ ~~24~~27
        B.      The Debtors' Business Operations ...................................................................... ~~25~~28
        C.      The Debtors' Cost Structure ............................................................................... ~~26~~29
        (i)     Supply Chain ..................................................................................................... ~~26~~29
        D.      Employee Compensation and Benefits ............................................................... ~~26~~29
        E.      Real Estate Obligations ..................................................................................... ~~26~~29
        F.      The Debtors' Prepetition Capital Structure ......................................................... ~~27~~30

VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................................ ~~28~~32

        A.      Challenging Operating Environment and Increased Rent Obligations .................. ~~29~~32

|  | B. | Supply Chain and Borrowing Base Challenges | 2932 |
|  | C. | Board Exploration of Strategic Alternatives | 3033 |
|  | D. | Operational Right-Sizing Initiatives | 3033 |

| VII. | | MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES | 3034 |
|  | A. | First Day Relief | 3034 |
|  | B. | Other Procedural and Administrative Motions | 3134 |
|  | C. | Final Approval of Debtor-in-Possession Financing | 3134 |
|  | D. | Schedules and Statements | 3235 |
|  | E. | Appointment of Official Committee | 3235 |
|  | F. | Litigation Matters | 3235 |
|  | G. | Rejection and Assumption of Executory Contracts and Unexpired Leases | 3235 |
|  | H. | Collective Bargaining Agreements | 3336 |
|  | I. | Sale and Marketing Process | 3336 |
|  | J. | Sale Transaction, the Wind-Down Debtors, and Wind Down | 3437 |
|  | K. | Administrative Claims Bar Date | 3538 |
|  | L. | Exclusivity | 3639 |
|  | M. | Recommendation to Support Plan | 3639 |

| VIII. | | RISK FACTORS | 3639 |
|  | A. | Bankruptcy Law Considerations | 3639 |
|  | B. | Risks Related to the Debtors' Businesses | 4043 |

| IX. | | SOLICITATION AND VOTING PROCEDURES | 4144 |
|  | A. | Holders of Claims Entitled to Vote on the Plan | 4144 |
|  | B. | Voting Record Date | 4245 |
|  | C. | Voting on the Plan | 4245 |
|  | D. | Ballots Not Counted | 4246 |
|  | **E.** | **Deadline for Returning Administrative Claim / Priority Claim Consent Forms and Release Election Forms** | **46** |

| X. | | CONFIRMATION OF THE PLAN | 4346 |
|  | A. | Requirements for Confirmation of the Plan | 4346 |
|  | B. | Best Interests of Creditors | 4346 |
|  | C. | Feasibility | 4447 |
|  | D. | Acceptance by Impaired Classes | 4447 |
|  | E. | Confirmation without Acceptance by All Impaired Classes | 4448 |

| XI. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 4549 |
|  | A. | Introduction | 4549 |
|  | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors | 4750 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 2 Other Priority Claims | 4851 |
|  | (i) | Character of Gain or Loss | 4851 |
|  | (ii) | Accrued Interest | 4852 |
|  | (iii) | Market Discount | 4952 |
|  | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Class 2 Other Priority Claims | 4953 |
|  | (i) | Gain Recognition | 5053 |

(ii)    Accrued but Untaxed Interest ................................................................ ~~50~~53

(iii)    FATCA ................................................................................................ ~~51~~54

E.    Information Reporting and Backup Withholding ............................ ~~51~~54

**XII.    RECOMMENDATION** ................................................................................ ~~53~~56

**EXHIBITS**

EXHIBIT A     Chapter 11 Plan

EXHIBIT B     Wind Down Budget

## I.    INTRODUCTION

Barneys New York, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests (each as defined in the Plan) in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Barneys New York, Inc. and Its Debtor Affiliates* [Docket No. 527], dated November 15, 2019 (as amended, supplemented, or modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES.    THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.    THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Barneys New York, Inc. (together with its Debtor affiliates, "Barneys New York") is an iconic luxury retailer and Manhattan staple since 1923.  Founded and headquartered in New York City, New York, over the course of the twentieth century Barneys New York grew from a small, downtown Manhattan-based men's retailer into an international arbiter of high style for both women and men and an iconic fashion institution.  Throughout the 1970s, Barneys New York became renowned for discovering and developing new and innovative design talent.  The once-local specialty retailer garnered acclaim for its ability to drive the frontier of the fashion industry by opening its doors to mesmerizing collections from the world's most forward-thinking designers.

Since prior to the Petition Date, however, Barneys New York, like many other retail and apparel-focused companies, has suffered from adverse macroeconomic and consumer spending trends as well as certain operational shortfalls.  More specifically, the general shift away from brick-and-mortar retail was further exacerbated by sharp increases in Barneys New York's lease obligations, including over ten million dollars in rent increases on an annualized basis and corresponding letter of credit obligations, which significantly constrained liquidity.  Due to these pressures, Barneys New York operated without sufficient liquidity throughout the summer of 2019.  Cash-on-delivery demands paralyzed the inventory stream, and efforts to raise incremental liquidity or implement an actionable holistic solution to these issues did not bear fruit.

As a result, the Debtors and their advisors worked tirelessly to solicit and develop various strategic alternatives throughout summer of 2019, including with respect to a potential sale transaction. Several strategic and financial investors expressed an interest in acquiring Barneys New York as a going concern, and the Debtors' intellectual property, including their brand equity, also received meaningful market interest.  Several parties engaged in substantial due diligence and submitted indications of interest. Despite substantial, around-the-clock efforts—and some very close calls—the Debtors ran out of time to execute an out-of-court transaction that would address their liquidity challenges and position Barneys New York for long-term success.  Consequently, the Debtors commenced the Chapter 11 Cases on August 6, 2019 to conduct an operational right-sizing, including an evaluation and adjustment to their

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

lease portfolio, explore value-maximizing transactions, including a going-concern sale, and obtain postpetition financing necessary to fund the Chapter 11 Cases and provide operating capital on a go-forward basis.

~~Those~~**The Debtors'** efforts have borne fruit. As described further herein, on October 16, 2019, the Debtors selected a bid submitted by the Purchasers as a "stalking horse" bid for substantially all of the Debtors' assets, the terms of which were memorialized in the Purchase Agreement.

When no other qualified bids were received by the bid deadline, the Debtors cancelled the auction but continued to discharge their fiduciary duties by exploring and developing alternative proposals, including a potential going concern transaction. Despite the Debtors' best efforts, no such indication of interest could be developed into a viable alternative, however. On October 31, 2019, the Bankruptcy Court approved the Sale Transaction. The Debtors consummated the Sale Transaction on November 1, 2019.

Under the Purchase Agreement and related documents, the Purchasers can assume certain costs and liabilities arising from and after the date of assumption of any contracts, leases, and collective bargaining agreements transferred or assumed and assigned pursuant to the terms of the Sale Transaction. The designation period generally continues until the earlier of the Confirmation Date or the Sale Termination Date (i.e., no later than February 29, 2020). The Purchasers also agreed to fund a $27 million wind down budget pursuant to which the Debtors intend to satisfy their post-closing obligations under the Purchase Agreement and other Sale Transaction documents and bring these chapter 11 cases to conclusion. **Upon the closing of the Sale Transaction, the Purchasers funded approximately $250 million, which sale proceeds were used to indefeasibly pay, in full in cash, all DIP Obligations for the benefit of the DIP Parties and the Flagship Partners lenders (see Docket No. 333 at ¶ 3), and approximately $15 million of the Wind Down Amount. As of November 23, 2019, the Debtors had utilized approximately $11.2 million of the Wind Down Amount in accordance with the Wind Down Budget. The Debtors do not anticipate material incremental cash receipts separate and apart from the Wind Down Amount and other Purchaser funding obligations. However, the Debtors continue to work with parties in interest to explore alternative arrangements that could generate incremental cash flows. Such net cash flows, if any, would inure to the benefit of the Estate's creditors and be distributed in accordance with the Plan.**

**As of November 30, 2019, the Debtors reported approximately $5 million of available cash. As set forth in that certain cash management motion [Docket No. 8] and the Debtors' schedules and statements [Docket Nos. 261–62], Debtor Barney's Inc. holds all of the bank accounts in its name. The Debtors estimate, based on current assumptions (including those set forth in Article III.E hereof), that the Distributable Cash as of the Effective Date will be between $2 million and $6 million. For more information on the Debtors' financial statements and information, please refer to the monthly operating reports filed by the Debtors from time to time with the Bankruptcy Court. *See, e.g.*, Docket Nos. 280, 349, 532, 562, and 591.**

The Plan contemplates that a Plan Administrator will be appointed on the Effective Date to finalize the wind down the Debtors' estates, monetize any remaining assets, and make distributions to creditors in accordance with the Plan. The Plan Administrator will be M-III Advisory Partners, LP, the Debtors' financial advisor, or such other entity or individual appointed by the Debtors in consultation with the Committee. Upon completion of the Wind Down, the Plan Administrator will take steps to dissolve any remaining Debtor entity. One or more Debtor may continue to exist after the Effective Date only to facilitate the conclusion of the Wind Down process. Specifically, under the terms of the Plan, Holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and in exchange for, such Holders' Claims and Interests:

- Holders of Allowed Other Secured Claims will be paid in full, in cash on the Effective Date or otherwise provided treatment as to render such Claims unimpaired.

- ~~Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each~~**All known Holders of Other Priority Claims have been sent an Administrative / Priority Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan.  The treatment afforded to Holders of Other Priority Claims under the Plan is only available if each such Holder agrees to such treatment.  The failure to return the Administrative/ Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by Section 1129(a)(9), and** such Holder shall receive its Pro Rata share of the Other Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter.

- Each Holder of an Allowed Prepetition Secured Claim shall receive a Pro Rata distribution of $25,000 on the Effective Date or as soon as reasonably practicable thereafter.

- Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Recovery on the Effective Date or as soon as reasonably practicable thereafter.

- Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims.

- Intercompany Interests shall be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

- Each Allowed Interest in Barneys shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Barneys shall be entitled to any recovery or distribution under the Plan on account of such Interests.

- Allowed Section 510(b) Claims, if any, will be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

**All known Holders of Administrative Claims and Priority Tax Claims will be sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan.  The treatment afforded to Holders of Administrative Claims and Priority Tax Claims under the Plan is only available if each such Holder agrees to such treatment.  The failure of a Holder of an Administrative Claim or Priority Tax Claim to return the Administrative / Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment as required by Section 1129(a)(9), and such Holder shall receive its Pro Rata share of the Administrative/ and Priority Tax Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter.**

In addition, Holders of Administrative Claims, Priority Tax Claims, Other Priority Claims, Prepetition Secured Claims, and General Unsecured Claims that vote to accept **or do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan** or do not object to the Plan shall be deemed "Released Parties" and benefit from the Debtor release. The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to swiftly emerge from chapter 11.

The Plan provides the best available alternative for the Debtors' estates and creditor recoveries. If the Debtors' business were liquidated in a chapter 7 process, store closing processes likely would be stopped in their tracks, forcing locations to go dark and terminate employees until a trustee could turn the lights back on. Even then, important employees with institutional knowledge will be gone for good, leaving an extremely large and complex liquidation to be managed by new hires unfamiliar with the Debtors' business. The needless loss of value to creditors and the Debtors' estates would be enormous. Creditors would receive lower recoveries in chapter 7 because the Debtors' estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.

**If confirmation or effectiveness of the Plan does not occur, the Plan shall act as a motion seeking a dismissal of the chapter 11 cases in accordance with the Bankruptcy Code.**

The Debtors believe that the Plan maximizes stakeholder recoveries in these chapter 11 cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all Holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Stretto, the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by the Voting Deadline, *i.e.*, January 17, 2020 at 4:00 p.m. prevailing Eastern Time. Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing. If the Bankruptcy Court does not confirm the Plan or the Plan is not consummated for any reason, the Plan shall serve as a motion to dismiss these chapter 11 cases in accordance with the Bankruptcy Code.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 3 | Prepetition Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in Barneys | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| | SUMMARY OF EXPECTED RECOVERIES[2] | | | |
|---|---|---|---|---|
| **Class** | **Claim / Equity Interest** | **Treatment of Claim / Equity Interest** | **Projected Amount of Claims** | **Projected Recovery** |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Plan Administrator: <br><br> (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; <br><br> (ii) the collateral securing such Holder's Allowed Other Secured Claim; <br><br> (iii) Reinstatement of such Holder's Allowed Other Secured Claim; or <br><br> (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $[275,000] | 100% |
| 2 | Other Priority Claims | *On the Effective Date, or as soon as reasonably practicable,* except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, **All known Holders of Other Priority Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Other Priority Claims under the Plan is only available if each such Holder agrees to such treatment.** <br><br> **The failure to return the Administrative/ Priority Claim Consent Form or to object to the Plan** *shall be deemed to be such Holder's consent to* **accept less than full payment of its Claim as required by section 1129(a)(9)** *and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.,* **and** in full and final satisfaction, compromise, settlement, and | ~~To Be Determined~~**Less than $1 million** | Unimpaired / Impaired |

---

[2] The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code. Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

| | | SUMMARY OF EXPECTED RECOVERIES[2] | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | **release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive its Pro Rata share of the Other Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter. The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive Unimpaired treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.**<br><br>If such Holder does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder. | | |
| 3 | Prepetition Secured Claims | Except as set forth in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Prepetition Secured Claim, each Holder thereof shall receive a Pro Rata distribution of $25,000.<br><br>If the amount of Allowed Prepetition Secured Claims is less than the amount of the Pro Rata distribution, any excess Cash shall promptly be transferred to the Post Effective Date Reserve and such funds shall be deemed Distributable Cash for all purposes hereunder.<br><br>If such Holder votes to accept **and/or does not otherwise oppose** the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.<br><br>**Wells Fargo Bank, N.A., in its capacity as lender and agent under the Prepetition Credit Documents, is, upon information and belief, anticipated to be the only Holder of Prepetition Secured Claims that votes on the Plan.** | To Be Determined | Impaired |

| SUMMARY OF EXPECTED RECOVERIES[2] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| 4 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall: (i) receive its Pro Rata share of the General Unsecured Claims Recovery; and (ii) if such Holder votes to accept and/or does not otherwise oppose the Plan, such holder shall be deemed a Released Party for all purposes hereunder. As set forth herein, because the Debtors believe it is unlikely all Allowed Administrative and Priority Claims will be paid in full in Cash, they further believe that it is unlikely that Holders of Allowed General Unsecured Claims will receive a Cash recovery under the Plan on account of such Claims. The Plan consideration for such Holders that vote to accept and/or do not oppose the Plan would be the mutual releases described herein. | $[353.6]190 million | Less than 1% |
| 5 | Intercompany Claims | Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| 6 | Intercompany Interests | Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | N/A | N/A |
| 7 | Interests in | Each Allowed Interest in Barneys shall be | N/A | N/A |

| | | SUMMARY OF EXPECTED RECOVERIES[2] | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| | Barneys | canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Barneys shall be entitled to any recovery or distribution under the Plan on account of such Interests. | | |
| 8 | Section 510(b) Claims[3] | Allowed Section 510(b) Claims, if any, shall be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | 0% |

### E.    How are Administrative Claims treated under the Plan?

Most, if not all, aAdministrative eClaims arising in the ordinary course during the Wind Down will be satisfied prior to or after the Effective Date pursuant to reimbursement obligations of the Purchasers under the Sale Transaction or Wind Down Funds in accordance with the Wind Down Budget. Any unpaid Administrative Claim arising prior to the Wind Down or not otherwise satisfied prior to the Effective Date will receive the treatment set forth in Article II.A of the Plan.  It is likely that there will not be enough Distributable Cash[4] to satisfy all remaining Allowed Administrative Claims in full in Cash. **Accordingly, it is likely that certain parties will be paid a higher percentage of their respective Administrative Claims incurred during these chapter 11 cases.**

**Moreover, the Plan provides that Allowed Professional Fee Claims will be paid in full in Cash from the Professional Fee Escrow Account without regard to the date incurred.  The Professional Fee Escrow Account which will consist of amounts funded by the Purchasers pursuant to the Wind Down Budget for that exact purpose as well as the Funded Reserve Amount established and funded pursuant to the DIP Order and escrowed into that certain professional fee escrow account as authorized by the Sale Order. In connection with negotiating the terms of the Purchase Agreement and Agency Agreement (as defined in the Sale Order), the Debtors bargained for and obtained, for the benefit of their Estates, the right to allocate any surplus from the Professional Fee Escrow Account to Holders of Allowed Claims.**

**The Debtors believe Holders of Administrative Claims will see a better recovery under the Plan than any other alternative path, including dismissal or conversion of these cases to proceedings under chapter 7 of the Bankruptcy Code.**

**All known Holders of Administrative Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the**

---

[3]    The Debtors do not anticipate that there will be any Allowed Section 510(b) Claims, but have included Class 8 Section 510(b) Claims as part of the Plan out of an abundance of caution.

[4]    "*Distributable Cash*" means Cash in an amount equal to the Wind Down Funds, if any, available after giving effect to the Wind Down Budget, plus any excess Cash from the Professional Fee Escrow Account remaining after satisfaction of all Allowed Professional Fee Claims, plus any other Cash available in the Estates.

**treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Administrative Claims under the Plan is only available if each such Holder agrees to such treatment. The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of an Administrative Claim prior to January 17, 2020 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in cash. If an administrative or priority creditor objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan. If the Plan cannot be confirmed for any reason, including, as a result of any such objections, the Plan shall act as a motion seeking dismissal of the chapter 11 cases in accordance with the Bankruptcy Code. It is possible that Holders of Administrative Claims may receive a smaller distribution on account of their Claims under any alternative to the Plan.**

The quantum of Allowed Administrative Claims and the related Administrative and Priority Tax Claims Recovery[5] available to satisfy such Administrative Claims are dependent on a number of variables and conditions subsequent that are outside the control of the Debtors. Those factors include, but are not limited to, the following:

- whether and to what extent the Purchasers (i) designate executory contracts and/or unexpired leases for assumption, and/or (ii) otherwise elect to assume liabilities of the Estates;

- the amount of proceeds generated pursuant to the store closing process, including satisfaction of certain performance metrics under the Purchase Agreement which could generate up to $6,000,000 of additional funds to satisfy employee severance obligations; and

- the ultimate timing and manner of the store closing process, employee separations, and closing of these chapter 11 cases.

Without limiting the variability of the foregoing and for illustrative purposes only, the Debtors estimate that Distributable Cash could be equal to $[2.0] - $[6.0] million, exclusive of $2.0 million already set aside to fund employee separation costs pursuant to the Sale Order. Assuming a mid-point of $[4.0] million for Distributable Cash, potential, illustrative recoveries for Allowed Administrative Claims are set forth below. **THE ILLUSTRATIVE RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. ACTUAL RECOVERIES COULD MATERIALLY AND/OR SUBSTANTIALLY DIFFER FROM THE BELOW.**

| Illustrative Administrative Claims Recoveries | | | | | | |
|---|---|---|---|---|---|---|
| Assuming $[4.0] Million of Distributable Cash | | | | | | |
| **Total Allowed Claims** | $10.0mm | $15.0mm | $20.0mm | $25.0mm | $30.0mm | $35.0mm |
| **Recovery Percentage** | [40]% | [26.7]% | [20]% | [16]% | [13.3]% | [11.4]% |

The initial Administrative Claims Bar Date (as defined herein) for certain Administrative Claims

---

5  "*Administrative and Priority Tax Claims Recovery*" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Secured Claims as set forth in Article III of the Plan, and (b) Cash in an amount equal to the Allowed Administrative Claims and Allowed Priority Tax Claims.

that arose prior to December 15, 2019 is January 10, 2020.  Pursuant to the Administrative Bar Date Order, any motion or like request for payment of such claims, including those relating to obligations not reimbursed by the Purchasers and/or contemplated under the Wind Down Budget, shall be held in abeyance pending the plan confirmation process. For more information please refer to Article VII.K of this Disclosure Statement.

**F.**        **How are Priority Tax Claims treated under the Plan?**

**All known Holders of Priority Tax Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of Priority Tax Claims under the Plan is only available if each such Holder agrees to such treatment.  The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of a Priority Tax Claim prior to January 17, 2020 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment of the full amount of such Claim. If an administrative or priority creditor objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan. If the Plan cannot be confirmed for any reason, including, as a result of any such objections, the Plan shall act as a motion seeking dismissal of the chapter 11 cases in accordance with the Bankruptcy Code.  It is possible that Holders of Priority Tax Claims may receive a smaller distribution on account of their Claims under any alternative to the Plan.**

**G.**        ~~F.~~ **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions and the Plan shall serve as a motion to dismiss these chapter 11 cases in accordance with the Bankruptcy Code.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors".

The Debtors believe that liquidation under chapter 7 of the Bankruptcy—a very possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan.   Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority, and potential disputes with the Purchasers in relation to the Debtors' obligations under the Purchase Agreement, Sale Order, and Sale Transaction.

**H.**        ~~G.~~ **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation"

refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (a) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (b) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (c) commencement of distributions under the Plan.

**I.    ~~H.~~ What are the sources of Cash and other consideration required to fund the Plan?**

The Wind-Down Debtors, through the Plan Administrator, will fund distributions under the Plan with Cash available on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining Sale Transaction Cash Proceeds after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors.  The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not object to the Plan.

**J.    ~~I.~~ Who are the Purchasers?**

ABG-Barneys, LLC ~~is a wholly owned subsidiary of~~**and** B. Riley Financial, Inc. ("B. Riley").  B. Riley is a publicly traded, diversified financial services company which takes a collaborative approach to the capital raising and financial advisory needs of public and private companies and high net worth individuals.  Headquartered in Los Angeles with offices in major U.S. financial markets, B. Riley consists of over 900 employees whose cross-platform expertise is mobilized to provide a myriad of financial solutions**.  In addition, Great American Group, LLC, an affiliate of B. Riley, is party to the related Agency Agreement pursuant to which Great American, as agent, monetizes certain purchased inventory**.

**K.    ~~J.~~ Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  In addition, if it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**L.    ~~K.~~ Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate amount of General Unsecured Claims that would be Allowed is up to approximately $[~~353.6~~]**190** million.  Except to the extent there is any Distributable Cash in excess of amounts necessary to satisfy all Allowed Other Priority Claims, if any, and after giving effect to the Administrative and Priority Tax Claims Recovery and Other Priority Claims Recovery, each Allowed General Unsecured Claim against the Debtors shall receive no distribution on account of such Allowed General Unsecured Claim; however, Holders of General Unsecured Claims will receive their pro rata share of any such excess Distributable Cash.  In addition, Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Released Party for all purposes under the Plan.  Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

**As set forth herein, because the Debtors believe it is unlikely all Allowed Administrative and Priority Claims will be paid in full in Cash, they further believe that it is unlikely that Holders of Allowed General Unsecured Claims will receive a Cash recovery under the Plan on account of such Claims. The Plan consideration for such Holders that vote to accept and/or do not oppose the Plan would be the mutual releases described herein.**

The projected amount of Allowed General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors, the Plan Administrator, the Committee, or other parties in interest may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**M.** ~~L.~~ **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (a) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan, (b) all Holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable **form or** ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable **form or** ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and settled all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing

to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.20 of this Disclosure Statement, entitled "Releases."

The Debtors, includingat the direction of one of the Debtors' disinterested directors (the "Disinterested Director"), are conducting an independent investigation into certain potential claims and cause of action held by the Debtors' estates. The Disinterested Director has been working closely with Katten Muchin Rosenman LLP ("Katten") to analyze whether any colorable claims or causes of action exist that are worthy of pursuit on behalf of the Debtors. In that regard, Katten has (i) made over two dozen separate information requests of the Debtors, (ii) reviewed over 2,000 documents, and (iii) conducted numerous interviews. The release and related provisions set forth in the Plan remain subject to the completion of this investigation of potential claims held by the Debtors' estates., Note also that certain claims against the Prepetition Secured Parties and DIP Lenders were previously released under the DIP Order (*see, e.g.*, DIP Order ¶ 81) and the related payoff letters. The Sale Order likewise contains findings of good faith on the part of the Debtors and the Purchasers that would likely be dispositive for section 363(n) purposes (*see, e.g.*, Sale Order ¶ 23).

**N.    M. What is the deadline to vote on the Plan?**

The Voting Deadline is January 17, 2020 at 4:00 p.m. (prevailing Eastern Time).

**O.    N. How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Solicitation Agent **on or before the Voting Deadline, *i.e.*, January 17, 2020 at 4:00 p.m. prevailing Eastern Time**. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**P.    O. Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.    P. When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for January 24, 2020 at [●] [●]12:00 p.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than January 17, 2020 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**R.    Q. What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued

by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

**S.** ~~R.~~ **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Stretto
> Re: Barneys New York, Inc., *et al.*
> 8269 E. 23rd Avenue, Suite 275
> Denver, CO 80238
>
> *By electronic mail at:*
> Barneys@stretto.com
>
> *By telephone (toll free) at:*
> (855) 202-8711 (toll-free) or (949) 346-3310 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at http://case.stretto.com/barneys (free of charge) or the Bankruptcy Court's website at http://ecf.nysb.uscourts.gov (for a fee).

**T.** ~~S.~~ **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    THE DEBTORS' PLAN

As discussed in Article III herein, the Plan contemplates, among other things, distributions to Holders of Allowed Claims in accordance with its terms, followed by the Wind Down of the Wind-Down Debtors.

Under the Plan, the remaining assets of the Debtors will be distributed to creditors in accordance with the waterfall priority payment scheme outlined therein and in accordance with the Bankruptcy Code. Furthermore, the Plan Administrator will take over as of the Effective Date and oversee the distributions under the Plan. Notably, the Plan contains certain releases for the Debtors and certain third-parties, as well as exculpation provisions as further discussed therein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and

in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Plan includes the following key terms, among others described herein and therein:

## A.    The Plan

### 1.    Restructuring Transactions

On the Effective Date, to the extent not inconsistent with the Sale Transaction, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described in the Plan, including, as applicable, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include:  the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### 2.    Sale Transaction; Sources of Consideration for Plan Distributions

The Plan Administrator and/or the Wind-Down Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining Sale Transaction Cash Proceeds after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan or in the Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, enjoined or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.

### 3.    Wind-Down Debtors

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in

all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any Estate non-Cash assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummating the Plan. Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

### 4. Plan Administrator

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of the Sale Transaction; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

### 5.    Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Debtors in consultation with the Committee and the Purchasers.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

### 6.    Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 7.    Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

### 8.    Post Effective Date Reserve

The Plan Administrator shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Distributable Cash it deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties thereunder.  The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein, the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve.  The Plan Administrator may create reserve specific amounts from the Post Effective Date Reserve in accordance with its business judgment.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

### 9.    Wind Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

18

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

After completion of the Wind Down, any remaining cash of the Debtors shall be distributed in accordance with the priority scheme under the Plan.

### 10. Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

### 11. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 12. Dissolution of the Debtors and Wind-Down Debtors

On or after the Effective Date, the Plan Administrator may File a certification with the Bankruptcy Court that it has substantially administered the Plan for any Debtor, other than Debtor Barneys, and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor(s) are formed or any other jurisdiction. With respect to Debtor Barneys, the Plan Administrator may File a certification with the Bankruptcy Court that all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 13. Cancellation of Securities and Agreements

Upon the Effective Date:  (1) the obligations of the Debtors under the Prepetition Credit Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or

ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and settled.

### 14. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions and (2) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by Article IV.K of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 15. Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 16. Section 1146 Exemption

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the

collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 17.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 18.    Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of Debtor Barneys, shall be deemed closed, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Barneys.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Barneys in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 19.    Recoveries to Certain Holders of Claims and Interests

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 20.    Releases

The Plan contains certain releases, as described in Article III.L of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### B.    Release of Liens

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

### C.    Releases by the Debtors

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents,**

the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided that any right to enforce the Plan and Confirmation Order is not so released.  Notwithstanding anything herein, certain of the releases set forth above are subject to concluding an independent investigation undertaken by the Debtors' disinterested directors. Without limiting the foregoing, neither the Debtors nor the Wind-Down Debtors, as applicable, shall pursue any claims against the Released Parties other than those incurred in the ordinary course of business.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.      **Third-Party Release**

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction,

23

contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.E, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.E is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) ~~a~~an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, cause of action or liability against any Released Party, or asserting any claim, ~~C~~cause of ~~A~~action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.    **Exculpation**

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, the DIP Facilities, the DIP Credit Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, satisfied, or are subject to exculpation are

permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.G of the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### 21.   Administrative Claims

~~Each~~All known Holders of ~~an Allowed~~unpaid Administrative Claim~~s.  (~~other than Professional Fee Claims~~.~~) and Priority Tax Claims~~, and except to the extent that an Administrative Claim or Priority Tax Claim has already been satisfied during the Chapter 11 Cases or a Holder of~~ have been sent an Administrative ~~Claim or~~/ Priority ~~Tax Claim and the applicable Debtor(s) agree to less favorable treatment, (a)~~Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan.  The Plan provides that each Holder of an Allowed Administrative Claim and Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Administrative and Priority Tax Claims Recovery. ~~The failure to object to Confirmation~~ The treatment afforded to Holders of Priority Tax Claims under the Plan is only available if each such Holder agrees to such treatment.  The failure to return the Administrative / Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of ~~an Allowed Administrative Claim and Allowed~~a Priority Tax Claim prior to January 17, 2020 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in ~~section~~11 U.S.C. § 1129(a)(9), which otherwise requires payment of the ~~Bankruptcy Code~~full amount of such Claim. If such Holder of an Administrative Claim and Priority Tax Claim fails to return the Administrative / Priority Claim Consent Form or does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

The treatment of Administrative Claims under the Plan is consistent with applicable law and similar approaches have been adopted by other debtors facing administrative insolvency and have been approved by bankruptcy courts under such circumstances. *See e.g.*, *In re MSR Hotels & Resorts, Inc.*, Case No. 13-11512 (SHL) (Bankr. S.D.N.Y. Dec. 20, 2013) (approving a disclosure statement that provided in relevant part, "General Administrative Claims, Other Priority Claims, DIP Claims, and Priority Tax Claims are impaired under the Plan. Failure to object to the Plan will be deemed consent to such treatment under the Plan"); *In re Teligent*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) (confirming a plan where administrative and priority claims would be paid through a claim fund and provided notice to administrative creditors via a consent form); *In re Trans World Airlines, Inc. III*, Case No. 01-00056 (PJW) (D. Del. Feb. 15, 2002) (confirming a plan that provided that any administrative expense convenience claims (as defined in the plan) were entitled to 50 percent of their allowed claim and any such creditors that failed to object would be deemed to accept such treatment). The rights of these administrative claimants to object to this treatment have been fully preserved.

The provisions in this section have been specifically included to make sure that affected creditors are fully informed of their rights. The Debtors seek to be completely transparent about the treatment of Administrative Claims under the Plan and have made clear that if a party does not timely object to its treatment under the Plan (such **or fails to return the Administrative / Priority Claim Consent Form (such forms and** objections are due by January [17],**17,** 2020 consistent with the Debtors' solicitation procedures), such party will be deemed to have consented to the treatment contemplated by the Plan.

The notion of such implied consent by the failure to object to the Plan complies with the Bankruptcy Code. The plain language of Section 1129(a)(9) simply requires "agreement" to different treatment of a Priority Claim. There is nothing in Section 1129(a)(9) that requires *affirmative agreement*. Courts should, therefore, "properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'"[6] The ordinary and common meaning of "agree" is "consent or accede."[7] "Consent" may be stated expressly, or implied from one's conduct without any direct expression.[8] Thus, Congress's use of the word "agree" in section 1129(a)(9) of the Bankruptcy Code should be interpreted to include implied consent.

Indeed, the bankruptcy and plan solicitation, voting and objection process is replete with situations where courts have found such processes include implied consent. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260-62 (Bankr. S.D.N.Y. 2007) (noting the importance of allowing non-voting creditors to be deemed accepted in large cases); *In re Trans World Airlines, Inc.*, No. 01–0056, (Bankr. D. Del. 2002) (holding "agree" in section 1129(a)(9) should be interpreted to include implied consent) (June 14, 2002 Hr'g Tr.); *In re Teligent, Inc.*, 282 B.R. 765, 771-73 (Bankr. S.D.N.Y. 2002) (same); *In re Specialty Retail Shops Holding Corp.*, *et al.*, No. 19-80064 (TLS) (Bankr. D. Neb. 2019) (same); *In re Toys "R" Us, Inc.*, No. 17-34665 (Bankr. E.D.Va. 2018) (approving solicitation procedures that included implied consent).

Where Congress has intended that a creditor has the right to *affirmatively agree* to certain treatment, it has expressly stated so in the provision. For example, section 1129(a)(8) requires that each class under a plan "accepts" the plan or is unimpaired. In order to accomplish this, Rule 3018(c) governing acceptance or rejection of a plan by voting classes, provides that "[a]n acceptance or rejection *shall be* in *writing*, identify the plan or plans accepted or rejected, be *signed* by the creditor…."[9] Congress clearly specified that voting creditors must affirmatively agree to be bound by a plan by

---

[6]    *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, et al.*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).
[7]    WEBSTER'S NEW WORLD COLLEGE DICTIONARY 23 5TH ED. (2014); *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 5TH ED. (2011) ("to express consent; concur").
[8]    *See* BLACK'S LAW DICTIONARY 300 (10th ed. 2014).
[9]    Rule 3018(c) (emphasis added).

providing a signed writing (in conformance with the Official Forms).[10]  Notably, there is no parallel Bankruptcy Rule for establishing how a party can "agree" to a different treatment under section 1129(a)(9).  Rather, section 1129(a)(9) has none of the affirmative requirements of Rule 3018(c), simply providing that a holder of a claim "agree" to treatment other than the default standard under Section 1129(a)(9).  Courts have recognized that the high bar set by the language in Rule 3018(c) in obtaining the agreement of voting creditors to a plan is not representative of other provisions of the Bankruptcy Code.[11]  Accordingly, use of the word "agree" without reliance on a specific meaning in section 1129(a)(9) demonstrates a broader usage consistent with the ordinary definition of the word.

For more information on Administrative Claims, please see Article III.E of this Disclosure Statement.  Please also refer to the Debtors' monthly operating reports [Docket Nos. 280, 349, 532, ~~562~~**562, 591**], which are incorporated herein by reference, and the Wind Down Budget attached hereto as **Exhibit B**.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Barneys' Corporate History

Originally conceived in 1923 when Barney Pressman pawned his wife's engagement ring to lease a small Manhattan store with 200 feet of frontage at the corner of Seventh Avenue and 17th Street, Barneys has grown from a downtown Manhattan-based men's retailer into an international arbiter of high style for both women and men and an iconic fashion institution.  Throughout the 1970s, Barneys became renowned for discovering and developing new and innovative design talent.  The once-local specialty retailer garnered acclaim for its ability to push the fashion industry forward by opening its doors to mesmerizing collections from the world's top designers, including women's and men's ready-to-wear, accessories, shoes, jewelry, cosmetics, fragrances, and gifts for the home.

In the late 1980s, Barneys sought to expand its business outside Manhattan by developing a national chain of department stores.  To secure the financing necessary for this endeavor, Barneys partnered with Isetan Co. ("Isetan"), one of Japan's largest retailers and a leading department store chain in Tokyo.  Under this arrangement, Barneys was to provide Isetan with expertise in merchandising and store design in exchange for the financing needed to construct stores in New York, Chicago, and Beverly Hills.  In 1993, Barneys achieved a corporate milestone when it opened its first store outside Manhattan, in Beverly Hills.  By the mid-1990s, however, Barneys became entangled in a dispute with Isetan with respect to its capital investment in Barneys.  The dispute culminated in Barneys' voluntary chapter 11 petition in 1996 and its contemporaneous lawsuit against Isetan to recoup millions in real estate payments.

When Barneys completed its chapter 11 reorganization in 1998, it received approximately $62 million in new capital from former unsecured creditors, Bay Harbour Management L.C. ("Bay Harbour") and Whippoorwill Associates Inc. ("Whippoorwill"), in exchange for over 70% of Barneys' reorganized equity.  The reorganization plan also resolved Barneys' dispute with Isetan.  Bay Harbour and Whippoorwill retained control of Barneys until 2004, when both controlling shareholders sold their

---

[10]  *See In re Vita Corp.*, 380 B.R. 525, 528 (C.D.Ill. 2008) ("[f]ailure on the part of creditors in impaired classes to cast ballots either accepting or rejecting the debtor's proposed Chapter 11 plan could not be deemed an 'acceptance' of the plan").

[11]  *See, e.g. In re Vita Corp.*, 380 B.R. at 528 ("The requirement for an affirmative writing [in Rule 3018(c)] is in sharp contrast to other provisions of the Code, during which the failure to act is expressly deemed an acceptance."); *In re Friese*, 103 B.R. 90, 91 (Bankr. S.D.N.Y. 1989) ("Rule 3018(c)...provides that "[a]n acceptance or rejection shall be in writing...the court cannot deem an impaired class to have accepted a plan if no creditors in that class have voted."); *In re Townco Realty, Inc.*, 81 B.R. 707, 708 (Bankr. S.D.Fl. 1987) ("there is no provision deeming a failure to vote as constituting acceptance").

interest in Barneys to Jones Apparel Group, Inc. ("Jones") for approximately $294 million in cash and Jones' assumption of approximately $106 million in debt.

Three years after purchasing Barneys, Jones sold its interest in Barneys to certain funds related to Istithmar World ("Istithmar") on August 8, 2007, pursuant to an amended and restated definitive stock purchase agreement for approximately $942 million in cash. Leveraged financing funded slightly over half of the purchase price. In early March 2012, Barneys, represented by Kirkland & Ellis LLP ("K&E") and Blackstone Group LP, completed a consensual out-of-court restructuring among Barneys, Perry Capital, LLC ("Perry Capital"), the Yucaipa Companies, LLC ("Yucaipa"), and Istithmar, designed to permit each class of creditors to receive a recovery consistent with their own view of the value of Barneys. In May 2012, Barneys struck a deal with Perry Capital that reduced its debt from approximately $590 million to approximately $50 million, and turned Perry Capital into its majority owner along with Yucaipa and Istithmar holding minority positions. As described below, these parties remain the Debtors' sole equity holders. The chart below depicts the Debtors' current corporate structure.



As of the date hereof, the Debtors' senior management includes Mohsin Y. Meghji, Chief Restructuring Officer and Grace Fu, Executive Vice President of Human Resources and General Counsel. The members of the board of directors for Barneys New York, Inc. include Richard Perry, Mark Lee, Robert C. Beyer, Stephanie Bond, Martin L. Edelman, and Simon Harland.

## B.    The Debtors' Business Operations

Barneys operated a network of fine specialty retail stores and outlets across three business channels: (a) flagship stores; (b) warehouse stores; and (c) digital platforms.

As of the Petition Date, Barneys leased its flagship stores in New York City, Beverly Hills, Chicago, Boston, San Francisco, Seattle, and Las Vegas. Comprising well over half of total consolidated sales, the Debtors' thirteen flagship stores constituted the key component of Barneys' core business. In recent years, Barneys remodeled its legacy flagship stores with a focus on growing sales through a revamped merchandise assortment and improved shopping environment. Several flagship stores also featured a "Fred's" restaurant, which the Debtors owned and operated.

As of the Petition Date, Barneys operated approximately nine warehouse stores nationwide. The warehouse stores allow Barneys to efficiently transfer designer merchandise from its flagship stores to an off-price setting, thus attracting a lower price point customer base. Most of Barneys' peers utilize similar supply chain logistics to liquidate excess inventory.

As of the Petition Date, Barneys maintained two e-commerce websites, www.Barneys.com and www.BarneysWarehouse.com, and mobile applications across a variety of digital platforms. To keep apace of the rise of online retail, Barneys has historically invested significantly into its digital presence. Barneys' online business has steadily developed into a profitable and promising revenue channel. Most recently, Barneys achieved rapid digital sales growth of 12.4% in FY 2018, with e-commerce constituting approximately 30% of Barneys' revenue.

Since the Petition Date, the Debtors closed fifteen store locations. Following the Sale Transaction, the Purchasers have commenced store closing procedures with respect to the remaining stores. The Purchasers, however, reserve the right to continue operating such and/or certain remaining stores under the Purchase Agreement in their sole discretion.

**The Debtors' liquidity profile was extremely limited immediately before and after the Petition Date. Their ability to negotiate terms and replenish inventory to normal, pre-restructuring levels likewise suffered. Many key suppliers imposed onerous trade terms or simply refused to transact. The Debtors' sale volumes suffered as a result, leading to noncompliance with certain financial covenants under the DIP Facility. In September and early October 2019, the Debtors successfully negotiated several amendments to the Final DIP Order with the DIP Lenders to avoid immediate value-destructive liquidation and allow the sale process to continue through the end of October 2019. *See* Docket Nos. 282, 303, and 333.**

### C.    The Debtors' Cost Structure

#### (i)    Supply Chain

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations. Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers. In limited circumstances, the Debtors contract with foreign manufacturers directly. Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a domestic warehouse that serves as the Debtors' distribution center.

### D.    Employee Compensation and Benefits

The Debtors employ approximately 1,600 employees, including approximately 1,450 full-time employees and approximately 150 part-time employees (collectively, the "Employees"). Approximately

800 of the Debtors' employees are members of a labor union (collectively, the "Union Employees").[12] The Debtors offer their employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, prescription drug, dental, and vision plans, flexible benefits plans, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, retirement plans, and other employee benefit plans. Pursuant to the transactions contemplated under the Sale Transaction, including a reduced if not eliminated physical store footprint, the Debtors anticipate further reductions to the workforce.

### E.    Real Estate Obligations

The Debtors leased all of their store locations. The majority of the Debtors' leased premises resided in New York, consisting of (a) their corporate headquarters, (b) two New York City flagship stores, including their historic Madison Avenue location, (c) two warehouse stores, including their Central Valley, New York location, (d) a web studio, and (e) a visual arts studio.

Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors undertook an extensive analysis of the Debtors' existing store footprint to determine if (and how many) stores the Debtors should close in connection with their broader financial and operational restructuring initiatives. Since the Petition Date, the Debtors' management team and advisors ultimately determined that it was appropriate to close fifteen unprofitable brick and mortar store locations.

In formulating the list of stores to close, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance. Each of the stores identified for closing has historically operated at a loss. Collectively, the stores closed generated approximately $14.2 million in losses for fiscal year 2018, which represents 98 percent of the Debtors' total losses from stores with negative contribution margin.

In addition, the Purchasers, following the Sale Transaction, likely will conduct store closing sales for the remaining stores, subject to their rights to continue operating certain store locations under the Purchase Agreement.

### F.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors were liable for approximately $190 million in principal amount of aggregate debt obligations. The Debtors' prepetition capital structure is summarized as follows:

---

[12]   The Union Employees are members of one of the three following unions (collectively, the "Unions"): (a) New York New Jersey, Joint Board, Workers United; (b) Philadelphia Joint Board, Workers United; and (c) Western States Regional Board, Workers United. The Union Employees work at stores located in Brooklyn, New York City, Long Island City, Philadelphia, Las Vegas, Los Angeles, and the Lyndhurst Distribution Center. As of the Petition Date, the Debtors were party to collective bargaining agreements with local chapters of the Unions.

| Funded Debt | Lenders | Maturity | Interest Rates | Principal Amount |
|---|---|---|---|---|
| **ABL Facility** | Wells<br>Citizens Bank<br>TD Bank | Dec. 19, 2023 | Base Rate + Applicable Margin OR LIBOR + Applicable Margin | $141 million[13] |
| **Term Loan Facility** | Wells<br>TPG | Dec. 19, 2023 | LIBOR + 7.00% OR Base Rate + 6.00% | $48.8 million |
| | | | | $189.8 million |

### 1.    The Prepetition Credit Agreement

Barneys, Inc., as lead borrower, the remaining Debtors, as guarantors, the lenders party thereto (the "ABL Lenders"), and Wells Fargo Bank, N.A.. (the "ABL Agent"), as administrative agent and collateral agent, are parties to the Prepetition Credit Agreement.  The Prepetition Credit Agreement provides for a $225 million ABL Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of December 19, 2023.  Obligations under the ABL Facility are secured by an all asset lien, including, without limitation, a first priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash and cash equivalents, intellectual property, and all equity interests of the Debtors and their subsidiaries (collectively, the "Collateral").  As of the Petition Date, approximately $141 million remained outstanding under the ABL Facility.

The ABL Facility provides for LIBOR loans and Base Rate loans.  The LIBOR loans bear interest at LIBOR plus an applicable margin of (a) 2.00% if the Quarterly Average Excess Availability (as defined in the Credit Agreement) exceeds $100,000,000 or (b) 2.25% if the Quarterly Average Excess Availability is equal to or less than $100,000,000.  The borrower may elect interest periods with respect to the LIBOR loans; *provided* that interest payments under these loans occur at least every three months.  The Base Rate loans bear interest at a Base Rate plus an applicable margin of (x) 1.00% if the Quarterly Average Excess Availability exceeds $100,000,000 or (y) 1.25% if the Quarterly Average Excess Availability is $100,000,000 or less.

Additionally, the Debtors have entered into deposit account control agreements in favor of the ABL Agent with respect to their bank accounts.  Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the ABL Agent.  Due to the non-payment of rental obligations and alleged events of default under the corresponding leases, the ABL Agent notified the Debtors of an alleged Event of Default under the Credit Agreement.  As a result of this Event of Default, the Debtors are required to remit all cash receipts on a daily basis to a non-Debtor account maintained by the ABL Agent (the "Agent Account").  Accordingly, each day, any excess cash is swept to the Agent Account and applied to prepay loans in accordance with the ABL Facility.  Due to the alleged Event of Default, there was no availability under the ABL Facility as of the Petition Date.  On August 5, 2019, the ABL Lenders and the ABL Agent terminated the ABL Facility.

In April 2019, the Prepetition Credit Agreement was amended to provide for the issuance of a last-out term loan (the "Term Loan Facility") with Barney's, Inc., as borrower, the remaining Debtors as guarantor parties thereto, the lenders thereto (the "Term Loan Lenders"), and Wells, as administrative agent.  The Term Loan Facility provides for a loan in an original principal amount of $50 million, with a

---

[13]    This amount includes approximately $26 million in undrawn letter of credit obligations.

maturity date of December 19, 2023. Obligations under the Term Loan Facility are secured by the Collateral.

The LIBOR loans bear interest at LIBOR plus 7.00%, and the Base Rate loans bear interest at Base Rate plus 6.00%. Interest on the Term Loan Facility is due on the first calendar day of each month. As of the Petition Date, approximately $48.8 million in aggregate principal amount remained outstanding under the Term Loan Facility. Upon an Event of Default and notice to the ABL Agent by the Requisite Lenders (as defined in the Prepetition Credit Agreement) or upon an acceleration of the obligations in connection with an exercise of remedies under the Credit Agreement, the Term Loan Facility payments are subordinate to payment to the ABL Lenders until the ABL Facility obligations are paid in full (other than Bank Products Obligations (as defined in the Prepetition Credit Agreement) in excess of a $5 million cap).

Under the terms of the Debtors' debtor-in-possession financing, as set forth in the *Second Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 364 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Authorizing Payment of Prepetition Secured Obligations, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 127] (the "Second Interim DIP Order") and the DIP Order, the Debtors and the DIP Lenders agreed to the use of proceeds of the DIP Facility to pay off the then-outstanding obligations under the Prepetition Credit Agreement. As of the date hereof, no debt obligations of the Debtors remain outstanding under the Prepetition Credit Agreement.

### 2.    Ownership Interests

As of the Petition Date, the ownership interests of each Debtor is 100% held by its immediate parent. Common stock in Debtor Barneys New York, Inc., the ultimate parent entity, is held by certain funds related to Perry Capital (approximately 72%), Yucaipa (approximately 20%), and Istithmar (approximately 8%).

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

Since 2012, the Debtors opened four new locations, including New York, New York, San Francisco and Livermore, California, and Rosemont, Illinois to achieve their retail footprint as of the Petition Date of twenty-two flagship stores and warehouse locations. During this period, the Debtors also invested in renovating their legacy flagship stores, as described above, as well as their operational infrastructure and digital platforms to provide a top-of-class digital customer experience available across a variety of mobile and web platforms. In recent years, however, the Debtors have consistently experienced decreased EBITDA due to increased operating expenses and decreased sales revenue as a result of the challenging macro retail and promotional sales environment. In addition, recent rent increases and corresponding credit support obligations in key locations, coupled with an onerous debt load, have challenged the Debtors' operations. As described below, these factors came to a head in 2019.

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These include macroeconomic factors—including most significantly, the general downturn in the retail industry, which has led to a decrease in sales, competitive sales promotions resulting in reduced profit margins, and the marked shift away from brick-and-mortar retail to online channels. These also include microeconomic factors—primarily a sharp increase in lease and rental obligations and a downturn in spring 2019 sales volumes. Over time, these factors have tightened the Debtors' liquidity and complicated their vendor relationships. As described above and in further detail below, these factors culminated in a liquidity crisis by summer 2019, when Barneys faced dwindling cash flows, inaccessible

inventory, the inability to access even incremental liquidity, and sales projections well below historical numbers.

### A.    Challenging Operating Environment and Increased Rent Obligations

The Debtors, along with many other apparel and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores.  Given the Debtors' brick-and-mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets.  In particular, the Debtors experienced a sharp increase in rent obligations and corresponding credit support obligations of approximately $12 million and $6 million, respectively, as compared to FY 2018.  The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their sale targets and depressed profitability performance.

### B.    Supply Chain and Borrowing Base Challenges

The Debtors' retail sales substantially underperformed expectations in the first half of 2019.  This was especially true at the Debtors' locations outside of major metropolitan markets.  In particular, the challenging sales performance from February to June 2019 resulted in a decrease of revenue of $34 million as compared to the same period for the prior fiscal year.  In particular, the ABL Lenders under the Debtors' prepetition ABL Facility increased the discretionary reserve under the ABL Facility by approximately $5 million in response to the Debtors' weak sales performance, further constraining access to operating capital.  These pressures led to a buildup in excess merchandise at unprofitable locations, while other, more profitable locations were unable to meet demand.  The ensuing lack of liquidity has made it difficult for the Debtors to appropriately allocate merchandise.

The historically low sales volume anticipated during July further complicated the liquidity shortage confronting the Debtors during the summer of 2019.  Moreover, July is characterized by committed payments, such as rent, payroll, sales tax, and purchase card expenses totaling approximately $34.5 million, which leave minimal funds to satisfy the Debtors' vendor base.  As the Debtors' liquidity tightened, supply chain vendors began to place pressure on the supply chain cost structure.  During summer 2019, merchandise shipments and inventory receipts began to slow due to liquidity tightness and a lack of vendor and factor support.  Prior the Petition Date, substantial numbers of vendors refused to ship inventory unless the Debtors paid cash on delivery, resulting in shelf-ready merchandise being stranded.  The lack of fresh and sufficient inventory further tightened the Debtors' liquidity (including by reducing the borrowing base under the ABL Facility), creating a negative feedback loop.  Without the flow of fresh inventory, the Debtors' retail business suffered greatly.

A critical component of the Debtors' postpetition financing DIP Facilities was securing approximately $25 million in incremental liquidity to fund the Debtors' operations and provide sufficient runway to canvas market interest in a going concern sale process.  Maintaining operations in the ordinary course preserved the value of the Debtors' business as a going concern.  The DIP Facilities balanced the Debtors' interest in pursuing a going concern transaction (*i.e.*, what the Debtors believed would maximize value) with the DIP Lenders' interest in monetizing their collateral package without incremental value leakage (*i.e.*, what the prepetition lenders were willing to finance).

### C.    Board Exploration of Strategic Alternatives

Recognizing the need to explore restructuring alternatives, the Debtors retained Kirkland & Ellis LLP, as legal advisor, in December of 2018.  Then, in June of 2019, the Debtors retained M-III Advisory Partners, LP, as restructuring and financial advisor (including to provide a Chief Restructuring Officer to

the Debtors), and the Debtors retained Houlihan Lokey Capital, Inc., as their investment banker, and Katten Muchin Rosenman LLP, as conflicts counsel, in July of 2019.

### D.    Operational Right-Sizing Initiatives

#### 1.    Landlord Engagement

In response to their lease pressures, the Debtors undertook efforts to obtain lease concessions and rent abatements from their landlords throughout spring 2019.  For example, members of the Debtors' management team met with the landlord for the Debtors' Chicago flagship store during January 2019 in response to requested letter of credit obligation increases of approximately $6 million seeking (a) a rent reduction, (b) reduced letter of credit obligations to three months' rent (as compared to six months' rent), and (c) authorization for a partial sublease of the leased premises.  With respect to its Madison Avenue flagship store, the Debtors sought a reduction in the rent increase for the first one to two years and a standstill on letter of credit obligations.  The Debtors sought similar rent reductions with respect to their Las Vegas flagship store.

#### 2.    Sales Promotions

To increase sales revenue and generate traffic to their physical stores, the Debtors conducted in-store sales promotion throughout 2019.  These promotions included merchandise markdown by approximately $70 million, an approximate 76% mark-down rate.  These promotions generated approximately $6 million in incremental sale proceeds, an increase of approximately 2% compared to the same period for the prior fiscal year.  Despite these efforts, the Debtors were unable to generate sufficient revenue in light of their significant operating expenses.  With a negative cash flow expected for most of the first half of FY 2019, the Debtors determined to explore financing initiatives to provide necessary liquidity to fund operations and unlock dormant inventory.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Barneys New York, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 22], filed on August 6, 2019.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://case.stretto.com/barneys.

34

### B.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion.  On August 21, 2019, the Debtors filed the *Debtors' Motion Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 152] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  On September 20, 2019, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 273].

- Retention Applications.   On August 27, 2019, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP, Katten Muchin Rosenman LLP as conflicts counsel, Houlihan Lokey Capital, Inc.  as investment banker, M-III Advisory Partners, LP as restructuring advisor, and Stretto[14] as administrative advisor (collectively, the "Retention Applications").  On September 19, 2019, the Bankruptcy Court approved the Retention Applications of Kirkland & Ellis LLP, Katten Muchin Rosenman LLP, and Stretto, and on September 20, 2019, the Bankruptcy Court approved the Retention Applications of Houlihan Lokey Capital, Inc. and M-III Advisory Partners, LP. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.   The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### C.    Final Approval of Debtor-in-Possession Financing

On September 5, 2019, the Bankruptcy Court entered the DIP Order approving the Debtors' proposed debtor-in-possession financing (the "DIP Financing") on a final basis [Docket No. 222].  Under the term loan component of the the DIP Financing, the DIP Lenders funded a $217 million debtor-in-possession facility, which included $75 million in new money commitments.

Pursuant to the Second Interim DIP Order, the Debtors were authorized and directed to, using cash proceeds of the DIP Financing, pay off the outstanding amount of the Prepetition Secured Obligations in the amount of approximately up to $142 million.

As of the consummation of the Sale Transaction, each Holder of Allowed DIP Claims shall have been indefeasibly paid in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, pursuant to the Sale Order, from the Sale Transaction Cash Proceeds.

### D.    Schedules and Statements

On September 17, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 261–62].

---

14   "Stretto" is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

### E.    Appointment of Official Committee

On August 15, 2019, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 131], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  Simon Property Group Inc., Flagship 660 Owner LLC & Flagship Partners II LLC, PRADA USA Corp., New York-New Jersey Regional Joint Board (affiliated with Workers United), Hilldun Corporation, Chloe (a division of Richemont North America, Inc.), and CSS Building Services.  The Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and AlixPartners, LLP as its financial advisor.

### F.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### G.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into over one thousand Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.  The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.  Indeed, on September 4, 2019, the Bankruptcy Court entered an order approving procedures for the assumption or rejection of Executory Contracts and Unexpired Leases [Docket No. 215].  Pursuant to the approved procedures, the Debtors have rejected approximately seventeen (17) Executory Contracts and Unexpired Leases as of the date hereof.

On October 10, 2019, the Debtors filed a *Notice of Cure Amounts and Potential Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases in Connection with Sale* [Docket No. 329] that informed certain of the Debtors' contract counterparties of the possibility that their contracts would be assumed and assigned as part of a potential sale and related cure amounts.  On October 11, 2019, the Debtors supplemented this notice via the *Supplemental Notice of Cure Amounts and Potential Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases in Connection with Sale* [Docket No. 339].

Under the Sale Transaction, the Purchasers have certain rights to designate executory contracts for assumption for a certain period of time (the "Designation Rights Period"). The Designation Rights Period ends upon the earlier of (i) the date on which the Bankruptcy Court enters an order confirming the Plan, (ii) the date on which the Sale is terminated at a specific store, if applicable, and (iii) the Sale Termination Date (no later than February 29, 2020). The expiration of the Designation Rights Period can

also be extended if consented to by the Purchasers, Debtors, and applicable executory contract counterparty.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

## H.    Collective Bargaining Agreements

To the extent any Collective Bargaining Agreement has not already been assumed and assigned to the Purchasers, terminated, or otherwise expired, such Collective Bargaining Agreements shall terminate in accordance with their terms as of or after the Effective Date.  Such terminations shall not constitute a rejection of any Collective Bargaining Agreement or implicate section 1113 of the Bankruptcy Code. The Plan Administrator is authorized to take any action that it deems necessary or appropriate to terminate any Collective Bargaining Agreement.  For the avoidance of doubt and notwithstanding the foregoing, to the extent section 1113 is applicable, the termination of the Collective Bargaining Agreements shall be deemed to satisfy such provisions.

## I.    Sale and Marketing Process

As described above, the Debtors conducted a marketing process for some or all of their assets or the equity interests in the Wind-Down Debtors.  The Debtors, working with their legal and financial advisors in consultation with representatives of the Committee and their secured lenders, contacted several interested parties, including both financial and strategic counterparties, a subset of which ultimately executed non-disclosure agreements for purposes of accessing a data room established in connection with the marketing and Auction process.  Each of these parties were also provided "teaser" materials and a process letter.

In furtherance of the Debtors' marketing process, the Debtors and the DIP Lenders thrice extended the milestones under the DIP Financing [Docket Nos. 282, 303, and 333] to avoid triggering a default under the DIP Facility while the Debtors were negotiating the terms of the Sale Transaction.

Under the bidding procedures (as modified from time to time, the "Bidding Procedures") approved by the Bankruptcy Court pursuant to the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 156],[15] the deadline for interested parties to submit

---

[15]    On September 3, 2019, the Debtors filed a *Notice of Filing of Revised Bidding Procedures* [Docket No. 200].

Qualified Bids to participate in the auction was October 22, 2019 (as modified from time to time, the "Bid Deadline"). The Debtors' marketing efforts and the Bidding Procedures were ultimately successful, resulting in several proposals from interested parties.

On October 16, 2019, the Debtors reached agreement with the Purchasers on the terms of a "stalking horse" bid for substantially all of the Debtors' assets and filed notice of such bid with the Bankruptcy Court [Docket No. 356].

On October 22, 2019, the Debtors provided notice to parties in interest that the Bid Deadline would be extended to October 23, 2019 at 5:00 p.m. prevailing Eastern Time [Docket No. 377]. When no Qualified Bids (as defined in the Bidding Procedures) other than the Purchasers' bid were received by the Bid Deadline, the Debtors cancelled the auction [Docket No. 418].

The Debtors ultimately determined that the Sale Transaction with the Purchasers was the highest and otherwise best available alternative, and following the Bankruptcy Court's consideration of the Sale Transaction at a hearing held on October 31, 2019, the Bankruptcy Court entered the Sale Order approving the Sale Transaction.

## J.    Sale Transaction, the Wind-Down Debtors, and Wind Down

The Debtors consummated the Sale Transaction with the Purchaser on November 1, 2019. The implied value of the Sale Transaction was approximately $271 million.

The Sale Transaction Cash Proceeds are equal to an aggregate dollar amount necessary to pay off the DIP Financing and the payoff amount for the postpetition consignment facility under the DIP Facility, estimated to be approximately $244 million. The Debtors' ability to satisfy administrative and priority claims in accordance with the Plan depends on the Debtors' ability to adhere to the Wind Down Budget. Such adherence is uncertain, and the Debtors' inability to meet the Wind Down Budget could materially impact the Debtors' ability to satisfy such administrative and priority claims. The Sale Transaction Cash Proceeds, after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, together with the other cash proceeds and other Cash on hand may be insufficient to pay all administration and priority claims outstanding as of the Effective Date.

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan

Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### K.    Administrative Claims Bar Date

On November 25, 2019, the Bankruptcy Court entered the *Order (I) Setting a Bar Date For Filing Proofs of Administrative Claims Against Certain Debtors, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claim Bar Date, and (V) Granting Related Relief* [Docket No. 551] (the "Administrative Claims Bar Date Order").

Under the Administrative Claims Bar Date Order, the Bankruptcy Court established January 10, 2020 at 4:00 p.m. (prevailing Eastern Time) as the bar date (the "Administrative Claims Bar Date") for filing proofs of Administrative Claims arising prior to December 15, 2019 at 11:59 p.m. (prevailing Eastern Time). The Administrative Claims Bar Date Order also set forth certain requirements for filing Administrative Claims which are identified in paragraph six of the Administrative Claims Bar Date Order.

Additionally, under the Administrative Claim Bar Date Order, any requests for payment of such administrative expenses, whether already asserted or asserted after November 25, 2019, are held in abeyance pending the Plan confirmation process. The Debtors requested the Administrative Claims Bar Date to better understand the quantum and Holders of Administrative Claims and create an orderly process by which to address all Administrative Claims.

The Administrative Claims Bar Date Order exempts the following parties from having to file a proof of Administrative Claim by the Administrative Claims Bar Date:

- any person or entity whose postpetition claim has previously been allowed by order of the Bankruptcy Court and paid by the Debtors;

- any person or entity with a claim arising under section 503(b)(9) of the Bankruptcy Code, which claims must be filed pursuant to the previous order setting certain bar dates that was entered by the Bankruptcy Court [Docket No. 214];

- any person or entity whose claim has been paid in full by the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Bankruptcy Court;

- any Debtor having a claim against another Debtor; and

- any entity holding a claim for which a separate deadline is fixed by this Bankruptcy Court, including requests from professionals for payment under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 272].

L.    **Exclusivity**

On November 25, 2019, the Bankruptcy Court entered the *Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 552] (the "Exclusivity Order"). Pursuant to the Exclusivity Order, the Debtors' exclusive period during which to file a chapter 11 plan was extended through and including April 2, 2020 and the Debtors' exclusive period to solicit acceptances of a chapter 11 plan was extended through and including June 1, 2020.

M.    **Recommendation to Support Plan**

As described above, the Plan paves the way for an efficient, cost-effective confirmation process and consummation of the Plan and Wind Down process. The Debtors urge all Holders of Claims entitled to vote to accept or reject the Plan to vote to accept the Plan.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.    **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.    **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or

other transaction would be similar or as favorable to the Holders of Allowed Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to fulfill their obligations related to the Sale Transaction and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication

of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan as of the date hereof. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

**7.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations, and (d) potential disputes with the Purchasers regarding the Debtors' obligations in respect of the Sale Transaction.

**8.      The Chapter 11 Cases Could Result in a "Structured Dismissal"**

If the Confirmation or Consummation of the Plan does not occur, (1) the Plan shall be null and void in all respects other than as set forth herein, (2) the Plan shall be deemed a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (3) nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect

**9.      The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**10.     Risk of Nonoccurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

42

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 12. The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The Debtors believe that releases, injunctions, and exculpations set forth in the Plan comply with the requirements for approval of such provisions under applicable law. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 13. The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to Holders of Allowed Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 14. The Total Amount of Allowed Administrative and Priority Claims May Exceed the Amount of Distributable Cash and/or Be Higher Than Anticipated

The amount of Cash the Debtors' ultimately receive on account of the Sale Transaction and from other sources prior to and following the Effective Date may be lower than anticipated. Additionally Allowed Administrative Claims and Allowed Priority Claims may exceed the total amount of Distributable Cash and/or be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

### 15. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors and Holders of Claims and Interests.

**B.**     **Risks Related to the Debtors' Businesses**

**1.**     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue to satisfy their obligations in respect of the Sale Transaction, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition and ability to consummate the Sale Transaction. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**2.**     **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity—including in respect of their obligations related to the Sale Transaction. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the bankruptcy process instead of focusing exclusively on fulfilling their obligations related to the Sale Transaction. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to support the Sale Transaction process.

**3.**     **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to satisfy their obligations in connection with the Sale Transaction.

### 4. The Wind Down Amount May Not Be Funded In Full

The Wind Down Amount was not fully funded at the closing of the Sale Transaction. Instead, it is funded via incremental disbursements by the Purchasers during the wind down process. It is possible that the Purchasers could attempt to withhold or otherwise delay funding the Wind Down Amount. Failure to fund the Wind Down Amount in a timely manner could adversely affect the Debtors' ability to fulfill their obligations related to the Sale Transaction and consummate the Plan.

## IX. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan*.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A. Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 and Class 4 (the "Voting Classes"). The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes **on the Plan** from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, and ~~8.~~**8, provided that each such Holder in an impaired or potentially impaired class shall receive a form on which to designate its election not to grant the releases under the Plan.** Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

**All known Holders of unpaid Administrative Claims (other than Professional Fee Claims) and Priority Tax Claims will be sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder under the Plan.**

**B.      Voting Record Date**

**The Voting Record Date is December 11, 2019**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

**C.      Voting on the Plan**

**The Voting Deadline is January 17, 2020 at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the reply envelope enclosed with your ballot or to one of the below addresses.

---

**If sent by hand delivery or overnight mail:**

**Stretto**
**Re: Barneys New York, Inc.,** *et al.*
**Attn: Voting Department**
**8269 E. 23rd Avenue, Suite 275**
**Denver, CO 80238**

---

**OR**

**SUBMIT AN ELECTRONIC BALLOT TO THE**
**SOLICITATION AGENT VIA ELECTRONIC MAIL TO**
**BARNEYSBALLOTS@STRETTO.COM**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 202-8711 (TOLL-FREE) OR (949) 346-3310 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO BARNEYS@STRETTO.COM.**

**D.      Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not

clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

**E.**   **Deadline for Returning Administrative Claim / Priority Claim Consent Forms and Release Election Forms**

**The Deadline for returning Administrative Claim / Priority Claim Consent Forms and Release Election Forms is January 17, 2020 at 4:00 p.m. (prevailing Eastern Time). To be effective, all Administrative / Priority Claim Consent Forms and Release Election Forms must be properly executed, completed, and delivered as directed, so that it is actually received by the Solicitation Agent on or before January 17, 2020 at 4:00 p.m. (prevailing Eastern Time).**

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Pursuant to the Sale Transaction, the Debtors already sold substantially all of their assets. As a result, a chapter 7 proceeding will do nothing more than create additional costs associated with converting to a chapter 7 liquidation. These additional costs include a percentage fee based on disbursements, as well as additional professional fees associated with a chapter 7 trustee selecting advisors.

While information regarding the additional costs are speculative, the costs are clearly higher and more burdensome for the Debtors' estates than the current proposed Plan (which do not have such incremental costs).

With respect to conversion from chapter 11 to chapter 7 and the related increased costs, delays, and lower recoveries, one bankruptcy judge in the Southern District of New York recently observed:

- "[L]eaving the case in Chapter 11 would, in fact, avoid the diminution of the estate that would actually occur in a Chapter 7 case." (*In re Hostess Brands, Inc.*, No. 12-22052 (Bankr. S.D.N.Y. Nov. 21, 2012), Hr'g Tr. at 146:21-23).

- "[G]iven the loss in value no new fiduciary could be expected to come up to speed in this case … without a destructive delay … unless he or she were to immediately hire the people that are implementing the wind down, which would be a difficult task without doing any analysis on his or her part, the resulting delay would seriously affect the sale value and greatly diminish the likelihood of there being a recovery here for at least the administrative claimants in full." (*Id.* at 148:17-149:6).

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Feasibility

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all administrative and priority claims unless holders of such claim consent to other treatment. The Plan provides for the payment of priority and administrative obligations from Distributable Cash and/or pursuant to the Sale Transaction. It is likely there will not be sufficient Distributable Cash to satisfy all administrative and priority claims in full upon the Effective Date. The Debtors will be required to obtain consent from any such claim holder that is not otherwise paid in full in Cash. The Debtors believe that the Plan is feasible on these alternative bases.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Wind-Down Debtors, and certain

beneficial owners of Claims (each, for purposes of this Article XI, a "Holder") entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in, or new interpretations of, Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not "U.S. Persons" (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (2) that are deemed to reject the Plan.

The Debtors expect to treat the Sale Transaction as a taxable sale of assets for U.S. federal income tax purposes.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. Persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. Person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner)

generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors

#### 1. Tax Consequences of Sale Transaction and Wind Down.

The Sale Transaction is a taxable transaction for U.S. federal income tax purposes. Gain or loss, if any, will be recognized based on the difference between the tax basis in the assets that were disposed of in that transaction and the sale price allocable to such assets. To the extent any taxable income is generated in connection with such sale, the Debtors have certain tax attributes that will be available to offset any such taxable income. The Debtors do not currently anticipate any material federal income tax liability as a result of the Sale Transaction.

To the extent the Debtors are treated, for tax purposes, as continuing to own any assets that are sold or otherwise collected upon following the implementation of the Sale Transaction (i.e., during the Wind Down), the sale or collection upon such assets will give rise to taxable income or loss, as the case may be, depending upon the Debtors' tax basis in such assets. So long as such sales or collections occur prior to the end of the tax year in which Claims against the Debtors are discharged, the Debtors' available tax attributes will be available to offset any resulting taxable income. It is unclear whether the Debtors will incur any taxable income as a result of the sale of, or collection upon, any assets that were not disposed of in the Sale Transaction.

#### 2. COD Income

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule described in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Debtors with respect to the sale of their assets). In general, tax attributes will be reduced in the

following order:  (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a general matter, the rules related to COD Income will only be relevant to the Debtors and Wind-Down Debtors to the extent that taxable income is realized following the conclusion of the current tax year.  In that case, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable to offset any taxable income arising in, *e.g.*, the Wind Down, after the conclusion of the current tax year.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 2 Other Priority Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

Class 2 U.S. Holders will receive in Cash their pro rata share of the Other Priority Claims Recovery, in exchange for full and final satisfaction, compromise, settlement, and release of its applicable Allowed Other Priority Claim.  Such U.S. Holders should recognize gain or loss equal to the difference between the adjusted issue price of the debt underlying their Claims and the amount of Cash received in exchange therefor.

### (i)    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Allowed Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the U.S. Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated.  Each U.S. Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

U.S. Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an

unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### (ii)    Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income.   Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for U.S. Holders.

### (iii)    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

D.    **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Class 2 Other Priority Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

(i)    **Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(ii)    **Accrued but Untaxed Interest**

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non U.S. Holder is not a bank that has made an extension of credit pursuant to a loan agreement entered into in the ordinary course of its trade or business, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W 8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax described in the preceding paragraph with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(iii)    **FATCA**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the total of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

E.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the Tax Code. The IRS may make the information returns reporting withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless the Holder of such Allowed Claim: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally by, in the case of a U.S. Holder, such U.S. Holder providing a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder providing a properly executed applicable IRS Form W-8 (or otherwise establishing such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in

which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

*[Remainder of page intentionally left blank]*

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  December 9,16, 2019

BARNEYS NEW YORK, INC.
on behalf of itself and its debtor affiliates


*/s/ Mohsin Y. Meghji*

Mohsin Y. Meghji
Chief Restructuring Officer
Barneys New York, Inc.


COUNSEL:

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

-and-

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile:  (212) 940-8776

*Co-Counsel for the Debtors and Debtors in Possession*

## EXHIBIT C

**Revised Plan**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT CHAPTER 11 PLAN OF BARNEYS
## NEW YORK, INC. AND ITS DEBTOR AFFILIATES

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:        (212) 940-8800
Facsimile:        (212) 940-8776

*Counsel for the Debtors and Debtors in Possession*

Dated: December 16, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 660 Madison Avenue, 9th Floor, New York, NY 10065.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW ...................................................................................................................1

    A.    Defined Terms ...................................................................................................1
    B.    Rules of Interpretation .......................................................................................9
    C.    Computation of Time .......................................................................................10
    D.    Governing Law ................................................................................................10
    E.    Reference to Monetary Figures ........................................................................10
    F.    Reference to the Debtors or the Wind-Down Debtors ........................................10
    G.    Nonconsolidated Plan ......................................................................................10

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS ..........................................................................................................................11

    A.    Administrative Claims and Priority Tax Claims. ...............................................11
    B.    Professional Fee Claims ...................................................................................11
    C.    DIP Claims......................................................................................................12
    D.    Statutory Fees..................................................................................................12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................13

    A.    Classification of Claims and Interests...............................................................13
    B.    Treatment of Claims and Interests ....................................................................13
    C.    Special Provision Governing Unimpaired Claims ..............................................16
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................16
    E.    Subordinated Claims ........................................................................................16
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ............17
    G.    Controversy Concerning Impairment .................................................................17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..............................................17

    A.    Restructuring Transactions ...............................................................................17
    B.    Sale Transaction; Sources of Consideration for Plan Distributions .....................17
    C.    Wind-Down Debtors ........................................................................................18
    D.    Plan Administrator ...........................................................................................18
    E.    Wind Down ....................................................................................................19
    F.    Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation .................19
    G.    Tax Returns.....................................................................................................20
    H.    Dissolution of the Debtors and Wind-Down Debtors .........................................20
    I.    Cancellation of Securities and Agreements .......................................................20
    J.    Corporate Action..............................................................................................20
    K.    Effectuating Documents; Further Transactions...................................................21
    L.    Section 1146 Exemption ..................................................................................21
    M.    Preservation of Causes of Action......................................................................21
    N.    Closing the Chapter 11 Cases ...........................................................................22

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............22

    A.    Assumption (or Assumption and Assignment) and Rejection of Executory Contracts and Unexpired Leases...............................................................................22
    B.    D&O Liability Insurance Policies.....................................................................22
    C.    Indemnification Obligations..............................................................................22
    D.    Collective Bargaining Agreements ...................................................................23
    E.    Claims Based on Rejection of Executory Contracts or Unexpired Leases...................23

F.       Cure of Defaults for Executory Contracts and Unexpired Leases Assumed (or Assumed and Assigned)..................................................................................................................23
G.       Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases...........24
H.       Modifications, Amendments, Supplements, Restatements, or Other Agreements........................24
I.       Reservation of Rights.....................................................................................................................24
J.       Nonoccurrence of Effective Date ...................................................................................................24

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................................................24
A.       Timing and Calculation of Amounts to Be Distributed ..................................................................24
B.       Disbursing Agent ...........................................................................................................................25
C.       Rights and Powers of Disbursing Agent .........................................................................................25
D.       Delivery of Distributions and Undeliverable or Unclaimed Distributions.....................................25
E.       Compliance with Tax Requirements ...............................................................................................26
F.       Allocations .....................................................................................................................................26
G.       No Postpetition Interest on Claims. ...............................................................................................26
H.       Foreign Currency Exchange Rate. ...................................................................................................26
I.       Setoffs and Recoupment ...............................................................................................................26
J.       Claims Paid or Payable by Third Parties .........................................................................................27

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ..............................................................................................................................................27
A.       Allowance of Claims.......................................................................................................................27
B.       Claims Administration Responsibilities...........................................................................................28
C.       Estimation of Claims.......................................................................................................................28
D.       Adjustment to Claims without Objection ........................................................................................28
E.       Time to File Objections to Claims ...................................................................................................28
F.       Disallowance of Claims ..................................................................................................................28
G.       Amendments to Claims ...................................................................................................................29
H.       No Distributions Pending Allowance...............................................................................................29
I.       Distributions after Allowance ........................................................................................................29

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ...............................29
A.       Settlement, Compromise, and Release of Claims and Interests .....................................................29
B.       Releases Subject to Investigation ...................................................................................................29
C.       **Release of Liens** ...........................................................................................................................29
D.       **Releases by the Debtors** .............................................................................................................30
E.       **Third-Party Release** ....................................................................................................................30
F.       **Exculpation** ...............................................................................................................................31
G.       **Injunction**...................................................................................................................................32
H.       Protections against Discriminatory Treatment.................................................................................32
I.       Document Retention. ......................................................................................................................32
J.       Reimbursement or Contribution.....................................................................................................32
K.       Term of Injunctions or Stays..........................................................................................................33

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN.....................................33
A.       Conditions Precedent .....................................................................................................................33
B.       Waiver of Conditions ......................................................................................................................33
C.       Substantial Consummation ............................................................................................................33
D.       Effect of Nonoccurrence to the Confirmation Date or Effective Date. ...........................................33

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .....................................34
A.       Modification and Amendments.......................................................................................................34
B.       Effect of Confirmation on Modifications.........................................................................................34

    C.      Revocation or Withdrawal of Plan ................................................................................34

ARTICLE XI. RETENTION OF JURISDICTION .............................................................................34

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................................36
    A.      Immediate Binding Effect ...........................................................................................36
    B.      Additional Documents .................................................................................................36
    C.      Payment of Statutory Fees. .........................................................................................36
    D.      Statutory Committee and Cessation of Fee and Expense Payment ............................36
    E.      Reservation of Rights ..................................................................................................37
    F.      Successors and Assigns................................................................................................37
    G.      Notices ........................................................................................................................37
    H.      Entire Agreement ........................................................................................................38
    I.      Exhibits .......................................................................................................................38
    J.      Non-Severability of Plan Provisions ..........................................................................38
    K.      Votes Solicited in Good Faith .....................................................................................38
    L.      Waiver or Estoppel......................................................................................................38
    M.      Conflicts ......................................................................................................................38

## INTRODUCTION

Barneys New York, Inc. and its debtor affiliates, as debtors and debtors in possession, in the above-captioned Chapter 11 Cases propose this joint plan pursuant to chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; and (b) Allowed Professional Fee Claims in the Chapter 11 Cases.

2.    "*Administrative Claim Bar Dates*" means the deadline for filing requests for payment of Administrative Claims, which shall be (a) 30 days after the Confirmation Date with respect to Claims that arose before the Confirmation Date; (b) 30 days after the Effective Date with respect to Claims that arose on or after the Confirmation Date; (c) the deadline for filing requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth in that certain *Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 214]; and (d) any other date(s) established by the Bankruptcy Court by which such Claims must be Filed pursuant to court order.

3.    "*Administrative and Priority Tax Claims Recovery*" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Secured Claims as set forth in Article III, and (b) Cash in an amount equal to the Allowed Administrative Claims and Allowed Priority Tax Claims.

4.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value

1

in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Wind-Down Debtor, as applicable.  For the avoidance of doubt:  (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

6.      "*Avoidance Actions*" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to chapter five of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.  For the avoidance of doubt, Avoidance Actions shall not include any claims transferred to the Purchasers pursuant to the Purchase Agreement.

7.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

8.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

9.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

10.     "*Barneys*" means Barneys New York, Inc.

11.     "*Bar Date*" means, collectively, the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed pursuant to that certain *Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 214].

12.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

13.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

14.     "*Causes of Action*" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise.  Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.  For the

2

avoidance of doubt, Causes of Action shall not include any claims transferred to the Purchasers pursuant to the Purchase Agreement.

15.        "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

16.        "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

17.        "*Claims Register*" means the official register of Claims maintained by the Notice, Claims, and Balloting Agent.

18.        "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

19.        "*Collective Bargaining Agreements*" means, collectively, those certain agreements by and between the Debtors, on the one hand, and, as applicable, the NY/NJ Regional Joint Board Workers United, Philadelphia Joint Board Workers United, and Western States Regional Board Workers United, on the other hand, as the same may have been amended from time to time, and any other similar agreements of the Debtors with any labor union or labor organization, and any extension, modification, memorandum of understanding, memorandum of agreements, or related agreements.

20.        "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on August 15, 2019 [Docket No. 131].

21.        "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

22.        "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

23.        "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

24.        "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

25.        "*Consummation*" means the occurrence of the Effective Date.

26.        "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

27.        "*Debtors*" means, collectively:  (a) Barneys; (b) Barney's Inc.; (c) BNY Catering, Inc.; (d) BNY Licensing Corp.; and (e) Barneys Asia Co. LLC.

28.        "*DIP Agent*" means GACP Finance Co., LLC in its capacity as administrative agent under the DIP Credit Agreement, together with its respective successors and assigns in such capacities.

29.        "*DIP Claims*" means all Claims of any DIP Party arising under, derived from, secured by, or based on the DIP Credit Documents.

30.        "*DIP Credit Documents*" means the DIP Credit Agreement and all other agreements, documents, and instruments related thereto, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

31.     "**DIP Credit Agreement**" means that certain senior secured debtor-in-possession credit agreement, dated as of August 15, 2019, as amended restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lenders, and the DIP Agent.

32.     "**DIP Facilities**" means the senior secured credit facilities under the DIP Credit Agreement.

33.     "**DIP Lenders**" means the banks, financial institutions, and other lenders party to the DIP Credit Agreement from time to time.

34.     "**DIP Order**" means that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Authorizing Payment of Prepetition Secured Obligations, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 222], as amended, supplemented, or otherwise modified from time to time.

35.     "**DIP Parties**" means the DIP Agent and the DIP Lenders.

36.     "**Disbursing Agent**" means the Debtors or the Plan Administrator (as applicable), or the Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

37.     "**Disclosure Statement**" means the *Disclosure Statement to the Joint Chapter 11 Plan of Barneys New York, Inc. and its Debtor Affiliates*, dated as of December 16, 2019, as may be amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

38.     "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39.     "**Distributable Cash**" means Cash in an amount equal to the Wind Down Funds, if any, available after giving effect to the Wind Down Budget, plus any excess Cash from the Professional Fee Escrow Account remaining after satisfaction of all Allowed Professional Fee Claims, plus any other Cash available in the Estates.

40.     "**Distribution Record Date**" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

41.     "**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

42.     "**Entity**" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

43.     "**Estate**" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

44.     "**Exculpated Party**" means collectively, and in each case solely in its capacity as such:  (a) the Debtors; (b) the Committee and each of its members; (c) the DIP Parties; (d) the Plan Administrator; and (e) with respect to each of the foregoing Entities in clauses (a) though (d), such Entity and its current and former Affiliates, and such Entities' their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors,

4

and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

45.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

46.      "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

47.      "*File*" or "*Filed*" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice, Claims, and Balloting Agent.

48.      "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided*, *however* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be filed relating to such order shall not cause such order to not be a Final Order.

49.      "*General Unsecured Claim*" means any Claim other than a DIP Claim, an Administrative Claim (including a Professional Fee Claim), an Other Secured Claim, a Prepetition Secured Claim, a Priority Tax Claim, an Other Priority Claim, or an Intercompany Claim.

50.      "*General Unsecured Claims Recovery*" means any Distributable Cash in excess of amounts necessary to satisfy all Allowed Other Priority Claims, if any, and after giving effect to the Administrative and Priority Tax Claims Recovery and Other Priority Claims Recovery.

51.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

52.      "*Holder*" means an Entity holding a Claim or Interest, as applicable.

53.      "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

54.      "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date.

55.      "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor or non-Debtor subsidiary or Affiliate.

56.      "*Interest*" means any equity security in any Debtor as defined in section 101(16) of the Bankruptcy Code.

57.      "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 272], entered by the Bankruptcy Court on September 20, 2019, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

58.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

59.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

60.    "*Notice, Claims, and Balloting Agent*" means Stretto,[2] in its capacity as notice, claims, and balloting agent for the Debtors and any successor.

61.    "*Other Priority Claim*" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

62.    "*Other Priority Claims Recovery*" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Administrative Claims and Priority Tax Claims and (b) Cash in an amount equal to all Allowed Other Priority Claims.

63.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim or Prepetition Secured Claim.

64.    "*Person*" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

65.    "*Petition Date*" means August 6, 2019, the date on which each of the Debtors commenced the Chapter 11 Cases.

66.    "*Plan*" means this *Joint Chapter 11 Plan of Barneys New York, Inc. and its Debtor Affiliates*, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

67.    "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated by the Debtors in consultation with the Committee, who will be disclosed at or prior to the Confirmation Hearing, to have all powers and authorities set forth in Article IV.E of this Plan.

68.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than five days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) Schedule of Retained Causes of Action; (c) the identity and terms of compensation of the Plan Administrator; (d) any transition services agreement between the Purchasers and the Debtors; and (e) any other necessary documentation related to the Sale Transaction or other Restructuring Transactions.

69.    "*Post Effective Date Reserve*" means any reserve established by the Plan Administrator in accordance with Article IV.D.4 hereof and funded from Distributable Cash.

70.    "*Prepetition Credit Agreement*" means that certain Amended and Restated Revolving Credit and Term Loan Facility, dated June 5, 2012, by and among Barney's, Inc., as borrower, and Wells Fargo Bank, N.A, as agent, the lenders party thereto, as amended, modified, restated, or supplemented from time to time.

---

[2]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

71.     "*Prepetition Credit Documents*" means the Prepetition Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

72.     "*Prepetition Secured Claims*" means any Claim, other than in relation to undrawn letters of credit or maintenance of the Debtors' cash management system, of a Prepetition Secured Party arising under, derived from, secured by, or based on the Prepetition Credit Documents or the DIP Order. For the avoidance of doubt, the Prepetition Secured Claims shall include contingent, unliquidated indemnification obligations.

73.     "*Prepetition Secured Lenders*" means the banks, financial institutions, and other lenders party to the Prepetition Credit Documents.

74.     "*Prepetition Secured Parties*" has the meaning ascribed to it in the DIP Order.

75.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

76.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

77.     "*Professional*" means an Entity retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

78.     "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

79.     "*Professional Fee Escrow Account*" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.

80.     "*Professional Fee Escrow Amount*" means the total amount of Professional fees and expenses estimated pursuant to Article II.B.3 of the Plan and after taking into account any Cash that has been escrowed for a similar purpose as part of consummating the Sale Transaction.

81.     "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

82.     "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtor in the Chapter 11 cases.

83.     "*Purchase Agreement*" means that certain Asset Purchase Agreement, by and among the Debtors and the Purchasers, dated as of October 16, 2019 [Docket No. 356], as may be amended, supplemented, or otherwise modified from time to time.

84.     "*Purchasers*" means, collectively, ABG-Barneys, LLC, and B. Riley Financial, Inc.

85.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

86.     "*Released Party*" means collectively, and in each case in its capacity as such:  (a) the DIP Parties; (b) the Committee and each of its members; (c) the Plan Administrator; (d) each Holder of an Administrative Claim, Priority Tax Claim, Other Priority Claim, Prepetition Secured Claim, and General Unsecured Claim that votes to

accept or or does not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan or does not object to the Plan; and (e) with respect to each of the Debtors, the Wind-Down Debtors, and each of the foregoing Entities in clauses (a) through (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any Holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

87.     "*Releasing Parties*" means, collectively, (a) the DIP Parties; (b) the Committee and each of its members; (c) the Plan Administrator; (d) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (e) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (f) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; and (g) with respect to each of the Debtors, the Wind-Down Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

88.     "*Reserves*" means, collectively the Post Effective Date Reserve and the Professional Fee Escrow Account.

89.     "*Restructuring Transactions*" means the transactions described in Article IV.A of the Plan.

90.     "*Sale Order*" means the *Order Authorizing (I) Entry Into and Performance under the Asset Purchase Agreement, (II) Sale of the Debtors' Assets, and (III) Granting Related Relief* [Docket No. 494].

91.     "*Sale Transaction*" means, collectively, those certain transactions between the Debtors and the Purchasers in connection with the Purchase Agreement and/or the Sale Order.

92.     "*Sale Transaction Cash Proceeds*" means all Cash proceeds of the Sale Transaction.

93.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors.

94.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors.

95.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

96.     "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; provided that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

97.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

98.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

99.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

100.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of New York.

101.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

102.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

103.    "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on January 17, 2020.

104.    "*Wind Down*" means the wind down and dissolution of the Debtors and final administration of the Estates following the Effective Date as set forth in Article IV.F.

105.    "*Wind Down Budget*" means that certain budget governing the fees, expenses, and disbursements as provided under the Purchase Agreement in connection with the Sale Transaction.

106.    "*Wind-Down Debtors*" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

107.    "*Wind Down Funds*" means the Cash funded by the Purchaser in accordance with the Purchase Agreement in connection with the Sale Transaction.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of

9

the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any effectuating provisions may be interpreted by the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (15) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formulation of the applicable Debtor or the Wind-Down Debtors, as applicable.

E.      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

G.      Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims and Priority Tax Claims.*

Except as otherwise provided in this **Error! Reference source not found.** and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Plan Administrator and/or Wind-Down Debtors no later than the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date**. Objections to such requests, if any, must be Filed and served on the Plan Administrator and/or Wind-Down Debtors and the requesting party.

Each Holder of an Allowed Administrative Claim, other than Professional Fee Claims, and Priority Tax Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been satisfied during the Chapter 11 Cases or a Holder of an Administrative Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Administrative and Priority Tax Claims Recovery. All known Holders of Administrative Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such Holder to the treatment afforded to such Holder hereunder. The failure to return the Administrative / Priority Claim Consent Form or to object to Confirmation by a Holder of an Allowed Administrative Claim and Allowed Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code. If such Holder of an Administrative Claim and Priority Tax Claim does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

B.      *Professional Fee Claims*

1.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Plan Administrator and/or Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.      Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Plan Administrator or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which Allowed Administrative Claim shall be satisfied in accordance with Article II.A of the Plan.

When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Post Effective Date Reserve and such funds shall be deemed Distributable Cash for all purposes hereunder.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors. The Debtors and Wind-Down Debtors (as applicable) shall pay, within ten business days after submission of a detailed invoice to the Debtors or Wind-Down Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Wind-Down Debtors (as applicable). If the Debtors or Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Claims*

As of the consummation of the Sale Transaction, each Holder of Allowed DIP Claims shall have been indefeasibly paid in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, pursuant to the Sale Order, from the Sale Transaction Cash Proceeds.

D.    *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, to the extent applicable, the Plan Administrator and/or Wind-Down Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy

12

Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Wind-Down Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof.

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 3 | Prepetition Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in Barneys | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      <u>Class 1 - Other Secured Claims</u>

(a)      *Classification:* Class 1 consists of all Other Secured Claims.

13

(b)    *Treatment:*  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Plan Administrator:

        (i)    payment in full in Cash of such Holder's Allowed Other Secured Claim;

        (ii)    the collateral securing such Holder's Allowed Other Secured Claim;

        (iii)    Reinstatement of such Holder's Allowed Other Secured Claim; or

        (iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)    *Voting:*  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Other Priority Claims</u>

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  All known Holders of Other Priority Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder hereunder. The treatment afforded to Holders of Other Priority Claims hereunder is only available if each such Holder agrees to such treatment. **The failure to return the Administrative / Priority Claim Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code, and in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive its Pro Rata share of the Other Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter.**  If such Holder does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

(c)    *Voting*:  Class 2 is either Unimpaired or Impaired under the Plan.  Holders of Other Priority Claims are conclusively deemed to have either accepted or rejected the Plan pursuant to section 1126(f) or (g) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 - Prepetition Secured Claims</u>

(a)    *Classification*:  Class 3 consists of all Prepetition Secured Claims.

(b)    *Allowance*:  Prepetition Secured Claims shall be Allowed as and to the extent set forth in the Prepetition Credit Documents and DIP Order, including interest, fees, and expenses.

(c)    *Treatment*:  Except as set forth herein, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Prepetition Secured Claim, each Holder thereof shall receive a Pro Rata distribution of $25,000.

If the amount of Allowed Prepetition Secured Claims is less than the amount of the Pro Rata distribution, any excess Cash shall promptly be transferred to the Post Effective Date Reserve and such funds shall be deemed Distributable Cash for all purposes hereunder.

If such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

    (d)    *Voting*: Class 3 is Impaired under the Plan. Holders of Prepetition Secured Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 - General Unsecured Claims</u>

    (a)    *Classification:* Class 4 consists of all General Unsecured Claims.

    (b)    *Treatment:* On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall:

        (i)    receive its Pro Rata share of the General Unsecured Claim Recovery; and

        (ii)    if such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

    (c)    *Voting:* Class 4 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 - Intercompany Claims</u>

    (a)    *Classification:* Class 5 consists of all Intercompany Claims.

    (b)    *Treatment*: Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims.

    (c)    *Voting*: Class 5 is Impaired under the Plan. Holders of Intercompany Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - Intercompany Interests</u>

    (a)    *Classification:* Class 6 consists of all Intercompany Interests.

    (b)    *Treatment*: Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

    (c)    *Voting*: Class 6 is Impaired under the Plan. Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 - Interests in Barneys</u>

    (a)    *Classification*: Class 7 consists of all Interests in Barneys.

(b) *Treatment*:   Each Allowed Interest in Barneys shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Barneys shall be entitled to any recovery or distribution under the Plan on account of such Interests.

(c) *Voting*:  Class 7 is Impaired under the Plan.  Holders of Interests in Barneys are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 - Section 510(b) Claims</u>

(a) *Classification:*  Class 8 consists of all Section 510(b) Claims.

(b) *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

(c) *Treatment*:   Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d) *Voting:*  Class 8 is Impaired under the Plan.  Holders (if any) of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Such Holders (if any) are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E. *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Restructuring Transactions*

On the Effective Date, to the extent not inconsistent with the Sale Transaction, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions"). The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

B.      *Sale Transaction; Sources of Consideration for Plan Distributions*

The Plan Administrator and/or Wind-Down Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining Sale Transaction Cash Proceeds after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan or in the Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, enjoined or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator. The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not object to the Plan.

17

C.      *Wind-Down Debtors*

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any Estate non-Cash assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummating the Plan.  Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.  Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee.  The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

D.      *Plan Administrator*

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including:  (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of the Sale Transaction; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

1.      <u>Appointment of the Plan Administrator</u>

The Plan Administrator shall be appointed by the Debtors in consultation with the Committee.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

2.      <u>Retention of Professionals</u>

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

3.      <u>Compensation of the Plan Administrator</u>

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

4.      <u>Post Effective Date Reserve</u>

The Plan Administrator shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Distributable Cash it deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties hereunder.  The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein, the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve.  The Plan Administrator may create reserve specific amounts from the Post Effective Date Reserve in accordance with its business judgment.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

E.      *Wind Down*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

F.      *Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects

19

by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

On and after the Effective Date, the Wind-Down Debtors and/or the Plan Administrator shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

G.    *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

H.    *Dissolution of the Debtors and Wind-Down Debtors*

On or after the Effective Date, the Plan Administrator may File a certification with the Bankruptcy Court that it has substantially administered the Plan for any Debtor, other than Debtor Barneys, and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor(s) are formed or any other jurisdiction. With respect to Debtor Barneys, the Plan Administrator may File a certification with the Bankruptcy Court that all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

I.    *Cancellation of Securities and Agreements*

Upon the Effective Date: (1) the obligations of the Debtors under the Prepetition Credit Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

J.    *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions and (2) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-

Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.       *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.       *Section 1146 Exemption*

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.       *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.      Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of Debtor Barneys, shall be deemed closed, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Barneys.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Barneys in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      Assumption (or Assumption and Assignment) and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.      D&O Liability Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all director and officer liability insurance policies and any agreements, documents, and instruments related thereto. The Wind-Down Debtors shall maintain all of its unexpired D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, and managers, which coverage shall be through the Effective Date of the Plan, and all such directors, members, trustees, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

C.      Indemnification Obligations

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees,

attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything herein to the contrary, the Wind-Down Debtors' obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Wind-Down Debtors, including any directors and officers insurance policies. For the avoidance of doubt, neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses.

D.      *Collective Bargaining Agreements*

        To the extent any Collective Bargaining Agreement has not not already been assumed and assigned to the Purchasers, terminated, or otherwise expired, such Collective Bargaining Agreements shall terminate according to their terms as of or after the Effective Date. Such terminations shall not constitute a rejection of any Collective Bargaining Agreement or implicate section 1113 of the Bankruptcy Code. The Plan Administrator is authorized to take any action that it deems necessary or appropriate to terminate any Collective Bargaining Agreement. For the avoidance of doubt and notwithstanding the foregoing, to the extent section 1113 is applicable, the termination of the Collective Bargaining Agreements shall be deemed to satisfy such provisions.

E.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

        Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Wind-Down Debtors, the Estates, or their property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Unsecured Claims.

F.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed (or Assumed and Assigned)*

        Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned), or (3) any other matter pertaining to assumption (or assumption and assignment), the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption (or assumption and assignment). At least ten days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption (or assumption and assignment) and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption (or assumption and assignment) or related cure amount must be Filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption (or assumption and assignment) or cure amount will be deemed to have assented to such assumption (or assumption and assignment) or cure amount.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time prior to the effective date of assumption (or assumption and assignment). **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed (or assumed and assigned) shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

G.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed (or assumed and assigned) shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Wind-Down Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

J.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed

Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent, which may be the Plan Administrator or the Wind-Down Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

C.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash from the Wind Down Amount.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions

Except as otherwise provided herein, the Plan Administrator shall make distributions to Holders of Allowed Claims and Allowed Interests on the Effective Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Plan Administrator; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.      Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be settled and

enjoined pursuant to Article X and its Holder is forever barred pursuant to Article X from asserting that Claims against the Debtors or their property.

4.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Wind-Down Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment*

Except as expressly provided in this Plan, each Wind-Down Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Wind-Down Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the

allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J.*      *Claims Paid or Payable by Third Parties*

   1.     <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Wind-Down Debtors.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Wind-Down Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Wind-Down Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

   2.     <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

   3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

*A.*      *Allowance of Claims*

After the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator shall have the authority:  (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Wind-Down Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed at any time or such other period as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the applicable Bar Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions after Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

A.      *Settlement, Compromise, and Release of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Releases Subject to Investigation*

The release and related provisions set forth in this Article VIII remain subject to the Debtors' investigation of potential claims held by the Debtors' Estates.

C.      **Release of Liens**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and**

29

the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

D.       *Releases by the Debtors*

        Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released. Without limiting the foregoing, neither the Debtors nor the Wind-Down Debtors, as applicable, shall pursue any claims against the Released Parties other than those incurred in the ordinary course of business.

        Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.       *Third-Party Release*

        Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action,

remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.E, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.E is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, cause of action or liability against any Released Party, or asserting any claim, cause of action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

F.    *Exculpation*

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, the DIP Facilities, the DIP Credit Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.      *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.F of the Plan.**

H.      *Protections against Discriminatory Treatment.*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a release), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Document Retention.*

On and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, as applicable, may maintain or dispose of documents in accordance with their discretion.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    the Bankruptcy Court shall have entered the Confirmation Order; *provided*, that with respect to Articles V.C, VIII.E, VIII.F, and IX.A hereof, the Confirmation Order shall not adversely modify such provisions without the Committee's consent not to be unreasonably withheld or delayed;

2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.    the Reserves shall have been established and funded as set forth herein; and

4.    the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors in their discretion.

B.      *Waiver of Conditions*

The conditions to Consummation set forth in Article IX.A may be waived by the Debtors, in consultation with Committee, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided* that the condition set forth in Article IX.A.1 pertaining to the Committee's consent right shall not be waived without the Committee's consent not to be unreasonably withheld or delayed.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. §§ 1101 and 1127, shall be deemed to occur on the Effective Date.

D.      *Effect of Nonoccurrence to the Confirmation Date or Effective Date.*

If the Confirmation or Consummation of the Plan does not occur, (1) the Plan shall be null and void in all respects other than as set forth herein, (2) the Plan shall be deemed a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (3) nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect.

# ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption (or assumption and assignment) or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder, or any other Entity.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including accrued Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Wind-Down Debtors amending, modifying or

34

supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J.1;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.      enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.      consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.       hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.       hear and determine all disputes involving the existence, nature, scope, or enforcement of any settlements, exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

23.       hear and determine all disputes related to the Sale Transaction;

24.       enforce all orders previously entered by the Bankruptcy Court; and

25.       hear any other matter not inconsistent with the Bankruptcy Code.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Wind-Down Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees and applicable interest payable pursuant to section 1930(a) of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Committee and its Professionals. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

E.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices*

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission). Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

> Barneys New York, Inc.
> 660 Madison Avenue, 9th Floor
> New York, New York 10065
> Attention: Mohsin Meghji
> E-mail address: mmeghji@miiipartners.com
>
> with copies (which shall not constitute notice) to:
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention: Joshua A. Sussberg, P.C.
> E-mail address: joshua.sussberg@kirkland.com
>
> - and -
>
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Attention: Chad J. Husnick, P.C.
> E-mail address: CHusnick@kirkland.com
>
> - and -
>
> Katten Muchin Rosenman LLP
> 575 Madison Avenue
> New York, New York 10022
> Attention: Steven J. Reisman
> E-mail address: sreisman@katten.com

After the Effective Date, the Wind-Down Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Balloting Agent at cases.stretto.com/barneys or the Bankruptcy Court's website at www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Purchasers consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

M.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

*[Remainder of page intentionally left blank]*

Barneys New York, Inc. and its affiliates


By:     /s/ Mohsin Y. Meghji
Name:   Mohsin Y. Meghji
Title:    Chief Restructuring Officer


COUNSEL:

Edward O. Sassower, P.C.                      Chad J. Husnick, P.C.
Joshua A. Sussberg, P.C.                      W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**                      **KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**        **KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue                          300 North LaSalle Street
New York, New York 10022                      Chicago, Illinois 60654
Telephone:      (212) 446-4800                Telephone:      (312) 862-2000
Facsimile:      (212) 446-4900                Facsimile:      (312) 862-2200


Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:      (212) 940-8800
Facsimile:      (212) 940-8776


*Co-Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT D</u>**

**Redline to Revised Plan**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARNEYS NEW YORK, INC., *et al.*,[1] | ) | Case No. 19-36300 (CGM) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT CHAPTER 11 PLAN OF BARNEYS
## NEW YORK, INC. AND ITS DEBTOR AFFILIATES

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Chad J. Husnick, P.C.
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:      (212) 940-8800
Facsimile:      (212) 940-8776

*Counsel for the Debtors and Debtors in Possession*

Dated: ~~November 15,~~ **December 16,** 2019

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Barneys New York, Inc. (1818); Barney's Inc. (2980); BNY Catering, Inc. (4434); BNY Licensing Corp. (4177); and Barneys Asia Co. LLC (0819).  The location of the Debtors' service address is 660 Madison Avenue, 9th Floor, New York, NY 10065.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW ..................................................................................................... 1

    A.    Defined Terms ............................................................................................. 1
    B.    Rules of Interpretation ................................................................................. 9
    C.    Computation of Time ................................................................................. 10
    D.    Governing Law .......................................................................................... 10
    E.    Reference to Monetary Figures .................................................................. 10
    F.    Reference to the Debtors or the Wind-Down Debtors ............................... 10
    G.    Nonconsolidated Plan ................................................................................ 10

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS ..................................................................................................................... 11

    A.    Administrative Claims and Priority Tax Claims. ...................................... 11
    B.    Professional Fee Claims ............................................................................. 11
    C.    DIP Claims ................................................................................................. 12
    D.    Statutory Fees ............................................................................................ 12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......... 13

    A.    Classification of Claims and Interests ...................................................... 13
    B.    Treatment of Claims and Interests ............................................................. 13
    C.    Special Provision Governing Unimpaired Claims ..................................... 16
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..... 16
    E.    Subordinated Claims .................................................................................. 16
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..... ~~16~~17
    G.    Controversy Concerning Impairment ........................................................ 17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................... 17

    A.    Restructuring Transactions ........................................................................ 17
    B.    Sale Transaction; Sources of Consideration for Plan Distributions ........... 17
    C.    Wind-Down Debtors .................................................................................. ~~17~~18
    D.    Plan Administrator ..................................................................................... 18
    E.    Wind Down ................................................................................................ 19
    F.    Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation ..... 19
    G.    Tax Returns ................................................................................................ ~~19~~20
    H.    Dissolution of the Debtors and Wind-Down Debtors ............................... 20
    I.    Cancellation of Securities and Agreements ............................................... 20
    J.    Corporate Action ....................................................................................... 20
    K.    Effectuating Documents; Further Transactions ......................................... ~~20~~21
    L.    Section 1146 Exemption ............................................................................ 21
    M.    Preservation of Causes of Action ............................................................. 21
    N.    Closing the Chapter 11 Cases .................................................................... ~~21~~22

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....... 22

    A.    Assumption (or Assumption and Assignment) and Rejection of Executory Contracts and Unexpired Leases ..... 22
    B.    D&O Liability Insurance Policies .............................................................. 22
    C.    Indemnification Obligations ...................................................................... 22
    D.    Collective Bargaining Agreements ............................................................ 23
    E.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..... 23

F.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed (or Assumed and Assigned) ................................................................................................... 23
G.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. .... 24
H.      Modifications, Amendments, Supplements, Restatements, or Other Agreements .............. 24
I.      Reservation of Rights ........................................................................................... 24
J.      Nonoccurrence of Effective Date ............................................................................ 24

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................... 24
A.      Timing and Calculation of Amounts to Be Distributed ................................................. 24
B.      Disbursing Agent ................................................................................................. 25
C.      Rights and Powers of Disbursing Agent .................................................................... 25
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ......................... 25
E.      Compliance with Tax Requirements ......................................................................... 26
F.      Allocations ......................................................................................................... 26
G.      No Postpetition Interest on Claims. ......................................................................... 26
H.      Foreign Currency Exchange Rate. ............................................................................ 26
I.      Setoffs and Recoupment ....................................................................................... 26
J.      Claims Paid or Payable by Third Parties ................................................................... 27

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ................................................................................................... 27
A.      Allowance of Claims ............................................................................................ 27
B.      Claims Administration Responsibilities .................................................................... 2728
C.      Estimation of Claims ........................................................................................... 28
D.      Adjustment to Claims without Objection ................................................................. 28
E.      Time to File Objections to Claims .......................................................................... 28
F.      Disallowance of Claims ....................................................................................... 28
G.      Amendments to Claims ....................................................................................... 29
H.      No Distributions Pending Allowance ...................................................................... 29
I.      Distributions after Allowance ............................................................................... 29

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ............... 29
A.      Settlement, Compromise, and Release of Claims and Interests ..................................... 29
B.      Releases Subject to Investigation ........................................................................... 29
C.      **Release of Liens** ........................................................................................... 29
D.      **Releases by the Debtors** ................................................................................ 30
E.      **Third-Party Release** ...................................................................................... 30
F.      **Exculpation** ................................................................................................ 31
G.      **Injunction** .................................................................................................. 3132
H.      Protections against Discriminatory Treatment. ......................................................... 32
I.      Document Retention. .......................................................................................... 32
J.      Reimbursement or Contribution. ........................................................................... 32
K.      Term of Injunctions or Stays ............................................................................... 3233

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ....................... 33
A.      **Conditions Precedent** .................................................................................... 33
B.      Waiver of Conditions .......................................................................................... 33
BC.     Substantial Consummation ................................................................................... 33
CD.     Effect of Nonoccurrence to the Confirmation Date or Effective Date. ........................... 33

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..................... 3334
A.      Modification and Amendments .............................................................................. 3334
B.      Effect of Confirmation on Modifications ................................................................. 34

C.       Revocation or Withdrawal of Plan ......................................................... 34

ARTICLE XI. RETENTION OF JURISDICTION ............................................................ 34

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................ 36
        A.       Immediate Binding Effect .............................................................. 36
        B.       Additional Documents ................................................................... 36
        C.       Payment of Statutory Fees. ............................................................ 36
        D.       Statutory Committee and Cessation of Fee and Expense Payment .......... 36
        E.       Reservation of Rights .................................................................... 36 37
        F.       Successors and Assigns .................................................................. 36 37
        G.       Notices ...................................................................................... 37
        H.       Entire Agreement ......................................................................... 37 38
        I.       Exhibits ..................................................................................... 37 38
        J.       Non-Severability of Plan Provisions .................................................. 38
        K.       Votes Solicited in Good Faith .......................................................... 38
        L.       Waiver or Estoppel ....................................................................... 38
        M.       Conflicts .................................................................................... 38

iii

**INTRODUCTION**

Barneys New York, Inc. and its debtor affiliates, as debtors and debtors in possession, in the above-captioned Chapter 11 Cases propose this joint plan pursuant to chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters.  Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**Article I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      "***Administrative Claim***" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; and (b) Allowed Professional Fee Claims in the Chapter 11 Cases.

2.      "***Administrative Claim Bar Dates***" means the deadline for filing requests for payment of Administrative Claims, which shall be (a) 30 days after the Confirmation Date with respect to Claims that arose before the Confirmation Date; (b) 30 days after the Effective Date with respect to Claims that arose on or after the Confirmation Date; (c) the deadline for filing requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth in that certain *Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 214]; and (d) any other date(s) established by the Bankruptcy Court by which such Claims must be Filed pursuant to court order.

3.      "***Administrative and Priority Tax Claims Recovery***" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Secured Claims as set forth in Article III, and (b) Cash in an amount equal to the Allowed Administrative Claims and Allowed Priority Tax Claims.

4.      "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "***Allowed***" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is

1

Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Wind-Down Debtor, as applicable. For the avoidance of doubt: (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

6.     "*Avoidance Actions*" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to chapter five of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws. For the avoidance of doubt, Avoidance Actions shall not include any claims transferred to the Purchasers pursuant to the Purchase Agreement.

7.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

8.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

9.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

10.     "*Barneys*" means Barneys New York, Inc.

11.     "*Bar Date*" means, collectively, the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed pursuant to that certain *Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 214].

12.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

13.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

14.     "*Causes of Action*" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise. Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the

Bankruptcy Code; and (e) any Avoidance Action. For the avoidance of doubt, Causes of Action shall not include any claims transferred to the Purchasers pursuant to the Purchase Agreement.

15. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

16. "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

17. "*Claims Register*" means the official register of Claims maintained by the Notice, Claims, and Balloting Agent.

18. "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

19. "*Collective Bargaining Agreements*" means, collectively, those certain agreements by and between the Debtors, on the one hand, and, as applicable, the NY/NJ Regional Joint Board Workers United, Philadelphia Joint Board Workers United, and Western States Regional Board Workers United, on the other hand, as the same may have been amended from time to time, and any other similar agreements of the Debtors with any labor union or labor organization, and any extension, modification, memorandum of understanding, memorandum of agreements, or related agreements.

20. "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on August 15, 2019 [Docket No. 131].

21. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

22. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

23. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

24. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

25. "*Consummation*" means the occurrence of the Effective Date.

26. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

27. "*Debtors*" means, collectively: (a) Barneys; (b) Barney's Inc.; (c) BNY Catering, Inc.; (d) BNY Licensing Corp.; and (e) Barneys Asia Co. LLC.

28. "*DIP Agent*" means GACP Finance Co., LLC in its capacity as administrative agent under the DIP Credit Agreement, together with its respective successors and assigns in such capacities.

29. "*DIP Claims*" means all Claims of any DIP Party arising under, derived from, secured by, or based on the DIP Credit Documents.

30. "*DIP Credit Documents*" means the DIP Credit Agreement and all other agreements, documents, and instruments related thereto, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

31.    "***DIP Credit Agreement***" means that certain senior secured debtor-in-possession credit agreement, dated as of August 15, 2019, as amended restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lenders, and the DIP Agent.

32.    "***DIP Facilities***" means the senior secured credit facilities under the DIP Credit Agreement.

33.    "***DIP Lenders***" means the banks, financial institutions, and other lenders party to the DIP Credit Agreement from time to time.

34.    "***DIP Order***" means that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Claims, (III) Authorizing Payment of Prepetition Secured Obligations, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 222], as amended, supplemented, or otherwise modified from time to time.

35.    "***DIP Parties***" means the DIP Agent and the DIP Lenders.

36.    "***Disbursing Agent***" means the Debtors or the Plan Administrator (as applicable), or the Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

37.    "***Disclosure Statement***" means the *Disclosure Statement to the Joint Chapter 11 Plan of Barneys New York, Inc. and its Debtor Affiliates*, dated as of [•]**December 16, 2019,** as may be amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

38.    "***Disputed***" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39.    "***Distributable Cash***" means Cash in an amount equal to the Wind Down Funds, if any, available after giving effect to the Wind Down Budget, plus any excess Cash from the Professional Fee Escrow Account remaining after satisfaction of all Allowed Professional Fee Claims, plus any other Cash available in the Estates.

40.    "***Distribution Record Date***" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

41.    "***Effective Date***" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A**B** of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

42.    "***Entity***" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

43.    "***Estate***" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

44.    "***Exculpated Party***" means collectively, and in each case solely in its capacity as such:  (a) the Debtors; (b) the Committee and each of its members; (c) the DIP Parties; (d) the Plan Administrator; and (e) with respect to each of the foregoing Entities in clauses (a) though (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors,

and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

45.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

46.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

47.    "*File*" or "*Filed*" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice, Claims, and Balloting Agent.

48.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided*, *however* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be filed relating to such order shall not cause such order to not be a Final Order.

49.    "*General Unsecured Claim*" means any Claim other than a DIP Claim, an Administrative Claim (including a Professional Fee Claim), an Other Secured Claim, a Prepetition Secured Claim, a Priority Tax Claim, an Other Priority Claim, or an Intercompany Claim.

50.    "*General Unsecured Claims Recovery*" means any Distributable Cash in excess of amounts necessary to satisfy all Allowed Other Priority Claims, if any, and after giving effect to the Administrative and Priority Tax Claims Recovery and Other Priority Claims Recovery.

51.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

52.    "*Holder*" means an Entity holding a Claim or Interest, as applicable.

53.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

54.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date.

55.    "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor or non-Debtor subsidiary or Affiliate.

56.    "*Interest*" means any equity security in any Debtor as defined in section 101(16) of the Bankruptcy Code.

57.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 272], entered by the Bankruptcy Court on September 20, 2019, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

58.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

59.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

60.    "*Notice, Claims, and Balloting Agent*" means Stretto,[2] in its capacity as notice, claims, and balloting agent for the Debtors and any successor.

61.    "*Other Priority Claim*" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

62.    "*Other Priority Claims Recovery*" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Administrative Claims and Priority Tax Claims and (b) Cash in an amount equal to all Allowed Other Priority Claims.

63.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim or Prepetition Secured Claim.

64.    "*Person*" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

65.    "*Petition Date*" means August 6, 2019, the date on which each of the Debtors commenced the Chapter 11 Cases.

66.    "*Plan*" means this *Joint Chapter 11 Plan of Barneys New York, Inc. and its Debtor Affiliates*, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

67.    "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated by the Debtors in consultation with the Committee, who will be disclosed at or prior to the Confirmation Hearing, to have all powers and authorities set forth in Article IV.E of this Plan.

68.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than five days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) Schedule of Retained Causes of Action; (c) the identity and terms of compensation of the Plan Administrator; (d) any transition services agreement between the Purchasers and the Debtors; and (e) any other necessary documentation related to the Sale Transaction or other Restructuring Transactions.

69.    "*Post Effective Date Reserve*" means any reserve established by the Plan Administrator in accordance with Article IV.D.4 hereof and funded from Distributable Cash.

70.    "*Prepetition Credit Agreement*" means that certain Amended and Restated Revolving Credit and Term Loan Facility, dated June 5, 2012, by and among Barney's, Inc., as borrower, and Wells Fargo Bank, N.A, as agent, the lenders party thereto, as amended, modified, restated, or supplemented from time to time.

71.    "*Prepetition Credit Documents*" means the Prepetition Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

---

[2]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

72.    "***Prepetition Secured Claims***" means any Claim, other than in relation to undrawn letters of credit or maintenance of the Debtors' cash management system, of a Prepetition Secured Party arising under, derived from, secured by, or based on the Prepetition Credit Documents or the DIP Order.  For the avoidance of doubt, the Prepetition Secured Claims shall include contingent, unliquidated indemnification obligations.

73.    "***Prepetition Secured Lenders***" means the banks, financial institutions, and other lenders party to the Prepetition Credit Documents.

74.    "***Prepetition Secured Parties***" has the meaning ascribed to it in the DIP Order.

75.    "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

76.    "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

77.    "***Professional***" means an Entity retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

78.    "***Professional Fee Claim***" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

79.    "***Professional Fee Escrow Account***" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.

80.    "***Professional Fee Escrow Amount***" means the total amount of Professional fees and expenses estimated pursuant to Article II.B.3 of the Plan and after taking into account any Cash that has been escrowed for a similar purpose as part of consummating the Sale Transaction.

81.    "***Proof of Claim***" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

82.    "***Proof of Interest***" means a written proof of Interest Filed against any of the Debtor in the Chapter 11 cases.

83.    "***Purchase Agreement***" means that certain Asset Purchase Agreement, by and among the Debtors and the Purchasers, dated as of October 16, 2019 [Docket No. 356], as may be amended, supplemented, or otherwise modified from time to time.

84.    "***Purchasers***" means, collectively, ABG-Barneys, LLC, and B. Riley Financial, Inc.

85.    "***Reinstate***," "***Reinstated***," or "***Reinstatement***" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

86.    "***Released Party***" means collectively, and in each case in its capacity as such:  (a) the DIP Parties; (b) the Committee and each of its members; (c) the Plan Administrator; (d) each Holder of an Administrative Claim, Priority Tax Claim, Other Priority Claim, Prepetition Secured Claim, and General Unsecured Claim that votes to accept or **or does not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan or** does not object to the Plan; and (e) with respect to each of the Debtors, the Wind-Down Debtors, and each of the foregoing Entities in clauses (a) through (d), such Entity and its current and former Affiliates, and such Entities' and their current and

former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any Holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

87.    "***Releasing Parties***" means, collectively, (a) the DIP Parties; (b) the Committee and each of its members; (c) the Plan Administrator; (d) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (e) all Holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (f) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; and (g) with respect to each of the Debtors, the Wind-Down Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

88.    "***Reserves***" means, collectively the Post Effective Date Reserve and the Professional Fee Escrow Account.

89.    "***Restructuring Transactions***" means the transactions described in Article IV.~~B~~**A** of the Plan.

90.    "***Sale Order***" means the *Order Authorizing (I) Entry Into and Performance under the Asset Purchase Agreement, (II) Sale of the Debtors' Assets, and (III) Granting Related Relief* [Docket No. ~~497~~**494**].

91.    "***Sale Transaction***" means, collectively, those certain transactions between the Debtors and the Purchasers in connection with the Purchase Agreement and/or the Sale Order.

92.    "***Sale Transaction Cash Proceeds***" means all Cash proceeds of the Sale Transaction.

93.    "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors.

94.    "***Schedule of Retained Causes of Action***" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors.

95.    "***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

96.    "***Section 510(b) Claim***" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; provided that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

97.    "***Secured***" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by

reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

98.      "***Securities Act***" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

99.      "***Security***" means a security as defined in section 2(a)(1) of the Securities Act.

100.      "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of New York.

101.      "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

102.      "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

103.      "***Voting Deadline***" means 4:00 p.m. (prevailing Eastern Time) on January 17, 2020.

104.      "***Wind Down***" means the wind down and dissolution of the Debtors and final administration of the Estates following the Effective Date as set forth in Article IV.F.

105.      "***Wind Down Budget***" means that certain budget governing the fees, expenses, and disbursements as provided under the Purchase Agreement in connection with the Sale Transaction.

106.      "***Wind-Down Debtors***" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

107.      "***Wind Down Funds***" means the Cash funded by the Purchaser in accordance with the Purchase Agreement in connection with the Sale Transaction.

B.      *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of

documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any effectuating provisions may be interpreted by the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (15) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formulation of the applicable Debtor or the Wind-Down Debtors, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Wind-Down Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

G.      *Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

**Article II.**
**ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *Administrative Claims and Priority Tax Claims.*

Except as otherwise provided in this ~~Article II.A~~**Error! Reference source not found.** and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Plan Administrator and/or Wind-Down Debtors no later than the Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date**.  Objections to such requests, if any, must be Filed and served on the Plan Administrator and/or Wind-Down Debtors and the requesting party.

Each Holder~~s~~ of an Allowed Administrative Claim, other than Professional Fee Claims, and Priority Tax Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been satisfied during the Chapter 11 Cases or a Holder of an Administrative Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, ~~(a)~~ each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Administrative and Priority Tax Claims Recovery.  ~~The failure~~**All known Holders of Administrative Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such Holder to the treatment afforded to such Holder hereunder.  The failure to return the Administrative / Priority Claim Consent Form or** to object to Confirmation by a Holder of an Allowed Administrative Claim and Allowed Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code. If such Holder of an Administrative Claim and Priority Tax Claim does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

B.    *Professional Fee Claims*

    1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Plan Administrator and/or Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

    2.    <u>Professional Fee Escrow Account</u>

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Plan Administrator or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee

Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which Allowed Administrative Claim shall be satisfied in accordance with Article II.A of the Plan.

When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Post Effective Date Reserve and such funds shall be deemed Distributable Cash for all purposes hereunder.

3.      Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors. The Debtors and Wind-Down Debtors (as applicable) shall pay, within ten business days after submission of a detailed invoice to the Debtors or Wind-Down Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Wind-Down Debtors (as applicable). If the Debtors or Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *DIP Claims*

As of the consummation of the Sale Transaction, each Holder of Allowed DIP Claims shall have been indefeasibly paid in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, pursuant to the Sale Order, from the Sale Transaction Cash Proceeds.

D.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, to the extent applicable, the Plan Administrator and/or Wind-Down Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Wind-Down Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**Article III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof.

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Reject) |
| 3 | Prepetition Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in Barneys | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.    <u>Class 1 - Other Secured Claims</u>

(a)    *Classification:*  Class 1 consists of all Other Secured Claims.

(b)    *Treatment:*  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Plan Administrator:

(i)      payment in full in Cash of such Holder's Allowed Other Secured Claim;

(ii)     the collateral securing such Holder's Allowed Other Secured Claim;

(iii)    Reinstatement of such Holder's Allowed Other Secured Claim; or

(iv)     such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)    *Voting:*  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

2.    Class 2 - Other Priority Claims

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  ~~On the Effective Date, or as soon as reasonably practicable,~~ except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, **All known Holders of Other Priority Claims have been sent an Administrative / Priority Claim Consent Form pursuant to which the Debtors are seeking the affirmative agreement of such party to the treatment afforded to such Holder hereunder.  The treatment afforded to Holders of Other Priority Claims hereunder is only available if each such Holder agrees to such treatment. The failure to return the Administrative / Priority Claim Consent Form or to object to the Plan** *shall be deemed to be such Holder's consent to* **accept less than full payment of its Claim as required by section 1129(a)(9)** *and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code*, **and** in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive its Pro Rata share of the Other Priority Claims Recovery.  ~~The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim~~ *shall be deemed to be such Holder's consent to* ~~receive Unimpaired treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code~~ *and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code* **on the Effective Date, or as soon as reasonably practicable thereafter**.  If such Holder does not object to the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

(c)    *Voting*:  Class 2 is either Unimpaired or Impaired under the Plan.  Holders of Other Priority Claims are conclusively deemed to have either accepted or rejected the Plan pursuant to section 1126(f) or (g) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

3.    Class 3 - Prepetition Secured Claims

(a)    *Classification*:  Class 3 consists of all Prepetition Secured Claims.

(b)    *Allowance*:  Prepetition Secured Claims shall be Allowed as and to the extent set forth in the Prepetition Credit Documents and DIP Order, including interest, fees, and expenses.

(c)    *Treatment*:  Except as set forth herein, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Prepetition Secured Claim, each Holder thereof shall receive a Pro Rata distribution of $25,000.

14

If the amount of Allowed Prepetition Secured Claims is less than the amount of the Pro Rata distribution, any excess Cash shall promptly be transferred to the Post Effective Date Reserve and such funds shall be deemed Distributable Cash for all purposes hereunder.

If such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

(d)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of Prepetition Secured Claims are entitled to vote to accept or reject the Plan.

4.     Class 4 - General Unsecured Claims

(a)     *Classification:*  Class 4 consists of all General Unsecured Claims.

(b)     *Treatment:*  On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall:

(i)     receive its Pro Rata share of the General Unsecured Claim Recovery; and

(ii)     if such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all purposes hereunder.

(c)     *Voting:*  Class 4 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 - Intercompany Claims

(a)     *Classification:*  Class 5 consists of all Intercompany Claims.

(b)     *Treatment*: Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Intercompany Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

6.     Class 6 - Intercompany Interests

(a)     *Classification:*  Class 6 consists of all Intercompany Interests.

(b)     *Treatment*:  Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

(c)     *Voting*:  Class 6 is Impaired under the Plan.  Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

7.  Class 7 - Interests in Barneys

    (a)  *Classification*:  Class 7 consists of all Interests in Barneys.

    (b)  *Treatment*:  Each Allowed Interest in Barneys shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Barneys shall be entitled to any recovery or distribution under the Plan on account of such Interests.

    (c)  *Voting*:  Class 7 is Impaired under the Plan.  Holders of Interests in Barneys are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Such Holders are not entitled to vote to accept or reject the Plan.

8.  Class 8 - Section 510(b) Claims

    (a)  *Classification:*  Class 8 consists of all Section 510(b) Claims.

    (b)  *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

    (c)  *Treatment*:  Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

    (d)  *Voting:*  Class 8 is Impaired under the Plan.  Holders (if any) of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Such Holders (if any) are not entitled to vote to accept or reject the Plan.

C.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.  *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.  *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the

16

Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**Article IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *Restructuring Transactions*

On the Effective Date, to the extent not inconsistent with the Sale Transaction, the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

B.      *Sale Transaction; Sources of Consideration for Plan Distributions*

The Plan Administrator and/or Wind-Down Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining Sale Transaction Cash Proceeds after giving effect to the wind down process contemplated under the Purchase Agreement and Sale Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan or in the Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, enjoined or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan

17

Administrator. The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not object to the Plan.

C.      *Wind-Down Debtors*

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction, (2) performing their obligations under the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any Estate non-Cash assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummating the Plan. Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

D.      *Plan Administrator*

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to the Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of the Sale Transaction; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

18

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

1.      Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Debtors in consultation with the Committee and the Purchasers. The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

2.      Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

3.      Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

4.      Post Effective Date Reserve

The Plan Administrator shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Distributable Cash it deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties hereunder. The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein, the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve. The Plan Administrator may create reserve specific amounts from the Post Effective Date Reserve in accordance with its business judgment. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

E.      *Wind Down*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to Wind Down and dissolve the Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

19

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

F.    *Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

*On and after the Effective Date, the Wind-Down Debtors and/or the Plan Administrator shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.*

G.    *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

H.    *Dissolution of the Debtors and Wind-Down Debtors*

On or after the Effective Date, the Plan Administrator may File a certification with the Bankruptcy Court that it has substantially administered the Plan for any Debtor, other than Debtor Barneys, and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor(s) are formed or any other jurisdiction. With respect to Debtor Barneys, the Plan Administrator may File a certification with the Bankruptcy Court that all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

I.    *Cancellation of Securities and Agreements*

Upon the Effective Date: (1) the obligations of the Debtors under the Prepetition Credit Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

20

J.      *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions and (2) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by this Article IV.~~K~~.**J** shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Section 1146 Exemption*

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date,

other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.    *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of Debtor Barneys, shall be deemed closed, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Barneys.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Barneys in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**Article V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    *Assumption (or Assumption and Assignment) and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; **or** (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan~~; or (5) is a D&O Liability Insurance Policy~~. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or

Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.    *D&O Liability Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all director and officer liability insurance policies and any agreements, documents, and instruments related thereto. The Wind-Down Debtors shall maintain all of its unexpired D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, and managers, which coverage shall be through the Effective Date of the Plan, and all such directors, members, trustees, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. ~~On and after the Effective Date, the Wind-Down Debtors and/or the Plan Administrator shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.~~

C.    *Indemnification Obligations*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtor which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything herein to the contrary, the Wind-Down Debtors' obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Wind-Down Debtors, including any directors and officers insurance policies. **For the avoidance of doubt, neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses.**

D.    *Collective Bargaining Agreements*

To the extent any Collective Bargaining Agreement has not not already been assumed and assigned to the Purchasers, terminated, or otherwise expired, such Collective Bargaining Agreements shall terminate according to their terms as of or after the Effective Date. Such terminations shall not constitute a rejection of any Collective Bargaining Agreement or implicate section 1113 of the Bankruptcy Code. The Plan Administrator is authorized to take any action that it deems necessary or appropriate to terminate any Collective Bargaining Agreement. For the avoidance of doubt and notwithstanding the foregoing, to the extent section 1113 is applicable, the termination of the Collective Bargaining Agreements shall be deemed to satisfy such provisions.

E.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Wind-Down Debtors, the Estates, or their property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully**

**satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Unsecured Claims.

F.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed (or Assumed and Assigned)*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned), or (3) any other matter pertaining to assumption (or assumption and assignment), the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption (or assumption and assignment). At least ten days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption (or assumption and assignment) and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption (or assumption and assignment) or related cure amount must be Filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption (or assumption and assignment) or cure amount will be deemed to have assented to such assumption (or assumption and assignment) or cure amount.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time prior to the effective date of assumption (or assumption and assignment). **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed (or assumed and assigned) shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

G.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed (or assumed and assigned) shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

24

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Wind-Down Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

J.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**Article VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent, which may be the Plan Administrator or the Wind-Down Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

C.      *Rights and Powers of Disbursing Agent*

1.      <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.        Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash from the Wind Down Amount.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.        Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.        Delivery of Distributions

Except as otherwise provided herein, the Plan Administrator shall make distributions to Holders of Allowed Claims and Allowed Interests on the Effective Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Plan Administrator; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.        Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be settled and enjoined pursuant to Article X and its Holder is forever barred pursuant to Article X from asserting that Claims against the Debtors or their property.

4.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Wind-Down Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

26

F.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

H.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.    *Setoffs and Recoupment*

Except as expressly provided in this Plan, each Wind-Down Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Wind-Down Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or the Wind-Down Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Wind-Down Debtors.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Wind-Down Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Wind-Down Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**Article VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator shall have the authority:  (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged

(including on the Claims Register, to the extent applicable) by the Wind-Down Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed at any time or such other period as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the applicable Bar Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions after Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

**Article VIII.**
**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

A.      *Settlement, Compromise, and Release of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Releases Subject to Investigation*

The release and related provisions set forth in this Article VIII remain subject to the Debtors' investigation of potential claims held by the Debtors' Estates.

C.      **Release of Liens**

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

D.      **Releases by the Debtors**

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising**

30

from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released. Without limiting the foregoing, neither the Debtors nor the Wind-Down Debtors, as applicable, shall pursue any claims against the Released Parties other than those incurred in the ordinary course of business.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.D by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.      *Third-Party Release*

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Credit Documents, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facilities, the DIP Credit Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

31

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.E, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.E is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) ~~a~~an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, cause of action or liability against any Released Party, or asserting any claim, ~~C~~cause of ~~A~~action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

F.      *Exculpation*

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, the DIP Facilities, the DIP Credit Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.      *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.F of the Plan.**

H.      *Protections against Discriminatory Treatment.*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a release), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Document Retention.*

On and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, as applicable, may maintain or dispose of documents in accordance with their discretion.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**Article IX.
CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

**A.**      ***Conditions Precedent***

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article ~~X~~**IX**.B hereof:

1.   the Bankruptcy Court shall have entered the Confirmation Order; ***provided*, that with respect to Articles V.C, VIII.E, VIII.F, and IX.A hereof, the Confirmation Order shall not adversely modify such provisions without the Committee's consent not to be unreasonably withheld or delayed;**

2.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

33

3.    the Reserves shall have been established and funded as set forth herein; and

4.    the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors in their discretion.

**B.**    ~~A.~~ *Waiver of Conditions*

The conditions to Consummation set forth in Article ~~X~~**IX.A** may be waived by the Debtors**, in consultation with Committee,** without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan**; *provided* that the condition set forth in Article IX.A.1 pertaining to the Committee's consent right shall not be waived without the Committee's consent not to be unreasonably withheld or delayed**.

**C.**    ~~B.~~ *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. §§ 1101 and 1127, shall be deemed to occur on the Effective Date.

**D.**    ~~C.~~ *Effect of Nonoccurrence to the Confirmation Date or Effective Date.*

If the Confirmation or Consummation of the Plan does not occur, (1) the Plan shall be null and void in all respects other than as set forth herein, (2) the Plan shall be deemed a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (3) nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect.

### Article X.
### MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or

compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption (or assumption and assignment) or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder, or any other Entity.

## Article XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including accrued Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Wind-Down Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.    ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

35

11.    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article IXVIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J.1;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any settlements, exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article IXVIII;

23.    hear and determine all disputes related to the Sale Transaction;

24.    enforce all orders previously entered by the Bankruptcy Court; and

25.    hear any other matter not inconsistent with the Bankruptcy Code.

### Article XII.
### MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity

acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Wind-Down Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees.*

All fees and applicable interest payable pursuant to section 1930(a) of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.    *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, ~~any statutory committee appointed in the Chapter 11 Cases~~**the Committee** shall dissolve **automatically** and **the** members thereof shall be released and discharged from all rights ~~and~~, duties**, responsibilities, and liabilities arising** from**,** or related to**,** the Chapter 11 Cases **and under the Bankruptcy Code**, except for the ~~filing of applications for compensation~~**limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Committee and its Professionals**.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by ~~any statutory committees~~**the members of or advisors to the Committee** after the Effective Date.

E.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Notices*

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

Barneys New York, Inc.
660 Madison Avenue, 9th Floor
New York, New York 10065
Attention:   Mohsin Meghji
E-mail address:  mmeghji@miiipartners.com


with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C.
E-mail address:  joshua.sussberg@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Chad J. Husnick, P.C.
E-mail address:  CHusnick@kirkland.com

- and -

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attention:  Steven J. Reisman
E-mail address:  sreisman@katten.com

After the Effective Date, the Wind-Down Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Balloting Agent at cases.stretto.com/barneys or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.     *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall

38

provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Purchasers consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.    *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

M.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

*[Remainder of page intentionally left blank]*

Barneys New York, Inc. and its affiliates

By:       */s/ Mohsin **Y.** Meghji*
Name:    ~~Moshin~~**Mohsin Y.** Meghji
Title:     Chief Restructuring Officer

COUNSEL:

Edward O. Sassower, P.C.                        Chad J. Husnick, P.C.
Joshua A. Sussberg, P.C.                         W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**                       **KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**   **KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue                              300 North LaSalle Street
New York, New York 10022                      Chicago, Illinois 60654
Telephone:        (212) 446-4800              Telephone:        (312) 862-2000
Facsimile:        (212) 446-4900              Facsimile:        (312) 862-2200

Steven J. Reisman
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone:        (212) 940-8800
Facsimile:        (212) 940-8776

*Co-Counsel to the Debtors and Debtors in Possession*